**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: 702-685-4444
Email:  ccarlyon@carlyoncica.com
dcica@carlyoncica.com
*Co-Counsel for STEEL Supplements, Inc.*

**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ.
*(Pro Hac Vice pending)*
SARAH A. GOTTLIEB, ESQ.
*(Pro Hac Vice pending)*
201 North Franklin Street, Suite 3550
Tampa, FL 33602
Phone: 813-488-2920
Email: jstearns@sgrlaw.com
sgottlieb@sgrlaw.com
*Co-Counsel for STEEL Supplements, Inc.*

**CARLYON CICA CHTD.**
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. BK-S-23-13871-NMC |
| BLITZ NV, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | **OPPOSITION TO MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION SECURED FINANCING; (II) GRANTING LIENS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF** |
| | **Hearing Date:** October 10, 2023<br>**Hearing Time:** 11:30 a.m. |

STEEL Supplements, Inc. ("STEEL"), by and through its undersigned counsel, hereby submits this Opposition (the "Opposition") *to Debtors' Motion for Interim and Final Orders: (I)*

*Authorizing Debtor to Obtain Post-Petition Secured Financing; (II) Granting Liens; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 41][1] (the "Motion") filed October 3, 2023 by the Debtor, Blitz NV, LLC ("Blitz" or "Debtor").

This Opposition is made and based upon the Points and Authorities and Exhibits filed herewith, the pleadings, papers and records on file in this action,[2] and any oral argument the Court may entertain at the time of the hearing on the Motion.

Pursuant to LR 9014.2(b), STEEL consents to the entry of final relief by the Bankruptcy Court in the event that the Bankruptcy Court lacks jurisdiction to issue a final order with respect to the Motion.

Respectfully submitted this 6th day of October, 2023

**CARLYON CICA CHTD.**

By: /s/ *Candace C. Carlyon, Esq.*
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Co-Counsel for STEEL Supplements, Inc.*

---

[1]  All references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the Clerk of Court.

[2]  Pursuant to FRE 201, STEEL requests that the Court take judicial notice of the pleadings and Court dockets referenced herein pursuant to FRE 201. *See, e.g.*, *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases"); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of court filings in a state court case where the same plaintiff asserted similar claims); *Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1071 (D. Nev. 2020) (court may take judicial notice of orders and filings, including  proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue); *Bank of Am., N.A. v. CD-04, Inc.* (*In re Owner Mgmt. Serv., LLC Trustee Corps.*), 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case and public records.").

2

**POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Dan Bilzerian, Blitz's principal and indirect owner, is a professional gambler and social media "influencer." Blitz is in the business of being Dan Bilzerian. Through the Motion, Blitz seeks approval of debtor-in-possession financing from a company associated with Mr. Bilzerian's father. The money would be used to fund the younger Bilzerian's bon vivant lifestyle, supplementing his meager monthly income so that he might keep up the appearances necessary to "drive clicks." Although there is nothing wrong with a father helping his son, such generosity should not be cloaked in the apparent legitimacy of a business loan that gives the lending creditor a senior lien in all of the debtor's assets. That is particularly true where, as here, the proposed debtor-in-possession credit facility, which hints at a *sub rosa* plan, would benefit Blitz's affiliate but would contribute nothing to Blitz's bankruptcy estate.

**II.**

**FACTS**

1.    Blitz's sole member is an entity called Goat Works, LLC, which is wholly owned by Dan Bilzerian ("Mr. Bilzerian").[3] Mr. Bilzerian is Blitz's CEO.[4]

2.    According to its bankruptcy papers, Blitz operates "businesses related to its trademarks" and marketing services. In reality, operating trademark and marketing services means managing Mr. Bilzerian's "brand" from a mailbox at a private Nevada airport and tending to Mr. Bilzerian's

---

[3] ECF No. 38 at Ex. 2, p. 4.

[4] *See* **Ex. 1**, December 17, 2021 Deposition Transcript of Jason Verona as Blitz's Corporate Designee, filed at Dkt. 139-8, pages 2-53, in *STEEL Supplements, Inc. v. Blitz, NV, LLC*, No. 8:20-cv-2971 (M.D. Fla.) ("Blitz Tr.") at 19:1-14; 66:5-10. *See also id.* at 24:23-25:6; 48:23-49:7 ("Blitz is Dan Bilzerian").

palatial, 17,000 square foot, multi-million dollar Las Vegas "estate".[5]

3.    For this, Blitz employs six individuals, including a Chief Operating Officer, Jason Verona. In its papers, Blitz never specifies what these employees, other than Mr. Verona, do. On information and belief, the employees are Mr. Bilzerian's personal staff (*e.g.*, a chef, a housekeeper, a personal valet).[6] Mr. Verona's position as Blitz's COO includes "coding" Mr. Bilzerian's American Express credit card every month to distinguish between Bilzerian's personal spending and corporate spending, as well as "keep[ing Mr. Bilzerian's] insurances" and registrations "on his cars and automobiles and boats, up to date."[7]

4.    Blitz owns, either directly or indirectly, the aforementioned Las Vegas "estate," five cars, and intellectual property related to Mr. Bilzerian's personal brand.[8]

5.    STEEL markets and sells body-building supplements. In March 2017, STEEL entered into an exclusive sponsorship agreement with Blitz under which Mr. Bilzerian would promote, endorse, and publicize STEEL's products.

6.    In December 2020, STEEL sued Blitz for breach of the agreement. Blitz counterclaimed. Following the Court's entry of partial summary judgment holding that the agreement was terminated due to Blitz's breach, Blitz agreed to settle STEEL's claims for $486,868.43 in favor of STEEL. Blitz has since attempted to rescind this settlement.[9]

7.    Blitz filed this Subchapter V Chapter 11 Case on September 6, 2023.

---

[5] *See* **Ex. 2**, September 2, 2021 Deposition Transcript of Jason Verona, filed at Dkt. 139-7, pages 2-78, in *STEEL Supplements, Inc. v. Blitz, NV, LLC*, No. 8:20-cv-2971 (M.D. Fla.) ("Verona Tr.") at 21:15-22:12; 32:11-33:12.

[6] *See id.* at 30:15-33:19 (listing eight Blitz employees at that time, which included two pilots, two chefs, an "executive assistant" who manages Bilzerian's travel, and a housekeeper).

[7] *Id.* at 48:21-50:2.

[8] *Id.* at 21:15-22:12 (testifying that "we run his estate through Blitz NV . . . ." and that "due to marketing efforts that [Bilzerian] uses at that estate, basically, the estate itself is owned by Blitz in one way or another"); 22:13-23:15 & 25:1-26:13 (testifying that Blitz "hold[s]" 30 Meadowhawk, which owns the estate); 50:20-51:1 (testifying that Blitz owns five cars, for personal and corporate use, and that Bilzerian owns zero cars).

[9] A more thorough recounting of the litigation, settlement, and aftermath can be found in *Response in Opposition to Debtor's Motion for (A) Sanctions and/or Damages for Violation of the Automatic Stay and (B) Holding the Steel Supplements, Inc. in Contempt.* ECF No. 38.

8.    As discussed in more detail in STEEL's *Response in Opposition to Debtor's Sanctions Motion* and STEEL's forthcoming *Motion to Annul, or Alternatively, Grant Relief from the Automatic Stay*, Blitz filed its bankruptcy petition in bad faith to avoid enforcement of its settlement agreement with STEEL, as evidenced by the following:

    a.    With the exception of STEEL, Blitz's creditors are insiders or otherwise closely related to Blitz or Mr. Bilzerian.

        i.    Blitz's only three scheduled creditors are: International Investments Ltd. of St. Kitts (the "DIP Lender"); 30 Meadowhawk Lane, LLC ("Meadowhawk"); and STEEL.[10] STEEL is scheduled with disputed debt in the scheduled amount of $486,868.43; the DIP Lender has scheduled debt in amount of $3,937,803.91; and  Meadowhawk has scheduled debt in the amount of $220,000 due on a lease and an additional $33,318.25 for loans.[11] The only executory contract scheduled is the lease with Meadowhawk.[12]

        ii.    On information and belief, the DIP Lender  is affiliated with Mr. Bilzerian's father, Paul Bilzerian, who has also previously consulted for Mr. Bilzerian's various companies, including Blitz.[13]

        iii.    Blitz and Meadowhawk share the same address as Mr. Bilzerian:  3990 W. Patrick Lane, Las Vegas.[14]  Additionally, Meadowhawk's point of contact is

---

[10] ECF No. 33 at pp. 3-4.

[11] *Id.*

[12] ECF No. 29 at p. 12.

[13] *See, e.g.*, Verona Tr. at 294:7-295:25; **Ex. 3**, November 2, 2021 Deposition Transcript of Dan Bilzerian, filed at Dkt. 161-1, pages 2-96, in *STEEL Supplements, Inc. v. Blitz, NV, LLC*, No. 8:20-cv-2971 (M.D. Fla.) ("Bilzerian Tr.") at 16:1-17:8; **Ex. 4**, Exhibit 5 to November 2, 2021 Deposition Transcript of Dan Bilzerian, filed at Dkt. 161-2, pages 114-115, in *STEEL Supplements, Inc. v. Blitz, NV, LLC*, No. 8:20-cv-2971 (M.D. Fla.) (email correspondence from Paul Bilzerian at his "paul@internationalinvestementsltd.com" email address to Mr. Bilzerian and other individuals at Blitz regarding Mr. Bilzerian's opportunity to endorse Jason Huh's company, STEEL, and asking for "a status report on all of Dan's projects and investment opportunities").

[14] ECF No. 1 at p. 1; ECF No. 33 at p.3; ECF No. 29 at p. 10.

Scott.Rohleder@ignite.co.,[15] who is also listed as having possession of Blitz's books and records.[16] And Jason Verona has testified previously that Blitz "hold[s]" Meadowhawk.[17]

b. Blitz's balance sheet reflects numerous loans to, and investments in, other companies, at least some of which appear to be affiliates.[18] However, none of those notes receivable or investments are listed in Blitz's schedules.

c. Blitz's Profit & Loss Statement for the period January – August of 2023, filed with its petition lists $145,695.56 in "vehicle expense" but lists no vehicles as being owned or leased.[19] There are also two separate line items for "security expense," the larger in the amount of $128,611.74, as wells as expenses for, among other things, computers, insurance, outside professionals, outside services-general, legal, professional services-other, repairs and maintenance, supplies, utilities, internet and telephone, and payroll and payroll processing, yet Blitz's schedules do not indicate any creditors in any of these categories.

d. There does not appear to be a business enterprise with ongoing operations. Blitz's budget attached to the Motion shows an income of less than $13,000 over the next quarter but expenses, primarily consisting of payroll and other employee-related expenses, over $227,000. Yet, as discussed *supra*, Blitz's employees' duties can hardly

---

[15] *See* Attorney Information Sheet, ECF No. 44 at p. 2. Rohleder, like Mr. Bilzerian's father, has been consulted over the years by Mr. Bilzerian's multiple companies. *See, e.g.*, **Ex. 5**, Exhibit 7 to September 2, 2021 Deposition Transcript of Jason Verona, filed at Dkt. 139-7, page 262, in *STEEL Supplements, Inc. v. Blitz, NV, LLC*, No. 8:20-cv-2971 (M.D. Fla.) (email from Jason Verona describing Rohleder as Blitz's Chief Financial Officer and copying Rohleder at his Blitz email address, scott@danbilzerian.com); Bilzerian Tr. at 174:17-25 (discussing email copying Scott Rohleder); *id.* at 365:9-22 (describing Rohleder as Chief Financial Officer of Ignite, a Bilzerian company).

[16] ECF No. 29 at p. 21, item 26.

[17] Verona Tr. at 22:13-23:11.

[18] Specifically, the Blitz's balance sheet shows over $9 million in loans to Goat Airways and Bilzerian Entertainment. ECF No. 1 at p. 8. Blitz "hold[s]" Goat Airways and Bilzerian Entertainment. Verona Tr. at 22:22-23:13.

[19] ECF No. 1 at p. 9

6

be deemed related to producing income for a business; rather, they are primarily to promote Mr. Bilzerian's personal interests.

9.    On October 3, 2023, Blitz filed the Motion, seeking $300,000 in debtor-in-possession financing (the "DIP Credit Facility") from International Investments, Ltd.

10.    The DIP Credit Facility is remarkable only inasmuch as the terms seem unusually favorable; however, the need for the money for any legitimate business purpose, and therefore the propriety of treatment under section 364, is unclear and unproven.

## III.
## LEGAL ARGUMENT

11.    The purpose of the provisions of Section 364 allowing a debtor to obtain credit upon court approval is to preserve the assets of the estate.  Such a motion may be denied where it appears that there is little hope of repaying the debt.[20]  Further, "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."[21]

12.    Blitz is essentially a holding company, yet the majority of the expenses detailed in the budget accompanying Mr. Verona's declaration are payroll-related, with the exception of legal fees, security, and, of all things, landscaping. How security and landscaping relate to marketing is not explained. As for the employees, on information and belief, they are Mr. Bilzerian's personal staff (*e.g.*, a chef, a housekeeper, a personal valet).[22] Here, Blitz's schedules show no assets to be preserved.  Blitz's budget shows no income to be preserved.

13.    Further, the proposal that the DIP Lender must approve any plan of reorganization, with

---

[20] *See, e.g., In re Crouse Grp., Inc.,* 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987) ("we can see little to be gained in moving the day of reckoning" where there is faint hope of debtor's success).

[21] *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).

[22] Verona Tr. at 30:15-33:19 & 48:21-50:2.

any failure constituting a default (and the automatic stay being vacated) reeks of a sub rosa plan.[23]

14.  Moreover, the relief Blitz seeks is emergent and interim—the Motion was filed only seven days ahead of the hearing.  Rule 4001(c)(2) provides that a request to obtain credit on less than 14 days' notice may only be authorized to the extent necessary to avoid immediate and irreparable harm to the estate. Nothing suggests that to be the case here.[24]

15.  If the DIP Credit Facility is approved, Mr. Bilzerian will have his lifestyle funded for another quarter and a company related to his father will be elevated to a super-priority secured creditor, but Blitz's estate will in no way be benefited. But it hardly seems necessary to subsidize the lifestyle of a professed multimillionaire.[25]

16.  Finally, the Debtor in Possession Loan Agreement is dated September 18, 2023,[26] but the Motion and related request for emergent relief was not filed until 15 days later, giving STEEL only three days to prepare this response. This stinks of the same gamesmanship that has permeated every aspect of this case and the litigation before it. The Court should not consider approving any financing until the parties have the opportunity to investigate both Blitz and the DIP Lender.

**IV.**

**CONCLUSION**

For the reasons stated above, STEEL respectfully requests that this Court deny the Motion, and grant such other and further relief as this Court may deem just and proper.

---

[23] *See, e.g., In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 812–13 (Bankr. S.D.N.Y. 2020) (proposed financing which would have, *inter alia*, dictated some of the terms of any future reorganization plans disapproved; stating: "[c]oncerns about sub rosa plans are not limited to transactions involving section 363 asset sales. They are germane to any transaction by a debtor that adversely impacts on interested parties' rights to participate in the restructuring process"); *In re Belk Properties, LLC*, 421 B.R. 221, 226 (Bankr. N.D. Miss. 2009) (court would not approve financing which dictated reorganization, and in effect constituted a clever way for lender to take over assets; court would consider such financing as part of a plan which provided for payment to other creditors).

[24] *See* Claire Reed, *Dan Bilzerian says there's a point where money no longer buys happiness*, Sept. 10, 2023, https://www.ladbible.com/entertainment/celebrity/dan-bilzerian-money-doesnt-bring-happiness-896536-20230910 (article dated less than one month ago, where Mr. Bilzerian claimed to be worth $350,000,000).

[25] *Id.*

[26] ECF No. 42 pp. 7, 40.

Respectfully submitted this 6th day of October, 2023.

**CARLYON CICA CHTD.**

By: /s/ *Candace C. Carlyon, Esq.*
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Co-Counsel for STEEL Supplements, Inc.*

&

**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ
*(Pro Hac Vice pending)*
SARAH A. GOTTLIEB, ESQ
*(Pro Hac Vice pending)*
201 North Franklin Street, Suite 3550
Tampa, FL 33602
Phone: 813-488-2920
Email: jstearns@sgrlaw.com
sgottlieb@sgrlaw.com

BRIAN P. HALL
(*Pro Hac Vice pending*)
MICHAEL F. HOLBEIN
(*Pro Hac Vice pending*)
1105 W. Peachtree St. NE, Suite 1000
Atlanta, GA 30309
Phone: 404-815-3500
Email: bhall@sgrlaw.com
mholbein@sgrlaw.com

*Co-Counsel for STEEL Supplements, Inc.*

9

**CERTIFICATE OF SERVICE**

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Cristina Robertson
An employee of Carlyon Cica Chtd.

# EXHIBIT 1

## Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEEL SUPPLEMENTS, a
Florida Corporation,
            Plaintiff,

vs.
                        CASE NO.:
                2020-008626-CA-01
BLITZ NV, LLC, a Nevada
Limited Liability Company,
            Defendant.

*********************************************************

VIDEOTAPED DEPOSITION OF CORPORATE
DESIGNEE OF BLITZ NV, LLC
JASON VERONA
APPEARING REMOTELY FROM
LAS VEGAS, NEVADA
TAKEN:        PURSUANT TO NOTICE
        COUNSEL FOR PLAINTIFF

DATE:            December 17, 2021

TIME:            11:30 A.M. - 6:04 p.m.

Videographer:    Mike Stingo

REPORTED BY:        ELSA M. HERNANDEZ, FPR
            Notary Public
APPEARING REMOTELY FROM HILLSBOROUGH COUNTY, FLORIDA

## Page 3

I N D E X
                    PAGE
DIRECT EXAMINATION BY MS. GOTTLIEB        5
STIPULATION            203
CERTIFICATE OF OATH            205
CERTIFICATE OF REPORTER            206
ERRATA SHEET            207

E X H I B I T S

FOR IDENTIFICATION            PAGE NO.

Exhibit No. 1            8
(Amended Notice of Taking Deposition of
Corporate Designee of Bliz NV, LLC)

Composite Exhibit No. 2            98
(Videos)
Exhibit No. 3            107
(Dan Bilzerian's Deposition Transcript)

Exhibit No. 4            117
(Plaintiff's First Requests for
Admissions)

Exhibit No. 6            141
(Blitz NV, LLC's Answer and
Counterclaim to Steel Supplements,
Inc.'s Amended Complaint)
Exhibit No. 7            158
(E-mail Dated 3/30/2017 Re:  Amendment)

Exhibit No. 8            196
(Video Promoting ZRO)
Exhibit 5 omitted.

## Page 2

REMOTE APPEARANCES:
        SARAH A. GOTTLIEB, ESQUIRE
        JASON P. STEARNS, ESQUIRE
        Freeborn & Peters, LLP
        201 North Franklin Street
        Suite 3550
        Tampa, Florida 33602
        jstearns@freeborn.com
        sgottlieb@freeborn.com
            Appearing on behalf of the Plaintiff

        KIMBERLY P. STEIN, ESQUIRE
        Flangas Law Group
        3275 South Jones Boulevard
        Suite 105
        Las Vegas, NV 89146
        kps@fdlawlv.com

        -and

        KEVIN P. MCCOY, ESQUIRE
        Carlton Fields, P.A.
        4221 West Boy Scout Boulevard
        Suite 1000
        Tampa, Florida 33607
        kmccoy@carltonfields.com
            Appearing on behalf of the Defendant

ALSO PRESENT:    Mehdy Karbid

## Page 4

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.  They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MS. GOTTLIEB:  No objection.

MS. STEIN:  No objection.

(Witness presented government-issued identification and identity verified.)

THE VIDEOGRAPHER:  We're now on the record for the video deposition of Jason Verona as corporate representative of Blitz NV, LLC, taken in the matter of Steel Supplements, Inc., v. Blitz NV, LLC.  Today is December 17, 2021 and the time is 11:36 a.m.  This deposition is being conducted via Zoom.  The court reporter is Elsa Hernandez and the videographer is Michael Stingo.

Will counsel please introduce themselves,

1 (Pages 1 to 4)

Page 5

after which the court reporter will swear in the witness.

MS. GOTTLIEB: Good morning, Sarah GOTTLIEB on behalf of plaintiff, Steel Supplements.

MS. STEIN: Is Jason there?

MS. GOTTLIEB: And my colleague Jason Stearns is here as well.

MS. STEIN: Kimberly Stein and Kevin McCoy on behalf of Blitz NV, LLC.

THE COURT REPORTER: Do you swear or affirm the testimony that you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

JASON VERONA, the deponent herein, being duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GOTTLIEB:

Q. Mr. Verona, good morning. Again, my name is Sarah GOTTLIEB and I represent the plaintiff in this case, Steel Supplements. So I know the answer to my first question, you have been deposed before; correct?

A. That is correct.

Q. And was the last time in September?

Page 6

A. Yes.

Q. And so we'll just go over the basics again. I'll just truncate it, because I know you've been through this. So you understand that you are under oath and you've sworn to tell the truth here today?

A. Yes.

Q. Okay. And is there anything at all that would prevent you from testifying truthfully? Medications? Any memory issues?

A. No.

Q. And again, just some background things that you are already familiar with; just let me finish the question. I know you might anticipate what I'm about to say, but so we get a clean record for the court reporter. If I ask a bad question, just ask for clarification; otherwise I'm going to assume you understood my question. That's about it for that. Where are you today, sir?

A. Las Vegas, Nevada.

Q. What address are you at?

A. 599 West Patrick Lane.

Q. Is that your home address?

A. It is not.

Q. Are you in an office?

A. I am in Dan Bilzerian's residence, and I work

Page 7

out of the home office but right now I'm actually -- because there are other people in the home office right now -- I actually went into one of his guest bedrooms.

Q. Okay. Is there anyone there in the room with you?

A. There is not.

Q. And I presume you are on a computer right now?

A. That is correct.

Q. Are there any chats, communications devices opened on that computer?

A. No.

Q. Any other devices in the room with you?

A. My cell phone, but it's off. It's powered off.

Q. Okay. And so, you can agree that you won't communicate with anyone else while you are on the record today?

A. Correct.

Q. Do you have any written materials with you?

A. I do not.

Q. All right. Mr. Verona, are you here to testify as the designee of Blitz NV, LLC?

A. Yes.

Q. And if I say "Blitz" today, you'll understand that I mean, Blitz NV, LLC?

Page 8

A. Yes.

Q. What is your position with Blitz?

A. Chief operating officer.

Q. And since when have you been chief operating officer?

A. September of 2020.

Q. So I'm going to send out a link to what we'll use as exhibits. So I will send that to Ms. Stein.

(A discussion was held off the record.)

MS. STEIN: I have it.

MS. GOTTLIEB: I'm going to share my screen.

(Exhibit No. 1 was marked for identification.)

BY MS. GOTTLIEB:

Q. Mr. Verona, can you see what is up on my screen?

A. I can.

Q. I'll scroll through it pretty quickly and you can just let me know if I need go back or go down, but my first question for you is going to be whether you are familiar with this document?

A. Yes.

Q. How are you familiar with it?

A. Yes.

Q. How?

A. I skimmed it.

| Page 9 | Page 11 |

Page 9

Q. And why did you skim it?

A. Because I wanted to know what was going to be asked of me during this deposition.

Q. Okay. So you see here where it says, "Specific topics for testimony"?

A. Yes.

Q. And I'll move through that quickly, and again, you just tell me if I need to stop or go back.

Sir, are you prepared to testify as to these topics today?

A. Yes.

Q. And you are here today to speak on behalf of Blitz; correct?

A. That is correct.

Q. When was the first time you saw these topics?

A. About two weeks ago.

Q. I'm going to stop screen sharing, because I don't think we need this right now. But if you need me to go back to it, just let me know.

All right. What did you do to prepare for your deposition today?

A. About a week and a half ago I spoke with Mr. McCoy for about two hours. I spoke to Mr. Bilzerian very briefly. I also reviewed and skimmed the answers to the interrogatories,

Page 10

discovery -- let's see, I reviewed discovery responses, requests for admissions, and not to fail to mention that I was basically present for a significant amount of the depositions that have been taken previously in this case, hours, upon hours of depositions being taken.

Q. Okay. You said you met with Mr. McCoy. Did you meet with Ms. Stein?

A. I did not.

Q. You said you met with Mr. McCoy for about two hours a week and a half ago; correct?

A. That is correct, and also in addition to that I met with -- I spoke with him on the phone today for about ten minutes.

Q. And you mentioned speaking with Mr. Bilzerian briefly; correct?

A. That is correct.

Q. How long is briefly?

A. About 30 seconds to a minute.

Q. Did you speak with anyone else at Blitz?

A. I did not.

Q. So in total, about how long would you estimate you spent preparing?

A. Give me a second. I would say in the neighborhood of 24 to 30 hours.

Page 11

Q. 24 to 30 hours?

A. That is correct.

Q. Okay. So does that include what you had mentioned about reviewing discovery responses?

A. That does include it.

Q. And does that include the depositions that were taken?

A. That does include it.

Q. Okay. Other than all of these things you've mentioned, anything else you did to prepare?

A. No.

Q. Did you talk to anyone else other than the people you just mentioned? Did you tell anyone else that you are being deposed today?

A. Dan's assistant, Michael Geller, so that he can cover the office for me today.

Q. Now, you are familiar with a variety of documents in this case, because you produced them; correct?

A. Correct.

Q. All right. So, you know, today if at any point I ask a question and you need to look at a document to refresh your memory or for any reason, just let me know and we have access to all those documents. I'd be happy to pull you up anything that would help

Page 12

you.

A. Sounds good.

Q. Have you reviewed any documents in this case that have not been produced?

A. No.

Q. All right. Let's get into some questions here, Mr. Verona.

Is it true that Mr. Bilzerian promoted Full Send on his social media?

A. No.

Q. Is it true that Mr. Bilzerian promoted an L-tryptophan product from the Treigning Labs on his social media?

A. No.

Q. Is it true that Mr. Bilzerian has promoted products that would compete under the agreement with Steel?

A. No.

Q. How many followers did Mr. Bilzerian have in 2017 on his Instagram?

A. I wasn't around.

MS. STEIN: Hold on. I'm going to object to that. Can you tell me what topic that is?

MS. GOTTLIEB: Sure. I'm sure it goes under a number of them. Number 4, Number 8, Number 9.

3 (Pages 9 to 12)

Page 13

MS. STEIN: Let's go through those specifically, because I want to know where the number of followers of Mr. Bilzerian's personal account goes to a topic for a Blitz 30(b)(6).

MS. GOTTLIEB: Can I just give you the numbers? Are you instructing Mr. Verona --

MS. STEIN: Oh, no. I'm asking you, so you are telling me four. How is information known or reasonably available to Blitz regarding the agreement relate to the number of followers of Mr. Bilzerian? I don't understand that topic.

MS. GOTTLIEB: I listed two more after that. We can keep going through them.

MS. STEIN: Let's go through each one.

MS. GOTTLIEB: But there's certainly some overlap, and rather than, you know, make this a very long day, why don't you just let me know if you're instructing him not to answer.

MS. STEIN: No. What I'm asking you specifically, so we have a clear record of the topics. So let's go through them. So there's four. What's the next topic?

MS. GOTTLIEB: Eight.

MS. STEIN: That's about access and control of an account, not number of followers.

Page 14

MS. GOTTLIEB: Nine.

MS. STEIN: Information known or reasonably available to Blitz regarding his promotion and publication of Steel, again.

Next one?

MS. GOTTLIEB: Kim, there are quite a few topics here and we've, you know, had some meet and confers with Kevin. I know you weren't on the call for our recent meet and confer, but anyway, again, are you instructing the witness not to answer?

MS. STEIN: Again, I'm asking you for a topic. I do not see a topic that this relates to, so I'm going to instruct the witness not to answer because this is beyond the scope of the 30(b)(6) deposition of Blitz.

MS. GOTTLIEB: Mr. Verona, are you taking your counsel's advice to not answer the question?

THE WITNESS: I am.

BY MS. GOTTLIEB:

Q. Mr. Verona, did Mr. Bilzerian promote ZRO on his social media?

A. Yes.

Q. Is Mr. Bilzerian a cofounder of Ignite?

A. Yes.

Q. Does Blitz know when Ignite started selling

Page 15

ZRO?

A. Yes.

Q. And when was that?

A. February of 2020, but my understanding is that it was under Ignite Spirits, which is no longer a company, and we moved over to another entity within Ignite.

Q. Mr. Verona, I heard some background noise. Is there anyone in the room with you?

THE WITNESS: That's not mine.

MR. MCCOY: That's me. I apologize.

(Off the record.)

BY MS. GOTTLIEB:

Q. Mr. Verona, is Mr. Bilzerian in the house with you today?

A. He is.

Q. So I want to make sure I got this. You stated that Ignite Spirits was in charge of ZRO?

A. Again, I'm not an -- well, I'm not an Ignite employee, but my understanding is that Ignite Spirits launched ZRO back in February of 2020, and when that company went -- when they decided no longer to continue with that entity, they brought it under another entity within Ignite and I do not know exactly which one that is.

Page 16

Q. Okay. Is one of the products Mr. Bilzerian posted about, was that the Veg Pro Peanut Butter from Steel?

A. Yes.

Q. And he posted about that on multiple occasions; correct?

A. Yes.

Q. And there were a few times in a row where he posted about only that product; correct?

A. I don't recall.

Q. Okay. What would you need to recall the answer to that?

A. Can you show me the post?

Q. Well, in preparation for your deposition today, did you go over Mr. Bilzerian's posts?

A. Yes.

Q. Okay.

A. But I can't necessarily attest to as to whether or not there was a background product or if it was just Veg Pro in there. For the most part, I know that that was something he was consistent in promoting.

Q. Okay. So, Mr. Verona, you said that you went over Mr. Bilzerian's posts in preparation for the deposition today; correct?

A. Correct.

4 (Pages 13 to 16)

## Page 17

Q. How many times did Mr. Bilzerian make a post promoting Steel?

A. You can just reference Dan's testimony.

Q. Well, you are here as the corporate representative for Blitz today; correct?

A. That is correct.

Q. Okay. So I'll ask again. How many times did Mr. Bilzerian post promoting Steel on his social media?

MS. STEIN: Objection to form. Asked and answered. Argumentative.

Go ahead.

A. Again, it was all part of Dan's deposition, he spoke to it. If you want to give me some numbers that were consistent with what you provided him, I'd be happy to confirm or deny as to whether or not he posted that many times.

BY MS. GOTTLIEB:

Q. Mr. Verona, what services does Blitz perform?

A. Blitz basically holds the intellectual property of Goat Skull trademark and licenses it out.

Also, every so often Dan is given opportunities to take part as an endorsement or sponsorship opportunity with companies much like Steel, and also it is a management company that runs the operations of a rather large estate here in Las Vegas.

## Page 18

Q. Is Blitz owned by someone or something?

A. Goat Works, LLC.

Q. And what is that?

A. It's the managing member.

Q. And who owns Goat Works, LLC?

A. Dan Bilzerian is the sole member of Goat Works.

Q. Does Blitz have any -- scratch that. Does Blitz have any executive officers?

A. Yes.

MS. STEIN: Objection. Sorry. Just objection to form. Go ahead and answer.

A. Yes.

MS. GOTTLIEB: What's the form objection, Kim?

MS. STEIN: It just goes to the way the structure of corporate law. It's not a very well-worded question based on corporate law, and also with regards to time frame.

BY MS. GOTTLIEB:

Q. Mr. Verona, who are -- were Blitz's executive officers in 2017?

A. Dan Bilzerian, David Vingiano.

Q. And what was Mr. Vigiano's title?

A. He spoke to that in his deposition, which you can reference.

## Page 19

Q. And who are Blitz's executive officers -- who were Blitz's executive officers in 2020?

A. What part of 2020?

Q. Why don't we go with the first quarter.

A. First quarter it would've been Dan Bilzerian CEO; Michael Fedder, president. And at that time I was the vice president.

Q. And the second quarter?

A. Same.

Q. Third quarter?

A. Dan Bilzerian CEO -- excuse me, go back. Same.

Q. And the fourth quarter?

A. Dan Bilzerian, CEO; Jason Verona COO.

Q. Did Mr. Fedder leave the employment of Blitz sometime between the third and fourth quarter of 2020?

A. Yes.

Q. Does Blitz have a CFO?

A. No.

Q. Did Blitz ever have a CFO?

A. No.

Q. Does Blitz have a board?

A. Yes.

Q. What is that board?

A. That would be Dan Bilzerian, and basically

## Page 20

Paul Bilzerian, Scott Bilzerian [sic] services -- excuse me -- advisory members of the board.

Q. I want to make sure I got that. You said Mr. Bilzerian, Dan Bilzerian?

A. That's correct.

Q. And you said Paul Bilzerian?

A. Correct.

Q. Was there anyone else?

A. Scott Rohleder.

Q. These are the current members of the Blitz board?

A. Correct.

Q. Are these the same members on the board that would've been on the board in 2017?

A. David Vingiano would've been on the board.

Q. Is there anyone else between 2017 and present that was on the board at one time or another, that you haven't already mentioned by name?

A. Rob Hagen.

Q. When was he on the board?

A. Donald Ron Hagen or Rob Hagen. June 2017 through February 2018.

Q. Blitz has employees; correct?

A. Yes.

Q. David Vingiano is an employee of Blitz?

5 (Pages 17 to 20)

Page 21

A. No.

Q. Okay. What was Mr. Vingiano's role with Blitz?

A. Again, you can reference the deposition that he did, but he did not work for Blitz. My recollection is that he worked for Bilzerian Entertainment.

Q. Was Paul Bilzerian ever employed by Blitz?

A. No.

Q. Does Paul Bilzerian have authority to act on behalf of Blitz?

A. No.

Q. Has Blitz ever paid Paul Bilzerian?

A. No.

Q. And you stated Paul Bilzerian is a consultant for Blitz; correct?

MS. STEIN: Objection. Misstates prior testimony and form. Also, with regards to scope, what topic are we on?

MS. GOTTLIEB: Two.

BY MS. GOTTLIEB:

Q. Mr. Verona, what is Paul Bilzerian's role with Blitz?

MS. STEIN: Objection to form. Asked and answered and as to time frame.

A. Consultant.

Page 22

BY MS. GOTTLIEB:

Q. What does Paul Bilzerian do as a consultant for Blitz?

A. Oftentimes Dan will go to his father and ask for advice.

Q. Was Paul Bilzerian giving advice about the agreement between Steel and Blitz?

A. First, reference the deposition from David Vingiano; second, no.

Q. Has anyone ever discussed the agreement between Steel and Blitz with Paul Bilzerian?

A. No.

Q. Michael Fedder was an employee at Blitz; correct?

A. Yes.

Q. Was Michael Fedder also an employee at Ignite?

A. Yes.

Q. Who was Mr. Fedder paid by?

A. Blitz.

MS. STEIN: Objection as to form and as to time frame.

BY MS. GOTTLIEB:

Q. What were the dates Mr. Fedder was employed by Blitz?

A. June 2018 -- excuse me -- May 2018 through

Page 23

September 2020.

Q. And do you know the dates when he was employed by Ignite?

A. He was never officially employed by Ignite. He worked for Ignite, he was given a title and performed duties -- performed services for that entity, but he was always paid by Blitz, and Blitz would ask for certain portions of his salary to be reimbursed based on his participation in Ignite matters.

Q. Okay. Well, do you know what the dates were that Mr. Fedder was doing work for Ignite?

A. You'd have to ask somebody who was employed, who oversaw his position at Ignite, but I would say -- and this is not a guess, but this -- this will be pretty accurate. I would say, January 2019 through -- excuse me, sorry. Summer of 2018 -- fall of 2018, through summer of 2019.

Q. What were Mr. Fedder's responsibilities at Blitz?

A. He was to try and get Dan opportunities in the business space. Opportunities for sponsorships and endorsements, ways in which to make money for Blitz based upon Dan's celebrity.

Q. What about his responsibilities for Ignite?

A. I do not know them.

Page 24

Q. Were there any other Blitz employees that also did work at one time or another for Ignite?

A. Let me think on that for a second. No.

Q. What about Brianna Elsey.

A. Brianna may have helped with a contract or two on -- but Brianna was first employed by Ignite, and then she came over to Blitz. By the time that she came over to Blitz, she was no longer working on Ignite matters.

Q. Do you know why she moved from Ignite to Blitz?

MS. STEIN: Objection. Beyond the scope, but go ahead.

A. I believe that they were just downsizing.

BY MS. GOTTLIEB:

Q. Mr. Verona, how are decisions made at Blitz?

MS. STEIN: Object to the form.

A. Dan Bilzerian makes all the decisions as far as Blitz is concerned, aside from minimal estate management duties in which I can make financial decision on its behalf.

BY MS. GOTTLIEB:

Q. Is it fair to say that Dan Bilzerian is Blitz and Blitz is Dan Bilzerian?

A. Yes.

6 (Pages 21 to 24)

Page 25

MS. STEIN: Objection.

THE WITNESS: I'm sorry.

MS. STEIN: To the extent it calls for a legal conclusion.

Go ahead and answer.

THE WITNESS: Yes.

BY MS. GOTTLIEB:

Q. Mr. Verona, you are familiar with the agreement between Steel and Blitz?

A. Enough that I've skimmed it a few times.

Q. What were Mr. Bilzerian's obligations under the agreement?

MS. STEIN: I object to the extent it calls for a legal conclusion, but go ahead.

A. To provide support as a celebrity through social media components, as well as other components as well.

BY MS. GOTTLIEB:

Q. And how would he provide support as a social media celebrity?

A. He'd post to his social media channels, as well as past that, utilize other social media contacts that he has to post on Steel's behalf without any compensation for them specifically.

Q. I'm sorry. I want to make sure I understood

Page 26

your last answer.

Could you repeat that?

A. Repeat the question again?

Q. Sure. I was asking -- you stated previously that Mr. Bilzerian provides support as a social media celebrity and I believe I asked what that entails?

A. That entails providing posting to his social media channels, as well as involving other social media influencers in which he has relationship with, that would promote Steel for no compensation to them -- to them, not specifically.

Q. And you stated there were other components. What are those other components?

A. Speaking on their behalf when discussing with high-level executives and such, and being just a proponent of the brand whenever he is -- when people come to the estate, celebrities and such. We have Steel Supplements throughout the -- the vacuum just went on in another room, that's not anybody in here. I promise.

The product is all over the estates. He had two estates at one time. Those estates were located in Los Angeles, as well as this one, specifically, in Las Vegas. He would have product out in many, many rooms throughout the estate and had many celebrity people

Page 27

who -- celebrities that would visit the estates and, obviously -- and he would have conversations with them about the product, hoping that they would potentially start using it themselves.

Q. Okay. Let's break some of that down.

So you mentioned working with other celebrities to have other celebrities promote Steel. You mentioned the product is around at your house, having conversations with others. My question for you is, where is that in the agreement? Where does it say Mr. Bilzerian should do that?

MS. STEIN: Objection to the extent it calls for a legal conclusion. You can go ahead and answer.

A. It says that he should be a proponent of the product and that he should be -- you know, being a spokesperson of the product, he should be using any avenues that he can to promote it.

BY MS. GOTTLIEB:

Q. That's your understanding of what the agreement is?

MS. STEIN: Objection. Form, but go ahead.

A. My understanding, I think it's beyond the scope of the agreement. My understanding of the agreement is that all he has to do is on social media,

Page 28

which obviously he fulfilled that component, but also by giving the opportunity to promote it past that of his obligations, I believe that to be a benefit of Steel.

BY MS. GOTTLIEB:

Q. Okay. Well, let's talk about the social media aspect of it. What did Mr. Bilzerian need to do specific to social media?

A. He needed to promote, when he believed it to be appropriate and organic to how he believes that his audience would be engaged. There was no specific set number on how many posts that he had to make and to which social media platform he would have to make it.

Q. Is it Blitz's position that Mr. Bilzerian met his obligations under the agreement?

MS. STEIN: Objection to form. And I'm going to ask -- I think I heard you right, Sarah, so I just want to make sure you said "his position" or "Blitz's position"?

MS. GOTTLIEB: Blitz's position.

MS. STEIN: Thank you. Sorry. I just want to make sure I heard that.

A. Can you repeat the question, Sarah.

BY MS. GOTTLIEB:

Q. Sure. Is it Blitz's position that

7 (Pages 25 to 28)

Page 29

Mr. Bilzerian met his contractual obligations under the agreement?

MS. STEIN: I'm going to object to the extent it calls for a legal conclusion, but go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. And how is it that you -- excuse me -- how is it that Blitz believes Mr. Bilzerian met his obligations?

MS. STEIN: I'm going to object to the extent it calls for a legal conclusion. I'm also going to object to the extent it involves anything with regard to attorney-client privilege. So only answer to what you would know and the company would know, not in relation to what you have been told by counsel, if you can.

A. Sure. Mr. Bilzerian has posted numerous times on social media on Steel's behalf, had done so in a front-loading manner, so there's millions of followers in the beginning -- in the infantile stages of their relationship, building up sales for Steel, a considerable amount. I believe that he -- you know, from 750,000 to 5 million, excuse me, actually, $250,000 in gross sales to about 5 million in gross sales across the time in which the relationship was

Page 30

happening. But I do believe that the first couple of months in which Mr. Bilzerian was involved there was a significant increase in sales, based upon the posts that he had front-loaded for them on behalf of the company. That being said, throughout the time of the relationship, Mr. Bilzerian posted as consistent with what was obligated of him in the contract, to post when he believed it to be appropriate on Steel's behalf, and he continued to do so throughout the life of the relationship.

Q. You stated that Mr. Bilzerian posted in a front-loading manner; is that correct?

A. I did.

Q. And what does that mean?

A. That means that he introduced his audience and millions of followers to Steel supplements through a number of social media posts, and did so in the beginning of the relationship, so that those followers would then be able to be retargeted, continually retargeted by Steel and -- yeah, he got his millions and millions of followers to start purchasing products through the Steel channels, by continually posting on its behalf in the beginning of the relationship, probably more so than he was doing at other times during the relationship, but that's -- that's the way

Page 31

in which you help build the business enough to, you know, bring up those numbers, to basically post as often as you possibly can in the beginning without overly seeming ad-y without seemingly overly ad-y and I think that he had done an extremely appropriate job -- he was appropriate in the way in which he did it.

Q. So Blitz would agree then that Mr. Bilzerian posted more at the beginning of the relationship than he did toward the end of the relationship; correct?

A. Yes.

MS. STEIN: Object to form, but go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. And you mentioned some numbers. Were you talking about Steel sales a moment ago when you were referencing numbers?

A. Correct.

Q. Okay. And where does that information come from?

A. That would be based upon the amount of money, commissions that Dan had gotten on those first few months of his relationship with Steel.

Q. And Blitz attributes Steel's growth to Mr. Bilzerian?

A. The vast majority, yes.

Page 32

Q. And why is that?

A. The numbers basically speak for themselves. You went from 250,000 a month, to 750,000 a month, to 1.25 million a month. These things would never -- or 1.5 million a month, I think. These numbers were never seen before by Steel, and the driving force was introducing them to an audience of over, you know, tens of millions of people, and that's what Steel brought him on for, it's to introduce them to that audience. And once that audience was engaged, they were able to capitalize on it.

Q. Does Blitz know what Steel did as far as its own marketing efforts?

A. No.

Q. All right. Mr. Verona, what were Blitz's obligations under the agreement?

MS. STEIN: Objection. Asked and answered. Calls for a legal conclusion, but go ahead.

A. If you are -- if Blitz is, like you said, Dan Bilzerian, they're one and the same, it would be to post on Steel's behalf when Blitz and/or Dan Bilzerian believed it to be appropriate and organic to his followers, organic to the way in which he was able to promote things in the past and to, you know, make a consistent amount of money on Steel's behalf for Steel.

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 33

Q. Blitz has additional -- scratch that.

We discussed earlier that Blitz has multiple employees and officers; correct?

A. Yes.

Q. Okay. So apart from Mr. Bilzerian, what did Blitz do to ensure that it met its contractual obligations?

MS. STEIN: Again, objection. Asked and answered. Form. Calls for a legal conclusion, and as to time frame, but go ahead.

A. Vingiano can obviously speak to the time in which he was employed, which you can -- you know, go back to his deposition. Hagen, you can do the same, you can go back to his deposition, as far as he participated. As far as when I was on board, basically, I would have conversations with -- I would have -- I would have conversations with Dan about the desires of Steel to post, and Dan would be the -- would be the person to make that decision as to whether or not he believed it to be appropriate to post at that time.

Q. So was there an individual in charge of the relationship between Steel and Blitz?

A. Dan.

Q. In addition to Dan?

Page 34

A. How so? Can you be a little bit more specific?

Q. Sure. I guess, let's start with -- actually, you know, we'll come back to that.

Mr. Verona, is that your -- is that sound I hear you from or is that someone else?

A. Yeah, I apologize, that was me. Someone was just asking me if I would like -- if they would like me to feed the tortoises. And I thought that I -- we have tortoises on property, and I wrote back, no. And I thought that I had quit my messages, but I did not, so I'm quitting them now. That is the only message that came through.

MS. STEIN: And just for the record, I didn't ask about tortoises.

THE WITNESS: That was not her.

Even if I quit messages, unless I actually take the program off my computer, there's a chance that something else might pop up, but I won't answer it.

BY MS. GOTTLIEB:

Q. Mr. Verona, did anyone at Blitz other than Mr. Bilzerian post on Mr. Bilzerian's social media about Steel?

A. No.

Page 35

Q. Does anyone else beside Mr. Bilzerian have access to Mr. Bilzerian's social media accounts?

A. No.

Q. Does anyone at Blitz control or influence the frequency of Mr. Bilzerian's posts?

A. No.

Q. And what about the content of his posts?

A. No.

Q. All right. Why don't we go ahead -- we've been going almost an hour, why don't we take ten minutes.

THE VIDEOGRAPHER: Off the record at 12:21 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record, 12:34 p.m.

BY MS. GOTTLIEB:

Q. Mr. Verona, is it true that Steel reached out to Blitz on multiple occasions and asked for help getting Mr. Bilzerian to post more often?

A. Yes.

Q. And it's true that Blitz understood the concerns that Steel raised?

MS. STEIN: Object to the form, but go ahead.

A. Yes.

BY MS. GOTTLIEB:

Page 36

Q. And true that Blitz agreed to speak to Mr. Bilzerian about those concerns?

A. Yes.

Q. And what were the concerns that Steel expressed?

A. They would just like Dan to post more.

Q. Anything else?

A. Not that I can recall.

Q. Did Blitz agree that it would get Mr. Bilzerian to post more?

A. No.

Q. Why not?

A. Because at the end of the day, it's Dan -- like you said, Blitz is Dan, Dan is Blitz. Dan has the final say, Dan makes the decision as to whether or not he is going to post on Steel's behalf and consistent with what his obligations are in the contract.

Q. Did Blitz believe that Mr. Bilzerian should post more?

A. No.

Q. Why not?

A. Because I am not a social media maven. I am not aware, speaking on Blitz' behalf, as to how to position a brand to be successful based upon social media posts and such. That, I left to the proprietor

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 37

of the company, that being Dan Bilzerian, to make that final decision which he had done on many occasions when I brought up to him the concerns of Steel.

Q.   Did Blitz's and Bilzerian's obligations under the agreement include working with Steel?

MS. STEIN:  Objection to the extent it calls for a legal conclusion, but go ahead.

A.   Can you be more specific in your question?  I don't get it.

BY MS. GOTTLIEB:

Q.   Sure.  So under the agreement, did Blitz or Mr. Bilzerian have an obligation to work with Steel, for example, to generate Mr. Bilzerian's content?

MS. STEIN:  Same objection.  Go ahead.

A.   No.

Q.   Why not?

MS. STEIN:  Same objection.

A.   It's in the agreement.  Dan is -- Dan decides what he wants to post and what he wants to post with.

Q.   So it's Blitz's position that Mr. Bilzerian wasn't required to listen to Steel?

MS. STEIN:  Objection.  Asked and answered, but go ahead.

A.   It's my contention that Dan -- and based upon the contract and being that he is a social media

Page 38

influencer, celebrity and expert, was given the opportunity to be in the position to make that decision as to whether or not he was going to post and how often he was going to post, and the content of those posts as well.

BY MS. GOTTLIEB:

Q.   Is it Blitz's position that Mr. Bilzerian wasn't required to incorporate any feedback or advice Steel may've had?

MS. STEIN:  Same objection.  Go ahead.

A.   Repeat the question, again, please.

BY MS. GOTTLIEB:

Q.   Sure.  Is it Blitz's position that Mr. Bilzerian wasn't required under the agreement to incorporate any feedback Steel may've had for him?

A.   I believe that it was under the agreement that he would listen to many thoughts and suggestions that Steel may have, which he did.  There are text messages provided by us in discovery, to show that Dan was trying to be amenable to some of the concerns that Steel had.  However, at the end of the day it is Blitz's contention that Dan had the final say as to how to appropriately promote the brand on Steel's behalf.

Q.   How was Mr. Bilzerian trying to be amenable?

A.   You can reference all the text messages that

Page 39

we've provided in discovery.  If you want to show me specific ones right now, I can speak to them as well.

Q.   Text messages provided in discovery.  Which text messages are you referring to?

A.   Between Dan and Jason Huh.

Q.   Any others?

A.   Not that I can recall.

Q.   Mr. Verona, is that the full basis for your statement about how Mr. Bilzerian was trying to be amenable?

A.   No, not at all.  I mean, he had Jason Huh many times come to his estates, both in Los Angeles and Las Vegas.  They did many posts with one another.  Jason was an active part of Dan's life during the time in which they were in a relationship with one another professionally, and to a certain extent personally, so -- I mean, they would confer with one another in person during the parties which Jason attended.  You know, so attended -- visited the estate on multiple occasions.  I can't speak as how many times, as I did not live in Los Angeles, so I couldn't speak to how many times he had been over there.  But based on the posts that both Jason Huh and Dan had done in the past, it seemed as if they had a relationship, one, in which they were seeing each other quite often.

Page 40

Q.   Is it true that Steel reached out to Blitz in about September of 2020, asking for help getting Bilzerian to post?

A.   Yes.

Q.   And do you know who at Blitz spoke to who at Steel with respect to that?

A.   I believe that there were conversations between myself, Jason Huh, and possibly Medhy, but I wouldn't -- I couldn't remember accurately if he had asked, but probably just myself and Jason Huh.

Q.   What was discussed at that time?

A.   Jason would ask if I would -- if I would ask Dan if he could post more.  And I said I would see what I can do.  And again, can't be more adamant about it, I have no control over as to how many posts go out on Blitz or Dan's Bilzerian's behalf, or onto his social media accounts.  I took whatever was told to me verbatim, to Dan, mostly in person, told him their concerns, and at the end of the day it was to his -- his discretion as to whether or not to post based upon those concerns.  And during those times Jason Huh was having side conversations with Dan on text, which you can reference in what was provided in discovery as well, where they were discussing the same things that I was basically proposing to Dan to do anyways.  So it's

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 41

like they're, you know, I was saying to Dan the same thing that Jason was saying to him just at different times -- excuse me -- probably more so consistent at the same time with one another.

Q. How did you communicate with Mr. Huh?

A. Phone calls, text messages, occasionally an e-mail, but mostly I would say text messages and phone calls.

Q. How frequently?

A. I'm sorry?

Q. How frequently?

MS. STEIN: Objection. Asked and answered. Go ahead.

A. Once every two to four weeks. So let's say three weeks on average.

BY MS. GOTTLIEB:

Q. What about during that specific period of time I referenced earlier in September, when Steel was asking for assistance getting Mr. Bilzerian to post, how often, if you know, did you speak to Mr. Huh in September?

A. I don't believe it was any more frequently than we normally had done.

Q. Did Blitz use any type of analytics to assess Dan's performance and the impact, if any, it had on

Page 42

Steel sales?

A. No, but my understanding is that Steel doesn't have that information either. Wouldn't it be the company's -- Steel's responsibility to be tracking that?

Q. So then, my next question is, did Steel provide Blitz with any of those analytics?

A. No.

Q. And does --

A. As far as the metrics, as far as how -- how many of Dan's -- or how much of the sales were attributed directly to Dan? No.

Q. Did Steel provide Blitz with analytics to support Steel's request that Dan -- that Mr. Bilzerian should post on certain times or for certain products?

A. Yes. But again, to that point, I mean, that's Steel just saying that they know more about social media than Mr. Bilzerian does. Mr. Bilzerian knows his audience, so he knows when to actually post, what to post, and you know, how often to do so. So Steel telling him to do so is kind of like, you know, telling you know -- you know, somebody that they know how to do their job better than the person that they hired to do it.

Q. So is it Blitz's position that Mr. Bilzerian

Page 43

knew better how to promote Steel's products than Steel did?

A. Social mediawise, yes.

Q. And why is that?

A. Mr. Bilzerian has over 30-, 40 million followers, which he began his social media, let's call it, career, and accumulating those followers, he had 40 million. And how many did Steel have? I do not know that answer, but obviously it was a small fraction of that. So, obviously, Dan is responsible for creating that type of a following, which obviously Steel needed and Dan was an expert in being able to do so, and that's what the whole deal was about. It was about introducing them to the -- introducing Steel to Dan's audience, because Dan was able to figure out a way in which to create an audience that was significantly larger than Steel could ever imagine reaching their own marketing initiatives to that point.

Q. Did Mr. Bilzerian listen to the information that Steel provided as far as, you know, the data for posting at certain times, frequency, content? Did Mr. Bilzerian listen to that?

A. Yes.

MS. STEIN: Objection to form. I'm sorry.

A. Yes, he listened.

Page 44

BY MS. GOTTLIEB:

Q. Did he take that into account when he would post?

A. He took it into consideration.

Q. Did Mr. Bilzerian care if his posts were effective?

A. Yes.

Q. Did Mr. Bilzerian want Steel to be successful?

A. Very much so. Obviously, the more money that Steel made, the more money that he made.

Q. What did Mr. Bilzerian do to determine if his posts were, in fact, effective?

A. I would refer to Dan's deposition. He talked about this ad nauseam. He's the one who is the creative genius who created, you know, that type of a following and he's the one to speak to how to make these organic posts to get his followers engaged. I can't speak to his social media, that has already been spoken to, again, during Dan's deposition over those eight or nine hours that you had him a couple of months back.

Q. Well, how does someone know if Mr. Bilzerian was right or Steel was right about whether a post was effective or not?

MS. STEIN: Objection. Calls for speculation.

11 (Pages 41 to 44)

Page 45

Go ahead.

A.  Well, it just relates back to what I was saying before.  Steel has never provided us analytics as to how effective Mr. Bilzerian's posts were as far as sales are concerned so, you know, he had to make the determination and follow what he believed to be in his -- in both, in the company's best interest, to post.

Q.  And what did Mr. Bilzerian do to determine that he knew more about -- more than Steel did about how to market Steel's products?

A.  Why would he have to --

MS. STEIN:  Hold on.  Objection.  Misstates prior testimony.  Go ahead.

A.  Why would he have to prove anything?  This was the whole point of the contract.  By having the contract in place they were basically -- Steel was basically admitting that Mr. Bilzerian knew a ton more about social media, as is why that they brought him on board to promote the brand.  It's basically just, you know, circle back to the contract.

If they didn't believe that he was an expert in the area and knew more about him, why would that be a specific component of contract asking him to post to his social media channels, in the way that he believed

Page 46

to be most appropriate.

Q.  So it's Blitz's position that Mr. Bilzerian could do whatever he wanted to do on social media?

MS. STEIN:  Objection.  Misstates prior testimony.  Argumentative, but go ahead.

A.  It's Blitz's contention that he would listen to what Steel had to request and recommend, and then it was to his jurisdiction -- excuse me -- yes, to his jurisdiction, as to whether or not to carry out what they were requesting and recommending, based upon his expertise in the area and what he believed that his following would want to see in order to appropriately continually promote Steel.

Q.  So a moment ago we were talking about Steel reaching out to Blitz in about September of 2020, asking Blitz to help get Mr. Bilzerian to post; correct?

A.  That is correct.

Q.  And it's true that Mr. Bilzerian did eventually post on September 26, 2020; correct?

A.  That is correct.

Q.  And it's true that that post didn't include the products that Steel requested that he post; correct?

A.  He posted on behalf of Veg Pro.

Page 47

Q.  And that wasn't one of the products Steel requested that he post; correct?

A.  It was one of the products that Steel had requested that he post, but he is not required to post any specific products.  He is required to post whatever he wants, whatever products he believes to be most appropriate and most consistent with what his following would gravitate towards.

Q.  And is it true that with that particular post, Mr. Bilzerian actually admitted he could've done better?

A.  Not that I'm aware of.

Q.  Is there someone else that would be aware?

A.  I mean, look into the discovery.  Could he have a phone conversation with someone, do you want to show me a text message, you want to show me an e-mail, where he suggested that he wasn't necessarily thrilled with the way in which he posted?  If you have something to show me, I'd be happy to speak to it, but you're just going -- I mean, if he could've said that to his mother, I don't know, you know.  Give me a little bit more background to it.

Q.  Sure.  Well, would Blitz agree that this post on September 26, 2020 was not effective?

A.  No.

Page 48

Q.  Why not?

A.  Because Dan posted it knowing his audience, knowing what works for his audience, and he decided that would be the most appropriate and effective post at that time.

Q.  Well, how did he determine if it was effective?

A.  Go back to his -- go back to his deposition, he spoke to this ad nauseam as well.  I don't know anything about -- I'm not an expert in social media.  I don't have -- I have an Instagram account for more so just to stalk what he's doing and find out what he's doing, other than that, I don't know much about social media at all.

I don't know why he thinks it would be most effective to do what he had done, but he does and he spoke to it for quite some time, obviously, on that deposition that you guys did with him, whenever that may have been, a couple of months ago, whenever it was.

Q.  Mr. Verona, just to clarify.  You are here on behalf of Blitz today; right?

A.  That is correct.

Q.  Okay.  So when I'm asking questions, I know, you know, you have some knowledge of this, but I wanted to know specifically about whether Blitz thought the

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 49

post was effective?

A. You just told me before that -- we established that Blitz is Dan Bilzerian. So if you want to say this -- do we believe that that was effective or do you believe that Dan Bilzerian and Blitz, in unison, being that it's the same person, believes that it's effective, the answer is yes.

Q. Does Blitz know how many sales the post generated? And again, I'm referencing the September 26th, 2020 post?

MS. STEIN: Sarah, just for my clarification. What topic is this, please?

MS. GOTTLIEB: 9, 11.

MS. STEIN: Hold on. Let's go slow. What specific post? Where is that in 9 or 11?

MS. GOTTLIEB: 9 is information known more recently to Blitz regarding Bilzerian's promotion, obligation or endorsement of Steel's products.

MS. STEIN: All right.

MS. GOTTLIEB: So, I think we can, you know, stop there, that's --

MS. STEIN: I tend to disagree, but the client -- he can go ahead and answer if he knows, but I disagree with your assessment of how this fits into a topic.

Page 50

A. Can you repeat the question again, please?

BY MS. GOTTLIEB:

Q. Sure. Mr. Verona, does Blitz know what sales were generated as a result of the September 26, 2020 post?

A. No, but in all fairness, I know that Jason had contacted me and said that it didn't move the needle. To what that means, I don't know exactly.

Q. And is Blitz aware of what the conversion rate would've been?

A. No.

Q. If Dan is Blitz and Blitz is Dan, as you've testified, why is Mr. Bilzerian, Dan Bilzerian not the corporate rep today?

MS. STEIN: Objection to form and calls for a legal conclusion. Argumentative.

A. Can I answer?

MS. STEIN: No, actually, it's not the standard. It's not a valid question, so you can move on.

MS. GOTTLIEB: Kim, are you, --

MS. STEIN: How is that a question, Sarah? Move on. You understand the standard of a 30(b)(6), do you not? You cannot ask a witness, and you know that the standard is somebody who has

Page 51

reasonable knowledge of the corporation and we can choose who that is. Apparently your colleague, your partner that you report to doesn't understand that. I think you do because you've clerked for a federal judge, but this is not the standard here.

Also, you're asking into work product situations of why, so I'm going to instruct him not to answer based on work-product/attorney-client privilege. And again, it's an invalid question so please move on.

MS. GOTTLIEB: Are you instructing him not to answer, Kim?

MS. STEIN: I said that, so can we move on and listen, please? Thank you.

BY MS. GOTTLIEB:

Q. Mr. Verona, are you taking the advice of your counsel to not answer?

A. I am.

MS. GOTTLIEB: Okay.

BY MS. GOTTLIEB:

Q. So, you know, back to this September 26th, 2020 post, just using this as an example, if Steel says this post wasn't effective, what facts does Blitz have to dispute that?

MS. STEIN: Objection. Calls for speculation.

Page 52

Form. Lacks foundation. Go ahead.

A. Well, one, what facts did Steel ever present to me, to Dan, or Blitz or anybody, to support that it wasn't effective, one. And -- I mean -- I'm sorry. Just repeat it once again, Sarah.

Q. No problem. If Steel says a post wasn't effective, for example, the September 2020 post, if Steel says that wasn't effective, what facts does Blitz have to dispute that?

A. Dan can show his retargeting, how many people -- excuse me, not retargeting -- how many views he got to the post, how many likes he got to the post, how many people, I guess, forwarded on the post or however that is, tagged the post and everything, which would seemingly -- would normally be a significant amount.

So if they're not able to convert, that's not necessarily an issue for Dan, but rather an issue for Steel. And past that, Steel never provided any information as to exactly what that post had done, that I can recall. All that they had said to me was that it didn't move the needle. So specifically speaking, I don't know exactly what that meant.

Q. What are the other facts Blitz will testify to at trial about whether Mr. Bilzerian's posts were

13 (Pages 49 to 52)

Page 53

effective?

MS. STEIN: I'm going to object. Calls for work product, attorney-client privilege. Form. I'm going to ask you to reword the question. You are asking him what Blitz is going to testify to at trial? I'm not understanding the question, so can you please reword.

BY MS. GOTTLIEB:

Q. Mr. Verona, are you able to answer the question?

A. Can you just repeat the question, even if it's not reworded.

Q. What's the factual basis for Blitz saying that posts Mr. Bilzerian did were effective?

A. That you already asked, that I already answered. You moved on to a new question about testifying.

Q. Right. So at trial, what will Blitz testify to? What are the facts that Blitz will testify about why posts were effective?

MS. STEIN: Again, calls for speculation, calls for legal conclusion, calls for attorney-client privilege and work product. So you can answer to the extent it doesn't involve work product or attorney-client privilege statement.

Page 54

A. I would assume that one of the witnesses is going to be Dan, and Dan can speak accurately as to exactly how effective his post was from his perspective. And also anybody who is just looking at the social media and captured that story or post or whatever it may have been, can see the engagement that he had from his followers, which obviously include a ton of likes, a ton of views, and a ton of hashtags and followers. Like I said, I'm not all that knowledgeable in that space, but Dan is and he would go back to, you know, anybody that he -- whenever he's speaking about this social media posts and the engagement. I guess the overall term is engagement, how many people saw it, how many people liked it, how many people passed it on to others. So he'll speak to that at trial.

Q. So Blitz's position is that the effectiveness of a post has to do with how many people saw the post?

MS. STEIN: Objection. Misstates prior testimony and to form as to what the definition of "effectiveness" is, but go ahead and answer if you can.

A. I mean, this is one post. I mean, he can say, yeah, that was the effectiveness of that post. You know, maybe it didn't translate necessarily into sales for that specific moment, but he can also relate back

Page 55

to the fact that the posts that he had done during the infantile stages of the promotion of the product during that, you know, the first few months and everything, how effective those were because of the sales numbers. He can just, obviously, point to the sales numbers and how much they went up from month to month every time that he would, because he got engaged with the company.

So at a certain -- to a certain extent, once you front load a company like that and you build them up to $5 million per month, and you are sitting here four years in -- three, four years into the relationship, if you post something, okay? And you post something to social media, and you get that kind of engagement, that's wonderful, and I think Dan will speak to that. But we, one, didn't get any notification as far as how many sales that actually did generate, so I do want to qualify what I'm about to say with that.

But also, if it didn't generate sales, that is not necessarily a function of Dan's participation, because he's already got his followers basically hooked. He build -- you know, he helped build up the company. So it's like, you know, you are going out to 35 million people or however many he did, I don't know with the likes and the re-tweets and all that kind of

Page 56

stuff, the retargeting and everything like that. But however many people that he posted to, people have already seen it, you know, so it's like, you know -- you know, seeing him promoting Steel and probably have already bought the products and have become like a customer of Steel, potentially for life.

So effectiveness in the latter stages of this agreement, probably would be more so about likes and views and, you know, if conversion is not happening, then we haven't seen that, you know, represented in any way to us during the latter stages.

Again, in the beginning stages of the relationship, obviously, we can see the differences in sales per month, as soon as he started posting on their behalf.

Q. So is it Blitz's -- so what I'm trying to understand is what Blitz -- what Blitz thinks goes into effectiveness? And I'm hearing a few different things, so is it Blitz's position that effectiveness of a post, that those parameters change over time?

MS. STEIN: I'm going to object here.

THE WITNESS: I believe --

MS. STEIN: Hold on. I'm going to object here. First of all, effectiveness is not in the agreement. You are asking for a legal conclusion.

14 (Pages 53 to 56)

Page 57

This has been asked and answered now multiple times, and we need to move on from the topic as you just said you have so many topics here. We're not going to be here all day, so can we please move on? Go ahead and answer if you know, but we need to move from this topic, Sarah.

A. Effectiveness can be qualitative, it could be -- it could be decided in many different ways, my understanding, and Blitz's understanding as far as me speaking on its behalf.

BY MS. GOTTLIEB:

Q. So effectiveness is what Dan -- what Mr. Bilzerian says it is; correct?

MS. STEIN: Objection. Misstates testimony. Argumentative. Asked and answered. Go ahead.

A. Refer to his deposition, since I've answered it many times over.

BY MS. GOTTLIEB:

Q. Did Mr. Bilzerian post again after September 26th, 2020?

A. On Steel's behalf?

Q. Yes.

A. I don't believe so.

Q. If you needed to know -- well, let me back up. So you are here testifying as the corporate

Page 58

representative of Blitz; correct?

A. That is correct.

Q. And you said that you -- part of your preparation was to review Mr. Bilzerian's posts?

A. That is correct.

Q. So how would you determine whether Mr. Bilzerian posted for Steel after September 26th, 2020?

A. I would've remembered seeing it in all the depositions that were presented, more specifically to him during his deposition when you guys took it, whenever that may have been a few weeks to a month ago.

Q. Independent of the depositions, how would you determine?

A. I mean, look, there are hundreds and hundreds of pages of documents and text messages and posts and depositions and everything, if I, you know -- if I remember seeing a post past September 26th or whenever it was, I would say I remember seeing a post. But I don't remember ever seeing a post, ever being discussed during the many depositions that have happened thus far and past that in all the documents that I have reviewed, the many hours that I've spent on the phone with my attorneys, Kevin -- Mr. McCoy, so if I saw it, I would tell you right now, yes he posted past

Page 59

September 26th. I do not recall seeing, nor remembering, nor do I believe that there was a post past that of September 26th, 2020.

Q. So when you testified earlier that you had reviewed posts in preparation for your deposition?

A. Correct.

Q. What, I guess, specifically were you referring to, was it these depositions? Help me understand, you know, when you say you reviewed posts, what you reviewed?

A. I reviewed all the --

MS. STEIN: Hold on. Asked and answered, but go ahead.

A. I mean the discovery, I mean everything that was given in the discovery and everything, and if I'm skimming through hundreds and hundreds of pages of what you guys were shown. I think Dan was shown posts and tweets and all that kind of stuff, that's the stuff that I remember from the deposition, so when you say "prepare," that was part of my preparation, obviously, being on the nine-hour deposition of Dan.

And past that, looking back at what was discussed during Dan's deposition, and if it was a transcript of however many pages it may have been, I don't think anybody would think that it would be

Page 60

necessary for me to study it as if I were studying for a college exam, but that's what I had -- remember seeing. I remember seeing some posts. I remember seeing a post on the 26th, I remember what that post is. I do not remember or recall a post being made after that date --

Q. So --

A. -- and that all occurred during my preparation for this deposition.

Q. Okay. So fair to say that if there isn't evidence of a post in discovery, then there wouldn't be?

MS. STEIN: Objection to form, but go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. True that around the time we were discussing, so September 2020, is it true that around that time Mr. Bilzerian suggested he wanted some kind of ownership stake in Steel?

A. Yes.

Q. And true that Mr. Bilzerian indicated he'd be more willing to post if he had some type of ownership stake in Steel?

A. Yes, but also this dates back to initial conversations between Jason Huh and Dan during the

15 (Pages 57 to 60)

Page 61

formation of the contract. You know, there are a lot of things that go into, obviously, being a part owner of a company as opposed to just representing it. There are FDA regulations and such, so Dan has to be very careful about promoting the product when Steel didn't necessarily do their homework and disclose to the FDA as to whom was actually speaking on their behalf. With an ownership, being that he would have some sort of an ownership in the company, he could obviously speak to the company -- speak on behalf of the company in a way in which the FDA wouldn't necessarily be -- there wouldn't be any issues with the FDA.

And past that, also, he with his audience, he doesn't want people knowing that he is selling out in a sense and basically just taking money to promote products because that's not the way to engage your audience. And as an expert that he is, he knows the best way to engage your audience is to do so organically. And in order to do so organically he -- you know, that's consistent with not having an ownership piece of the company. If he had an ownership piece in the company, then he can just flat out come out and say it, "Look, I have an ownership piece in this company." Let's, you know -- and you know, make it less organic than it was, but he would only feel

Page 62

comfortable doing so if he was disclosing that to his followers.

Q. Well, regardless of whether he's an owner or not, he would be taking money from Steel; correct?

MS. STEIN: Objection. Argumentative. Form. Go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. So, I mean, I suppose my question is what's the difference?

A. What's the difference between what?

Q. Between having an ownership in Steel and having what Mr. Bilzerian had at 10 percent, why would having ownership mean that he could post more?

MS. STEIN: Objection to the extent it calls for a legal conclusion. Objection to form. Asked and answered and argumentative.

A. I'd ask you to refer to Dan's deposition because he definitely discussed that.

BY MS. GOTTLIEB:

Q. Okay. But I'm asking you as the corporate representative for Blitz, what Blitz's position is?

MS. STEIN: And he answered the question.

A. And my understanding is that as a corporate representative of Blitz, being that I was on the

Page 63

deposition, heard the deposition and everything, I'm able to actually tell the counsel to refer to said deposition to find the answers themselves.

BY MS. GOTTLIEB:

Q. Did Mr. Bilzerian disclose to his followers that he receives 10 percent commission with his agreement with Blitz -- with Steel?

A. No.

Q. Why not?

A. Because he didn't want -- he didn't necessarily -- he wanted his posts to seem organic, and he wanted to seem as if it was something that he uses on a regular basis and doesn't necessarily have an ownership in.

Q. But if he was an owner in Steel, then he would have disclosed he was an owner?

MS. STEIN: Objection. Calls for speculation.

A. Again, you're asking a question in just a different way, and I asked you to please refer to Dan's testimony which he spoke to it quite often, I think that you guys brought it up many times.

BY MS. GOTTLIEB:

Q. You mentioned -- you testified about -- did you mention the FDA? Did I hear that correctly?

A. I did.

Page 64

Q. What do you mean by that? Can you elaborate on that, I don't understand.

A. My understanding is that there was supposed to be some sort of disclosure as far as Dan's endorsement of the brand, and that wouldn't necessarily be Dan's responsibility, but more so the responsibility of Steel. So if Dan were out there and advertising and making it look like an ownership or -- excuse me, let me take that back.

If he were advertising it inorganically, it could look like he was being, you know, in a sense, paid for promotion and that could necessarily raise a red flag with the FDA.

Q. And what does the basis of that information come from?

MS. STEIN: I'm going to object to the extent it calls for attorney-client privilege, but you can go ahead answer it if it does not involve any communications with attorneys.

A. It does involve communications with attorneys.

BY MS. GOTTLIEB:

Q. Does Blitz have any relationship with Ignite?

MS. STEIN: Objection to form. Specifically, what Ignite are you referring to?

***

16 (Pages 61 to 64)

Page 65

BY MS. GOTTLIEB:

Q. Are you able to answer, Mr. Verona?

A. She asked you which Ignite you are referring to.

Q. Well, without me clarifying for the record, are you able to answer the question?

THE WITNESS: Yes.

Kim, can I?

MS. STEIN: If you can.

A. We don't have a formal relationship with Ignite. From time to time we would help out with certain things that they have going on. Like, for instance, whenever they have something happening in Vegas, oftentimes we'd lend a helping hand by allowing them to use the estate here in Vegas, to hold certain events with people, distributors, wholesalers and such, people that they would want to necessarily take in their product, but as far as a formal relationship, there is none.

BY MS. GOTTLIEB:

Q. Great, but my question wasn't about a formal relationship. It was just a relationship. So you started to get into that. Is there anything else?

A. No.

MS. STEIN: Objection. Asked and answered.

Page 66

Go ahead.

A. That's to the extent of Blitz's relationship with Ignite.

BY MS. GOTTLIEB:

Q. Why does Blitz lend Ignite a helping hand?

MS. STEIN: Objection. Calls for speculation. Way beyond the scope. And as far as it involves attorney-client communications, so if you can answer outside of that, you can go ahead.

A. Dan is the CEO of both companies.

BY MS. GOTTLIEB:

Q. Is that the only reason?

MS. STEIN: Objection. Argumentative. Asked and answered. Go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. When was it that Blitz learned about ZRO?

A. Are we speaking about when did Dan, as you know, being the same entity as Blitz, learned about ZRO? Because that's what you wanted to establish early on, so if that's the case, then February of 20- -- probably prior to February 2020, when they were developing the product.

Q. That's when Mr. Bilzerian would've learned of it?

Page 67

A. Yes. And also, he spoke to this in his deposition as well. I ask you to refer to that as well.

Q. Did the rest of Blitz know about ZRO at the same time that Mr. Bilzerian knew about it?

A. No.

MS. STEIN: Just for the record, objection to form. Go ahead.

Jason, I'm going to ask you again to please slow down.

THE WITNESS: I'm sorry, Kim.

MS. STEIN: With computers there's a little bit of a delay.

THE WITNESS: I apologize.

BY MS. GOTTLIEB:

Q. So when did others at Blitz learn about ZRO?

MS. STEIN: Objection to form. Vague. Go ahead.

A. Can you be more specific as to who at Blitz?

BY MS. GOTTLIEB:

Q. Sure. When did you learn about ZRO?

A. When it launched.

Q. When was that?

A. I answered this before, but February of 2020.

Q. What about Paul Bilzerian?

Page 68

MS. STEIN: I'm going to object to the extent that, again, he is an consultant and advisory board member. I don't see where in the scope this relates to Mr. Paul Bilzerian specifically.

Can you explain that to me, Sarah, please, what topic?

MS. GOTTLIEB: Topic Number 3, 2, and 14.

MS. STEIN: Okay. Three -- so two is the role of Mr. Paul Bilzerian. Three is about Blitz's relationship and again with the role and -- I'm sorry, which is the third?

MS. GOTTLIEB: 14.

MS. STEIN: Information readily available to Blitz regarding Bilzerian's promotion. That's Dan's promotion of Ignite's product, not Mr. -- again, I believe you are lacking foundation here. I will let the client go ahead and answer, if he can.

A. Sarah, repeat the question again, please.

BY MS. GOTTLIEB: When did Paul Bilzerian learn about ZRO?

MS. STEIN: Same objection.

A. You'd have to ask somebody from Ignite.

BY MS. GOTTLIEB:

Q. Why would I ask someone from Ignite?

17 (Pages 65 to 68)

Page 69

A. Because he's a consultant for Ignite. ZRO has nothing to do with Blitz.

Q. So Mr. Bilzerian is -- Mr. Paul Bilzerian is a consultant for both Blitz and Ignite?

A. My understanding, yes.

Q. Was Blitz compensated for the posts Mr. Bilzerian did for Ignite?

A. No. Mr. Bilzerian gets a salary from Ignite.

Q. Did Blitz ever investigate whether ZRO would compete with Steel?

A. Yes.

Q. When did it do that?

A. This was probably February 2020, when it first came out. And again, Dan spoke to this in his deposition, so I would ask you to refer to that, please. Because it was a conversation between he and Jason Huh. Now, the conversation between me and Jason Huh was basically asking him if he wanted to sell the ZRO through Steel supplements, and he had said that he didn't see -- he didn't have the desire to do so because he did not believe that the marketing department at Ignite was doing a good job, so he did not necessarily want to associate himself with ZRO. But in that conversation that he and I had, in no way did he ever suggest that ZRO was a competitor of his

Page 70

product and to bring it to anyone's attention by any means.

And I believe that if you go back to James Graceli's deposition, he would speak to -- he would be better to speak to as to whether or not there were conversations with Steel Supplements about ZRO prior to its release.

Q. All right. So let's break some of that down. I want to make sure I understand. You said -- so I asked if Blitz ever investigated whether ZRO would compete with Steel. You said it did, in February 2020 when it came out; is that correct?

A. No, I would say before that, because Dan was investigating it and that is something that would have taken place prior to February 2020. I'm just saying February 2020 is probably, you know, in line with when I had had that conversation with Jason Huh.

However, that being said, Dan Bilzerian on behalf of Blitz -- and he spoke to this in his deposition -- would've spoke to the fact that this was investigated prior to the launch of the beverage, as well as -- and you know, speaking -- I understand that it's a Blitz question, but this is all ZRO, this is all Ignite stuff that you should've gotten from the corporate testimony from that person. However, that

Page 71

being said, Dan Bilzerian had had conversations with those at Ignite on Blitz's behalf, about it potentially being a cause for concern as far as there being -- it being a competitive product of anything that's Steel, and it's not, it's an energy drink. It's not a bodybuilding supplement.

I mean, the whole thing that you guys are trying to get at is ZRO, and he said it, obviously, many times over, it's just absolutely ludicrous.

Q. Did you say that Blitz and Ignite spoke about or -- yeah, did you say that Blitz and Ignite spoke about whether ZRO would compete with Steel? Did I hear that correctly?

A. And that would be, yes, Blitz as in Dan spoke to Ignite.

MS. GOTTLIEB: Why don't we take about 20 minutes. It's past lunchtime over here, so let's come back -- let's make it 1:45.

MS. STEIN: Why do we need 20 minutes, because -- I mean, obviously we have a lot of topics to go through and again, we would like to get done sooner. I mean, can't we not work through? It's 10:20 here.

MS. GOTTLIEB: Yeah. We were scheduled to start at 10:00, but I had a request to start at

Page 72

11:30, so you know, I would love if we could finish early too on a Friday, but...

MS. STEIN: I understand, but why do we need 20 minutes? Can we not work through? We're ready to go and -- again, we're on the Pacific time, so we would like to -- can we just do ten minutes?

MS. GOTTLIEB: We're going to take a lunch break here, because it's well past lunch on --

MS. STEIN: You're kidding; right?

MS. GOTTLIEB: -- the East Coast, so let's just do 1:45, all right. Let's go off the record.

MS. STEIN: No, we're not. No. We don't agree to that. I mean, again, you're wasting time. This is what you've done before in prior depositions. We need to keep going here.

MS. GOTTLIEB: Kim, we're going to take a break.

MS. STEIN: Well, we'll be back in ten minutes. We expect you back. And again, I'm going to take this off of error time then, if you would like to do that, because this is ridiculous.

This is a 30(b)(6) deposition and we need to be done. So you could've worked through lunch, which we normally do. And if we start at 11:30, you could've eaten before. So we're going to take

888.909.2720        Anthem Reporting        813.272.2720
anthemreporting.com

Page 73

ten minutes, and if you want to take 20, that's fine. I'm going to put ten minutes off your record time. Okay?

We'll see you at 1:45 because you want to eat.

THE VIDEOGRAPHER: Off the record at 1:23 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record 1:47 p.m.

THE WITNESS: Just one thing that I wanted to mention was, I think that I referenced it as the FDA before. I meant the FTC, so just to put that on the record, whenever I was referencing the FDA I meant the FTC.

BY MS. GOTTLIEB:

Q. Okay. Thank you.

Mr. Verona, before the break I had asked you whether Blitz ever investigated whether ZRO would compete with Steel; correct?

A. You did.

Q. And am I correct that your response was Dan was investigating before February 2020?

MS. STEIN: Objection. Asked and answered, but go ahead.

A. That is correct, and I believe when I thought on it during the break, that he had mentioned -- again, reference his depo, please, but I'll speak to it

Page 74

briefly, that Curtis Heffernan on his behalf had cleared everything with Steel. That's what he had mentioned in his depo, and that's what Blitz believes as well.

BY MS. GOTTLIEB:

Q. What does that mean that Curtis Heffernan cleared it with Steel?

MS. STEIN: Objection to form. But go ahead.

A. Please refer to Dan's deposition as he spoke to it.

BY MS. GOTTLIEB:

Q. So that was one part of your answer. I believe there was a second part of your answer, as far as what Blitz did to investigate. Am I correct that you stated that --

MS. GOTTLIEB: Sorry. Did someone just enter?

MS. STEIN: It also said something about recording when that person entered.

THE VIDEOGRAPHER: I didn't see that on my end, but let me look. It shows I'm the only one recording, just the videographer.

MS. STEIN: Because if someone is recording on their own, they know they can't do that, that's when that person, whoever entered from Steel, when they entered, it said "recording."

Page 75

MS. GOTTLIEB: Kim, I don't think it's an issue. I think it was just -- when you come in, it tells you it's recording. I think that's what we heard.

MS. STEIN: Okay. I just want to make sure.

BY MS. GOTTLIEB:

Q. Mr. Verona, let me start over. So you testified before the break that you on behalf of Blitz had also investigated whether ZRO would compete with Steel; is that correct?

A. Well, I wouldn't necessarily use the word "investigate," because it wasn't my job to investigate as I'm not an Ignite employee. I think that I remembered it a bit better that Jason Huh and I had had a conversation, and it was probably more so in the spring or summer of 2020, whereas I asked him if he were amenable or interested in having Steel [sic] being sold through Steel, the different channels that Steel has, and he wasn't interested based upon his disappointment in what he believed to be the Ignite marketing department.

So the investigation that -- I would, again, refer back to what Dan had said to his depo, speaking on what Curtis had done on his behalf, and I'm going to leave it at that.

Page 76

Q. Okay. So we're going to come back to some of that. I just want to be clear, did Blitz do anything else to investigate whether ZRO would compete with Steel aside from what you're referencing that Mr. Bilzerian said in his deposition?

MS. STEIN: Objection. Form. Go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Mr. Verona, when did you become aware of ZRO?

A. I believe I answered this already, February, when it was released in February of 2020.

Q. So you were not aware of ZRO before it was released?

MS. STEIN: I'm going to object.

Are you asking him personally or in his capacity as a 30(b)(6)?

MS. GOTTLIEB: His capacity.

MS. STEIN: Thank you.

THE WITNESS: Is she allowed to ask in my capacity?

MS. STEIN: Yeah, she's asking you as Blitz, not as a person.

A. Oh, okay. Yeah, February 2020.

BY MS. GOTTLIEB:

Q. So Blitz knew about ZRO in February of 2020,

19 (Pages 73 to 76)

Page 77

that's your testimony on behalf of Blitz?

MS. STEIN: Objection. Asked and answered multiple times, but go ahead.

A. No. That is not what I have said. What I have said is that Dan, on behalf of Blitz, had done his due diligence, utilizing the president of Ignite at that time, Curtis Heffernan to run everything by Steel, making sure that it was okay, that there weren't any issues with coming out with an energy drink, which -- and then as far as my -- again, we're -- you know, you're trying to determine, you know, a distinction between Blitz and Dan. And the only one that really exists is that Blitz is the LLC, Goat Works is the LLC, and Dan controls them both. So, in a sense -- I'm going to leave it at as well.

BY MS. GOTTLIEB:

Q. Mr. Verona, I appreciate that. Let me just be clear, I guess. What I'm actually trying to figure out is, when Blitz knew about ZRO. So I understood, and please correct me if I'm wrong, I understood you testified that Mr. Bilzerian was aware of ZRO before February 2020, because you stated he did an investigation with Curtis Heffernan, as he testified at his deposition; correct?

A. Correct.

Page 78

Q. Okay. So -- but you also testified, I believe, when I asked about when Blitz knew when ZRO came out, you referred to February 2020. So are there other individuals at Blitz who found out about ZRO?

A. I may have been confused, because you know, this personal capacity and this corporate capacity are, you know -- obviously, I'm not well versed in depositions, so I would say that my recollection of ZRO is 2020, is February of 2020. And Blitz's recollection is prior to that, and its investigation was prior to February 2020, and done so by -- on its behalf by its CEO, Dan Bilzerian, again, spoke to quite often or spoke to in his deposition that you guys have taken.

Q. Okay. Thank you. So you, Jason Verona, personally, found out about ZRO in February 2020; is that correct?

A. From what I can recall, yes.

Q. And at the time you found out, you know, that Ignite was coming out with this product called ZRO, did you know that ZRO was going to be marketed at the vitamin shop?

A. No, but I did find out through a post on, I believe, it was Dan's Instagram, that it was located at The Vitamin Shoppe.

Q. When was that?

Page 79

A. That post was probably the summer of 2018. Again, went through, you know, hundreds of pages of these, you know, the ones that you showed Dan and what I can recall from memory, based upon all of that discovery, it was probably right around summer of 2020. It's no longer there, from my understanding.

Q. If I heard you correctly, I think you first said summer of 2018.

A. 2020.

Q. Okay. Summer of 2020 is when you saw The Vitamin Shoppe post; correct? About?

A. About that, yes.

Q. All right. And when you learned about ZRO, again, talking about approximately February 2020, did you know that ZRO was going to be sold at Gold's Gym?

A. No.

Q. When did you -- did you come to find out that it would be sold at Gold's Gym?

A. No.

Q. This is the first you are hearing of that?

A. That is correct.

Q. And again, when you first learned of ZRO, did you know that Ignite was planning to launch the product at the Arnold Convention?

A. No.

Page 80

Q. Are you aware of that?

A. No.

Q. This is the first time you are hearing of that?

A. Correct.

Q. Again, around when you first learned of ZRO, so again, around February 2020; did you know that ZRO was going to be marketed as an energy drink?

MS. STEIN: Objection to form. Go ahead.

A. Let me think about that for a second, if you don't mind.

MS. GOTTLIEB:

Q. Take your time.

A. Yes.

Q. Did you know that ZRO, at that time, was going to be marketed as a performance drink?

A. No.

Q. Have you since learned that ZRO has been marketed as a performance drink?

MS. STEIN: I'm going to object. Sarah, what topic are we on?

MS. GOTTLIEB: 3, 14.

MS. STEIN: 3 is about a relationship with Ignite which is best -- I don't see how that relates. And what's 14? Let me get there.

## Page 81

Information that -- regarding Bilzerian's promotion of Ignite's products. Okay. I'm still not seeing how these specific questions on these are going. We talked about it, but I'll let him answer.

A. Repeat the question, please, Sarah.

BY MS. GOTTLIEB:

Q. Sure. Have you come to know that ZRO has been marketed by Ignite as a performance drink?

A. I heard it during Dan's deposition, but I had never known it before to be considered a performance drink. I think that the -- I would need to necessarily know -- you know, I haven't heard the word "performance."

Any time ZRO has ever been mentioned, even during those events in which I mentioned that there were Ignite people here at the estate in Vegas, any kind of, like, adjective that they used to describe it would be "energy." So -- "energize," if you want to use that as an adjective, so no.

Q. Mr. Verona, before we took a break, you were talking about a call you had with Jason Huh; correct?

A. That is correct.

Q. And the call was about Ignite ZRO?

A. That is correct.

Q. And when was that call?

## Page 82

A. I believe it was the summer of 2018 -- summer of 2020.

Q. And how did you speak to Mr. Huh?

MS. STEIN: Objection. Asked and answered. Go ahead.

A. Over the phone.

BY MS. GOTTLIEB:

Q. About how long was the conversation?

A. My recollection, probably -- we had some, probably, banter with one another to open up the conversation, and then I probably led into asking him about ZRO being carried, so I would say probably about two-and-a-half, three minutes.

Q. And did you call him or did he call you?

A. I would've called him.

Q. And did you do so on your own or at somebody else's direction?

A. At somebody else's direction.

Q. Who?

A. Dan Bilzerian.

Q. Mr. Bilzerian asked you to call Mr. Huh?

A. That is correct.

Q. Why did Mr. Bilzerian want you to call Mr. Huh?

A. He had asked me to reach out to Jason, to see

## Page 83

if Steel were interested in carrying the energy drink through their sales channels, most specifically to that, through Steelsupplements.com.

Q. Okay. And what is it that you told Mr. Huh?

MS. STEIN: Objection. Asked and answered. Form. Go ahead.

A. Told in that same phone call that we had had in the summer of 2020.

BY MS. GOTTLIEB:

Q. Right. What was the content of your conversation?

MS. STEIN: Same objection.

A. Content? Basically, like I said, it probably started off with some friendly banter between he and I, and then it went into asking him, "Hey, would you guys be at all interested in carrying the energy drink through your online channel and as well as other avenues?"

And he had said, "Let me think on it."

And then he came back to me and he said that he wasn't interested at that time because he didn't believe in the marketing department at Ignite and that was it. And I just relayed that back to Mr. Bilzerian and that was basically it. I do believe that Mr. Huh did say, "Why don't we revisit this at another time

## Page 84

once the marketing team, because once the marketing team kind of gets their strategy a bit better, we can maybe revisit it at another time, but right now I'm not too competent in them, and we don't want to carry a product like that, that doesn't have the marketing support necessary."

Q. What details did you provide Mr. Huh about the energy drink?

A. Nothing. Other than, "You know of the Ignite energy drink?"

"Yes."

"You know, it's called ZRO? Would you like to carry it?"

Q. You asked him if he knew of the Ignite energy drink?

MS. STEIN: Objection. Misstates prior testimony. Asked and answered, but go ahead.

A. I don't recall the way in which it was actually brought up with one another. I'm sure that I said something to, "Hey, Jason, you know, Ignite ZRO?"

And he was probably like, "yes."

And I probably said, "Hey, would you have any interest in potentially carrying it through the channels of Steel supplements?"

And that's probably -- my recollection of the

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 85

way in which I speak to people on the phone, so that's probably the way in which the conversation unfolded with Mr. Huh.

Q. So your testimony is that Mr. Huh acknowledged that he knew what Ignite ZRO is?

A. Oh, yeah, absolutely. It wasn't like he asked what is Ignite ZRO?

Q. Well, how is it that you think he knew what it was?

MS. STEIN: Objection. Calls for speculation. Go ahead.

A. Because he didn't ask any follow-up questions. I just said to him, "You know of the Ignite beverage, ZRO?"

And he was like "Yeah, what about it?"

And I'm like, "Do you want to carry it?"

It wasn't like, what is Ignite -- he never asked what is Ignite ZRO, what are its ingredients, it what -- you know, is it an energy drink or performance drink? None of that was discussed. It was a two-sentence request of him, you know, "Are you interested in carrying it?"

And he said, "Let me talk to my team."

BY MS. GOTTLIEB:

Q. So Mr. Huh didn't tell you what he thought

Page 86

Ignite ZRO was; is that correct?

A. No.

Q. So there was no conversation about what this product was; is that correct?

A. Yes. I said that it's ZRO energy drink, so he knew it to be an energy drink.

Q. Okay. But other than the title of Ignite ZRO energy drink, was there anything else about the drink, any details of the drink, the products that were discussed?

A. No.

MS. STEIN: Objection. Misstates prior testimony. Misstates the actual product title, but go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Did you tell Mr. Huh that ZRO was going to be marketed as a performance drink?

MS. STEIN: Objection. Assumes facts not in evidence. Calls for speculation. Form. Go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Did you tell Mr. Huh -- scratch that.

Are there any other details about your conversation with Mr. Huh about Ignite ZRO that we

Page 87

haven't already discussed?

A. No.

Q. Okay. Were there any other conversations you had with anyone from Steel about Ignite ZRO?

MS. STEIN: Sarah are you asking in his capacity as himself or as a 30(b)(6)?

MR. GOTTLIEB: Himself, whether Mr. Verona had any conversations.

MS. STEIN: I'm going to object to that as beyond scope. Again, you've already deposed Mr. Verona in this matter and we agreed to his testimony in that case and I'd ask you to stick to topics at hand.

BY MS. GOTTLIEB:

Q. Mr. Verona, did anyone from Blitz have any conversations with anyone at Steel -- other than -- about Ignite ZRO, other than the one we just discussed with you and Mr. Huh?

MS. STEIN: Objection. Lacks foundation. Misstates prior testimony, but you can go ahead and answer.

A. I would ask that you reference Dan's deposition. He'd be the only one who would've had a conversation.

***

Page 88

BY MS. GOTTLIEB:

Q. Before the break -- and correct me if I'm wrong -- I believe that you testified that individuals from Blitz had discussions with individuals from Ignite about whether Ignite ZRO would compete with Steel products. Is that correct? Did I get that right?

A. Repeat it once again, please.

Q. Did anyone from -- did any individuals from Ignite have any conversations with any individuals from Blitz, about whether Ignite ZRO would compete with any Steel products?

MS. STEIN: Again, objection. Asked and answered, but go ahead.

A. Yes, and again, please refer to Dan's deposition in which he speaks to it.

BY MS. GOTTLIEB:

Q. So when you mentioned Dan's deposition earlier, you were talking about Dan talking to Curtis Heffernan at Ignite. So is that when -- when you testified earlier that people at Blitz and people at Ignite had conversations about ZRO, and whether it competed with Steel, is that the only thing you are referring to, when Mr. Bilzerian was in communication with Mr. Heffernan, or were there any other conversations that Blitz is aware of?

888.909.2720        Anthem Reporting        813.272.2720
anthemreporting.com

Page 89

MS. STEIN: Objection. Misstates prior testimony. Asked and answered, but go ahead.

A. That's all I know. I am not an Ignite employee.

BY MR. GOTTLIEB:

Q. Okay. So Mr. Bilzerian's deposition contains the entire factual knowledge that Blitz has of any of these conversations about ZRO competing with Steel; correct?

A. Yes. Blitz stands by anything that Dan has said in his deposition.

Q. Was Blitz aware that Mr. Bilzerian was going to promote Ignite ZRO on his social media?

A. Are you asking me in my personal capacity, or are you asking me as a corporate representative of Blitz, because again, there's a very thin line. This is not a corporation that runs like normal corporations by any means. There's Dan, there's Blitz -- I mean, did he know that he was going to promote ZRO? I would imagine that he would.

I, personally, and I guess in a corporate capacity, didn't know what he was going to be doing with it, no. Actually -- yeah, I don't know anything. Dan does his own social media. He spoke to Ignite and Ignite asked him to do things on behalf of ZRO and he

Page 90

did them.

Q. Okay. So if Blitz was aware Mr. Bilzerian was going to promote Ignite ZRO, it was because Mr. Bilzerian knew he was going to promote ZRO; is that correct?

MS. STEIN: Objection. Asked and answered. Misstates prior testimony. Go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. Mr. Verona, when we were discussing the conversation between you and Mr. Huh about Ignite ZRO, you testified that the purpose of your call was to ask whether Steel would sell Ignite ZRO on Steel's website; correct?

MS. STEIN: Again, objection. Asked and answered. Go ahead.

A. Correct. Amongst other channels that they have.

BY MS. GOTTLIEB:

Q. Why was it that Blitz wanted Steel to sell that product?

MS. STEIN: Objection. Lacks foundation, misstates prior testimony. Go ahead and answer.

A. It's more so that obviously Ignite had wanted Steel to sell its product, and I was simply a middleman

Page 91

between its CEO and the CEO of Steel, Jason Huh. Again, Dan being the CEO of both companies, he had asked me if I would have a conversation with Jason, being that he and I had a nice rapport with one another.

BY MS. GOTTLIEB:

Q. When you had the conversation with Mr. Huh, did you indicate to him that you were acting on behalf of Ignite?

MS. STEIN: Objection. Misstates prior testimony. Lacks foundation. Form, but go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Did Mr. Bilzerian explain why he wanted you to ask Steel to sell ZRO on Steel's website?

A. No.

Q. So he never told you what his interest was or what Blitz's interest was in having ZRO sold on Steel's website, specifically?

MS. STEIN: Objection. Calls for speculation. Form. Misstates prior testimony. Lacks foundation. Go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Did Mr. Bilzerian ask you to reach out to

Page 92

anyone else to sell ZRO on any other company's website platform store?

A. No.

Q. Had Mr. Bilzerian ever asked you before to reach out to Steel to sell Ignite products on Steel's website?

A. No, not that I can recall.

Q. This was the first time that that occurred?

MS. STEIN: Objection. Asked and answered. Go ahead.

A. If you'd like to show me something where -- whether it be a text conversation or an e-mail in which I had said something to Jason? Again, hundreds and hundreds, maybe even thousands of e-mails and things that I went over for this deposition, I didn't necessarily see it. However, if you have something to show me, I can speak to it. But as far as I recall, no other products have I ever asked -- from Dan's direction, have I asked Jason or Steel to sell in their site.

BY MS. GOTTLIEB:

Q. Is Blitz familiar with what other products Ignite sells?

A. Yes.

Q. What other products does Ignite sell?

23 (Pages 89 to 92)

Page 93

A. Not all of them. Obviously, I'm not really all that knowledgeable, but apparel, they have bikinis, they have -- for women, they have workout wear, they have men's slides, men's shorts, men's T-shirts, hats. I don't know if you want me to go into all the different categories of apparel. They have that, they sell vape pens in different puff counts, some are nicotine, some are synthetic nicotine. There is a CBD line. They obviously sell ZRO. They sell vodka, they sell types of tequila, and that's basically all of it, that I can -- that I know of.

Q. Did anyone from Blitz ever approach anyone from Steel, asking whether Steel would be interested in selling any of those products on Steel's website?

MS. STEIN: Objection. Asked and answered, but go ahead.

A. No.

BY MS. GOTTLIEB:

Q. Mr. Verona, when we came back from the break, you mentioned the FTC; correct?

A. Yes.

Q. Does that stand for Federal Trade Communication?

A. Commission or -- I think it's commission, is it not?

Page 94

Q. That's correct, I misspoke. Federal Trade Commission.

A. Yes.

Q. Okay. Has the FTC ever contacted Blitz regarding Bilzerian social media activity?

A. No.

Q. Has Blitz ever contacted the FTC regarding Bilzerian's social media activity?

MS. STEIN: I'm going to object to the extent it calls for attorney-client privilege. So to the extent that you know and it's separate from any communications with attorneys -- and I'm assuming, Sarah, you are not asking whether Blitz's attorneys had contacted -- I will let him go ahead and answer to that extent.

A. No.

BY MS. GOTTLIEB:

Q. How does Blitz ensure that Mr. Bilzerian complies with FTC regulations with Bilzerian social media activity?

MS. STEIN: Again, objection to the extent it calls for attorney-client privilege. So if you know beyond anything with regards to attorneys, what they've told the company or what the attorneys have done, you can answer.

Page 95

A. It's all done with attorney-client privilege.

BY MS. GOTTLIEB:

Q. Did Blitz ever discuss the FTC or FTC regulations with respect to Bilzerian social media posting, outside of any attorney discussions?

A. No.

Q. Did Blitz ever disclose the nature of the relationship with Steel?

MS. STEIN: Objection to form.

A. Be more specific, please.

To whom are you asking if we disclosed the relationship to?

BY MS. GOTTLIEB:

Q. To the public?

A. No.

Q. Do you know if Mr. Bilzerian disclosed the relationship to the public?

A. Reference his deposition, please.

Q. Has Blitz ever received any complaints regarding Mr. Bilzerian's social media activity?

MS. STEIN: Objection to form. Vague.

A. No.

BY MS. GOTTLIEB:

Q. Did Ignite know about the terms of the agreement between Blitz and Steel?

Page 96

MS. STEIN: I'm going object as to beyond the scope. Calls for speculation.

You can answer, if you know.

A. You'd have to ask Ignite.

BY MS. GOTTLIEB:

Q. Did Blitz ever disclose the terms of the agreement to Ignite?

A. No, not in my personal capacity, nor as a corporate capacity, if anything were mentioned of it, it would be in Dan's depo which I asked you to reference.

Q. Why would individuals from Ignite have been assisting with an amendment to the agreement in 2019?

MS. STEIN: Again, beyond the scope. Calls for speculation. Go ahead and answer, if you know.

A. You would have to ask Ignite.

BY MS. GOTTLIEB:

Q. Well, I'm asking -- so you're here on behalf of Blitz today as the corporate rep; correct?

A. Correct.

Q. So --

A. -- if you rephrase the question, it might be a little more appropriate for me to answer.

Q. Did Blitz ask Ignite to work on an amendment to the agreement?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 97

A.  I ask you to please reference Dan's testimony in which he would've spoken about it.  An amendment -- wait, an amendment to what agreement?

Q.  The agreement between Steel and Blitz?

A.  Yeah, no, and please reference --

Q.  Go ahead.

A.  -- Dan's depo.

Q.  Say that again?

A.  Please reference Dan's depo.

Q.  You just asked which agreement.  I just want to be sure we're on the same page.  Is there any other agreement that comes to mind?

A.  No.  I have no personal knowledge of any agreement or as a corporate representative of any agreement discussed and amend- -- discussing with Ignite, making an amendment to the Steel/Blitz contract, no.  But if I missed something from Dan's deposition, I apologize.  Again, many, many hours spent listening.  If he had said something, I do ask that you reference what he had said regarding that issue.

Q.  Mr. Verona, we're going to talk some more about Bilzerian's posting for Steel.  I'm going to share my screen.

Ms. Stein and Mr. McCoy, you should have some more exhibits in the ShareFile at this point, that we

Page 98

added over the break.

MS. STEIN:  When you were supposed to be eating?  It would be a lot easier if you guys learned to, actually, do this in advance, that would be helpful, it takes time.

MS. GOTTLIEB:  I'm going to share my screen here.

MS. STEIN:  Which are you using, please?

MS. GOTTLIEB:  So can you see the title up there, its 2017-0317, it has the Bates number.

So this is going to be a few of these, so if we can just mark this as Composite Exhibit 2.

MS. STEIN:  Again, what topics are we on?

(Composite Exhibit No. 2 was marked for identification.)

MS. GOTTLIEB:  9, 11, 5, 12.

MS. STEIN:  Hold on.  Slow down, please.  Thank you.  So 9, this is the promotion of Steel products, okay.  11, information known or reasonably available to Blitz, regarding Blitz and Bilzerian's efforts under the agreement.  12, information known or reasonably available to Blitz regarding Blitz's nonperformance and nonperformance of its obligations, responsibilities.  And what other number, please?

Page 99

MS. GOTTLIEB:  I think I said, 9, 11, 12, 5, I think.  But I mean, that should, you know, the other I already said should cover it.

MS. STEIN:  So are we going to go through every post that you went through in Mr. Bilzerian's deposition at this point?  Is that what your plan is?

MS. GOTTLIEB:  We'll go through and I'll ask the questions I need to ask of Mr. Verona as the corporate rep.

MS. STEIN:  I understand that, but in the same token, what I'm asking you is specifically these topics weren't very specific to individual posts.  And, again, as the testimony has already stated, Mr. Bilzerian controls his own posts, so I'm not clear why we're going to be going through all of these and wasting time, and particularly as you continue to ask for breaks and waste time through this, and said you needed to eat lunch and clearly you weren't eating lunch, you were doing extra stuff that should've been done before this deposition.  So I just want to make sure the record is clear.

MS. GOTTLIEB:  Are you done, Kim?

MS. STEIN:  I didn't say anything else.  You

Page 100

can move on, but I'm just saying I think this is beyond scope, but I'll let him answer, if he can.

BY MS. GOTTLIEB:

Q.  Mr. Verona, you can see my screen; correct?

A.  Yes, I can.

Q.  There's a video on the screen.  Okay.  And again, we're going to go through a few of these, so this is Composite Exhibit 2.

So I'm going to play this video and I'll ask you a few questions about it.

A.  Go ahead.

Q.  Can you hear that, by the way?

A.  Play it a little bit more.  (Playing video.)  Yeah, I can hear it.

BY MS. GOTTLIEB:

Q.  Mr. Verona, is this a post that Mr. Bilzerian made to promote Steel?

A.  Yes.

Q.  And is this something that you reviewed in preparation for your deposition today?

A.  Yes.

Q.  And in what capacity did -- how did you review it, where did you see it?

A.  Well, we talked about -- I talked about it with my attorney, he said --

25 (Pages 97 to 100)

Page 101

MS. STEIN: No, no, don't talk about what you talked with your attorney.

THE WITNESS: I'm sorry. You're right.

It was discussed with my attorney.

Attorney-client privilege.

BY MS. GOTTLIEB:

Q. Mr. Verona, you said no one has access to Mr. Bilzerian's social media other than Mr. Bilzerian; correct?

MS. STEIN: Asked and answered. Go ahead.

A. That is correct.

BY MS. GOTTLIEB:

Q. So only -- so you do not have Mr. Bilzerian's log-in?

MS. STEIN: Asked and answered. Go ahead.

A. That is correct.

BY MS. GOTTLIEB:

Q. In preparation for your deposition today, did you go to Mr. Bilzerian's social media pages and review the content in those pages?

MS. STEIN: Asked and answered. Go ahead.

A. What was available to the public, yes.

BY MS. GOTTLIEB:

Q. And are there any -- do you know how many times Mr. Bilzerian posted about Steel in this social

Page 102

media?

A. You asked this question already. Please refer to Mr. Bilzerian's deposition for that answer.

Q. I'm going to pull up another video, and again this is part of Composite Exhibit 2.

MS. STEIN: Sarah, it's locked, at least on my end.

MS. GOTTLIEB: Yes, I paused it. I'm going to unpause it in a moment.

MS. STEIN: Okay. No, it's locked on what you had playing before, is what it's showing to me. I don't know, Jason, is that showing to you as well?

THE WITNESS: I see a street cone.

MS. STEIN: Yup.

MS. GOTTLIEB: Okay. Well, I'm about to move to something else.

MS. STEIN: Okay. Just thought you should know we're not seeing anything.

MS. GOTTLIEB: Thank you. Is there something new on the screen now?

MS. STEIN: Yes.

THE WITNESS: Yes.

MS. GOTTLIEB: So I'm going to play this video. And again, for reference of which document this is, there is the title at the 2017 404 on the

Page 103

Steel Bates number.

(Video playing.)

BY MS. GOTTLIEB:

Q. Mr. Verona that was a post Mr. Bilzerian did for Steel; correct?

A. Yes.

Q. And it looks like it sort of cut off in the middle; correct? Is that what you saw too?

A. Yeah. I couldn't hear much of the middle audio by any means, but I heard "supplements" and I know that it was probably a Steel product, but I couldn't hear the middle audio.

Q. Is that because the audio was low?

A. It was a cutoff. If you play it again, maybe I can hear it a bit better. You want to try it again?

THE WITNESS: Would anybody mind if I take a 30-second break to go to the bathroom?

MS. GOTTLIEB: Go ahead.

THE VIDEOGRAPHER: Off the record, 2:32 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record, 2:35 p.m.

MS. GOTTLIEB: All right. So we're having some technical difficulties with the videos, as you can probably tell, so I'm going to come back to this a little later. All right.

Page 104

BY MS. GOTTLIEB:

Q. Mr. Verona, does Blitz have a document retention policy?

A. No.

Q. There is a -- for Blitz, they have an @ -- let me rephrase the question.

What e-mail domains does Blitz have?

A. @danbilzerian.com, @blitznv.com.

Q. Okay. And the @danbilzerian.com, did you look for e-mails related to those e-mail addresses that had @danbilzerian.com?

A. Yes.

Q. And were those produced in response to Steel's request for documents?

A. Yes.

Q. Did you have any difficulty locating any e-mails from @danbilzerian.com?

A. Yes.

Q. Okay. And why was that?

A. Something went wrong with our server, where some of the e-mails were not accessible prior to a certain date, which I think was 2018. So there's a bit of a -- some e-mails are just not there, and I've asked our specialists about it and they said that they switched over service -- services and they've noticed

Page 105

that some of their servers didn't necessarily carry over all of the e-mails. So there's -- it's gaps, it's just weird gaps, but not anything specific to anything that you guys might have produced, that we couldn't necessarily get our hands on as well.

Q. Okay. And when did you first realize that there were e-mails that were missing?

A. I think about two years ago or a year and a half ago, I had asked Dan to look back and do a search for something, and he had told me that his e-mails do not go back prior to 2020 or 2019, and he never asked why that was. He just told me that they weren't there and that's when I did my research with Computer Repair Specialists, who control that e-mail address and, basically, they had just said that they switched over servers and some -- some, you know, past e-mails may have been lost.

Q. Okay. Did I hear you correctly, you said you did your research with Computer Repair Services?

A. Well, I did my due diligence, I just called them and find out, you know, why are some of the e-mails lost.

Q. And their response was that they switched servers?

A. Uh-huh. Yes.

Page 106

Q. Was there any other reason they gave you?

A. No. It wasn't that important at the time. I wasn't using @danbilzerian any more. Well, some people still use my @danbilzerian account, only because that's what I started with, but the only people that utilize that account didn't need e-mails that were prior to that time anyway, so I didn't make a big deal out of it.

Q. So when you contacted Computer Repair Service, was that your attempt to recover those e-mails?

MS. STEIN: Objection. Misstates prior testimony.

A. More so a reason as to why they were not there.

Q. Okay. Did you do anything else to try to recover the e-mails?

A. I went to the exchange and I went through all of the accounts, and I went thoroughly through each and every account that ever did exist on that exchange, and provided anything relevant to this case that was searched. That was the extent of what I can do. I am not an IT specialist, so I could not figure out anything past what CRF had told me a long, long time ago, nor was I concerned about it at all.

Q. What do you mean by "relevant to this case"?

Page 107

MS. STEIN: Objection to the extent it calls for a legal conclusion or attorney-client privilege, but go ahead.

A. Anything that had the word "Steel, ZRO, Jason Huh, Jake Goodwin, Medhy Karbid." Let's see, who else was there? Tony -- you know, the other guy Tony, a very, very thorough search to anything having to do with Blitz's relationship with Steel through that domain. And again, is there an e-mail that you found on your side that we didn't find on ours? Because if there is, just show it to me and I can -- I'd happily speak to it.

BY MS. GOTTLIEB:

Q. Mr. Verona, before we -- earlier we were talking about Mr. Bilzerian's post for Steel, and I had asked you how many times Mr. Bilzerian had posted to Steel, and you referred me to Mr. Bilzerian's testimony; correct?

A. That is correct.

Q. Okay. So is -- well, let's pull that up, then. All right. So I'm looking at -- we can mark this as Exhibit 3.

(Exhibit No. 3 was marked for identification.)

MS. STEIN: And where is that?

MS. GOTTLIEB: It's Mr. Bilzerian's

Page 108

transcript.

MS. STEIN: I know, but where is that on the Dropbox so I can go to it?

MS. GOTTLIEB: It's not in the Dropbox. Do you need me to -- I assume you have a copy.

MS. STEIN: I do not.

MS. GOTTLIEB: Okay. You need me to stop and get you that?

MS. STEIN: Again, we've already admitted these posts in other discovery, but we can go through them if you want to continue, but I do need them.

MS. GOTTLIEB: You need the deposition?

MS. STEIN: I need the deposition transcript, yes.

MS. GOTTLIEB: Okay. Just give me a moment. Let me see if I can get that to you without us having to take a break.

MS. STEIN: Why don't we go ahead and just take five minutes, if that's okay? I can run to the restroom myself, so...

MS. GOTTLIEB: Okay.

THE VIDEOGRAPHER: Off the record at 2:43 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record, 2:49 p.m.

27 (Pages 105 to 108)

Page 109

BY MS. GOTTLIEB:

Q. Mr. Verona, we were talking about -- I had asked you earlier the number of times Mr. Bilzerian posted about Steel on social media, and you told me I need to refer to Mr. Bilzerian's transcript; correct?

A. Correct.

Q. So we're going to, again, take a look at that, and this is Exhibit 3. All right. So I'm going to direct you to page 274, and of course, let me know if you need me to scroll down, up, stop.

A. 274 is -- okay. Let me read it real quick. I'm sorry. I'm mumbling. I don't want this on the record. I'll read to myself quietly.

Got it.

Q. So starting on 274, Line 15. You see where Mr. Stearns is asking Mr. Bilzerian how many dates he posted for Steel?

A. I do.

Q. Mr. Bilzerian responds: "I think at least 24, not counting my Snapchats, not counting Twitter, not counting Facebook."

And Mr. Stearns asked, "I've got about 24 Instagram posts. Is that consistent with what you understand?"

Mr. Bilzerian says "Yes."

Page 110

Then there's a question: "Two Facebook posts; is that correct?"

Mr. Bilzerian responds, "I think it was more than that."

And then there's some more discussion about how many. And ultimately, and tell me if you read it any differently, but it appears we don't have a response here as to how many posts there were; correct?

MS. STEIN: I'm going to object. Misstates the actual document. Misstates testimony. Lacks foundation and form, but go ahead.

A. What's the question?

BY MS. GOTTLIEB:

Q. So Mr. Bilzerian doesn't give a number of how many times he posted for Steel; correct?

MS. STEIN: Objection. Document speaks for itself, go ahead.

A. Document speaks for itself.

BY MS. GOTTLIEB:

Q. Okay. Mr. Verona, how many times did Mr. Bilzerian post on his social media to promote Steel?

MS. STEIN: Objection. Lacks foundation. Misstates prior testimony. Asked and answered, and I'm also going to object here on completeness

Page 111

because testimony wasn't just about the transcript, but go ahead.

A. I stand behind what Mr. Bilzerian has said in his deposition.

BY MS. GOTTLIEB:

Q. Okay. But Mr. Bilzerian doesn't provide a number; correct?

MS. STEIN: Objection. Misstates the testimony and also, again, you're not showing the full transcript. You're showing one section, so if you're asking in this section. But go ahead and answer if you can.

A. He says that he posted 24 in the -- what is that? In Instagram. And then he said, "at least two in Facebook."

And I am confirming that to be accurate based on his recollection of what he had done.

BY MS. GOTTLIEB:

Q. What is -- what does that mean "at least two"?

MS. STEIN: Objection. Document speaks for itself. Calls for speculation. Go ahead.

A. It could mean two, it could mean four, it could mean six, it could mean eight. That's what he said, "at least two."

BY MS. GOTTLIEB:

Page 112

Q. Could mean 2,000; correct?

A. Very well could mean 2,000.

Q. Isn't Steel entitled to know the basis for what Blitz says that it did to comply with the agreement?

MS. STEIN: Objection. Form. Argumentative. Calls for a legal conclusion. Misstates prior testimony.

A. I don't see where you are going with this, in that Dan had the ability to post when he believed it to be appropriate to anyone of his sites. Nothing in the agreement stipulates as to how many he needs to post to Facebook, how many he needs to post to Instagram, so I find this kind of irrelevant. But I mean, you know, we've done our due diligence and again, this is not an exact science and Dan, this is four years ago, some of those posts may not actually live on that page anymore. If I had to give a number, based upon on what I have done in my due diligence in preparing for this deposition, I would say two to four posts on Facebook.

BY MS. GOTTLIEB:

Q. You said that there are things that may no longer be on Bilzerian's social media; correct?

A. I don't know. I have no control over his social media.

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 113

Q. Didn't you say that a moment ago? Did I understand what you said?

A. I mean, I don't know that for a fact. It's possible. I don't have any control over his social media.

Q. Okay. So Mr. Bilzerian says -- strike that. Again, Mr. Stearns is trying to find the answer to the question of how many posts, and we go through Facebook, Snapchat. And Mr. Bilzerian says, that to get the answer to this question he'd have to go back through the archives of his social media accounts. Do you see that?

A. I do.

Q. Did Blitz do that?

A. Did Mr. Stearns ask them to do that?

Q. The question is, have you gone through the archives of your social media accounts and produced every Steel post that you've made?

A. Yes, all reasonable efforts were made --

MS. STEIN: Wait. Objection. Asked and answered. Argumentative, but go ahead.

A. We did our due diligence in doing as much digging as we possibly could, to come up with the numbers that were provided. And again, I don't necessarily see anything where Mr. Stearns says can you

Page 114

do that and find out exactly how many. And my recollection from what I had done to prepare for this depo, as well as pulling together information with Dan, is that my recollection is between two and four posts to Facebook.

If you would like, you can put it on record and I'm happy to have a conversation with Dan. He can open up his Facebook for me and we can go through and find every single little post for Steel. I'm happy to do so.

BY MS. GOTTLIEB:

Q. So what we just went over where Mr. Bilzerian says he'd have to go over the archives, and then he lists a few numbers. He says about two on Facebook, he says 24 for Instagram; is that Blitz's evidence for trial of what Mr. Bilzerian did to post for Steel?

MS. STEIN: Objection. Calls for work product. Legal conclusion. Speculation. Go ahead, answer to the extent that you know.

A. To the extent that I know, we produced everything that was asked of us from those social media accounts, as far as posts are concerned.

BY MS. GOTTLIEB:

Q. Well, apart from producing the documents, just answering the question as Mr. Bilzerian was asked and

Page 115

as I'm asking today. As far as the number of posts, is that the testimony, what Mr. Bilzerian said about the posts or is, you know, Blitz going to dig up some other posts and come to trial with additional posts?

MS. STEIN: Objection. More than argumentative. Misstates prior testimony. Misstates the record. Again --

A. I don't even -- I mean, you want to repeat the question? It's -- I hate to say it, but this is a ridiculous line of question, but you want to give it to me again, Sarah, please.

BY MS. GOTTLIEB:

Q. Sure. It had been asked at Mr. Bilzerian's --

A. Oh, if we're going to produce anything past that of what we produced? No.

Q. Well, not -- right, so there's production and then there's testimony. So I hear what you said about the production, but now at trial will Blitz say or will Mr. Bilzerian say, "Oh, you know, actually, I posted this time and this time," things that were not mentioned in the deposition, that are not mentioned here today, are there additional posts that Blitz or Mr. Bilzerian are aware of, that they intend to use and say, "This is what Blitz did. This is what Mr. Bilzerian did to comply with the agreement"?

Page 116

MS. STEIN: Hold on. Objection. Misstates prior testimony. Calls for a legal conclusion. Calls for attorney-client privilege and work product, and you seem to want to forget all of the mass discovery in this matter, including our response to, I believe, over 70 to 80 requests for admissions regarding posts. The record speaks for itself.

You can go ahead and answer, Mr. Verona.

A. Again, the question, Sarah, please?

MS. GOTTLIEB: Madam Court Reporter, can you read back the question?

(The question was read back.)

A. No, nothing that --

MS. STEIN: Same objection.

A. And no, nothing that Blitz is aware of.

BY MS. GOTTLIEB:

Q. So I'm going to screen share again. Your counsel just mentioned about the discovery that's been served in this case, so I'm going to go to one of those.

MS. STEIN: Where is that in the Dropbox?

MS. GOTTLIEB: You know, that should be in there already.

MS. STEIN: Where is that, because there's a

29 (Pages 113 to 116)

Page 117

lot of stuff now.

MS. GOTTLIEB:  It's titled 2021 11-18 Defendant's Response to Plaintiff's First Request for Admission.

MS. STEIN:  None in there.

MS. GOTTLIEB:  None in there, okay.

MS. STEIN:  I see a 3/10 answer, I see the transcript.  And again, I'm going to ask you where this comes into play under our topics for this witness?  You are going to put that it in the Dropbox, I'm assuming, and mark it as an exhibit.

MS. GOTTLIEB:  Sure, it's being added now.  This will be, I believe we're up to Number 4.

(Exhibit No. 4 was marked for identification.)

MS. STEIN:  What topic is this?

MS. GOTTLIEB:  Five.

MS. STEIN:  Five is, information known available to employees.  This not about the responses to discovery.  Where is that as a topic, please?

MS. GOTTLIEB:  Scratch five, it will be nine.

MS. STEIN:  Again, reading nine, it's about promotion of publication, endorsement of Steel's products.  Again, these are not on the list on requests for admissions to answers.  Where is it on

Page 118

the list about discovery responses for your topic for the 30(b)(6)?  As I see, it's not there.  By the way, this is not in the Dropbox still, and this is not there, so with regards to this exhibit, again this -- especially for time's sake, we responded to this exhibit, not in your topics that you've requested, so I'm not clear where you are going here.

MS. GOTTLIEB:  It should be in your link momentarily.  Do you need it --

MS. STEIN:  Yeah.  I got it.

MS. GOTTLIEB:  You got it?

MS. STEIN:  Again, I would like you to answer what topic, regarding our responses to discovery which stand for themselves?

MS. GOTTLIEB:  Right.  I already said it's Number 9.

MS. STEIN:  It is not.  So, again, it is not there, you just can't find it because it's not there.  You are way beyond scope here.  So again, I will allow the witness to answer, if he can, but I will also again stipulate that it stands on its own, so we don't have to waste time, we can move on.  You like to waste a lot of time in depositions.  I got to be honest, this is getting

Page 119

ridiculous.  I've never seen anybody do exhibits the way your firm does them, in my life.  And I've done a lot.  And again, this is a 30(b)(6), this is not you're re-deposing Mr. Verona.  This has to stand to topics.  There is no topic here that you can point me to, correct, that lists discovery responses; am I correct?

MS. GOTTLIEB:  Do you have the document in your link?

MS. STEIN:  No. Still waiting.  I've refreshed it about eight times.  There it is.  It finally showed up.  But again, can you please answer the question.  Where is your topic that says you are going to ask about discovery responses?  Are you not going to answer that question?

MR. STEARNS:  Sarah, she just crashed.  Her computer crashed.  You saw she was frozen on the screen, so she's restarting her computer.

MS. STEIN:  I didn't see that.  We should go off the record.

THE VIDEOGRAPHER:  Off the record 3:06 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  On the record 3:14 p.m.

BY MS. GOTTLIEB:

Q.  Mr. Verona, again we're talking about

Page 120

Mr. Bilzerian's posts with Steel.  I'm about to share with you my screen.  Does this document look familiar to you?

MS. STEIN:  Again, I'm going to object here and ask you, again, that this is not -- beyond scope.  The topic here, there is no topic that discusses Blitz's responses to discovery that you can point me to, so I will let Mr. Verona answer, if he can.

A.  Off topic.  I will not be answering because it's off topic.

And I can be wrong, but I think Sarah is frozen again.

MS. STEIN:  She is, yes, I just saw her freeze.  She's gone again.  Let's go off the record.

THE VIDEOGRAPHER:  Off the record at 3:15 p.m.

(Off the record.)

THE VIDEOGRAPHER:  On the record at 3:29 p.m.

BY MS. GOTTLIEB:

Q.  Mr. Verona, can you see my screen?

A.  I can.

Q.  And are you familiar with this document?

A.  Yes.

Q.  How are you familiar with it?

30 (Pages 117 to 120)

Page 121

MS. STEIN: And again, I'm just going to make a standing objection to this document as beyond topic. You can go ahead and answer, if you know.

A. I briefly remember it. I mean, it's not something that I studied up for on this depo, as it wasn't mentioned in that list that Kim is referencing, so you can ask the questions, I just don't know if I'll necessarily have all the answers you are looking for.

BY MS. GOTTLIEB:

Q. Do you need me to scroll through it?

A. I mean, you can, yeah. Yeah, ask me specific questions and I'll do the best I can to answer.

Q. Mr. Verona, is it true that between March of 2017, at the beginning of the agreement and January 2021, at the end of the agreement, that Bilzerian posted about Steel on all of his social media about 40 times?

MS. STEIN: Again, object. Which response are you questioning and also asked and answered. Go ahead.

A. Ask the question again, please.

BY MS. GOTTLIEB:

Q. Is it true that between March 2017, when the agreement began and January 2021, when the agreement ended, that Bilzerian posted about Steel on his social

Page 122

media about 40 times total?

MS. STEIN: Same objection.

A. I think more than that.

BY MS. GOTTLIEB:

Q. What makes you think that?

A. Referencing Dan's deposition in which even Jason Stearns said 44, and so I don't know if you consider 46, 48, around 40, but I would say between 40 and 60.

Q. Let's go back to that transcript. I think we left --

MS. STEIN: And again, I'm going to place an objection here, that this is only part of the transcript, not the full transcript.

MS. GOTTLIEB: Well, Kim, do you want to take a break and allow Mr. Verona to read the transcript if he didn't already do that while I was having technical difficulties.

MS. STEIN: Why would we? No, we don't need to take a break. Again, I'm lodging my objection, he can answer to the best of his knowledge. But again, if you want to show one section of the deposition, I'm allowed to lodge my objection.

A. Now that I'm looking at it again, circle back to your question, the answer is yes.

Page 123

BY MS. GOTTLIEB:

Q. The answer is yes, that he posted about 40 times in total on all of his social media?

A. Yes.

Q. So let's go back to the request for admissions. This is the document we were just at, which I believe we previously marked as Exhibit 4. All right. So, Mr. Verona, in looking at -- I'm going to scroll to about Number 42 here.

And of course, let me know if you need me to stop so you can look at something, but what I see is requests for admissions that Mr. Bilzerian posted social media on certain social media platforms on certain dates. And the response to all of these is "Admitted."

MS. STEIN: And I'm going to object, again, beyond topic and, again, the document speaks for itself.

BY MS. GOTTLIEB:

Q. So, Mr. Verona, when we get to Number 43, it says, "Admit Bilzerian did not post social media content promoting, endorsing or publicizing Steel on Instagram on any dates other than," and then it lists a number of dates.

And now, the response from Blitz is "Denied."

Page 124

So, you know, what we just went through, you just told me that Mr. Bilzerian posted about 40 times. I'm trying to understand, can you tell me what is Blitz's basis for this denial?

MS. STEIN: Again, I'm going to object as beyond scope. Not a topic in this, and again the document speaks for itself.

A. I don't know.

BY MS. GOTTLIEB:

Q. You don't know Blitz's basis for the denial?

MS. STEIN: Asked and answered. Go ahead.

A. I didn't have time to review this or I did not know to review this document, so you are throwing dates at me and everything like that, this would take me some time to go through, so as of right now I'm saying I don't know.

BY MS. GOTTLIEB:

Q. So then, go to Answer 45. "Admit Bilzerian did not post social media content, promoting, endorsing or publicizing Steel on Snapchat on any dates other than" -- and then it lists a bunch of dates. Again, the response from Blitz is "Denied."

So same question for you, if Mr. Bilzerian posted about 40 times as you previously testified, and the dates in Numbers 1 through 42 were admitted, what

Page 125

is the basis for this denial here?

MS. STEIN:  Same objections.  Beyond scope.  Document speaks for itself.  Go ahead and answer if you know.

A.  I do not know.

Q.  Number 47, "Admit Bilzerian did not post" --

MS. STEIN:  Sarah, again, I'm going to stop you.  We're on a time crunch, this is a waste of time, you are beyond topic, and if you are going through each and ask for a basis, again, the document stands on its own.  These are documents that were submitted in discovery.  This is beyond your topic.  Why are we going to go through each one?

MS. GOTTLIEB:  We've already discussed that this goes to Topic Number 7 and that --

MS. STEIN:  And it doesn't.

MS. GOTTLIEB:  -- entitled to discuss --

MS. STEIN:  Sarah, it doesn't.

MS. GOTTLIEB:  -- responses to discovery.

MS. STEIN:  Move on, Sarah.  Move on.  You're wasting time.

MS. GOTTLIEB:  Well, we're in -- Steel is entitled to an answer about the number of times Mr. Bilzerian posted.  If you know of a better way

Page 126

to do this, I believe Mr. Verona offered, you know, to get with Mr. Bilzerian and go through the archives, however you want to do it.

MS. STEIN:  He didn't offer to do anything, and Mr. Stearns didn't ask him.  Stop rewording things.  This is getting absurd.  Really, it's getting absurd.  Your topics do not include discovery responses.  We're not going back to any archives, we're not doing that.  You asked a question about 18 times.  Move on.  We will stipulate that the document here speaks for itself.  But we are not going to go through a document that is not on topic, and the topic that you referred to has been asked and answered now about nine times this morning alone.

MS. GOTTLIEB:  Why are you yelling?

MS. STEIN:  Because this is getting frustrating, and we're all on a time crunch, which you don't seem to care but the rest of us do.  So please move on.

MS. GOTTLIEB:  Absolutely --

MS. STEIN:  Mr. Verona is a busy man, who needs to work, and apparently you don't seem to care about that.

MS. GOTTLIEB:  Absent a solution offered by

Page 127

you, I mean, this is the way we'll have to go through it --

MS. STEIN:  There is no solution, and we're not going through this.  So move on from this.  This is beyond topic.

BY MS. GOTTLIEB:

Q.  Mr. Verona, so again, Number forty --

MS. STEIN:  Again, move on.

MS. GOTTLIEB:  Are you instructing him not to answer?

MS. STEIN:  I'm instructing him that his answer that he has given to the other two questions at this point will be the same and to move on.

MS. GOTTLIEB:  Are you instructing him not to answer?

MS. STEIN:  I am instructing him to move on.  So if you want to keep going, I will note that for the record that you've again wasted further time and I'm going to take all of this time and start timing it, and I'm going to ask the reporter, at this point I will mark it at 12:36 starting at my time because you've already wasted our time, and I'm going to take this off any time here again, along with the other ten minutes from earlier.  So we can go -- you want to go forward, please go

Page 128

ahead and waste your time.  Thank you.

BY MS. GOTTLIEB:

Q.  Mr. Verona, Number 47, what's the basis for this denial?

A.  I don't know.

Q.  Number 49 says, "Admit Bilzerian did not post social media content promoting, endorsing or publicizing Steel on Twitter on any dates other than July 16, 2017."

"Denied."

What is the basis for that denial?

MS. STEIN:  Again, same objections.

A.  I don't know.

MS. GOTTLIEB:  I will stop screen sharing.

BY MS. GOTTLIEB:

Q.  Mr. Verona, can Blitz testify today with precision how many times Mr. Bilzerian posted and when?

MS. STEIN:  Objection.  Asked and answered.  Form.  Go ahead.

MS. GOTTLIEB:  Let me clarify.

BY MS. GOTTLIEB:

Q.  I'm sorry.  Let me clarify.  Of course I mean, posted for Steel.  So can Blitz testify with precision today how many times Mr. Bilzerian posted on his social media for Steel?

32 (Pages 125 to 128)

Page 129

MS. STEIN: Objection. Form. Asked and answered. Go ahead.

A. Please reference Dan's deposition in which he spoke to it, and we -- Blitz is in line with what he has to say.

Q. Sorry. I didn't catch the last part.

A. Blitz is in line with what Mr. Bilzerian had to say at his deposition.

BY MS. GOTTLIEB:

Q. Mr. Verona, is it true that after July 16, 2017, Mr. Bilzerian didn't post about Steel on his own social media again until about February 22nd, 2018?

A. Again, please reference Dan's deposition in which you guys talked about this.

THE WITNESS: Is it wrong or do I have permission, is it okay if I snack on some nuts while I'm here? To avoid taking any sort of a break. Is that okay? Sarah, do you mind?

MS. GOTTLIEB: I think as long as we can hear you clearly and your counsel is okay with that, I don't have an issue with it.

MS. STEIN: That's fine.

THE WITNESS: Thank you.

BY MS. GOTTLIEB:

Q. Okay. So I'll share my screen again. Let's

Page 130

go back to Mr. Bilzerian's deposition transcript which was Exhibit 3, I believe. All right. So I'm looking at page 279, starting at Line 9. Mr. Stearns says, "Okay. Mr. Bilzerian, you actually went at one point pretty early on the relationship, what was it seven months, without a single post for Steel; is that right?"

Mr. Bilzerian testifies, "I don't know what the time was between posts."

Mr. Stearns asks, "Okay. Do you have any reason to believe that it wasn't a seven-month period of time where you didn't post a single time for Steel in 2017?"

Mr. Bilzerian testifies, "I don't remember."

A. Uh-huh.

Q. So you just told me in response to my question about -- if there was a period of time Mr. Bilzerian didn't post between July 16, 2017 and February 22nd, 2018, and you told me to look at Mr. Bilzerian's transcript.

A. Correct.

Q. And I'm looking at Mr. Bilzerian's transcript, he says he doesn't know?

A. Right.

MS. STEIN: I'm going to object. That

Page 131

actually misstates the transcript. It's not complete, the section you are reading and again, I'm going to object to form, but go ahead.

A. Well, what I'm gathering from this is that, basically, he doesn't know for sure if it was exactly seven months. He has his social media account. I can't date back to those. As I mentioned before, I don't have access to his social media account, so -- and Mr. Stearns was not asking him to look into, as to whether or not that was an accurate statement, so I'm sticking with what Dan has to say during the deposition. Blitz is in line with exactly the way in which he answered it.

BY MS. GOTTLIEB:

Q. Is it true that Mr. Bilzerian decided he wasn't going to post for a period of time until Steel acquiesced to doing some things that Mr. Bilzerian wanted?

MS. STEIN: Objection. Form. Lacks foundation. Go ahead and answer.

A. Please reference Dan's deposition where he had answered that question. We're in line with his answer.

BY MS. GOTTLIEB:

Q. Do you know where in Mr. Bilzerian's deposition that is?

Page 132

A. I do not.

Q. Okay. Because I'm not sure that was spoken to in Mr. Bilzerian's transcript. So, do you have an answer on behalf of Blitz as to whether Mr. Bilzerian refused to post for Steel for a period of time, until Steel acquiesced to some of his demands?

MS. STEIN: Objection. Misstates prior testimony. Lacks foundation. Argumentative. Asked and answered. Go ahead and answer.

A. No.

BY MS. GOTTLIEB:

Q. Is it true that Mr. Bilzerian wouldn't post for Steel for a period of time, until Steel agreed to produce a professional video including Mr. Bilzerian's image?

MS. STEIN: Objection. Form. Lacks foundation. Misstates facts not in evidence, but go ahead.

A. No.

BY MS. GOTTLIEB:

Q. That's not true?

A. That is not true.

Q. Why is that?

A. Because my knowledge of the situation is that the video was something that he was going to be posting

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 133

on behalf of, but it didn't say anything about whether he was going to -- I haven't seen any documentation to suggest the fact that he was not going to post in the interim between the production of the video and the time in which they spoke about the video.

Q. Okay. So the basis for your -- for the answer "no," the basis for Blitz's position, "no," is that you have not seen any document suggesting that; is that correct?

A. In my review of the documents I have not seen that.

Q. Okay. Are there any other facts that support Blitz's position that Blitz disagrees with the statement that Mr. Bilzerian refused to post, until Steel agreed to produce a professional video for him?

A. Same question asked a different way. Same answer, no.

Q. Well, I just want to know if there are any other facts?

MS. STEIN: Asked and answered, but go ahead.

A. Everything that I've reviewed, no.

BY MS. GOTTLIEB:

Q. Okay. Mr. Verona, what is Blitz's position on what the term "bodybuilding supplement" in the agreement means?

Page 134

MS. STEIN: Object, first of all, to what topic this is, and then also to the extent that this calls for a legal conclusion. And -- you can go ahead and answer if you know, but first I just need to know what topic we're on.

MS. GOTTLIEB: Number 4.

MS. STEIN: And explain to me in Number 4 -- actually, I'm going object, as well, to the extent it calls for a legal conclusion, based on that Number 4 is asking for information known or reasonably available to Blitz regarding the agreement, including but not limited to the negotiation, preparation, execution of all versions of the agreement, the drafts of the agreement, and then all proposed amendments and the termination of the agreement. I'm not understanding how that fits into this topic, but if you would like to show us the agreement, and then reask the question.

BY MS. GOTTLIEB:

Q. Mr. Verona, do you need to see the agreement to answer the question?

A. The question, please?

Q. The question was, what is Blitz's position regarding what the term 'bodybuilding supplement' means?

Page 135

A. Well, I wasn't involved with the initial negotiations, as far as the contract is concerned, so I would ask you to reference David Vingiano's deposition for that answer, and Dan's if he did mention it. I don't remember him doing so, but I do believe that Vingiano had spoke to it. And I don't have a definition of "bodybuilding supplements."

Q. When you say you don't have a definition, do you mean you personally or on behalf of Blitz?

A. Personally do not. Blitz's answer is that basically we -- I was not involved in the actual negotiation of the contract itself, the wording of the contract, that was all done through legal counsel as well as David Vingiano, so I'm not aware of what definition they had come to with one another.

Q. Do you know if Blitz was ever confused by what the term meant?

MS. STEIN: Objection. Document speaks for itself. Calls for a legal conclusion, but go ahead and answer if you can.

THE WITNESS: Give me one second, please. Someone is knocking on this door.

I'm back. And I apologize. Being in the estate, there are vendors here at all times, and some idiot was just at the door banging on it

Page 136

because they had to get into this room, and I had to tell them to go away. So I apologize.

Where were we at?

MS. STEIN: We have to go back on the record.

THE VIDEOGRAPHER: I didn't stop recording.

BY MS. GOTTLIEB:

Q. So I was asking if Blitz was ever confused by the term "bodybuilding supplement" in the agreement?

MS. STEIN: Same objections.

A. You would have to ask -- well, you would have to reference the David Vingiano testimony. It was a discussion that he had had along with Dan, with those that he did the deal with with Steel, including legal counsel, so...

Q. Well, I'm asking you in your capacity as the corporate representative of Blitz. You are here in that capacity; correct?

A. Yes --

MS. STEIN: Objection. Argumentative, and asked and answered.

A. As I've said before, yes.

BY MS. GOTTLIEB:

Q. Okay. And you've reviewed the topics that we looked at in Exhibit 1?

A. Yes.

Page 137

MS. STEIN: Again asked and answered.

BY MS. GOTTLIEB:

Q. And you are prepared to testify today on those topics?

MS. STEIN: Again, argumentative. Asked and answered.

A. Yes.

BY MS. GOTTLIEB:

Q. Well, so is Blitz aware of any facts relating to the term "bodybuilding supplement product"?

MS. STEIN: Objection. Asked and answered. Object to the extent it calls for attorney-client privilege. But you can go ahead and answer to the extent that it doesn't involve privilege.

A. Please reference David Vingiano's testimony.

BY MS. GOTTLIEB:

Q. Is that the entire basis of Blitz's understanding with respect to the word "bodybuilding supplement," is to reference Mr. Vingiano's testimony?

MS. STEIN: Objection. Argumentative. Calls for a legal conclusion. Calls for speculation. Go ahead and answer, if you can.

A. Blitz's understanding is that the contract was done, the contract was agreed, the contract was negotiated between two different parties, both of whom

Page 138

understood the definition of "bodybuilding supplement." That definition would be known best by David Vingiano or Dan Bilzerian. Corporately I can speak to it -- the only way that I can speak to it is that it's in the contract itself, it says "bodybuilding." I was not involved in the actual negotiation or the actual definition of "bodybuilding supplements."

If you want my personal opinion, it is not, you know -- ZRO is not a bodybuilding -- and also past that, you are asking me questions that you should be asking our expert next week. You are wasting time on asking me questions that I just answered twice already. Ask the expert. That's the person who could speak to it a bit better than I can, because they'll have the background information on everything.

Q. All right. So Blitz's position of what a bodybuilding supplement is, is David -- whatever David Vingiano said about it in his testimony, whatever Dan Bilzerian said about it in his testimony, and what the experts say about, is that -- that's the full scope? Those are all the facts?

MS. STEIN: Objection to the extent it calls for a legal conclusion. Form. Asked and answered, but go ahead.

A. That is correct.

Page 139

BY MS. GOTTLIEB:

Q. There came a time in 2017, shortly after the agreement was entered into, that Blitz asked to amend the agreement; correct?

A. Please reference David Vingiano's testimony where he spoke to that.

Q. Why did Blitz want to amend the agreement in March of 2017?

A. Please reference David Vingiano's testimony where he spoke to that.

MS. STEIN: Sorry. I was on mute and I didn't realize it. I had two objections on those. And I apologize, I just want to say, just for the record, so we can put it on there, it just misstates facts in evidence. And you can read the answers. Sorry about that.

BY MS. GOTTLIEB:

Q. Steel didn't agree to any amendments to the agreement; correct?

MS. STEIN: Objection. Misstates facts in evidence. Lacks foundation. Form. But go ahead.

A. Please reference David Vingiano's testimony, along with the fact that I and -- my understanding is that Steel never was presented with an actual amendment to consider.

Page 140

BY MS. GOTTLIEB:

Q. Why is that your understanding?

A. From David Vingiano's testimony, and everything else is confidential between attorney-client privilege.

Q. So what you just stated as based on whatever Mr. Vingiano may've testified to?

A. Yes.

Q. Okay. So is the basis for Blitz's position regarding any amendments -- any factual basis can be found in Mr. Vingiano's testimony; is that correct?

MS. STEIN: Objection. Misstates prior testimony. Calls for attorney-client privilege and work product, but go ahead.

A. The question, please.

Q. Sure. I'm asking you here about amendments to the agreement, and you are referring me to Mr. Vingiano's deposition testimony, so my question is: Are all of the factual basis Blitz has regarding amendments to the agreement, are they all to be found in Mr. Vingiano's deposition transcript?

MS. STEIN: Again, same objection.

A. Yes.

Q. So Blitz has no other information regarding agreements, amendments to the agreement; correct?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 141

MS. STEIN: Objection. Misstates testimony. Lacks foundation. Calls for attorney-client privilege and work product. To the extent you can answer beyond that.

A. No.

BY MS. GOTTLIEB:

Q. I didn't hear your answer.

A. No.

Q. And was that -- just to clarify, was that, no, you agree with me that Blitz has no other information?

A. No. Well, I'll say it, Blitz has no other information other than what was discussed during David Vingiano's testimony.

Q. Okay. Thank you.

MS. GOTTLIEB: Why don't we take five minutes here.

THE VIDEOGRAPHER: Off the record at 4:01 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record, 4:05 p.m.

BY MS. GOTTLIEB:

Q. I'm going share my screen again and we're going to mark Blitz' Answer and Counterclaim to Steel's Amended Complaint, and I think this is Exhibit 6?

(Exhibit No. 6 was marked for identification.)

Can you see my screen?

Page 142

A. I can.

Q. Are you familiar with this document?

A. Can you go down a little more?

Q. Of course.

A. Yeah, I am.

Q. Okay. How are you familiar with it?

A. I reviewed it prior to the deposition.

Q. Okay. Great. Let's go through some of these. So my first question for you, if you would, please read paragraph 3 and Blitz's answer to yourself, if you need to, and let me know when you are ready.

A. Done.

Q. So my question for you is, what is the factual basis of Blitz's denial of Steel's allegation in paragraph 3?

MS. STEIN: I'm going object to the extent that the document speaks for itself. To the extent it calls for a legal conclusion, but you can go ahead and answer.

A. And I can break it up into different parts, if you'd like. The promoting, endorsing and publicizing competitor's, he didn't do that.

Furthering violation of the agreement -- I'm going to read it -- I'll read it to myself, each portion. I answered the first part of it. He did

Page 143

provide services required by the agreement, to the best of his skill and ability. We discussed that earlier.

Dan has not been involved in immoral acts that adversely affect the reputation of Steel. In fact, it's a double-standard, based upon the things that Jason Steel -- excuse me, Jason Huh has done, which would significantly compromise the reputation of the company as opposed to Dan. Those specifically speaking to steroid use, and how we can believe an immoral act to be something like smoking marijuana, when Jason has been at all the parties, has made posts, basically stating that he is in favor of everything that Dan Bilzerian does in his free time and seems to have been participating in it as well, including threesomes at the parties in which he was invited and participated in as a Steel representative. So if you want to break that down any further, I'll be happy to do so, but that's my overall take on it.

Q. Yeah, let's break that down. Let's go in reverse order, since I believe you are talking about, the last one just now.

You said Mr. Bilzerian has not engaged in immoral acts; is that correct? That was your testimony?

A. That is correct.

Page 144

Q. What are the factual basis for Blitz's position on that?

MS. STEIN: Objection. Asked and answered. To the extent it calls for a legal conclusion, but go ahead.

A. He has not committed any immoral acts.

(Telephonic interruption.)

Sorry. He has not committed any immoral acts.

BY MS. GOTTLIEB:

Q. And you were just talking about Mr. Huh?

A. Uh-huh.

Q. Why did you bring that up?

A. Because if the immoral acts that you guys were speaking to, which you haven't obviously outlined here, but I've heard, are, you know, if you are going to say something about like smoking marijuana and partying. Obviously, Jason Huh is just as guilty, if not more guilty of that and -- in respect to immoral acts, and also things in which, like I said before, engaging in a threesome at a party in which he was participating on behalf of Steel Supplements, in a capacity as himself, but that's the only reason that I made mention of it. So it's kind of a double-standard, that you guys can attack Dan for the way in which he lives his life, which I don't believe to be immoral at all, yet Jason

Page 145

Huh's actions are not immoral and can stand under the agreement.

BY MS. GOTTLIEB:

Q. What knowledge do you have to support the statements you just made about Mr. Huh?

A. Dan's deposition, as well as text messages that Dan has provided between he and Jason Huh. Steroid use, having threesomes.

Q. You didn't witness any of these things you're discussing?

A. No.

Q. So all of the things you just --

MS. STEIN: Hold on. I'm going to object here as, again, he's here in his capacity as a 30(b)(6). You are asking on behalf of Mr. Blitz, not Mr. Verona personally.

BY MS. GOTTLIEB:

Q. What's the basis of Blitz's knowledge for all the things that were just referenced with respect to Mr. Huh?

MS. STEIN: Asked and answered.

A. Jason Huh has posted to social media and has been part of Dan's social media, smoking marijuana.

Q. Your testimony is that Jason Huh has been on social media, smoking marijuana? Was that your

Page 146

testimony? Did I understand that?

A. My testimony is that that's one of the three things in which I can go off of your -- you asked if Blitz has any personal -- like have I ever seen it? The only time that I've seen it happened to be in those posts that either Mr. Huh or Mr. Bilzerian were posting, where the both of them were in it.

As for the other stuff that I had made mention of, those were text messages brought between Dan and Jason, of which I was made aware through his, through Dan's deposition, as well as gathering all the information for you guys during discovery.

Q. What's the factual basis for your statement that Mr. Bilzerian has not promoted, endorsed or publicized competitor's products?

A. He has not.

Q. How do you know that?

A. Because I know that. I've never seen him promote another or publicize another competitor's product, in any capacity that I'm aware of.

Q. And you stated that Blitz did ensure that Bilzerian provided the services required by the agreement to the best of his skill and ability. Is that your testimony?

MS. STEIN: Asked and answered. Go ahead.

Page 147

A. Blitz has not failed.

Q. Okay. What's the basis for that, the factual basis?

MS. STEIN: Again, I'm going to object to the extent it calls for a legal conclusion, and asked and answered, but go ahead.

A. Blitz had -- has acted upon the contract appropriately and in a manner consistent with what they've been asked to do.

BY MS. GOTTLIEB:

Q. How so?

MS. STEIN: Asked and answered. Go ahead.

A. Dan Bilzerian, on behalf of Blitz, was supposed to be posting to his social media accounts, at a rate he believed to be appropriate, in a manner he believed to be appropriate, with what content he believed to be appropriate.

I mean, we're really going -- being redundant on all of this. You can keep on going, but if you can -- can you move a little bit faster because -- like each thing you are asking is like taking forever.

BY MS. GOTTLIEB:

Q. For number -- you can still see my screen; correct?

A. Yes, I can.

Page 148

Q. Read Number 45 to yourself, please.

A. Uh-huh.

Q. What's the basis for Blitz's denial to that allegation?

MS. STEIN: Again, document speaks for itself and object to the extent it calls for a legal conclusion, but you can go ahead and answer.

A. He doesn't have a YouTube page.

BY MS. GOTTLIEB:

Q. Is that the entire factual basis for the denial?

MS. STEIN: Same objection. Go ahead.

A. That is correct.

BY. MS. GOTTLIEB:

Q. Let's go to Number 47. Read that to yourself, please.

A. Okay.

Q. What is the basis for that denial?

MS. STEIN: Same objections, so I don't have to say it again for the reporter.

A. Not all of Bilzerian's texts are highly sophisticated. Oftentimes it's something that he is just doing at the moment. If he is riding in his truck or something like that, and wants to obviously grab the attention of his followers. They're not necessarily

37 (Pages 145 to 148)

Page 149

all highly sophisticated.

BY MS. GOTTLIEB:

Q. Okay. Well, I don't read that to say all of Bilzerian's posts are highly sophisticated. I'm reading, "Blitz and Bilzerian are highly sophisticated in the art of social media influencing."

Is that statement true or false?

MS. STEIN: Objection. Misstates documents. Argumentative. Asked and answered. Go ahead.

A. Let me read it again.

That is correct. The second sentence is what was the basis of denial. Bilzerian's social media posts and stories are carefully measured, to further his goals -- are maintained -- so they aren't carefully measured. The fact is that oftentimes, many of them are carefully measured, some of them are not. Some of them are just off the cuff, basically. Like I said, if he has a visitor over to his estate and she jumps into the trampoline pit, that I don't believe to be carefully measured.

BY MS. GOTTLIEB:

Q. Okay. So does Blitz then dispute Mr. Bilzerian's testimony, where Mr. Bilzerian indicated that his posts are made very carefully?

MS. STEIN: Objection. Argumentative.

Page 150

Misstates prior testimony. Go ahead.

A. I believe that some of his are definitely carefully posted, but not all of them. A lot of thought going into them, but not all of them.

BY MS. GOTTLIEB:

Q. Well, how do we know? How do we know which is carefully measured to further his goals and which aren't?

MS. STEIN: Objection. Form.

A. Again, Dan is the only one in control of his social media. He is the expert on the subject, he knows which ones need to be carefully measured to further his goals of maintaining his lavish social media identity and promoting his business ventures and which ones do not necessarily need to be consistent with that.

Like I said, the example given, a girl jumping into a trampoline, isn't necessarily going to further his goals of maintaining his lavish social media identity and promoting his business ventures. These are Dan Bilzerian questions, that I believe were answered during this deposition, so I ask you to refer to that as well.

BY MS. GOTTLIEB:

Q. Well, you used the trampoline as an example,

Page 151

so what would be an example of a post where Blitz is or Mr. Bilzerian is carefully measuring to further his goals?

A. Steel Supplement posts.

Q. All of them?

A. Yes.

Q. How about ZRO?

MS. STEIN: Objection. Beyond the scope.

A. What was the full question?

BY MS. GOTTLIEB:

Q. Yes, so I'd asked in which posts is Mr. Bilzerian carefully measuring to produce dual goals of maintaining his lavish social media identity and promoting his business ventures. You gave the example of Steel, so now I'm asking does that also apply to ZRO?

MS. STEIN: And I'm going object as beyond scope. He is not here with regards to as a 30(b)(6) or ZRO, he is here for Blitz. And you are asking -- it's beyond topic. He can go ahead and answer if he knows.

A. I do not know.

BY MS. GOTTLIEB:

Q. How about Full Send?

MS. STEIN: Objection as lacks foundation. Go

Page 152

ahead and answer.

A. No. Dan has no relationship, Blitz has no relationship with Full Send. Let's just hopefully end the conversation there, but I know that you are going to keep going, so go ahead.

Q. What do you mean "He has no relationship"?

MS. STEIN: Asked and answered and beyond scope, but go ahead and answer if you can.

A. Dan did not promote Full Send, he -- you know what, he spoke to this in his deposition, so I will refer to his deposition where he can speak more eloquently about it than I can.

BY MS. GOTTLIEB:

Q. Well, you just said he has no relationship, so I want to know what the basis is for the knowledge?

MS. STEIN: Asked and answered.

A. Oh, Dan's depo. Let's go.

BY MS. GOTTLIEB:

Q. He appeared on a podcast for Full Send, didn't he?

MS. STEIN: Objection. Way beyond scope. Misstates testimony. Has nothing to do with posts. Please move on. Go ahead and answer if you can.

A. That was well after anything had happened, after Steel filed.

38 (Pages 149 to 152)

Page 153

BY MS. GOTTLIEB:

Q. So he does have a relationship with Full Send, then?

MS. STEIN: Objection. Misstates testimony. Lacks foundation. Argumentative. And way beyond scope and topic.

A. I'm supposed to be answering based upon this suit, not anything that took place after January -- whenever the filing was made. That's what I've been advised to do, so that's what I'm doing.

BY MS. GOTTLIEB:

Q. Let's go to 48. Read that to yourself.

A. Got it.

Q. What's the basis for that denial?

A. Same thing as what we just discussed. Some posts are shot with the precision of a movie -- not of a movie production, but some he does actually hire some people to do on his behalf, to make it more produced. Other times it's sometimes just something that he quickly shoots with his phone. Again, the example that I will give is a girl jumping on a trampoline.

Q. Okay. Was that response you just gave, that testimony, was that with respect to the first sentence, with respect to both sentences?

A. That would be more respective -- respective to

Page 154

the first part and -- (reading to self) -- yeah, I would believe everything is, so the objection is part of the first part.

BY MS. GOTTLIEB:

Q. Okay. And we can break this down however you need to, so it's clear. All right. So 49. Please read that to yourself.

A. Okay.

Q. What's the basis for that denial?

MS. STEIN: I'm going to object as it calls for a legal conclusion and speculation on the part of Blitz about the reasons why Steel entered into agreement, which are also irrelevant, but you can go ahead and answer.

A. I would say that -- this was all -- this is all in David Vingiano -- excuse me. I ask you to reference Vingiano's testimony for this one.

BY MS. GOTTLIEB:

Q. Blitz doesn't have any other facts about the denial of this allegation?

A. I'm not saying that, but some of it actually happens to be between client-attorney privilege.

Q. Well, outside of anything that's privilege, does Blitz have any other facts?

A. Other than everything that's been -- there's

Page 155

been a ton of stuff provided. I can't necessarily speak to every single piece of document that's been provided. But from what I can recall, everything that you would need in order to have a basis for the denial is between -- it's attorney -- obviously, client confidential, and in Vingiano's testimony, along with the documents presented to you, the litany of documents presented to you during the discovery process.

Q. Let's do this another way. I'm going to read 49.

"In light of Bilzerian's success as a social media influencer, Steel entered into negotiations with Blitz for an exclusive sponsorship agreement."

Answer, "Denied."

So we agree that Blitz entered into an agreement with Steel for an exclusive sponsorship; correct?

MS. STEIN: Asked and answered. Calls for a legal conclusion and speculation, but go ahead and answer.

A. This was also, again, answered in David Vingiano's deposition. I'm leaving it at that.

You can keep asking if you'd like, but I will not say anything more.

***

Page 156

BY MS. GOTTLIEB:

Q. Please read 53 to yourself.

MS. STEIN: Which topic is 53, please?

MS. GOTTLIEB: 24.

MS. STEIN: It's 54, not 53.

MS. GOTTLIEB: Okay.

MS. STEIN: You want him to read 53 or 54?

MS. GOTTLIEB: 53 to start.

MS. STEIN: That's not a topic; correct?

MS. GOTTLIEB: If it's not specifically listed, certainly provides context for 54. Is that going to be an issue?

MS. STEIN: No. I just want to make sure that's what you are having him read it for. Thank you.

MS. GOTTLIEB: Yes.

A. I read it.

BY MS. GOTTLIEB:

Q. So what's the basis for that denial?

MS. STEIN: Again, I'm going to object to the extent that it calls for a legal conclusion, calls for speculation, misstates facts in evidence. Go ahead.

A. This was discussed during David Vingiano's deposition, and I don't believe an amendment was

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 157

actually ever given to Steel.
BY MS. GOTTLIEB:
Q. Why not?
A. Because we've never -- I've never seen an amendment that's been delivered to Steel with this type of language in it. If you'd like to show me it, I'd be happy to take a look at it and comment on it at that point. But again, throughout my diligent review, I did not see anything that would suggest that Blitz had indeed approached Steel and asked them to sign an amendment. I don't see anything that says they signed -- asked Steel to sign an amendment.
Q. Were there other amendments that Blitz asked Steel to sign?
A. No.
Q. No amendments to the agreement?
A. Nothing that was sent to Steel.
Q. And what is the basis for the denial for 54?
MS. STEIN: Again, 54 I'm going to object as far as it calls for a legal conclusion and also speculation on the part of Blitz about with regards to why Steel would do anything, but you can go ahead and answer.
A. Steel was never presented with the amendment.
MS. GOTTLIEB: Just a moment here.

Page 158

Ms. Stein, I'm adding a document to the ShareFile. You should have that momentarily.
MS. STEIN: Which document?
MS. GOTTLIEB: It may take another moment, but it's Vingiano Exhibit 29.
MS. STEIN: Yes, it's there.
(Exhibit No. 7 was marked for identification.)
BY MS. GOTTLIEB:
Q. You can see my screen?
A. Yes.
Q. You see where it says from David Vingiano, David@danbilzerian.com?
A. I do.
Q. Was that David Vigiano's e-mail address?
A. It was.
Q. And to Jason@steelsuppsusa.com. Do you know whose e-mail address that is?
A. I assume it to be Jason Huh.
Q. And you see the subject says "amendment"?
A. I sure do.
Q. Does this appear to be an e-mail that was sent from David Vingiano of Blitz to Jason Huh of Steel?
MS. STEIN: Objection. The document speaks for itself.
A. Sure seems to be one.

Page 159

BY MS. GOTTLIEB:
Q. Why don't you take a moment to read that to yourself?
A. Got it.
Q. I'm going to scroll down now. This references an attachment, Steelsuppsamendment.docx; correct? Is that a yes?
A. Yes.
Q. Just want to make sure I hear you. So I'm scrolling down. Do you see where it says First Amendment to Personal Services Sponsorship License Agreement, dated March underline 2017?
A. I do.
Q. Okay. So does this change your prior testimony at all?
A. No, I see David's -- see David's testimony.
Q. You testified that you weren't aware of any amendments that Blitz sent to Steel; correct?
A. Correct.
Q. Okay. So does looking at this document, refresh your recollection or change your testimony in any way?
A. Well, the testimony remains the same that I don't recall it, but now that you are showing it to me, it seems as if something was sent.

Page 160

Q. Let's go back now to the answer. So you had stated that Blitz denied the allegations in 53 and 54 because there was no amendment presented to Steel.
A. I believe that it's about amending the agreement exclusivity provisions. Doesn't say anything about exclusivity, does it? Is that what it's referencing? Is that what the document is about?
Q. We can take a look at it.
MS. STEIN: Again, same objections from before with regard to the questions. It calls for a legal conclusion.
MS. GOTTLIEB: This is going to be seven, I believe.
BY MS. GOTTLIEB:
Q. Mr. Verona, I'm looking at paragraph C. Can you read that to yourself, please.
A. Okay.
Q. Again, same question for you. The basis for the denial of paragraphs 53 and 54, of Steel's allegations. Does looking at this document change your testimony with respect to those denials?
MS. STEIN: Again, objection to the extent it calls for a legal conclusion. Asked and answered but go ahead.
A. Let me see those numbers again?

Page 161

BY MS. GOTTLIEB:

Q. 53 and 54.

A. I'm trying to remember exactly what this was all about. Was this answered prior or after David Vingiano's testimony?

Q. I'm sorry. Say that again?

A. Were these answered prior to or after David Vingiano's deposition?

Q. See if we can find that answer for you here. Do you see the date up here? Filed March 10th.

A. 2021. So it seems as if we were unaware.

Q. Unaware of what?

A. That an amendment had been sent.

Q. Okay. So now that Blitz is aware that an amendment was sent, does that change the testimony about paragraphs 53 and 54?

A. No.

MS. STEIN: Objection to the extent it calls for a legal conclusion. Go ahead.

A. I don't know for a fact that Steel declined to agree to the amendment. Do you have anything that says, like an e-mail saying, "Absolutely not. We're not going to be -- we're not going to accept the amendment." And if you go back up to 53 -- now I'm remembering it a bit better -- go up to 53 for a

Page 162

second, please. Blitz requested Steel sign an amendment which would allow Blitz to submit request to Steel -- okay, so that one obviously we were unaware of, and seems to be the case that that's what had come to light during David Vingiano's testimony. However, Steel declined -- however, Number 54, Steel declined to agree to the amendment. We don't have any proof that they declined to agree to the amendment and that's why it's been denied.

BY MS. GOTTLIEB:

Q. Let's take that one by one. So let's just go with Number 53 for now. You would agree that Blitz did provide Steel with a proposed amendment; correct?

A. No. And this is why, and now I remember. Blitz did not do that. David Vingiano was Bilzerian Entertainment. David approached him and David was a member of Bilzerian Entertainment. He was not a Blitz employee.

Q. Okay. Let me make sure I understand this. So the basis for the denial for Number 53 is that it wasn't Blitz that approached Steel, it was Bilzerian Entertainment?

MS. STEIN: Misstates prior testimony. Argumentative, and again asking for a legal conclusion. Go ahead.

Page 163

A. Well, it's incorrect. Bilzerian Entertainment approached Steel about amending the agreement's exclusivity provisions, so it is incorrect and that's why it was denied. That's my understanding as to why it was denied. There may be other reasons, but those I would have to discuss with counsel.

BY MS. GOTTLIEB:

Q. Why would Bilzerian Entertainment approach Steel versus Blitz?

MS. STEIN: Objection. Calls for speculation. Lack of foundation and beyond scope. Go ahead.

A. David Vingiano was an employee of Bilzerian Entertainment, not Blitz.

BY MS. GOTTLIEB:

Q. How is Steel to distinguish between Blitz and Bilzerian Entertainment?

MS. STEIN: Objection. Calls for speculation as to what Steel would know or not know. Go ahead and answer if you can.

A. I don't know.

BY MS. GOTTLIEB:

Q. Please read Number 57 to yourself.

A. Got it.

Q. Basis for that denial?

MS. STEIN: I'm going to object here on the

Page 164

basis it calls for a legal conclusion. But go ahead and answer.

A. He did not promote, publicize or endorse competitor products.

BY MS. GOTTLIEB:

Q. Read Number 60 to yourself, please?

A. Okay.

Q. What's the basis for that denial?

MS. STEIN: Objection to the extent it calls for a legal conclusion. Go ahead.

A. I don't categorize that as an endorsement, based on Dan's testimony, which you can reference in Treigning Lab product is L-Tryptophan. Tryptophan has nothing to do with a competitor -- a competitor product.

BY MS. GOTTLIEB:

Q. Okay. Let's break that down a little bit. So you said wouldn't characterize as an endorsement. Is that what you just testified?

A. Based upon Dan's deposition, yes, so I'd reference Dan's deposition when it comes to that.

Q. Number 60 says, "As depicted in the screenshot from Bilzerian's Instagram story below, Bilzerian endorsed the Treigning Lab product, the L-Tryptophan supplement, clearly bearing the Treigning Labs name and

41 (Pages 161 to 164)

Page 165

logo."

Answer "Denied."

So is the only basis for the denial the term "endorsed"?

MS. STEIN: Objection. Misstates prior testimony. Asked and answered, but go ahead.

A. As I said before, please reference Dan's deposition in which he spoke to it.

BY MS. GOTTLIEB:

Q. Well, these are Blitz's answers to Steel's complaint; correct?

A. Yes, and Blitz answered them during Dan's deposition.

Q. Please read 61 to yourself.

A. Okay.

Q. What's the basis for Blitz's denial to the allegation in paragraph 61?

MS. STEIN: Again, objection, to the extent it calls for a legal conclusion, but go ahead.

A. And I would ask that you reference Dan's testimony, but I'll also say that just because it has one component of -- they share one component with one another, that being tryptophan, that doesn't necessarily mean that's their products --

Q. You cut out the last part of what you said?

Page 166

A. There are products out there that have tryptophan in them, that does not mean that they are actually competitive products with one another. So by saying that the product competes with Steel because it has L-tryptophan in it is ludicrous, because a million different products have L-tryptophan in them. Turkey has L-tryptophan in it, so basically if you are saying, you know, eating a turkey competes with a Steel product.

Q. Please read paragraph 70 to 72 to yourself. Actually, I'm sorry. Just start with 70.

A. Okay.

Q. What's the basis for that denial?

MS. STEIN: I'm going to object to the extent it calls for a legal conclusion. Go ahead.

A. My understanding is that it was actually co-founded in 2017 under a different entity named -- (technological interruption) -- enterprises.

BY MS. GOTTLIEB:

Q. But it's correct Mr. Bilzerian is a co-founder of Ignite?

MS. STEIN: Asked and answered, but go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. I didn't hear you?

Page 167

A. Yes.

Q. Read 71 to yourself, please.

A. Okay.

Q. What's the basis for that denial?

MS. STEIN: I'm going to object to the extent it calls for a legal conclusion, and also as it relates to prior testimony, but go ahead.

A. And I believe that this is simply denied because it didn't necessarily specify the company within Ignite in which it was unveiled.

BY MS. GOTTLIEB:

Q. Read 72 to yourself, please.

A. Got it.

Q. What's the basis for that denial?

MS. STEIN: Again, objection to the extent it calls for a legal conclusion. Go ahead and answer.

A. Blitz has never heard nor seen it marketed as a performance drink.

BY MS. GOTTLIEB:

Q. Can you repeat that. I want to make sure I heard you correctly.

A. Blitz has never seen nor heard it referred to as a performance drink.

Q. Is Blitz aware that ZRO is sold in supplement stores like The Vitamin Shoppe?

Page 168

A. Blitz was aware, yes, that it was sold at The Vitamin Shoppe.

Q. Okay. So the basis for the denial is only that Blitz was unaware that ZRO was marketed as a performance drink; is that correct?

MS. STEIN: Objection. Misstates prior testimony. Misstates the document. Lacks foundation. Asked and answered. Go ahead.

A. As I had said before, yes, the reason for the denial was that Blitz was unaware of it being marketed as a performance drink.

Q. Read 79 to yourself, please.

A. Okay.

Q. What is the basis for that denial?

MS. STEIN: I'm going to object again, the basis is it calls for a legal conclusion, and also relates to an entity that is not Blitz, but go ahead.

A. I have no idea what's in ZRO. That's why it was denied.

Q. You have no idea or Blitz has no idea?

A. Blitz has no idea what ingredients are in ZRO.

Q. Please read 93 to yourself.

A. Got it.

Q. What's the basis for the denial?

42 (Pages 165 to 168)

Page 169

MS. STEIN: Object to the extent it calls for a legal conclusion, based on misstates facts in evidence, but go ahead.

A. One, Bilzerian's relationship with Steel wasn't a violation of Federal Trade Commission. Two, if it were a violation of Federal Trade Commission, the ones that should be -- that violated would be Steel supplements, not Dan Bilzerian, that's why the answer was denied. That's why the answer was, yeah, denied.

MS. GOTTLIEB:

Q. You testified earlier that Mr. Bilzerian had not disclosed the nature of his relationship with Steel to the public; correct?

MS. STEIN: Asked and answered. Go ahead.

A. That is correct. That's why he did not violate it.

BY MS. GOTTLIEB:

Q. Explain that.

A. (Reading to self.)

My understanding is that because he is not officially associated with Steel in the capacity that it was announced, he doesn't necessarily need to disclose the nature of his relationship with Steel. Steel was the one that was required to disclose that relationship with the FTC, not Bilzerian.

Page 170

Q. Okay. Read Number 95 to yourself, please.

A. You got to give me a minute. There are a lot of these, so I need to read this one for a second. It's denied because he didn't want to necessarily disclose what type of relationship he had with Steel because then there would be an issue with the Federal Trade Commission and that would probably be more so an issue of Steel getting in trouble rather than Dan.

Q. Did Mr. Bilzerian --

A. She's frozen again.

Q. No. I heard you -- I'm thinking I heard you mention something about the FTC, but this allegation doesn't talk about the FTC. So it says, "Bilzerian did not decline to disclose his relationship with Steel to make his postings appear more organic to increase consumer interest and in turn increase his profit share of Steel sales," so --

A. It was denied because he denied to disclose his relationship with Steel because of FTC regulations, not because of what that latter part of the paragraph suggests.

Q. Did Mr. Bilzerian attempt to make his postings organic to increase interest?

A. He did. There are multiple reasons, so that happened to be one as well.

Page 171

Q. I see. So Number 95, the allegation is not untrue, it was denied because it was lacking additional information; is that correct?

A. Partially true.

Q. But so this statement in Number 95 is true?

MS. STEIN: Objection. Misstates prior testimony. Asked and answered.

A. It is not true because it does not contain the other reason that I had given you.

BY MS. GOTTLIEB:

Q. Okay. But if it contains the other reason, it would be true?

MS. STEIN: Objection. Calls for speculation. Go ahead.

A. Yes.

BY MS. GOTTLIEB:

Q. Number 96, please read that to yourself.

A. Okay.

Q. What's the basis for that denial?

MS. STEIN: Objection to the extent it calls the for a legal conclusion. Go ahead.

A. Bilzerian and Blitz did everything that was required of them per the agreement to make sure that he -- that Dan was properly promoting the brand as consistent as it needed to be with the contract that

Page 172

was agreed upon by both parties, so in no way was Dan taking his own self-interest ahead of Steel's interest and Steel's consumer goodwill.

BY MS. GOTTLIEB:

Q. You said Mr. Bilzerian never put his own interest ahead of Steel; is that correct?

MS. STEIN: Asked and answered. Go ahead.

A. I mean, of course at times, you know, Dan is going to put his own self-interest ahead of anybody, I mean, if he put -- I mean, I'm going to put my self-interest ahead of Dan at times, so yes, he will put his self-interest, but not -- not ahead of Steel's, not all the time ahead of Steel's interest and Steel's consumer goodwill. He had every reason as to promote them in a way in which he believed to be appropriate, so as the sales would increase, and if sales would increase, then he would move on to a larger percentage of the profits -- excuse me, gross revenue, gross profits.

BY MS. GOTTLIEB:

Q. Would Mr. Bilzerian focusing on his book be an example of Mr. Bilzerian putting his own interest ahead of Steel?

MS. STEIN: Objection. Argumentative. Calls for speculation. Beyond topic. Go ahead and

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 173

answer.

A. Please refer to Dan's testimony with respect to that.

BY MS. GOTTLIEB:

Q. And what about with respect to Ignite? Was Mr. Bilzerian's post for Ignite -- rather than post for Steel, an example of the time when Mr. Bilzerian might have put his own interest ahead of Steel's?

MS. STEIN: Same objections.

A. Same answer. Please refer to Dan's testimony where he spoke to this.

BY MS. GOTTLIEB:

Q. Please read 104 to yourself.

MS. STEIN: Again, what topic is 104 or does this relate to 105?

MS. GOTTLIEB: Relates to 105.

MS. STEIN: Okay.

A. Okay.

BY MS. GOTTLIEB:

Q. What is the basis for the denial of paragraph 104?

MS. STEIN: Objection to the extent it calls for speculation and the extent it calls for legal conclusion. Go ahead.

A. The substantial amount of time is not defined

Page 174

and I don't believe that there was a substantial amount of time in which he only promoted Veg Pro Peanut Butter protein powder without other supplements being included in the posts.

BY MS. GOTTLIEB:

Q. What's the basis for that knowledge? Why don't you believe that?

A. Based on Dan's -- based on all the discovery that's come through, as well as Dan's deposition, as well as some stuff that was discussed behind attorney privilege.

Q. Okay. Well, I don't want to know about the attorney privilege, but what -- specifically, you say stuff that's come through and stuff Mr. Bilzerian talked about, what specifically are you referring to?

A. I don't understand your question.

Q. You mentioned there were -- you gave me a few reasons, I thought, why that statement that Mr. Bilzerian hadn't posted about anything except Veg Pro for an amount of time wasn't true. You testified, I believe, that it was based on what Mr. Bilzerian said. You said there were things that had come through, I think were your words. So I'm just looking for the factual basis of why you think there was not a period of time where Mr. Bilzerian would only post Veg

Page 175

Pro Peanut Butter?

MS. STEIN: Asked and answered.

A. First off, you are saying a period of time. In this it says, "A substantial amount of time." So a substantial amount of time is not very descriptive as to how much time that actually is, so that's point number one.

"Bilzerian would only post about one of Steel's products" -- that is just not true because you can see from the posts that you discussed with Dan during this deposition, as well as what has been available in discovery, that he did not only post about Steel's products, the Veg Pro, during this whatever you called substantial amount of time. Because you haven't even defined it. What is a substantial amount of time? Four days? Four weeks? Four months? No idea.

Q. You said "can see from posts." Are there any specific posts that you are thinking of?

A. No, but if you want to show me them. If you are prepared to show me some that can show them only being promoting Veg Pro, I'd be happy to take a look at it and comment on them at that time.

Q. Please read 107 to yourself.

A. Okay.

Q. What's the basis for that denial?

Page 176

MS. STEIN: I'm going to object as it calls for a legal conclusion, also misstates the document, and the document speaks for itself.

A. Document certainly speaks for itself, and Blitz would not receive a commission based on percentage of certain categories. Blitz would be entitled to a percentage of the overall gross monies received by Steel. Not certain categories, the overall monies received, including returns, shipping, any of that stuff that should've been put there as well.

BY MS. GOTTLIEB:

Q. What's the basis for that statement?

A. The basis is the agreement that was signed by both parties and spoke to by David Vingiano during his testimony, as well as Dan Bilzerian's during his testimony, and my review of the object itself.

Q. Okay. So that's Blitz's interpretation of the agreement, and it's based on previous testimony we heard in this case; is that accurate?

MS. STEIN: Objection. Calls for a legal conclusion. Misstates prior case testimony.

A. And also, just to put out there -- we'll get to that, but go ahead. I'm sorry.

And also, I will put that out there in this, actually. Let me add something to that, actually.

| Page 177 | Page 179 |
|---|---|
| Percentage of certain categories, not for nothing, obviously, and it's been said many times before, but there were many things that were hidden that had to be found out by me as to where Steel was making other amounts of money. Specifically, being Amazon and wholesale so -- I just want to put that on the record right now if we don't actually get to that statement in which it was denied, so... | wholesale? |

**Page 177**

Percentage of certain categories, not for nothing, obviously, and it's been said many times before, but there were many things that were hidden that had to be found out by me as to where Steel was making other amounts of money. Specifically, being Amazon and wholesale so -- I just want to put that on the record right now if we don't actually get to that statement in which it was denied, so...

Q. Can you explain that, what do you mean things were hidden with Amazon and wholesale?

A. And this actually relates back to -- and I probably should've made mention of this back when you were talking about immoral acts. I believe an immoral act, also specifically speaking to that clause, but it kind of -- is consistent with what's asking here.

They did not disclose any Amazon or wholesale sales for well over -- about a year. I would say about 12 or 13 months, when they were in business with Dan. They hid those monies, and instead had only been giving him a percentage of the sales from Steelsupplements.com. And to that effect, too, as far as these percentages, and categories and stuff, our expert, obviously, would speak to this a bit better than I can.

I will say that this is, you know, did not

**Page 178**

disclose -- the contract was for gross sales of everything, not certain --

Q. What's the basis for saying that Steel hid it?

A. Because they never disclosed it. They would send me reports every month of how much the company had made. They would give me access to their back end, to see what they had made in Steel supplements. And until I asked them were they making monies elsewhere other than Steelsupplements.com, did they actually start being truthful and tell me, "Yes, we have been."

To which I asked, "For how long have you been?"

"Since the inception of Dan's deal."

Great. So we had to actually go back and we had to reconcile with them for the many months that they never disclosed those profits or those gross sales, and I think that that's extremely immoral and, obviously, put them in breach of contract way back when.

Q. Do you know when Steel started selling on Amazon?

MS. STEIN: Objection. Calls for speculation. Go ahead.

A. I do not recall.

Q. Do you know when Steel started selling

**Page 179**

wholesale?

MS. STEIN: Same objection.

A. I do not recall.

BY MS. GOTTLIEB:

Q. Please read paragraph 116 to yourself.

A. Please refer to David Vingiano's testimony as far as that's concerned.

MS. STEIN: I'm just going to object to the extent it calls for a legal conclusion.

BY MS. GOTTLIEB:

Q. Please read paragraph 131 to yourself.

A. Got it.

Q. What is the basis for that denial?

MS. STEIN: Again, objection to the extent it calls for a legal conclusion, but you can go ahead and answer.

A. Blitz has indeed ensured that Bilzerian provides the services to the best of his scope and ability. Blitz is not in breach of the agreement.

Q. I didn't hear the last part of what you said.

A. Blitz has not breached the agreement.

Q. So how has Blitz ensured that Bilzerian provides the services to the best of his skill and ability?

A. Bilzerian being -- Blitz being Bilzerian and I

**Page 180**

guess, to a certain sense, myself on a corporate capacity, he has posted consistent with what was obligated of him to his best skill and ability, based upon his expertise in the area and what he believed to be best -- in the best interest of not only himself but more specifically the relationship with Steel. The contract allowed him to do what he believed would be best and he did that.

He built that company from nothing to what it is right now. So with that, I mean, you know, the numbers can't lie, especially the first three months of that relationship.

Q. So Blitz's position is that the best of Bilzerian's skill and ability is what Mr. Bilzerian says it is?

MS. STEIN: Objection. Argumentative. Asked and answered. Misstates prior testimony. Go ahead.

A. What I said before.

MS. STEIN: So you know, you are still sharing.

(A discussion was held off the record.)

BY MS. GOTTLIEB:

Q. Mr. Verona, do you have a response?

THE WITNESS: What was the question?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 181

MS. STEIN: What was the question? Sorry. I have no question either, Sarah.

BY MS. GOTTLIEB:

Q. I asked you if it's Blitz's position that the best of Bilzerian's skill and ability is whatever Mr. Bilzerian says it is?

MS. STEIN: Asked and answered.

A. I answered it.

Q. I didn't hear you.

A. I answered it and I said that I'm sticking with my answer that I've already given you.

Q. Okay. And what was that?

A. You have it -- you have it, you've written it down. I don't have to repeat myself.

Q. This would probably go faster if you just let me know what you said if I didn't hear it.

A. It's possible this could go any faster? Blitz has not ensured that --

(Court reporter clarification.)

BY MS. GOTTLIEB:

Q. I'm going to ask you the question again so we have a clean record.

A. Go ahead.

Q. Mr. Verona, my question is, is the best -- is it Blitz's position that the best of Mr. Bilzerian's

Page 182

skill and ability is whatever Mr. Bilzerian says it is?

MS. STEIN: Objection. Asked and answered. Argumentative.

A. Yes.

MS. GOTTLIEB: Let's take ten minutes here.

THE WITNESS: Come on. For what?

MS. STEIN: Why do we have to do ten? Can't we just do five? Again, we're trying to get done here so Kevin can get to his family.

MS. GOTTLIEB: Right. But Kevin also asked to start at 11:30, which was an hour and a half after it was scheduled.

MS. STEIN: Because that would've been 7:00 a.m. for us, I'm sorry, for myself and the witness.

MS. GOTTLIEB: Right and we have seven hours of take time, so I mean the quicker --

MS. STEIN: We wasted a lot of time going through ridiculous questions and we only have -- from my calculation, we have five topics left, so can we not get this done? Why do we need ten minutes?

MS. GOTTLIEB: We're taking ten minutes. Off the record, please.

MS. STEIN: I'll add that to the record.

Page 183

THE VIDEOGRAPHER: Off the record, 5:12 p.m. (A brief recess was taken.)

THE VIDEOGRAPHER: On the record, 5:20 p.m.

BY MS. GOTTLIEB:

Q. Mr. Verona, I have some questions for you about Blitz's defenses to Steel's amended complaint. I'm going to scroll down now to that portion. I'm going to share my screen in a moment.

Mr. Verona, would you take time to read the second defense to yourself.

MS. STEIN: To yourself.

A. Okay.

Q. My question is, what are the factual basis for that defense?

MS. STEIN: Objection to the extent it calls for a legal conclusion. You can go ahead and answer.

A. The posts that Blitz has seen with Jason and them and Dan, depicting Dan's lifestyle, and also the text messages which were reviewed, that discuss Jason Huh's use of steroids, as well as -- obviously, that being a immoral and criminal -- as well as sexual escapades that wouldn't necessarily be considered the norm.

Q. Okay. So Blitz's factual basis is based on

Page 184

text messages that were produced in this case and --

MS. STEIN: Objection. Misstates prior testimony.

A. I've done this with you before, Sarah. Text messages, as well as posts in which I've seen Jason and Dan enjoying the Bilzerian lifestyle.

I hate to do this, but I need to take a two-second break because I forgot to get a cup of coffee and I really need one.

Can I take like a one-minute break here.

MS. GOTTLIEB: Fine with me.

THE WITNESS: Kim?

MS. STEIN: That's fine.

THE VIDEOGRAPHER: Off the record, 5:23 p.m. (A discussion was held off the record.)

THE VIDEOGRAPHER: On the record, 5:25 p.m.

BY MS. GOTTLIEB:

Q. Mr. Verona, I was asking you the basis for Blitz's second defense. And you mentioned text messages, posts, is there anything else? Any other facts I need to know that form the basis of that defense, that we're going to hear about at trial?

MS. STEIN: Objection to the extent it calls for a legal conclusion and also to the extent it calls for work product. So you can go ahead and

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 185

answer to the extent you know.

A.  I do believe that an extensive amount of paperwork was provided on this.  I can't necessarily point to exactly which documents that were produced, would speak to that, but there are other documents that speak to it as well.

MS. STEIN:  I want to note for the record, Kevin McCoy has dropped off.  We can still continue.

MS. GOTTLIEB:  Do we want to wait for him to come back?

MS. STEIN:  He is not coming back.  He had to go.  It's fine.  I'm here.

MS. GOTTLIEB:  I'll share my screen again so we can move to the next one.

BY MS. GOTTLIEB:

Q.  Would you please read the third defense, to yourself?

A.  Okay.

Q.  What is the factual basis for that defense?

MS. STEIN:  Again, objection, to the extent it calls for a legal conclusion.  Go ahead.

A.  They didn't pay -- they didn't pay returns.

Q.  Where does that information come from?

A.  E-mail sent to me from Medhy Karbid, based

Page 186

upon sales each month and also -- not for nothing, whatever our experts are going to be testifying as to which -- what payments they did not make us aware of or -- including a company called CM Innovations, but I think that the expert, the financial expert is going to speak to it better than I can.  But from a kind of broader stroke, I know that the e-mails each time that they were sent to me did not include returns or payments weren't based upon gross sales because they took out returns first.

Q.  Any other facts?

A.  I'm sure that there are more facts that are in the documents that have been presented during discovery, but I can't remember anything else right now.

Q.  Can you read the fourth defense to yourself, please.

A.  Okay.

Q.  What is the factual basis for that defense?

MS. STEIN:  Objection to the extent it calls for a legal conclusion.  Go ahead.

A.  Basically, what I stated before.  Jason has committed immoral acts, those being using steroids, referencing certain people by derogatory names, such as "faggot" or the "N" word, as well as -- as well as,

Page 187

obviously, not disclosing all the monies in which Steel was making to their biggest -- the person that is bringing them in the most significant amount of money.

BY MS. GOTTLIEB:

Q.  Do any of those facts come from any documents that were not produced in this case?

A.  No.

Q.  And what was the basis for your last statement?

A.  The basis for my last statement were the -- obviously, communications that I've had with Steel, where they admitted that they weren't reporting all of their income or their gross sales -- I'll try to use that as much as I can possibly can, the gross sales -- the criminal contact and the utilization of derogatory terms were in text messages between he and Dan Bilzerian -- yeah.

Q.  How does Blitz know that -- what's the factual basis for your statement that Blitz -- that Bilzerian brings in the most money for Steel?

MS. STEIN:  Objection, on the fact that it misstates facts in evidence.

A.  My factual reference for that is the amount of money that they went up when he started posting on their behalf.

Page 188

BY MS. GOTTLIEB:

Q.  Do you have any data?

A.  I don't have any data, nor has Steel ever produced any data to suggest that it wasn't the reason why.

Q.  You don't have any information about Steel's marketing; correct?

MS. STEIN:  Objection.  Asked and answered. Go ahead.

A.  I asked for their marketing and for whatever reason I was told by Steel that they couldn't provide me with their marketing budget because it somehow tied into Jason Huh's income tax, which to me made no sense at all, and I believe made no sense at all to Dan as well, but we didn't push them on it.

BY MS. GOTTLIEB:

Q.  Did you review the marketing data that Steel produced in this case?

A.  The only marketing data that I remember them to have produced were the best posts that Dan had done.

Q.  Did you review any other data that Steel produced?

A.  I reviewed everything.  I can't necessarily speak verbatim to everything that was produced, talking about thousands of pages of documents, once again, but

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 189

I can speak to what I remember seeing.

Q. Well, of all -- does anything else stand out to you of all the documents?

A. No.

Q. Would you read the fifth defense to yourself, please. Let me know when you need me to scroll.

A. Okay. You can scroll down. Got it. Got it.

Q. Okay. And so my question, of course, is what are the factual basis for the fifth defense?

MS. STEIN: Object to the extent it calls for a legal conclusion. Document also speaks for itself, but go ahead.

A. Scroll back to the top and we can go through it individually, because there's quite a lot of line items in there.

Fifth defense, okay. Jason is discussing Dan's launch of the Ignite brand or product lines of -- Jason did that -- Jason was, actually, I believe, present at Ignite's launch and was well aware of the product lines in which they were offered.

Q. Let's -- I'm sorry to -- go ahead. I'm sorry.

A. So Jason Huh posing in social media pictures with individuals. Those were obviously up on social media for anybody to see. Obviously, from the YouTube video, you can get everything else that was mentioned

Page 190

subsequent to the posting of the link.

Go down. Dan thought that he had no problem with the Treigning Lab post, as obviously discussed in this text message conversation between Dan and Jason.

Q. Did you say Mr. Huh was present on a ZRO launch?

A. I said Ignite launch. He may have been present at the Ignite brand launch. Definitely -- I don't think he was present -- there wasn't a ZRO launch, that I'm aware of.

Q. Okay. When would the Ignite brand launch have been?

A. Probably summer of 2018.

Q. And why is that relevant to Blitz's defense?

A. Go back up.

MS. STEIN: Objection to the extent that calls for a legal conclusion, but go ahead.

A. Because by attending those parties he's admitting that some of this stuff that he believes to be immoral acts of Dan or not supporting the brand and the components of the brand, obviously, are being seen by his attending the parties. Not having any issues attending the parties, being that he believes Dan participates in immoral acts is ridiculous, considering the fact that he's been to those parties, has posted on

Page 191

social media and -- yeah. That's basically why.

Q. You testified earlier that Ignite sells a number of different types of things; correct?

A. That is correct.

Q. Okay. Was there anything else, any other facts that support the fifth defense that we haven't already discussed?

A. No, not that I can recall.

Q. Please read the sixth defense to yourself.

A. Okay.

Q. What are the factual basis for the sixth defense?

MS. STEIN: Objection to the extent it calls for legal conclusion.

A. And Dan spoke to this specifically in his deposition, so please refer to that as to what the deals that he turned down because of his involvement with Steel.

BY MS. GOTTLIEB:

Q. Any other facts, or just rely on what Mr. Bilzerian testified to?

A. There may be others in the -- in some of the documentation that was provided during discovery.

Q. Anything that stands out to you?

A. No, but if you have anything to show me, then,

Page 192

I would be happy to speak on it -- speak to it.

Q. Anything you are relying on or thinking of from a document that was not produced in this litigation?

A. No.

Q. All right. Mr. Verona, we don't have very much, just longer, maybe just a few more minutes. I just have a couple of more questions for you. I'll stop sharing.

So earlier, toward the beginning of the deposition I was asking you about Mr. Bilzerian's posts on social media. And it was Blitz's position -- tell me if I'm incorrect -- but I understood your testimony to be Blitz's position was that Mr. Bilzerian promoted ZRO, but Mr. Bilzerian did not promote the Treigning Labs and did not promote Full Send; correct?

MS. STEIN: Asked and answered, but go ahead.

A. That is correct.

BY MS. GOTTLIEB:

Q. And what is it about Dan's -- Mr. Bilzerian's social media posts related to ZRO that allowed Blitz to determine that Mr. Bilzerian promoted ZRO? What about the posts made them a promotion of ZRO?

MS. STEIN: Objection to scope. Calls for speculation. Lack of foundation, but go ahead.

48 (Pages 189 to 192)

Page 193

A.  And I believe you can rely on Dan's testimony as far as that's concerned.  I can't speak to his thought process as to what he believes to be most appropriate for each brand that he represents in one way or another.

Q.  Well, that wasn't really my question.  I mean, I'm asking based on what you testified earlier.  You testified Mr. Bilzerian's posts for ZRO, that was a promotion.  But that Mr. Bilzerian did not promote the Treigning Labs and did not promote Full Send.  So, again, my question is:  What makes the posts for ZRO a promotion?

MS. STEIN:  Again, asked and answered.  Argumentative.  Go ahead.

A.  Dan, one, is the CEO of the company, so he has a financial stake in the company and has incentive towards promoting it.  Full Send and Treigning Lab, he has no incentive for promoting either brand, nor had he ever done so.

Q.  So -- okay, so I want to make sure I understand.  So Blitz's position is that a promotion has to do with whether -- scratch that.

Blitz's position is a promotion is based on whether Mr. Bilzerian has a certain interest in the product or the company he's posting about; is that

Page 194

correct?

MS. STEIN:  Objection to the extent it calls for a legal conclusion.  Misstates prior testimony and form.  Go ahead.

A.  No, you are saying whether or not Mr. Bilzerian needs to be compensated in any way?  No.  If he wants to promote something on behalf of a friend or something, and he believes that to be appropriate for that person, he's very -- he very well could.  Like, I'm sure that he promotes, you know, Steve Aoki when he goes out to an event or something like where Steve is performing.

As far as -- I mean, if you are going to tie it down to compensation, there are other factors that go into it, for sure.  What I can tell you and I -- you know, I've used this, but it's ad nauseam -- there was absolutely no relationship between he and Full Send and/or Treigning Lab to have done that for anything other than to make it a more organic post on Steel's behalf.  Which again, was shown in the text messages between he and Huh, to suggest that Huh and the team were very pleased with the post.

MS. GOTTLIEB:  I'm going to share my screen in a moment.  I'm just pulling up what I need.  We're going to be adding some more documents to the

Page 195

ShareFile.  Do you want to wait a moment until that comes through to you or do you just --

MS. STEIN:  Yes, I just -- I want to see it.

MS. GOTTLIEB:  Okay.  It will just be a moment.  Let's go off for a few.

THE VIDEOGRAPHER:  Off the record at 5:45 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER:  On the record at 5:49 p.m.

BY MS. GOTTLIEB:

Q.  Mr. Verona, Mr. Bilzerian intentionally marketed ZRO to his followers on his social media; correct?

MS. STEIN:  Objection.  Calls for a legal conclusion.  Misstates facts in evidence.  Argumentative.  Form.  Go ahead.

A.  Yes, and you can reference Dan's deposition, please, for more specific information on that.

BY MS. GOTTLIEB:

Q.  Okay.  So we're going to look at a couple of things.  Mr. Verona, is this a post that Mr. Bilzerian made?

MS. STEIN:  Again, I'm going to object.  Beyond scope.  Lacks foundation.  Misstates facts in evidence, but go ahead.

A.  I believe it is, but Dan spoke to it on his

Page 196

deposition, so please rely on what he had to say about it.

BY MS. GOTTLIEB:

Q.  This is a ZRO can here; correct?

A.  It seems to be.

Q.  Okay.  And so this is a promotion Mr. Bilzerian did for ZRO?

MS. STEIN:  Objection.  Calls for a legal conclusion.  Misstates facts in evidence.  Beyond scope.  Go ahead and answer it.

A.  Dan spoke to that in his deposition, please rely on that.

BY MS. GOTTLIEB:

Q.  If Dan says this is a promotion, then this is a promotion?

A.  I'm in line with whatever Dan had said, so if that's what Dan had said, I'm in line with that.

MS. GOTTLIEB:  And I will mark this as Exhibit 8.  I believe we're up to Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MS. GOTTLIEB:

Q.  Mr. Verona, does this also appear to be one of Mr. Bilzerian's posts that he did promoting ZRO?

MS. STEIN:  Again, beyond scope.  Misstates facts in evidence.  Lacks foundation.  Form.  You

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 197

can go ahead.

A. It looks to be; however, I would rely on Dan's deposition.

BY MS. GOTTLIEB:

Q. I'll play a video and then I'll ask you about it. Do you recognize that video, Mr. Verona?

MS. STEIN: Again, same objections. Go ahead.

BY MS. GOTTLIEB:

Q. I didn't hear you.

A. I do.

Q. What is that video?

MS. STEIN: Again, same objections.

A. Dan spoke to it at his deposition and I stand by what he had to say about it.

Q. That was the Full Send bag in the back of the truck; is that correct?

A. There is a Full Send bag in the back of the truck, a bag that says Full Send on it in the back of the truck, yes, I can see that.

Q. Okay. But it's Blitz's position that that post was not a promotion for Full Send; correct?

A. Correct.

MS. STEIN: Asked and answered.

BY MS. GOTTLIEB:

Q. I didn't hear you.

Page 198

A. Correct.

Q. Okay. So what is the difference between a post like that for Full Send, including a Full Send bag, that's not a promotion, and a post like the ones we just saw that included the ZRO can, that were promotions? What's the difference?

MS. STEIN: Objection. Form. Misstates actual facts in evidence. I'll be honest, that form, I'm not even sure how he can answer that, but if he can, he can try, but the way that was worded, I would probably tell you to reword it and it's also compound. Go ahead.

A. I mean, I'm not a social media expert. Dan is, so he makes decisions as far as what is a promotion and what is not a promotion. It would be completely subjective for me to sit here and say, yes, that's a promotion and something else isn't a promotion. But again, please rely on Dan's testimony. What I can say from a Blitz corporate perspective is that there was no relationship between Full Send and Dan Bilzerian. As far as why the bag was in there, Dan spoke to it, per the -- you know -- I don't think there's any denying as to the reason or any reason to not -- to be suspect of the reason as to why he said the bag was there.

Q. So a promotion is what Mr. Bilzerian considers

Page 199

to be a promotion; is that correct?

MS. STEIN: Objection. Misstates testimony. Form. Go ahead.

A. I don't know what Mr. Bilzerian thinks. I'm not in his head. If he answered that during his deposition, then that's indeed what I will stay in line with. I don't remember his deposition verbatim, but if he had said that, then I will stand in line with him on that.

Q. Okay. Just so I'm clear, because, again, you are here as the Blitz corporate rep. Blitz's position as to what a promotion is, when Mr. Bilzerian posts, is what Mr. Bilzerian says is a promotion or is not a promotion; correct?

A. Yeah. You know what? I'll say yes to that so we can move on, yes.

Q. You testified earlier that Full Send -- scratch that. Let me start over.

Do you remember the last video that I just played for you? Do you need to see it again? I'm about to ask another question.

A. I do not need to see it again.

Q. Did you see Steel anywhere in that video?

A. I don't remember seeing Steel in that video.

Q. Let's play it again just to be sure.

Page 200

MS. STEIN: Objection, the video speaks for itself, and I object to the title of the document as you put it up there. Go ahead. It's not playing.

(Video playing.)

BY MS. GOTTLIEB:

Q. So no Steel in the video; correct?

MS. STEIN: Same objection. Go ahead.

A. It's in the video, there is no Steel in the video.

Q. Okay. You testified earlier that Mr. Bilzerian's posts for Full Send -- or scratch that.

You testified earlier that Mr. Bilzerian's inclusion of Full Send in a post was only because he wanted to make posts more organic for Steel; correct?

MS. STEIN: Objection. Misstates prior testimony.

A. I never said that.

BY MS. GOTTLIEB:

Q. What were you referring to when you said that if Mr. Bilzerian is including others, that he's doing it to make it more organic on behalf of Steel?

MS. STEIN: Objection. Misstates prior testimony. Form. Go ahead.

A. Just something that he uses, and it is organic

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Page 201

to say, "I use, you know, a Steel product and I use this other product that helps me sleep."

BY MS. GOTTLIEB:

Q. I'm going to pull up one more and we'll be done in a couple of minutes.

A. Okay.

Q. Mr. Verona, I'm going to play this and I'll ask you a couple of things.

Do you see at the top the file name, TCS Steel underscore?

A. I do.

Q. Okay. So do you understand that that means this was produced by Steel in this litigation?

A. If that's what you are telling me, then I'll believe it.

Q. Just having a tech issue, I'll take a moment, please.

MS. STEIN: Do you want me to try to share and play it?

MS. GOTTLIEB: No. I think I just need a minute. Thank you.

BY MS. GOTTLIEB:

Q. Mr. Verona, are you there?

A. I'm here.

Q. So I'm going to play this video and I'll ask

Page 202

you a couple of things.

(Video playing.)

Mr. Verona, was that a promotion of Steel that we saw by Mr. Bilzerian?

MS. STEIN: Objection. Lacks foundation. Asked and answered. Misstates facts in evidence, but go ahead.

A. I do believe that it was.

Q. Did you see the Treigning Lab product in that video that Mr. Bilzerian picked up?

MS. STEIN: Again, document speaks for itself or video speaks for itself.

A. Video speaks for itself, but I definitely did see it in there.

BY MS. GOTTLIEB:

Q. And it's Blitz's position that that was not a promotion for The Treigning Lab?

A. That is correct.

Q. And why is that?

MS. STEIN: Asked and answered. Go ahead.

A. Dan has -- Dan spoke to this in his testimony and deposition, so I'd ask you to rely on that, but I will also say that he does not have a -- any sort of formal relationship, or informal for that matter, with Treigning Labs. He took the product, he tried it out.

Page 203

BY MS. GOTTLIEB:

Q. Okay. So to make sure I understand. Blitz's position is that showing the Treigning Lab product was not a promotion of the Treigning Lab, because Mr. Bilzerian doesn't have a relationship with the Treigning Lab?

MS. STEIN: Misstates prior testimony and asked and answered. Go ahead. And form.

A. Correct.

BY MS. GOTTLIEB:

Q. Any other reason?

A. I would refer to Dan's testimony. I think he spoke to it.

MS. GOTTLIEB: Mr. Verona, that's all I have for you, so we are done here. Thank you very much for your time.

MS. STEIN: Thank you, Jason. And we'll read and sign.

THE VIDEOGRAPHER: Off the record at 6:04 p.m.

STIPULATION

It was stated by counsel that the exercise of reading and signing the transcript would not be waived.

(WHEREUPON, the taking of the deposition was

Page 204

concluded at 6:04 p.m.)

Page 205

CERTIFICATE OF OATH

STATE OF FLORIDA            )
COUNTY OF HILLSBOROUGH   )

************************

I, ELSA HERNANDEZ, FPR, Notary Public, State of Florida, certify that the witness JASON VERONA, who produced a driver's license for identification, personally appeared before me and was duly sworn.
WITNESS my hand and official seal this date: 17th day of December, 2021.

_____
ELSA HERNANDEZ, FPR
Notary Public, State of Florida
Commission No. DD897203
Expires 9/30/2023

---

Page 206

CERTIFICATE OF REPORTER

STATE OF FLORIDA            )
COUNTY OF HILLSBOROUGH   )

I, ELSA HERNANDEZ, FPR, Court Reporter, and Notary Public, do hereby certify that I was authorized to and did stenographically report the deposition of JASON VERONA; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 202, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of December, 2021.

_____
ELSA HERNANDEZ, FPR
Notary Public

---

Page 207

ERRATA SHEET
IN RE:  STEEL SUPPLEMENTS v. BLITZ NV, LLC
CASE NO:        2020-008626-CA-01
DATE TAKEN:     December 17, 2021
DEPOSITION OF:  JASON VERONA

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

Please sign, date, and return this sheet to our office.
If additional lines are required for corrections, attach additional sheets.

At the time of the reading and signing of the deposition, the following changes were noted:

PAGE      LINE      CHANGE      REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.
SIGNATURE OF DEPONENT: _____
DATE: _____

---

Page 208

December 22, 2021
KEVIN P. MCCOY, ESQUIRE
Carlton Fields, P.A.
4221 West Boy Scout Boulevard
Suite 1000
Tampa, Florida 33607
kmccoy@carltonfields.com

In Re:  Mr. Verona

Dear Mr. McCoy,
Attached is your copy of the transcript so Jason Verona may read and sign.  Please have him make whatever changes are necessary on the errata page and sign it.  Please then forward the original errata page back to our office at 101 South Franklin Street, Suite 101, Tampa, Florida 33602.

If the errata page is not signed by the witness within 30 days after this letter has been furnished, we will then process the transcript without a signed errata page.  If your client wishes to waive his right to read and sign, please have him sign on the signature line at the bottom of this letter and send it back to our office.

Your prompt attention to this matter is appreciated.

Sincerely,

Elsa Hernandez, FPR
Anthem Reporting
I do hereby waive my signature

_____
JASON VERONA

---

52 (Pages 205 to 208)

# EXHIBIT 2

## Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEEL SUPPLEMENTS, INC., a
Florida Corporation,
          Plaintiff,

vs.
                    CASE NO.:
                         8:20-cv-2971-T-02AEP
BLITZ NV, LLC, a Nevada
Limited Liability Company,
          Defendant.

*******************************************************

DEPOSITION OF JASON VERONA
APPEARING REMOTELY FROM
LAS VEGAS, NEVADA
TAKEN:          PURSUANT TO NOTICE
          COUNSEL FOR PLAINTIFF

DATE:          SEPTEMBER 2, 2021

TIME:          12:06 P.M. - 8:25 P.M.

REPORTED BY:     ELSA M. HERNANDEZ, FPR
               NOTARY PUBLIC
APPEARING REMOTELY FROM HILLSBOROUGH COUNTY, FLORIDA

## Page 2

REMOTE APPEARANCES:

     BRIAN D. GOODRICH, ESQUIRE
     Bentley Law Firm, P.A.
     783 South Orange Avenue
     Suite 300
     Sarasota, Florida 34236
     bgoodrich@thebentleylawfirm.com
      And
     JASON P. STEARNS, ESQUIRE
     SARAH A. GOTTLIEB, ESQUIRE
     Freeborn & Peters, LLP
     201 North Franklin Street
     Suite 3550
     Tampa, Florida 33602
     jstearns@freeborn.com
          Appearing on behalf of the Plaintiff

     KEVIN P. MCCOY, ESQUIRE
     Carlton Fields, P.A.
     4221 West Boy Scout Boulevard
     Suite 1000
     Tampa, Florida 33607
     kmccoy@carltonfields.com

ALSO PRESENT:     Kim Stein, Esquire
               Jason Huh
               Mehdy Karbid

## Page 3

I N D E X
                    PAGE
DIRECT EXAMINATION BY MR. GOODRICH          7
STIPULATION          303
CERTIFICATE OF OATH          304
CERTIFICATE OF REPORTER          305
ERRATA SHEET          306


E X H I B I T S

FOR IDENTIFICATION          PAGE NO.

Plaintiff's Exhibit No. 1          77
(Final Executed Contract)
Plaintiff's Exhibit No. 2          118
(Personal Services Sponsorship/License
Agreement)
Plaintiff's Exhibit No. 3          121
(First Amendment to Personal Services
Sponsorship/License Agreement)
Plaintiff's Exhibit No. 4          127
(Payment E-mails)

Plaintiff's Exhibit No. 5          150
(E-mail from Rex Raymond Dated
1/3/2018)

Plaintiff's Exhibit No. 6          154
(E-mail Dated 2/21/2018 re: Steel
Video)

Plaintiff's Exhibit No. 7          156
(E-mail Dated 1/28/2019 - re: Merchant
Account Solution CBD)

Plaintiff's Exhibit No. 8          159
(E-mail Dated 8/23/2019 from M. Feder)
Plaintiff's Exhibit No. 9          165
(E-mail Dated 7/8/2020 To: Jason Huh,
Lester Lee re Steel Supplements Call)

## Page 4

Plaintiff's Exhibit No. 10          167
(E-mail Dated 9/11/2020 re Steel
Payment - August 2020)
Plaintiff's Exhibit No. 11          178
(E-mail Dated 9/17/2020 to M. Karbid re
Steel products)
Plaintiff's Exhibit No. 12          189
(E-mail Dated 9/22/2020 to J. Verona
from M. Karbid)
Plaintiff's Exhibit No. 13          191
(E-mail Dated 9/26/2020 to J. Verona
from M. Karbid)
Plaintiff's Exhibit No. 14          197
(E-mail Dated 10/3/2020 to M. Karbid
from J. Verona re Dan's posts)
Plaintiff's Exhibit No. 15          203
(E-mail Dated 10/12/2020 re November
Post)
Plaintiff's Exhibit No. 16          222
(E-mail Dated 10/19/2020 re - Dan
Investing in Steel)
Plaintiff's Exhibit No. 17          227
(E-mail Dated 10/21/2020 re Dan's
Posts)
Plaintiff's Exhibit No. 18          230
(Termination Letter Dated 12/14/2020)

Plaintiff's Exhibit No. 19          258
(Treigning Lab Video)
Plaintiff's Exhibit No. 20          261
(Full Send Video)

Plaintiff's Exhibit No. 21          265
(Amended Complaint)
Plaintiff's Exhibit No. 22          268
(Blitz NV, LLC's Answer and
Counterclaim to Steel Supplements
Amended Complaint)

1 (Pages 1 to 4)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

## Page 5

Plaintiff's Exhibit No. 23          270
(Defendant's Initial Disclosures - 26
Initial Disclosures)
Plaintiff's Exhibit No. 24          272
(Amended Declaration of Jason Verona)

Plaintiff's Exhibit No. 25          289
(Plaintiff's First Interrogatories)
Plaintiff's Exhibit No. 26          290
(Plaintiff's First Requests for
Production)
Plaintiff's Exhibit No. 32          290
(Second Amended Declaration of Jason
Verona)
Exhibit 27 - Defendant's Amended
Responses to Plaintiff's First Set of
Interrogatories.
Exhibit 28 - Defendant's Amended
Responses to Plaintiff's First Request
for Productio.
Exhibit 29 - E-mails
Exhibits 30 and 31 - Videos

## Page 6

THE VIDEOGRAPHER: This is the deposition of Jason Verona, taken in the matter of Steel Supplements, Inc., v. Blitz, LLC. Today is September 2nd, 2021, the time is 12:06 p.m., Eastern Standard Time. The deposition is being conducted via Zoom. The court reporter is Elsa Hernandez, the videographer is Matthew Eisenberg, both representing Anthem Reporting.

Will counsel please introduce themselves, after which the court reporter will swear in the witness.

MR. GOODRICH: Good morning, Brian Goodrich on behalf of Steel Supplements.

MR. STEARNS: Jason Stearns on behalf of Steel Supplements.

MS. GOTTLIEB: Sarah Gottlieb on behalf of Steel Supplements.

MR. MCCOY: Kevin McCoy on behalf of Blitz, NV, LLC. I have with me, Kim Stein, who is outside counsel to Blitz NV, LLC.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu

## Page 7

of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. GOODRICH: Brian Goodrich, on behalf of the plaintiff and, yes, that's fine.

MR. MCCOY: Kevin McCoy on behalf of Blitz, agreed.

(Witness presented government-issued identification and identity verified.)

THE COURT REPORTER: Would you raise your right hand, please. Do you swear or affirm the testimony that you are about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

JASON VERONA, the deponent herein, being duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GOODRICH:

Q. Good morning, Mr. Verona. My name is Brian Goodrich, again, on behalf of Steel Supplements. We're

## Page 8

here to take your deposition today.

Q. Have you ever been deposed before?

A. Once.

Q. Okay. Well, you might remember this, but I'll go over some general ground rules to make a go, hopefully, smooth and get everyone out of here on time. The first is, although we are being recorded by video today, it makes for a cleaner record if you answer verbally. So, shaking of the heads don't really work, or uh-huh, uh-uh, don't really translate to a transcript. So if you can answer verbally, we all lax into it, but I will try and remind you if it happens, that would be great.

The second is, at some point today I might ask a question that's confusing. In fact, that will probably happen. If you don't understand a question I'm asking; please ask me to clarify and I'll do my best to do so. But at the same time, if you don't ask me to clarify, I will assume you understand what I'm asking. Is that fair?

A. Understood.

Q. All right. Thanks very much.

All right, sir. Can you please state your name.

A. Jason Verona.

888.909.2720                    Anthem Reporting                    813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 9

Q. Do you have a middle name?

A. I do. Glenn.

Q. Glenn. Okay. And what is your home address, Mr. Verona?

A. 6075 Belvedere Canyon Avenue -- if you need me to spell Belvedere, let me know. And that's in Las Vegas, Nevada, 19839.

Q. Okay. And what is your date of birth?

A. [redacted].

Q. And you mentioned you gave a deposition before. Can you tell me about that?

A. Sure. I had a client back in the day when I was doing entertainment management, and there was a civil lawsuit having to do with video cameras being present in a dressing room, and because I managed the client, of whom some video was taken, I was asked to -- I was deposed.

Q. Okay. Were you deposed as a corporate representative of your client?

A. No.

Q. Were you deposed as a nonparty witness?

A. I believe so. I don't know.

Q. Okay. Do you recall whether you were a plaintiff or a defendant in that lawsuit? Meaning, you were either suing or being sued?

Page 10

A. I was not suing anybody. My client was the plaintiff.

Q. So your client was suing someone?

A. Correct.

Q. And about how long ago was that?

A. I don't recall.

Q. More than ten years ago?

A. No.

Q. Who is your client?

A. I -- Kevin, do I have to answer that? That's privileged information between me and client at that time, so I don't think I necessarily have to say who that is.

Q. Okay. So you are not answering because it's privileged?

A. Correct.

Q. Where are you physically located today?

A. In a law office in Las Vegas, Nevada.

Q. Okay. Whose law office?

A. Kim Stein.

Q. Okay. Is Ms. Stein in the room with you?

A. She is not.

Q. Is anyone in the room with you?

A. Nobody is.

Q. Is Ms. Stein in an adjacent room?

Page 11

A. From what I understand, yes.

Q. Have you seen her this morning?

A. I did.

Q. I want to talk a little bit about your education, starting with high school and then going from there. So where did you go to high school?

A. East Brunswick High School.

Q. Where is that located?

A. East Brunswick, New Jersey.

Q. And did you graduate?

A. Yes.

Q. Where did you go from there in terms of education?

A. College was University of Maryland.

Q. And what year did you start in Maryland?

A. '97.

Q. Did you graduate from Maryland? Sorry, I might have missed your answer.

A. Yes.

Q. And what type of degree did you obtain?

A. Bachelor of arts.

Q. Okay. And did you have any areas of focus?

A. Government and politics.

Q. And what year did you graduate?

A. 2002.

Page 12

Q. After you graduated from Maryland, what did you do?

A. Moved to Los Angeles.

Q. Okay. Where did you work when you moved to Los Angeles?

A. A company called The Firm.

Q. And what did The Firm do?

A. It was an entertainment management company.

Q. What did you do for The Firm?

A. At first I started in the mailroom, and then I worked my way up to an assistant, and then from there to a director of brand marketing, and then from there a day-to-day manager of entertainment clients.

Q. Okay. When did you start in the mailroom?

A. 2002, July.

Q. And how long were you there?

A. August -- actually, I don't recall.

Q. Okay. Give or take, more than a year, less than a year?

A. Much more than a year.

Q. All right. Do you remember when you started as an assistant?

A. I don't recall.

Q. Okay. How long were you an assistant?

A. About two years.

3 (Pages 9 to 12)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)        7495137d-4848-4119-b9a3-022d2841cf03

Page 13

Q. Do you remember when you were promoted from being an assistant?

A. After two years.

Q. Okay. Do you remember what year that was?

A. I don't recall.

Q. Okay. And how long were -- after assistant, you made the jump to brand marketing manager, I think you said?

A. Director.

Q. Yes, director. And how long were you director?

A. I can't recall.

Q. What did you do as a director?

A. We had brands that the company, basically, managed. Specifically speaking, Virgin Cola and Pony and athletic brands. And what we would do is match up our extensive talent within the management company itself, with those brands and have them promote those brands on behalf of the company.

Q. Is this in the era of social media?

A. No.

Q. Okay. So what kind -- what medium were your talent using?

A. Billboards, TV adds, appearances, product placement.

Page 14

Q. Okay. And you don't recall how long you were a director?

A. I don't recall.

Q. And you named one more position after you were a director. I think you said manager?

A. Day-to-day manager.

Q. Day-to-day manager. What did you do as a day-to-day manager?

A. Worked under my boss at that time, representing anywhere between two and three clients doing their day-to-day management.

Q. Okay. So you only worked for a couple of different clients at a time as a manager?

A. Yes.

Q. And how long did you do that?

A. About three years.

Q. And do you recall when you left?

A. Well -- and I'll be honest here -- obviously I got to be honest, but it's a weird way to qualify a conversation, but -- what happened was the company, the two of the principals from the company left and started their own management company, and I went with them. And that was around the end of 2008, and then I stayed with them at that new company until around -- actually, 'til the end of August 2009.

Page 15

Q. Okay. So when you were a day-to-day manager, was it still with The Firm?

A. Not for that last year and some time, it was -- it didn't have a name at that time.

Q. And did the company you joined in 2008, did it ever have a name?

A. Does now.

Q. Okay. What is it now?

A. LBI Entertainment.

Q. And who were the two people you left with?

A. Rick Yorn, David Barron.

Q. And are they still with LBI -

A. I don't know.

Q. Okay. What did you do after you left what is now LBI, in 2009?

A. I started my own management company in Las Vegas.

Q. And what is that management company called?

A. That was called Archway Entertainment.

Q. And you said it's a management company. Specifically, what did Archway do?

A. So, basically, I managed three reality stars and produced a television series during that time. So by manage, I would've negotiated some of their contracts, got them appearances, got them -- got them

Page 16

appearances, got them to have opportunities in live shows on the strip and so forth.

Q. Okay. And that company was located in Las Vegas?

A. That is correct.

Q. How many employees did it have?

A. Just me.

Q. Did you -- were you the sole owner of Archway?

A. Yes.

Q. You said you managed three reality stars. Who did you manage?

A. That's client-privileged, I believe.

Q. Okay. So as I understand, you are not going to answer because it's privileged?

A. Correct.

Q. And you also talked about a TV show. What TV show were you associated with?

A. Public knowledge, I guess, Holly's World.

Q. Holly's World. Okay. And what year was that?

A. I don't recall.

Q. And do you still have any affiliation with Archway?

A. No.

Q. Is it an active entity?

A. No.

4 (Pages 13 to 16)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                          7495137d-4848-4119-b9a3-022d2841cf03

Page 17

Q.  Okay.  So tell me about how you left Archway or stopped working with Archway?

A.  I dissolved it around -- I dissolved it, and I went on to writing screenplays and -- one of which I ended up -- well, we don't have to get into that until you ask me, but I dissolved the company.

Q.  What happened with your screenplay?

A.  Sold it.

Q.  To whom did you sell it?

A.  I believe that's also privileged.

Q.  Okay.  Is it something we would've heard?

A.  No, because it never got made.

Q.  Got it.  When was Archway dissolved?

A.  I can't recall.

Q.  Okay.  Ballpark, more than ten years ago?

A.  Less than ten years ago.

Q.  Less than ten years ago.  Okay.

How long were you working on your screenplay?

A.  That took me about three months.

Q.  And in that time you were not working for anyone else, you were just working on the screenplay?

A.  That is correct.

Q.  Okay.  And what did you do after that?

A.  I took some time for myself.

Q.  About how long?

Page 18

A.  I was trying to, actually, continue writing screenplays.  Unfortunately, with little to no success, and during the day I was substitute teaching.

Q.  Okay.  Where did you teach?

A.  Sierra Vista High School, here in Nevada.

Q.  Any particular subjects or just whatever was needed?

A.  Just basic substitute.

Q.  And how long did you do that?

A.  I don't recall.

Q.  You said you took some time to yourself; how long did you take to yourself?

A.  Don't recall.

Q.  What did you do when you took some time off?

A.  Wrote.

Q.  So after being a substitute teacher, what did you do?

A.  I started working for Blitz.

Q.  Okay.  And we'll talk about Blitz in a little bit.  Do you hold any licenses or certifications of any sort?

A.  The only certification or license, if you want to say it, I'm a member of the Writers Guild of America, but I don't think that's relevant, but that's the certification I do have.

Page 19

Q.  And you're still, to this day, a member of Writers Guild?

A.  That's correct.

Q.  You have never been suspended or revoked for any reason?

A.  No.

Q.  Other than the Writers Guild, are you a member of any professional organization?

A.  No.

Q.  You talked about giving a deposition before.  Have you ever been a party to a lawsuit?

A.  No.

Q.  Convicted of a crime?

A.  No.

Q.  I want to touch briefly on what you did to prepare for your deposition.  So, can you walk me through -- and I don't want to know about specific conversation with your counsel, but without disclosing your attorney-client communications, tell me what you did to prepare for today?

A.  I had two calls with counsel.  One about two weeks ago and one last week.

Q.  And when you said "counsel," which counsel?

A.  Kevin McCoy.

Q.  Okay.  About how long were you on the phone

Page 20

with Mr. McCoy?

A.  About an hour each time.

Q.  Okay.  Did you speak with Ms. Stein in advance to your deposition?

A.  Yes.

Q.  How many times did you speak with her?

A.  Twice.

Q.  Okay.  About how long?

A.  15 minutes each time.

Q.  Other than at the direction of counsel, did you review any documents in preparation for today?

A.  Yes.

Q.  What did you look at?

A.  The declarations that I signed.

Q.  Okay.  But aside from the declarations you didn't look at any documents?

A.  No.

Q.  Okay.  And I think you said you had two calls with Mr. McCoy.  When were your phone calls?

A.  I don't recall exactly.

Q.  And they were about an hour each?

A.  I think so, yes.

Q.  Did you meet with anyone in person?

A.  No.

Q.  Okay.  Who -- when you spoke with Mr. McCoy,

5 (Pages 17 to 20)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 21

was there anyone else on the phone other than you and him?

A. No.

Q. Okay. What about with Ms. Stein? -- let me back up. Did you meet with Ms. Stein in person or did you just have a phone call?

A. Phone call.

Q. Okay. Was there anyone other than you and Ms. Stein on the call?

A. No.

Q. Okay. Have you talked about this case or your deposition with anyone other than Ms. Stein or Mr. McCoy?

A. No.

Q. So you brought up Blitz, and now I do want to talk about Blitz, so -- what is Blitz?

A. Blitz is, basically, a holding company for all of Dan Bilzerian's entities that he has any association with, and also his estate management.

Q. Okay. So what entity --

A. -- that would exclude one company. Ignite has nothing to do with Blitz.

Q. So if I understand, it's a holding company for all of Dan's entities, other than Ignite and his estate management; correct?

Page 22

A. It's with his estate management.

Q. When you say "with his estate management," what do you mean by "with his estate management"?

A. Basically, we run his estate through Blitz NV, so he has a pretty massive estate in Las Vegas. And due to marketing efforts that he uses at that estate, basically, the estate itself is owned by Blitz in one way or another.

Q. And when you talk about his estate, you are talking about the physical property that Mr. Bilzerian lives on; right?

A. That's correct.

Q. You mentioned Blitz is a holding company. What companies does Blitz hold?

And before you answer that, just so it's clear on the record, we're talking -- when I say "Blitz," we're talking about Blitz NV, LLC; correct?

A. That is correct.

Q. And if I just say "Blitz," you'll understand that I'm referring to that entity?

A. That is correct.

Q. Okay. So what entities does Blitz hold?

MR. MCCOY: Object to the form.

THE WITNESS: What was that, Kevin?

MR. MCCOY: I objected to the form.

Page 23

THE WITNESS: Got it.

Bilzerian Entertainment, LLC; 30 Meadowhawk, LLC.

BY GOODRICH:

Q. I'm sorry. I'm trying to --

A. Bilzerian Entertainment, LLC.

Q. Okay.

A. And 30 Meadowhawk, LLC.

Q. Are you saying Meadowak?

A. Meadowhawk, M-E-A-D-O-W-H-A-W-K, and the Number 30 before it.

Q. Any other entities?

A. Goat Airways.

Q. Anything else?

A. Not that I can recall.

Q. Okay. So let's talk about Bilzerian Entertainment. What is that?

A. It's basically nothing more than where he gets some SAG after royalties for movies that he's done in the past.

Q. What kind of entity is it?

A. It's an LLC.

Q. And who are the members of that?

A. Dan.

Q. Okay. He's the sole owner?

Page 24

A. Correct.

Q. Is there a separate manager?

A. I don't know.

Q. Are there any employees for Bilzerian Entertainment?

A. Not that I'm aware of.

Q. Have you ever seen an operating agreement for Bilzerian Entertainment?

A. I've seen it, only to present to a bank to get a bank account.

Q. Okay. And Bilzerian Entertainment has a separate bank account?

A. Yes.

Q. Are there -- is there a physical office for Bilzerian Entertainment?

A. No.

Q. Does it have any employees?

A. No, not that I'm aware of.

Q. Okay. So the only purpose of it is to collect the SAG royalties from movies Mr. Bilzerian has been in; correct?

A. Yes.

Q. Okay. So let's talk about -- let me back up. Is that a Nevada entity?

A. I'm not sure.

6 (Pages 21 to 24)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 25

Q.  Let's talk about 30 Meadowhawk.  Where is that?

A.  That's who owns his -- who actually owns the estate.

Q.  Okay.  So this would be the estate management you mentioned?

A.  That's correct.

Q.  What is Mr. Bilzerian's interest, if any, in 30 Meadowhawk?

A.  I don't know the answer.

Q.  Okay.  Who would?

A.  I don't know.

Q.  Okay.  Do you know if Mr. Bilzerian has any interest in 30 Meadowhawk?

A.  I don't know.

Q.  Do you know if that entity has -- that entity being 30 Meadowhawk, does that have a physical office?

A.  It does not.

Q.  Employees?

A.  It does not.

Q.  Okay.  Do you know where it was organized or incorporated?

A.  I do not.

Q.  And you might have answered this, so I apologize.  Do you know what form of entity it is?

Page 26

A.  I do not.

Q.  Okay.  And you've never seen an operating agreement or shareholders agreement?

A.  Only for bank accounts.

Q.  Okay.  So you have --

A.  There is no bank accounts for 30 Meadowhawk.

Q.  Okay.  And other than owning the house that Mr. Bilzerian lives in, does 30 Meadowhawk conduct any business?

A.  No.

Q.  How does 30 Meadowhawk, if you know, make money?  If it does?

A.  It doesn't.

Q.  Okay.  Let's talk about Goat Airways.  What's that?

A.  Plane management.

Q.  Does Goat Airways itself own a plane?

A.  No.

Q.  What plane or planes does it manage?

A.  The tail is 701DB.

Q.  And what kind of plane is that?

A.  A G4.

Q.  Okay.  And I'll phrase it a different way.  Do you know who or what entity owns that plane?

A.  I do not.

Page 27

Q.  Okay.  And how -- what, if anything, is Mr. Bilzerian's connection with Goat Airways?

A.  He flies the plane.

Q.  He physically flies the plane?

A.  No.  He is a passenger on the plane.

Q.  Are there any employees for Goat Airways?

A.  No.

Q.  Are there independent contractors?

A.  Yes.

Q.  Okay.  And who are the independent contractors?

A.  There's one, Greg Vanbrunt.

Q.  Is he a pilot?

A.  No.

Q.  What does he do?

A.  He is a consultant.

Q.  Okay.  What does he consult about?

A.  Just when I ask him how many hours a trip is going to take?  How much it will cost to rent a 701DB to fly to certain places.

Q.  Okay.  Can you describe what the business model of Goat Airways is?

MR. MCCOY:  Objection to form.

A.  I don't know.

BY MR. GOODRICH:

Page 28

Q.  Okay.  Does it rent out the airplane?

A.  No.

Q.  Okay.  So the plane is just for Mr. Bilzerian's use?

A.  Correct.

Q.  When the plane flies -- how do you get a pilot?

A.  We have two pilots.

Q.  Okay.  So are the pilots employees or independent contractors?

A.  They're employees of Blitz.

Q.  They're Blitz employees?

A.  That is correct.

Q.  And how long have the pilots been Blitz employees?

A.  I can't recall.

Q.  How long has Mr. Bilzerian -- I hesitate to say own, because you don't recall who owns the plane, but how long has Mr. Bilzerian had this plane?

A.  Before my time, so I wouldn't be able to give an accurate representation of that time line.

Q.  Okay.  So now let's -- there was no aspect -- you mentioned estate management, there is no aspect of the estate management aside from 30 Meadowhawk; correct?

7 (Pages 25 to 28)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 29

A. Correct.

Q. Okay. So if I understand, the scope of Blitz is, is a holding company and it holds Goat Airways, Bilzerian Entertainment, and 30 Meadowhawk, and that's the scope of its operations or am I missing something?

A. That's my understanding.

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Okay. So now let's talk about Blitz in a little more detail. Who owns Blitz?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Let me ask it this way: Do you know who owns Blitz?

A. I do not.

Q. Okay. Do you know if there are multiple owners of Blitz?

A. Do not.

Q. Who would know the answer to that?

A. I do not know.

Q. Okay. Have you seen any operating agreement, shareholders agreement, with respect to Blitz itself?

A. Yes, when I send it to a bank to apply for bank accounts.

Q. Okay. And when was the last time that

Page 30

happened?

A. I tried to apply for a bank account three months ago.

Q. Okay. And did you read the document you presented to the bank?

A. No.

Q. Okay. How did you get it?

A. Kim Stein.

Q. Okay. How many -- let me back up. I understand you don't know who owns Blitz; correct?

A. That is correct.

Q. And you don't know if there are multiple owners of Blitz, one owner, et cetera; correct?

A. That is correct.

Q. How many employees does Blitz have?

A. Give me a second. I can count them out.

Q. Sure.

A. Eight.

Q. Can you name the eight employees?

A. Is that privileged?

MR. MCCOY: I don't think it's relevant, but if you can say the names of eight employees from memory, then...

A. Okay. Michael Geller, Heidi Arreaga, Eric Pickens, Andrew Smith, two pilots, I do not know their

Page 31

names. How many was that?

Q. Six.

BY MR. GOODRICH:

A. Myself, and Victor Rodriguez.

Q. Is Mr. Bilzerian an employee of Blitz?

A. I don't know.

Q. Okay. So all these people you named, they all get paychecks from Blitz; correct?

A. That is correct.

Q. I just want to quickly run through some of these names. Michael Geller, what does he do?

A. Dan's executive assistant.

Q. What does Dan's executive assistant do? And we'll use, occasionally, Dan and Mr. Bilzerian interchangeably, but you understand we're referring to the same person, Mr. Dan Bilzerian?

A. Certainly.

Q. What does Mr. Geller as Dan's executive assistant do?

A. Administrative duties, mostly travel, arranging travel, traveling with him, making sure that Dan gets what needs, where he is going and where he's at.

Q. Okay. You mentioned a Heidi. What does Heidi do?

Page 32

A. Housekeeper.

Q. Okay. Eric. I apologize. I don't remember all of their last names.

A. Pickens. Chef.

Q. Okay. Andrew S?

A. Smith, chef.

Q. Okay. So there are two chefs?

A. Correct.

Q. Okay. And Victor. What does Victor do?

A. Bookkeeper.

Q. Does -- is there a physical Blitz office?

A. Yes.

Q. Where is that?

A. 6005 Las Vegas Boulevard South, Suite No. 7, and that's in Las Vegas and it's 89119.

Q. And I'll take it that's in a building of some sort?

A. Yeah. It's at the airport. There's offices within the private airport, Signature Air.

Q. Okay. And do the Blitz employees go there regularly?

A. I go there once a week to pick up the mail.

Q. Okay. Do any of the eight employees you named or that you just told me about yourself, do any of those employees go to that physical office on a regular

8 (Pages 29 to 32)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 33

basis?

A. No.

Q. Okay. Where does -- where does Mr. Geller work from?

A. When Dan is in town, he works from the same office within the home estate that I do.

Q. Okay. Would that be the same for Heidi, Mr. Pickens, Andrew S, and Victor R?

A. No.

Q. Okay. Where --

A. Everybody, except Victor. Victor works in Wisconsin.

Q. Okay. I assume Victor lives in Wisconsin?

A. That's correct.

Q. Okay. And does Victor ever come to Las Vegas?

A. No.

Q. Is he an employee or an independent contractor?

A. He is an employee.

Q. Are there any officers of Blitz?

A. I believe I'm the chief executive operation officer.

Q. Okay. Aside from yourself, are there any other officers?

A. No.

Page 34

Q. Do you know if Blitz is, what's called, a member-managed company?

A. I don't know.

Q. Okay. Who has management authority in Blitz?

A. Can you be more descriptive in your question, please?

Q. Yeah. Who decides day to day what is going to happen at Blitz?

MR. MCCOY: Form.

A. I think that's a challenging question. I handle the estate management, and as far as business practices and such, that's Dan.

Q. Okay. Does Dan have a title within Blitz?

A. I don't recall.

Q. Okay. Have you ever heard him refer to himself, using a particular title?

A. No.

Q. Okay. Is Dan -- does Dan receive compensation from Blitz?

A. No.

Q. Let's talk about how you got to Blitz. So, we were discussing your job history and then you left off with Blitz. So, when did you join Blitz?

A. First week of February 2018.

Q. And how did you get there?

Page 35

A. It was listed as a job opening on Indeed.

Q. Okay. And did you submit an application via Indeed?

A. That is correct.

Q. Who did you interview with, if anyone?

A. Rob Hagen, and then Rob Hagen and Scott Rohleder, and then Dan Bilzerian.

Q. Okay. Let's talk about Rob Hagen first. Who is he?

A. Rob? He was only with the company a short period of time after I started. My understanding with Rob was that he was in charge of procuring opportunities for Dan in the business space.

Q. What sorts of opportunities?

A. Endorsements, sponsorships, social media placement and such.

Q. Okay. And did he have a title?

A. I don't recall.

Q. And how long was Mr. Hagen with Blitz?

A. I don't recall the timeline.

Q. Do you recall when he left Blitz?

A. I don't recall.

Q. Does he have any association, today, with Blitz?

A. No.

Page 36

Q. Does he have any association with any Dan Bilzerian entity today?

A. No.

Q. Okay. What were the circumstances of his departure from Blitz?

A. I don't know. You'd have to ask Dan.

Q. So if I understand, you were not a part of those discussions or decisions?

A. No.

Q. So Dan would be the person to ask for that?

A. That would be correct.

Q. All right. What about Mr. Rohleder?

A. What about Scott?

Q. Who is he?

A. Scott works for Dan's father, and I don't know his position.

Q. And when did you first meet Mr. Rohleder?

A. In an interview in Los Angeles for this position.

Q. And do you remember when, relative to you being hired?

A. January -- January of 2018.

Q. Okay. So just to get the question on the record. You first met Mr. Rohleder in an interview in January of 2018; correct?

9 (Pages 33 to 36)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                           7495137d-4848-4119-b9a3-022d2841cf03

Page 37

A. That is correct.

Q. And you said he has some connection with Mr. Bilzerian's father?

A. That is correct.

Q. How did you learn that?

A. I don't recall.

Q. Do you know if he said that?

A. I don't recall.

Q. At the time you interviewed with Mr. Rohleder, was he an employee of Blitz?

A. I wouldn't know.

Q. Okay. Was he ever an employee of Blitz?

A. Not during the time that I have been employed by Blitz.

Q. Okay. What is his connection with Blitz, if anything?

A. He helps out with some of the endorsing -- I'll circle back a bit. He overlooks some of Dan's expenditures.

Q. Okay. Expenditures in connection with Blitz?

A. Correct.

Q. Okay. What expenditures does Mr. Rohleder overlook?

A. We have a monthly meeting and every month the bookkeeper presents him with Dan's financials and he

Page 38

reviews those financials, and then he and I review those financials and then those financials are on the board call.

Q. You mentioned a board call. What board are you referring to?

A. The Blitz board.

Q. Okay. Who is on the Blitz board?

A. I don't know.

Q. Well, you know Scott. Scott is on the Blitz board or is he not a member?

A. I'm not on the Blitz board and I'm on the call, so I'm not exactly sure.

Q. Okay. So your testimony is you don't know who is on the call, you don't know anyone --

A. Oh, I know who is on the call. I don't know who is on the board.

Q. Okay. Who's on call? That's a better way to ask it?

A. Bill Bilzerian, Paul Bilzerian, Scott Rohleder, and myself, currently.

Q. That's the current call?

A. Correct.

Q. You used the term "Blitz board"; is that a term that Mr. Bilzerian has used?

A. Not that I've heard him use.

Page 39

Q. Where did you learn the term "Blitz board"?

A. Michael Feder, probably you've heard his name before. He was the one who served in my capacity prior to his departure and he was on those calls, so he would send around -- he would say to me, "I have a Blitz board of director call today."

Q. Okay. Do you know that there is an actual Blitz board of directors, or is that just parlance? What you refer to it as?

A. It could be parlance. I'm not too aware of anybody, specifically, actually mentioned as a board member. Could very well just be us just discussing Dan's business and personal issues.

Q. Okay. Have you heard either Paul Bilzerian, Dan Bilzerian or Scott Rohleder refer to that collection of people as "The Blitz board"?

A. No.

Q. Have you heard any of those individuals say the phrase "Blitz board" ever?

A. No.

Q. Okay. You mentioned that Mr. Rohleder goes over the finances on a monthly basis; right?

A. That is correct.

Q. Is he given any compensation in connection with his work for Blitz?

Page 40

A. Not from Blitz.

Q. Okay. Who is he compensated by?

A. I don't know.

Q. Okay. And has Dan ever -- Mr. Bilzerian ever explained what his capacity is?

A. No.

Q. Okay. Has anyone ever told you what Mr. Rohleder's capacity is?

A. No.

Q. Okay. Talked about Paul Bilzerian, which I gather is Dan Bilzerian's father; correct?

A. That's correct.

Q. What is his connection with Blitz?

A. My understanding, he is just on that one call and that's it.

Q. Okay. So have you ever been told that by anyone that he has a connection to Blitz? Aside from just being on that call?

A. No.

Q. Okay. Do you have -- let me scratch that. Is Mr. Bilzerian -- Paul Bilzerian paid by Blitz?

A. No.

Q. Okay. What -- can you just generally walk me through what happens on a call? What generally is

10 (Pages 37 to 40)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 41

discussed?

A. There's an agenda, the agenda was presented to you, many of them. We just go through topics of discussion that need some resolution or need some updates.

Q. Okay. And who prepares the agenda?

A. I do.

Q. How do you prepare the agenda?

A. Based on outstanding issues as well as updates that need to be provided.

Q. And do you share with anyone for review, comment, edit, before the meeting actually happens?

A. Not the agenda, no.

Q. Is there -- is the Blitz board meeting, so to speak, always over the phone?

A. Yes. Since I've been there, yes.

Q. And have you discussed this lawsuit on a Blitz board meeting?

A. I can't recall.

Q. Okay. Is there anything that would help you remember whether you talked about this lawsuit on one of the Blitz board meetings, so to speak?

A. Not that I can think of right now.

Q. And would it have been on an agenda that you created?

Page 42

A. Most likely.

Q. Okay. So you would have talked about the -- this lawsuit at a Blitz board meeting?

A. If it's on the agenda, then we would've, but I can't recall if it was on an agenda.

Q. Okay. So sitting here now, you just don't recall one way or the other whether this lawsuit was a topic of conversation at a Blitz board meeting; correct?

A. That is correct.

Q. All right. Have you ever spoken with Paul Bilzerian about this lawsuit?

A. No.

Q. Have you ever spoken with Paul Bilzerian about Steel?

A. No.

Q. Okay. Other than being on the Blitz board, for lack of a better word, Paul Bilzerian, does he have any connection whatsoever to Blitz?

MR. MCCOY: Form.

A. I don't know.

Q. And I might have asked this, so I apologize. Is Mr. Paul Bilzerian compensated by Blitz?

A. No.

Q. Sorry. I missed your answer.

Page 43

A. No.

Q. All right. You talked about a Michael Feder. Who is he?

A. Michael Feder is somebody who came to serve in the same capacity -- actually, you know, can I go back to that answer about Paul Bilzerian being paid by Blitz? Actually, I don't know.

Q. Okay. Who would know?

A. Let me definitely note that I really don't know. Hang on one second.

Q. Looks like you're looking at something. What are you looking at right now?

A. An Adobe update just came up on my computer.

Q. Ah, the darn Adobe updates. So, you were telling me about Paul Bilzerian, and you don't know whether he was compensated by Blitz. Who would know that?

A. Kim Stein.

Q. Is Ms. Stein in charge of payroll for Blitz?

A. No.

Q. Who is?

A. I am.

Q. So if you are in charge of payroll, how is it that you don't know whether someone is compensated by Blitz?

Page 44

A. I have never personally paid Paul out of any Blitz accounts.

Q. Okay. But is it -- it's possible, you're saying, that he was compensated by someone other than you?

A. I would say, I don't know.

Q. Okay. Who keeps track of Blitz's finances?

A. I do.

Q. Okay. So would you notice if someone who is not one of the eight employees you listed, was paid compensation?

A. Yes.

Q. Okay. And have you noticed that someone other than one of those eight employees was being compensated?

A. No.

Q. So you personally don't know of any payments to Mr. Paul Bilzerian?

A. That is correct.

Q. Now, we were talking about Michael Feder, and I think our conversation got a little derailed when you went back to talk about Paul Bilzerian, so can you explain to me who is Mr. Feder?

A. So Michael Feder is or was the CEO of Blitz. He was basically brought on, to my understanding, to

11 (Pages 41 to 44)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 45

serve in a similar-type capacity as Rob Hagen, that being to procure opportunities for Dan, the endorsements, sponsorships, social media space.

Q. Okay. Was Mr. Hagen a CEO of Blitz?

A. I don't know.

Q. Okay. And is there a current CEO of Blitz?

A. No -- no, I don't know.

Q. Okay. Who would know the answer to that?

A. Dan.

Q. Okay. As CEO of Blitz, what were Mr. Feder's responsibilities?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. I'll rephrase. To the extent you know, what were Mr. Feder's responsibility?

A. Like I just said, procure opportunities, sponsorships, endorsements and such. That's all I know.

Q. And how long was he with Blitz?

A. I can't recall.

Q. Okay. Did your work for Blitz ever overlap with Mr. Feder's work?

A. Yes.

Q. Were you there at the same time?

A. Yes.

Page 46

Q. Okay. So do you know when Mr. Feder left Blitz?

A. September of 2020.

Q. What were the circumstances of his departure?

A. You would have to ask Dan. I don't know.

Q. Sorry. I would have to ask who?

A. You would have to ask Dan. I don't know.

Q. Okay. So I guess, or I gather you were not part of any conversations regarding Mr. Feder leaving?

A. That is correct.

Q. Do you have any -- any thought as to why he left Blitz?

A. I do not.

Q. Okay. Have you spoken to him since he left Blitz?

A. Spoke to him a couple of times after he left.

Q. What did you talk about?

A. Give me a second. I can try to think about our conversations. Actually, I don't recall.

Q. When was the last time you spoke with Mr. Feder?

A. I don't recall.

Q. Have you talked with Mr. Feder about this lawsuit?

A. No.

Page 47

Q. Have you talked with Mr. Feder about Steel?

A. No.

Q. And generally, again, when I say --

A. Yes -- no, I have talked to Mr. Feder about Steel, yes, regarding when payments were to come in and such.

Q. Okay. And we'll touch on that in a second, but just for clarification. When I refer to Steel, you understand I'm referring to Steel Supplements, Inc., which is the plaintiff in this lawsuit; correct?

A. Understood.

Q. Okay. So you talked with Mr. Feder about payments from Steel. What was the conversation?

A. He would just ask when Steel's payments are coming in, and I would tell him.

Q. Okay. Aside from that, did you ever speak with Mr. Feder on the subject of Steel in terms of anything?

A. Yeah, he once wanted to have a conversation with Jason, so I think I made the introduction to them, sometime in 2018. And I believe, based on the e-mails that I was able to recover, that they had communication with one another.

Q. You said Mr. Feder wanted to speak with Jason Huh?

Page 48

A. Yes.

Q. We have a lot of Jasons floating around, so --

A. Imagine if I was Jason Huh.

Q. This would be very difficult. I will try to use every Jason's first and last name or make sure you know who we're talking about so.

If I'm understanding your testimony, the only times or the only topics of conversation with Michael Feder about Steel are payment e-mails, and at some point Mr. Feder wanted to talk with Jason Huh about something, and that's it?

A. That's correct.

Q. And what did he want to speak with Jason Huh about?

A. I can't recall.

Q. Okay. Do you know that they actually spoke?

A. I do.

Q. Okay. Did you have any conversations with Mr. Feder about his talks with Jason Huh?

A. No.

Q. Okay. When you're coming to join Blitz, did you replace anyone?

A. There was -- yes, for some of the roles in which I serve, I replaced -- I had somebody named Jody Eicher.

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 49

Q. And how do you spell Eicher?

A. E-I-C-H-E-R.

Q. And what was his role with Blitz?

A. I don't know what his title was, but he basically went through -- my understanding, when he transitioned his stuff over to me, all that he showed me was going through Amex bills, coding Amex bills and helping manage the plane, as well as keep Dan's insurances on his cars and registration on his cars and automobiles and boats, up to date. Those are, basically, the only things that he had told me about.

Q. Okay. And what do you mean by coding Amex bills?

A. Every month an Amex bill comes in, and within those Amex bills I have to code them based upon which company, which entity is responsible for them, as well as a description as to what the payment was for.

Q. And when you say which entity is responsible, are you sorting them by Bilzerian Entertainment, 30 Meadowhawk and Goat Airways, or are there different entities you are talking about?

A. Just Blitz and Dan personal.

Q. Okay. Does Dan use the same credit card for Blitz and personal use?

A. Yes.

Page 50

Q. And that's the purpose of the coding?

A. Correct.

Q. Okay. So you said he coded Amex bills. When you say coded Amex bills, I understand you're sorting out whether it's an obligation of Dan or Blitz, but what do you do with that information?

A. That information then is given to our bookkeeper, Victor, and Victor enters it into QuickBooks, respectively, to how I coded it.

Q. And you send reports to Victor? How do you convey that information to him?

A. Through e-mails.

Q. Okay. And is it just you type up and e-mail an open e-mail which --

A. I do.

Q. -- which entries -- all right. Then you said he maintains registrations on cars, referring to Mr. Eicher; right?

A. Right. And I do that now.

Q. What cars are you talking about? Are these cars owned by Mr. Bilzerian personally or --

A. Personally and corporate.

Q. How many cars does Blitz own?

A. One -- five cars.

Q. Okay. How many cars does Mr. Bilzerian own?

Page 51

A. Zero.

Q. Okay. So other than the coding of Amex bills, registration on cars, did Mr. Eicher do anything?

A. He told me a little bit about the plane management, how to help manage the plane.

Q. And did he assist with that?

A. He did.

Q. Was he paid by Blitz?

A. That is my understanding.

Q. And did he have a title?

A. I do not know what his title was.

Q. Okay. How long was he there after you were hired?

A. After I was hired?

Q. Correct.

A. He wasn't. I think he was -- I believe he was terminated immediately upon my starting date.

Q. Okay. Have you ever had any conversations with him since he was terminated?

A. No.

Q. You know why he was terminated?

A. No.

Q. Did you ever have a conversation with Mr. Eicher about Steel?

A. No.

Page 52

Q. What was your title when you were hired at Blitz?

A. Vice president.

Q. Was it vice president of Blitz or vice president of something in particular?

A. Vice president of Blitz.

Q. Okay. And as vice president of Blitz, what were your responsibilities?

A. Basically, the same as what I do now.

Q. Which is?

A. Oversee the estate, financial recording and dealing with some of the -- dealing with the vendors, dealing with all -- helping manage the plane. Keeping Dan's business in order, both on a personal and a professional level.

Q. When you say "oversee estate," what goes into that?

A. It's a five-acre estate, there's 40,000 square feet and I have to, you know, there's major maintenances that need to be done, there's construction projects that need to happen on -- at the estate. There's regular repairs also, obviously, handling the staff and keeping everything in order in that large of a compound base.

Q. When you say "staff," are you referring to the

13 (Pages 49 to 52)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 53

eight individuals including yourself?

A. That's correct.

Q. Okay. There's not a separate staff for the estate?

A. No.

Q. Okay. And as vice president of Blitz, who reported to you?

A. Those -- six of those eight people. People have changed. There's been different employees during that time, so you're going to have to ask specific dates and I can see if I can recall whom at that time was reporting to me.

Q. When you started, generally, who was reporting to you?

A. His executive assistant at that time, two chefs, a housekeeper, Victor, and I believe that was it.

Q. Who is the executive assistant?

A. His name is Jeremy Guyman.

Q. And does he still work for Blitz?

A. No.

Q. As an executive assistant, what did Mr. Guyman do?

A. Same thing as I described for Michael Geller, traveling assistant, handling some personal matters on

Page 54

Dan's behalf, helping manage schedules, meetings, travel mostly.

Q. And when did Mr. Guyman leave Blitz?

A. March of 2021.

Q. Okay. And have you had any conversations with him --

A. My first since he's left --

Q. -- wait until I finish my question, because I don't want you to answer a question I'm not asking.

So have you had any conversations with Mr. Guyman, ever, about Steel?

A. No.

Q. Okay. Have you spoken with Mr. Guyman since he left Blitz?

A. Yes.

Q. And what did you talk about?

A. What he was doing.

Q. Okay. What did he say?

A. He's in Austin, Texas, working for a medical manufacturing company.

Q. Do you know when he started?

A. I do not.

Q. Okay. And when was the last time you spoke with him?

A. I don't recall.

Page 55

Q. Okay. About how many times have you spoken with him since he left Blitz?

A. Once.

Q. So when you were hired as VP, who did you report to?

A. Rob Hagen.

Q. Okay.

A. And Dan Bilzerian.

Q. How would you communicate with them?

A. Rob, I guess, mostly over the phone. Dan, over -- in person.

Q. Where was Rob?

A. I don't know.

Q. Okay. Have you ever learned where he --

(Technological interruption.)

BY MR. GOODRICH:

Q. What about Dan? How often would you -- let me back up. How would you communicate with Mr. Bilzerian?

A. In person, for the most part.

Q. Was he mostly at the estate?

A. About 50 percent of the time.

Q. And where was he -- where was he the other 50 percent of the time?

A. Traveling or at his other estate in Los Angeles.

Page 56

Q. Okay. And have you been to his estate in Los Angeles?

A. I have.

Q. Is that estate connected with Blitz in any way?

A. No.

Q. Do you know who owns that estate?

A. I do not.

Q. At any point, did your position change from vice president of Blitz?

A. Just titlewise.

Q. Okay. And when did your title change from vice president?

A. I can't recall.

Q. Okay. Ballpark, was it a year after you started with Blitz? Two years?

A. Less than a year ago.

Q. Less than a year ago. So we're in September of 2020. So if I understand, within the past year, roughly, your title has changed?

A. Yes.

Q. And what did it change to?

A. Chief operating officer.

Q. And what prompted the change?

A. Taking on new responsibilities.

14 (Pages 53 to 56)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 57

Q. Okay. What additional responsibilities have you taken on?

A. I believe that I was asked to do some things that Michael was handling at the time with lawyers and such.

Q. Specifically, what?

A. I really can't recall.

Q. Okay. Who promoted you?

A. Michael.

Q. Did you have any conversations with Mr. Bilzerian about being promoted?

A. No.

Q. As COO, who do you report to?

A. Dan.

Q. Okay. Who reports to you as COO?

A. The estate, the members of the -- the employees of the estate. Aside from the pilots.

Q. Okay. So would it be fair to say, other than the pilots -- other than the pilots and Mr. Bilzerian himself, everyone at Blitz reports to you?

A. That is correct.

Q. On a day-to-day basis, can you describe what you do for Blitz?

A. I run the estate, I handle incoming payments and I handle outgoing payments. Most recently, I was

Page 58

tasked with helping sort and get his book published, printed, distributed.

Q. Okay. What did you do to help get his book published and printed and distributed?

A. I found the self-publisher, I found the PR company, and I would work with them in unison to promote the book in one way or another, but this dates back a couple of years now, so -- the self-publisher kind of -- he took a more one-on-one position in communicating with Dan.

Q. Okay. And other than that, do you have any other new responsibilities as COO?

A. No.

Q. Do you work for any other entity aside from Blitz?

A. No.

Q. Are you compensated by anyone else other than Blitz?

A. No.

Q. Do you perform work for any Ignite entity?

A. No.

Q. Does your paycheck come from Blitz?

A. Yes.

Q. Sorry. That was a yes? You broke up.

A. Yes.

Page 59

Q. Do you have any connection to entities, any other entities owned by Blitz, aside from Meadowhawk, Bilzerian Entertainment, and Goat Airways?

A. No.

Q. Can you describe for me how decisions are made within Blitz?

A. I ask Dan.

Q. Okay. So Dan is the sole decision-maker, essentially?

A. That is correct.

Q. One name that has come up is David Vingiano; do you know who that is?

A. I know of him. He was there long time before I came onboard.

Q. Okay. When you say he was there, where was he?

A. At Blitz.

Q. What was his role at Blitz?

A. I do not know.

Q. Do you know when he left Blitz?

A. I do not know.

Q. Do you have any sense of what services he performed?

A. I do not.

Q. Have you ever spoken with him?

Page 60

A. I have not.

Q. Okay. So, now I want to talk about Mr. Bilzerian himself. How did you meet Mr. Bilzerian?

A. The first time was after the interview that I had with Rohleder and Hagen in Los Angeles. They set up a meeting to meet with Dan in Las Vegas in his previous home, which was attended by Rob Hagen.

Q. Okay. So this was after your initial interview; correct?

A. Yes. The interviews were on the phone with Rob, then in person with Rob and Scott in Los Angeles, and then third of which was in Las Vegas with Dan and Rob.

Q. Okay. Help me understand. The first one was just on the phone. Where were you, physically, for that interview?

A. Las Vegas, Nevada.

Q. The second was with Rob and Scott in person; correct?

A. That is correct.

Q. And where did that interview take place?

A. A hotel near the Airport LAX.

Q. Okay. And am I understanding you didn't meet Mr. Bilzerian after that interview, but the following interview?

15 (Pages 57 to 60)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

## Page 61

A. I'm sorry. Can you repeat yourself?

Q. When relative to that interview did you meet Dan Bilzerian?

A. In that interview, no.

Q. Okay. So you -- and you had a third interview?

A. Correct.

Q. Rob, Scott, and Mr. Bilzerian; correct?

A. Just Rob and Dan.

Q. Okay. And then what happened after the interview?

A. I remember them going off to discuss whether or not they were going to bring me onboard. They didn't make a decision then. I sat down for dinner with Dan and Rob, and then I got the call the next day that I was being hired.

Q. Okay. And this would've been in January of 2018, roughly?

A. That is correct.

Q. Well, let me phrase it like this: Since meeting Mr. Bilzerian in 2018, we're now in September of 2021; how would you describe your relationship with him?

A. Fine.

Q. Well, are you friends? Are you work

## Page 62

associates?

A. Colleagues. Business associates, only.

Q. Okay. Have you ever socialized with him?

A. No.

Q. Have you ever spoken with Mr. Bilzerian about this lawsuit?

A. No.

Q. Okay.

A. Other than the fact that he knows I'm taking the depo today.

Q. Okay. What did you talk about it regarding your deposition?

MR. MCCOY: Form. I want to just clarify. I presume your question, Brian, is outside of any work that has been undergone with respect to litigation or to collect information. You are talking about just general conversations about the lawsuit?

MR. GOODRICH: Yeah. And I don't want to know, I never want to know anything you talked with -- between an attorney or anything done at the direction of counsel. But if, otherwise, you have had conversations with Mr. Bilzerian about your deposition, then that's what the question is. And I appreciate the clarification.

## Page 63

A. Basically, the only conversation that I had was with him this morning, telling him when he was asking me to do something. And I, basically, just said to him, "I can't do it. I'm being deposed today."

Q. Okay. So he just, within the past day, learned that you were being deposed today?

A. No, an e-mail was sent to him. He knew. But he needed to be reminded.

Q. How do you communicate with Mr. Bilzerian, typically?

A. E-mails, text messages, phone calls.

Q. Okay. And have you preserved all e-mails, text messages, with Mr. Bilzerian since March 2017?

A. I don't save text messages.

Q. You don't? How -- describe for me, what are your settings? How often are they deleted?

A. I'm pretty OCD, and I probably delete everybody's text messages off my device, probably, ten to -- at least ten times a day.

Q. And is there a setting that deletes the text messages automatically?

A. No, I do it on my phone and then I do it on my desktop.

Q. Okay. And have you ever been instructed not to do that because of the pending lawsuit?

## Page 64

MR. MCCOY: Objection. That would've been an attorney-client communication.

MR. GOODRICH: Fair enough.

BY MR. GOODRICH:

Q. You haven't -- if I understand -- I'll rephrase.

You haven't discontinued your practice of manually deleting text messages; correct?

A. That's correct.

Q. All right. I want to touch on Mr. Bilzerian's social media. Do you know, first off, what social media accounts Mr. Bilzerian has?

A. To my knowledge, Instagram, Facebook, Twitter, and Snapchat.

Q. Instagram, Facebook, Twitter, Snapchat. Do you know whether he has a YouTube channel?

A. Not that I know of.

Q. No TikTok?

A. Not that I know of.

Q. Who has access to Mr. Bilzerian's social media accounts?

A. Only Dan.

Q. Okay. Have you ever been provided access?

A. Never.

Q. Have you ever requested access?

16 (Pages 61 to 64)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 65

A. Never.

Q. And do you have any understanding as to how Mr. Bilzerian gets social media followers?

A. No idea.

(Technological interruption.)

A. I have no idea.

Q. Do you know whether Mr. Bilzerian or someone on his behalf buys social media followers?

A. I do not know.

Q. And who would know that?

A. Dan.

Q. I want to touch on Steel, which is the plaintiff in this lawsuit. What is Steel?

A. To my understanding, a supplement company, a work-out supplement company.

Q. And when did you first learn about Steel?

A. Probably when Rob Hagen was bringing me up to speed when I first started the position.

Q. When would that have been?

A. That would've been February, the beginning of February 2018.

Q. Do you remember what Mr. Hagen told you about Steel?

A. He just told me the basic components of the deal. Dan has an endorsement deal with them, he posts

Page 66

on their behalf and looks out for the numbers each month.

Q. Did he tell you anything about Steel's relationship with Blitz or Steel's relationship with Dan?

A. Not so, no.

Q. Okay. Other than generally saying Dan posts and gets paid for it, did Mr. Hagen say anything else?

A. No.

Q. Okay.

MR. MCCOY: Brian, can we -- we don't have to do it right now, but whenever we get to a spot, we've been going an hour and 20 minutes.

MR. GOODRICH: That's a good point. We can go on break now. We'll pick up. You want to call it 1:30 our time?

MR. MCCOY: That's fine.

MR. GOODRICH: We'll come back in about 12 minutes. We can go off the record.

THE VIDEOGRAPHER: Off the record at 1:20 P.M. Eastern Standard Time.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record at 1:35 P.M. Eastern Standard time.

MR. MCCOY: For the benefit of the court

Page 67

reporter, Counsel, is it okay with you if we stipulate to the testimony that's been given and we'll just designate the rest of the transcript pursuant to the confidentiality agreement as confidential?

MR. GOODRICH: Yes.

MR. MCCOY: Thanks.

BY MR. GOODRICH:

Q. All right, Mr. Verona, when we last left off, you were telling me about your conversations with Rob Hagen when you joined Blitz. And if I understand, he told you a little bit about Blitz, the fact that -- or sorry, about Steel. The fact that there was a relationship under which Dan would post, and in exchange Steel would pay Dan, but not much more. My question for you is, were you told what Blitz was receiving in exchange for promoting Steel?

MR. MCCOY: Form.

A. I don't recall.

Q. Okay. Do you remember anything about your conversation with Mr. Hagen or anyone on behalf of Blitz about Blitz's relationship and agreement with Steel?

A. I don't recall.

Q. Would you have any e-mails going back, in

Page 68

which someone from Blitz described to you the relationship between Steel and Blitz?

A. Possibly -- no, no e-mails. I don't recall -- well, no e-mails. I want to say there was 10 percent of -- Dan was entitled to 10 percent of sales.

Q. Okay. You sound confident that there are no e-mails; why that?

A. Because there are a number of things that Rob and I had discussed with one another during the time we went through my transition and everything was told to me on many different -- possible, potential business interests back in the day, and a million different things that he was going through, and Steel just happens to be one of them. Follow-up or anything like that was unnecessary.

Q. So there may have been a larger conversation, you just don't remember it?

A. That would be accurate, I guess.

Q. Would there be any way to recreate what your conversation was?

A. Not that I would know of.

Q. When you were having this conversation about Steel, did you inquire as to what the terms of the deal were?

A. I was told 10 percent.

17 (Pages 65 to 68)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 69

Q. And who told you that?

A. Rob.

Q. And do you recall, specifically, what words he used?

A. No.

Q. Before the break we were talking about your text messages and you mentioned that you tend to delete text messages. How often do you do that?

A. You asked me this question already.

Q. Yeah. I might not have comprehended the answer, so how often do you delete text messages?

A. As I mentioned before, probably somewhere in the neighborhood of ten times a day, off my cell phone as well as off my computer.

Q. Okay. So you delete e-mails as well?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Okay. When you say you delete off of your computer, does that mean you delete your text messages from the computer?

A. That is correct.

Q. So how are your text messages stored on the computer?

A. They're not.

Q. Okay. What do you delete? What are you

Page 70

deleting, when you say you delete ten times a day?

A. Personal text messages between myself, friends, family, everything.

Q. When you say you delete text messages from the computer, walk me through that process. Is this like an iCloud storage you log into and delete text messages or what?

A. I just bring up the messages on my desktop and basically hit, I think it's Control D, and it prompts me do you want to delete the text messages and I say yes.

Q. And when you say you bring up text messages on your desktop, is there some sort of program? How do you do that?

A. There's an iMessage program on all Macs. It's a little icon at the bottom, it pops up every day for me. That's when I know I'm getting two sets of text messages, one to my home and one to desktop, just in case I mistakenly or erroneously delete one or the other, so that I know that I have at least one as backup -- something.

Q. You cut out for the last part, last phrase of that answer. I didn't hear what you said.

A. The -- I have -- when the text messages come up on my computer or my phone, I typically delete them

Page 71

when they come in --

Q. There's some feedback or something.

A. Can you guys hear me?

Q. Yeah. We heard up to the words "comes in."

A. So the text message will come into my account on both the computer as well as the phone, and I will delete it twice, actually, once I know that the project that's being asked of me is completed in the business sense.

Q. Okay. And is this blanket, all text messages that are deleted?

A. That is correct. If I know that I've answered them through their completion and I don't need to necessarily do anything further with them, then I will delete them.

Q. And do you delete the text messages from your phone and the computer at the same time?

A. No. Oftentimes -- no. I mean, if I'm on my computer and working off my computer and I see five text messages on there, I'll start deleting those. And then if I'm on my phone, when I walk away from my computer and do something else and I see them, I will delete those then.

Q. Okay. But it's your testimony that you don't have, like, an automatic deletion setting in place?

Page 72

For example, every 30 days your text messages will delete; correct?

A. I do not.

Q. Okay. Is there a litigation hold in place at Blitz?

A. I don't know what you mean by that.

Q. You don't know what that means?

A. No. I'm not a lawyer.

Q. Again, you have not changed your actions of automatically deleting text messages from your phone and your computer as a result of this lawsuit; correct?

A. I have not changed my -- the way in which I go about deleting my texts, no, nor --

Q. Sorry. I missed what you just said.

A. I did not change the way in which or how often I delete my text messages from both devices since the inception of this lawsuit.

Q. Okay. I want to talk about the personal services agreement, which is the contract between Steel and Blitz. I understand you started with Blitz around February 2018.

A. Is it okay if I just stop for a second.

Kim, is it appropriate for me to say -- just to get some coffee in here?

(A discussion was held off the record.)

18 (Pages 69 to 72)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

## Page 73

THE WITNESS: Sorry. Go ahead.

BY MR. GOODRICH:

Q. The question is, is it fair to say you were not a part of the negotiations regarding the contract between Steel and Blitz?

A. That is correct.

Q. Do you know who was?

A. I do not know.

Q. Do you know if anyone on behalf of Blitz, we'll start with, that did or claims to have a role in negotiating the agreement between Steel and Blitz?

A. I do not.

Q. Okay. And anyone from the Steel side?

A. I do not.

Q. Okay. Have you had any discussions with anyone about the negotiations over Steel and Blitz's agreement?

A. Repeat the question again.

Q. Have you had any discussions, in any format, text, e-mail, in person, over the phone, with anyone about the negotiations over Steel and Blitz' contract?

A. No.

MR. MCCOY: Can we just clarify that, Brian, just to exclude communications with counsel, just for clarity purposes.

## Page 74

MR. GOODRICH: Yes.

BY MR. GOODRICH:

Q. With the exception of communications with counsel, have you had discussions with anyone over the negotiation of Steel and Blitz' -- about the negotiation of Steel and Blitz's contract?

A. No.

Q. Okay. Has anyone ever told you anything about how this contract came to be?

A. No.

Q. Have you had any conversations with anyone about whether -- what Blitz's commission is to be based on?

A. No.

Q. Okay. Earlier I thought --

A. This is all outside of legal; correct?

Q. Correct.

A. No.

Q. Correct. Earlier I thought you testified that Rob Hagen said something to the effect, that it was 10 percent of sales?

A. Correct.

Q. Okay. So that's what I'm asking about. I'm asking about any conversations about what Blitz's commission was to be based off?

## Page 75

A. No idea.

Q. Well, you had a conversation with Rob Hagen?

A. Correct.

Q. Okay. So aside from Rob Hagen, were there any conversations?

A. No.

Q. Okay. So when is the first time you see a copy of the contract between Steel and Blitz?

A. When I was hired.

Q. Okay. And would that have been in or around February 2018?

A. Correct.

Q. Do you remember what day you started?

A. No.

Q. Were you hired as a full employee?

A. Yes.

Q. So I'm going to share my screen. We sent some documents to Mr. McCoy, but I think we unintentionally did not send them to Ms. Stein. I'm going to share my screen, so maybe you can read along with me, but we can also send them to Ms. Stein via DropBox if you prefer that.

A. Yeah, go ahead. I'll read them.

Q. Can you see what I'm looking at right now, the Personal Services Sponsorship/License Agreement?

## Page 76

A. I do.

Q. So your testimony is you first saw this around February 2018?

MR. MCCOY: Objection. Hold on. Which one is this?

BY MR. GOODRICH:

Q. First of all, this is the contract with -- using the phrase "gross sales." I'll go down to the bottom so you can see the signature line, and I'm happy to scroll through this so you can read any portion of this you want.

A. Go to the first page. I'll read through it.

MS. STEIN: Brian, do me a favor, make it a little bit smaller. It's not showing up as a full agreement.

MR. GOODRICH: Does that help?

MS. STEIN: Perfect. Thank you.

MR. MCCOY: Are the numbers here, Brian, are these the anticipated -- or are these going to be the exhibit numbers for purposes of identification?

MR. GOODRICH: Yeah, that's what I anticipate, but we'll say it's for identification purposes and we'll have the court reporter later mark the exhibits. But yes, this is -- this will be Exhibit 1.

19 (Pages 73 to 76)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    7495137d-4848-4119-b9a3-022d2841cf03

| Page 77 | Page 78 |
|---|---|

Page 77

(Plaintiff's Exhibit No. 1 was marked for identification.)

A. Go to the second one.

Q. Sure. Whenever you want me to scroll, let me know.

A. Okay. You can go down.

You can go to the next page.

Go ahead. You can scroll down.

Everything else is legal language. That's all Chinese to me.

BY MR. GOODRICH:

Q. Did you have -- after receiving this contract, other than counsel, did you have any conversations with anyone about this agreement, what it means, or how it's supposed to operate?

A. No.

Q. Do you know who prepared this agreement?

A. I have no idea.

Q. Does Blitz enter into agreements that look, substantially, like this document?

A. I don't know.

Q. Okay. Have you seen this -- --

(A discussion was held off the record.)

BY MR. GOODRICH:

Q. Have you seen this form of agreement used by

Page 78

Blitz before?

A. I'm sorry. Can you repeat the question again?

Q. Sure. Have you seen this form of agreement used by Blitz before or since?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Because this appears to have been entered into before your time at Blitz, is it safe to say you didn't review it before the execution?

A. That is correct.

Q. Do you have any understanding about how it was signed? When I say "how it was signed," I'm talking about in person versus e-mail back and forth?

A. I do not know.

Q. Okay. Who would know all these details?

A. I do not know.

Q. My first question on the agreement itself says -- is under the Recital Section B. It says, "Blitz manages and provides celebrity"; that would be Dan Bilzerian; correct?

MR. MCCOY: Form.

A. I don't know.

Q. You don't know?

A. No.

Q. Okay. Well, up here it says, "Dan Brandon

| Page 79 | Page 80 |
|---|---|

Page 79

Bilzerian, celebrity." Do you see that?

A. I do. Okay.

Q. How many times have you reviewed this contract?

A. Probably read through it or briefed over it once.

Q. Okay. So other than the one time, you've never seen this document before?

A. Other than when it was a legal privilege, no.

Q. Okay. When was the first time you looked at this contract?

A. Again, you are asking the same question. Right about when I started.

Q. Yeah. Did anyone -- who gave it to you?

A. Rob Hagen.

Q. And, again, you don't recall him saying anything about this agreement when he gave it to you?

A. No. Other than Dan is entitled to 10 percent of sales.

Q. Okay. So I'm going to ask you some questions about the contract. If you don't know the answer, then that's fine. But I just want to get your perspective. We're looking at Recital B, which says that "Blitz manages and provides services of celebrity in connection with various endorsement deals."

Page 80

Do you know what deals that references --

A. No.

Q. Do you know what endorsement deals --

A. No.

Q. You have to let me finish my question.

Do you know what endorsement deals Mr. Bilzerian was a part of around March 7th, 2017?

A. I can't recall.

Q. Okay. Do you know any?

A. One.

Q. What's that?

A. Actually, two. One he had a Save Dan video game that was trying -- they were trying to sell it to the app store, I don't think that it worked. As well as he had an wakeboarding contract with -- he was endorsing wakeboarding brand. I can't remember the name off the top of my head.

Q. Did you say "Save Dan"?

A. That's what I believe -- I can't recall the exact name of the game.

Q. What was the game about?

A. I've seen pictures of it, and it looked like Dan was going abroad with a gun and saving people.

Q. Oh, so Dan was doing the saving?

A. Maybe. You know what, now that I think about

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 81

it and say it out loud, probably wasn't Dan. It was probably save Dan and other people were trying to save him.

Q. And you don't recall the wakeboarding company?

A. Sorry?

Q. You don't recall the wakeboarding company?

A. No.

Q. Okay. Who would know about the wakeboarding company?

A. I have the contract somewhere.

Q. When was the last time -- when was the first time you looked at that contract?

A. When Rob dumped all the contracts.

Q. How many contracts were there?

A. I don't remember.

Q. More than ten?

A. No.

Q. More than five?

A. Probably not.

Q. Probably not more than five?

A. Right. Less than five.

Q. Were they all -- when we're talking about contracts, were they all endorsement-type deals?

A. I don't recall.

Q. Okay. Do you know if the majority were

Page 82

endorsement deals?

A. I don't recall.

Q. So this contract, which is Exhibit 1, uses -- defines the term "gross sales." On your own and without reference to the contract, do you have any understanding of what the phrase "gross sales" means?

MR. MCCOY: Form.

A. I don't.

Q. Okay. Reading -- I want you to read the contract definition and tell me in your own words what you think it means to you?

MR. MCCOY: Objection to form.

THE WITNESS: Still answer, Kevin?

MR. MCCOY: If you can.

A. I still can't make much of it. I'm not an accountant, so I can't really -- I can't really dissect the definition too well.

Q. Okay. So based on the definition, you don't know what "gross sales" in the contract means; correct?

A. That is correct.

Q. In your own words, what are Blitz's obligations under this agreement which is Exhibit 1?

MR. MCCOY: Objection to form.

A. I don't know.

***

Page 83

BY MR. GOODRICH:

Q. Gross sales includes the phrase that says, "Sales derived by Steel supps" right here. Do you have any understanding what that means?

A. I do not.

Q. Have you had --

A. I mean, I know what sales are, obviously, but no, I'm not an accountant and I don't understand that definition.

Q. Okay. Have you had any discussion about this phrase. "Sales derived by Steel supps" with anyone?

A. Not outside of the legal privilege that we've been discussing. Sorry.

Q. Okay. The end of the definition says, "Sales derived by Steel supps from all sources, included but not limited to the sale of products, services, and related-like items." Do you have any understanding of what a "related-like item" means?

A. I wouldn't have an accurate -- I can come up with an accurate representation as to what it means to me. I'm not an accountant. I don't know those terms. I know what the terms mean independently but not all together like that.

Q. What does that mean, independently, to you?

A. I mean, I know what a product is, I know what

Page 84

a service is, I know what a related item is, but I don't know what -- when you put all that together, I don't know what the definition actually means.

Q. Do you have any -- in your opinion, do you have an example of what a related-like item would be?

MR. MCCOY: Objection to form.

A. No.

Q. Under this definition, would -- if Steel charges its customers for shipping, would that be a gross sale?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. You don't know?

MR. MCCOY: You gotta give me a minute to object. Object to form. You can answer.

A. I don't know.

BY MR. GOODRICH:

Q. Okay. Have you ever had a conversation with anyone, other than legal counsel, about whether shipping is included in the amounts that Steel has to pay commission on?

A. No.

Q. Same question with respect to taxes?

A. No.

Q. Do you have any understanding of whether --

21 (Pages 81 to 84)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 85

when Steel charges taxes, it has to pay commission on those taxes?

A. I'm sorry. Repeat the question.

Q. So when Steel will sell a product; right?

A. Uh-huh.

Q. And there will be a sales tax?

A. Sure.

Q. Listed under the product?

A. Uh-huh.

Q. The customer will pay that sales tax; right?

A. Sure.

Q. And do you have any understanding of whether Steel owes Blitz commission on that sales tax?

MR. MCCOY: Form.

A. No.

Q. Who would know that?

A. I don't know.

Q. What about -- same question with respect to any items that are returned. So there are items that are bought by Steel customers and then returned. Under this definition of "gross sales," is that included in Mr. Bilzerian's commission or not?

MR. MCCOY: Objection to form.

A. I don't know.

***

Page 86

BY MR. GOODRICH:

Q. Okay. Have you ever had, outside of legal counsel, any discussions with anyone about sales tax, shipping or returns?

A. No.

Q. What about discounts?

MR. MCCOY: Form.

A. No.

BY MR. GOODRICH:

Q. Okay. Paragraph 2.1 says, "The term of this agreement shall be for the contract period, unless this agreement is terminated."

Do you have any opinion on what that sentence means?

A. No.

MR. MCCOY: Form.

A. No.

Q. Okay. Going down to 2.2. This is the termination provision and it appears to provide ways in which Steel can terminate the agreement. I'm going to ask you to read Roman F(i) and tell me what that means to you?

MR. MCCOY: Objection to form.

A. Where would you like me to read again?

Q. So little (i) in parentheses.

Page 87

A. Okay. I'm not an attorney, so I don't know what that means.

Q. Okay. You have no opinion one way or the other?

A. No opinion.

Q. Do you have a general sense of how --

(Technological interruption.)

Q. We seem to be back on after a momentary break.

Do you have any understanding of --

THE VIDEOGRAPHER: Sorry, counsel. I'm having Internet issues, I think.

(A discussion was held off the record.)

MR. GOODRICH: I'll generally reask the question.

BY GOODRICH:

Q. Do you have any understanding of what Roman F (i) here means?

A. No, I read it and I don't.

Q. Okay. Other than conversations with counsel, have you spoken with anyone about what Roman F(i) means?

A. No.

Q. Can you describe, if you know, the circumstances in which Steel can terminate this agreement?

Page 88

MR. MCCOY: Form.

A. I don't know.

BY MR. GOODRICH:

Q. Okay. You don't know one way or the other if Steel can terminate?

A. That is correct.

Q. Do you have any opinion as to whether or not this agreement is perpetual in nature?

MR. MCCOY: Form.

A. I do not know.

Q. Do you have any understanding as to whether Steel could terminate this agreement if Mr. Bilzerian stopped posting on social media about Steel?

MR. MCCOY: Form.

A. I do not know. Did you hear my answer?

Q. Yes, I did. I did.

I'm moving down to Paragraph 3.1.1. Earlier you talked about Dan's social media sites, and I think you said he has an Instagram, a Facebook, a Twitter, and a Snapchat. Did I miss anything?

A. Those are the ones I'm aware that he has.

Q. Okay. Does he have a YouTube channel?

MR. MCCOY: Objection. Form.

A. I do not know.

Q. Have you ever seen a YouTube video from Dan

888.909.2720     Anthem Reporting     813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 89

Bilzerian?

A. No.

Q. Paragraph 3.1.1 says, "Celebrity shall not promote, publicize or endorse the services or products of any competitor."

My question is pretty simple: Do you have any understanding of what these phrases mean, "promote, publicize or endorse"?

MR. MCCOY: Objection to form.

A. I do not.

Q. Do you know whether they have the same definition or different definitions?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. 3.1.1 talks about how -- generally, how "Mr. Bilzerian shall not promote, publicize or endorse services or products of a competitor of Steel," and in parentheses there's a definition of "provider, seller, manufacturer or distributor of bodybuilding supplement products."

Do you have any understanding of what bodybuilding supplement products are?

MR. MCCOY: Objection to form.

A. No.

Q. Okay. What is a "provider"? Do you know what

Page 90

that means?

A. No.

Q. Okay. Have you had any discussion with anyone other than legal counsel about this definition, "competitor of Steel supplements"?

A. No.

Q. Okay. Never spoken with Dan about it?

A. No.

Q. Okay. Never spoken with Paul Bilzerian about it; right?

MR. MCCOY: Objection to form.

A. No.

Q. 3.1.2 talks about how Mr. Bilzerian is going to promote Steel through his social media sites by posting at his discretion. So I want to stop there and ask you. I understand there's such thing as a post and such thing as a story. Do you know -- and let me back up. Are you familiar with social media?

A. Yes.

Q. Okay. Do you have personal social media accounts?

A. Yes.

Q. Do you have an Instagram?

A. I do, but that's mostly just to look at what Dan's got, anything like that.

Page 91

Q. What about a Facebook?

A. I do.

Q. Do you have a Twitter?

A. I do, but it's been inactive. I never posted on -- I never put anything on it, but I think I do have an account.

Q. You have a TikTok?

A. No.

Q. Okay. Any other social media? LinkedIn?

A. I have LinkedIn.

Q. Anything else I'm missing?

A. No.

Q. Are you familiar with how those social media sites operate?

A. I'm not an expert on it. I can, from a user perspective, somebody who knows, maybe, a little percentage of how that works. Instagram I'm not that familiar with at all. I know what the difference is between story and a status, if you want to ask me that question.

Q. Yeah. You can finish your answer and we'll --

A. I'm not that knowledgeable. I know how Facebook works. I don't know algorithms. I don't know about getting followers, how that works. I'm a novice when it comes to it, other than, obviously, looking for

Page 92

-- to see where my friends are and people I have acquaintances with in the past.

Q. Who does that for Dan?

A. All Dan.

Q. All Dan. Okay. You mentioned or I mentioned the difference between a post and a story. Can you describe what that is?

A. I know that a story is something that is short-lived. It's typically -- well, it can be in any format, I suppose. It can be a screenshot, it can be a video. I don't know the length of time in which a story stays on, but that's what story is -- but I know that there's an end to the actual post being up there. Static post stays on there as long as the accountholder leaves it on there.

Q. Okay. Do you know if -- that you can have a post and a story for Facebook, for example, or is this only applicable to Instagram?

A. You know, I've seen that people do have stories now on Facebook, yes.

Q. Okay. And you don't know how long a story stays up?

A. No.

Q. Okay. Does anyone other than Mr. Bilzerian operate his social media accounts?

23 (Pages 89 to 92)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 93

A. No.

Q. Does anyone have acces to his social media accounts other than Mr. Bilzerian himself?

A. Not that I'm aware of.

Q. Were you ever around when Mr. Bilzerian was creating a post for Steel?

A. No.

Q. Okay. Do you know what his process was in creating a post for Steel?

MR. MCCOY: Form.

A. No.

Q. Have you had discussions with Mr. Bilzerian about posts for Steel?

MR. MCCOY: Form.

A. No.

Q. Okay. So your testimony is you have never discussed a Steel post?

A. Creatively or just saying, you know, "Steel wants you to post"?

Q. Let's start with creatively. Have you had any creative-type conversation with Mr. Bilzerian?

A. No.

Q. Sorry. That was a no?

A. No.

Q. What about the latter?

Page 94

A. Can you say the question.

Q. Yeah. So you divided my question into creatively, or have you had any conversations with Dan about Steel asking you to post. So, tell me about those latter conversations.

A. Steel has on occasion asked for Dan to post.

Q. Okay. And how often does Steel ask?

A. I don't recall.

Q. Okay. Was it more than five times?

A. I don't recall.

Q. Do you remember when the first time was that this became -- this was a question from Steel?

A. I don't recall.

Q. Okay. Do you remember the last time that you spoke about this with someone from Steel?

A. I don't recall.

Q. Okay. What would you tell Dan based on your conversation with Steel?

A. "Hey, Dan, can you post for Steel?"

Q. All right. Would you have that in person?

A. Yes.

Q. What was his response?

MR. MCCOY: Form.

A. I don't recall. You will have to ask Dan.

Q. Okay. You don't remember what he said to you

Page 95

in response to you saying, "Hey, Dan, can you post?"

A. No.

Q. Is there a reason you wouldn't remember that?

MR. MCCOY: Form.

A. I don't know. I don't have any reason.

Q. Okay. I should've asked this preparatory question at the beginning. Is there any reason why you wouldn't be able to testify truthfully and accurately today?

A. No.

Q. Any issues with memory that you know about?

A. No.

Q. Do you know whether Mr. Bilzerian had a different method of creating a post versus a story?

A. No.

Q. Okay. Did you ever talk about -- with him, whether he was going to post a post or story?

A. No.

Q. Was that all left up to him?

A. Correct.

Q. What determined the frequency with how Dan would post? How was that figured out?

A. You have to ask him. I don't know.

Q. So you don't know? That would all be a question for Dan?

Page 96

A. It would be a yes, correct. That would be a question for Dan.

Q. Do you know whether Mr. Bilzerian posted about Steel on all of his social media accounts?

MR. MCCOY: Form.

A. I do not know.

Q. Do you know how Mr. Bilzerian determined if he was to post on one platform versus another?

MR. MCCOY: Form.

A. Ask Dan. I do not know.

Q. Okay. That's a Dan question.

So in terms of the Steel products, do you know if Dan posted about each and every Steel product?

A. I don't know.

Q. Did you ever have a discussion with Dan about what products he would post on any given day?

A. I don't recall.

Q. Okay. How would you go about recreating whether or not a conversation like that existed?

A. I don't understand your question.

Q. Yeah, so if I understand your response, so -- let me back up.

The question is: Did Dan post about each and every Steel product? And your response is you don't remember. Is there a way for you to find out?

24 (Pages 93 to 96)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 97

A. No. I would ask Dan. I wasn't involved during the beginning stages of this deal, so it would be impossible for me to determine as to whether or not he was posting on things that were available, you know, before my time, nor did I keep track or inventory of every product that he's ever posted on behalf of Steel.

Q. And just to be clear, I'm not -- I haven't been limiting the questions to any particular time frame in terms of your relationship with Blitz. So does that change any answers to questions you've been giving? I'm asking overall in your relationship with Blitz?

A. It does not.

Q. Okay. And do you know whether Mr. Bilzerian endorsed some products more than others?

A. I can't recall.

Q. Okay. Who would know that?

A. Dan.

Q. And did you ever have any conversation with Dan about the products that Steel was requesting he endorse?

A. Repeat the question, please.

Q. Yeah. So was there ever a conversation between you and Mr. Bilzerian about the products that Steel was requesting Dan endorse?

Page 98

A. I can't recall.

Q. Do you know whether Mr. Bilzerian did a post or a story more frequently for Steel?

A. I can't recall.

Q. Did you keep track of that in any way?

A. No, I did not.

Q. Did anyone from Blitz keep track of -- first off, the platform on which Mr. Bilzerian would post for Steel?

A. I can only speak for myself. And you would have to ask Dan.

Q. But you said -- the question is a little bit different.

Did anyone from Blitz keep track of the platform on which Mr. Bilzerian was endorsing Steel?

A. Not that I'm aware. However, I can't speak for Dan. I don't know.

Q. Did anyone from Blitz keep track of the frequency of posts?

A. Not that I'm aware of.

Q. What about the products that Mr. Bilzerian was posting about?

A. Not that I'm aware of.

Q. Do you have any understanding of what a story highlight is?

Page 99

A. No.

Q. Okay. Have you ever heard that phrase before?

A. I have not.

Q. Do you know whether a post or a story provides more value to Steel?

MR. MCCOY: Form.

A. No.

Q. Again, your testimony is no conversation with Mr. Bilzerian about posts, stories, story highlights, anything along those lines?

A. No.

MR. MCCOY: Brian, hold on one -- I just want to so I don't have to interject. All these conversations you are asking about with anything that relates to this would -- can we just agree that all of this is prior to filing the lawsuit, that's what you are asking about?

MR. GOODRICH: Yes. I'm asking about pre-lawsuit conversations.

MR. MCCOY: I just wanted to clarify that across the board, that way I don't have to interrupt your flow.

MR. GOODRICH: Yes.

MR. MCCOY: All right. Thank --

MR. GOODRICH: Sorry.

Page 100

MR. MCCOY: Sure. No problem.

BY MR. GOODRICH:

Q. Now, in looking at Exhibit 1, still, we have, in paragraph 4, a provision that says, "Steel Supps shall pay Blitz a 10 percent commission on a gross sales of Steel Supps, beginning with sales" -- "beginning as of April 1, 2017."

Do you see that?

A. I do.

Q. Okay. Did Steel do that?

MR. MCCOY: Form.

THE WITNESS: And I have no idea what that term means so I have no idea.

BY MR. GOODRICH:

Q. So you don't know whether it happened; correct?

A. Correct.

Q. And you don't know -- when you say what "term" means, are you talking about gross sales?

A. Correct.

Q. Is it Blitz's contention that it was underpaid?

MR. MCCOY: Form. Just to be clear, for purposes of everything today, he is not the corporate rep.

25 (Pages 97 to 100)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 101

MR. GOODRICH: Fair enough.

MR. MCCOY: And that, maybe, shortens what you are trying to accomplish. He's here in his personal capacity, as he was noticed, so not on behalf of the company.

MR. GOODRICH: Fair enough. I understand that.

MR. MCCOY: Okay.

BY MR. GOODRICH:

Q. Do you know whether Blitz is claiming it was underpaid?

MR. MCCOY: Form.

THE WITNESS: Yes.

BY MR. GOODRICH:

Q. And by how much? Do you know?

MR. MCCOY: I'm going to -- unless you know that independent of a conversation you've had with counsel in a privileged setting, you are not going to answer that question.

So do you know that from some source other than speaking with the attorneys.

THE WITNESS: No.

BY MR. GOODRICH:

Q. I actually want to go backwards now, to paragraph 3.1.2. And here it says -- and you can

Page 102

follow along with my pointer. "Blitz agrees to and will procure that celebrity provides the services to the best of their skill and ability."

Do you see that sentence?

A. Yes.

Q. Would you agree with me that Mr. Bilzerian's efforts in terms of promoting Steel were minimal?

MR. MCCOY: Form.

(Multiple speakers.)

THE WITNESS: I don't know on that. Why don't you ask Dan?

BY MR. GOODRICH:

Q. Sorry. If you'd just give Mr. McCoy a second after I ask the question.

A. I apologize.

Q. I missed the answer, so can you please restate it?

A. Yes. I have no opinion on that.

Q. Okay. If Mr. Bilzerian characterized his effort as minimal, you'd agree with that?

MR. MCCOY: Form.

THE WITNESS: You have to ask Dan.

BY MR. GOODRICH:

Q. Okay. So whatever Dan says?

A. Correct.

Page 103

Q. You, Jason Verona, individually and as COO of Blitz, have no opinion one way or the other about Mr. Bilzerian's efforts under the agreement?

A. That is correct.

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Did you ever have a concern that Mr. Bilzerian was not posting as much as he should?

A. Repeat the question, please.

Q. Did you as -- Jason Verona, as COO of Blitz, ever have a concern that Mr. Bilzerian was not posting as much as he should?

MR. MCCOY: Form.

THE WITNESS: I can't recall.

BY MR. GOODRICH:

Q. Okay. How would I determine whether this was a concern of yours? Would there have been an e-mail exchange, something?

MR. MCCOY: Form.

THE WITNESS: Ask Dan.

BY MR. GOODRICH:

Q. Okay. So only Dan would know the answer to that?

A. If it ever happened, he would.

Q. We touched on this briefly, but I want to

Page 104

expand on it. Did Steel ever express frustration with Dan's posts?

A. I can't recall.

Q. Okay. So you don't remember any conversations with Steel about either the frequency of the posts, the quality of the posts, the content, anything along those lines?

A. I can't recall. If you have some documents that you want to throw in front of me, I can read them and then confirm at that point, but off my memory, I can't recall.

Q. Okay. And we'll go through some documents later. Did Steel ever convey to Blitz what types of posts were best?

A. Not that I can recall.

Q. Do you -- when I use the phrase a swipe up with a direct link; do you know what that means?

A. Yes.

Q. Okay. What does that mean to you?

A. If you put it -- a swipe, like on the bottom, it's a swipe up, and you can swipe up, and it goes directly to wherever you are directing that swipe up to.

Q. Did Steel ever have a conversation with Blitz that swipe ups with direct links were the best types of

26 (Pages 101 to 104)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 105

posts?

THE WITNESS: Kevin, should he be referring to it as conversations with Blitz or conversations with me?

MR. MCCOY: Yeah. I -- if you have personal knowledge of this or recollection, then, obviously, we can talk about it. If there are e-mails that would refresh your recollection. But you're not --

THE WITNESS: But he's talking about Blitz, I mean --

MR. MCCOY: Yeah. You're not speaking on behalf of Blitz.

BY MR. GOODRICH:

Q. And I don't want to get this confused. Like your counsel said, you are not a 30(b)(6) deposition here today. And I want to know about if you individually --

A. Individual -- you are saying did Blitz have any conversations? That's kind of a broad term. There are other employees at Blitz. I can't speak on their behalf, especially while we're in here, that's what I was told prior to me starting.

Q. That's fair enough. So the question is: Do you know of anyone having a conversation with Steel about the fact that swipe ups with direct links, that's

Page 106

the best type of post? Whether it was you or someone else?

A. No, I do not recall.

Q. Sorry. I missed that.

A. I do not recall if I've had any communication regarding that issue and I do not know if anybody else on Blitz's half had that conversation with Steel.

Q. Do you know how often, if ever, Mr. Bilzerian, in his posts for Steel, included a swipe up with a direct link?

A. No.

Q. Do you recall any conversation with Steel about Mr. Bilzerian's metrics?

A. No.

Q. Any conversation with Steel about how much of a bump he was providing in Steel -- providing to Steel, relative to how much money he was making?

A. I don't recall.

Q. I have heard in the course of this lawsuit that Mr. Bilzerian claims he built Steel. Have you ever heard someone say that?

A. Yes.

Q. Okay. And who have you heard talking about that?

A. Dan.

Page 107

Q. What does he say, specifically?

A. Specifically, that he built Steel.

Q. How did Mr. Bilzerian build Steel?

A. He had said that they had -- sales had increased a considerable amount since he had signed on to become an endorser or sponsorship capacity.

Q. Okay. When did you have this conversation with Mr. Bilzerian?

A. I don't recall.

Q. Because earlier I thought you testified that you have not spoken with Mr. Bilzerian about this lawsuit or Steel at all. And I understand now you are telling me you have heard that Mr. Bilzerian said about Steel, "I built it"?

MR. MCCOY: Objection to form. Those are two different things. There's a question about whether he talked about the lawsuit, and then there's a separate issue of whether he talked about building Steel, so...

BY MR. GOODRICH:

Q. So, let's talk about the latter. Tell me about all pre-lawsuit conversations you can recall with Mr. Bilzerian about Steel?

A. Well, since you brought that one up, that I remember having a conversation. It was brief. He

Page 108

would just say, "I built" -- like you said, "built Steel."

And I told you the -- how the conversation went. Basically, I'm just saying that he's built them up from a -- a considerable amount of revenue per month, since Dan himself entered the agreement.

Q. And when did this conversation happen?

A. I don't recall.

Q. Do you remember when -- was it more than once?

A. I don't recall.

Q. And what was the context? Did he come in your office and say, "Hey, I built Steel." How did that happen?

A. I don't recall.

Q. Okay. What was your response?

A. I basically would nod and say, you know, "If that's what you believe, then, you know, I believe that to be the case." I never did any research on it, so it is what it is.

Q. Okay. Do you have any opinion as to whether or not that's true?

A. No.

MR. MCCOY: Form. Sorry.

BY MR. GOODRICH:

Q. In saying that he built Steel, do you know

27 (Pages 105 to 108)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 109

what Mr. Bilzerian is relying on?

MR. MCCOY: Form.

THE WITNESS: You're going to have to ask Dan.

BY MR. GOODRICH:

Q. Did he ever identify -- so other than saying, "I built Steel, they have a lot of sales now," other than by reference to sales, generally, can you point to anything in particular which would show whether he, in fact, built Steel?

A. I don't recall.

Q. Okay. Have you ever heard of the phrase "organic posting"?

A. Yes.

Q. What does that mean?

A. I do not know.

Q. Okay. Who have you heard use that phrase?

A. Dan.

Q. And what has Dan said?

A. He's just said that he likes to -- whenever he does posts, he likes to do them organic. Whether it be for just a regular post or posting on anyone's behalf, he likes to do so organically.

Q. And what does that mean to you?

MR. MCCOY: Form.

THE WITNESS: I don't know. You'll have to

Page 110

ask Dan.

BY MR. GOODRICH:

Q. Okay. And how has organic posting come up in conversations with Mr. Bilzerian?

A. I don't recall.

Q. Do you know whether what he calls organic posting whether it's permissible --

MR. MCCOY: Form. Sorry. Go ahead.

BY MR. GOODRICH:

Q. -- whether it's permissible?

MR. MCCOY: Form.

THE WITNESS: I don't understand what question you are asking.

BY MR. GOODRICH:

Q. Yeah. So have any issues -- across the spectrum of Mr. Bilzerian's businesses, have any issues, to your knowledge, arisen with respect to the FTC, the Federal Trade Commission, and Mr. Bilzerian's organic posting?

A. Not that I'm aware of.

Q. Okay. Have you ever had this discussion with Mr. Bilzerian over whether he can permissibly post organically?

A. Not that I recall.

Q. Are you aware of any complaints based on the

Page 111

organic posting?

A. Not that I can recall.

Q. Any discussions with Mr. Bilzerian about that at all?

A. Not that I can recall.

MR. GOODRICH: We've been going for over an hour. Can we take, maybe, a 15-minute break? Does that work for everyone?

MR. MCCOY: That's fine with me.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Off the record 2:32 p.m. Eastern Standard time.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record, the time is 2:48.

MR. GOODRICH: So we're back after a brief break.

BY MR. GOODRICH:

Q. So, Mr. Verona, we talked about text messages. I want to continue to drill down on that. Did you ever -- did you communicate with Mr. Bilzerian by text regularly?

A. Define "regularly."

Q. How often -- well, let's rephrase. How often would you communicate with Dan Bilzerian by text?

Page 112

A. I really don't recall. I mean, maybe once or twice a day.

Q. Okay. And is that from inception of your work at Blitz, around once or twice a day?

A. That would be accurate.

Q. Did it ever increase?

A. Depends if we're in a heated conversation with one another, it can go back and forth sometimes.

Q. Okay. Would you text over the weekends?

A. Sure.

Q. Okay. What about Rob Hagen? You brought his name up, would you ever text with him?

A. I can't recall.

Q. Okay. Mr. Feder, would you text with him?

A. Minimally, but, yes.

Q. How often would say you texted with Mr. Feder?

A. Once a week.

Q. Generally, was there a specific topic of conversation?

A. Not that I can recall.

Q. Okay. What about Mr. Rohleder?

A. All personal, if anything. Actually, like if -- yeah, it's all personal and I would say once every three weeks.

Q. What's your personal relationship with

28 (Pages 109 to 112)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 113

Mr. Rohleder?

A. Just like -- I was helping him get a car to him, I think, a couple of weeks ago, so I was talking to him about that.

Q. Okay. This doesn't relate to Blitz or Blitz's business in any way?

A. No.

Q. Do you text with anyone else at Blitz?

A. Yes.

Q. With who?

A. All my employees.

Q. So, Mr. Geller, you text with --

A. Yes.

Q. -- Victor R, the bookkeeper?

A. Victor, no.

Q. Okay. How would you communicate with him?

A. The housekeeper, yes; chefs, yes; executive assistants, yes.

Q. Who is your cell phone provider?

A. Cricket.

Q. Okay. And does Blitz pay for your cell phone?

A. No.

Q. And I might have asked this in a different way before, but have you, at any point, been instructed to stop deleting messages?

Page 114

A. Not that I can recall.

MR. MCCOY: Objection. Obviously, any communications that have happened with counsel, I'm going to ask you not to disclose those.

BY MR. GOODRICH:

Q. Does -- do you know if Mr. Bilzerian also deletes his messages?

A. I don't know. You have to ask him.

Q. Do you know if anyone at Blitz deletes messages, whether text messages, e-mails?

A. You have to ask them. I do not know.

Q. Does Blitz have an e-mail account, so like, @blitz.com or something like that?

A. @blitznv.com.

Q. Okay. And who has @blitznv.com e-mails?

A. I have an account, Feder had an account, and Michael Geller has an account.

Q. So you, Michael Feder, and Mr. Geller. Anyone else?

A. Currently?

Q. Let's start with when you started. Do you know who had -- well, let me back up. Was the e-mail address always the same?

A. No, there was an @danbilzerian.com address as well.

Page 115

Q. Okay. Does -- and do you know if Mr. Bilzerian has an @blitz e-mail address?

A. He does not.

Q. Okay. So when you started, who had the Blitz e-mail address?

A. Nobody.

Q. Well, sorry. When you obtained the @blitz e-mail address, who was getting one?

A. Me and Michael Feder. Actually, it was just me at first, and then Michael Feder. I can't remember how long after I had it, but it was less than three months, probably.

Q. And then, at some point, Mr. Geller was given an e-mail address?

A. Mr. Geller started March, and instead of giving him an @danbilzerian account, I gave him an @blitznv account.

Q. Why did you give him a Blitz as opposed to an @danbilzerian?

A. Same reason that I basically switched over because I didn't believe it appropriate or professional for anybody to be having @danbilzerian at the end of their e-mail. One, it basically states who you work for. Especially in our line, where we're e-mailing, like, vendors, those type of people, you don't want

Page 116

them knowing that you work for Dan Bilzerian because then they're going to try to upcharge you on certain things, and -- yeah, that's basically the reason why.

Q. Was the @bilzerian e-mail address associated with any company in particular?

A. I don't know how to answer that. You want to repeat the question?

Q. Yeah. Was there a Dan Bilzerian company, for example, which all employees had an @danbilzerian e-mail address?

A. No.

Q. Okay. So how did you get the @danbilzerian e-mail address?

A. That was given to me when I first started, by Rob Hagen asking Jeremy Guyman to set me up.

Q. Okay. Who made the decision to transition to the Blitz e-mail address?

A. I did.

Q. And did anyone, at any point, other than yourself, Mr. Feder, Mr. Geller, have a Blitz e-mail address?

A. They did not.

Q. Does Mr. Feder still have access to his Blitz e-mail address?

A. No.

29 (Pages 113 to 116)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 117

Q.  Does Mr. Geller still have access to his?

A.  Yes.

Q.  Okay.  So if I understand, you are the only two people with Blitz e-mail addresses; correct?

A.  Correct.

Q.  Have you ever addressed Mr. Feder's Blitz e-mail address?

A.  Yes.

Q.  And when was that?

A.  Upon the first request from Kevin McCoy to collect the e-mails.

Q.  Okay.  And did you access Mr. Geller's e-mail at the same time?

A.  Yes -- no.  No, I did not.

Q.  Is there a reason why not?

A.  Michael Geller has nothing do with this.

Q.  Okay.  Did you find any e-mails from Mr. Feder related to this lawsuit or Steel?

A.  Yes.

Q.  And did you produce them?

A.  Yes.

Q.  Do you remember when it was?  Like, in terms of a date, when you accessed Mr. Feder's e-mail account?

A.  I don't recall.

Page 118

Q.  Okay.  Have you accessed his account since that initial search?

A.  Yes.

Q.  Okay.  When was that?

A.  I don't recall.

Q.  What were the circumstances for you accessing it again?

A.  Basically, Kevin presented to me with two e-mails that he thought that were produced by your side.

MR. MCCOY:  Hold on.  Whoa, whoa, whoa.  If you were doing stuff because of conversations with us, do not answer that.  So if you did it for some reason unrelated to information I provided or instruction I gave, then you can talk about that.  If you did it not -- if you did it as part of the efforts to collect data in this case and produce it, then do not answer that question.

THE WITNESS:  That is the only time I had done it.

BY MR. GOODRICH:

Q.  So I'm going to share my screen again.  We're going to talk about Exhibit 2.

(Plaintiff's Exhibit No. 2 was marked for identification.)

Page 119

BY MR. GOODRICH:

Q.  I will represent this is another version of the Personal Services Sponsorship/License Agreement and the change that I see is this agreement talks about gross profits as opposed to gross sales.  Again, I'm happy to scroll through as quickly or slowly as you would like.

A.  You can start scrolling through.

Q.  Sure.  Just let me know when you want me to keep going.

MS. STEIN:  Again, if you can zoom out a little bit.

MR. GOODRICH:  Yeah.  Sorry.  It looks normal size to me.  So let me know if you need that.

MS. STEIN:  That's better.  Thank you.

THE WITNESS:  There's a typo right there at 1.2.

BY MR. GOODRICH:

Q.  Where's the typo?

A.  "Steep Supps."

Q.  I see.  We should see if there -- anyone in that company.

A.  Let's go -- yeah, keep on going.  Okay.  Keep going.  Keep going, please.  Keep going.  Yeah, now, you are in the legal language.  Okay.

Page 120

Q.  Okay, as in you're good or okay, keep scrolling?

A.  I'm good because the rest is all legal language, so...

Q.  So my first question is:  Have you ever read this version of the agreement, which is Exhibit 2?

A.  No.

Q.  Okay.  You've never seen this before today?

A.  Correct.

Q.  Okay.  Has anyone ever told you anything with respect to a contract containing the phrase "gross profits"?

A.  No.

Q.  Do you have any understanding as to how the agreement went from first gross profits to gross sales?  What the difference between the two contracts are?

A.  No.

Q.  Okay.  So your testimony is, this is your first time seeing this document today?

A.  Yes.

Q.  Okay.  And no conversation with Mr. Bilzerian -- and again, I'm not asking about any conversations at the direction of counsel or with counsel -- but no conversation with Mr. Bilzerian about a contract containing gross profits?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 121

A. No.

Q. Okay. AND no conversation about the phrase "gross profits" with anyone in terms of Blitz's relationship with Steel?

A. Not that I can recall.

Q. Okay. I'm going to pull up Exhibit 3.

(Plaintiff's Exhibit No. 3 was marked for identification.)

THE WITNESS: I'm closing two notifications on top of my computer right now, just so you know.

BY MR. GOODRICH:

Q. Not related to the deposition, I assume?

A. Weekly update call-in for a reminder for Norton Antivirus.

Q. A reminder for what?

A. Norton Antivirus.

Q. You get a lot of those updates.

All right. So I have Exhibit 3 on a screen. Do you see what I'm looking at?

A. Hang on one second. I'm having -- my whole screen just went smaller. Hang on a second. Videos. I'm just trying to figure out how to enlarge my screen here. Sorry.

Q. I can make this document larger if it helps.

A. No, my screen -- it was the full screen before

Page 122

and when I clicked on it to close those notifications, all of the sudden, it, like, minimized.

(Off the record.)

THE WITNESS: All right. You know what, let's try to work off of this for right now. I don't see anybody's faces and I don't see -- I can probably just -- I can see the agreement, though, that you have in front of me.

BY MR. GOODRICH:

Q. Okay. Well, as long as can you see the agreement, that's the important part for now.

A. Okay.

Q. Do you need me to scroll through this agreement because I'm happy to?

A. This agreement. Can you scroll through? Keep going. Keep going. Keep going.

Q. Okay. Have you ever seen that document before?

A. No.

Q. Have you had any conversations with anyone about an amendment to the Steel and Blitz contract?

A. Once again, this is outside of the communication with legal; correct?

Q. Correct.

A. Then, no.

Page 123

Q. Okay. So putting aside conversation, do you know that there was ever an anticipated amendment -- or let me rephrase.

Do you know whether there was an anticipated amendment to the agreement with Steel?

MR. MCCOY: Form.

THE WITNESS: No.

BY MR. GOODRICH:

Q. Okay. So my question is, again -- and I'm looking at recitals in paragraph C. Paragraph C says something to the effect -- well, I'll read it. It says -- I'm picking up at the middle of this sentence, "Celebrity may want to promote, publicize, or endorse the services or products of a competitor." And I'll stop there. Do you know what "competitor" this references?

MR. MCCOY: Form.

THE WITNESS: And I do not.

BY MR. GOODRICH:

Q. Was there ever a discussion with anyone about Dan or Blitz endorsing someone or a company competitive to Steel?

A. No.

Q. Okay. So you don't know where this document comes from?

Page 124

A. Correct.

Q. The following phrase says, "Moreover, there's a question as to the breadth of what is considered a bodybuilding supplement product." Do you see where I'm reading?

A. I do.

Q. Have you had -- do you know of any conversations to that effect?

A. No.

Q. Okay. Have you ever heard anyone talking about, you know -- again, outside of what you've spoken with counsel -- have you had any conversations about constitutes a bodybuilding supplement under the Steel/Blitz agreement?

A. No.

Q. Do you know whether Blitz or anyone from Blitz addressed this question in terms of what is a bodybuilding supplement with Steel?

A. I can only speak for myself and, no.

Q. Okay. So you never addressed the question of what constitutes a bodybuilding supplement with Steel; correct?

A. That is correct.

Q. I have a question about the last sentence in paragraph 3 on page 1, which says, "In addition, per

31 (Pages 121 to 124)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

## Page 125

the avoidance of doubt, the definition of any competitor of Steel Supp shall not include a provider, seller, manufacturer, or distributor of supplement products, if not marketed or sold as building supplements," and then in parentheses, "(i.e., a vegan supplement for health or nutrition.)"

Again, have you had -- first of all, take a step back. Do you understand what that means?

MR. MCCOY: Objection to form. Sorry.

THE WITNESS: I really don't. I'm no lawyer and I'm not an expert in supplements, so I really don't -- I can't give you an accurate definition of what I believe that to mean.

BY MR. GOODRICH:

Q. Okay. Do you have any -- let me back up. How is something marketed as a bodybuilding supplement, if you know?

A. I don't know.

Q. You don't know. Okay. Would you agree that how something is marketed is important?

MR. MCCOY: Objection to form.

THE WITNESS: Repeat the question.

BY MR. GOODRICH:

Q. Yeah. Would you agree that how something is market is important?

## Page 126

A. Yes.

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. So under this language -- and if you don't know or you don't have any opinion, that's fine. Under this sentence that I just read, would endorsing a vegan supplemen66666665t that's marketed as a bodybuilding supplement be prohibited under this agreement?

MR. MCCOY: Objection to form. Are we looking at the same thing that's not signed?

MR. GOODRICH: Yeah. I'm asking about this document.

MR. MCCOY: Okay. But scroll down so I can --

MR. GOODRICH: This is --

MR. MCCOY: Very good.

MR. GOODRICH: Not signed. I'm just asking about your interpretation of this document, if you have one.

MR. MCCOY: Okay.

THE WITNESS: You want to repeat the question again?

BY MR. GOODRICH:

Q. Yeah. So, for example, it says -- it's basically, as I read it, saying that the definition of a competitor doesn't include provider, a seller,

## Page 127

manufacturer, or distributor of something if it's not marketed or sold as a bodybuilding supplement. So my question -- and then it lists an example, a vegan supplement for health and nutrition. So if something was -- my question is, if there is a vegan supplement marketed as a bodybuilding supplement, under this language it would be prohibited; correct?

MR. MCCOY: Objection to form.

THE WITNESS: You're reading it. I mean, I have no opinion.

BY MR. GOODRICH:

Q. You have no opinion. Okay. So, again, you don't know whether this agreement was signed, became effective, you don't know anything about this agreement?

A. That is correct.

Q. Okay. I am going to pull up -- so Exhibit 4 as we've sent over, is a compilation of payment e-mails. So I'm not going to go through every single one of them.

(Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. GOODRICH:

Q. I have a question just about a couple, and I'll pull this one up. This is within the Exhibit 4

## Page 128

compilation, it's Bates-stamped Steel284, and it's an e-mail to you from Jason Huh, on June 8, 2018. Do you see that?

A. I do.

MR. MCCOY: Brian, a quick question. So is Exhibit 4 going to be all of these e-mails or is Exhibit 4 now this portion?

MR. GOODRICH: No, I'm just going to admit Exhibit 4, the compilation.

MR. MCCOY: Okay.

MR. GOODRICH: Not just this. But I just have a couple of questions about these payment e-mails.

BY MR. GOODRICH:

Q. Because I -- my first question is -- let's see. I'm reading here, it's a June 8, 2018. You write. "Hope all is well. Just checking in on when we should expect May's wire, also financials on that month would be very much appreciated."

Do you see where I'm looking?

A. I see it.

Q. What determined whether Blitz would ask for financials or not?

A. I believe that -- just give me a second. Let me try to think back. This is obviously three and a half years ago. (Reading to self.)

888.909.2720                    Anthem Reporting                    813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 129

I believe that was the impetus to me discovering that there weren't being sales reported from Amazon or wholesale, and I believe that that's how I started that conversation.

Q. Okay. So I thought you testified that you didn't know about underpayment?

MR. MCCOY: Objection to form.

THE WITNESS: I may have been mistaken because I think I was going off of, like, the 10 percent, whether or not there was underpayments on that. More specifically speaking, I knew that there was underpayments beginning in the infantile stages of my employment, knowing that they were not reporting Amazon and wholesale sales.

BY MR. GOODRICH:

Q. Oh, let's break it up because you say in the beginning stages of your employment you knew that Steel was underemployed -- underpaying. How did you discover that?

A. I didn't know for sure, but I figured that to be the case because I went -- I simply went to Amazon.com and I saw that Amazon was providing -- Amazon was providing -- they were selling product on Amazon. So at that point, I thought that it would be appropriate -- and if I'm reading these e-mails

Page 130

correct, I don't know the order, what the one on top is. But I thought that to the -- that there was other avenues in which they were bringing in money and that's why I had asked.

Q. So prior to June 18th, 2018, you were not aware that Steel was selling products through Amazon?

A. I'm not too certain of those dates, because I don't know what that e-mail states above because it says "wholesale and Amazon," so that might be before. See, I'm just a little confused here, because it came to me -- what was the -- at 12:55. So at 1:29 p.m., you guys gave me the wholesale and Amazon, so -- yeah, that's probably why I had asked for the breakdown.

Q. Before this, this June 18th, 2018 e-mail, Blitz wasn't getting compensation related to Amazon?

A. I don't recall when the actual -- when that actually happened and when I had brought that to their attention. It was probably right around June. It could've very well been the month before, it might have been the month after. I don't remember exactly.

Q. So how did you bring it to their attention?

A. That was on a phone call.

Q. So what did you say?

A. I said, "Hey guys, are you guys selling through Amazon and/or -- and wholesale?"

Page 131

And they said "yes."

And I said, "Well, you got to start reporting that." And they're like, okay.

Q. Who did you speak with on this phone call?

A. I don't recall. But -- you know, like, it could've been Tony Pasquale, it could've been -- Jason could've been on the call. I really don't recall exactly who I spoke to.

Q. Jason Huh could've been on the call?

A. Could've been.

Q. You mentioned Tony Pasquale. Who is Tony Pasquale? He's copied on this e-mail.

A. Sure. So my understanding -- I mean, I don't know what his title is, but he was the one, back then, who would send me the numbers.

Q. Okay. And would it always be in a format similar to this?

A. For the most part.

Q. Okay. And your testimony is that in June 2018, you -- well, let me back up. How did you discover that, according to you, Steel was underpaying Blitz by going to the Amazon website?

MR. MCCOY: Objection to form.

THE WITNESS: I already answered this but I guess I'll answer it again.

Page 132

BY MR. GOODRICH:

Q. Please.

A. I basically just went on Amazon, and I saw, you know, the amount of money that Dan was getting paid per month, and I said, you know what, this seems to be somewhat of a successful company. I would assume them to be selling through alternate means other than simply through steelsupplements.com. It was just a hunch.

Q. Okay. And you've since confirmed your hunch; right?

A. That is correct.

Q. How?

A. By them admitting that there were other -- other channels in which they were selling the product.

Q. So tell me more about the call. So you get on a call and you're speaking with -- well. You don't remember who you're speaking --

A. I don't recall who was on the call. I really don't.

Q. Would it have been around this time frame, June 8th, 2018?

A. Within -- it might have been May, it might have been June, and it -- yeah, it had to be, like, May or June, I would say.

Q. And according to you, you confront Steel about

33 (Pages 129 to 132)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 133

the fact that they're selling on Amazon; right?

A. That is correct.

Q. And before this time frame, Amazon -- Amazon was not reflected in the payment e-mails; correct? That's your position? Yes?

A. That is correct.

Q. Okay. And what's the response from Steel?

A. I think that they were pretty amenable to making the change. And I said, "We have to go back, and we have to go back to the inception of the contract, and you are going to have to provide those figures from Amazon, but I also have to assume that you guys are selling in stores too."

And they didn't deny that to be -- you know, they didn't deny that they were.

Q. Okay. Let's take it one step at a time. So you said, we got to go back to the inception of the contract and reconcile all this; right?

A. Sure.

Q. Again, you don't -- this isn't refreshing any recollection of who you spoke with?

A. Not on the phone, no.

Q. Okay. So you are speaking with someone from Steel. What do they say in response to your request to reconcile?

Page 134

A. From what I can recall, again -- I'll answer it again. They said, "Okay. You're right. We are selling on Amazon, we are selling wholesale, we'll start reporting it, and we'll provide" a -- you know, "we'll reconcile back to the beginning of the contract."

Q. And did they?

A. They did. Based on the number that they gave me. I don't know if that number was correct. I was just assuming that to be the case.

Q. Well, you say don't know if the number was correct, but you had access to Steel's financial dashboard; right?

A. Just off of Steelsupplements.com. I did not have Amazon -- access to their Amazon or their wholesale.

Q. So walk me through what -- walk me through what the financial dashboard looks like, so I can get an understanding.

A. I can't recall. There's a -- I can't -- honestly, I can't recall. It says, "Total sales," there might be a returns number on there, and then I think you have the ability to do it month by month, week by week.

Q. And I mean, you have no recollection of what

Page 135

it looks like, is it just numbers or can you click links to access sales or different sales channels? Any --

A. -- yeah, I believe that there's, on the left-hand side, analytics. Again, I don't work with Shopify all that often, but -- and so there's analytics -- that's all that I can really remember off of the site dashboard. I mean, yeah, there are terms inside of the dashboard, you can get more deep into the reports than simply the number that's provided on the front page.

Q. Okay. And did you look at that information?

A. The only time that I did that was to do three days at a time.

Q. Sorry. The only time you did what?

A. The only time that I would go past that, of the number that was reported on Steel on the Shopify account, was to implement the actual month. So if I went in, let's say, on August 2nd, total sales would be showing -- might be showing for just August 2nd. So I had to go in and put in July 1st through July 31st to find out what that total would've been for July.

Q. Okay. And how often did you log into the dashboard?

A. Once a month. Maybe I missed a couple of

Page 136

months here and there.

Q. Did you log into the dashboard prior to June 8th, 2018?

A. I don't remember when they gave me access.

Q. Okay. So you have to rely on whatever Steel said in terms of -- in terms of when you had access to the dashboard?

A. That would be correct. Jake gave me access, I just don't remember when.

Q. Who gave you access?

A. Jake.

Q. Jake? And is that Jake Goodwin?

A. I don't know his last name, but I would assume that to be, I guess.

Q. Okay. And would your access have been given to you over e-mail or would that have been a phone call with the information?

A. I don't recall.

Q. Okay. Do you know whether the information you looked at on the dashboard was different from what Steel looked at?

A. I do not know.

Q. Okay. So it could've been the same information?

MR. MCCOY: Form.

34 (Pages 133 to 136)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 137

BY MR. GOODRICH:

Q. So as far as you're concerned -- let me rephrase.

So June 2018, you point out to Steel, "Hey guys, you've been underpaying us since the inception of this contract." Right so far?

A. Correct.

Q. Steel says, "Yeah, you are right. We will correct this;" correct?

A. Correct.

Q. At any point, did Blitz issue Steel a notice of breach?

A. Not that I'm aware of.

Q. Okay. Steel then corrected it; right?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. And then the relationship continued?

A. Correct.

Q. Okay. So --

A. You might say Steel remedied it or corrected it. They just reported numbers on wholesale and Amazon without necessarily providing any backing to those reports.

Q. So what did they provide you?

A. They basically provided me what you're seeing

Page 138

right there, wholesale 23,296 and 14 -- 114,906.95, nothing past that.

Q. Well, you had access to the dashboard; right?

A. No. I just had access to that first 997 dashboard. I never had -- 997, so if you look at the 997 number, that was always given to me as Steelsupplements.com; okay? That wasn't Amazon. 23,296 is what they're claiming to have sold wholesale and to stores. $114,906.95 is what they're claiming to have sold on Amazon. The latter two, I never received any reports to, necessarily, correlate that those were the accurate numbers. The only number that -- in the dashboard that I saw was reflected in that $997,000.

Q. So if I'm understanding what you are saying, you didn't see any reports specifically with respect to wholesale or with respect to Amazon?

A. That is correct.

Q. And they weren't located on the dashboard?

A. That is correct.

Q. Were you ever able to access the wholesale and Amazon information on the dashboard?

A. No.

Q. Did you ever ask Steel to provide you that information?

A. No.

Page 139

Q. Why?

A. You know what, it was a -- you know, I believed them, I thought they were good people, at that time. I thought that they were going to be reporting honestly and I just went on that.

Q. Okay. So do you have any reason to believe these numbers here, for example, the 23,296 and 114,906.95 are inaccurate?

MR. MCCOY: I'll just object. If you have a belief based upon any work product or conversations with counsel. But if you have something independent of what's been developed as part of our case. Do not reveal anything you've discussed with counsel.

THE WITNESS: Okay. Then, no.

BY MR. GOODRICH:

Q. So when did you develop the belief that these were inaccurate?

THE WITNESS: Kevin, should I be answering that?

MR. MCCOY: If you had the belief prior to the lawsuit being filed, you can tell them that date. If you have a belief after the lawsuit was filed -- let me put it this way, if you have a belief prior to the date the lawsuit was filed, you can tell him

Page 140

that date. Outside that, then you don't answer.

THE WITNESS: I don't have a belief before the lawsuit was filed.

BY MR. GOODRICH:

Q. Okay. Did you ever ask Steel or anyone at Steel to physically go to Steel to look at financial records?

A. No.

Q. Did anyone from Blitz ask that?

A. I can't speak on anybody else's behalf. I don't know.

Q. Okay. So after the reconciling, so to speak, was there any underpayment by Steel?

MR. MCCOY: Objection to form.

THE WITNESS: Not that I thought to be the case at that time.

BY MR. GOODRICH:

Q. And I think you testified you would access the financial dashboard about once a month; correct?

A. Yes. Some months I didn't, but for the most part, I did.

Q. Okay. Did you ever ask Steel, you know, what documents, aside from the financial dashboard, that they had?

A. No.

35 (Pages 137 to 140)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 141

Q. Okay. So you don't know if --

A. In the capacity of, you know, did the money come in? The money came in, great. Guys, where is our -- you know, if ever they were late on payment, I would ask them, you know, "Did you guys send the payment?" They would say, "We're sending it this date. Here is the reconciliation," and that's basically all I do. I don't speak to the law, I don't speak to the actual contents of the contract itself. I just speak to whether or not a payment was received or not.

Q. Okay. And over what period did Steel make up this gap, in terms of -- that's a bad question.

So you testified that Steel didn't originally pay on Amazon and then they made up a gap, at some point, they reconciled it?

A. Amazon and wholesale.

Q. Sorry. What's that?

A. Amazon and wholesale.

Q. Correct. Amazon and wholesale. And then you testified that that was reconciled, they caught up. Over what period was that caught up?

A. I don't recall if it's June that I'm saying that -- this is where I found it out. Then go back to the beginning of the contract, maybe 2017. If that's when they start selling on there, I don't recall.

Page 142

Q. Yeah. I mean, in terms of -- and my question is a little different. Over what period -- so for lack of a better word, you called out Steel and said, "You are not paying on all you should be"?

A. Correct.

Q. And then they made up those payments. Over what period did that making up of payments happen?

A. I don't recall.

Q. Okay. Is there a reason you don't know?

A. I didn't see the documents or anything. I mean, I didn't have financials in front of me, so...

Q. Okay. But you are the guy, though, you are the COO?

A. I'm the COO.

Q. Right. So would the reconciliation be in these payment e-mails? Would there be a separate line item for the reconciliation?

A. That's all the reconciliation that they ever gave me.

Q. When you say "all," what do you mean?

A. I don't understand what you are suggesting.

Q. Yeah. So as I understand your testimony, Blitz -- or rather, Steel, made up past due wholesale and Amazon payments after you called them out?

A. Correct.

Page 143

Q. Was there a separate line item that said reconciliation of payments or something along those lines? Was it a single payment?

A. I -- it was a single payment, for sure.

Q. Okay.

A. And I don't recall the actual e-mail in which it was sent.

Q. Okay. And do you remember what it was called in the e-mail that was sent to you?

A. I do not.

Q. Would Blitz -- would the single payment appear on a Blitz bank statement somewhere?

A. I don't know.

Q. Well, if it doesn't appear, where would it appear?

A. I would say, actually, yeah, it probably would appear somewhere on a statement.

Q. Okay. You said something along the lines of, you would make inquiry if Steel's payment was late. Did I get that right?

A. That is correct.

Q. How often were Steel payments late?

A. There was a period right before, I think, maybe right around COVID, there was, like, a four or five-month period where they were paying past the 15th

Page 144

of each month, which they were typically paying on. I don't know if, contractually, they were obligated to pay or when they were obligated to pay, but they ended up paying, usually, something by the end of the month.

Q. So if you don't know what the contract says, how do you know they were late?

A. Because every month that they would be paying on the same date.

Q. Okay.

A. They send an e-mail and say, "Oh, it's going to come in on the 13th or the 14th."

Q. You can't -- if I'm understanding you, you can't point to something in the contract that says Steel was late making its payment?

A. No, I was just asking based upon e-mails that they were sending me, consistently saying, from Medhy, specifically, that, oh, payment will be made on the 14th or the 15th.

Q. So when you say a -- sorry. I didn't meant to cut you off. You can continue.

A. Typically, they would say the payments would be on the 14th, or the 15h, or somewhere around that neighborhood, and sometimes the payments weren't made by then. So I would ask as to why that was the case. I wasn't saying -- I was never quoting the contract

36 (Pages 141 to 144)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 145

because I'm not that familiar with it.

Q. Because you're not familiar with the contract?

A. That is correct.

Q. Okay. So when you say payments were late, those are Jason Verona terms, that's not relying on anything in the contract?

A. That is correct.

Q. I'm going to, again, pull up a document within Exhibit 4. This is an e-mail from you; correct? Jason@danbilzerian.com?

A. Okay.

Q. And you see you have the Dan Bilzerian e-mail account address?

A. Uh-huh.

Q. Does this refresh your recollection in terms of when you stopped using the Dan Bilzerian e-mail address?

A. It could be right around that time. Honestly, I don't know.

Q. Okay. So this is a September 6th, 2019 e-mail. Did your use of the Dan Bilzerian e-mail address and the Blitz e-mail address overlap, ever?

A. Yes.

Q. Okay. And how long was that period?

A. They still do every so often. I still have

Page 146

the Jason@danbilzerian.com account.

Q. So when do --

A. -- we rarely, if ever, use it. Sometimes it automatically populates with people that I've had communication with in the past, through the Jason@danbilzerian account, and that's why it probably went from Jason@danbilzerian at that time. I would think that I had the Blitznv account during that time.

Q. And do you remember when you started with the Blitz e-mail address?

A. I can't recall.

Q. Okay. And in looking for production, did you go back to the Jason@danbilzerian.com e-mail address and do a search of those e-mails?

A. I did. However, there are -- they go back to a certain distance and then I can't access them past, like, 2019, for whatever reason.

Q. Do you know what that reason is?

A. I have no idea. They' just not there.

Q. Okay. And we'll touch on that a little bit later. But I want to talk about this particular e-mail. Again, it looks to be an e-mail between you and -- from you to Medhy Karbid. You used Mr. Karbid's name, who is Mr. Karbid?

A. That would be Medhy.

Page 147

Q. Okay. Who is Medhy. Who is Medhy to you?

A. Medhy is the guy who reported the sales every month.

Q. Okay. Was he your most frequent point of contact with -- at Steel?

MR. MCCOY: Form.

THE WITNESS: I can't recall.

BY MR. GOODRICH:

Q. Who would you speak with at Steel?

A. I've spoken to Jason, I've spoken to Medhy, I've spoken to -- I don't think Tony ever -- well, maybe on the phone. I don't really remember that relationship. Jake, that's about it.

Q. So in this September 6th, 2019 e-mail Medhy writes, "We look forward to a successful launch of PRE," in parentheses, "our new pre-workout," which will generate more opportunities for Steel."

Do you recall any discussion about that with anyone?

A. No.

Q. Okay. You never talked with Dan about Steel launching PRE?

A. No.

Q. Did you ever investigate what PRE was?

A. No.

Page 148

Q. Do you remember this e-mail at all, other than me showing it to you?

A. No.

Q. No discussion --

A. Dan might've had conversation with them, but I didn't get into product-specific communication with them.

Q. Okay. So all product communication, on behalf of Blitz, would've been done by Dan?

A. Yes.

Q. So after the date of this e-mail -- well, I'll rephrase.

Aside from this e-mail, you don't recall any other discussion with anyone about Steel's launch of PRE?

A. No.

Q. And again, so I'll ask you -- here there appears to be a format from Medhy where he says, "Dan B payout," and then a formula that follows.

Is this typical of the format that Mr. Karbid would send you?

MR. MCCOY: Objection to form.

THE WITNESS: Yes.

BY MR. GOODRICH:

Q. That's okay. Do you know what the origin of

37 (Pages 145 to 148)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 149

this format is?

A. I can't recall.

Q. Do you know when Steel began using this format?

A. Same question.

Q. You don't know?

A. I don't recall.

Q. Okay. So shifting gears, I want to talk about the contract. So as I understand, you're not that familiar with the contract between Steel and Blitz?

A. That is correct.

Q. And having read it once, outside the context of the lawsuit, you -- you are not familiar with the specific terms of the agreement; right?

A. That is correct.

Q. So, who at Blitz would -- whose job would it be to ensure that Blitz is fulfilling the contract obligations?

A. That's something you would have to ask Dan.

Q. So would it be Dan's job to make sure that Blitz is complying with the contract with Steel?

MR. MCCOY: Objection to form.

THE WITNESS: I have no opinion on that.

BY MR. GOODRICH:

Q. Well, you understand there's a contract. Did

Page 150

someone -- did someone at Blitz ensure that Blitz complied with the Steel contract?

A. You are going to have to ask Dan.

Q. So you don't know one way or the other?

A. That is correct.

Q. Did you ever have any text messages with anyone at Steel about PRE, which is -- according to this e-mail, a pre-workout?

A. Not that I recall, but if you want to show me something.

Q. I'm just asking if you remember any.

A. I don't remember any, no.

Q. Okay. We will move on. I'll show you -- I'll show you what we'll mark as Exhibit 5.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. GOODRICH:

Q. I'll let you know that this is an e-mail between a firm, Rex Raymond. First off, do you know who Rex Raymond is?

A. No idea.

Q. Okay. And it's an e-mail to Jason@steelsuppsusa, who I will represent is Jason Huh. I will ask you the question: Have you ever seen this e-mail before? And it is a little bit before your

Page 151

time, so I don't know that you would've, but it's a January 3rd, 2018 e-mail between Rex Raymond and Jason Huh.

A. No.

Q. Okay. And there is an e-mail address, Rob@danbilzerian.com. Would that have been Rob Hagen?

A. Yes.

Q. Okay. So I will represent that in this e-mail, this guy, Rex Raymond, is writing Blitz saying what Steel wants from Dan in 2018. And he outlines a specific list of things that Steel wants from Blitz. Take some time to read that, if you want, with my question in mind, being, have you ever had a conversation about these items?

A. I have not -- I've already read it. I have not. This is something you would have to ask Rob.

Q. Okay. Well, any conversation with Dan about, you know, Steel is asking for a minimum of posts or anything along those lines?

A. No.

Q. This e-mail references viral videos. Do you know what that refers to?

A. I kind of have an idea of what viral videos are. I mean, you make a video and if it -- you know, if it's kind of unique -- I guess, that's basically

Page 152

what TikTok is trying to do these days, I guess.

Q. Specifically says, "the viral videos." Do you know of any viral video with respect to Dan and Steel?

A. A viral video?

Q. Yeah, something people --

A. Yes, I know that they were doing a video with one another. I saw once, a video that was produced by Steel, right around the time that I started. I remember seeing that and I believe that they wanted that to be a viral video.

Q. Okay. And did you have any conversations with anyone at Blitz about the video?

A. I can't recall.

Q. Did -- any specific conversations with Rob Hagen that you recall? Michael Feder?

A. No.

Q. Okay. Do you know who's idea the video was?

A. That, I do not know.

Q. Did Dan ever say anything to the effect that it was his idea?

A. Not that I can recall.

Q. Do you know how the video got made?

A. Steel made it.

Q. How do you know that?

A. Because they, I guess, sent it to us, that one

38 (Pages 149 to 152)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 153

time that I saw it.

Q. Do you remember when Steel sent it to you?

A. I don't recall. It was in the beginning of my employment, so it had to be somewhere in those first few months of 2018.

Q. All right. Did you speak with anyone at Steel about the video?

A. I can't recall.

Q. Okay. Do you know how much the video cost?

A. Oh, I can't recall.

Q. Were there any ongoing discussions either with Steel or anyone at Blitz about these items in Exhibit 5? And we'll take them one by one. So Number 1, is a minimum of one Steel post on either Facebook or Instagram per month by Dan, except when he posts the viral videos. Any discussion you can recall about that?

A. No.

Q. What about Dan putting a link in the bio?

A. No.

Q. Posting the viral videos on Facebook and Instagram on a set day?

A. I can't recall.

Q. Any discussions, at any point, about a performance clause that you can recall?

Page 154

A. No.

Q. Okay. What about Dan foregoing his commission to help pay for the video?

A. No, I don't have any recollection of that at all.

Q. And what about a 30-day termination clause? Have you ever heard of that?

A. No.

Q. Okay. Do you have any understanding -- I'll show you here -- for the sake of keeping my exhibits in order, I'll show you Exhibit 6.

(Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. GOODRICH:

Q. So this is a February 21, 2018 e-mail from Jake at Steel. Is that the Jake you were talking about earlier?

A. Yes.

Q. Do you know what Jake does?

A. Marketing.

Q. And again, to Rex Raymond, still no recollection of who that is?

A. No.

Q. And it's to Dan. And is this Dan's e-mail address, Dan@danbilzerian.com?

Page 155

A. Yes.

Q. And you appear to be copied. Do you have any recollection of this e-mail?

A. (Reading to self.)

MR. MCCOY: Hold on. Mr. Verona, if you are going to read it, read it to yourself, so the court reporter is not trying to figure out that sound.

THE WITNESS: I don't recall it, but I'm obviously cc'd on it, so I must've received it.

BY MR. GOODRICH:

Q. Okay. So on this e-mail, it appears that Rex Raymond is talking to Dan and he is saying that "Through market research and previous launches, we found that the ideal day to do any type of promotion is on Thursdays."

Do you have any recollection of when Mr. Bilzerian posted this video?

A. You have to ask Dan, I don't.

Q. You don't know. Okay. Do you know whether he posted the video?

A. I do not. You have to ask Dan.

Q. And I assume you don't know whether Mr. Bilzerian posted a link to Steel with the video?

A. That, I do not know. You would have to ask Dan.

Page 156

MR. GOODRICH: Kim, I don't know if your lunches have arrived, if it's a good time for a short lunch break. If not, I can keep going.

MS. STEIN: Lunch is actually just arriving.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Off the record. The time is 3:47 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record. The time is 4:21 p.m.

BY MR. GOODRICH:

Q. All right, Mr. Verona, so we're back and I'm going to run through some exhibits. So I put up what we'll mark as Exhibit 7.

(Plaintiff's Exhibit No. 7 was marked for identification.)

BY MR. GOODRICH:

Q. AND this is an e-mail from you to Jason Huh and cc'ing Scott Rohleder on January 28, 2019. In this e-mail, you appear to be writing Mr. Huh, saying you're bringing in Scott Rohleder to talk about --

MR. MCCOY: Can you, again, make the screen a little bit --

MR. GOODRICH: Sorry. Let me know if I need to do that. It doesn't appear to be too big on my

39 (Pages 153 to 156)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
7495137d-4848-4119-b9a3-022d2841cf03

Page 157

screen.
BY MR. GOODRICH:
Q. You appear to be talking about Jason Huh's interest in selling CBD infused products. My question is, can you tell me about any and all conversations you've had with Mr. Huh about CBD products?
A. Let me see. Let me read this for a second. Okay. So this e-mail was because Jason was asking me --
Q. Jason, being Jason Verona?
A. Jason Huh.
Q. Jason Huh. You're Jason Verona. I apologize. Okay.
A. So my recollection from this e-mail was that I spoke with Jason Huh, and Jason had asked me how to go about, potentially, starting some sort of a CBD line. And because I know very little about it, I told him that we -- I think that we have a merchant account. I think he asked me how do it on a merchant account because he's aware that there are limitations with supplements, so he had asked if with CBD if there are limitations, and I said I know very little about it. So I had put him on the e-mail with Scott, to make the introduction to whomever he has because I know, like, Scott knows all sorts of merchant account information.

Page 158

So seemed as if he would be the most appropriate person.
Q. Okay. And I recall you saying you don't remember what Mr. Rohleder's position within Blitz was?
A. That is correct.
Q. How many conversations did you have with Jason Huh about this?
A. I don't believe that there were many. This could, potentially, have been it. And if you're asking about the CFO thing, the CFO was basically just to explain Scott a bit better, without actually going into what I do know about him, which is -- you know, like I said, I just gave him a title. He said I could give him a title, just so that Jason would know he's speaking with the finance guy.
Q. Okay. So, from your perspective, Mr. Rohleder was a financial guy?
A. He was a financial guy and he has relationships with merchant accounts.
Q. When -- you said he was a financial guy, would he review Blitz's financial documents?
A. I already said that he did, yes.
Q. Okay. Would he prepare Blitz's tax return, if any?
A. No. We have an outside firm that does the tax

Page 159

returns.
Q. Okay. Do you know what ended up happening as result of this conversation?
A. You know what, I have no idea.
Q. Okay. Do you know whether Steel ever pursued a CBD infused product?
A. I have no idea.
Q. Okay. There's a name listed here, Troy, L-O-E-H-R, Loehr, with Imperium Payment Solutions. Do you know who Mr. Loehr is?
A. I don't.
Q. Have you ever spoken with him, one-on-one?
A. Troy Loehr? Not that I can recall.
Q. Okay. Where did you get his name?
A. From Scott.
Q. Okay. All right. So I'm now going to share what we will mark as Exhibit 8.
(Plaintiff's Exhibit No. 8 was marked for identification.)
BY MR. GOODRICH:
Q. And I'll ask you to look at this e-mail and tell me if you have ever seen it before.
A. Okay.
Q. I will point out that you are not copied on it, so you may have not.

Page 160

A. I have never seen this before or aware of this conversation.
Q. Okay. August 2019, were you already COO of Blitz?
A. No.
Q. Okay. And you probably already said, but can you remind me when in the time line you became COO with Blitz?
A. Right at the end of Michael Feder's tenure here.
Q. Which was within the last year or so?
A. Yes.
Q. Okay. In this correspondence between Mr. Feder and Dan Bilzerian, they appear to be talking about -- it appears to me they're talking about modifying the Steel supplement agreement. Have you ever heard of any conversation with respect to modifying this Steel agreement?
A. No.
Q. You weren't copied in on this -- I mean, you weren't looped into the discussion in any way; right?
A. No.
Q. Okay. Have you ever heard any discussion about this item, in particular, a 20-year term where you have -- you probably being Dan or Blitz, have the

40 (Pages 157 to 160)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

## Page 161

right to exit the deal but they do not?

A. No.

Q. Did you have any discussions with Dan or anyone from Blitz, that they wanted the option to exit the Steel agreement?

A. Give me one sec here.

(A discussion was held off the record.)

BY MR. GOODRICH:

Q. So the question is, they appear to be talking about an amendment or a proposed amendment to the Steel Supplements agreement, and Michael Feder is talking about the high points. "A 20-year term, where you have the right to exit the deal but they do not."

Have you had any conversation with anyone about Blitz or Dan wanting the right to exit the Steel agreement, but that right not being reciprocal?

A. No.

Q. Okay. Safe to say -- same question with respect to Number 2; any conversation with anyone about Dan or Blitz's percentage stays the same but he gets a percentage on sale?

A. No, no.

Q. Okay. So safe to say you don't know anything about this e-mail or the facts underlying it?

A. No. One time Dan had said to me, "Is there

## Page 162

any possibility of getting a percentage of the company from Steel?" And I, basically, said I'd ask and that was it.

Q. All right. When did Dan ask you that?

A. I don't recall.

Q. How did he ask you that? Would it have been a text, e-mail, phone call?

A. Probably in person.

Q. What, specifically, did he say, if you remember?

A. I don't remember specifically what it was.

Q. Okay. Did he say why he was entitled to a percentage of Steel?

A. No.

MR. MCCOY: Object to form.

BY MR. GOODRICH:

Q. Did he say what he would give up to get a percentage of Steel?

A. No.

Q. So what was your conversation, then, with Steel about Dan wanting a percentage of the company?

A. I, basically, just said, "Are you guys open to discussing a way in which he can get a percentage of the company?"

Q. And what was the response?

## Page 163

A. I believe the response was no.

Q. Who did you speak with?

A. Probably Jason.

Q. Okay. Did you make any offer or suggestion in terms of what Dan would give up in consideration for his ownership -- proposed ownership interest?

A. No, we didn't speak specifics.

Q. Okay. Did Dan ever suggest any consideration in exchange for his proposed ownership interest?

A. No, not that I recall.

Q. Was the idea that Dan would just get a percentage of Steel?

A. I have no opinion. You are going to have to ask Dan.

Q. Well, I'm not asking for your opinion. I'm asking for any facts you recall. So, do you recall whether the idea behind this was, Dan was just going to get a percentage?

A. I just remember asking if I can get a percentage of the company and that was it.

Q. Okay. And with no undertaking on behalf of Mr. Bilzerian; right?

A. With no undertaking? What do you mean by that?

Q. So you just made the blanket request, "Can Dan

## Page 164

have a percentage of Steel?"

A. Okay.

Q. Without saying, "Dan is," for example, "is willing to pay X dollars to get an ownership stake of that"?

A. Oh, he said he would be willing to kick in some money, let's call it, to get a percentage. I do not remember how much money that was or if he said it. He didn't even give a monetary amount.

Q. Okay. Well, do you have a ballpark? Are we talking $5 million, $20 million?

A. I -- no. He never even said.

Q. There was no --

A. He was amenable to wanting to do something along those lines.

Q. Okay. Do we know what percentage of Steel Dan was seeking?

A. No.

Q. What happened in response to the conversation? Was it only one conversation?

A. One conversation.

Q. Okay. Okay. And, again, you don't recall when in the timeline --

A. I don't.

Q. -- this had happened?

888.909.2720    Anthem Reporting    813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 165

A. It's quite some time ago.

Q. Okay. Bear with me for one second. I'm going to pull up what we'll mark as Exhibit 9.

(Plaintiff's Exhibit No. 9 was marked for identification.)

BY MR. GOODRICH:

Q. This is an e-mail from you to Jason Huh, cc'ing Lester Lee, in July 2020. Who is Lester Lee?

(A discussion was held off the record.)

A. Lester Lee was the former -- I don't know his actual title -- head of Ignite.

Q. Okay. When you say former head -- okay, so you don't know any title?

A. I don't recall.

Q. How did you meet Mr. Lee?

A. I think I met Lester when he came over to interview with Dan at the estate.

Q. Interview for a position at Ignite?

A. For this position at Ignite; correct.

Q. Okay. What -- beyond that first meeting, what was your relationship with Mr. Lee?

A. Nothing at all. Never heard of him, never knew him.

Q. Well, you are sending an e-mail in July 2020 to Jason Huh, copying Lester?

Page 166

A. Yes.

Q. First off, why -- what is this e-mail about and why are you sending it?

A. Because Dan had asked me to connect Jason with Ignite because he was -- he liked the way that Steel Supplements was retargeting, I guess, their marketing, or their social media posts, or Dan's social media posts, and he wanted to try to have Jason help out Ignite to do the same.

Q. What does retargeting mean?

A. I have no idea.

Q. Okay. How many times would you say you've spoken with Lester Lee?

A. I can't recall, but it's less than three.

Q. Okay. Would it have always been over e-mail?

A. Well, the first time was probably in person, this was at the estate. And, honestly, this could very well be the only e-mail communication I ever had with him --

Q. What --

A. -- e-mails I might have seen in person or something.

Q. What was Dan's, if you recall, what was his specific direction to you, that prompted Exhibit 9?

A. Dan said to me to make an introduction to

Page 167

Lester so that he can speak with Jason and Jason Huh's marketing team about their retargeting strategy, so that Ignite could, basically, take something from what Jason and his marketing team had to suggest.

Q. Do you know if anything came of Exhibit 9, did anything --

A. No, it did not. I don't think they ever got together with one another.

Q. I'm going to share with you what we will mark as Exhibit 10.

(Plaintiff's Exhibit No. 10 was marked for identification.)

(A discussion was held off the record.)

THE VIDEOGRAPHER: Off the record. The time is 4:37.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record. The time is 4:38.

BY MR. GOODRICH:

Q. Mr. Verona, I have what we'll mark as Exhibit 10, and this is an e-mail from you to Dan, copying Scott Rohleder, Victor Rodriguez, on September 11, 2020.

A. Okay.

Q. My first question is, in this e-mail you

Page 168

appear to be sort of parroting the payment e-mail, Mr. Carter was sending you. Is this similar to the format you would use to show Mr. Bilzerian what the money coming in from Steel was?

A. That is correct.

Q. Okay. And I've only seen a couple of these. Is there a reason why we only have a couple from you to Mr. Bilzerian in this particular format?

A. Every one, you should have. Might be some missing from the @jasonbilz -- jason@danbilzerian account. But, again, I lost a significant amount of e-mails, as did everybody else with that host, but all the Blitz ones you should probably have.

Q. How did you create this? Did you -- well, I'll leave it at that. How did you create this calculation that we are looking at here on Exhibit 10?

A. So I took what Medhy had sent me, and I subtracted the returns, and just gave Steelsupplements.com income, the wholesale income, and the Amazon income, and did a 10 percent, and that is what Dan was due.

Q. Were these all numbers that Mr. Karbid provided you?

A. All three of those numbers, I don't think they provided the 3.8 because I just did the math. He

42 (Pages 165 to 168)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 169

provided me with the in and out and subtracted a minimum amount of returns, which is like $1,700 a month, if I remember correctly, which would've equated to $171 for Dan, so I didn't believe it to be necessary to make a big deal of it.

Q. Sorry. So you added which number that Medhy --

A. Medhy was -- so the 2.8 million --

Q. Uh-huh.

A. So from Steelsupplements.com he would show a -- he would show a number and then he would subtract returns and that's where I got that number from. So I wouldn't show the returns when I was presenting them to Dan, Victor, and Scott. And the reason for that was simply because it was such a minimal amount, it was typically about $1,700, and I didn't believe it to be necessary to strike up any issues over what would be due to Dan of $171.

Q. Okay. Did Dan ever ask about returns?

A. No.

Q. Did Dan ever ask about shipping or taxes?

A. No.

Q. What about discounts?

A. No.

Q. Would he typically copy both Scott and Victor?

Page 170

A. Yes.

Q. I understand you said Victor is the bookkeeper; right?

A. Correct.

Q. And Scott has some financial position. How would you differentiate, if at all, Victor's position versus Scott's position?

A. Victor is a part-time, maybe 15 to 20 hours a week, up in Wisconsin. He's worked with Blitz since 2014, 2015, where he, basically -- so I'll tell you what Victor does. So, basically, when I get a bill, I will forward it to Victor and I will code it, either Dan or Blitz. He will cut the check in Wisconsin, mail me the checks to sign and send out. Scott, again, reviews financials. He is only bigger picture when -- at the end of the month, board meeting and everything -- which, again, I don't know who the board members are -- but Scott gets the document from Victor, because Victor downloads all this into QuickBooks. And so after the QuickBooks download is done at the end of the month, and Victor reconciles it the best he can, it goes to Scott, Scott discusses it with me briefly, and then we present it in the monthly meeting.

Q. Okay. And that's the Blitz board meeting you talked about?

Page 171

A. Yes.

Q. Okay. So in this e-mail -- again, it's from you to Dan, you write "They're asking," "they," presumably, being Steel; right?

A. Yes.

Q. "They're asking that you please post at any time between 9/11, which was the date of the e-mail, and 9/30, to optimize September sales. If not, sales may plateau until the Black Friday push."

Aside from that sentence in the e-mail, did you have any conversation with Dan about that?

A. No. I would just -- those notes -- and I could be incorrect. What I would do was -- but I'm pretty sure -- I would just copy and paste what Medhy had put in the bottom, in his notes to me for the month, which stopped after a while, I think -- and Tony had notes as well. They would give me little notes like what they were going to be doing and things that they were hoping to have happen within the next month or so. So I, basically, just copy and paste those. We leave it to Dan to make a decision as to what he would want to do.

Q. Before the day of this e-mail, September 11, 2020, did Steel ever ask that Dan post at a certain time?

Page 172

A. I do remember them asking around the Black Friday, yes.

Q. Okay. Was it only around Black Fridays, typically, or were there other times Steel said we'd like Dan to post on X date?

A. Not that I can recall.

Q. Okay. And do you remember what -- well, let me scratch that.

Did Dan, actually, post between September 11th and September 30th, 2020?

A. I don't remember.

Q. Okay.

A. Ask Dan.

Q. What would you have done to follow up with Dan?

A. I wouldn't ask.

Q. You wouldn't?

A. No.

Q. So if I understand, you would convey this information to Dan via e-mail, just, basically, paraphrasing the notes that Mr. Karbid sent you; correct?

A. That is correct.

Q. And you would send it to Mr. Bilzerian; right?

A. Correct.

43 (Pages 169 to 172)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 173

Q. And after that, it was out of your hands; right?

A. Yes.

Q. Was there ever an in-person conversation between you and Mr. Bilzerian about posting at a certain time?

A. I do remember Black Friday, now that I'm looking at this document, yes, I remember having a conversation with them about this specific instance.

Q. And what was that conversation?

A. They're asking that you post, so that we have the opportunity -- mentions the Black Friday push.

Q. Did Dan actually post on Black Friday on whatever Steel was requesting?

A. Again, I don't know.

Q. Okay. Typically, when you asked Dan to post at a certain time, would he?

A. Again, I don't recall any specific instances, other than this one, in which I requested that Dan post, so I couldn't necessarily report that back too accurately.

Q. Okay. Have you ever spoken on the phone with Medhy about Dan's posts, generally?

A. I don't think that we -- I can't recall any phone conversations with Medhy.

Page 174

Q. Got it. Okay. So if Medhy or someone on behalf of Steel would say you had conversations about the frequency of Dan's posts or the content in Dan's posts, you wouldn't be able to dispute those conversations; right?

A. I'm sorry. Can you repeat the question?

Q. Yeah. So my understanding of the testimony is you don't recall any conversations with Medhy, or anyone on behalf of the Steel team, about the frequency of Dan's posts, the content, anything with respect to Dan's posts; right?

A. Correct. I can't recall those.

Q. Okay. So if someone from Steel testifies that you did have a conversation about the frequency of posts, you wouldn't be able to dispute that; right?

A. I wouldn't?

Q. Yeah.

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Let me rephrase. If someone from Steel testified that you had conversations about the -- specifically, about the frequency of Mr. Bilzerian's posts; would you be able to dispute that?

MR. MCCOY: Objection to form.

THE WITNESS: Depends upon the -- if they give

Page 175

me more information about the specific instance. I can't remember any -- just saying, you know, generally speaking, I can't remember any. But if there is a specific instance where they said that they did and you want to show it to me on an e-mail and everything? I apologize but my memory is not that great to remember those types of things.

BY MR. GOODRICH:

Q. Is your memory generally not that great or -- how would you describe your memory?

A. My memory is okay.

Q. Okay. Okay, as in average, below average?

A. Average.

Q. Average. Again, I'm specifically talking about phone conversations, so in this question, there wouldn't be a specific e-mail exchange I'm talking about. The question is just, if someone from Steel shows up and says, "I talked to Jason Verona and said Dan is not posting enough."

Do you have any way to dispute that?

MR. MCCOY: Objection to form.

THE WITNESS: I would say, tell me the situation behind it so I can remember a bit better.

BY MR. GOODRICH:

Q. Well --

Page 176

A. If there was a situation, which that had actually taken place.

Q. Yeah. I assume -- and maybe this will refresh your recollection, that the situation was, "Yeah, we're paying Dan 2 million bucks a year and he posts six times. He needs to post more."

Does that refresh your recollection? Is there any conversation along those --

A. Not a specific instance of that, no.

Q. Would you be able to dispute that there were conversations with Steel about the content of Dan's posts?

MR. MCCOY: Form.

THE WITNESS: Honestly, I don't have -- I can't recall.

BY MR. GOODRICH:

Q. Okay. You can't recall one way or the other, whether you spoke with anyone --

A. If you want Jason, basically, to have a conversation with me and say, hey we talked about this, that can potentially jog my memory, but for right now I don't remember anything other than this one you have in front of me.

Q. But outside of someone from Steel speaking with you, you can't point to anything, you can't recall

44 (Pages 173 to 176)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 177

whether you had a conversation about the content, quality, frequency of Dan's posts?

A. I can't recall.

Q. In this e-mail, Exhibit 10, you say, "They will be sending us products for Tuesday delivery that they ask you to use."

Do you recall what products you are talking about?

A. "They'll be sending product for Tuesday delivery that they ask you" -- I do not.

Q. Okay. Do you know whether Dan complied with this request?

A. He didn't -- he wasn't the one sending the product. I mean --

Q. Yeah. Steel is asking you, I gather, to ask Mr. Bilzerian to promote a particular product. That's my read on this. Right?

A. Uh-huh.

Q. Okay. Do you know whether Mr. Bilzerian actually endorsed that product?

A. I do not know. You would have to ask Dan.

Q. When Mr. -- let me rephrase.

Did you have a conversation like this with Mr. Bilzerian more than once? And when I say "like this," asking him to post at a certain time and asking

Page 178

him to post certain products?

A. I don't recall if I've had this conversation with him more than once.

Q. Okay. Do you know -- irrespective of that, do you know whether Mr. Bilzerian would, typically, listen when you would tell him to post at a certain time, post a certain product?

MR. MCCOY: Objection to form.

THE WITNESS: Repeat the question again.

BY MR. GOODRICH:

Q. Yeah. Do you know if Mr. Bilzerian would, typically, listen when you said, "Post at a certain time or post a certain product"?

A. I can't recall.

Q. All right. We're going to move to Exhibit 11?

(Plaintiff's Exhibit No. 11 was marked for identification.)

BY MR. GOODRICH:

Q. Okay. So this is an e-mail which starts -- the top line is September 17, 2020, between -- or from you to Mr. Karbid, but I want to start at the bottom of the e-mail.

A. You want to make it smaller, please?

Q. Yeah, sorry. Is that good?

A. Yes, that's better.

Page 179

Q. So on Wednesday, September 6th, Mr. Karbid is writing you and says, "We just sent some products which should have arrived," and he identifies what products they were. So, typically, did Steel just send Mr. Bilzerian whatever they wanted him to endorse?

MR. MCCOY: Form.

THE WITNESS: That's -- they said that they would send packages.

BY MR. GOODRICH:

Q. Okay. Did you coordinate the shipment of Steel products to Mr. Bilzerian?

A. I just told them where to send them.

Q. And where would they typically send them?

A. To his estate.

Q. Okay. And on September 6th, Mr. Karbid points out that any of these would be great to post. Prior to this, do you have any recollection of Steel, or Mr. Karbid in particular, giving you comments about Dan's content?

A. No, but looking at this e-mail, it looks familiar. And I probably told Dan in person and showed him the products.

Q. What would you have told Dan?

A. "Dan, Steel sent products. These are what they would like you to promote," and left it at that.

Page 180

Q. Did you have any understanding as to why Steel would be sending you thoughts -- from this e-mail, it says, "otherwise we can send you some thoughts in the morning." And they're talking about ideas on how to present the content. Why would, as far as you understand, Steel be saying that?

MR. MCCOY: Objection to form.

THE WITNESS: I can't answer on their behalf. They wrote that, not me.

BY MR. GOODRICH:

Q. Okay. But you have no understanding, as Jason Verona, of why Steel is sending thoughts on Dan's posts?

A. I mean, I can speculate but I mean --

Q. What is your speculation?

A. My speculation --

MR. MCCOY: Objection. Objection to form.

BY MR. GOODRICH:

Q. Yeah. What is your hunch? Why do you think?

THE WITNESS: Do I have to answer that, Kevin?

MR. MCCOY: You're not supposed to be speculating, so if you have a speculation that you are going to volunteer, then I would counsel you not to speculate at all in this deposition.

THE WITNESS: I don't know what their intent

45 (Pages 177 to 180)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)        7495137d-4848-4119-b9a3-022d2841cf03

Page 181

was.

BY MR. GOODRICH:

Q.   Do you have a thought why Steel was asking Dan to post certain product or commenting on Dan's content?

A.   No.

Q.   Okay.  So on September 17th, you write Medhy and say, "We'll certainly have these out for Dan when he wakes up and continually discuss having him post."

What do you mean by this?

A.   Exactly what it says.

Q.   Well, there seems -- okay.  It seems to me you are saying, "I'm going to put out the products that Steel sent;" right?

A.   Correct.

Q.   "And continually discuss having him post." Why are you continually discussing having Dan post?

A.   I think that was more so to appease Steel so as to make it seems as if I would be having continual conversations with Dan on their behalf.

Q.   Why did you feel the need to appease Steel?

A.   Because they had a nice relationship with one another and because I wanted the relationship to continue.

Q.   Did you ever ask Dan to post and he didn't?

A.   I don't know.

Page 182

Q.   Okay.  So only Dan would know that?

A.   Only Dan would know that.

Q.   Okay.  There's nothing -- again, this is a conversation between -- let me back up.

You are the point person for Steel, for the Steel relationship; right?

MR. MCCOY:  Objection to form.

BY MR. GOODRICH:

Q.   Are you the point person for the Steel relationship?

A.   What's your definition of "point person"?

Q.   Steel communicates with you when they want something?

MR. MCCOY:  Objection to form.

THE WITNESS:  Say it again?  Steel communicates what?

BY MR. GOODRICH:

Q.   Yeah.  Steel would communicate with you on behalf of Blitz?

MR. MCCOY:  Objection to form.

THE WITNESS:  As far as what is concerned, I mean, I told you already we didn't have a discussion regarding the contract.  You have to be more specific than that for me to answer the question.

Page 183

BY MR. GOODRICH:

Q.   The question -- and I'll try and ask it a different way -- is, in this e-mail you seem to be saying that you are going to continually discuss having Dan post.  And my question was, was this ever an issue? Did you have to ask Dan to post more than once?

A.   I would, typically, ask Dan once.  Dan is not somebody to continually bombard with pushing him to do something that he doesn't want to do.  Where if he would've wanted it, have done it, and that goes in any instance.  It doesn't have anything specific to do with this case.  Jason Huh knows that as well.  Best thing to do is tell him once, it's to his determination as to what he is going to do.  So it's best --

Q.   Okay.  That clarifies.  So, even though you told Medhy you were going to continually discuss having him post, you probably only told him once?

A.   That could be correct.

Q.   When you say it could be correct, what do you mean by "could be"?

A.   Because I don't remember this.  This is September 17th of 2020.  I don't remember how many times I had a conversation with Dan about this specific post.  I remember that I did tell him at least once, there very well could have been another time in which I

Page 184

told him, but I don't remember, verbatim, that time of the year, and every single time that I may have told him or reminded him to, please, post.

Q.   But, generally, you wouldn't remind Dan more than once?  You would just tell him "Steel wants you to post" and then whatever he did with it, he did with it?

MR. MCCOY:  Form.

THE WITNESS:  I don't recall.

BY MR. GOODRICH:

Q.   Well, let me rephrase.  Generally, would you remind Dan more than once?

A.   I don't recall.

Q.   Okay.  So would you communicate Steel's request to have Dan post or request to post certain content in any way, other than verbally, with Dan?

A.   Verbally was always best.

Q.   Okay.  Well --

A.   Other than -- other than if it was specifically written to me in an e-mail, I would just forward the e-mail like the one that we were looking at before.

Q.   Well, I thought -- okay.  Above this September 17th e-mail, maybe on the same day, where it specifically writes, that the items would pack a punch with these items.  Do you have any recollection of

46 (Pages 181 to 184)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                        7495137d-4848-4119-b9a3-022d2841cf03

Page 185

whether Mr. Bilzerian, actually, posted about any of these items on or about September 17th, 2020?

A. I don't recall.

Q. Do you know whether Mr. Bilzerian would generally take the suggestion of Steel?

A. That's something you have to ask him. I can't answer for him.

Q. Would you look at his posts after he did them?

A. Rarely.

Q. When did you versus when didn't you?

A. Whenever I wanted to open up in Instagram, which was every so often.

Q. Did he ever talk with you about posts?

A. Very limited, other than when I said to him, like, "This what they want you to do." He would be, like, "Okay."

Q. Did he ever seek your input?

A. Never.

Q. Okay. You didn't have any say in terms of content?

A. Never.

Q. Did you have any say in terms of the frequency of Dan's posts?

A. Never.

Q. What about the platform on which Dan would

Page 186

post?

A. Never.

Q. Did anyone --

A. There's something that I want to get across and on the record here. I have nothing to do with Dan's social media. Dan's social media is completely to his discretion as to what he wants to do. The contract itself will ask him to do so at his discretion. He is able to do so, and he does so, and nobody has any -- nobody has any way in which to convince him into doing anything, nobody has any way to get onto his Instagram, get onto his Facebook, or anything like that. All I can be is a middle man to say something to him, but at the end of the day, he knows what the contract says better than I do, so you really just have to ask him all these questions directly. Because asking me if I'm going -- if I'm being a middle man, and anything like that, makes no sense at all because in the contract itself, it's at his discretion, according to Dan, what he tells me, so you better just have that conversation directly with Dan.

Q. Yeah, so my first question is, at -- did anyone at Blitz have control or influence over frequency, content, other than you, other than you?

Page 187

THE WITNESS: Kevin -- no. I don't know. I don't control other Blitz employees. Do I know if, you know, an assistant, basically, pulled Dan aside and said, "Hey, Dan, you know, it would be great, I'd love to see more Steel posts." I don't know.

BY MR. GOODRICH:

Q. Well, that's the question. The question is did any Blitz employees, other than you, have a say? And if the answer is you don't know, then you don't know.

A. I don't know.

Q. Okay. You mentioned that Dan said something to the effect that, "Well, the posts are at my discretion."

When did that conversation happen?

A. I don't recall.

Q. How did it get brought up?

A. I don't recall.

Q. Okay.

A. Other than I would tell him that Steel was asking him to post, you know, through e-mails like this one right here.

Q. Okay. So if I'm understanding, you would go to Dan in person; right? That was a yes or no?

A. Yes.

Page 188

Q. And say, "Steel wants you to post." Right so far?

MR. MCCOY: Objection to form.

THE WITNESS: Specific to this e-mail, yes.

BY MR. GOODRICH:

Q. Okay. And Dan would say something along the lines of, I have discretion in my contract in terms of when and how much I post. Is that a --

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Is that a fair assessment?

A. He would say "Okay." And then, "It's at my discretion and I will do with it what I will."

Q. Okay. What did he end up doing with it?

A. Again, I don't know.

Q. Okay. So you had no -- and I understand you had no access, you didn't discuss posts, but you did not -- you were not notified when he did post?

A. No.

Q. And the only way you would've known about a post is if you, Jason Verona, signed into your personal Instagram and happened to see that Dan posted about Steel; is that fair?

A. That's correct.

Q. Okay.

47 (Pages 185 to 188)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 189

MR. GOODRICH: We'll transition to Exhibit 12.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MR. GOODRICH:

Q. Again, this is another e-mail to you from Medhy, September 22nd, 2020. And specific to this e-mail, I'm going to the bottom of it, on September 21, 2020, Mr. Karbid writes, "I'm not sure what happened this past weekend but Jason" --

A. Try to make the file smaller.

BY MR. GOODRICH:

Q. Yeah. Sorry. Keep on me about that. Is that okay? Okay. He says, "Jason spoke to Dan and was told he would be posting. I'm sure you tried your best and something must've come up to alter the plans, but it's definitely a missed opportunity."

Can you describe for me what's going on here?

A. Pretty much, in the e-mail, obviously, they were expecting Dan to post and he didn't.

Q. Okay. Was there --

A. They had asked for Dan to post and he didn't.

Q. Do you know of any reason why he didn't?

A. If you scroll up, we might read it.

Q. Well, let's do just that. So, on September 22nd, you write to Medhy and say, "I

Page 190

certainly did request that he post. He may have been overwhelmed as he had over 25 people at the estate that day." Stop there. What does that mean?

A. It means that he may have been overwhelmed because he had 25 people at the estate that night.

Q. Okay. He writes -- or you write, "I'd have Jason H" -- presumably, Jason Huh, "text him as I approached him about it yesterday and would he do so again today."

Was this -- is this something that happened more than once? That you would ask Dan to post and he wouldn't?

MR. MCCOY: Form.

THE WITNESS: I don't know.

BY MR. GOODRICH:

Q. You don't know?

A. Well, if you are showing me one time here, I will say that, yes, he probably did.

Q. Do you remember any instances other than this?

A. No, but if you want to show me e-mails where it says that in there, then so be it, and I'll look at those, and then I can comment to those specific instances.

Q. Okay. This e-mail reflects that you are going to ask Dan, again, on September 22nd to post. Do you

Page 191

know whether you actually did?

A. I don't recall.

Q. Do you know whether as a result of you -- well, do you know whether Mr. Bilzerian made a post in response to you asking him?

A. I don't know.

Q. At the top of this e-mail, Mr. Karbid says, you know, "Let Jason know and I'm pretty sure he'll reach out to Dan at some point to see when he can post. September would be preferable, though."

Did you have any conversation with Mr. Medhy about why that is?

A. What's the question?

Q. So Mr. Karbid is saying September is preferable. Did you have any conversation with Mr. Karbid about what that means, why he is saying that?

A. If it's -- I can't recall, but if you show me an e-mail where I went back to him and said something, I probably could speak to it a little bit better. But, again, this is a specific instance in which I don't know much more than what you are showing me now.

Q. Now, I want to take you to what we'll mark as Exhibit 13.

(Plaintiff's Exhibit No. 13 was marked for

Page 192

identification.)

BY MR. GOODRICH:

Q. This is an e-mail chain between you and Mr. Karbid ending on September 26, 2020. This is an e-mail from --

A. Make it smaller again, please.

Q. Yeah.

A. That's good.

Q. So in the e-mail, Mr. Karbid is telling you, "I was told Dan posted earlier today but just ran some analytics, it did not move the needle, unfortunately?"

Did you ever discuss analytics in terms of, you know, what Dan's posts was doing for Steel?

A. Yes, once. I had asked them to present to me, provide to me effective posts that he had done in the past.

Q. Why did you make that request?

A. So that I could forward it on to Dan and he could make a decision from there --

(Technological interruption.)

Q. Yeah. What prompted you to do that?

A. Let me think on that. Probably something like this. Probably came around this time, that they weren't happy with the posts and they wanted something more effective. And I said, "Well, show me what you

48 (Pages 189 to 192)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 193

want, and I will be the middle man, and pass it on to Dan."

Q. Okay. So Steel expresses some sort of displeasure with the posts or how they're performing, and your response is, "Show me what works and I'll take it to Dan." Did I get that right?

A. Correct.

Q. Okay. In the e-mail, Mr. Karbid says, "The timing is questionable."

Do you have any understanding of why that would've been?

A. I don't.

Q. Had you ever talked about -- with anyone at Steel, about the timing of Dan's posts and what timing was optimal versus not as good?

A. Not that I can recall.

Q. Okay. And in this e-mail, Mr. Karbid says, something we talked about earlier, "The posts that work best generally involve a swipe up or a more direct shout out." Had Steel ever communicated anything along those lines before?

A. I'm reading it now, and that's probably the time in which I'm realizing that they did communicate it there.

Q. Okay.

Page 194

A. But I have no recollection of anything else.

Q. So is this the only conversation you can remember with respect to Steel saying a swipe up or more direct shout out works best?

A. From my recollection, yes.

Q. So if Steel says differently, would you have anything to dispute that?

A. Yes.

Q. Which is? You can point to anything, other than this e-mail, to say it's happened more than once.

A. I don't recall any other instances. If you want to give me other instances, specifics and such, I can say as to whether or not I recall a conversation. I do not recall conversations. I told you this.

Q. And I think the disconnect we're having is over the phrase "I don't recall." When you say "I don't recall," I take that to mean I don't know one way or the other, as opposed to, no. So when you tell me "I don't recall whether there was another conversation," and I say, well if someone else said there was, how would you dispute that?

A. I would've recalled --

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. You can answer.

Page 195

A. So you're correct in assuming that "I don't recall" could've been either which way, but I'm not saying, necessarily, that if I had a conversation with Jason covering that -- (technological interruption) -- a conversation with Jason Huh right now, and he said to me, "Jason, don't you remember the time that we talked about X, Y, and Z, and posts on X, Y, and Z?" Maybe I will when he brings it back to my attention or maybe I'd be like, "Jason, we never had that specific conversation. You may've just had that conversation directly with Dan." That's why I'm saying I don't recall.

Q. So in some sense you are depending on Steel to refresh your recollection?

MR. MCCOY: Form.

THE WITNESS: I am depending on having a conversation with the person who is accusing me of having a conversation with them regarding the substantive nature of what you're asking, yes.

BY MR. GOODRICH:

Q. I don't want to get it confused. Nobody is accusing you of anything. I, as an attorney, am asking you questions, in a deposition, that I don't know the answer to. So I don't want you to get that confused.

Later in this e-mail, Mr. Karbid writes, "The

Page 196

key is to drive as much traffic as possible, obviously, and it will be tough to get much traction through this IG, Instagram story, especially given the push for Ignite's $50,000 giveaway." What does that mean?

A. Let me read it again.

Q. Sure.

A. He is asking that he wanted it to be a swipe up or direct shout out.

Q. I'm talking specifically about the Ignite $50,000 giveaway. What does he mean by that?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Did you have any understanding that Ignite was doing a $50,000 giveaway around September 2020?

A. Not that I can recall. I don't work for Ignite.

Q. Okay. Was there -- the suggestion seems to me to be that Dan's posting on Ignite is going to detract from his ability to post for Steel or the effectiveness as opposed -- in terms of posting for Steel. Would you dispute that?

THE WITNESS: Kevin, please. I can't speak on Ignite's behalf.

BY MR. GOODRICH:

Q. I'm not asking you to speak on Ignite's

49 (Pages 193 to 196)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 197

behalf. I'm asking you, Jason Verona -- and again, Mr. Karbid is asking you as COO, in September 2020. Would you have been COO in 2020?

A. I don't recall.

Q. Okay. Well, Mr. Karbid is having a conversation with you on behalf of Blitz and bringing up a $50,000 Ignite giveaway. Do you have any understanding of what that means?

MR. MCCOY: Objection to form.

THE WITNESS: No, no understanding.

BY MR. GOODRICH:

Q. Okay. So I pulled up what we'll mark as Exhibit 14.

(Plaintiff's Exhibit No. 14 was marked for identification.)

BY MR. GOODRICH:

Q. Again, another e-mail between you, Mr. Karbid, Gregory Wayne, in October of 2020. And Mr. Karbid appears to have attached or compiled posts that Dan may've had generate better results. You touched on it. What was happening here?

A. He had provided us with posts that they believed to be more effective.

Q. Okay. This looks like, again, Steel is telling you, please note that all of these posts,

Page 198

in referencing the more effective ones, include a swipe up and direct reference to Steel. Do you see that?

A. Uh-huh.

Q. So is this now the second time Steel is bringing that up?

MR. MCCOY: Form.

THE WITNESS: Seems to be the case.

BY MR. GOODRICH:

Q. Okay. And it says, "The posts also perform better when Dan was very descriptive when presenting the products."

Did you have a conversation about any of this with Mr. Bilzerian?

A. I'm sure that I told him about it. In what way, I'm not -- I can't recall.

Q. Okay. So no memory of sitting down, physically, in person with Dan, discussing this?

A. No. I think that's something, you know, I have to hammer home again.

My relationship with Dan is -- it's strictly to a matter of fact. "Dan, this is what they're asking. Here it is." Leave it at that. There's no sitting down with Dan and having a conversation.

Q. Why is that?

A. Dan makes his decisions on his own.

Page 199

Q. Okay. Well, is Dan your boss?

A. Yes.

Q. Okay. So how -- if not sitting down, how would you communicate this to him?

A. Probably in passing. Literally, in the hallway. It could've been possibly an e-mail, if you have that record, if I provided that, but those would be the two ways that I would've communicated with him. If I run into him in the hall. You got to do these thing as a matter of fact way. I don't schedule time with him to sit down to discuss these matters.

Q. And why is it that you said these things had to be done in a matter of fact way. Why is that?

MR. MCCOY: Objection to form.

THE WITNESS: Well, I've been with Dan for years and I know how things effectively get communicated to him.

BY MR. GOODRICH:

Q. Okay. Why do you say things get effectively communicated in this certain way?

A. So that he actually hears me and it's his decision as to whether or not he wants to move forward.

Q. Okay. And when you say "this way," is it always a conversation in passing in the hall?

MR. MCCOY: Form.

Page 200

THE WITNESS: I can't recall every single conversation that I've had with Dan. For the most part, any time that I'm having a meaningful conversation with him, it happens to do with the estate, it does not happen to do with any contracts, it doesn't happen to do with any business dealings, and I'm trying to get that across to you. The vast majority of what I do on Dan's behalf is writing checks, depositing checks, helping with financials, being the middle man, and running his estate. If I sit down with him, I'm running through a list of things on his estate. "Dan, you got to get new fountains. This is how much it's going to cost."

"Give me three bids. Okay."

"Dan, your fish tank is getting put in."

"Okay. How much is it going to cost? What are my three bids? What are my three options?"

Those are the types of conversations that I have with Dan in a meaningful manner. When it comes to contracts, it's a matter of fact way. I do not press him on anything. It's his decision.

BY MR. GOODRICH:

Q. Okay. So if I understand, you don't have meaningful conversations with Dan about his

888.909.2720                    Anthem Reporting                    813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 201

relationship with Steel?

A. That is correct.

Q. Okay. When -- you referenced conversations in passing, and I think you said "when I pass him in the hall"; how long are these conversations between you? Is it -- withdraw that.

How long are the conversations?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Okay. For example, this conversation when you would have conveyed -- first of all, would you have conveyed this to Dan? We're talking about May 14.

A. I would have.

Q. Okay. And would it have been a five-minute conversation, a 15-second conversation, any ballpark?

A. I don't recall.

Q. How does Dan respond to a conversation like that?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Do you remember how he responded to this particular conversation?

A. I do not.

Q. Sorry. You do not?

A. Not to the specific conversation, no.

Page 202

Q. Okay. Do you remember how he responded to any conversation in which you asked him to post more?

A. If I had those conversations with him, it typically would be, "Okay."

Q. Well, any conversation, in person, I'm asking about, in passing, as you had said?

A. That would be the response, "Okay."

Q. He would just say "Okay," and then, I gather -- yeah. I gather, based on your prior testimony, there's no further discussion about it?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Correct?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. You can answer.

A. Correct.

Q. So, now, I'll pull up --

MS. STEIN: Counselor, before the next exhibit, can we take a quick five-minute break?

MR. GOODRICH: We can go off the record.

THE VIDEOGRAPHER: Off the record. The time is 5:24 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record. The time is

Page 203

5:39.

(Plaintiff's Exhibit No. 15 was marked for identification.)

BY MR. GOODRICH:

Q. All right, Mr. Verona, I pulled up, on the screen, what we'll mark as Exhibit 15. So my first question has nothing to do with Exhibit 15. It looks like you had a change of scenery. Are you in a different room than you were earlier?

A. No. I just had to plug in my computer, so I'm turned a different way.

Q. Got it. Is there still nobody in the room with you?

A. Nobody is here.

Q. Okay. Okay. So we're looking at Exhibit 15.

A. Can you make it a little bit smaller?

Q. Yeah. Sorry. This is an e-mail from Mr. Karbid to you on October 12th, 2020. And I'll start at the bottom. In this e-mail, Mr. Karbid is telling you that -- where am I -- "From our analysis and our schedule, the ideal date to post is later in the day on November 15th," obviously, 2020. Do you see where I'm pointing at?

A. I do.

Q. Okay. Does this refresh your recollection

Page 204

about any other conversation with Steel about when the ideal date or time to post is?

A. Let me read it.

Q. Yeah.

A. What was your question, again?

Q. Does this refresh your recollection as to any conversations with Steel about when the best date or time to post is?

A. It does.

Q. Okay. And aside from this conversation, does it refresh your recollection as to any other conversations we haven't discussed today?

MR. MCCOY: Form.

THE WITNESS: It does not.

BY MR. GOODRICH:

Q. Okay. Do you know -- scratch that.

Was this e-mail followed up with a phone conversation?

A. I don't recall.

Q. Mr. Karbid notes that "The best results come from a post with a swipe up, similar to the ones we e-mailed you a few days ago."

Did you convey that to Mr. Bilzerian?

A. Don't recall.

Q. Okay. Would you have --

51 (Pages 201 to 204)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 205

A.  I would've told him the top part.

Q.  You would've told him the top part?

A.  Yes.

Q.  Being, "The ideal date to post is November 15th" -- let me rephrase.  What do you mean by the top part?

A.  Up until the point where it says, "the best results will come in the way of a swipe up."

If I did tell Dan through e-mail, then I would've just forwarded that to him.  But if not, my guess would've been that I would've told him, "Dan, they want you to do a post on the 15th, 7:00 a.m., and for the 30 percent off holiday event."

Q.  Okay.  And you wouldn't have said do a swipe up post?

A.  I don't recall.

Q.  Do you recall ever using the phrase "swipe up post" in a conversation with Dan?

A.  If it said it -- no, I don't recall specifically saying "swipe up."

Q.  Okay.  And I'm not talking about in an e-mail, I'm talking about in a in-person conversation.  Do you remember asking Dan to do a swipe up post?

A.  I don't know.

Q.  Okay.  Did you ever have a conversation with

Page 206

Dan about a swipe up post?

A.  I don't recall.

Q.  Okay.  Above this, on October 12th, 2020, you write to Mr. Karbid -- well, to all, "In preparing to speak with Dan this week, I was wondering if you could provide some financials as to a typical" -- "as to what a typical month's budget looks like, as we've discussed."

So my first question is:  What is this conversation?  What's happening here?

A.  Let me read it again.

Q.  Sure.

A.  Dan asked me to ask them to get the financials of what would've been a typical month's budget.

Q.  A typical month's budget for Steel?

A.  Correct.

Q.  Why -- do you know why Dan asked you to get that?  Do you know -- what were you going to do with that information?

A.  Give it back to Dan.

Q.  Okay.  Do you know what Dan was going to do with it?

A.  I do not.

Q.  Did you have access to that sort of information on the Steel financial dashboard?

Page 207

A.  No.

Q.  Then you say -- well, you say, "I was wondering if you could provide financials as to what a monthly budget looks like, as we've discussed."

Do you remember any conversations about this?

A.  If I said "as we discussed," then we probably had had a phone conversation, and it probably happened during that phone conversation that I said, "Dan would like some financials regarding that typical month's budget."

Q.  Okay.  And do you remember any specifics from a conversation like that?

A.  No.

Q.  How long were your typical conversations on the phone with Steel?

A.  Short.

Q.  Have you ever visited Steel, Steel's primary location?

A.  No.

Q.  Do you know where Steel is located?

A.  It's in Florida.

Q.  Okay.  Do you know where in Florida it is?

A.  No.

Q.  Okay.  Then you followed it up by saying, "It would be nice to give Dan the overall picture of the

Page 208

company and where it's intended to head."

What do you mean by that?

A.  I think Dan wanted to know where the marketing dollars were going.

Q.  Where Steel's marketing dollars are going?

A.  That's correct.

Q.  Why did Dan want to know that?

A.  I don't know.

Q.  Okay.  Did he have a conversation with you about Steel's marketing budget on how Steel was marketing?

A.  Dan would ask me to ask them, to get an overall picture of the company's marketing budget and that's what I have on here.

Q.  And was that -- was that the entire conversation?

A.  Correct.

Q.  And you had no understanding of why you were asking Steel for that?

A.  That is correct.  Again, Dan would ask -- this is a middle man in this relationship, one of which I was trying to mend fences all the way through, and be -- you know, be a proponent for each side.  At the end of the day, I think Jason appreciated getting messages from me, as opposed to, you know, sometimes directly

52 (Pages 205 to 208)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 209

from Dan. He needed to know that there was somebody else there, and I was there. But at the end of the day, what I was doing was, Dan was, basically, telling me one thing, and I was conveying it to them in the same words that Dan was telling me. I never asked them any questions. I would never ask Dan why.

Q. Okay. So when you are writing an e-mail to Dan, are you using Dan's words?

A. When I'm writing an e-mail to Dan?

Q. I'm sorry. When you are writing an e-mail to Steel, in which you are making a request on behalf of Dan, are you using Dan's words?

A. For the most part. I mean, I would say that -- you know, obviously, we have different ways of speaking but we're getting across the same point.

Q. So would this e-mail have been Dan's words?

A. Yes.

Q. And did this e-mail have to do with Dan wanting to purchase or wanting to have an ownership interest in Steel?

A. I don't believe so, no.

Q. Was that -- first off, was that only a one-time conversation that Dan brought up about becoming an owner of Steel -- (crosstalk) -- sorry, I missed the answer.

Page 210

A. I recall it to be a one time that I ever heard.

Q. Okay. And was that one-time conversation before October 2020?

A. I can't recall.

Q. You say that -- you used the phrase that you are a middle man. And I've heard you say it more than once. So if I'm I understanding you, Dan calls all the shots. Is that a fair assessment?

A. That is a fair assessment.

Q. Is it -- in terms of Dan's leadership, is it Dan's way or the highway?

MR. MCCOY: Form.

THE WITNESS: When it comes to business decisions like this, yes. When it comes to more menial issues, such as estate management, and employee management, plane management, he'll listen to me.

BY MR. GOODRICH:

Q. Okay. But --

(Technological interruption.)

THE WITNESS: -- conversations that happened when it comes to those. When it comes to money or deals in which he has money, it's his way or the highway and I am a middle man and I basically, like

Page 211

I said, I tell him what others have told me to tell him and then I report back what he says to me to others.

BY MR. GOODRICH:

Q. So all business decisions are made by Dan and Dan alone?

A. Now, yes. And probably, I would say -- I don't want to speculate, but some of those e-mails probably suggest that Feder had something to do with some of the discussions that Dan would have with him on business decisions.

Q. I want to talk about during your time because you started as vice president and then you became the COO. Who is making the business decisions for Blitz?

A. Dan.

Q. Okay. So did anyone, aside from Dan, have input into business decisions?

A. Yes.

Q. Who would that be?

A. Michael Feder.

Q. And what sort of input did Mr. Feder have?

A. I don't know.

Q. Those would've just been conversations between him and Dan?

A. That is correct. Higher level.

Page 212

Q. Were you ever present for any of these conversations?

A. No, not that I can recall.

Q. You used the word "mending fences," and that you're constantly mending fences. What do you mean by that?

A. I just wanted to make sure that, you know, this relationship stayed as amicable and as possible. And I believe that I was consistent in being able to do so throughout the time in which I was there. And by that, I mean, I think Feder got involved with Jason Huh at one point, so I had to come in, and just be, again, that middle man, so that he didn't have to deal with Feder, who I know that he didn't like all that much.

Q. Why did he not like Mr. Feder?

A. I don't know.

Q. Can you testify about any other instances in which you were mending fences?

A. Not that I can recall.

Q. What is your relationship with Mr. Feder? Are you friends?

A. I don't have any relationship with him.

Q. Okay. During your overlapping time at Blitz, what was your relationship with Mr. Feder?

A. It was strained in the beginning, but then

53 (Pages 209 to 212)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 213

became friendly in a business manner with one another. We both respected what we were each doing on Dan's behalf, and I think it took some time for us to realize and come to that conclusion with one another, so we were amicable for the vast majority of the time Michael Feder was there.

Q. Why was it strained?

A. Michael is somebody who is very -- at first impressions, not many people like Michael Feder. He's a -- he believes himself to be the smartest person in the room. He thinks he's funny when he is not, and he thinks everything he says is the smartest thing anybody's ever heard. So it's difficult for this guy to come in, and, basically, try to take charge of me, who had just started, and was working under somebody that I respected quite a bit, who was Rob Hagen. And this Feder guy comes in and starts telling me what to do and demanding things of me -- and nobody had told me that this was happening, so it was a contentious way which began the relationship between he and I.

Q. Nobody told you what was happening?

A. Nobody had told me that Michael was coming into this position at Blitz. I found out during, what I believe to be the second interview with Dan, when he called me in to meet Michael. So it wasn't all

Page 214

Michael's fault. It was probably Dan's or somebody should've probably given me the heads up, they're bringing this guy in. Michael is a good guy, deep down, but I think that he is, you know -- like I said, he tends to rub people the wrong way, especially first interaction with one another. And I know that he had done so with Jason -- and I do like Jason, I will say that on the record, I like Jason. I don't have anything against him.

Q. Jason Huh?

A. Yeah, Jason Huh. I have nothing against him personally. And I wanted to make sure that he was comfortable with the relationship moving forward. I wanted to make sure that Dan was comfortable with the relationship moving forward, and I wanted to remain the middle man in that, I didn't believe that to the best interest of both.

Q. Mr. Feder, was he terminated from Blitz?

A. I believe so.

Q. By whom was he terminated?

A. I don't know.

Q. Do you know why he was terminated?

A. I do not.

Q. Okay. Do you remember any conversation about, he's here one day and he's not the next, where he went,

Page 215

why he is not here?

A. I believe Dan simply told me, "We're getting rid of Feder."

Q. And no further conversation on that point?

A. No, because he thought that I still had held a grudge against Feder from the beginning of his employment, and he is like, "Oh, I'm getting rid of Feder. You are probably happy about that."

I'm like, "Dan, he and I get along famously at this point. If you're getting rid of him, that's our choice but I have" -- you know, I have nothing bad to say about Michael at this. He and I got along famously towards the end of our employment with one another, even though, technically, I was reporting to him, but it became more a, it went from like this --

Q. Did you ever express to Dan when things were not going famously with Michael Feder?

A. He could sense it, though.

Q. How often were all three of you in the same room, you, Dan, Michael Feder?

A. Rarely.

Q. Okay. I don't know if I asked this about Rob Hagen. Where is he now?

A. My last known -- what I know of him last is that he is still in Las Vegas.

Page 216

Q. Do you know what he does?

A. I think that he said he was going to start back up the company that he was once working on, which was an independent entity that he had had, called Fame Farm.

Q. Fame Farm?

A. Yeah. It's a really great name, isn't it?

Q. What is Fame Farm?

A. Honestly, I have no idea. Michael would talk and -- just to hear himself talk -- and I never really necessarily understood it and I would just nod my head and be like, okay. I think it's got something to do with marketing of celebrities, images and such.

Q. Okay. And does Blitz have any relationship with Fame Farm?

A. No.

Q. No agreements between the two?

A. No.

Q. So other than the Feder debacle, for lack of a better word, do you recall any instance of mending fences between Steel and Blitz?

A. No.

Q. Just the one time?

A. I believe that to be the case, yes.

Q. In this e-mail which is Exhibit 15.

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 217

On October 12, 2020, you write to Medhy and said -- You're asking for dates, sales results, and traffic that -- generated by the historical posts. He provided he via Dropbox and -- sorry, below that you say, "I just want to be able to present him a more elaborate representation so he can appreciate the effectiveness of one type of post versus another." What is happening in this e-mail that I just read?

A. Basically, I had asked -- because Dan had asked me, when they provided the photos of the posts that were most effective, I was asked to find out more about it. You know, he just didn't want another post, he wanted to know dates that they were posted, the sales results, the traffic generated and such. I think that that's what it was, sales, yeah -- so that he could know a bit better about what's the most effective, just by presenting it with the posts themselves. I believe he felt that to be not enough material for him to necessarily get a post that would be acceptable by Steel. So he was just asking for more information, and I don't believe that we ever got it.

Q. Okay. And was this --

A. -- also, I forgot to mention too. If I can go back, now that my memory is serving me a bit better.

Page 218

So when I asked for the Steel's financials, Jason -- if we can go down a little bit, because you skipped over it. I was asking for marketing numbers and such. To which it was responded by Medhy, that they couldn't give marketing numbers because it was directly -- it pertained to Jason's personal income tax statement, and I didn't understand that, and I told Dan that as well. That they wouldn't give us the marketing numbers because it was consistent -- it had something to do with Jason's personal income tax situation, and to me that made no sense, but like said, middle man. Told Dan and at that point he said, "that makes absolutely no freaking sense." I mean, I don't know how the marketing numbers for his company would have anything to do with his personal tax situation. But as you can see, I didn't push him on it, because Dan didn't push me on it to ask him. The thing that I pushed on was to try to get more accurate representation of the posts and what they generated historically so I can pass those figures over to Dan.

Q. In that e-mail below, which we did go over, on October 12, 2020. It's from you to -- looks like to the Steel team. And it appears that you are asking for financials as to a typical month's budget, which I take to be different than marketing materials request.

Page 219

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. The question is: Is there -- was there a separate request for marketing materials?

A. No, but that's what we discussed over the phone that I recall. I just didn't put it in an e-mail. But that's what I had meant by -- and even if it is a month's budget, I mean, that should have little, if anything, to do with Jason's personal tax return anyways. But again, I'm not an accountant, nor was I going to push the issue. I just told Dan what he had said and then -- to which we would respond to get more historical data on posts.

Q. Okay. But you do recall a separate phone conversation in which you asked Mr. Karbid for marketing materials?

A. I do believe that we did have one, yes.

Q. And when, relative to this October 12, 2020 e-mail, would that have been?

A. I can't recall. I would've been a while.

Q. Do you know, specifically, that it is -- it is a while, but we're less than a year from this. Do you remember, specifically, what you would've said on the call?

A. I probably would've said something along the

Page 220

line that Dan wants to know what you guys are spending the marketing dollars on, would you be amenable to sharing that with him.

Q. Okay. Would you have made that call from your cell phone?

A. Yeah.

Q. Would you ever have used a different phone number other than your cell phone in communicating with Steel?

A. No.

Q. Do you know if you called Mr. Karbid on his cell phone?

A. I don't know if it was Medhy or I don't know if it was Jason.

Q. Okay. And when you spoke --

A. -- whatever -- I have one number for each of them, I believe so, whatever number -- I would say probably -- I don't know who I spoke to. But I do remember bringing that to someone's attention and asking for marketing reports for the marketing budget, and, obviously, putting it in different words in the e-mail.

Q. Was there any further discussion you can remember about Steel given Blitz marketing reports?

A. Just what's up top.

55 (Pages 217 to 220)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 221

Q.  And did you have any understanding of Blitz's need for marketing reports?

A.  No.

Q.  It was entirely based on what Dan wanted?

A.  Correct.

Q.  So this request, where you are asking for more information on October 12th of 2020, is this -- was this a request from Dan?

A.  That is correct.

Q.  And you said earlier that sometimes you use Dan's words in writing the e-mail to Steel.  Would you -- do you know if you did that here?

A.  No.  Again, we talk in different ways.  You know, Dan says, "Get the results, get the traffic, get the dates, get this, get that" -- and, you know, whatever I hear and take with me, because I -- you know, I don't ask him again, and I just take whatever I can remember from the conversation and put it in as professional of a sentence as possible to send to Steel.  But these requests are not coming directly from me, these requests are coming directly from Dan.

Q.  Okay.  So this sounds like Dan's language?

A.  I don't think Dan would ever write an e-mail like this, no.  I think that the point coming across in the e-mail was Dan's.  And then, like I said, I'll

Page 222

clean it up and put it into more, I guess, you know, more formal language to say.

Q.  And what happened as a result of this?  I mean did you -- did Steel provide you with documents you were seeking?

A.  Can you go up a little bit?

Q.  Yeah.

A.  Yeah.  I don't think that he ever gave it to us.

Q.  Okay.

A.  I don't remember ever seeing actual -- the actual sales results, and traffic, and those dates, and everything, so I had nothing to write to Dan.

Q.  And did you recall any follow-up by Blitz for this information?

A.  I don't believe so.  I don't recall.

Q.  All right.  So I'm going to show you now what we'll mark as 16.

(Plaintiff's Exhibit No. 16 was marked for identification.)

BY MR. GOODRICH:

Q.  And this is an e-mail from Gregory Wang to you, on October 19th, 2020.

A.  Sure.

Q.  And I want to scroll down because I want to

Page 223

focus on this October 17th e-mail from Mr. Wang.  And he writes that, "Jason Huh informed me that he and Dan spoke recently and that Dan made a serious overture about investing in Steel."

Do you have, you know, any memory, first, of a conversation with Dan, around October 17th, 2020, about investing in Steel?

A.  Well, now that that's shown to me in an e-mail -- can you make it a little smaller, by the way?

Q.  Yeah.  Keep reminding me.  I'll do it.

A.  Now that you are showing me this e-mail, and I'm remembering it a bit better, I would say that that conversation about investing in Steel probably did happen right around that date.

Q.  Okay.  And does this refresh your recollection as to whether there was more than one conversation like this?

A.  I do believe that there was only one conversation.

Q.  Did you speak with -- did you speak with Paul Bilzerian about Dan acquiring an interest in Steel?

A.  No.

Q.  Okay.  Did you ever speak with Mr. Karbid directly about Dan acquiring an interest in Steel?

A.  No.  If I remember correctly, reading this

Page 224

e-mail and everything, I believe I had a quick conversation with Jason, "So, would you be amenable to having Dan invest in Steel for a percentage of the company?"

Jason said -- I don't remember how Jason responded, but evidently, it led to him -- or I probably said, "Why don't you call up Dan and have a conversation with him about it because I'm not sure of the specifics," and, evidently, he did have a conversation with Dan.

Q.  So going back to the prior exhibit -- I'll jump back.  So we're back on Exhibit 15 again.  We talked about you requesting marketing materials.  And in this October 12th e-mail, you say, "I wonder if you could provide some financials."

So in light of Exhibit 16 that we just went over, does this refresh your recollection as to whether this request for financials related to Dan's interest in investing in Steel?

A.  No.  No.  I believe that they were completely independent of one another.  I wouldn't have had this and that conversations regarding that.  It's not my duty, basically, to negotiate these things on Dan's behalf, that's why I requested that Jason speak to him.  The marketing budget was sent so Dan could see what

56 (Pages 221 to 224)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

|  | Page 225 |  | Page 226 |
|---|---|---|---|

Page 225

they were -- asking to see what they were actually spending money on past that of his posts.

Q. Who does negotiate this stuff on behalf of Dan?

A. Feder.

Q. What about after Feder left?

A. I'm sorry?

Q. What about after Feder left?

A. I don't know. I would assume that Dan had a conversation with Jason, they went back and forth for some time. I'm saying it speculative and putting it out there, I really don't know, but I have no problem saying this. I believe they probably spoke to one another, they were going back and forth, you know, and Jason said no, Dan said yes, this and that, and then it led to December when they called.

Q. Okay. But, again, you don't know that that conversation happened, you are just assuming?

A. I do not.

Q. Would Mr. Feder have been there in October 2020?

A. No.

Q. And by "there" I mean, "Blitz" of course.

So in this e-mail that references Dan making a serious overture about investing in Steel. Do you know

Page 226

whether the intent was for Dan individually to invest in Steel as opposed to Blitz?

A. I don't know.

Q. Okay. Are you aware of any other correspondence between -- between anyone, regarding Dan's investment in Steel?

A. I do not.

Q. Have you ever spoken with anyone -- anyone, period, about Dan investing in Steel?

A. Other than when Dan asked me to ask Jason, no.

Q. Okay. Did you ever speak with anyone at Steel and have a conversation to the effect that Dan would be more likely to post if Steel gave him shares or an ownership interest in Steel?

A. No.

Q. Okay. So that conversation just didn't happen?

A. Correct.

Q. How did Dan -- so at some point, this negotiation, whatever you want to call it, this transaction didn't happen; is that your understanding?

A. My understanding is that it never happened.

Q. Okay. What was Dan's response to Steel not offering him an interest in the company?

A. You are going to have to ask Dan. He never

|  | Page 227 |  | Page 228 |
|---|---|---|---|

Page 227

discussed his response with me.

Q. Okay.

A. Because once it was left to him and Jason.

Q. He never talked about it with you, never circled back, and said, "Steel is not accepting my offer"?

A. No. Told you, those are conversations that Dan and I never had.

Q. Right. And you -- was there -- and I'm rephrasing a question I asked earlier, so it will sound slightly different. Was there ever a conversation with Mr. Karbid, that Dan would be more likely to post if he were an owner of Steel?

MR. MCCOY: Objection.

THE WITNESS: No.

BY MR. GOODRICH:

Q. So I'm going to pull up what we'll mark as Exhibit 17.

(Plaintiff's Exhibit No. 17 was marked for identification.)

BY MR. GOODRICH:

Q. And this is an October 21, 2020 e-mail from Mr. Karbid to you. And in it, he attaches some relevant number regarding Dan's previous post. And below this, there's a chart. My first question is,

Page 228

what prompted this?

A. That was -- the last e-mail prompted this.

Q. Okay.

A. So I'm saying, now that I'm seeing it, they did actually report to him as far as the traffic and I sent this off to Dan.

Q. So when you say "the last e-mail," is that this exhibit?

A. Go to the top.

Q. Yeah. Exhibit 15, where you are asking for dates, sales results, traffic?

A. Correct.

Q. Okay. So did you share this with Mr. Bilzerian?

A. I believe I did.

Q. Okay. Do you have any understanding -- so, as I read this, this box up on -- the top of Dan posts, has four top -- sorry -- top four posts. Do you have any understanding as to what made these top posts?

A. No.

Q. Any understanding of --

A. Traffic, I mean, 100,000 people. Estimated orders, 1,150. Conversion rate. I guess that's just the percentage of the estimated traffic.

Q. Any understanding of whether the format of the

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 229

post -- and when I say that, I mean, like, story versus post or story versus highlight, impacted what was a top post or not?

A. I have no idea.

Q. Okay. There was no conversation with Steel about what makes a top post?

A. No, not by me.

Q. Do you remember any conversation with Mr. Bilzerian about this chart?

A. No, I believe I sent it to them, told them --

(Technological interruption.)

Q. Sorry. You cut out for a second.

A. I believe I sent it to him and left it as is.

Q. Okay. Would you have sent it to him over e-mail?

A. Correct.

Q. Do you know if, in response to receiving this e-mail from you, Mr. Bilzerian changed his behavior in any way?

A. Can you be more specific?

Q. Yeah. So Steel is providing all this information you've asked for about Dan's prior posts, including traffic, orders generated, and conversion rate.

A. Sure.

Page 230

Q. And they're providing it at Mr. Bilzerian's request, according to what you said earlier; right?

A. Correct.

Q. So did Mr. Bilzerian, upon receiving this, do anything different?

A. I did not see him acting any differently than he normally does with me. Never discussed.

Q. Okay. We'll move to Exhibit 18.

(Plaintiff's Exhibit No. 18 was marked for identification.)

BY MR. GOODRICH:

Q. Which I'll reference is a copy of a termination letter from Steel, and I can go through it, if you'd like. But my question is going to be, first, whether you've received and reviewed this agreement? Again, with the caveat that I don't want to know about any conversations with counsel or anything done at the direction of counsel.

A. I got it and sent it to counsel.

Q. Okay. Did you -- before speaking with counsel, did you have any conversations with Mr. Bilzerian about this letter?

A. No.

Q. Did you have any conversations with anyone about this letter before sending it to counsel?

Page 231

A. No, because Dan was on a call with me, Medhy, and Jason, and they knew that he was terminating him. So they said that they were sending a letter, so we were expecting it and -- so as soon as I got it, I didn't even read it, I just forwarded it to counsel.

Q. Okay. Did you have any -- a conversation with Mr. Bilzerian about what happened on the call with Jason and Medhy?

A. I was on the call.

Q. Oh, you were on the call. Okay. So what happened?

A. So, basically, couple of days before the call, Jason had said to me, "Can we set a call with Dan?"

And I said, "Sure. Can you tell me what it's about?"

And they're like, "Well, just the upcoming year and things that we want to get accomplished."

I was like, "Sure."

So I set a call and --

(Technological interruption.)

THE WITNESS: So I set a call with Dan, as I do, you know, administrative tasks, menial tasks that I do on behalf of he and his businesses, and I sat in on the call. And, basically, on the call -- which I thought to be weird that they wanted to do

Page 232

it by, I guess, was it Skype back then. I don't even know if Zoom was a thing, but it was definitely a video call.

And Jason and Medhy were out there on a picnic bench, and Dan was out by the pool, and I was in one of his bedrooms. And, basically, they just said, "Dan, you know, this is a conversation because we're not happy with the partnership and we want to terminate the agreement."

BY MR. GOODRICH:

Q. Was there any -- do you remember what Mr. Bilzerian's response was?

A. I think that they argued the contract a little bit, to where Dan says, "I'm allowed to post at my discretion." And, you know, I don't remember what Jason or Medhy's response to that may have been at the time, but I think that they were, obviously, steadfast in wanting to move forward with this.

You know, the conversation was relatively quick. It was not heated. I think Dan had taken it a lot better than I thought that he would. And then -- I actually stayed on the line with Medhy and Jason a bit after Dan had hung up and said, "Look, let's work through this. Let's try to find some sort of resolution."

58 (Pages 229 to 232)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    7495137d-4848-4119-b9a3-022d2841cf03

Page 233

And, unfortunately, they didn't give us the opportunity to do so. Never proved possible, and I'm sorry that, you know, unfortunately, it's come to this now.

Q. Did you say anything other than that last part, "Let's try and work through this"? Do you remember anything else you said on the call?

A. I don't know -- well, both of us were saying, "Is there anything we can do about this?"

And no, I think that was it. Look, it's been a pleasure working with you. No. Again, I like Jason on a personal, you know, he and I had a great personal rapport with one another. Hopefully, he and I can do so in another time, in another place with one another, but it was really amicable.

I said, "Look, it is what it is. You guys did what you had to do and now Dan's gonna have to do what he needs to do."

And they were, like, totally respectful of that and they said, you know, "We're going to send the letter."

And I said, you know, again, "Do what you need to do and, you know, just know that Dan's gonna do what he needs to do," and that was basically how I left it.

Q. And after that, what happened? Was the next

Page 234

step to send it to counsel?

A. Sent it to counsel.

Q. Okay. Any other conversations with anyone other than counsel about this letter?

A. No.

Q. One question I think I missed. You said that Blitz has an office and sometimes you go to the office, I think, one day a week you said. Did I get that right?

A. I do.

Q. And the remainder of the week you work at Dan's house in Las Vegas?

A. All of the week I work at Dan's office at his house. I just go in -- the airport is not too far out of the way, so I just stop off there one day a week to pick up the mail.

Q. Okay. Is it -- are there desks in the mail part --

A. It's not a real office. There's a desk and the office mainly serves for when the plane goes into maintenance. We'll pull all the stuff from the plane and put it in the office, such as his TV, anything that might be personal effects of his, things that he wouldn't want to, necessarily, get stolen, that we leave on the plane for the most part. And other than

Page 235

that, it's more so served so that people don't know Dan's personal address.

Q. Is there a landline?

A. There is not.

Q. Is there any phone at the office?

A. No.

Q. We were talking about the termination of the Steel contract. Was the Steel contract the highest value contract for Blitz?

A. That I know of, yes.

Q. Okay. Who would know of any others?

A. Dan.

Q. I want to shift gears and talk a little bit about Ignite. What do you understand Ignite to be?

A. Ignite is a -- well, it started off, in its infantile stages, as a cannabis/CBD company. It's morphed itself into doing more so in the nicotine -- synthetic nicotine space, as well as spirits.

Q. Okay. Who owns Ignite?

MR. MCCOY: Object to the form. Let me clarify. Which entity are you referring to? There's multiple Ignite entities.

MR. GOODRICH: Okay. That's a great point.

BY MR. GOODRICH:

Q. Let's talk about Ignite Brands, LLC. Have you

Page 236

ever heard of that company?

A. Yes, I have.

Q. Okay. What does that company do?

A. I honestly don't know the difference between all of the Ignite entities. You can call it Ignite Brands LTD, you can call Ignite -- I guess there's other companies that Ignite, Ignite Spirits, Ignite Brands. Honestly, I don't know what -- I know that the Ignite International -- what was the one that you said?

Q. I'm talking right now about Ignite Brands, LLC and the question was, do you know --

A. I don't know what that one, specifically, does.

Q. Okay. Do you know who owns it?

A. I do not.

Q. Do you know whether Mr. Bilzerian has an interest in it?

A. He does have an interest in it.

Q. Do you know if he is the majority owner?

A. I do not.

Q. Do you know of any other owners aside from Mr. Bilzerian?

A. I do not.

Q. And you don't know what -- what type of business Ignite Brands, LLC has?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 237

MR. MCCOY: Objection to form.

THE WITNESS: Not specifically to that independent entity, no. Ignite as a whole, I know what they're involved in, but I don't know what Ignite Brands is.

BY MR. GOODRICH:

Q. Other than counsel, have you ever spoken with anyone who worked at or was a representative of Ignite Brands, LLC?

A. I've spoken to Ignite employees, but I don't believe that -- I don't know if they work for Ignite Brands, Ignite International, LLC, many of the other Ignites, Spirits. I don't know exactly which company they work for.

Q. Sure. So I would just want to run through that to see what you know about each of the Ignite entities. So turning to Ignite International LTD, do you know who owns it?

MR. MCCOY: Objection.

THE WITNESS: No.

BY MR. GOODRICH:

Q. Okay. You don't.

Do you know if Mr. Bilzerian is an owner?

A. I believe that he has an interest.

Q. Is Mr. Bilzerian an owner in some part of all

Page 238

of the Ignite entities?

A. To my --

MR. MCCOY: Objection.

BY MR. GOODRICH:

Q. You can answer.

A. Honestly, I don't know, because I don't know all of the Ignite entities.

Q. Okay. So we'll go through them and you can tell me if you know Mr. Bilzerian is an owner. So, Ignite International, do you know any owner other than Mr. Bilzerian?

A. I do not.

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. Do you know what that entity does?

A. I do not.

Q. Ignite Distribution Company, is Mr. Bilzerian an owner of that?

MR. MCCOY: Objection to form.

THE WITNESS: I don't know.

BY MR. GOODRICH:

Q. Okay. Do you know any owners of that -- do you know who are any of the owners of that entity?

A. I do not.

Q. Do you know what Ignite Distribution Company,

Page 239

Inc. does?

A. No.

Q. Okay. What about Ignite Nootropics?

A. I never heard of that one.

Q. Okay. So you don't know who, if anyone, owns that company?

A. Correct.

Q. What about Ignite Spirits?

A. I don't know who owns it.

MR. MCCOY: Objection.

BY MR. GOODRICH:

Q. Do you know what that entity does?

A. I do not.

Q. Okay. And do you know if Mr. Bilzerian owns a portion of it?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Same question about Ignite Beverages; do you know who owns it?

MR. MCCOY: Form.

THE WITNESS: Let me just clarify here. I know that Dan has ownership stake in Ignite, and let me specify that I have no idea, necessarily, as far as all these different entities. I don't know. I know that he was one of the founders of the

Page 240

company, and has an ownership -- has some sort of ownership in Ignite as a whole, but when you are whittling it down to different entities within, I don't know. He might have no interest in Spirits and 100 percent in the LTD. I don't know. Those are not questions for me. Those would be questions for somebody who works for Ignite.

BY MR. GOODRICH:

Q. Okay. So with respect to all of them, you don't really know who owns what, basically?

A. That's correct.

Q. Or what entity -- what each entity is?

A. That is correct.

Q. Is there any relationship between Blitz and any Ignite entity?

MR. MCCOY: Form.

THE WITNESS: Give me a second to think. Is there any relationship to Blitz and any Ignite entity?

Not that I can recall.

BY MR. GOODRICH:

Q. Okay. No agreement you can think of?

A. They license the goat skull from Blitz.

Q. The goat skull. Tell me about the goat skull?

A. The goat skull is that image that is on the

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 241

packaging for Ignite, the brand, whatever -- all their brands that they're doing, and it's that ram or goat head -- it's a goat head, skull, and Blitz owns the skull. Dan designed it some time ago and he licenses it to Ignite on a yearly basis.

Q. Okay. Have you seen a written agreement to that effect?

A. I have seen one but I did not study it.

Q. Okay. Was that something that would be in your purview as COO of Blitz?

MR. MCCOY: Objection.

THE WITNESS: Michael Feder did it.

BY MR. GOODRICH:

Q. Aside from the licensing arrangement, does Blitz have any business with any Ignite entity that you are aware of?

A. No -- say that question again. I'm sorry.

Q. Aside from the licensing agreement --

A. The goat skull.

Q. -- the goat skull. Are you aware of any business that Blitz has with any Ignite entity?

A. No.

Q. Does Blitz receive any payments from any Ignite entity?

MR. MCCOY: Form.

Page 242

BY MR. GOODRICH:

Q. Other than with respect to the license arrangement?

A. No.

Q. Okay. Has -- to your knowledge, has Blitz ever been compensated by any Ignite entity?

A. When you say Blitz, are you referring to the members of -- the employees?

Q. That's a good point. No. I'm asking, has there ever been money passed from an Ignite entity to Blitz, and I'm not talking specifically about Dan Bilzerian?

MR. MCCOY: Form.

THE WITNESS: No.

BY MR. GOODRICH:

Q. Does anyone who works for Blitz also work for Ignite or any Ignite entity?

A. Now?

Q. Sure.

A. No.

Q. Okay. In the past?

A. Michael Feder --

Q. Okay. And when did --

A. To some extent, I don't know.

Q. I'm sorry. I rudely talked over you. I

Page 243

missed the first part of your answer.

A. Feder had worked for -- had been doing work on Ignite's behalf, but I don't know to what extent, nor do I really know what he was doing with them or on their behalf, but I think, at one point, he served the dual purpose. One, in which he kind of focused a lot of this time on Ignite and, you know, that's when, basically, he was doing stuff for Ignite, and I would just handle everything that was happening in Blitz, aside from the business agreements and such, and that's why he and I started having a more amicable relationship with one another.

Q. While he had a dual role, was he employed by Blitz?

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. He, being Michael Feder, by the way.

A. He was paid by Blitz, but I do believe that a portion of his salary was reimbursed by Ignite.

Q. He was paid by Blitz but a portion of his salary was reimbursed by Ignite. So Ignite, if I understand, would pay Blitz some portion of Mr. Feder's salary?

A. Yes. And I'm sorry if I didn't mention that before, as far as monies received from Ignite, for

Page 244

Blitz from Ignite. It's the accounts receivable.

Q. Do you know what percentage of his salary they reimbursed?

A. I don't recall.

Q. Have you ever heard of a product called ZRO?

A. Yes.

Q. What is it?

A. It's an energy drink.

Q. Do you know when it debut?

A. No idea.

Q. Do you know which Ignite -- does an Ignite entity have an interest in the ZRO product?

MR. MCCOY: Form.

THE WITNESS: I don't know.

BY MR. GOODRICH:

Q. So safe to say, you don't know which, if any, Ignite entity has ownership of the ZRO product?

A. That is correct.

Q. You didn't have any involvement in the creation or marketing of ZRO; correct?

A. That is correct.

Q. Do you have any understanding of how it was marketed?

A. No.

Q. Sorry. You cut out for me.

61 (Pages 241 to 244)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 245

A. No.

Q. Okay. Did you ever see marketing materials for the ZRO product?

A. We once had a Ignite event at Dan's house and I saw some, I guess, banners you can call them, that they had laid out in the foyer of his house for the Ignite party.

Q. And what did the banners say, if you remember?

A. Just ZRO. Probably a picture of the product as well.

Q. Do you know --

A. We had a couple of ZRO fridges at his estate.

Q. Do you know whether Ignite is marketed -- let me scratch that.

Have you seen whether Ignite is marketed as a Ignite pre-workout drink?

MR. MCCOY: Form.

THE WITNESS: I have no idea.

BY MR. GOODRICH:

Q. Do you know what a pre-workout is?

A. No.

Q. Was there ever any discussion with anyone about whether ZRO competed with Steel's products?

MR. MCCOY: Form.

THE WITNESS: No. The only -- I did have a

Page 246

conversation with Jason Huh once, at Dan's request, asking if he would sell ZRO on Steelsupplements.com.

BY MR. GOODRICH:

Q. Okay. When was that?

A. I don't recall.

Q. And did you -- when you say you had a conversation, did you actually call Mr. Huh?

A. I believe it was over the phone.

Q. Okay. What did he say?

A. I believe that he said that until -- he wasn't confident in the Ignite marketing team, didn't think that they did a good job because, at that point, Ignite wasn't doing very well. And he said he would think on it and see how the sales were for a while, and then they would revisit the idea, and that was, basically, it, and I just went back to Dan with that.

Q. Was there ever any discussion -- any further discussion with Steel about ZRO?

A. Not that I'm aware of.

Q. Okay. Was there any discussion or analysis by Blitz about whether ZRO was a bodybuilding supplement product under the Steel/Blitz contract?

A. Not that I'm aware of.

Q. You mentioned an event, an Ignite event at

Page 247

Dan's house. First off, was there more than one Ignite event at Dan's house?

A. Yes.

Q. How many would you say?

A. Let's call it three or four.

Q. When there was an Ignite event at Dan's house -- and I understand Dan's house is owned by the 30 Meadowhawk entity; is that right?

A. I believe so, but Kim would know more on that than I would. Much like the owners of the entities and themselves. I'm guessing on those to be completely honest with you. Kim knows the owners of everything.

Q. When there was an Ignite event, was Blitz compensated in any way?

A. Was Blitz compensated in any way? Blitz was reimbursed for expenses that we had spent on Ignite's behalf to throw the party.

Q. Okay. Was there any sort of rental fee, for example?

A. No.

Q. And when you talk about the five -- I think you said three events?

A. You can call it five. We had one the other day, I mean, they're small, little, tiny, ten-person events, but you can call it five.

Page 248

Q. Were they always at the Las Vegas house?

A. No, the only -- I believe we only had one at the Las Vegas house, when he had his Los Angeles house, and that was only because there was a trade show in town.

Q. Sorry. So one at the Las Vegas house and the rest at the Los Angeles house?

A. When the Los Angeles house did exist.

Q. So it no longer exists?

A. Well, it's no longer being used by Ignite, no.

Q. And did Meadowhawk have an ownership interest in the Los Angeles house?

A. I don't know.

Q. Okay. Do you know whether Mr. Bilzerian owned the Los Angeles house? Do you know who owned it?

A. He did not own it, and I believe the owner is -- Don Boland is the owner's name. His company, I don't know who the company is, but he is the owner of the company that rented it out.

Q. At what point did -- let me back up. I gather Mr. Bilzerian rented it?

A. I believe so.

Q. Was that --

A. I don't believe that Mr. Bilzerian rented it. I believe that Ignite rented it.

62 (Pages 245 to 248)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 249

Q. Okay. So this was not a Blitz rental agreement?

A. No.

Q. Okay. This was an Ignite issue?

A. To my understanding.

Q. Okay. I don't know if I specifically asked this question. I'm sorry, if so. Did you ever see any marketing material surrounding ZRO, using the term pre-workout?

A. No.

MR. MCCOY: Form.

BY MR. GOODRICH:

Q. Okay. Now, I understand your answer to that and we'll see if this refreshes your recollection. Do you remember having a conversation or an e-mail exchange with Mr. Karbid in which he told you that Steel was launching a product called PRE?

A. Well, I remember that you showed it to me.

Q. And do you remember any further conversation, as we sit here today?

A. What's the question again?

Q. So earlier, I showed you that e-mail.

A. Yeah.

Q. And I can pull it up again. Probably. You said you don't remember any conversation about PRE,

Page 250

other than what's in that e-mail?

A. That is correct.

Q. Okay. In the time we've been sitting here today, have you remembered any further conversations?

A. Definitely did not have a conversation about PRE.

Q. Do you know whether Mr. Bilzerian ever endorsed the Steel product PRE?

A. I do not know.

Q. Were you ever around when Mr. Bilzerian promoted, or endorsed, or publicized the ZRO product?

MR. MCCOY: Form.

THE WITNESS: Around?

BY MR. GOODRICH:

Q. Did you ever physically see him while he was posting on social media for ZRO?

A. No.

Q. Do you know where he would create his posts for ZRO?

A. I remember seeing a post that he did when he was traveling. It was, like, a can on one of the -- maybe the coffee tables. I believe that -- that's what I can remember. Is there anything that he was promoting for Steel?

MR. MCCOY: Brian, sometime in the next ten

Page 251

minutes can we take --

MR. GOODRICH: Of course.

(A discussion was held off the record.)

BY MR. GOODRICH:

Q. Did you -- Mr. Verona, did you complete the answer?

A. That was the only thing I remember. Just looking on his Instagram, where he had an Ignite bottle right there.

Q. I understood your testimony earlier to be that you don't -- you didn't keep track of how much Mr. Bilzerian posted about Steel; correct?

A. Correct.

Q. Do you have any knowledge about whether Mr. Bilzerian posted about ZRO more than he did Steel?

A. I don't know.

Q. I'm going to run through just a couple of names and ask you if you know who these individuals are. Have you ever heard of a Brianna Elsey?

A. Yes.

Q. Who is that?

A. She was an attorney for Ignite, and then, I believe, for a very, very short period of time, Feder brought her over to Blitz, and she was there for a minimal amount of time. Like, maybe 30 days.

Page 252

Q. What was her role at Blitz?

A. I don't remember.

Q. Do you know when Feder brought her over?

A. I don't recall.

Q. Okay. Have you spoken with her in the last two years?

A. No, no. I didn't know her. I'm trying to think. The last time -- no, we haven't spoken since she left.

Q. Okay. What about a Rob Jones? Do you know who that is?

A. Yes.

Q. Who is that?

A. Rob Jones did the -- ran the Twitch Channel for Ignite, it's my understanding.

Q. And how did you come to know him?

A. Because they would call me to schedule Dan to do appearances on the Ignite channel. And so -- yeah, so Rob or his team would call me to arrange for him to be available.

Q. Why would they call you?

A. Because they know that I'm kind of administrative support for him, more so than, you know -- it's, basically, me and his executive assistant serve in similar capacities, to a certain extent. But

63 (Pages 249 to 252)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 253

when his executive assistant was doing something else, they would ask me to step in and try and help coordinate his appearances.

Q. Okay. What about a Sam Sarulla? And I'll spell it for you, S-A-R-U-L-L-A.

A. Sam, no.

Q. Have you heard of a Jesse Menzies, M-E-N-Z-I-E-S?

A. Yes. I've heard his name, but I don't know what he does or did for -- it's definitely not Blitz. He must've been with Ignite, but I don't know what he did.

Q. Okay. What about a Chris Neville, N-E-V-I-L-L-E?

A. Yes. Chris Neville was a partner with Dan in a -- another deal that he did that -- I don't know if I should be speaking to it, but it was a --

MR. MCCOY: Is it a Blitz deal that involves a consumable by the human body?

THE WITNESS: No.

MR. MCCOY: Okay. Then you probably shouldn't because I think that's what our order says.

BY MR. GOODRICH:

Q. Was Mr. Neville ever employed by Blitz?

A. No.

Page 254

Q. Okay. When is the last time you communicated with Mr. Neville?

A. I never did.

Q. Okay.

A. Maybe an e-mail here and there, but never had a communication, nor would he recognize me by voice or face.

Q. Have you heard of a website called Blitzbet.com?

A. Yes.

Q. What is that?

A. I don't know exactly. Dan had a business deal with -- it's probably another name, and he was doing promotions on its behalf.

Q. Does Blitzbet.com have any relationship with the Blitz entity?

A. No.

Q. Okay. What sort of promotions was Mr. Bilzerian doing on behalf of Blitzbet?

A. He did a freeroll tournament and allowed them to use his name and likeness to promote the site.

Q. Okay. Do you recall when that was?

A. I do not recall.

MR. GOODRICH: So now is a logical time to stop and take a break. Go off the record.

Page 255

THE VIDEOGRAPHER: Off the record. The time is 6:45.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're now on the record. The time is 6:57 p.m.

BY MR. GOODRICH:

Q. Mr. Verona, I want to talk about Blitz around the time of COVID. Was Blitz having any money problems around COVID times?

A. Let me think. I have to think back. You are saying right when the -- basically when COVID hit or during the whole?

Q. Around the time of the pandemic. I mean, let's frame it as, you know, February 2020 forward.

A. The bank accounts weren't as healthy as they once were.

Q. Was that as a result of COVID?

A. I don't know.

Q. Okay. So do you have any understanding why that was?

A. Just Dan's spending habits changed.

Q. Changed for the worse, meaning?

A. Just buying more stuff for the estate -- which, yeah, buying more stuff for the estate than normal, trips that were being taken. So more money was

Page 256

taken out of the account than typical times because there was little to do other than that.

Q. Did you have a conversation with Mr. Feder, ever, about leaning on Blitz -- on Steel, rather, to make an earlier payment than is required under the contract?

A. An earlier payment as required. I believe that I had a conversation with Michael that they hadn't paid at the 15th, which they normally do. And he is like, "Okay, let me have a conversation with them."

Q. And do you know whether Mr. Feder actually spoke with Steel?

A. I do believe that he did.

Q. And did you -- what was the result of the conversation?

A. I think that they're in the e-mails, but something along the lines of that they'll pay half of it by a certain date and another half of it by another date.

Q. We talked about the L.A. house and the Las Vegas house. Do you know whether Mr. Bilzerian did posts for Steel while he was at the Los Angeles house?

A. I don't recall. Actually, I do recall. Because I remember there was posts with Jason in them, that they posted at the gym, I believe.

64 (Pages 253 to 256)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          7495137d-4848-4119-b9a3-022d2841cf03

Page 257

Q. Okay. And so you are saying Jason Huh was there, and they were in the gym, and you know that that was at the Los Angeles house because the Los Angeles house has a gym?

A. That is correct. Well, so does the Las Vegas one, but Los Angeles has a bigger gym, so --

(Technological interruption.)

Q. In terms of Dan posting products, did -- would Steel always send Blitz the products to post?

A. Not always, but oftentimes.

Q. How would Dan get the products he posted about?

A. A lot of times he has a stockpile of them in the house.

Q. Okay. From a previous package from Steel?

A. Yes. I mean, Dan is not going to purchase the stuff, so yeah. Obviously, all the stuff that he's ever posted on their behalf would've been given to him by a Steel representative.

Q. Do you remember how often Blitz would get packages from Steel?

A. Once every two to three months.

Q. Okay. I want to shift gears and talk about an entity called The Training Lab. Have you ever heard of that?

Page 258

A. Only privilege with the attorney.

Q. Okay. So other than communications with counsel, you've never heard of a company called The Training Lab?

A. Never.

Q. I'm going to pull up a -- what we'll mark as Exhibit 19 or at the very least have a placeholder for it. And I have two videos that are posts from Mr. Bilzerian, that are for The Training Lab products. So if you bear with me, I'm going to share my screen. Here is the video of August.

(Plaintiff's Exhibit No. 19 was marked for identification.)

(Video playing.)

BY MR. GOODRICH:

Q. Okay. That's the first video.

(Video playing.)

Q. I want to pause it here on the Training Lab Product. Can you, by looking at the counter, identify where Mr. Bilzerian is here?

A. Play the whole video again. Could you?

Q. Yeah. Sure.

A. That's his bathroom in Las Vegas.

Q. I know you said you, generally, didn't have any creative control or influence over Dan's posts.

Page 259

Specifically, about this one, did you talk with him about this in advance?

A. No.

Q. Did you have any discussion with Mr. Bilzerian -- except anything regarding any conversations with counsel -- about this post?

A. No.

Q. Does Mr. Bilzerian have any relationship with The Training Lab?

A. No.

Q. Okay. Does Blitz have any relationship with The Training Lab?

A. No.

Q. Do you know how Mr. Bilzerian got this product?

A. I do not.

Q. Do you know whether any of Mr. Bilzerian's entities have any relationship with The Training Lab?

A. They do not.

Q. Okay. Including the Ignite entities?

A. I can't speak on behalf of Ignite. I apologize. Every entity that I have mentioned thus far, with the exception of any Ignite entities, do not have anything to do with Training Lab, no conversations, no deals, no mention of them, no

Page 260

nothing.

Q. Do you know how Mr. Bilzerian got that bottle of Training Lab called Tryptophan?

A. I have no idea.

Q. Do you know whether he would've received it for free?

A. From Brie?

Q. For free.

A. I'm sorry. I have no idea.

Q. Have you had any discussion with anyone about concerns, analysis of whether this would compete with a Steel product?

A. No.

Q. Okay. So if I understand, this wasn't a topic of talk or conversation among the Blitz camp; correct?

A. No, never.

Q. Now, I want to ask you about an entity called Full Send. Do you know what Full Send is?

A. Not before the attorney privilege.

Q. Okay. So you never heard of Full Send outside of communications with counsel?

A. That's correct.

Q. Do you know if Mr. Bilzerian has any relationship with Full Send?

A. No, he doesn't.

65 (Pages 257 to 260)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 261

Q. Okay. You know that he does not personally have a relationship?

A. Personally or on Blitz?

Q. Yeah, starting with Mr. Bilzerian personally. Do you know whether he has any relationship with Full Send?

A. You would have to ask him.

Q. What about Blitz? Does Blitz have a relationship with Full Send?

A. No.

Q. At any point -- again, I'm not referring to -- let's just make it a blanket rule. I'm never asking you about communications with counsel.

At some point, did you become aware that a company called Full Send sold supplements?

A. No.

Q. I'm going to pull up another video, which we'll mark as Exhibit 20, and put a placeholder.

(Plaintiff's Exhibit No. 20 was marked for identification.)

(Video playing.)

BY MR. GOODRICH:

Q. My first question is: Do you recognize -- it looks like this a goat skull and it says ZRO. Do you recognize that in the first portion of this video as --

Page 262

A. I do.

Q. -- the ZRO brand?

A. Yes, I do.

Q. Okay. Have you ever seen this video before? Again, outside of anything with counsel.

A. Yes.

Q. When did you see it?

A. The day that he took it.

Q. Okay.

A. He went to shoot up that car.

Q. Because he wanted to what?

A. He was going to shoot up that car with this.

Q. Oh. He was going, like, take guns and blow it up?

A. That's what he does, yes.

MS. STEIN: I want to add in, for the record, this was legalized -- it was done on a certain area with permits, so I just want to make that very clear for the record. Thank you.

MR. GOODRICH: Fair enough.

BY MR. GOODRICH:

Q. Were you part of the blowing up of this car in any way?

A. No.

Q. So how does this, what does Dan tell you about

Page 263

this car, if anything?

A. He told me to get him a junker.

Q. And did he say why?

A. He said he was going to go shoot up a car.

Q. And do you recognize where the car is parked?

A. I do.

Q. Where is that?

A. That's in the porte-cochere of his house in Vegas.

Q. I'm going to play the video. There's a bright red bag from Full Send. Had you ever seen it -- had you ever seen this bag before?

A. No.

Q. Okay. Did you have any discussion with Dan about Full Send?

A. No.

Q. Was there any -- do you know how Dan got this bag?

A. I have no idea.

Q. Do you know if Mr. Bilzerian was ever identified as an influencer for Full Send?

A. From a Blitz perspective, no.

Q. Okay. But from any perspective, do you know whether he was identified as --

A. Dan would have to speak on a personal level.

Page 264

I don't know. But anything Blitz-related, no.

Q. Did you have any discussions about this particular post?

A. No.

Q. Okay. Do you know whether it was a story versus a highlight, versus a post to Instagram?

A. I believe it was a story.

Q. Why do you say that?

A. Because he rarely puts up videos for static posts. So I can't say for sure, but I'm pretty confident it was a story.

Q. Have you -- do you know why he was including this Full Send bag in his post?

A. I don't know.

Q. Do you know whether Mr. Bilzerian or Blitz was compensated as a result of placing this bag in this video?

A. Both were not.

Q. Sorry. I missed the answer.

A. Both were not.

Q. Okay. Aside from, like, monetary compensation, do you know whether Blitz received anything in exchange for this post?

A. Blitz received nothing.

Q. Okay. What about Mr. Bilzerian?

66 (Pages 261 to 264)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 265

A. You would have to ask Dan.

Q. Do you know whether Full Send ever endorsed, publicized, or promoted Blitz?

A. I have no idea.

Q. Have you ever spoken with someone named Phil Front [phonetic] at Full Send?

A. Never heard of the name before.

Q. Have you ever spoken with someone named Bradley Pardon [phonetic]?

A. Never heard the name before on that one.

Q. Have you ever spoken with someone Joey Swoll?

A. I have not. I know who he was, but I never spoke to him.

Q. How do you know who Joey Swoll is?

A. I know Dan's friends with a guy named Joey Swoll, and he's a workout guy, he is a bodybuilder.

(Plaintiff's Exhibit No. 21 was marked for identification.)

BY MR. GOODRICH:

Q. So I've opened Exhibit 21, which is a copy of the amended complaint in this case. Have you read this?

A. No.

Q. My question is --

A. I've seen it but I haven't read it.

Page 266

Q. -- pretty simple. In the amended complaint, paragraph 97, Blitz has alleged that since the effective date of the agreement, since filing of the lawsuit, Bilzerian has endorsed Steel three times on Facebook, one time on Twitter, 15 times on Snapchat, 24 times on Instagram, and never on YouTube. Do you know whether or not this paragraph is true?

MR. MCCOY: Objection to form.

THE WITNESS: I do not.

BY MR. GOODRICH:

Q. Okay. Sitting here today, do you have any reason to doubt that this is true?

MR. MCCOY: Objection to form.

THE WITNESS: Honestly, I can't answer that one way or another.

BY MR. GOODRICH:

Q. Okay. Do you know if when Mr. Bilzerian would do a social media endorsement for Steel, would he simultaneously do the same post on Facebook and Instagram, for example?

A. I don't know. I don't know.

Q. When Dan would go on vacation, who would book those trips?

A. It depends, if it was a vacation of his -- typically, I handle the plane no matter what, alongside

Page 267

that guy -- (technological interruption) and I'll do that, all that.

Typically, his executive assistant will do the hotels and those lodging accommodations, or we have an outside travel agent. On occasion, one of his friends might invite him out on a trip, and I will help with the organization of its travel, specifically speaking to the plane, and -- like I said, the accommodations, I don't deal with, only because that is so specific to him, in that he relies on his executive assistant to make those choices. I don't know where he wants to stay.

Q. So I'll represent to you that Mr. Bilzerian posted on July 16th, 2017, and then not again until February 22nd, 2018, which is about six months, roughly. What -- and in context, I understand you were starting around February 2018; right?

A. Correct.

Q. Do you have any understanding of why there was this lag from July 2017 to February 2018, in terms of posting?

A. I have no idea.

Q. When -- was this discussed at all around the time you were hired, that Dan hadn't posted since July 2017?

Page 268

A. No. The only thing I knew is that they had this video that they had, and they were going to be asking Dan to post that. That's the only thing I was told by Rob when I came onboard.

Q. Okay. When Rob was telling you this, was this in the context of Dan is not posting because of this video, or was that all you remember about the conversation when you started?

A. That's all I remember.

Q. That's all you remember. I'm going to pull up Blitz's answers and affirmative defenses, which is Exhibit 22, with a couple of short questions.

(Plaintiff's Exhibit No. 22 was marked for identification.)

BY MR. GOODRICH:

Q. Have you ever reviewed this document?

A. I think I reviewed it, but I wouldn't say that I necessarily read it in-depth, so I probably breezed over it.

Q. Do you know whether you read it before it was filed?

MR. MCCOY: Form.

THE WITNESS: When was it -- I would think so.

BY MR. GOODRICH:

Q. We're going to go down to Blitz's affirmative

67 (Pages 265 to 268)

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 269

defenses and the third defense.

A. Can you make it a little smaller?

Q. Of course. Says, "Steel has failed to pay Blitz the full commissions due on gross sales, which constitutes a prior material breach." Do you, sitting here today, know how much Blitz is alleging Steel underpaid?

A. No.

Q. Who at Blitz would know that?

MR. MCCOY: Objection to form.

THE WITNESS: I probably -- believe we have an expert and the expert reports to Kevin. So Kevin would have to speak to that.

BY MR. GOODRICH:

Q. All right. The fourth defense says that "Steel has unclean hands due to Mr. Huh's immoral and criminal conduct."

Do you have any understanding what that means?

A. (Reading to self.)

I believe, his use of steroids.

Q. Okay. When did you learn Mr. Huh used steroids?

A. You know what, I apologize. That was during the client-confidentiality thing with the attorneys.

MR. MCCOY: We'll strike that. Doesn't really

Page 270

matter, but that's privileged from here on further.

THE WITNESS: I'm sorry.

MR. GOODRICH: That's fine.

BY MR. GOODRICH:

Q. Putting that aside, do you have any facts underlying this affirmative defense, that Mr. Huh has committed immoral or criminal conduct?

A. Predating the discussions with counsel, no.

Q. Have you ever had a conversation with Jason Huh, Tony Pasquale, Jake, to discuss how often Mr. Bilzerian should be posting?

A. I can't recall.

Q. Do you remember having a conversation with Steel that they would like to see Mr. Bilzerian posting once a quarter, at minimum?

A. I don't recall.

Q. I'm pulling up Blitz's initial disclosures. Have you reviewed these disclosures?

MR. MCCOY: If you looked at these at the direction of counsel, then I don't want you to disclose anything about that. If you've otherwise, reviewed these, then you can talk about that.

THE WITNESS: I read it at the request of counsel.

(Plaintiff's Exhibit No. 23 was marked for

Page 271

identification.)

BY MR. GOODRICH:

Q. Okay. So I just have some questions about this. Who is Jessica Huh?

A. I've never heard her name, but I would assume that's Jason's wife.

Q. Do you know what information relative to this lawsuit she would have?

A. I do not.

Q. I see a Paul Costello. Who is that?

A. I do not know.

Q. I think you testified you don't really have an understanding how the contract works; is that fair to say or not?

A. Can you make it a little smaller?

Q. Yes. Sorry.

A. Sure.

Q. You are here listed as having information about the contract, calculation of gross sales, commissions, and Blitz's performance under the agreement. Is that an accurate statement?

A. Says, "may have information," and I've given you all the information that I know.

Q. Okay. Who is John Skywalker?

A. I remember him being talked about in a

Page 272

conversation. I think he is an influencer of some sort.

Q. And do you remember what the conversation was?

A. I think it was -- that was a guy named Mike Tally. John Skywalker. Was he getting stripped naked at a -- I don't know if they had -- they were going to ask him to strip naked at a show.

Q. Was he going to be, like, hired by Blitz?

A. No.

Q. Who was asking him to strip naked, if you remember?

A. Steel.

Q. What about Aaron Singerman? Any understanding who that is?

A. I have no idea who that is.

Q. Eric Hart?

A. No idea.

(Plaintiff's Exhibit No. 24 was marked for identification.)

BY MR. GOODRICH:

Q. I will quickly walk through what is Exhibit 24, which is your amended declaration. I saw that you filed a second amended -- or counsel filed a second amended declaration, so I just want to quickly touch on this, and then I'll pull up the second

68 (Pages 269 to 272)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 273

amended, and we'll talk about the differences, if any.

So in this declaration -- first, you recall the context of this was that there was an order on a motion to compel, and the result was Blitz had to go look through its documents, confirm whether it had certain documents or not; right?

A. Sure.

Q. In paragraph 4, this is, again, your first amended declaration. It says, "I've conducted an additional review for non-objectionable, non-privileged records."

Can you describe for me what did you do at the time of this declaration to search for records and information?

A. Well, this amended declaration, I can -- this was all during privilege time.

Kevin, I can speak to this?

MR. MCCOY: I think you can speak to what you did, not any communications that we had or directives, but just literally what you did, I think is fine. And for the second one, to speak about what you did for the second one, I think it's okay. I mean, we're not here on behalf of the company, but you gave the declaration, even though this is on behalf of the company, but in your

Page 274

personal capacity, if you can walk through what you did, I don't have a problem with that.

THE WITNESS: Well, it seems that there was a couple of documents missing. This was dated three days after I had a major car accident.

MR. MCCOY: Wait. Let's look at the date. What is the date of this one?

MR. GOODRICH: This is July 23rd.

MR. MCCOY: Very good. Thank you.

THE WITNESS: It's just dated three days after a major car accident that I had, one of which I was from ambulance to the ER, three days after this -- or three days before this. I was told that a couple of documents were missing, and I went back and I found those couple of documents and sent them over.

BY MR. GOODRICH:

Q. How long were you in the ER? How long were you in the hospital? Sorry.

A. About six hours. Maybe less than that.

Q. Did you have surgery?

A. No, but I do need knee surgery.

Q. Sorry to hear that. Did they give you any medication or anything, like pain medication?

A. No.

Page 275

Q. Okay. So you have a car accident, you are not feeling well, and three days later there's a request for you to review additional -- search for additional documents.

A. We matched up, and a couple of them were missing, and then I provided those.

Q. Okay. So take me through what your efforts were in terms of searching for documents?

A. In general?

Q. Yeah, so it says, "I've conducted an additional review for non-objectionable, non-privileged records."

A. Well, I spent, all told, about eight, nine hours, searching records, searching for any identifiable terms in my e-mails, in Dan Bilzerian accounts for myself, David Vingiano, Kevin -- I forgot Kevin's last name, you're gonna have to look that up -- Michael Feder and myself, and searched all key terms; Steel, ZRO, Jason@steelsupps.com, Steel Supplements, and then I did the same search on the Blitznv server for myself and for Michael Feder. And what had happened with the @danbilzerian accounts, for everybody, they're wiped, and I can't give you the date, but my account, basically, only has a select few e-mails from, maybe 2019, while I was still using the

Page 276

account and Feder's had none. And I believe that it has something to do with the server crashing.

However, I also don't put it past Michael to have deleted some e-mails and potentially hold on -- not, specifically, for this case, by any means -- but I wouldn't put it past him to have possibly helped himself to some e-mails and taken them off prior to his not being able to access them anymore.

Q. And do you have any reason to believe that that actually happened?

A. I do not have any reason to believe that. I don't have any definitive reason to believe why that would happen, but, you know, it could've.

Q. You identified some keywords. Did you -- did you only perform, like, a keyword search, or did you also search by events, search by dates, or anything other than keywords?

A. I searched by -- let me think what else. I put in Tony Pasquale, I put in Jake -- I didn't know his last name at that point. I put in Medhy, I searched Steel, I searched ZRO, I searched supplements, I searched -- I believe that's pretty much what I searched. Oh, I searched Training Lab, I searched Full Send.

Q. Did you -- was it only the keyword search or

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 277

was it also like -- did you go back to a certain time period and say, "Look, we're in February 2018.  I know there were a lot of e-mails going back and forth.  Let me look there."

A.  Well, if an e-mail popped up from one of my searches, which I believe was pretty exhausting of a search, I would read through any e-mails around that time, to see if there were any other mentions of what -- the things which I've provided in discovery, so...

Q.  I know you said you did it, did you have any instance in performing this search?

A.  No.

Q.  And in response -- if I understand, in response to this, with regard to this amended declaration, you spent about eight or nine hours searching for documents?

A.  I would say the first search, I did it for about eight or nine hours.  This one, I had specific things that I was looking for and then I did a more abbreviated search, again, after I provided the things that were being asked of me -- that were provided by Steel.

Q.  So about how long would you say you took searching with respect to this amended declaration?

Page 278

A.  The amended declaration?

Q.  Correct.

A.  An hour to two hours.

Q.  What about with respect to the second amended declaration?

A.  So the second amended declaration, what had happened was, Ignite was providing e-mails with Michael Feder's name on it.  Michael Feder was acting on behalf of Steel -- excuse me -- on behalf of Ignite at that point.  I did not believe it to be necessary or appropriate to be providing those e-mails because he wasn't speaking on Blitz's behalf.  He was speaking on Ignite's behalf.  So it was decided that I should be providing those, so I spent another three hours on providing every single one of -- then I started thinking, let's just do Steel everything.  And then, you know what, I think I handed over to Kevin, you know, all Feder's things that he was doing on behalf of Ignite.  And then I think there was some Steel e-mails about, like, buying Steel for the property, you know, Steel prices or something like that.  I really just don't -- didn't understand or appreciate exactly what you were trying to get at with this production.

My understanding was that you were trying to find out if Dan had any ancillary deals.  And I can

Page 279

promise you, and I signed the declaration to that, that he doesn't, with Blitz, for anything having to do with consumable goods and anything in competition with Steel.  And I would even give access to my e-mail account.  I have nothing, nor do any of those accounts that I've searched.  So the second amended declaration was, basically, because Ignite had produced some e-mails with Feder on it.  So with that, I decided, "All right.  Here are Feder's e-mails," but he was acting on behalf of Ignite, so I did not believe, initially, that to be necessary to turn over, but it was decided that I should, and I did, and I gave everything.

Q.  Okay.  So if I understand, the difference between the second and third declaration is that in the third, you amended to provide all e-mails from Michael Feder, with respect to this capacity at Ignite?

A.  That is correct.

Q.  Okay.  And would he use the same e-mail address, whether he was conducting Ignite business versus Blitz business?

A.  He would use Blitz's e-mail address at all times to communicate, from my search, that I could find, but I knew it to be all Ignite.  And then he had an Ignite e-mail address, but, obviously, I don't have

Page 280

any access to that.

Q.  Okay.  Have you asked anyone at Ignite or any Ignite entity for documents?

MR. MCCOY:  Form.

THE WITNESS:  No.

BY MR. GOODRICH:

Q.  Does Blitz have a document retention policy?

A.  Document retention policy, no.

Q.  Does Blitz have a standard practice in terms of retaining documents?

A.  No.  One thing I just want to put on the record.  This is not your normally operated company.  This is not, like, you know, A Fortune 500 company, by any means, that has, you know, practices, and rules, and all that kind of stuff because it's -- because it operates in such a variety of different ways, and because Dan is such a strange entity in himself, this company operates in ways way different than most corporations would.  So, no, we have no practices or anything like that put in place.

Q.  Do you know --

A.  I'm diligent in keeping important documents, important e-mails.  Obviously, not so with texts because that's just -- there's nothing important there.  But I am pretty calculated and OCD, in making sure that

70 (Pages 277 to 280)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

Page 281

I have everything I believe to be necessary in order to answer any administrative or operational questions that attorneys and/or Dan may ask of me.

Q. Do you know how Blitz's documents are stored?

A. We do have one shared folder on a thing called a ShareSync, on a website called ShareSync, and I throw some documents in there, but those are mostly tax-related, and a lot of those documents are kept on folders on my computer.

Q. Are e-mails saved anywhere?

A. In folders on my e-mail.

Q. Okay. But not outside of your e-mail account?

A. No.

Q. Is there any sort of cloud-based storage that Blitz uses? Does it use servers?

A. Well, Gmail is our service for the Blitz NV e-mails. So I would have to assume -- and I'm no IT expert -- but I'd have to assume that there's a cloud storage of those. The Jason -- the @Danbilzerian, or a third company called CRS, and they were the service provider, so they would serve it. They were onboard prior to my employment there. I never checked in with them as to why some of the e-mails were missing. I didn't believe that to be necessary until privileged communication between myself and the attorneys. But

Page 282

the Blitz ones, I would say are accessible, so long as we play our G Suite bill, which obviously we're up to date on.

Q. Okay. Has that ever lapsed?

A. G Suite? No. Actually -- well, no. There was an issue with somebody mistakenly logging into our account and it got fixed.

Q. Okay. Because of that lapse or whatever the issue was, is there a period before which Blitz can't access e-mails?

A. No, not on the Blitz NV cloud. Everything is on there. I mean, Feder could've deleted some before I took access away from him, but everything that Feder has on there that I've provided is still on there. Any e-mail that I've ever written, any e-mail that I've ever received is either -- I haven't even emptied the trash on my computer or on the web, so every single e-mail that I've had on that Blitz NV account is on my computer, and/or in the cloud, or through G Suite.

Q. You mentioned that in the ShareSync folder there are tax returns. Are there any other documents?

A. Yes, I mean, they date back to before I even started. There's when, you know, Blitz got incorporated, when -- who filed for the trademark for goat skull, I remember I had to find once. I do

Page 283

believe that the -- I put the Steel contract on there. When I originally got contracts that Rob provided to me, I threw them all on there. And I believe that there is some stuff on the plane. I don't use it all that often, and I probably should more than not, but for the most part, it's contracts that were given to Rob because I just wanted to make sure that everybody had access to them if I went away. The tax returns go on there, some plane stuff, movie stuff, when he did the movie roles and everything because we had a situation come up where I had to find a contract for that. Some of the stuff was on there for a couple of the movies that he had done. That's all that I can recall really being on there.

Q. Does Blitz have a practice of deleting any documents at any point?

A. No.

Q. So if someone, for example, gives you a paper document, how is that document processed?

A. Can you give me an example as far as what paper document you are referring to?

Q. Yeah. So instead of e-mailing you a contract that's been signed by Dan, if someone physically hands you a contract that has been signed by Dan, but you don't have access to it over e-mail, what does Blitz do

Page 284

with that?

A. Okay. Well, that's random -- excuse me -- that rarely happens. But, like, for instance, like, I referenced a time where Rob gave me all the contracts that Dan was involved in, I would scan them in, and then put them on the ShareSync folder, but I would also save them on my hard drive.

Q. Who --

A. Maybe another type of document.

Q. Yeah. Anything that wouldn't be transmitted electronically?

MR. MCCOY: Would be or wouldn't?

BY MR. GOODRICH:

Q. Would not be. Because I understand from your testimony that if it's an important electronic document, like a tax return, you would get it and drag it to the ShareSync folder?

A. Sure. And that stuff sometimes comes -- most of those come electronically, but, you know, if I'm dealing with a situation where the IRS writes him a letter. Obviously, that's how the IRS communicates. So I would take that letter, I would scan it in, I would send it to our accountants, I would also send it to Scott, and then I would put in one of my folders. I don't think I would put that on the ShareSync.

71 (Pages 281 to 284)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    7495137d-4848-4119-b9a3-022d2841cf03

## Page 285

Q. Does that happen often?

A. IRS letters?

Q. Yes.

A. No. I'm just thinking of one that came within the last couple of weeks, something having to do with an amended return, but it's completely irrelevant.

Q. Who at Blitz has access to the ShareSync folder?

A. Myself, Victor Rodriguez, and Scott Rohleder.

Q. Okay. And Michael Feder, at some point, did?

A. I don't think so.

Q. Does Mr. Bilzerian have access?

A. No. He probably doesn't know it exists.

Q. Does Steel have an outside IT team, someone he uses for IT services?

A. Steel?

Q. Sorry. Blitz. I apologize.

A. Yes, we have -- so there's two people that I use. Basically, it's a guy named Andrew Richardson and I have him do a couple of things on Blitz's behalf, like set up an e-mail address when somebody comes in, because he's a little bit more knowledgeable and he used to work for Dan many years ago. And then CRS, which is Computer Repair Services, and they handle -- the reason that they're in the role is that Dan uses

## Page 286

his @Danbilzerian.com account. He's pretty much the only one that uses it. When I use it, it's mistakenly put -- it just auto-generates, populates, based upon who I'm speaking with. So if I haven't spoken to someone in three years and I'm writing them an e-mail, it will pop, you know, I won't even look and it will say Jason@danbilzerian, as opposed to Jason@blitznv.com. But CRS, Computer Repair Services.

Q. Does CRS ever perform any services with respect to the @Blitz e-mail account?

A. No.

Q. Does Mr. Richardson perform services with respect to Blitz?

A. Just adding e-mail addresses.

Q. Okay. Does CRS perform services for Blitz, generally?

A. They also hold some of our domains that we own, and they renew them on our behalf. And again, if we have any issues, specifically speaking, pretty much to only Dan's e-mail at this point, if his e-mail goes down, then we reach out to them. But other than that, they're basically a server that, for whatever reason, maybe it's more secure.

Q. Sure.

A. That was already put in place prior to my

## Page 287

employment, probably years before, because that Dan Bilzerian address was with everyone, a lot of people prior to me.

Q. So you referenced domains that you own. So what domains, specifically, are you talking about?

A. I can't remember all of them, but I mean, they're like PartywithDanBilzerian24.com. DBilzerian.net, DanBilzerian.net, partywithDan.com. Party@Blitz.com. Things that were bought many, many years -- excuse me, prior to my time at the company.

The only domain that I ever purchased for Blitz would've been BlitzNV.com, I bought that on Blitz's behalf. Are there any others? Oh, goat skull -- Dan was thinking of doing a clothing line at one point, so we had goatskullthreads.com. I remember I did that one.

And I can't necessarily recall any of them -- they were all just stupid stuff so that nobody else can use his name or his company one way or another without, obviously, you know, having a website to do so. This is why we have IP attorneys as well, to protect us from that. I'm sure that our IP attorneys were the ones that had told us, initially, to buy all those domains.

Q. I'm going to share my screen again with the amended declaration. I'll point you to paragraph 4.

## Page 288

And it says that Blitz is responding with -- searched for documents responsive to the request within Blitz possession, custody, and control.

Again, without reference to anything you've spoken to with counsel, do you have any understanding of what possession, custody, or control means?

A. Not really.

Q. Did you review this document before it was sent out, this entire PDF?

A. I reviewed it.

Q. Okay. So my question for you is, on the first page, in paragraph 3, it references that "I," and since you signed it, that would be you, "Jason Verona have reviewed the court's order, Steel Supplements' request for production, and interrogatories, marked as Composite Exhibit B."

And then when I go to Composite Exhibit B, I see Blitz's request for production, not Steel's. So the question is, did you review Steel Supplements' request for production and interrogatories in connection with --

MR. MCCOY: So you know, that was an error on counsel's part, which was corrected in the second amended declaration we provided to you.

MR. GOODRICH: Okay.

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 289

BY MR. GOODRICH:

Q. So the question is still, did you, in connection with actually filling out this declaration, review Steel Supplements' first request for production and first set of interrogatories?

A. Keep going down. First of all, make it a little bit smaller.

Q. Yeah. Sorry.

A. And can you go to where -- what Steel was requesting.

Q. This document doesn't appear to have Steel's request for production or interrogatories. It has Blitz's. So my question is, in connection with --

A. I would have to see the document in order to confirm as to whether or not I read it.

Q. Okay.

MR. GOODRICH: We can mark this as 25.

(Plaintiff's Exhibit No. 25 was marked for identification.)

BY MR. GOODRICH:

Q. This is Steel Supplements' first set of interrogatories to Blitz, and I'll scroll with the question in mind being, did you review this before filling out and executing the Exhibit 24, amended declaration?

Page 290

A. I reviewed it.

Q. Okay. So you did review this document; correct?

A. Correct.

(Plaintiff's Exhibit No. 26 was marked for identification.)

BY MR. GOODRICH:

Q. Okay. And did you review this document as well? This is Exhibit 26, plaintiff's first request for production?

A. I reviewed it. I wouldn't say read it word by word, but did enough of it, and when I spoke to my attorneys, they basically told me what was in it.

MR. MCCOY: That's enough. We don't need to get into that.

(Plaintiff's Exhibit No. 32 was marked for identification.)

BY MR. GOODRICH:

Q. So now I'm going to jump to your second amended declaration.

A. Okay.

Q. I understand this is the declaration which you amended, so as to provide the documents for Mr. Feder with respect to Ignite?

A. That is correct.

Page 291

Q. Okay. In looking at this, this morning, I see that there's a page 1 and a page 3. Do you know why that is?

MR. MCCOY: That's an error on my part. We were in deposition yesterday and I was trying to get it to you so there wasn't complaining about it today.

BY MR. GOODRICH:

Q. Okay. Have you, in connection with this second amended declaration, did you review three separate pages?

A. Three separate pages?

Q. Yeah. So the second amended declaration appears similar in form to the first amended declaration, at page 1 and page 3, but not at page 2. So I want to know, did you review the second page?

A. Hold on. There was a second page. Yes, I reviewed it.

MR. GOODRICH: Kevin, I didn't have a chance to ask you before the deposition. I probably should have. But if you can get us --

MR. MCCOY: You want to take a break? I'd like to get it to you because I don't want to have now we have to come back.

Let's take a quick break.

Page 292

THE VIDEOGRAPHER: Off the record. The time is 7:52 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: On the record. The time is 8:07.

BY MR. GOODRICH:

Q. Mr. Verona, I have a copy of your second amended declaration. I see in paragraph 5, you are talking about the motor vehicle accident you just testified about. Did you have a hand in preparing this document?

A. No.

Q. Do you know who did prepare it?

A. Is this the second one or the first one?

Q. Sorry. I'm probably too zoomed in for you. This is the second amended declaration.

A. I think I went over some of it with counsel, with respect to the car accident and Feder, at the end.

Q. So in here, in paragraph 7 it says, "Blitz has supplemented its production to account for documents that involve ZRO, while certain former employees were working for Ignite, but using a Blitz e-mail account." Where it says "employees," does that refer to anyone other than Mr. Feder?

A. No, it was just Feder.

73 (Pages 289 to 292)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 293

Q. Okay. And, again, the only effect of this second amended declaration was to produce Mr. Feder's e-mails while he was -- with respect to ZRO, while he was working at Ignite?

A. That is correct.

MR. MCCOY: I will note, in the supplemental production that was made, there were other documents besides those from Mr. Feder, just so everyone is clear. It wasn't just Feder e-mails, but there are other -- there are other documents in the production that Blitz made, the most recent, whatever installment that was. I want everybody to be clear about that.

BY MR. GOODRICH:

Q. In conducting a search for materials under any of these declarations, you identified some search terms you used. Did you ever use Z-RO?

A. I did.

MR. MCCOY: I'm sorry. Did he verbalize that or just shake his head.

MR. GOODRICH: No, he said he did.

THE WITNESS: I also did it for ZRO.

BY MR. GOODRICH:

Q. When was the last time that you saw Paul Bilzerian?

Page 294

A. Saw Paul Bilzerian?

Q. Yeah. Have you ever seen him?

A. Last time I saw Paul Bilzerian, that would be over two years ago.

Q. And where did you see him?

A. He was visiting Dan for the holidays.

Q. How many times have you seen Mr. Paul Bilzerian in person?

A. Two to three times.

Q. And did you have any conversations with him the last time you saw him?

A. Not business. Always, when he's in person, he is there for the holidays, he's just talking about family and about Dan when he was a kid, all that kind of stuff.

Q. Have you ever, in person, had occasion to speak with Mr. Bilzerian about business?

A. Sometimes about the book and its delay of coming out. And, basically, him getting on my case because, even though it was Dan's fault for the delay, and he knows that, can't necessarily blame his son, he'll blame me as the administrative proxy.

We also had a discussion about the plane. We had one recently about how much money it would cost to fly from one place to another, and whether it would be

Page 295

in Dan's best interest to not send the plane out to pick him up where he is at right now, as opposed to him flying back commercial.

Q. Okay. Has he --

A. He's on the board call.

Q. Sorry. What's that?

A. And he's on the board call, so whatever is on those agendas.

Q. Is Dan's book, is that a Blitz project or a Dan Bilzerian, individually, project?

A. Kind of hard to say. I would say it's a Dan project.

Q. Okay. And have you ever discussed Blitz's finances with Paul Bilzerian?

A. Yes.

Q. Have you ever talked about Steel, Steel sales, Steel revenue, anything along those lines with Paul Bilzerian?

A. Only to the extent of what was on those board calls. If he would ask, "Let's look at Dan's revenue for the month."

And he would say, "Okay. That's his revenue from Steel, that's his revenue from X, Y, Z," so those are basically the conversations that I have with him as relates to Steel.

Page 296

Q. And would he make any suggestions or any comments with respect to Steel?

A. No.

Q. Okay. Any -- on the board calls, any other conversations with Paul Bilzerian you can recall, other than what you just testified to?

A. Again, it's, you know, things that Dan is spending money on, sometimes we discuss that. I think in my last production, actually, I gave all those agendas and everything, so minimal. I mean, things to discuss. You know, most recently has been -- obviously, the book has been --

Q. Were you actually a part of the board calls, Blitz board calls?

A. I would write the agenda and then I would basically say, "Okay, let's discuss this. Let's discuss" -- and then we would discuss it. And then we would discuss the next issue. And sometimes a question would come up, so, yeah, I participated but I'm not on the board.

Q. Okay. So you were all on the call when they were having --

A. I was on the call after Michael Feder left.

Q. Okay. And do you know, ballpark, when that was?

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 297

A. Feder left in September of 2020, so I probably jumped on in October of 2020.

Q. Did Paul Bilzerian ever say anything to the effect that Steel was the largest income producer for Blitz?

A. Not him personally, no. I can't recall that to be the case.

Q. When you say "not him personally," did anyone say that?

A. I mean, it was known. Somebody might have said it. I knew it. I mean -- but I don't think it was ever discussed to be the case, so -- I can't recall somebody personally making mention of it.

Q. Did Paul Bilzerian ever look at Blitz's sources of revenue?

A. Yes.

Q. And what would he do with that information?

MR. MCCOY: Objection to form.

BY MR. GOODRICH:

Q. If you know?

A. It would be discussed and I don't think he would do anything with it. He'd be like, "Dan, why the hell are you spending, you know, $300,000 a month on redoing your rec center?" You know, those types of questions. And, "Jason, why are you letting him spend

Page 298

it?"

Again, it circles back to, you know, Dan does what he wants.

Q. So did -- was there ever a conversation about what Ignite could learn from Steel?

MR. MCCOY: Objection to form.

THE WITNESS: No.

BY MR. GOODRICH:

Q. Did Paul Bilzerian ever bring up that Ignite could learn X, Y, and Z from Steel?

A. Not that I'm aware of.

Q. I briefly want to touch on CW Nevada. Do you know what that is?

A. I know about it. I know of it.

Q. What do you know of it?

A. Back when I first started, I do believe -- and Ignite was not -- Ignite was just starting and they were trying to do some sort of a co-branding of a dispensary out in Las Vegas, and I believe the corporate name was CW. That wasn't the name of the actual -- the actual dispensary, it was just the name of the corporation that ran it -- and CW were trying to work in unison with one another to co-brand the dispensary.

Q. Was there an agreement between CW and Blitz in

Page 299

place?

A. I never saw one.

Q. Okay. Did you ever have conversations about an agreement between CW and Blitz?

A. No.

Q. Did you have -- do you know that there actually was any ongoing relationship between CW and Blitz?

A. There was not.

Q. Okay. Do you know when -- or any relationship, so to speak, lapsed?

MR. MCCOY: Form.

THE WITNESS: I don't recall.

BY MR. GOODRICH:

Q. Have you had any conversations with Mr. Bilzerian about CW?

A. No. Other than to tell him, I remember, if he had a meeting at CW, I probably told him, "You have a meeting there."

Q. Is it safe to say that when working with Mr. Bilzerian, it's his way or the highway?

MR. MCCOY: Form.

THE WITNESS" I can't say that. I can't speak to that accurately. I can't say whether or not that's the truth or not.

Page 300

BY MR. GOODRICH:

Q. Okay. But fair to say what Dan Bilzerian says goes?

A. With his company, specifically with his company, yes.

Q. Okay. From your -- I'm not asking about you, your perspective, is it hard working for Dan Bilzerian?

MR. MCCOY: Form.

THE WITNESS: Sometimes.

BY MR. GOODRICH:

Q. Why sometimes?

A. He expects quite a bit of his employees and sometimes he is not -- sometimes he is abrasive in his approach. And -- again, I've been here four years, so it ain't that bad -- three and a half years.

Q. How would you describe Mr. Bilzerian as a communicator?

A. With me, limited.

Q. Okay. With everyone else?

MR. MCCOY: Objection to form.

THE WITNESS: I can't speak on anybody else's behalf.

BY MR. GOODRICH:

Q. Okay. Would you say that Mr. Bilzerian has unrealistic expectations?

75 (Pages 297 to 300)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 301

MR. MCCOY: Objection to form.

THE WITNESS: I couldn't make that claim, no.

BY MR. GOODRICH:

Q. Okay. Well, do you personally, you, Jason Verona, feel that his expectations are unrealistic?

MR. MCCOY: Objection to form.

THE WITNESS: I don't believe so, no.

BY MR. GOODRICH:

Q. Okay. In terms of decision-making, would you say Mr. Bilzerian is more analytical or more reactive?

MR. MCCOY: Objection.

THE WITNESS: What are you asking?

BY MR. GOODRICH:

Q. Have you been a part of any major decisions on behalf of Blitz that, you know, required a sit-down discussion with Mr. Bilzerian?

A. I don't believe so.

Q. Who, on the board, makes all those major decisions on behalf of Blitz? Would it only be Mr. Bilzerian?

A. It would be Dan and -- when Michael Feder was there, I know they had talked about major decisions with one another.

Q. Okay. Is there a reason why, after Michael Feder left, Mr. Bilzerian is not discussing major

Page 302

decisions with you?

A. Because he realizes that he, basically, can handle it on his own. This circles back to an initial conversation that I had when I started working, you know, my initial idea as to what I was going to be doing, I thought it would be more consistent with my previous job, which was management of celebrities. I soon realized that he did not want my input, he did not need my input, and he basically just wanted me to do what he tells me to do.

Q. So, basically --

A. Like I said, once I started moving into the estate management stuff and a bit on this book, I hate to be redundant, but now he has given me a little authority to do some stuff on behalf of the book. But most of the estate management stuff, now he trusts me enough that I can do what I want with that, for the most part. But as far as major business decisions, and advice, and management, I did nothing with him on that -- on those type of fronts.

Q. And you said Mr. Bilzerian thinks he can handle it on his own or something to that effect. Do you think that?

MR. MCCOY: Form.

THE WITNESS: I don't know.

Page 303

BY MR. GOODRICH:

Q. Do you have a sense?

MR. MCCOY: Form.

THE WITNESS: I really don't.

BY MR. GOODRICH:

Q. Do you think Mr. Bilzerian is a strong business leader?

MR. MCCOY: Objection to form.

THE WITNESS: I have no opinion on that one way or another.

MR. GOODRICH: All right. Mr. Verona, I kept you here long enough. That's all I have, although counsel might have some follow-up questions.

MR. MCCOY: I don't have any questions. We'll read and sign. Appreciate everybody's time. Take care.

THE VIDEOGRAPHER: This concludes the deposition. We're off the video record at 8:23.

(Exhibits 27, 28, 29, 30 and 31 not addressed on the record, but supplied to the court reporter.)

STIPULATION

It was stated by counsel that the exercise of reading and signing the transcript would not be waived.

(WHEREUPON, the taking of the deposition was concluded at 8:23 p.m.)

Page 304

CERTIFICATE OF OATH

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH    )

*************************

I, ELSA HERNANDEZ, FPR, Notary Public, State of Florida, certify that the witness JASON VERONA, who produced a driver's license for identification, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this date: 2nd day of September, 2021.

_____
ELSA HERNANDEZ, FPR
Notary Public, State of Florida
Commission No. DD897203
Expires 9/30/2023

888.909.2720          Anthem Reporting          813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

7495137d-4848-4119-b9a3-022d2841cf03

Page 305

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )
COUNTY OF HILLSBOROUGH    )

I, ELSA HERNANDEZ, FPR, Court Reporter, and Notary Public, do hereby certify that I was authorized to and did stenographically report the deposition of JASON VERONA; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 300, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 23rd day of September, 2021.

*Elsa Hernandez*

ELSA HERNANDEZ, FPR
Notary Public

Page 306

ERRATA SHEET
IN RE: STEEL SUPPLEMENTS, INC. v. BLITZ NV, LLC,
CASE NO:        8:20-cv-2971-T-02AEP
DATE TAKEN:     September 2, 2021
DEPOSITION OF:  JASON VERONA

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

Please sign, date, and return this sheet to our office.
If additional lines are required for corrections, attach additional sheets.

At the time of the reading and signing of the deposition, the following changes were noted:

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.
SIGNATURE OF DEPONENT: _____
DATE: _____

Page 307

September 23,2 021
Kevin P. McCoy, Esquire
Carlton Fields, P.A.
4221 West Boy Scout Boulevard
Suite 1000
Tampa, Florida 33607
kmccoy@carltonfields.com

In Re: Jason Verona
Dear Mr. McCoy,
At the conclusion of the deposition in the above-styled case you indicated that Mr. Verona would read and sign his testimony.
I would suggest you facilitate this within the next 30 days so counsel will have the benefit of any corrections or amendments you may wish to make.
If you have any questions, please do not hesitate to call. Thank you in advance for your assistance in this regard.
If the errata page is not signed by the witness within 30 days after this letter has been furnished, we will then process the transcript without a signed errata page. If your client wishes to waive his right to read and sign, please have him sign on the signature line at the bottom of this letter and send it back to our office.
Your prompt attention to this matter is appreciated.
Sincerely,
Elsa Hernandez, FPR
Anthem Reporting

I do hereby waive my signature

_____
JASON VERONA

77 (Pages 305 to 307)

888.909.2720        Anthem Reporting        813.272.2720
anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)        7495137d-4848-4119-b9a3-022d2841cf03

# EXHIBIT 3

CONFIDENTIAL

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEEL SUPPLEMENTS, INC.,
a Florida Corporation,

    Plaintiff,

-vs-        CASE NO. 8:20-cv-02971-WFJ-AEP

BLITZ NV, LLC, a Nevada
limited liability company,
    Defendant.
_____/

VIDEOTAPED
VIDEOCONFERENCE
DEPOSITION OF:    DANIEL BILZERIAN
DATE TAKEN:    Tuesday, November 2, 2021
TIME:    1:03 p.m. to 10:18 p.m.
PLACE:    All participants appearing
    remotely via Zoom videoconference

REPORTED BY:    Beverly Replogle, RPR
    Kelley N. Black, RPR

CONFIDENTIAL

## Page 2

APPEARANCES:
JASON P. STEARNS, ESQUIRE
SARAH GOTTLIEB, ESQUIRE
    Freeborn & Peters LLP
    201 North Franklin Street, Suite 3550
    Tampa, Florida 33602
    813-488-2920
    jstearns@freeborn.com
-and-
BRIAN D. GOODRICH, ESQUIRE
    Bentley Law Firm, P.A.
    783 South Orange Avenue, Floor 3
    Sarasota, Florida 34236-4702
    941-556-9030
    bgoodrich@thebentleylawfirm.com

    Appearing via Zoom videoconference on
    behalf of the Plaintiff

KIMBERLY STEIN, ESQUIRE
    Flangas Dalacas Law Group
    3275 South Jones Boulevard, Suite 105
    Las Vegas, Nevada 89146
    702-307-9500
    kps@fdlawlv.com
    Appearing via Zoom videoconference on
    behalf of the Defendant Dan Bilzerian

KEVIN P. McCOY, ESQUIRE
    Carlton Fields Jorden Burt, P.A.
    4221 West Boy Scout Boulevard, Suite 1000
    Tampa, Florida 33607
    813-223-7000
    kmccoy@carltonfields.com

    Appearing via Zoom videoconference on
    behalf of the Defendant Blitz NV, LLC

ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:

    Mike Stingo, videographer
    Jason Verona
    Mehdy Karbid
    Jason Huh

## Page 3

I N D E X
TESTIMONY OF DANIEL BILZERIAN:
PAGE

    Direct Examination by Mr. Stearns......... 8

    Instruction not to Answer................ 53

    Instruction Not to Answer................ 56

    Instruction Not to Answer................ 66

CERTIFICATE OF REPORTER (REPLOGLE)............... 374

CERTIFICATE OF REPORTER (BROWN)................. 375

CERTIFICATE OF OATH............................. 376

ERRATA SHEET.................................... 377

LETTER TO ATTORNEY.............................. 378

- - - - -

E X H I B I T S

PAGE

Exhibit Number 1
    Blitz 191.................................... 29
Exhibit Number 2
    Third Amended Notice of Taking
    Videotaped Zoom Deposition................... 36
Exhibit Number 3
    Dan Bilzerian's Responses and
    Objections to Plaintiff's Third
    Amended Subpoena Duces Tecum"................ 59

Exhibit Number 4
    Blitz 000032................................. 94
Exhibit Number 5
    Blitz 000878................................. 172

## Page 4

E X H I B I T S (Continued)

PAGE

Exhibit Number 6
    Three pages of texts with the first
    one being "All your unflavored
    products are ready"......................... 202
Exhibit Number 7
    STEEL 0000072, Personal
    Services/Sponsorship License Agreement
    (unsigned).................................. 203

Exhibit Number 8
    Personal Services Sponsorship/License
    Agreement (signed).......................... 207

Exhibit Number 9
    2/4/21 letter filing Personal Services
    Sponsorship/License Agreement under
    seal........................................ 207
Exhibit Number 10
    STEEL 0000093............................... 212

Exhibit Number 11
    Text messages produced in an Excel
    spreadsheet (Duplicate of Exhibit 6)........ 221

Exhibit Number 12
    Blitz 000022................................ 234
Exhibit Number 13
    Blitz 00009................................. 245

Exhibit Number 14
    STEEL 127................................... 291
Exhibit Number 15
    Blitz 001089................................ 296

Exhibit Number 16
    Blitz 001057................................ 311
Exhibit Number 17

888.909.2720    Anthem Reporting    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 5

E X H I B I T S (Continued)

PAGE

Exhibit Number 18
Outdoor gym.................................. 337

Exhibit Number 19
Vitamin Shoppe in background................. 341

Exhibit Number 20
Vitamin Shoppe Ad with Protein............... 342

Exhibit Number 21
ZRO, Ignite vodka, Ignite Water.............. 345

Exhibit Number 22
Computer Poker............................... 345

Exhibit Number 23
Outside, ZRO, bong, girl..................... 346

Exhibit Number 24
Outside gym (duplicate)...................... 347

Exhibit Number 25
ZRO by Computer.............................. 347

Exhibit Number 26
Full Send bag and guns....................... 348

Exhibit Number 27
Treigning Lab for sleep...................... 371

## Page 6

THE VIDEOGRAPHER: We are now on the record for the video deposition of Dan Bilzerian taken in the matter of STEEL Supplements's, Inc., versus Blitz NV, LLC.

Today is November 2, 2021, and the time is 1:03 p.m. This deposition is being conducted via Zoom. The court reporter is Beverly Replogle, and the videographer is Michael Stingo.

Will the court reporter please swear in the witness?

THE COURT REPORTER: Before I swear in the witness, I need for the attorneys participating in this deposition to acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order AOSC20-16 (and extended by AOSC20-23). The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting, including the fact that the witness is located outside the state of Florida.

Please indicate your agreement by stating your name and your agreement on the record, starting with counsel for the plaintiff.

## Page 7

MR. STEARNS: Good afternoon. Jason Stearns for STEEL, and STEEL does not object.

MR. McCOY: Good afternoon. Kevin McCoy for Blitz NV, LLC; no objection.

MS. STEIN: Good afternoon. Kimberly Stein on behalf of the witness, Dan Bilzerian; no objection.

THE COURT REPORTER: Mr. Bilzerian, would you raise your right hand for me, please.

Do you swear or affirm that the testimony you're about to give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

DANIEL BILZERIAN, having been first duly sworn, was examined and testified upon his oath as follows:

MR. McCOY: Hey, Jason? One quick issue. Can we just do an objection for one as an objection for all? Kim may have some for the witness in his individual capacity. I may have objections; but instead of it getting messy with "join" and doubling up, we just have an objection for one, it's good for both sides?

MR. STEARNS: I don't know. I don't know that I think that makes sense because I think, you know, there's different interests obviously. So if you're

## Page 8

objecting, Kevin, it's for Blitz. If Kim's objecting, it's for Dan. I think we should probably keep it clean.

MR. McCOY: All right. Well, we'll do it however you want. We'll just both object when it's appropriate.

MR. STEARNS: All right.

MR. McCOY: All right.

MR. STEARNS: Are we all set? All right.

DIRECT EXAMINATION

BY MR. STEARNS:

Q Mr. Bilzerian, good afternoon -- or I guess good morning.

A How's it going?

Q Good. Where are you today, sir?

A I'm in Kim Stein's office.

Q And that's in Las Vegas, Nevada?

A It is.

Q Okay. Are you in a room by yourself?

A I am.

Q And you're here today to have your deposition taken in a case between STEEL and Blitz. You understand that?

A Yep.

Q Have you ever had your deposition taken before?

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 9

A  I have.

Q  Approximately how many times?

A  I think twice, that I can remember.

Q  What was -- what was the nature of those -- those cases?

A  One was about a security deposit, and I think I got depoed in the Nik Richey case, but I don't recall. I think so.

Q  What's the -- did you say Nik Richey or Mick Richey?

A  Nik, N-i-k.

Q  What's that about?

A  I was suing him for -- I don't remember exactly what it was, what the case was technically.

Q  Okay.  But you understand today for your deposition, you're under oath, and so your testimony today is -- is sworn testimony under penalty of perjury. You know that?

A  Yes.

Q  Okay.  And did you prepare for your deposition testimony today prior to today?

A  Briefly, yes.

Q  When was that?

A  What's that?

Q  When did you prepare?

## Page 10

A  Yesterday.

Q  And what did you do to prepare?

A  I spoke with Kevin for about an hour or two on the phone.

Q  Is Kevin your lawyer?

A  He is.

Q  Is Kevin representing you -- Kevin McCoy representing you personally?

A  I don't know if it's personally or the company or -- I'm not really sure how it's structured, but he's representing me.

Q  Okay.  And is Kim Stein also your lawyer?

A  Yes.

Q  And did you meet with Kim Stein prior to today to prepare for your deposition?

A  No.

Q  So other than your meeting with Kevin McCoy yesterday, your testimony is you have done nothing else to prepare for today?

A  Not that I recall.

Q  Do you recall looking at any particular documents prior to today to prepare for your deposition?

A  No, not for preparation of the deposition.

Q  What would you have looked at documents for?

A  I mean, I look at documents every day.

## Page 11

Q  Fair question.

Did you look at any documents that were produced in this case by either Blitz, STEEL, or any other nonparty prior to today?

A  Yes.

Q  And do you recall which specific documents you might have looked at?

A  Huh.  There's been a lot.  I don't -- I don't remember the specifics.

Q  Do you recall any?

A  I mean, in, say, you know, STEEL versus Dan or Dan versus STEEL.  I mean, there are court documents.  I don't really know how to describe them.

Q  Okay.  Did you review any emails or text messages about this case prior to today?

A  Yes.

Q  Okay.  Which emails or text messages, if you recall?

A  There was numerous.  I mean, I had to go through all of the text messages with Jason.  Then they wanted the text messages with David Vingiano and then all of the emails related to STEEL.  Yeah, I mean, it's been numerous.

Q  And I want to talk about Blitz.  Blitz is a party in this lawsuit.  You're aware of that, right?

## Page 12

A  Yes.

Q  And what is Blitz?  What kind of company is Blitz?

A  What kind of company?  I mean, I don't know. But -- I don't know what kind of company it is.  An LLC. I'm not sure.

Q  That was a bad question.

What does Blitz do?  Like, does Blitz have an operational charge?  Does it do certain things, or is it just a holding company?

A  To be honest, I have a business manager, and he kind of handles that, so I'm not sure how it's structured.

Q  Who's your business manager?

A  Jason Verona.

Q  How long has Jason Verona been your business manager?

A  I don't recall.  I think four or five years-ish, but I'm not sure.

Q  Is Jason Verona your personal business manager for any business that you, Dan Bilzerian, own, or is he business manager for Blitz or both?

A  I would say -- I mean, it's a general title. He's basically in charge of, you know, many of my business affairs.

3 (Pages 9 to 12)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

---

**Page 13**

Q  How did you meet Jason Verona?

A  I don't recall. I mean, I hired him, I think, through a headhunter.

Q  Do you know how Jason Verona gets paid?

A  Through payroll. I mean, what -- I'm not sure what you mean.

Q  Does Blitz pay him or does Dan Bilzerian pay him? Who -- who pays Jason Verona?

A  I don't know. My accountant handles all of that.

Q  Now, earlier you said that you had reviewed text messages between yourself and Jason Verona. Do you -- do you text with Mr. Verona frequently?

A  I think I said I did it for Jason and then David Vingiano. I'm not sure -- I don't -- I don't believe the ones with Jason were submitted. Maybe they were. Maybe they were on his end. I'm not really sure, to be honest.

Q  Well, I guess that's my question. Are there text messages between you and Jason Verona?

A  I mean, of course. The guy was my business manager for five years. What do you mean?

Q  Well, understood. I don't know what you have and so I'm just trying -- and I may ask you a question, sir, that seems silly to you but there's certainly going

---

**Page 14**

to be a little more of an information asymmetry. You know a lot more about your business and Blitz than I know about what you do and what Blitz does, so --

A  Okay.

Q  -- it's a fair question; but like I said, I'm just trying to find out what the answers are.

A  Gotcha.

Q  So -- so there are text messages between yourself and Jason Verona; that's your --

A  Yes.

Q  And you currently have text messages on your phone between yourself and Jason Verona, correct?

A  Yes.

Q  And you have not -- have you deleted any of these text messages in the past year?

A  Not that I remember, no.

Q  Do you recall the last time you would have deleted a text message between yourself and Jason Verona?

A  I don't know that I ever have.

Q  So fair to say on your cellphone currently, if there was a text message between you and Jason Verona, it would still be there?

A  Yes.

Q  Do you happen to know who the officers are for

---

**Page 15**

Blitz?

MS. STEIN: Object to form, but you can go ahead and answer if you know.

A  Yeah, I don't.

BY MR. STEARNS:

Q  Your father, Paul Bilzerian, is he an officer of Blitz?

A  I don't believe so.

Q  Do you know if your father, Paul Bilzerian, has an ownership interest in Blitz?

A  He does not.

Q  Does Mr. Bilzerian -- I'm sorry.

Does Paul Bilzerian have any advisory role or capacity with respect to Blitz?

A  I mean, I don't think he has any technical position. Does he advise me? I mean, I ask my dad for advice all the time, but I don't believe he has any official position, no.

Q  So you discuss Blitz or any other business activity with your father all the time, right?

MR. McCOY: Form.

A  I mean, I -- I mean, I ask my father for advice. With respect to Blitz? Yeah. I mean, Blitz -- there is not a ton of business that Blitz is doing, so it's not -- you know, it's not a regular discussion.

---

**Page 16**

BY MR. STEARNS:

Q  Well -- and we're going to go through some of them, but I've seen emails with your father emailing folks at Blitz or folks at Ignite, and I'm just trying to figure out why your father would be emailing folks at Blitz. That was the reason for the question. Do you happen to know?

MS. STEIN: Objection to form.

MR. McCOY: Join.

A  Okay.

MS. STEIN: You can go ahead and answer.

BY MR. STEARNS:

Q  Those are form objections, so -- so in a trial, there will be a judge, and if your counsel has an objection, the judge will rule on it, and you'll either answer or you won't.

A  Okay.

Q  Because there's no judge here, your lawyers will object to the form on occasion, and they're just preserving the record. So you still have to answer the question --

A  Okay.

Q  -- but they have a form objection. That's what that means.

So I was wondering if you knew why your father,

---

4 (Pages 13 to 16)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 17

Paul Bilzerian, would communicate with folks at Blitz or Ignite on business matters and what -- what the reason for that would be?

A Well --

MS. STEIN: Same objection.

A Yeah, like I said, I mean, he -- he advise- -- you know, he helps me out. He, you know, gives me advice, so...

BY MR. STEARNS:

Q Yeah, I understand you're the -- you're the sole member of Goat Works, LLC; is that right?

A Once again, I'm not sure how these corporations are structured. I'm not sure, you know, how the payroll's structured. I don't really deal with that stuff, so I have an accountant. I've got a business manager, and, you know, I have attorneys and they kind of, you know, handle that sort of thing.

Q Fair enough. But do you know if there's any other person who has an ownership interest in Blitz or -- and a member of Blitz? In other words, are you a 100 percent owner of Blitz in some form?

A I believe so, but I don't know. I mean, there -- I don't see why anybody else would have an ownership in there; but like I said, I didn't, you know, look at the structure, certainly not recently.

Page 18

Q Understood. And it's fair. If you don't know the answer, that's a fair answer.

Well, let me ask you this. When it comes to the activities of Blitz, are you -- do you consider yourself to kind of be the boss? Like, do people listen to you --

A Yes.

Q -- at Blitz?

Is there anybody at Blitz that you would report to get permission or authority to do something?

A No.

Q Help me understand if you can -- and I understand that you may not know the corporate formalities of which entity is owned by another entity, but who works for Blitz? Is there a team? Are there employees? Is there a payroll? Can you walk me through that?

A Like I said, I honestly don't know the structure of -- of, you know, who's employed by Blitz. These are like accounting things that, you know, some things are set up through corporations, you know, and I don't know the, you know, ins and outs of that.

Q Okay. Well, let's start with Jason Verona. Is Jason Verona a Blitz employee?

A I believe so, but I don't know.

Page 19

Q What about Rob Hagan?

A He is -- he does not work for me any longer.

Q He used to, correct?

A I believe about four years ago, three or four years ago.

Q And do you know if Rob Hagan worked for Blitz?

A I don't recall.

Q What about David Vingiano?

A He -- I employed him. I just don't know how it was structured.

Q And does he still work for you?

A No.

Q Do you recall when David Vingiano stopped working for you?

A I believe it was about five years ago.

Q Do you have a personal assistant?

A I have two.

Q Who are they?

A Michael Geller and -- oh, jeez. What the hell is his name? -- Jimmy, I don't know his last name. He's part-time.

Q Can you spell Michael Geller's last name?

A Can I spell it?

Q Yes.

A I believe it's G-e-l-l-a-r [sic].

Page 20

Q And did you have a personal assistant prior to Michael or Jimmy?

A Yes. I've had many.

Q Who -- who was your assistant prior -- immediately prior to Michael?

A That would be Jeremy Guymon.

Q Can you spell Jeremy's last name?

A G-u-y-m-o-n.

Q And do you recall the date that Jeremy stopped working for you?

A I don't.

Q Now, I understand -- and this is just my understanding from the -- from the case and what I've learned in discovery, so if I'm wrong, tell me I'm wrong; but I understand Blitz owns certain intellectual property. Do you understand that, too?

A I believe that's the case. I think the goat skull and my likeness, yeah.

Q Do you know if that's why the agreement with STEEL that we're going to talk about here in a little bit, as that -- is that why Blitz was the party to the agreement instead of you personally?

MS. STEIN: Object to the extent it calls for a legal conclusion, and I'm going to instruct the witness to answer only to the extent if he knows the

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 21

answer, not in relation to any conversation with counsel.

MR. McCOY: Join.

A Yeah. Once again, this is something that's set up by my legal team, so I don't know. You know, when we structure deals, sometimes they're through an entity, sometimes they're personal; and, you know, some of that has to deal with, like you said, trademark rights, copyright stuff, and I don't assume to know why.

BY MR. STEARNS:

Q Okay. Fair enough. Other than Jason, Michael, or Jimmy, is there anybody currently at Blitz that reports to you?

A Once again, I don't know the exact structure, so I don't know if my chefs are under Blitz. I'm not sure, you know, how my attorneys have structured it; but, you know, there's payroll. There's maids. There's chefs. I have two pilots, a plane manager. You know, there's a bunch of staff, so I don't know who exactly falls under what.

Q Do you -- I'm sorry. Was that the end of your answer?

A Oh. I was going to say, I believe it's under Blitz. I mean, that's my understanding, but I could be wrong.

## Page 22

Q I've seen emails in this case with the email domain blitznv.com. Are you familiar with that?

A I believe that's associated with Blitz.

Q Okay. Is there an IT guy, or is there somebody who maintains Blitz's emails and servers and the infrastructure for IT?

A We have an IT person that, like, does danbilzerian.com. I assume they do the Blitz NV; but I'm -- you know, once again, I'm not sure.

Q Okay. I was going to ask you about that one next. The @danbilzerian.com, that's your email domain, correct?

A Yes.

Q I mean, when you email, it's dan@danbilzerian.com, right?

A That's correct.

Q And you understand that is also owned by Blitz?

A I don't know. I don't know exactly everything that Blitz owns. If we can, you know, to save time, I don't know exactly who's employed, what it owns. I don't know. I don't know the full structure of how my employees are hired, what falls under what. I -- I -- you know, I just would be guessing.

Q Fair enough. Do you get a paycheck from Blitz or a distribution?

## Page 23

A Not that I know of, but I don't also handle the finances either, so...

Q To your knowledge, has Blitz had any financial difficulties in the last four years, meaning cash-flow problems?

A Not that I've been made aware of.

MR. STEARNS: Sarah, can you go ahead and release Exhibit 6?

So what we're going to do -- Kevin and Kim, do you have the share-file link to the exhibits?

MS. STEIN: I do not.

MR. McCOY: I don't.

MR. STEARNS: No?

MS. GOTTLIEB: I'm sending it right now.

MR. STEARNS: Okay. So Sarah is going to send you a share-file link, and you'll have access to all of the documents in there. So as we use them, rather than email you each individual exhibit, we'll just send them into the -- into the box.

THE WITNESS: You talking to me or Kim?

MS. STEIN: I'm sorry. I was talking to Kim and Kevin.

THE WITNESS: Okay.

BY MR. STEARNS:

Q While Sarah's doing that, Mr. Bilzerian, let me

## Page 24

ask you this: Are there any other emails other than dan@danbilzerian.com that you use?

A I have other emails. I don't use them very frequently.

Q What are they?

A Dan -- I believe it's danbilzerian@mac.com, and I -- and I have dan@ignite.co, I believe. I mean, I pretty much exclusively just use dan@danbilzerian.com, but I have other emails that I've set up in the past.

Q When's the last time that you've accessed danbilzerian@mac.com?

A I don't recall doing it anytime recently. That's for sure.

Q Same question for dan@ignite.co?

A I mean, all of those emails, I believe, get forwarded to the same -- you know, to the inbox, which is the dan@danbilzerian, so I don't know what's coming from what; but, like, the Ignite stuff just gets auto-sent.

Q Is that something you set up on your phone, like a rule or, you know, a forward function?

A I did not. I believe that was the IT guys.

Q If -- if you want to go into the dan@ignite.co email store, you would have access to that personally, right?

6 (Pages 21 to 24)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 25

A No.

Q You would not?

A I don't remember what the password was.

Q But you --

A I just have it auto-forwarded.

Q You could get it, though, correct?

A Yes, I'm sure I could figure it out. I probably would just have to reset it.

Q But you wouldn't have a -- there would be no issue with authority? That's my question.

You, Dan Bilzerian, can log in to that. You have the authority to go into that email store. You just don't know the password; is that fair?

MS. STEIN: Object to the extent that calls for a legal conclusion, but go ahead and answer.

A It's forwarded to the inbox that I access, I believe.

BY MR. STEARNS:

Q Do you know if anybody else has your log-in or password information for the three emails that we've identified?

A I believe Jason has the dan@danbilzerian password, because I don't have it.

Q You don't have the password for that email, but you're just -- you're logged in on your phone?

Page 26

A Exactly.

Q Does Jason Verona, to your knowledge, access dan@danbilzerian.com on any occasion?

A Not that I've been aware.

Q Have you given Jason Verona permission to access your email store, dan@danbilzerian.com, on any date?

A Not that I recall.

Q To your knowledge, if there was an email sent from dan@danbilzerian.com, would that email have been authored by you?

A Unless it was hacked or somebody signed in unbeknownst to me.

Q Right. So -- so I guess a better question is: To your knowledge, only you send emails from that domain, dan@danbilzerian.com?

A I hope so.

Q I asked you the question about text messages with Jason Verona. You said that you hadn't deleted any in the last several years. Same question for your tire phone. Do you have a habit of deleting text messages from your phone?

A I mean, I have deleted text message, but I'm not one of those people that deletes them every time they come in.

Page 27

Q So for the folks that we've already mentioned -- Vingiano, Hagan, Verona, or any of the folks that we've -- that we're going to talk about, to your knowledge, you wouldn't have deleted text messages from your phone?

A Not that I recall, no.

Q Are you familiar with the app WhatsApp?

A I am.

Q What's that?

A It's a text-messaging app.

Q Do you use WhatsApp?

A I do.

Q Why?

A Some people don't have iPhones. Some people prefer to communicate on there.

Q What's your preference?

A I don't really have one.

MR. STEARNS: So, I'm sorry, Sarah. Can you release Exhibit 6?

MS. GOTTLIEB: I did. Do you want me to pull it up?

MR. STEARNS: I'm sorry. I meant -- I meant 7. I misspoke. I said 6. Yeah, release 7 and go ahead and pull it up.

BY MR. STEARNS:

Page 28

Q How does WhatsApp work, Mr. Bilzerian? Are there lots of accounts or emails? Like is it just like a phone? I don't have it, so help me understand.

When you go into WhatsApp, what do you see?

MS. STEIN: Objection as to form, but go ahead and answer.

A I mean, for me it functions the same as SMS, just texts. You can also video -- video call on there, like you could FaceTime.

BY MR. STEARNS:

Q And can you send audio, like voice recordings?

A Yes.

Q And do you do that frequently?

A Well, define "frequently."

Q How often do you do it?

A I don't know. I mean, it -- I mean, I don't -- I couldn't define a frequency that I leave voice notes. I mean, once in a while.

Q Is there a reason why you would send a voice note versus a text?

A If I have a lot to say and I don't want to type, I'm driving, or it's easier or -- I mean, I don't know; a bunch of reasons, I suppose.

MR. STEARNS: Do you have 6 ready, Sarah?

A What's that?

7 (Pages 25 to 28)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 29

BY MR. STEARNS:

Q I'm sorry. I was talking to Ms. Gottlieb.

MS. GOTTLIEB: 6 or 7?

MR. STEARNS: 7. Sorry.

MS. GOTTLIEB: Yes, I pulled it up now.

MR. STEARNS: Thanks.

MS. STEIN: And, Sarah, it looks like -- because I'm on share link. I'm not -- it looks like you had 6. Now, it's gone. So are you only -- are we going to keep them in there, as you use them, so we have access to download after the depo?

MR. STEARNS: 100 percent. Yeah, they'll be in there, too. Yeah.

MS. STEIN: Thanks. Sorry. I'm just making sure I'm understanding.

MR. STEARNS: We're trying something new. We'll see how it goes.

BY MR. STEARNS:

Q All right. So I'm going to show you what we're going to mark as Exhibit 1 to the deposition. There's numbers on the file, Mr. Bilzerian. Those are for us. This is going to be marked as Exhibit 1.

(Exhibit Number 1 marked for identification.)

MR. STEARNS: Sarah, could you scroll down for Mr. Bilzerian so he can see what we're looking at?

## Page 30

BY MR. STEARNS:

Q Do you recognize Exhibit 1, sir?

A Do I?

Q Yes. It might help you, sir, if you look at the bottom of each page.

MR. STEARNS: So if you'll scroll down a little bit, Sarah.

BY MR. STEARNS:

Q See where it says "Bilzerian," and then there are numbers, 00 --

A Yes.

Q -- 191. These are documents that were produced through your counsel, and so I don't know if that might help you figure out what we're looking at, but this was produced by your lawyer pursuant to the subpoena we served to you.

A Okay.

Q Does this look familiar?

A I mean, not particularly. I mean, it's -- I don't recall my texts from five years ago; but I mean, it looks like a combo that I had.

Q All right. So if we go up to the first page of Exhibit 1, which is marked Bilzerian 191, do you see there are -- it looks like four different texts, and then there's black -- it's between two black boxes. Do

## Page 31

you see that?

A Yep.

Q And my first question is: Is this a WhatsApp conversation, or is this an SMS text?

A I mean, how would I know? This is five years ago.

Q I don't know either, sir. And you produced it, so that's why I'm asking you.

A I mean, yeah. I mean, did -- what did they say it was?

Q This is my chance to ask you. This is your document that you produced pursuant to a subpoena. Do you not know what it is?

A I mean, it looks like a conversation between me and David Vingiano, so I mean -- but you're asking me if it was on WhatsApp or text messaging. I mean, I don't know. I don't recall. I mean, I can find out, I'm sure, but...

Q Could you find out and let me know?

A Okay. You want me to find out now?

Q We're going to be taking a break, you know, in a -- in a matter of a few minutes or so once we get going, and maybe on a break you can talk to your counsel and figure it out.

A Okay. I mean, can I ask them now?

## Page 32

THE WITNESS: Kim, do you remember, is this SMS, or is this WhatsApp? I'm not sure why it matters, but do you know?

BY MR. STEARNS:

Q Why don't you guys talk on a break, Mr. Bilzerian. Your lawyer probably would appreciate that.

A Okay.

Q All right. So my next question for you is -- so it appears to be a conversation between you and David Vingiano, right?

A Yep, that's what it appears.

Q And on the first page, the one -- of Exhibit 1, marked 191, there are two blacked-out boxes, right?

A Okay.

Q Did you black those out?

A I did not.

Q Do you know why they're blacked out?

MS. STEIN: Objection to the extent it calls for a legal conclusion and regarding attorney-client privilege. But you can answer to the extent that it doesn't involve any of -- any conversations with attorneys.

A So the way I understood it is that you guys asked for the conversations, and I gave Jason access to

8 (Pages 29 to 32)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 33

my computer and access to my phone. He downloaded the conversations and then submitted them. That's, you know, to my knowledge how this was presented. So if there was black boxes, I don't know why. Maybe it had nothing to do with this. Maybe it was privileged. I -- I don't know.

BY MR. STEARNS:

Q   Okay. And that was going to be my next question. Because when I -- if I look at the document -- and, Sarah, go ahead and scroll down several pages slowly.

When I look at the document, all I see are either David V-i-g or Dan Bilzerian as far as the names go. I don't see any lawyers on this text thread.

Do you know if there are lawyers on this text thread?

A   Lawyers on the text? I don't understand what that means. Like, would there be a lawyer in the chat?

Q   Correct.

A   I mean, not that I'm aware of. All I see is text messages between myself and David Vingiano.

MR. STEARNS:  Stop right there for a second, Sarah.

BY MR. STEARNS:

Q   So this is on page Bilzerian 194. Do you see

## Page 34

where it says "David Vig," and then it says "image omitted"?

A   I do.

Q   Do you know what that means?

A   I don't. Maybe -- maybe when they uploaded the text, the image, it didn't upload JPEGS. I'm not sure.

Q   But sitting here today, your testimony is you didn't direct anybody to black out any of these messages; is that -- is that right?

A   That is correct; I did not.

Q   And you don't know why they were blacked out; is that also correct?

A   Yes. I would be guessing.

MR. STEARNS:  Hey, Sarah, are the -- are the subpoenas and the responses in the Dropbox -- or the file share?

MS. GOTTLIEB:  Yes.

MR. STEARNS:  Okay. Can you go ahead and pull up the third amended subpoena to Mr. Bilzerian?

MS. STEIN:  Just for the record, we served a fourth.

And I do apologize, Jason. My husband had a severe accident on Sunday, and I was at the hospital all day yesterday.

MR. STEARNS:  Understood. I hope he's okay.

## Page 35

Is he okay?

MS. STEIN:  He's going to have surgery on Friday, so...

MR. STEARNS:  Car accident?

MS. STEIN:  No. Unfortunately, at my 50th birthday party, he rented an ice rink and fell and shattered his wrist pretty badly.

MR. STEARNS:  Oh. Sorry to hear that. That's why I don't ice skate.

MS. STEIN:  Well, we will never again. That's a promise. But I do apologize; I was not around yesterday at all.

MR. STEARNS:  No problem.

Do you have that subpoena, Sarah? Go ahead and pull that.

BY MR. STEARNS:

Q   Sir, I'm going to mark as Exhibit 2 a subpoena that was issued to you. Do you recall receiving a subpoena in this case?

A   Are you going to pull it up?

MS. GOTTLIEB:  I'm working on it.

MR. STEARNS:  I've got it right here. Oh, you got it, or do you want me to do it?

MS. GOTTLIEB:  I've got it.

(Exhibit Number 2 marked for identification.)

## Page 36

BY MR. STEARNS:

Q   All right. Mr. Bilzerian, I'm going to show you Exhibit 2. This is a Third Amended Notice of Taking Videotaped Zoom Deposition.

Do you recall receiving this document?

A   I don't personally recall, but I'm sure that I received it.

MR. STEARNS:  Okay. Go ahead and go to the document request, Sarah.

BY MR. STEARNS:

Q   So starting here at Number 1 on the top of the page, do you see where it says "Requests" and they're numbered?

A   Yes.

Q   Do you recall looking at a document with numbered requests for documents that you were asked to provide for your deposition today?

A   I mean, I got a lot of paperwork in this case. I don't recall all of it; but I mean, I do remember them requesting all of the agreements, and I believe we've submitted those.

Q   Okay. Tell me what you did to provide documents pursuant to this subpoena.

A   Well, I went through all of my text messages, and then those were uploaded. I went through all of the

9 (Pages 33 to 36)

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

Page 37

emails and forwarded all of those and then went through the text messages, I believe, with David Vigiano as well and uploaded those -- or I guess Jason uploaded them for me. And then, you know, my attorneys have produced a bunch of documents as well.

Q Did you personally review every text message and every email that you were going to forward on to the lawyers?

A Did I personally review every text message? No. The -- the David Vigiano one, I gave Jason access, and he uploaded the entire conversation.

Q Well, I guess that's what I'm trying to get at, Mr. Bilzerian. How did you identify what documents, text messages, or emails would be responsive to the subpoena? Did you -- did you personally go search for documents and run search terms, or was it given to Jason Verona to do?

A No. I did. I ran everything with STEEL in a search option; and then with respect to the text messages, we just uploaded every text message. It wasn't -- we didn't sort through it. And then, yeah, I mean, that's what I was responsible for is all of the emails and the texts and then --

Q So texts -- I'm sorry. I didn't mean to interrupt you.

Page 38

A Yep.

Q Text messages, who did you -- which text messages did you upload and send to your lawyers?

A Between me and Jason Huh, and then it was the David Vigiano ones and -- and, I believe, Rob Hagan. I don't -- I don't remember if there was much with him, but I believe those were sent as well.

Q What about Jason Verona?

A I thought that he uploaded them.

Q So you're saying you did not upload them?

A Well, it would be a mirror. So if he uploaded, it's the same as if I uploaded.

Q Right. Do you know if you did, though?

A I don't recall.

Q What about with your father, Paul Bilzerian?

A I didn't know that he was involved in this case.

Q Well, we're going to look at some emails later on where there's emails that were produced by either Ignite or Blitz that include email communications between various Blitz or Ignite folks and your father and --

A I mean, our -- our --

MS. STEIN: Hold on. I'm just going to object to form before you answer and misstates facts in

Page 39

evidence and foundation, but go ahead.

BY MR. STEARNS:

Q Okay.

A I mean, the agreement is between Blitz and STEEL, so I don't know what, you know, communication my father would have to do with that. He wasn't involved in the negotiations, so I don't know why that would be relevant.

Q Okay. So Number 4 -- I'm sorry -- Number 3 on the request, Exhibit 2, "Documents and communications between you and any person other than STEEL relating to the negotiation of the agreement." Do you see that?

A Yes.

Q All right. And if you had a test message with anybody other than STEEL about the negotiation of the agreement, you understand you were requested to provide that, correct?

MR. McCOY: Form.

MS. STEIN: Join.

A Okay. Well, I mean, I didn't negotiate the agreement with anybody other than STEEL.

BY MR. STEARNS:

Q Right. So going back to Number 3, though, you understand that what it's asking you to produce is documents relating to the negotiation?

Page 40

A Okay.

Q So, for example, if you send a text to your father about the STEEL agreement negotiation, that is responsive to Number 3. Do you understand that?

MS. STEIN: Objection --

A Yes.

MS. STEIN: -- argumentative. Asked and answered. Go ahead.

BY MR. STEARNS:

Q You understand that, Mr. Bilzerian?

A I do. And, once again, he was not part of the negotiation of the STEEL/Blitz agreement.

Q Is your -- is your testimony that your father had no involvement at all, to your knowledge, with the negotiation of the agreement?

MS. STEIN: Asked and answered. Go ahead.

A No. He was not a party to the negotiation.

BY MR. STEARNS:

Q And you never talked to your father about the agreement?

MR. McCOY: Form.

MS. STEIN: Join.

A Okay. I mentioned to him that I was contemplating an agreement with STEEL, but he was not a party to the negotiation.

10 (Pages 37 to 40)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 41

BY MR. STEARNS:

Q   Right.  And do you see in Number 3 where it limits documents with other persons only if those persons were a part of the negotiations?  Do you see that limitation in Number 3?

MS. STEIN:  Objection.  Calls for a legal conclusion.  Argumentative.  Asked and answered.

Counsel, this is getting repetitive, and you're actually misstating your own document.  So I'm going to ask you to rephrase the question.

BY MR. STEARNS:

Q   Do you understand my question?

MS. STEIN:  I don't even understand what you're asking.

BY MR. STEARNS:

Q   Mr. Bilzerian, do you understand the question?

A   I mean, I believe it's been asked and answered three times; but if you want me to do it again, we can go through it again.

Q   Yeah.  No, I mean, the question that I'm asking you now is:  Would you agree with me there's no limitation in Request Number 3 to only produce documents with a person who was actively negotiating the agreement?  That limitation doesn't exist in Number 3.  Do you agree with me?

Page 42

MS. STEIN:  Objection.

MR. McCOY:  Objection to form.

MS. STEIN:  Misstates the document.

A   It says --

MR. McCOY:  Hold on, Dan.

A   It says right there, relating to the negotiation of the agreement.

BY MR. STEARNS:

Q   Right.

MR. McCOY:  We've also got objections that were served to the scope of the request.  Actually, this isn't even the operative subpoena, so I just want to note that for purposes of clarity on the record.

MS. STEIN:  And join.

BY MR. STEARNS:

Q   Understood.

Okay.  So let's go to Number -- Number 5, Mr. Bilzerian.  Number 5 asks you to produce documents and communication between you and any person other than STEEL relating to your performance under the agreement.  Do you see that?

A   I do.

Q   Did you respond to Number 5?  Did you provide those documents?

A   I -- relating to my performance, so there was

Page 43

no performance clause in the agreement, so I'm not really sure what that would even mean.

Q   You don't know what that means?

A   Well, there wasn't a performance clause, so I didn't have to do a certain amount of posts there, you know, so -- so I'm not even sure what that would talk about.  If there wasn't a performance clause, then what -- what does that even mean?

Q   Okay.  And Number 7 -- scroll down, Sarah.

Number 7 asks you to produce documents and communications between you and any person, other than STEEL, relating to the agreement.

Do you see that?

A   I do.

Q   And so my question is:  Would you have had a communication in writing, email, or text with your father relating to the agreement in any way?

MS. STEIN:  Objection to form.  Calls for a legal conclusion.

A   Not that I recall.

MS. STEIN:  Form, but go ahead.

MR. McCOY:  Join.

BY MR. STEARNS:

Q   Do you --

A   No, I'm not --

Page 44

Q   -- understand the question?

A   I mean, I feel like we keep going over the same thing.  You're asking -- okay.  Can you ask the question once more.

Q   Right.  You understand that Number 7 asks you to produce any document or communication between you and any person, other than STEEL, relating to the agreement.  You understand that, right?

A   Yes.

Q   And you understand that 7 has no limitation, like we talked about earlier, not about negotiations or performance; there's no limitation?  You see that, right?

MR. McCOY:  Object to form.

A   Sir, so you're basically -- you're basically asking for any text message anytime I ever mentioned STEEL with any person since the start of this agreement?  I mean, do you realize how ridiculous that is?  I mean, if I ever mentioned STEEL.

I mean, like Steve Aoki, for instance.  I got him to post for STEEL for free.

You know, Logan Paul; I reached out to him to try and, you know, get him to post for STEEL as per Jason's request.

I reached out to Floyd Mayweather because Jason

11 (Pages 41 to 44)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 45 | Page 46 |
|---|---|

asked me to get him as an athlete.

I've got -- I had Katie Bello post for STEEL for free. I mean, I've mentioned STEEL to tons of my friends.

My buddy, Bill Perkins, did a post for free. I've had tons of people, you know, do things for me for STEEL, for STEEL's benefit. And so every time I mention STEEL, if you want me to produce those texts, like you realize it's just a ridiculous request, right?

Q Did you -- did you comply with Number 7, sir?

MR. McCOY: Objection to form.

MS. STEIN: Objection to the extent -- the same, join to form; but also with regards to the extent it calls for a legal conclusion. And, again, number one, this is not the operative document; two, we've already responded to this request; and, again, you're misstating the document and the request. As Mr. Bilzerian has actually very eloquently pointed out, this request is relating to the agreement.

MR. STEARNS: Are you done, Ms. Stein?

MS. STEIN: I am, uh-huh.

BY MR. STEARNS:

Q Okay. Mr. Bilzerian, did you provide documents responsive to Number 7?

MR. McCOY: Form.

---

MS. STEIN: Same.

A Yes.

BY MR. STEARNS:

Q And did you look for communications between yourself and Paul Bilzerian about the agreement with STEEL; yes or no?

MS. STEIN: Objection --

A I did --

MS. STEIN: -- to form.

A I did not --

MR. McCOY: Same objection.

THE COURT REPORTER: Wait. Guys, wait. If we could have just maybe a pause between the objection and answering, it will make it a little bit easier for me, please, okay?

THE WITNESS: Okay. Understood.

THE COURT REPORTER: Thank you.

MR. McCOY: Sorry, Bev. Join.

BY MR. STEARNS:

Q Do you remember the question, sir?

A Okay. When you asked it to me, you didn't say relating to the agreement. You just said any communications you had with respect to STEEL. So if it's relating to the agreement, then that's a much smaller scope. Is that what you're asking?

| Page 47 | Page 48 |
|---|---|

Q Did you look at your text thread between yourself and your father for any texts to produce in this case?

A There was no communication with my father and I about the negotiation of this agreement.

Q Again, not my question.

Did you look for any text message that might be between you and your father -- you and your father relating to the agreement?

MS. STEIN: Object to the extent it calls for a legal conclusion and form.

MR. McCOY: Join.

BY MR. STEARNS:

Q It's a simple question, sir.

A Yes. I did a search for STEEL.

Q So all you did -- how did you -- how does one do a search for STEEL? Tell me -- walk me through that process. What did you do on your phone?

A So you go to the text message thread, and then you put in a search for a term, and it can -- and it will pull up, just kind of like you can do for emails.

Q Okay. And you did that on your phone, and you did it for the word STEEL; is that correct?

A Yes.

Q Did you search for any other word?

---

A I mean, for the purposes of this, no.

Q So it's possible there would have been an email or a text thread with your father about this case or about the agreement that didn't use the word STEEL, and you wouldn't have found that; is that true?

MR. McCOY: Form.

A Well, if we were talking about STEEL, it would be kind of hard to not mention that, I feel like, but --

BY MR. STEARNS:

Q Is it your testimony --

A -- like I said, I mean, for the fifth time, my father was not a party to the negotiation of the STEEL agreement, so I don't understand what you keep asking me about.

Q Is it your testimony --

A If I've told you five times that he's not a party to the agree- -- you know, to the negotiation of the agreement, then why do you keep asking me the same thing? I don't -- I don't understand.

Q Can you testify, sir, with personal knowledge and certainty that Paul Bilzerian had no involvement with the negotiation of the agreement between Blitz and STEEL?

MS. STEIN: Asked and answered about, now, six, seven times.

12 (Pages 45 to 48)

888.909.2720      Anthem Reporting      813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)      5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

---

Page 49

A   Yeah.  I mean, how many times do you want to ask me the same question?

MR. STEARNS:  Can you read the question back, Madam Court Reporter?

MS. STEIN:  I'm going to ask Counsel to move on and the court reporter not to read the question back.  This is ridiculous.

MR. STEARNS:  That's not how it works, Kim.  That's not how it works.

MS. STEIN:  It is how it works, Mr. Stearns.  I'm instructing him at this point he's answered this.  So if you're going to have her read back, I'd like her to go back and read the other six times and the answers, and those will satisfy the answer.

MR. STEARNS:  It's not your deposition.

MS. STEIN:  I'm asking you to move on.

MR. STEARNS:  Ms. Stein, it's not your --

MS. STEIN:  It doesn't matter that it's not my deposition.

MR. STEARNS:  I'm going to need you to stop.

MS. STEIN:  This is getting to be harassment at this point.

MR. STEARNS:  It is not.

MS. STEIN:  And this is a witness who's not a party to this litigation.  And you're becoming

---

Page 50

harassing, Mr. Stearns.  So I'm going to ask that we go ahead -- we've been going for about 50 minutes.  Why don't we go ahead and take a break.  We'll have Mr. Bilzerian on the one issue, and we'll come back and have you move on at this point.

MR. STEARNS:  Well, there's a pending question, so let's ask this one question, and then we'll take a break.

Madam Court Reporter, can you please read us the last question back?

THE COURT REPORTER:  Give me a second.

MR. STEARNS:  No problem.

(Record read as requested.)

MS. STEIN:  Asked and answered.

MR. McCOY:  Form.

BY MR. STEARNS:

Q   You can answer, sir.

A   My father was not a party to the negotiation between Blitz and STEEL.

Q   And you know that he had no involvement; that's what you're saying?

MS. STEIN:  Same answer.

MR. McCOY:  Form.

A   Okay.  Once more, my father was not a party to the negotiation between Blitz and STEEL.  My father was

---

Page 51

not a party to the negotiation between Blitz and STEEL.  Would you like me to say it 12 times?  13?  I mean, how many do we want to do here?

BY MR. STEARNS:

Q   Have you ever talked to your father about the STEEL relationship?

A   Have I mentioned the STEEL relationship with my father?  Yes.

Q   Okay.  Does your father know the general terms of the STEEL relationship?

MS. STEIN:  Objection to form.  And also --

MR. McCOY:  Join.

MS. STEIN:  -- I thought we were taking a break after that last question.  You go ahead and answer, and then we'll take a break, please.

BY MR. STEARNS:

Q   Did you -- did you understand that question, sir?

A   I did, and I thought we agreed that after I answered the question for the 17th time, that we were going to take a break, are we not?

MR. STEARNS:  We can take a break; that's fine.  Let's take a -- how long do you need, Kim?

MS. STEIN:  Why don't we do 10 minutes.

MR. STEARNS:  10 minutes.

---

Page 52

THE VIDEOGRAPHER:  Off the record at 1:53 p.m.

(Recess taken from 1:53 p.m. to 2:05 p.m.)

THE VIDEOGRAPHER:  On the record 2:05 p.m.

BY MR. STEARNS:

Q   Mr. Bilzerian, we were talking about your -- your response to the subpoena that was served on you before the break, and I think you said that your -- the search term that you used for texts and emails was STEEL; is that right?

A   With respect to the original agreement.  I mean, later there was ZRO.  There was other things used in the searches; but with respect to the original agreement, which is what you're talking about, correct?

Q   Well, no.  I want to know actually -- tell me every search term that you used to look for an email or text.

MS. STEIN:  I'm going to object to the form.

MR. McCOY:  I am going to object.  That's work product and that's attorney-client privileged.

MR. STEARNS:  Are you guys instructing him not to answer?

MR. McCOY:  If he would have learned any search terms to be used -- that he personally used from counsel, yes.  I don't believe those have been provided from STEEL either.

---

13 (Pages 49 to 52)

888.909.2720                Anthem Reporting                813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

---

Page 53

So that was part of the email. I think we were going to talk about a global protocol, which that -- that piece was ignored.

MR. STEARNS: Let's not -- Kevin, we got -- we got tape time. So with respect to this issue, are you instructing him not to answer? Yes or no?

MR. McCOY: Yes. If his answer is because he was provided information from counsel, then, yes, I am.

BY MR. STEARNS:

Q Okay. Mr. --

MR. McCOY: All right.

BY MR. STEARNS:

Q -- Bilzerian, did you come up with any search terms to look for documents outside of your conversations with counsel?

A The ones I remember looking up for certain was --

MS. STEIN: Wait. Wait. Hold on. Just make sure you -- before you answer, again, listen to what the question was, because did you come up with -- it's a yes or no. Did you come up with any search terms without counsel instructing you; yes or no?

A Oh. I mean, we had -- we had -- I had conversations with counsel, so is that privileged?

---

Page 54

MR. McCOY: Yes.

BY MR. STEARNS:

Q Yeah. So --

A Okay.

Q So you told me earlier you searched for STEEL. Is that a search term that you came up with on your own? Because you told me about it, and your counsel didn't object.

A I mean, that's probably the most obvious term to be used. I don't remember if that was -- I didn't know that that was privileged if -- you know, because when we discussed what terms to search, that was done with the attorneys. So I don't know if they came up with that or I came up -- I mean, that was an obvious one. Obviously, if it's a STEEL case, we're going to search STEEL so --

Q Right.

A -- I don't remember whose idea that was.

Q And you said that you searched for ZRO; is that correct, ZRO?

A Yes.

Q You physically did the search yourself?

A I did a search. Jason did a search. I mean, there were multiple searches done.

Q Okay. I didn't get any emails produced by you

---

Page 55

relating to ZRO. So is it your testimony that you have no emails in your phone or text messages in your phone that mention the word "ZRO"?

MS. STEIN: I'm going to object. Actually, that misstates actually the documents produced to you; so that is an -- that is an incorrect statement, Mr. Stearns. I would ask you to correct that.

MR. McCOY: And it also ignores the objections that were served.

MR. STEARNS: Fair enough.

BY MR. STEARNS:

Q You can answer the question, though.

MS. STEIN: He cannot answer the question. I've asked him --

(Multiple voices speak at the same time.)

THE COURT REPORTER: Wait, wait, wait, wait, wait. Please, I can only do one person at a time. Ms. Stein, would you start your objection over, please.

MS. STEIN: Sorry. Again -- again, I'm saying don't answer because I'm asking Mr. Stearns to rephrase the question properly. It's not a proper question. It misstates the responses that you've been served. It misstates the documents you have.

---

Page 56

So I need -- I need you to reword the question, and I'm going to instruct him not to answer that question the way you've worded it.

BY MR. STEARNS:

Q Are you going to listen to your counsel's instruction not to answer the question, Mr. Bilzerian?

A Well, if you phrase the question incorrectly and you're misstating the facts, then -- and she's recommending me not answer, then I'm going to not answer.

BY MR. STEARNS:

Q Did you produce any ZRO emails?

THE WITNESS: Kim, what do you -- I mean, I'm not really sure what --

MS. STEIN: Again --

THE WITNESS: -- you guys want me to do.

MS. STEIN: -- objection to the form, and I'm going to go ahead and again -- your form of -- what do you mean by "ZRO emails"? Do you mean emails relating to ZRO?

MR. STEARNS: All right. So I'm going to add some tape time onto this, Kim, with your speaking objections. So if you have --

MS. STEIN: No.

MR. STEARNS: So if you have an objection, go

---

14 (Pages 53 to 56)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 57

ahead and make it.  Otherwise, just object to the form.  I'm fine hearing you out, Kim.  I'm not --
THE WITNESS:  During -- during the last deposition, by the way, Jason, you objected to every single question that was asked, just so you know.  You literally objected to every single question during the entire deposition.  So I think it's a little out of line if you're getting upset because she's objecting for, you know, 30 seconds here when you spent the entire deposition objecting to every single thing that was asked.
MS. STEIN:  Thanks, Dan.  But, again, Dan, let me kind of do the objection.
I'm going to object to you adding to any tape time because I'm going to ask -- because of the way you asked the question.  So please go ahead and reword your question properly and not ask misproper questions if you want to waste your tape time, but I'm not adding any tape time to that.
BY MR. STEARNS:
Q   Sure.  How about this, Mr. Bilzerian.  When you typed in "ZRO" as a search term for emails, how many emails populated with that search term?
A   I don't recall.
Q   Do you recall any emails populating with that

Page 58

search term?
A   I mean, the word "ZRO" was mentioned in an email, I'm sure.  I don't remember -- I -- I provided everything that I had relating to this.  I mean, there might have been a ZRO email that had nothing to do with STEEL.  I'm not sure.  I -- you know, like I said, I believe we've produced everything that was requested.
MR. STEARNS:  Sarah, can you go ahead and pull up the objections, the third amended and fourth amended objections?  Do you guys need me to send those to you, Kevin and Kim?  You should have them.
MR. McCOY:  I have a -- I have a copy.  Are you marking them?
MR. STEARNS:  Yes.
MS. STEIN:  And I would object to anything with the third, since we've amended those, and the proper responses would be to the fourth.
MR. STEARNS:  You can note your objection.
All right, Sarah.  Go ahead and send the third and the fourth objections to Kim and Kevin and pull up the third objections, please.
BY MR. STEARNS:
Q   Mr. Bilzerian, I'm going to show you what we're marking as Exhibit 3.
(Exhibit Number 3 marked for identification.)

Page 59

MS. GOTTLIEB:  I have the fourth.  I just need a moment for the third.
MR. STEARNS:  Okay.  I have it, Sarah.  I'll go ahead and do it.
MS. GOTTLIEB:  Okay.  I have the fourth when you're ready for that.
MR. STEARNS:  Okay.
BY MR. STEARNS:
Q   Mr. Bilzerian, this is Exhibit 3.  Do you see on the screen where on the top it says "Dan Bilzerian's Responses and Objections to Plaintiff's Third Amended Subpoena Duces Tecum"?
A   "Nonparty Dan Bilzerian's Responses," yes.
Q   Did you see this document before it was provided to us?
A   I've seen so many court documents that it's hard to discern what exactly I've seen and when, but...
Q   Okay.  So Number 5, paragraph 5 of your response states that you did a diligent search and a reasonable inquiry -- do you see that -- to find documents?
A   "Without waiving his objection, Mr. Bilzerian states that a diligent search and a responsible inquiry has been made in an effort to comply with the requests and that unless otherwise specified, no documents have

Page 60

been deleted and, if not produced, are not in Mr. Bilzerian's possession or control and/or Mr. Bilzerian is unable to comply because these documents never existed and/or Mr. Bilzerian could not locate such documents because Mr. Bilzerian does not know of any documents at this time that have been purposely withheld."
Q   Right.  And that's a true statement, sir?
A   Yes.
MR. McCOY:  Objection.
BY MR. STEARNS:
Q   Other than what we've talked about with the search terms or searching for emails and texts using search terms, what else did you do to provide documents, if anything?  That might be it.
A   I mean, searching.  Yeah, I mean, you guys requested the emails and, you know, we did the searches and submitted the emails.  I mean, ZRO is not a competing product anyway, so it's really like a nonissue, but...
Q   Explain that.
A   Because it's not a bodybuilding supplement.
Q   Okay.  What's a bodybuilding supplement?
A   Well, I'll read you the definition from the Oxford dictionary.  "Bodybuilding" --

15 (Pages 57 to 60)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 61

Q Hold on.

A -- "is work involving" --

THE COURT REPORTER: Wait, wait, wait, wait, wait. Again, I can only have one person speak at a time.

A Okay. I'm going to answer the question.

BY MR. STEARNS:

Q Hang on just one second.

A Bodybuilding, according to the Oxford dictionary, is a sport involving strenuous physical exercise in order to strengthen and enlarge the muscles of the body.

So ZRO does not enlarge the muscles of the body in any way, shape, or form. It's not a bodybuilding supplement, and STEEL is a hard-core bodybuilding company, so it's not a competing product in any way, shape, or form.

Mr. Huh, you know, was informed of, you know, ZRO. We discussed doing, you know, joint ventures. He's not in the RTD business. He's not doing any ready-to-drink stuff, and that's a completely different business than selling supplements online.

RTD is a point-of-sale item that, you know, you have to get distribution. It's in gas stations. It's not a competing, you know, product in any way, shape, or

Page 62

form.

BY MR. STEARNS:

Q I appreciate that, sir.

A It's not a bodybuilding supplement.

Q So one question I do have for you. You were reading a dictionary definition. Was that from your phone?

A Yes.

Q All right. Have you used your phone at all in the prior hour of this deposition while we've been talking?

A No.

Q Okay. And I'm going to ask you not to use your phone for this deposition going forward. Is that okay?

A Okay.

Q Okay. And so back to Number 5, it states that no documents have been deleted. And you testified earlier that that's a true statement. You haven't deleted any emails or texts, correct?

A That's correct.

Q Okay. I'm going to go to paragraph 7 of your response. Number 7 -- and I'm looking at the third sentence. It states, "Thus, if none -- if indicated none below, such documents may be in Blitz's possession or control, but not Mr. Bilzerian's personally."

Page 63

Do you know what that sentence means?

MS. STEIN: I would object to form.

MR. McCOY: Join.

MS. STEIN: You can go ahead and answer.

A Yeah, that means that it could be in Blitz's possession but not mine. So Jason Verona could have it, but I don't. That's what I believe that to mean.

BY MR. STEARNS:

Q Okay. And earlier I had asked you if there was anybody at Blitz that you reported to, and you said no. Do you remember that?

A Yes.

Q And that is true, right?

A Yes.

Q And so if Blitz has a document, if it's in Verona's email or anybody at Blitz and you want to see it, sir, you, Dan Bilzerian, you can get that, correct?

MS. STEIN: Objection to form.

A I would have to ask him for it because I don't have his password.

BY MR. STEARNS:

Q Fair enough. But would Jason Verona tell you "No, Dan. I'm not going to get you that document"?

Would he -- would he be able to tell you that?

A He would not, and I haven't withheld any

Page 64

documents.

Q Understood. But if you asked anybody at Blitz with a Blitz email domain, "Sir, go get me a document or search for a document" or do anything related to email or documents, they would listen to you, correct?

A Yes.

Q Okay. And so my question is, then: How would Blitz have control over something but you not have control? I don't understand that.

MS. STEIN: Objection --

A I already --

MS. STEIN: -- to the extent it calls for a legal conclusion and form.

BY MR. STEARNS:

Q You can answer, sir.

A Well, like I said before, if he had -- if he has it in his email and I don't have his password, then I don't technically have access to it.

Q But you can get it upon demand, right?

A I mean, there's things that you --

MS. STEIN: Hold on, Dan.

A There's things --

MS. STEIN: Asked and answered. Dan, hold on. Asked and answered, calls for a legal conclusion, and form.

16 (Pages 61 to 64)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 65

A I mean, there's things that you can get that you don't have access to immediately.
BY MR. STEARNS:
Q But there's nothing at Blitz that you can't get when you ask for it, correct?
MS. STEIN: Objection. Form. Asked and answered. Go ahead.
BY MR. STEARNS:
Q Sir?
A I don't even -- I've already answered this. Yes.
MR. STEARNS: All right. You can -- you can take that down for a second, Sarah.
BY MR. STEARNS:
Q I want to talk to you about Ignite, sir. What is your relationship to Ignite?
A I am the CEO, and I have a controlling interest in the company.
Q Do you know the -- the Ignite entity that you're the CEO of? Is there a specific entity, like Ignite Brands, LLC? Ignite International, LTD? Do you know the name of the Ignite company that you're the CEO of?
A I mean, I don't know the exact legal structure; but Ignite International, I believe, is the parent

Page 66

company.
Q Is that the Canadian company, sir?
A It's a Canadian -- yes, it's on the CSE.
Q And you're the CEO of that company?
A Yes.
Q How long have you been the CEO of Ignite?
A I don't remember the exact date.
Q You said you had a controlling interest?
A Yes.
Q Do you know what percentage?
A I believe it's around 65 percent.
Q Is it fair say that if Ignite is profitable and Ignite makes money, you benefit from that?
MS. STEIN: I would object, and I'm actually going to instruct him not to answer with regards to the Court's ruling on the protective order.
MR. STEARNS: Hold on a second.
MR. McCOY: Heffernan.
MR. STEARNS: Hold on a second, Kim. What -- what ruling relating to Ignite gives you the authority to instruct him not to answer the question?
MS. STEIN: The Heffernan question.
MR. STEARNS: This is not a Heffernan question.
MS. STEIN: It absolutely is.

Page 67

MR. McCOY: It is. The instruction's made. Next question.
MS. STEIN: Yep.
BY MR. STEARNS:
Q The question was: If Ignite makes money, do you stand to benefit?
MS. STEIN: Object.
MR. McCOY: I'm not -- I'm not -- we're not going to debate this. We're going to follow the Court's instruction. We have the right to give him an instruction; and if we need a ruling on it, we'll take it up with the judge.
BY MR. STEARNS:
Q Okay. Mr. Bilzerian, are you going to listen to your lawyers and not answer that question?
A I am.
Q Okay.
A I mean, it's kind of a silly question.
MR. STEARNS: I'll caution you, Kevin and Kim -- I mean, I'll caution you guys, that's so far from Heffernan; that there might be closer calls. That is not one of them; but we'll be here for a few hours. I'll ask it again at the end -- or towards the middle and -- but I'll let you guys know before I do and give you some time to think about it

Page 68

because I think you're getting out over your skis a little bit on that one.
MS. STEIN: Well, I also think --
MR. McCOY: Thanks, Jason.
MS. STEIN: Thank you, Jason.
MR. McCOY: I don't think you know what --
(Multiple voices speaking at the same time.)
THE COURT REPORTER: Wait, wait, wait, wait, wait. Guys, I'm not getting it.
MR. McCOY: It's fine, Kim. It's fine. Kim, we don't need to debate the point. It's fine.
MS. STEIN: Well, I just want to make it clear. We're not -- and you're not going to ask it in the middle. The Court instructed that if you're going to ask any questions related to Heffernan, that you do so at the end, so I'm going to ask you to do that.
MR. STEARNS: What does this have to do with Heffernan?
MS. STEIN: It has everything to do with Heffernan.
MR. STEARNS: How? Explain that to me. Because when I file my motion, I want to be able to tell the Court, "I even asked them to explain how in the world this had to do with Heffernan and they

17 (Pages 65 to 68)

888.909.2720        Anthem Reporting        813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 69

refused to," unless you want me to tell me what the answer is.

MR. McCOY: I don't think that the protocol required us to have argument with you right now, Mr. Stearns.

MR. STEARNS: Well, the protocol didn't allow you to instruct him not to answer relating to --

MR. McCOY: It also did -- and thank you, Kim -- instruct you to ask your Heffernan questions at the end. This is one of them.

MR. STEARNS: It's not a Heffernan question.

MR. McCOY: Fine.

THE WITNESS: What does it -- what does it have to do with STEEL?

MR. McCOY: Dan, hold on.

It's -- next question. What do you got, Mr. Stearns?

BY MR. STEARNS:

Q Okay. So, Mr. Bilzerian, you're the CEO of Ignite. Same question that I just asked you for Blitz: Do you have access to Ignite's documents and information?

A Ignite's documents and information? I mean, I don't have access to all of the Ignite emails, if that's what you're asking.

Page 70

Q Would you have access to an email that was sent to you relating to Ignite?

MR. McCOY: Form.

A I mean, I would assume so if it was sent to me.

BY MR. STEARNS:

Q I want to talk about Ignite ZRO specifically. Do you know when Ignite ZRO was formulated and created?

A I don't remember the exact date, but I remember Jason was consulted before and had no objection.

Q Wasn't my question. So, you know, just try to answer the questions I ask, sir, and you'll have a time to tell your story when your lawyers talk to you, okay? Yes?

A Yep.

Q All right. So do you -- do you have an approximate -- do you have an understanding of approximately when ZRO was formulated?

MS. STEIN: Asked --

A I -- I --

MS. STEIN: -- and answered, and (inaudible) --

A I would be guessing.

BY MR. STEARNS:

Q What's your best --

THE COURT REPORTER: Wait, wait. Stop, please. I heard, "Do you have an approximate -- do you have

Page 71

an understanding of approximately when ZRO was formulated?"

Ms. Stein said, "Asked and answered" and something else.

And the answer was, "I would be guessing," and at the same time Mr. Stearns said something else. So this is not an accurate transcript at this point.

MR. STEARNS: I apologize.

BY MR. STEARNS:

Q What is your understanding, sir, of when ZRO was formulated?

MS. STEIN: Asked and answered.

A I've already -- why are we asking the same question over and over again? I don't understand. The answer is not going to change.

BY MR. STEARNS:

Q Was it 2017?

A I just told you I would be guessing. I don't remember the exact date.

Q Right. And I understand. And it's fine, sir. And this is going to be a long day if we have to keep doing this, and if we have to come back for a second day because we're going around and around. I understand if it's a guess, and sometimes I want to know what your guess is. If you have no idea --

Page 72

MS. STEIN: Well, hold on.

MR. STEARNS: Kim, I'm talking. Stop.

BY MR. STEARNS:

Q So, sir, right now --

MS. STEIN: Well, you're not going to instruct my client legally on what you think the law is. He is not to guess. You're entitled to his best testimony. He's asked [sic] your question, and what you're trying to do is badger this witness. And we're not coming back for a second day.

You have seven hours. You can ask your questions. If you want to waste your time on repetitive questions, that's your issue; but we're not going to agree with that, and you're not going to instruct my client legally at all. And I do object to that very vehemently.

THE WITNESS: Yeah, I was told that I'm not supposed to guess, so you're instructing me to guess?

BY MR. STEARNS:

Q No. I want to know what your personal knowledge is. And right now I'm asking for an estimate, and that's fine. Your lawyers know that. They're just being obstructive, sir.

MS. STEIN: Oh, God.

18 (Pages 69 to 72)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 73

BY MR. STEARNS:

Q  But what I'm asking you is --

A  Sir, I just wanted to be clear.  You want me to guess?  Because I told you that I don't -- I don't know, and so you're -- you're insisting that I guess.  That's what you want me to do is guess?

BY MR. STEARNS:

Q  Okay.  I'm asking you if you can provide an estimate.  If the answer is you can't, that's fine.

A  Well, I told you three times that I couldn't, so are you asking me to guess?  Is that what you want?  Because that's what I've been told, you're not supposed to guess in depositions.  So if I tell you that I don't have knowledge of it, you keep pestering me, I'm not really sure where you're going with that.  Then you're suggesting that I guess.  I mean, is that what you want?  You want me to guess?

Q  I want --

A  Is that even legal?  Are you allowed to do that?  I don't think so.

Q  Okay.  I want you to tell the truth, sir.  You understand that, right?

A  And that's what I'm doing.  And so I'm asking you, after I've answered your question three times and told you that I don't have knowledge and you're asking

Page 74

me to guess, I mean, I think you're out of line.

MR. STEARNS:  Okay.  Go ahead and pull up, Sarah -- actually, I'll pull it up.

BY MR. STEARNS:

Q  Okay, sir.  Do you see that?  I'm showing you a document.  Do you see it?

A  What is it?

Q  This is Exhibit 3.  These are your objections.  Do you see this?

A  Okay.  I do.

Q  Okay.  Similar question that we talked about with Blitz.  Here in the middle of 8 -- and I want you to read the whole paragraph 8, but this sentence that I've highlighted, I want you to tell me what that means.

MR. McCOY:  Form.

MS. STEIN:  Join.

A  You want me to tell you what that sentence means?

BY MR. STEARNS:

Q  Yes, sir.

MS. STEIN:  But, Dan, read the whole paragraph before you answer.

THE WITNESS:  Okay.

BY MR. STEARNS:

Q  If you need the context, that's right.

Page 75

A  All right.  "Mr. Bilzerian is also the founder of the Ignite brand."

Q  Have you read paragraph 8, sir?

A  Yeah.  It's saying that we objected and that we've produced 360 pages of documents.

Okay.  So part of the objection is three pages, including an email.  "And while Mr. Bilzerian is director of Ignite International, other requested documents may be considered in his possession and/or control."

Q  Right.  This -- as I read it, it says that you may have possession or control of certain documents because you're the director of Ignite.  Is that what it says?

MR. McCOY:  Form.

MS. STEIN:  Form.  Join.  Sorry.

A  Yeah.  I mean, I read it to say Mr. Bilzerian is a director of Ignite.  Other requested documents may be considered in his possession or control, so...

BY MR. STEARNS:

Q  That's what it says, right?

A  It does.

Q  And that's true, right?

MR. McCOY:  Form.

A  Yes.

Page 76

BY MR. STEARNS:

Q  Okay.  All right, sir.  I want to change gears.  What I want to know is starting back in April of 2017 to the present -- if it changed at all, we can go through the various years; but, generally speaking, what is it that you do?  In other words, do you have a job?  Do you go to an office?  Do you wear a suit?  Tell me, generally speaking, what is it that your day-to-day activities are like.

A  This is from 2017?

Q  Yes, sir.

A  Okay.  2017.  I believe around 2017, I was in the process of starting Ignite.  I was working with STEEL.  You know, those are my two main focuses.  So I was not wearing a suit, and I was not going into a regular job.  I mean, I did wear a suit when we went on the roadshows to try and raise money for Ignite.  You know, I -- you want -- I mean, I don't remember my exact day-to-day in 2017, but part of it was, you know, promoting STEEL.

Q  You travel a lot; is that right?

A  Yes.

Q  Internationally as well as domestic?

A  Yes.

Q  How would you find out where you were from --

19 (Pages 73 to 76)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 77

for example, in 2017 to the present? Is there a calendar that you keep? Is there a record of that somewhere?

A  I mean, I don't really understand the question. Do you want to know where I was on a certain date or you just want me to give you a timeline of where I went in 2017? I don't understand.

Q  No. I want to understand if you were going to find out or you needed to find out where you happened to be at a certain date, could you do that? Do you have a calendar or a log that you keep to -- you know, just to say where you are?

A  I don't keep a -- I don't keep a diary of where I go.

Q  Does anybody --

A  There might be flight logs. I don't know. I'm not -- you know, I don't remember a lot of what, you know, I did day-to-day in 2017. I mean, I can't tell you, like, my exact trip records if that's what you're asking.

Q  Yes. I also want to talk about -- so you don't know? You wouldn't have a record of your day-to-day location?

A  I didn't keep a diary of my travel, no.

Q  I want to talk about social media, sir. I

Page 78

understand you're self-proclaimed the king of Instagram; is that right?

A  No. I never proclaimed that.

Q  Okay. Who calls you that?

A  The media has referred to me as that.

Q  Could you tell me what social media platforms you use and have access to?

A  Instagram, Snapchat, Twitter, TikTok, and that's all I can think of off the top of my head.

Q  Facebook?

A  Yes, I have Facebook as well.

Q  YouTube?

A  I have, I think, a YouTube channel that I don't have access to at the moment.

Q  Do you have your passwords, sir, for your social media accounts?

A  They're all saved in my phone, so facial ID, and then it auto-fills it.

Q  Do you share your passwords with anybody?

A  No.

Q  If a post, comment, or other activity occurs through your social-media platforms, would that be you doing it, or does anybody else do that on your behalf?

A  Well, my accounts have been hacked before and so there's been posts in the past that have not come

Page 79

from me.

Q  But as far as you know, at least for posts relating to STEEL in this case, for example, those would have been you?

A  Yes.

Q  You would have actually uploaded them physically into your phone?

A  Yes.

Q  Okay. And same with respect to Ignite posts or ZRO posts; those would have been you, right?

A  If what you're getting at is did I promote ZRO, I'll just cut to the chase and tell you yes.

Q  Oh. No, that's not what I was asking, but I do appreciate that.

No, I just -- I just want to make sure that if we're looking at posts, to your knowledge, those are posts that you would have physically done; is that fair?

A  Yes.

Q  All right.

A  Yes.

Q  But you just said a second ago that you'll cut to the chase, that you promoted ZRO. Is that what you're saying?

A  Yes.

Q  So all of your eggs are in the basket that ZRO

Page 80

is just not a bodybuilding supplement; is that right?

A  Absolutely not.

Q  Right?

A  No more than -- no more than coffee is or Red Bull or any of that other stuff.

Q  But you agree with me that if the Court disagrees, that you have breached the contract with STEEL, correct?

A  No.

MS. STEIN:  Objection to the extent --

MR. McCOY:  Form.

MS. STEIN:  -- it calls for a legal conclusion and form.

A  Bodybuilding has a very specific definition, and ZRO does not fall under it.

And we also consulted Jason before we launched the beverage, and he had no complaints, nor did he have any intention of going into the RTD business.

In fact, I discussed doing it with him on the proteins --

BY MR. STEARNS:

Q  Sir, you're muted.

A  Sorry. And I discussed doing it on the protein side with him, and he said he had no interest in doing RTD. So it wasn't competing. He had no issue with it,

20 (Pages 77 to 80)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 81

and so it's really a nonissue; but if you want to keep going into it, we can discuss it.

Q   Sir, your testimony is that if it -- if an -- if a supplement is not an RTD, it's not competing with STEEL?  Is that your testimony?

A   No, no --

MR. McCOY:  Form.

A   -- I'm saying STEEL did not do RTDs, so an RTD would not compete with STEEL.

BY MR. STEARNS:

Q   But you agree with me that there are bodybuilding supplements that are not RTDs, correct?

MR. McCOY:  Form.

MS. STEIN:  Join.

A   That's not what I'm saying.  I'm saying that -- that -- that ZRO was an RTD drink and STEEL does not do any RTDs, so it's not competing with STEEL --

BY MR. STEARNS:

Q   Right.  My question is --

A   -- by its --

THE COURT REPORTER:  I'm sorry.  Wait.  I didn't hear what you said, sir, after you said, "So it's not competing with STEEL."

A   By definition.

BY MR. STEARNS:

Page 82

Q   By whose definition?

A   I mean, any reasonable party.  I mean, if you're -- if you don't produce a product -- you know, like if you don't make tires and I come out with a tire, then, you know, I'm not competing with you because you don't sell tires.  So that would be the definition of competing.

Q   Okay.  And we're going to come back to that and talk about that in a little more detail, but I appreciate that insight.

Oh, let me ask you a question.  Do you recall Mr. Huh sending you an RTD back in 2017?

A   No.

Q   Okay.  If Mr. Huh testifies that in fact he did, would you say that Mr. Huh's a liar, or do you think you just forgot?

A   Well, he's been proven to be a liar numerous times in this case, but so...

Q   How so?

A   -- yes, I would say he is a liar.

Q   How so?  How did Mr. Huh lie?

A   Well, he lied about -- he had sales on Amazon that he didn't disclose.  We caught him there.

Then he made a shell corporation to hide his sales there.

Page 83

He's tried to state that water is a bodybuilding supplement.

He's, you know, claimed that he's an upstanding, you know, family man, this and that; and, you know, he's against weed, but he's promoting weed on his page.  He actually was considering going into the weed business.

You know, he's promoting himself as a family man, but he's banging two girls in my bathroom at my party.

So it's like, you know, I don't present myself as this, like, upstanding guy.  You know, he's trying to, you know, make claims that he is, which is just bullshit.  So you ask if he's a liar, he absolutely is a liar.

Q   So your testimony is Mr. Huh never sent you an RTD in 2017?  That's your testimony?

A   An RTD -- an RTD of what?

Q   Of anything.

A   No.

Q   So your testimony is Mr. Huh never sent you an RTD in 2017; true or false?

MR. McCOY:  Objection to the form.

MS. STEIN:  Asked and answered.  And join.

A   He never sent me an RTD.  He's never -- he's

Page 84

never had an RTD.

BY MR. STEARNS:

Q   Or prototype?

MR. McCOY:  Form.

MS. STEIN:  Join.

A   Prototype for what?

BY MR. STEARNS:

Q   An RTD.

A   No.

Q   Okay.  Let's go back to social media.  We'll get back to that in a second, sir.

Have you deleted any posts from your social media accounts?

A   Yes.

Q   Why?

A   I mean, I delete posts all the time.

Q   What's the purpose for deleting posts?

A   If I feel like it doesn't look right on the page, if I feel like it would be a better post for another account, if the engagement on it sucks, if I posted at a bad time.  I mean, there's -- there's numerous reasons.

Q   Have you deleted any posts related to STEEL in the last three years?

A   I don't recall.  I think I might have archived

21 (Pages 81 to 84)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 85 | Page 86 |
|---|---|

**Page 85**

one, but I don't -- yeah, I think I've archived. I might have deleted some. I'm not sure.

Q   Have you deleted any posts relating to Ignite ZRO in the last year?

A   Not that I can recall.

Q   Have you deleted any posts relating to any bodybuilding supplements that you might have posted in the last year?

MS. STEIN:  Objection to the form.

A   Not that I can recall. I didn't post any bodybuilding supplements that I remember. I mean, I haven't been paid by any bodybuilding supp, you know, companies.

I haven't -- I mean, the whole thing of this, you know -- and, look. The bottom line is he's trying to weasel out of the contract, and he's trying to weasel out of the contract by saying that I'm promoting other supplements, which is just nonsense, because my very first post with him was other competing supplements, and he was okay with it. And the whole point of it was to be organic and to show STEEL comparing to other supplements. So we've done that from day one.

STEEL doesn't produce every kind of, you know, supplement in the supplement industry. So there will be times when I'll post something else, so it's not just

**Page 86**

STEEL, STEEL, STEEL, and it appears more organic. So -- and Jason has approved the posts. He's seen posts where I've posted other stuff. He's never had any objection. It's just all of a sudden in, you know, 2020 when he wants to weasel out of the agreement, he all of a sudden has an objection to ZRO. He has an objection to me posting this, but yet didn't voice any concerns whatsoever up until the point. So I mean, it's just -- it's just nonsense. He's just trying to weasel out of the agreement.

BY MR. STEARNS:

Q   Sir, true or false, you have posted to promote a bodybuilding supplement other than STEEL in the last two years, haven't you?

MS. STEIN:  Asked and answered.

BY MR. STEARNS:

Q   Yes?

A   I have -- I have not been paid to promote, and I haven't actively promoted anything else, so...

Q   Yeah, so not my question, sir. I'll ask it again. I think it's pretty simple.

True or false, you have posted to endorse a bodybuilding supplement that is not a STEEL supplement in the last two years?

MR. McCOY:  Form.

**Page 87**

MS. STEIN:  Asked and answered.

BY MR. STEARNS:

Q   I thought you were a straight shooter, sir. It's pretty straightforward.

A   I am a straight --

MS. STEIN:  Argumentative. And, Counsel, I'm going to -- also, you've cut off the witness several times, so I would stop doing that. And stop arguing with my client, please. Thank you.

A   So I've done numerous posts where STEEL was featured, and other supplements were also featured. Jason was okay with that. He felt that that was organic. We did that with Carbolin, which he did not produce. He was okay with that.

He was also okay with us showing, you know, multiple preworkouts and comparing them to STEEL. This has always been the strategy since the very beginning, and I've got text messages from Jason approving those posts.

So I wasn't compensated. I wasn't promoting you know, other companies for any financial benefit. I had no equity in those companies. The only bodybuilding supplement company that I've really pushed was STEEL.

Q   Okay. Again, we'll get to those text messages shortly. My question, that you didn't answer, is: Yes

**Page 88**

or no, have you posted to promote a bodybuilding supplement other than STEEL in the last two years? Yes or no?

MS. STEIN:  Form.

A   I don't believe I've -- I don't believe --

(Multiple voices speaking at the same time.)

A   I --

THE COURT REPORTER:  Wait, wait, wait, wait, wait. Hold on, sir. Could we start with the objection first?

MR. McCOY:  Form.

MS. STEIN:  Join.

THE COURT REPORTER:  Go ahead, Mr. Bilzerian.

A   I cannot think of a bodybuilding supplement that I have promoted in the last two years other than STEEL.

Q   Treigning Labs, L-tryptophan?

A   That's not a bodybuilding supplement. That's a sleep aid. And that's not even really a sleep aid. It's an amino acid, I think. It's like some nonissue. That's not bodybuilding.

Q   STEEL sells sleep aids, correct?

A   I believe they sell Rested-As Fuck. That is their sleep product that's supposed to -- I don't know -- increase growth hormone production or something

22 (Pages 85 to 88)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 89 | Page 90 |
|---|---|

**Page 89**

like that.

Q And it competes with Treigning Labs L-Tryptophan, correct?

A No.

Q Full Send Supplements, you've heard of them?

A No.

Q Okay. Your testimony is you've never heard of Full Send Supplements?

A I mean, I hadn't heard up until you guys brought it up and said that they sell supplements. Until that point I didn't know that they had sold any supplements. So prior to your telling me that they did, no, I had no knowledge of that. Nor -- and also you -- you know that they didn't pay me anything. You've already talked to them. I showed a duffle bag. It's not -- I didn't show any supplements. I showed a duffle bag, okay?

So if I showed a Nike bag and Nike produces supplements, I'm not -- you know, I'm not promoting Nike if there's a swoosh on my shoe.

It was -- it wasn't -- it wasn't tagged. It wasn't promoted. It was a duffle bag in a random video, okay.

And so you guys want to just cling to any straw that you can to act like I'm promoting other brands.

**Page 90**

It's just not true. Why would I promote a brand that I wasn't getting paid for, one that I had no equity in? It doesn't even make sense.

Q Sir, do you know how many Instagram followers you have?

A I believe it's 32.7 million.

Q And how do you amass followers?

A There's many ways.

Q How do you do it?

A I mean, there's been media that's been done on me; news articles; you know, people sharing my things. You know, how does -- how does one get followers? I mean, there's -- there's many ways.

Q Do you -- do you know what a click farm is? Do you ever subscribe to those?

A No.

Q Do you know if any of your followers are a part of click farms?

A What's a click farm?

Q Do you know what a click farm is?

A No.

Q Do you know if all of your followers are actual people? That's my question.

A I would assume there's a percent that is not; but due to my engagement, I would say that I actually

| Page 91 | Page 92 |
|---|---|

**Page 91**

have more followers than is listed because I'm getting 42, 43 million views of video, and I've got 32 million followers. And The Rock's got 200 million followers, and he's getting 5 to 10 million. So I'm getting, you know, three to four times the engagement that he has, and I have, you know, less technical followers.

I think everybody's got a bunch of bought followers. I mean, if you look at Nike's account, they have 107 million followers. Ignite gets better engagement with 3 million. So I would say I'm probably the only guy that has a real account right now. Everybody else has bullshit accounts with bought followers. So I would say mine is overrepresented.

Q Do you know if most of your followers are athletes or non-athletes? Do you have those demographics?

A The Instagram doesn't tell you if your followers are athletes.

Q Okay. How do you decide which Instagram accounts you're going to follow?

A I mean, if the content is interesting to me, if I've got a relationship with that person, maybe.

Q We've already talked about Ignite. You're the CEO, and you promote ZRO. So it's no surprise you follow both Ignite's Instagram account and Ignite's ZRO

**Page 92**

page. Is that right?

A That's correct.

Q Do you have any input or involvement into Ignite's Instagram pages?

A I run the Ignite Instagram page.

Q What does that mean?

A That means I control it, and I post on it.

Q So if something gets posted on an Ignite page, you physically do that?

A On the Ignite page, not the affiliate pages, like ZRO or Ignite UK. I don't have access to those accounts.

Q Okay. Do you know who has access to the Ignite ZRO page?

A I don't.

Q Have you ever interfaced with anybody at Ignite with respect to posting on the Ignite ZRO page?

A I wasn't never really worried about that account too much, nor was I really worried about Ignite ZRO. We haven't really focused on that too much.

Q Right. But do you recall ever interfacing with anybody at Ignite for the Ignite ZRO Instagram page?

A Define "interface."

Q Talk to, communicate, collaborate.

A On -- for Ignite ZRO posts, no, not really.

23 (Pages 89 to 92)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 93

Q Is it your testimony you've never talked to anybody at Ignite about an Ignite ZRO post, or you just don't recall?

A I don't recall consulting --

Q Is it possible?

A -- about an Ignite ZRO post. I never cared about that account.

Q Okay. Have you seen the Ignite ZRO account page?

A Yes.

Q And you've seen the posts on that page?

A Wait, wait. Hold on. Your -- your connection broke up. What?

Q Oh. You've seen the Ignite ZRO posts that were posted on the Ignite ZRO page, all of them, right?

A No, I don't think I've seen all of them.

Q When's the last time you looked at the page?

A Maybe six months ago.

Q Would you agree with me, sir, that Facebook is probably the most powerful social media --

MR. McCOY: Form.

BY MR. STEARNS:

Q -- around?

A I would say Instagram is.

Q Okay. I'm going to go ahead and mark

Page 94

Exhibit 4.

(Exhibit Number 4 marked for identification.)

MR. STEARNS: Sarah, can you send Kim and Kevin premarked Exhibit 9?

Do you still have to go in 15 minutes, Kim?

MS. STEIN: Yeah, if that's okay. I think that would be a good time as well.

BY MR. STEARNS:

Q Okay, sir. I'm going to show you Exhibit 4. On the bottom here, there's a little number, Blitz 000032. Do you see that?

A I don't see any 00.

Q Down here at the bottom.

MS. STEIN: I don't see it either, Jason, just to let you know. Maybe make it smaller because I think that's the problem. There you go. Thanks.

MR. STEARNS: Can you see it now?

MS. STEIN: Yeah.

BY MR. STEARNS:

Q Okay. Do you see that, sir?

A Yeah. I mean, I see the text messages. "Just checked, it's over nine minutes."

Q Do you recognize this as a text between you and Jason Huh?

A Yep.

Page 95

Q Very top, it says, "Facebook is powerful because of its shareability and links." Do you see that?

A Yep, I do.

Q And that's what I was getting at. I mean, is that -- is that true? I mean, is Facebook powerful because of shareability and links?

A Well, this was probably a conversation from 2017, which is -- you know, Facebook was a lot more powerful back then than it is now. I believe Facebook has declined, and I think Instagram has taken over.

Also, back then, you couldn't share on Instagram like you can share now. So if you're trying to, like, catch me in what I said, I mean, you're using old texts. So back then, I would say Facebook, you know, was a pretty powerful platform; and, like I said, the shareability was stronger on Facebook than it was on Instagram. Now I'd say the opposite is true.

Q Right. And just so you know, there's nobody trying to catch anybody in anything. I just -- I just want to know what you think, and so that's why I asked you about that text.

A Okay.

Q So your testimony, sir, is that in 2017 Facebook was a pretty powerful social-media platform,

Page 96

but it's declining; is that fair?

A That's accurate, yes.

Q Okay. All right. You often will appear on podcasts; is that true?

A I would not say "often." I hadn't done any in about two or three years, but recently I've done a few.

Q Did you recently do one with The NoteBoys?

A Yes.

Q That was on September 30th of this year?

A If you say so. I don't remember the exact date, but that sounds right.

Q So I've got a title of it. It's -- when I pulled it up it says "Dan Bilzerian on Dating 50 Girls at the Same Time and Fraud Accusations." Does that sound right?

A Yes.

Q Did you come up with that title?

A I did not.

Q What was the fraud accusations?

A With respect to, like, the YouTube videos; Curtis Heffernan, you know, whistle-blower nonsense.

Q And did you talk about the Curtis Heffernan and whistle-blower nonsense during that podcast?

A I believe I did, but I don't recall exactly what was said.

24 (Pages 93 to 96)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 97

Q   What is Blitz TV?

A   Blitz TV was something that we started -- I don't know -- around five years ago, maybe.  It was -- it was supposed to be where you pretty -- you know, you could put content on there, and basically people would pay to subscribe; but what we learned pretty quickly is that it's very difficult to get people to pay for content when there's so much free content out there, so it was pretty quickly abandoned.

Q   So is it fair to say that Blitz does not currently use Blitz TV as a sort of going concern?

A   Yes, that would be accurate.

Q   You've been referred to as a social media influencer; is that fair?

A   Yes.

Q   And what would you say a social media influencer is?

A   Somebody that has social influence due to social media.

Q   And -- and a social media influencer will post typically to promote or endorse a product, right?

MR. McCOY:  Form.

A   I mean --

MS. STEIN:  Join.

A   -- sometimes, yes.

Page 98

BY MR. STEARNS:

Q   Well, and that's what I'm saying, right?  I mean, you market yourself as a social media influencer to get paid to promote products; is that true?

MR. McCOY:  Form.

A   Not really.  I turn down more money than I accept.  I just got offered $3 million to promote a cryptocurrency, and I said no.  So, I mean, I get offers a lot, and you don't see me doing very many ads.

BY MR. STEARNS:

Q   You were a social media influencer for STEEL, correct?

A   I don't know what you -- I mean, yeah.  I mean, I don't know if that was defined in the contract or what; but, I mean, sure.

Q   What about Alister?  Is that how you say the name, Alister?

A   It was Alister.  That was -- that was, you know, a soap and shampoo company, but that doesn't really have anything to do with this.

Q   Fair enough.  Were you a paid social media influencer for Alister?

A   No.  No, I just had equity in the company.

Q   So you would post for Alister using your social media platforms to raise the awareness on the brand to

Page 99

increase the value of the company, yes?

A   Yep.

Q   Okay.  Is Alister still a going concern?

A   I don't think they're -- I don't think they're going anymore.  The deal I cut with them was that they were supposed to get brick and mortar, and I was going to do the promotion if they got brick and mortar; and then they wanted to rely on me to basically promote the product, and so the deal kind of fell apart because if they had gotten the brick and mortar, then the deal would have been fine, giving me 30ish percentage.  But if they wanted me to carry the whole brand on my back and, you know, promote it just through my channels and they weren't going to have it, you know, as a point-of-sale item, then it didn't make sense.  So when they failed to get shelf space, the deal fell apart.

Q   Have you ever used the phrase "organic" -- or the word "organic" when referring to social media posting?

A   Yes.

Q   What does that phrase mean when you use that word?

A   When I use it, it means that it's a post that somebody would make because they believed in a product, not necessarily because they were being paid to promote

Page 100

a product.

Q   So is it your intention when making an organic post to make the consuming public not realize that you're being paid to promote a product?  Is that your focus?

A   I wasn't being --

MS. STEIN:  Form.  Hold on, Dan.  Form.

A   I wasn't being paid to promote the product.  I had 10 percent of gross in perpetuity whether or not I promoted or not, so I wasn't technically being paid to promote.

BY MR. STEARNS:

Q   So your testimony, sitting here today, is that the STEEL agreement -- you understood that under the STEEL agreement you didn't even have to post a single time, and you would get paid forever.  Is that what your testimony is?

MR. McCOY:  Form.

A   Not that --

MS. STEIN:  Join.

A   -- that I didn't have to post a single time, but there were no posting requirements.  It wasn't directly correlated to what I would get paid.

Typically, when, you know, an influencer does a deal with a company, they'll get paid, and they'll have

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 101

to post a certain amount of times, and their posts will be directly correlated to how much money they get paid.

I had a different deal. I was offered 40 percent equity in the company, and I turned it down for 10 percent in gross in perpetuity and -- you know, so I basically took a big risk because I did a bunch of posts in the beginning for peanuts, hoping that I would build value in the company and then later on down the line get, you know, fair compensation, and that's what happened.

I built, you know, Jason a, you know, $100 million business or billion-dollar business, however you want to value it.

BY MR. STEARNS:

Q So let's break that up. The last thing you said was you built Jason a $100 million business. Is that what you said?

A Initially, and I think it's probably worth more like a billion now.

Q Your testimony is that you, Dan Bilzerian, are responsible for the growth of STEEL. Is that what you think?

A Absolutely.

Q Okay. And we'll come back to that in a little bit.

Page 102

A I mean, all you have to do is look at their sales, right? I mean, they were doing 200K a month, 300K a month; and then I did a post, and you know, we got to 900,000. We got to 1.2 million. It was directly correlated to my post. In fact, I shut their website down for two days, so -- and they had no other influencers on board at the time, so there's -- you know, it wasn't like, you know, some random coincidence that when I started posting, the company five X'd.

Q So, again, we'll -- we're going to get to that, sir. I want to break down one of your other points that you made in your answer.

With respect to organic posting, which is what I was asking you about -- and I wasn't even speaking about STEEL. Just generally, your definition of an organic post is that -- that consumers -- and I might misstate it. Well, just say it again. I don't want to misstate it.

What's an organic post in your words?

MR. McCOY: Form.

MS. STEIN: Join.

A An organic post would be a post that somebody would do on their own because they believed in a product.

BY MR. STEARNS:

Page 103

Q Okay. And whether you're getting paid or not, you agree with me that you always understood organic posting in your view was the most effective; is that right?

A Yes.

Q And you would post organically to -- to portray to the consumers that you just like a product, and you're not doing it because you're getting paid; is that right?

MS. STEIN: Object --

MR. McCOY: Form.

MS. STEIN: -- to the form.

A So, yes. Once again, when I said an organic post is something that somebody would do because they believed in a product, not necessarily because they were getting paid.

So, you know, I posted products that I believed in and they did better than, you know, "@y" posts. An "@y" post would be something with a big, you know, "@" sign like "@steelsupplements," you know, whatever. That would be, you know, more of an "@y" post.

BY MR. STEARNS:

Q Did you ever disclose when you were posting about STEEL that you had a financial interest in STEEL?

A Posts to who?

Page 104

Q Anybody. And I'm sorry. Maybe you didn't hear the question.

Did you ever disclose while posting about STEEL, right, so you're -- whoever is going to see the post, that you had a financial relationship with STEEL?

A Well, that, by definition, would kind of like make it more of an "@y" post, right? Like, "Hey, I have a percent of this company. Come buy it." Is that what you're saying? No, I obviously didn't do that.

Q So you would post for STEEL about STEEL products and never disclose the financial relationship with STEEL; true or false?

MS. STEIN: Objection to form.

MR. McCOY: Join.

A I just -- I just told you, no, I did not include in my posts that I have a financial interest in STEEL.

BY MR. STEARNS:

Q Have you ever been contacted by any regulatory authorities regarding the manner in which you post on social media?

A No.

Q Never received any complaints?

A No, because -- no. The regulation is based on if you get paid for a post and you don't do the #@ or

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 105

whatever. And so I wasn't being paid for the posts. I had, you know, a piece of the company, so it's -- you know, it's different.

Q You're saying that you owned equity in STEEL?

A 10 percent of gross in perpetuity, which is equivalent to equity.

Q All right. We'll get to that in a second.

MR. STEARNS: Kim, you want to take a break?

MS. STEIN: Jason, yeah. But can you please stop interrupting him? You don't let him finish, and then it's probably going to cause the court reporter heartburn as well; and she's shaking her head, but you guys keep interrupting.

MR. STEARNS: Yeah, I'll certainly try to do better. It might be a glitch on the timing --

MS. STEIN: Yeah.

MR. STEARNS: -- like you just did to me.

MS. STEIN: It could be --

MR. STEARNS: Yeah, I don't think it's intentional. I think there's the timing of the video, but I'll certainly -- I'll certainly try.

Did you need to take a 30-minute break, Kim?

MS. STEIN: Yeah, if that's okay with you because I got to deal with this and then -- so we can come back at 12:30 our time, which is 3:30 your

Page 106

time.

MR. STEARNS: Sounds good. See you then.

MS. STEIN: Thank you.

THE VIDEOGRAPHER: Off the record 2:59 p.m.

(Recess taken from 2:59 p.m. to 3:31 p.m.)

THE VIDEOGRAPHER: On the record 3:31 p.m.

BY MR. STEARNS:

Q Mr. Bilzerian, are you -- are you ready to proceed?

A I am.

Q Okay. We were talking about social media posting before the break.

A Uh-huh.

Q I'm going to ask you a few more questions about that.

Is it true that you are (inaudible) --

THE COURT REPORTER: Wait, wait. I'm sorry. You said, "I'm going to ask you a few more questions about that. Is it true that you are" --

BY MR. STEARNS:

Q -- meticulous in the way that you prepare your -- your posts when you're endorsing a product?

MS. STEIN: Objection to --

A Yes.

MR. STEARNS: -- form.

Page 107

A Yes, I am extremely meticulous. I'll sometimes record 50 to 100 videos before I pick one.

BY MR. STEARNS:

Q And what is it about the post that will cause you to jettison the post and redo it? Like what is it that you're trying to do?

A I am trying to -- you know, it just depends on what I'm trying to communicate. I want to communicate in the best way possible. I want to, you know, show the product. There's -- you know, there's a lot of different ways you can say something; so, yeah, a lot of factors.

Q Fair to say that if you watched a draft post -- I'll call it a "draft post," but you know what I mean by that?

A Yep.

Q Like a post that you make before you actually upload it and post it, you review it before you post every -- every post?

A Yes.

Q And if something -- when you review the post, if something is in the screen or out of place, you'll catch those? That's an attention to detail that you have, right?

MR. McCOY: Form.

Page 108

A Yeah, I mean, some -- I don't know. I mean, it's not so much about like where stuff is placed. It's more just how I communicate the post. Is it clear? Is it concise? Could I say it better? How's the lighting? You know, there's just a lot of -- a lot of things.

BY MR. STEARNS:

Q And how did you learn how to do that? Just in practice over time?

A Yeah. I mean, I -- it's -- you know, I just do what I think is, you know, going to translate the, you know, the most sales or, you know, most highly beneficial.

Q To your knowledge, does every social media influencer agreement that you currently have run through Blitz?

A I don't know.

Q Okay. If you know, how much time would you say you spend on an average month with social media influencing?

A It's -- it really depends. Like when I was writing my book, not a lot. When I was doing STEEL/Ignite, a decent amount. It's, you know, fluid. It changes. It also depends on if I'm traveling, if I'm around a bunch of girls, you know, if there's good content. There is, I would say, a lot of factors.

888.909.2720        Anthem Reporting        813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 109

Q You said when you were writing a book, not a lot. When did you write your book? Is that "The Setup"? Is that the book you're referring to?

A Yes.

Q When were you writing that book?

A I believe I started in 2019, maybe '20.

Q When in --

A What's that?

Q Oh. I didn't mean to speak over you. Do you recall when in 2019?

A Yeah, I think it was either the end of '19 or early '20. I'm not sure.

Q When did you complete the book, if you remember?

A I believe it was about three months ago, maybe.

Q So from end of 2019 till about three months ago, fair to say that the book consumed the lion's share of your -- of your time?

A Yes.

Q And you didn't do any -- you didn't do as much social media endorsement as you would have otherwise done outside of that window?

A Yeah, I didn't do as much posting in general.

Q Do you recall when you were -- during that time period from the end of 2019, roughly, until about three

Page 110

months ago, how many hours a day would you work on your book?

A It -- it varied, but I would say 16 hours a day.

Q Would you work every day, seven days a week, if you could?

A Pretty much.

Q Okay. In the -- you made a comment, and I didn't really catch it. You -- when I asked how often or how much time you spent posting, you mentioned the book, and then you said something about STEEL and Ignite, and I didn't follow what you were saying.

A Yeah, I said back when -- when I was doing that, I was posting more, so...

Q What do you mean by that, back when you were posting for STEEL and Ignite?

A Well, before they weaseled out of the contract or tried to sue me or whatever it was that they did, I was -- you know, that was a -- that was a main priority was STEEL and Ignite.

Q So what does that have to do with Ignite?

A It doesn't. Those are the two priorities. You asked about social media postings. Those were the two companies I was posting for.

Q No, I was wondering when you said you -- back

Page 111

when you were posting for STEEL and Ignite, you posted more. Are you still posting for Ignite?

A I am.

Q Okay. And at some point, because you said "back," so at what point did you stop posting more frequently for Ignite?

A I would say around the COVID time. I mean, there was less content, less ability to post. Everything was shut down, the masks, the this, the that. So it became difficult to, you know, really promote for, you know, anything.

Q Going back to your use of the word "organic," fair to say that when you post or promote a product, your objective is to make it organic every time? Yes?

MS. STEIN: Objection to form.

MR. McCOY: Join.

MR. STEARNS: What's the objection to form?

MR. McCOY: What product are you talking about? Vague. I mean, are you talking about every post ever made that had nothing to do with products? Products? A specific product? A STEEL product? An Ignite product?

MR. STEARNS: Yeah, fair enough.

MR. McCOY: A bodybuilding supplement? A non-bodybuilding supplement?

Page 112

BY MR. STEARNS:

Q Okay. So, Mr. Bilzerian, when you post for any product at any time, is it your objective to make it organic?

A No.

Q So are there times that you post for products where the objective is to make it nonorganic?

A Yes.

Q And when are those times?

A When I post, like, the Ignite vapes. And it's a line of six vapes. I would say that would be a very nonorganic "@y" post.

Q Okay. When you would endorse or promote the Ignite ZRO product, would those be nonorganic or "@y" posts, or would they be organic posts?

A I think I promoted Ignite ZRO two to three times, total, and so one of them, I believe, was pretty "@y." I had the can held up like that, and then there was two other posts, I believe, that I did that were organic, but that was -- that was it, you know, three posts or maybe four posts. I don't know, but it wasn't a lot (inaudible) --

Q When you refer to --

THE COURT REPORTER: I'm sorry. Wait. "Three posts or maybe four posts. I don't know, but it

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 113

wasn't a lot." Then he said, "When you refer to," and then what did you say?

A And I said not compared to STEEL, not compared to how many times I posted for STEEL. It was very minuscule what I did for Ignite ZRO.

BY MR. STEARNS:

Q The organic ZRO post that you're referring to, are those the ones where you would just see the Ignite ZRO can in the background in various spots in your house?

A Yes. I believe there was two of those.

Q Okay. That's an example. Those would be examples of an organic post, though, yes?

A That would be organic, yep. It's not really calling attention to the product. It's something that's just naturally there. It's -- yeah, I would say that that would be organic.

Q But it was still nonetheless an intentional act on your part to promote ZRO, yes?

A Yes.

Q Now, again, using your use of the word "organic" and your methodology for posting as an influencer, is there any kind of a benchmark or protocol for how often or frequent one -- you should post?

A So, you know, I talked to Jason about this, and

Page 114

this is what we discussed when we, you know, initially did our deal was that I would do, you know, organic stuff in the beginning; and then we would announce our partnership, and then I could go and do more, you know, "@y" posts. I could, you know, more openly associate with the brand. And I kept asking Jason like, "Hey, you know, can I buy in the company? Can I, you know, do something? Like, you know, do you want to announce so then I can post, you know, more frequently?"

And he kept pushing -- pushing it off, so I actually actively tried to do more posting for STEEL, but you can only do so much where it's organic before you have to -- I mean, I wanted to announce and let people know, "Hey, I'm investing in STEEL. I'm a part of STEEL," whatever, and then that way I could post more frequently; but Jason, you know, kept pushing that off.

Q Is it your testimony that Jason Huh told you not to post about STEEL?

A That's -- are you listening to what I said?

Q No, I'm just asking for a clarification, sir. You're not saying that Jason Huh told you not to post about STEEL, correct?

A No, I did not say that.

Q And, in fact, Jason Huh would repeatedly ask you to post about STEEL; isn't that true?

Page 115

A He did ask me to post.

Q Frequently he would ask you, yes?

A And I told him -- I said, "If you want me to post more frequently, let's do what we said initially and let's announce that I'm a partner with STEEL so that I can do this, and it doesn't always have to be organic."

Because if it's going to be organic, it has to be, by nature, less frequent, because some guy's not just going to post STEEL supplements, you know, all the time if he's not getting paid or he doesn't have some kind of monetary incentive. So I did it, and it was really supposed to be more front-loaded.

I mean, I got him an email list. I got him the ability to retarget these customers. I mean, if you look at when I did the posts, and from the time I started posting, his sales skyrocketed. And they skyrocketed not just because of my post but because of the traffic that I drove him that he was then able to retarget; and because of those emails lists that he accumulated, that he was, you know, able to re-, you know, blast these guys over and over again for sales, et cetera, et cetera.

So, you know, the benefit that I gave Jason was multifaceted, and it lasted, you know, far longer than

Page 116

the posts. Those email lists are going to live on forever, and those are extremely valuable, not to mention, you know, all of the traffic that I sent to his site that he picked up on a pixel that he can then, you know, retarget.

And it's been proven that when people see an ad more than once, that, you know, they're much more likely to buy the third time.

And so what he would do is he would use my likeness and run paid ads and then people would see my posts multiple times, they'd retarget them, and it translated to sales.

Q Okay. Going back to my original question, though -- and this wasn't STEEL specific. This was a general question.

To make a post organic, do you have a rule of thumb with respect to how frequently you can post and it still appear to be organic and not --

A It has to feel organic by definition.

So for me, if it's a natural time, if it's something that I'd normally do, then I would do it. And I tried to do it as frequently as I could, you know, based on, you know, an affiliation I had with Jason.

I would tag Jason. I would promote him personally. I would, you know, tag other athletes that

29 (Pages 113 to 116)

888.909.2720       Anthem Reporting       813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

Page 117

were affiliated with STEEL. I would get people to -- you know, other celebrities to post for STEEL for free. You know, there was many things that I was doing behind the scenes beyond and up and above, you know, just the posting that I was doing.

So, you know, when I tagged Jason and he gained followers on his personal account, then he was able to utilize, you know, that new following to, you know, then convert them to sales as well. And when I promoted other STEEL athletes, like Robert Frank, and did training videos with him, then, you know, he was also able to, you know, convert that new traffic.

So it wasn't just from the posts that I did. It was, you know, my promotion of other athletes, including Jason himself.

Q Did I hear you say earlier that you wanted to post more frequently, but you wanted to have a financial stake in the company or an ownership interest before you did that? Did I hear that correctly?

A No. What I told him was that if we were going to, you know -- okay. So we agreed that initially it was going to be the organic posts; and then after a bit of time, that we were going to announce that I was, you know, investing in STEEL and that we going to be partners and that, you know, then I could, you know,

Page 118

post much more frequently because it was -- you know, it was public knowledge that we were associated.

So I just didn't want to, you know, do a ton of posts where it didn't -- you know, it was like we're pretending like I'm not affiliated. I just -- I wanted to announce it. Like you had said earlier, you know, I wanted to let people know; but, you know, he was -- you know, he just dragged his feet with it, so there's nothing I could do about it.

Q Well, I'm confused because you -- you were affiliated with STEEL. You had actually a sponsorship and affiliate agreement with STEEL?

A No, I didn't.

Q Blitz didn't have an agreement with STEEL since April of 2017?

A I mean, we -- I had 10 percent of gross in perpetuity. I didn't have, you know, an affiliate sponsorship. I had a piece of the company. So what I wanted to announce is that I had invested in STEEL and that I was, you know, an owner in the company, and that's what Jason agreed initially.

He said, you know, "We'll just announce that, you know, you bought -- you know, you've invested in STEEL."

And it could have been, you know, a half a

Page 119

percent. It could have been, you know, a tenth of a percent, just something where I'm investing in STEEL. I could tell people, "Hey, I own a piece of STEEL. I've invested in it. I believe in this company," and then I could more actively promote without it, you know, coming across as being, you know, unauthentic.

Q So when you asked to buy an equity interest in STEEL and Jason rebuffed your offer, were you just not posting to sort of force him to the table? Why would you just stop posting during that conversation?

MS. STEIN: Objection.

A I didn't.

MS. STEIN: Hold on. Objection, form. Argumentative.

MR. McCOY: Join.

A I didn't stop posting.

BY MR. STEARNS:

Q But -- okay. So back to the original question then for organic posting. Would it be -- would it be fair to say that posting at least once a month could still -- is still organic? There's nothing unorganic about that or nonorganic about that?

A That would not be fair to say.

Q Because in the initial stages of your relationship with STEEL, you posted more than once a

Page 120

month, right?

A No, I didn't.

Q You didn't?

A Nope.

Q Okay. How about once every two months? Is that still organic?

A I mean, it's organic if it feels organic. I mean, most people don't promote, you know, products that they're not getting paid to promote very frequently. I mean, it's an infrequent thing, and that's what makes it organic.

So, by definition, if you're promoting something a bunch, then it's not going to feel organic because who the fuck is just going to promote some product that he doesn't have a piece of over and over and over again? That was my issue, and that's why I wanted to announce that we were -- had a partnership.

Q Do you recall telling Jason Huh that you didn't want to announce to the public that you were affiliated with STEEL?

A Do I remember saying that I didn't -- I -- I actively asked him on numerous occasions to announce to the public that I was involved in STEEL, and that's why I wanted to, you know, buy a tiny piece or let people know that I was investing in the company.

30 (Pages 117 to 120)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 121

Q  Did you ever tell Jason Huh you did not want the consuming public to know that you had a financial interest in STEEL?

A  I don't remember that conversation.  If I said it, maybe it was early on, because I said organic might do better.

Q  So you're saying that you might have said it; you just don't recall?

A  I don't recall.

Q  Okay.  I'd like to talk about bodybuilding. I've seen your posts.  You appear to be in shape.  Fair to say you are somebody who works out?

A  I do.

Q  What kind of training or experience in bodybuilding do you have?

A  I mean, I've been lifting weights for 24, 26 years.

Q  I understand you're prior military as well?

A  Yes.

Q  Navy?

A  Yep, four years in the Navy.

Q  When to when?

A  April of '09 or -- April of '99 until April of '03.

Q  I was Navy January of '98 to '04.  I think we

Page 122

missed each other, though.

A  Wait.  Oh, you were?

Q  Yeah.  During the time in the last 24 to 26 years, fair to say you've used bodybuilding supplements during that time?

A  Yes.

Q  And which ones?

A  Primarily protein.

Q  What else?

A  I've used prohormones before, and I've used steroid.  I mean -- well, I've used steroids, but that -- I wouldn't really consider that a -- well, I mean, I don't know.  I guess that could be a bodybuilding supplement.  I guess it depends on how you define it.

When I think supplements, I think of something, you know, over the counter.  So as far as that, I would say just the protein is pretty much the primary one of -- like I said, I did some prohormones before, but that's about it.

Q  Preworkouts?

A  Not really.  I mean, I tried them here and there, but it definitely wasn't a staple.

Q  But you're familiar with preworkouts, yes?

A  I am.

Page 123

Q  Do you know what the active ingredients in a preworkout are?

A  Well, I believe they vary.

Q  Right.

A  Like the ones that Jason was selling, I think they had an illegal ingredient that was very gray area; but it, you know, in the Amped, it was something that -- you know, it was similar to a methamphetamine, and that was, you know, what he said was going to, you know, kind of drive people to use his over other products was because this is a semi-illegal ingredient and that it worked very well.  So I don't remember what it was, but it was some sort of an amphetamine.

Q  You're not testifying that Jason -- that STEEL's products are illegal to sell, are you?

A  Yes.  I believe the initial amphetamines that he was using in there are now illegal, and I think at the time they were a gray area.

Q  Have you taken all of Jason's STEEL products or the STEEL --

A  No.

Q  -- products?

Have you taken Focus AF?

A  I don't believe so, but I don't recall.  I don't think that I have.

Page 124

Q  I'm going to refer you to Exhibit 4.  I'm going to share my screen.  Can you see -- I think it's the wrong picture.  Hold on.

Do you see what's on my screen, sir?

A  I do.

Q  Is it a picture of you, and then it says "Blitz 181" on the top?

A  Yep.

Q  Okay.  So we're looking at Exhibit 4.  This is that text message thread between you and Jason.  Do you recall that?

A  Okay.  He's supposedly in bed --

Q  Well, what I was going to ask you -- and I can scroll up or down if you need context --

A  Okay.

Q  -- do you see here, there's a picture of you on the right?

A  Yep.

Q  And then you say, "Which one?  They are different," right?

And you start talking about nootropics, or you write "neurotropic," and you see Jason responds, "Yes, sir, there was a blend of neutropics in it that are like nothing else out.  No one can compare to our blend."

Do you see that?

31 (Pages 121 to 124)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)　　　5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 125

A   Yep, I do.

Q   Do you know what that conversation is referring to?

A   When was this?  What -- what year?

Q   There was 2017.  I'm going to scroll up to -- I'm on page 180 of Exhibit 4.  You see at the top it says "May 10, 2017"?

A   Yeah.

Q   These go chronologically.  That's on that day.  I will just tell you we can scroll down, but you can see it starts there.  I'm going to scroll down.

A   Okay.

MR. McCOY:  Can you scroll so I can read what we've got going on on this page?

MR. STEARNS:  Sure.

A   Okay.  "There's a point where I have to just align with STEEL."  Hold on.  There it is right there.

"There is a point where I have to just align with STEEL and promote it.  I'm feeling like it may have to be in the next post.  I'm just going back and forth on whether it's better to post a commercial before I do."

So there you go.  That's back in 2017.  I'm telling him that I want to align with STEEL so I can let people know that I'm affiliated.  You literally have

Page 126

proof right there.

BY MR. STEARNS:

Q   Mr. Bilzerian, this was March -- this was May of 2017, right?

A   Yeah, so I'm telling him from the very beginning that I want to be -- I want to be affiliated with STEEL so that I can promote them more.  So it's not like I'm making this up.  I said it back then.

Q   Understood, but you just signed the contract with STEEL two months or three months earlier, right?

A   Uh-huh.

Q   Yes?

A   I mean, I don't remember when -- when the contract was signed.  I did -- I did a post before it was signed, I believe, and I shut down their site for two days.

Q   The post was -- the agreement was dated March 7th, to be effective April 1, 2017, right?

A   I don't -- I mean, if that's what you're saying it is, then I'm assuming that is.  I don't remember.

Q   We're talking about a text message in May of 2017 where you're telling Jason from STEEL, "I need to align with STEEL to promote it," right?

A   No.  I said, "There's a point where I have to just align with STEEL and promote it.  I'm feeling like

Page 127

it may have to be the next post.  I'm going back and forth."

So "the next post" being a few months, and then after that, I, you know, would have to align with STEEL.  So, you know, after like six months or so, I figured it would be good to align with STEEL.

He wanted to keep the organic posts rolling because they were so effective, so that's what we did; but you can see there early on, I'm saying that I wanted to align with STEEL, which is counter to what you're trying to, you know, tell me I said, and I'm, like, looking at proof right here.

Q   Okay.  And when you say "align with STEEL," you mean have an equity interest in STEEL, yes?

A   I was --

MR. McCOY:  Objection.  Hold on.

A   Oop.

MS. STEIN:  Objection, form.  Misstates prior testimony.  Document speaks for itself.

A   When I say -- when I say "align with STEEL" it means to let people publicly know that I'm aligned with STEEL.  And the best way that I thought to do that would be to, you know, invest a small amount of money and get some kind of equity interest and tell people that, "Hey, I invested in STEEL.  I believe in this company."

Page 128

Going forward, the posts could be much more frequent and less organic.

BY MR. STEARNS:

Q   Okay.  And just to have a simple question and answer on the transcript, it's a true statement that you're telling Jason Huh in May of 2017 that you need to have an equity interest in STEEL to promote it?

MS. STEIN:  Objection.  Asked and answered.  Form.

A   No, it's -- it's not asked and answered.  He's making up testimony.  That's not what I said.  It's literally -- you can see what I said.  It's literally right there.

I said there is a point where I have to just align with STEEL and promote it.  So I'm saying at some point I need to align with STEEL so that I can just promote it and I don't have to consistently come up with these organic posts, which as time goes on becomes more and more difficult to do.

BY MR. STEARNS:

Q   You, sir, could have just promoted STEEL without announcing that you have an ownership interest in STEEL, yes?

MR. McCOY:  Form.

MS. STEIN:  Objection, form.  Argumentative.

32 (Pages 125 to 128)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 129

MR. STEARNS: It's not argumentative. It's a simple question. I mean --

MS. STEIN: It is, Counsel.

MR. STEARNS: -- I disagree.

MS. STEIN: I'm not going to argue with you over my objection.

MR. STEARNS: Please don't.

MS. STEIN: I'm going to object and instruct him to answer, so thank you.

MR. STEARNS: Kim, please don't, then.

MS. STEIN: I have to object, Counsel, and you don't need to comment on my objections. We can let a judge rule later.

I objected. I then told the client he can go ahead and answer. You felt the need to comment further. I'm not going to continue to argue with you. I'm allowed to make my objection, which I have done.

MR. STEARNS: Are you done?

MS. STEIN: Thank you. Are you?

BY MR. STEARNS:

Q Mr. Bilzerian, true statement, right, you could have posted for STEEL without announcing a public relationship with STEEL?

MS. STEIN: Same objection.

Page 130

MR. McCOY: Join.

A I mean, I don't -- I don't understand what you're trying to get at. I could -- I could -- I could do two types of posts. There's organic posts, and there's nonorganic posts. Organic posts can happen less frequently because, by definition, they're organic, meaning that they would just come about naturally. People don't naturally promote products very frequently; however, if you align with a brand, you can promote it more often because, you know, people expect that. And so I wasn't just going to, you know, not tell people that I was aligned with STEEL and just promote it all the time. That would be very weird and unauthentic, so I either wanted to do natural organic posts that I would do otherwise because I believed in the product or I wanted to announce to people, "Hey, I'm investing in STEEL. I believe in this company," and then, you know, they would expect to see posts frequently with me promoting a product that I invested in.

BY MR. STEARNS:

Q Right. And do you know, sitting here today, whether the contract that Blitz entered into with STEEL that's the subject of this litigation made a distinction about your performance being organic or inorganic or anything? Did that distinction -- was that disclosed in

Page 131

the contract?

A It specifically said that there was no performance requirements, that I didn't have any posting requirements. And the reason that was stipulated in there is because that's how I've done all my contracts because in these agreements, what you do is you promote early, and you can do it more frequently early; and then, you know, that's when you generate the most, you know, benefit for the -- for the business.

Because then they get the email list. Then they get to retarget that traffic. They get those buyers. Those buyers then refer new buyers, and it's a snowball effect. And so, you know, you do more initially; but, you know, you don't just post every single month without announcing that you're a partner. It's just going to look weird.

I mean, I don't do a lot of promotion in general, so for me to just consistently promote a product that I don't have a direct affiliation with would not seem, you know, organic or authentic or anything. So, you know, that's why I stuck it in there.

If Jason wanted a post every month, then he should have asked for that in the contract. In fact, he did ask for that, and I said no. I said no because I didn't want to do a post every month.

Page 132

What I did was effective. I grew his business from doing $200,000 a month to over 5 million a month. So I did what I was supposed to do, okay? It didn't need to be once a month, and in fact, I'd argue that if I did it once a month, it would have been counterproductive. I did what I did, and it worked.

So, you know, if he wants to use that and, you know, say "Oh, well, he didn't, you know, promote enough" or "he didn't do enough," then he should have stipulated what he thought that I should do, which is what he did, and I said, "No, I'm not going to post that much."

I mean, it was very clear. If he -- if he wanted a minimum amount of posts, he should have just stuck that in the contract, but he trusted on my best judgment, and accurately so, because now he's driving a Rolls-Royce and making 5 million a month because of my posts. So what I did worked.

Q Do you recall the contract saying that you had to post to the best of your ability?

A Yeah, and I did post to the best of my ability. If you want organic posts, I posted to the best of my ability.

If he was willing to announce that I was partnering with him, which is what we discussed from the

33 (Pages 129 to 132)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 133

very beginning -- and you saw that back in 2017 -- then I could have posted more frequently.

Q But that's what I was trying to get at earlier, and I asked you, right, for an organic post to be effective, what's the frequency requirement or the limitations, and you said, "It's whatever I feel." You said it's infrequent.

A Yeah. It's infrequent by definition is what I said --

Q Right.

A -- because it's organic, and organic is by feel. I mean, that's -- I mean, look it up. Organic, it's natural. I mean, you don't naturally post something.

I mean, look at -- on your social media, do you naturally post what coffee you drink every fucking month? Like do you post what protein you take every single month? Do you post that on your social media? Do you do ads for a company that's not paying you every month? Do you do that? Do you see anybody doing that?

Q So -- but that's what I'm trying to understand, because the Court is going to have to look at this contract, Mr. Bilzerian, and the Court's going to have to make a judgment as a matter of law, what do these words mean? And I want to know what your understanding

## Page 134

of these words mean.

A I mean --

Q What it says -- hold on, sir. I'm still talking. The court reporter is going to -- and so this is really tough. There's a couple of things going on. We've got a couple of really Type A, aggressive personalities in the room. We've got video and -- and internet connections with delays, and then you've just got a bunch of people excited to tell their story. And as a result of that, Bev has admonished us multiple times, and I can see her shaking her head now, right?

I do it, too, and I don't mean to, but I will interrupt you at times, sir. And some of that is, I think, when you're answering a question, you might stop talking and pause, and I think you're done, but you're still going to keep going. So that's going to happen, but I'll try to stop.

When Ms. Stein objects -- hopefully, to form and she lodges her objection -- you can then answer. But it's going to be really tough, and we'll do our best to not talk over each other. But I don't know if you were done with your answer or if you even know what the question was, sir, but I -- I have a question. It's up to you.

MS. STEIN: And I'm going to ask you, Jason,

## Page 135

actually for me, if you could repeat the question, and then I want to do an objection. So I need -- you know, Dan, I need you to -- and that's what I was trying to have him stop because you guys are talking over each other.

THE WITNESS: Okay.

MS. STEIN: I think also there is a delay, Dan, because we're on this internet, as Jason explained, so if everybody could just kind of take a breath, Jason is going to ask a question. Give it a couple of seconds just because of the delay, that way if Kevin and I have an objection, and then answer. And --

THE WITNESS: Okay.

MS. STEIN: And I think we'll all try to do it and Bev won't kill us before the end of the day, although she might have a dartboard at the end of the day.

THE WITNESS: I apologize, Bev. Sorry.

BY MR. STEARNS:

Q Okay. Mr. Bilzerian, when the Court's interpreting the contract and the words "to the best of your ability" appear, what do you want to tell the judge that you think that means?

MS. STEIN: And --

## Page 136

MR. McCOY: Form.

MS. STEIN: -- I'm just going to object to the extent it calls for a legal conclusion and to the form.

MR. STEARNS: Understood.

MR. McCOY: Join.

MS. STEIN: Go ahead and answer, Dan.

A I would say it is to what I consider the best of my ability.

BY MR. STEARNS:

Q Entirely subjective, whatever you decide?

MR. McCOY: Form.

A I put that in there specifically so that I would have control over how much I had to post because I didn't want anybody telling me how much I had to post. I didn't want pressure that I had to post if I didn't have content. I didn't want to do a nonorganic post. I didn't want to do something that didn't feel authentic.

And I had done this before. I did it for Dollar Beard Club. I mean, I knew what worked, and it didn't take a lot. You -- you know, you get these viral videos. I mean, when I -- when I post a story, my stories are getting 8 to 12 million views a story. My Snapchats are getting up to, you know, 3, 4 million views of Snapchat.

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

Page 137

So just that together, I mean, you're -- you know, 15 million people are seeing these posts. I mean, you don't have to have a ton of posts where 15 million people are seeing it for it to be effective. And so it doesn't call for something to be done, you know, all the time. And the organic posts clearly worked, and they work. You could just see it in the sales. You could see it in the sales spikes. So, you know, what I did was extremely effective.

BY MR. STEARNS:

Q All right. So the agreement gives you discretion to determine the frequency of posts. You agree with that, right?

A Yes.

Q And that -- and that discretion is, you would agree, counterbalanced by the requirement that you post to the best of your ability, though, yes?

MR. McCOY: Form.

MS. STEIN: Objection to the extent it calls for a legal conclusion, and I join the form as well.

MR. McCOY: Join.

A Okay. So initially when we did this agreement, Jason wanted to offer me 40 percent equity in the company. I chose to get 10 percent of gross, which is top-line revenue.

Page 138

I know you guys are having a real hard time understanding what the gross is; but if you just Google it and look up the definition of "gross sales," it will tell you that it's top-line revenue.

I chose to do that because it would be a lot easier to calculate, and I knew that I would get paid every month, and I wouldn't have to, like, trust his accounting, which as we've seen over time has been, you know, not only flawed but, you know, dishonest.

So I did that to make it simple; and, you know, I could have had 40 percent equity in the company. That would have given me more money, a bigger payday, whatever, but I chose to just keep this very simple.

And I also chose to keep the posting requirement very simple as to, like, whatever I wanted to do. And I told Jason up front. I said, "I'm not going to, you know, have to do a lot of posts."

I said, you know, "The posts that I do are going to be very impactful, and I'm not going to put" -- you know, he wanted to put in there that I had to post once a month, once a quarter.

I said, "No. I'm going to post however often I feel is natural and whatever I feel is going to be, you know, organic. And then as -- you know, if you want more posts, then we can announce that I'm affiliated

Page 139

with the company and then I can post more frequently."

So this was never, you know, something that, you know, should have any ambiguity. It was, you know, to my best ability, and I had every incentive to, you know, drive as much traffic to the company and the website as possible because I was getting 10 percent of gross.

So, you know, I -- and I mean, I had -- it was -- you know, I was monetarily motivated to post, and I did. I posted as frequently as I could.

BY MR. STEARNS:

Q So your testimony is that when you were writing a book and not posting for STEEL, that's still, to the best of your ability, in good faith under this agreement?

MR. McCOY: Form.

A I mean --

MS. STEIN: (Inaudible) --

A -- I didn't post for --

THE COURT REPORTER: Wait. Hold on. I'm sorry.

Ms. Stein, I didn't hear what you said.

MS. STEIN: I just said "Same."

A So, yes, to the best of my ability, because I was doing the book, which I felt was very important, so

Page 140

I didn't post for Ignite very much. I didn't post for STEEL very much, but I still did post.

And, you know, shortly thereafter, Jason tried to weasel out of the contract; so then obviously after that point, I didn't do any posts when, you know, we're in litigation.

So, yeah, I mean, during quarantine, it's very difficult to come up with organic content when the whole world is locked down and, you know, gyms are closed and you're supposed to be wearing a mask, and you're supposed to be six feet away from people, and you can't have gatherings, and you can't have girls over. And, you know, I have a lifestyle brand. It's very difficult to organically be promoting things.

And when I'm not posting my own personal content, then it makes, you know, posting an ad for STEEL even less authentic or, you know, organic.

So I told Jason, I said, "Let's just announce that I've invested in STEEL so then I can actively promote it."

I literally said that to him during quarantine while I was doing the book, because he wanted me to post.

And I'm like, "Well, I'm not -- I'm not posting anything naturally, so let's just announce that we're

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 141

partners, and then I can post more frequently."
BY MR. STEARNS:
Q   For the pandemic, yeah, gyms were closed, but I would imagine you probably spent a lot of time at home during that time, yes?
A   Yep.
Q   And I would imagine you worked out, right?
A   Yeah, but you have to have somebody to, like, film, you know.  There has to be, you know, something to do, right?  Like, I'm working out by myself, so what am I supposed to do?  How am I supposed to get content there?  There's no girls, and what am I supposed to do, just me working out at the gym?  "Hey, I'm taking my protein shake."
    I mean, it's not organic.  That's what I'm trying to say.  I mean, you know, you don't understand social media.  I mean, I clearly do, and so I'm telling you that it's very difficult to post during quarantine, you know, promoting a product that you -- that, you know, you don't have a direct affiliation with.  That's a difficult post to do especially after I've done it, you know, 30 other times in the past, you know.  It's hard to find a new normal way to post that.
    Just like I explained to you, you don't post the protein that you take, you know, 30, 40 times a

Page 142

year.  You know, you don't post it probably once or twice a year, do you?  I mean, how many times on your social media do you post the protein that you take?
Q   Well, I don't normally answer questions during a deposition, but I will tell you, I don't have a social media account at all.
A   But if you did, do you think you'd be posting your protein all the time?
Q   So, I mean, do you think, what, six months' hiatus without a single post with STEEL, that's reasonable?  Is that what you're saying?
A   Yeah.
    MR. McCOY:  Form.
BY MR. STEARNS:
Q   Okay.
    MS. STEIN:  Join.
BY MR. STEARNS:
Q   And the contract says that Jason and STEEL would have known that you understood this agreement to mean you can go six months on a hiatus without a single post?  That's your testimony?
    MR. McCOY:  Form.
    MS. STEIN:  Objection to form.
A   Yes.  I -- I promote -- some -- some months I do two posts.  Some months I do three posts.  Some

Page 143

months I wouldn't do posts for three or four months.  I mean, that's organic.  That's how organic works.
    Organic works when you're doing stuff and you feel like a post is natural, you make a post.  And sometimes you do two posts in a month, which I did; and then other times I'll go two, three months without doing a post.  And during quarantine, not promoting products is, you know, pretty standard.  I mean, the whole world shut down; so I mean, I don't think that that's out of line, not posting for six months during quarantine when the whole world is shut down and I'm, like, writing a book and there's not -- I don't have a camera girl around and there's not, you know, a bunch of chicks and I don't have any lifestyle stuff to promote.  So, yes, I think that that's totally reasonable.
    And I told -- I told Jason, I'll be happy to post.  Let's just announce that I'm affiliated with STEEL, and I'll do an "@y" post right now.  I literally said that to him.
BY MR. STEARNS:
Q   But to announce your affiliation with STEEL, you wanted equity, correct?
A   I wanted to buy like -- you know, I could have bought a thousand dollars' worth of stock in STEEL, just something that I could say, "Hey, I invested in STEEL."

Page 144

It doesn't have to be any big amount.  I can just say, "Hey, I invested in STEEL," and then from that point forward people would know that I invested in STEEL.
    It doesn't have to be a big investment.  It just means that I believe in the company.  I put my money in there, and now I'm naturally going to be promoting it.  I mean, that's a very normal thing, and that's what Jason and I discussed from the very beginning as you can see in the 2017 texts.
Q   Right.  And that's more natural because then you're telling the world, "I have a financial interest in this company," so it doesn't have to be organic because it makes sense why I'm promoting --
A   Exactly --
Q   -- I make money.
A   -- and then I could promote more frequently, which is what I was saying.
Q   But couldn't you just tell the world, "I get 10 percent off their top-line revenue, guys.  I have a financial stake in this company, so I'm going to keep promoting them every day."  You could have --
A   No.
Q   -- done that, right?
A   No.
Q   Why?

36 (Pages 141 to 144)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 145

A  Because it's not organic.  It's not natural.

Q  I don't understand that.

A  How do you not understand that?

Q  I thought the point of announcing your affiliation was to leave the world of organic posting and go into inorganic posting?

A  It is, but it has to be a story that makes sense, not just like, "Oh, all of a sudden they're just giving me 10 percent of gross in perpetuity."

Q  But that's a true story.  You could just tell them the truth?

A  Oh, my God.  I -- we already discussed this.  I talked to Jason, and he agreed that I was going to be able to buy in a small percent and we were going to be able to tell people that, "Hey, I invested in STEEL." That was what we both agreed.  Not to say, "Hey, by the way, four years ago, I made a deal with STEEL that's giving me 10 percent of gross in perpetuity" and then basically throwing out all of the organic posts that I did up into that point.  So, no, that's not what we discussed.

Q  I'm sorry.  You said you agreed -- Jason agreed to sell you a portion or an equity interest in STEEL. Is that what you just said?

A  Yes.

Page 146

Q  And when was that?  Do you recall?

A  I mean, you saw it in the 2017 text. I said, "Hey, you know, pretty soon we're going to have to announce that, you know, we're affiliated."  And obviously the way to announce that you're affiliated is just to say, "I invested in STEEL."

And like I told you, it could be a hundred dollars.  It could be a thousand dollars.  It doesn't matter.  It's just basically me buying some piece of STEEL so I can tell people, "Hey, I invested in STEEL." That was always the plan from day one.

Q  What is day one?  Is that before the contract that currently exists or after the contract that currently exists?

A  Before and after, we discussed this, and it was we're going to do organic posts until it doesn't feel organic anymore, and then we're going to announce, "Hey, I'm partners with STEEL, and I'm investing in STEEL," and I'm going to buy, you know, some small piece.

Q  And your testimony to the Court is that you told all of that information that you just said to me about organic posting dying off to Jason Huh prior to signing the contract that exists in this case?

A  I don't remember if it was before or after. It's right in the text.  You can see it in 2017.  I

Page 147

mean, we discussed it.

Q  Well, that is important, because Jason Huh, I can just tell you, is going to tell the Court you did not say, prior to signing that contract, you were going to trail off your posting to make it organic when he agreed to sign that contract, and so I was just wondering what your side of the story was going to be.

MS. STEIN:  Objection, form.

MR. McCOY:  Objection, form.

MS. STEIN:  Objection, form.  Misstates prior testimony.  Lacks foundation.  Argumentative.

MR. McCOY:  And also -- sorry -- I just got to throw in, it misstates the chain of communications that have been in this case from day one.  It's just remarkably misstating the whole line of text messages.

A  I mean, it's very typical of Jason and Jason, but I expect it at this point.

Yeah, I mean, the point I -- I discussed with Jason and we agreed that I was going to do organic posts until it didn't seem organic, and then we're going to announce some kind of partnership.

Jason kept on pushing off announcing the organic post -- or announcing the partnership; and so, you know, he kept on wanting to do the organic posts

Page 148

because they were so effective.  And they were effective because, you know, people thought that they were, you know, because I just wanted to post.  So that's why they work so good, and he wanted to keep that going.  I wanted to tell people, "Hey, I'm affiliated with STEEL." He didn't want to do that, so talk to your client.

BY MR. STEARNS:

Q  Anything else?

A  (Witness shakes head.)

Q  Do you recall how you met Jason Huh?

A  I was introduced to Jason through Joey Swoll, and Joey introduced us, and Jason had promised him that if he introduced me that he would give Joey, you know, some kind of a deal with STEEL.

And then he screwed Joey out of that and then blamed it on the fact that Joey -- he said Joey was gay, so that's how I was introduced.

Q  Okay.  So this goes to your counsel's objection of the narrative that you just gave about what you thought Jason Huh understood about this relationship.

You would agree with me that there's no agreement that's enforceable unless you put it in writing or there's some assent to the terms.  You would agree with that, right?

MS. STEIN:  Objection --

888.909.2720                Anthem Reporting                813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 149

MR. McCOY: Form.

MS. STEIN: -- to the extent it calls for legal conclusion. Join in form.

The answer, you know, Counselor --

(Multiple voices speak at the same time.)

THE COURT REPORTER: Wait, wait, wait, wait, wait. One person at a time, please.

MR. STEARNS: And let me just say, Ms. Stein, if you stop interrupting Dan, let him testify, just object to the form. I know what your objection is, and that's fine. But that's why we keep talking over each other, because Dan's trying to testify and you are, too.

MS. STEIN: No.

A It depends --

MS. STEIN: I'm not trying to -- wait, Dan, hold on. I'm not trying -- I actually tell him, "Go ahead and answer," and then you go, "You can answer."

You're not his attorney, Mr. Stearns, and I'm tired of it. And actually it's going longer because you don't like objections. We literally say "Form" and then you -- and we go, "Go ahead and answer," and you're like, "Well, you can go ahead and answer."

Page 150

So what's taking so long is you. So instead of trying to blame me for the record, I want to be very, very clear here that it's been you, and you're just doing this to try to get more time. Why don't you let the objection stand, and let me instruct my client, not you.

MR. STEARNS: Anything else?

MS. STEIN: Nope.

BY MR. STEARNS:

Q Mr. Bilzerian, did you want to talk?

A It is -- it is my understanding that in some states verbal contracts are binding; but, you know, I'm not a lawyer, so...

Q Well, fair enough. But you don't have a -- you don't have a breach-of-contract claim in this case. You're not saying that -- that STEEL has a binding agreement to give you equity with Jason Huh, are you?

A They don't have to give me --

MS. STEIN: Form.

A That's not what I said. Jason agreed that we would announce a partnership and we'd announce a partnership by me saying I am -- I was going to invest in STEEL and buy some tiny piece. It could have been, like I said, a hundred dollars, a thousand dollars, whatever. It was just basically to let people know that

Page 151

I'm affiliated with STEEL. I'm investing in STEEL, and then, going forward, I could do more frequent promotions.

BY MR. STEARNS:

Q I've seen a lot of the text messages, and it seemed like there was a lot of discussion early on where you were giving Jason Huh what you thought was good advice about running STEEL.

Do you recall those texts?

A So Jason -- Jason --

MS. STEIN: Object to the form.

A Jason lied about hiring a CEO. That was -- that was the initial cause of a lot of our issues was upon entering this agreement, he promised that he would hire a CEO because -- and I said frequently, and you can see it in the texts, I don't want to get in the same situation I did as Dollar Beard Club where they said they're going to hire a CEO, and then this guy wants to just now be the CEO.

And Jason, you know, swore up and down that he would hire a CEO. He went back on his word, which was very typical of him, and so we argued about it, because he didn't -- you know, he thought he knew everything about running a company and that he was going to be a great CEO and this and that.

Page 152

And I said, "Well, you know, you promised me you were going to hire a CEO, and you didn't."

So that was a big source of conflict. I wasn't telling him how to run his company. I was telling him to hire somebody that does know how to run a company; and, you know, and we would go back and forth on that.

BY MR. STEARNS:

Q I'm going to show you what we previously marked as -- I think it was the first exhibit, Exhibit 1. I'll share my screen.

MS. STEIN: Jason, has this been premarked? Because I don't have Exhibit 1 that's been done, so -- and then in that box that Sarah has, it's not, like, fully populated.

MR. STEARNS: This would be the texting between Vingiano and Bilzerian. Which exhibit was that, Sarah?

MS. STEIN: I have that at 7, just so you know, Jason.

MR. STEARNS: It's a premarked number. That's not the exhibit --

MS. STEIN: Oh.

MR. STEARNS: -- for the deposition.

Do you have that exhibit, Kevin? Do you have Exhibit 1?

38 (Pages 149 to 152)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

## Page 153

MR. McCOY: I'm sorry. Are you asking Kim? I didn't hear --

MR. STEARNS: Do you guys have the exhibit, the Vingiano exhibit?

MR. McCOY: It is Bilzerian 191, the 76 pages?

MR. STEARNS: Yes.

MR. McCOY: Yeah, I have that up. I -- yes.

MR. STEARNS: Okay.

MS. STEIN: Sorry. I was getting confused. Sorry, Jason. I thought you were asking Sarah to pull it up, so pardon me.

BY MR. STEARNS:

Q Okay. So, sir, I'm going to show you text messages with David Vingiano. Do you see my screen?

A I do.

Q And these are -- it purports to be text messages between yourself and David Vingiano in April of 2017; is that right?

MS. STEIN: Objection to form.

MR. STEARNS: What's the objection, Kim?

MS. STEIN: It's an issue of these aren't text messages. And remember you asked that earlier, and we went on a break and went through that.

MR. STEARNS: Right.

BY MR. STEARNS:

## Page 154

Q Did you end up giving the answer? Do you know if this is a WhatsApp message or a text message, Dan?

A I believe it's WhatsApp.

Q Okay. So this is a written communication, either WhatsApp or a text message, between yourself and David Vingiano, right?

A That's what it appears.

Q Okay. And this is in April of 2017, right?

A That's what it says.

Q And here on April 6th of '17 at 3:50:55 p.m. -- I'm sorry -- at 3:53:44, you say, "He's maybe the worst guy I've ever done business with."

Do you see that statement?

A Where is it at?

Q I'll highlight it here. This is at 3:53. It looks like it's a message from you to David Vingiano.

A Yeah. And this is -- this goes back to what I was saying. I said, "This guy is like Stoikos on steroids." And Stoikos was the guy from Dollar Beard Club that refused to hire a CEO.

And so, yeah, that was -- that was the issue. He promised me that he was going to hire a CEO, and then he went back on his word.

Q But your agreement with Jason or with STEEL -- Blitz's agreement with STEEL that's at issue in this

## Page 155

lawsuit, there's nothing in that agreement that requires Jason to get a CEO, correct?

A Just his word, which I know doesn't mean much, but that's what he gave me.

Q Well, I appreciate that, sir, and I -- and I certainly understand and I can sense your frustration, both today and now that I've read your text messages, so I understand that. But are you telling the Court that your performance under the agreement was tied to Jason hiring a CEO and stepping down?

A Why do you make things up?

Q No, I'm just asking.

A You just manufacture what's convenient for you and you just say that and then just act like that's my testimony? Is that what you do?

Q Is that your testimony, sir; yes or no?

A Obviously, it's not. You made that up yourself. You'd like that to be my testimony, I'm sure, but that isn't it.

Q No, I want to know what your testimony is, and so my other --

A Then just ask me and don't make it up.

Q So you would agree with me that Jason Huh did not have to step down as CEO, and you still had to comply with the obligations of the agreement, correct?

## Page 156

A If -- if he didn't want to keep his word, then, no, he didn't have to step down.

Q Was it your intention to comply with the terms of the agreement notwithstanding that, in your view, Jason Huh wasn't keeping his word to step down as CEO?

A I fulfilled my agreement. That's why the company's worth so much. I mean, you can see it. You literally see when I post and the massive spike in sales. And you see the massive spike in traffic to the point I shut his website down for two days. So it's obvious what I did for him. I mean, I took his company from being a bullshit $200,000 a month in sales to over $5 million a month. I mean, so -- and you see it in the posts. And I did it in record time. It was like within two or three posts I got it over a million a month or a million a -- yeah, a million a month. He did a million two, I believe.

Q What was the conversion rate when you would post about STEEL? Do you know?

A Well, like I said, he was going -- he was doing 200,000 a month -- 2- to $300,000 a month in sales and I got him to 1.2 million in like a month and a half.

Q That wasn't my question.

Do you know what a conversion rate is when it comes to social media and website traffic and sales?

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 157

Have you heard that phrase?

MS. STEIN: Objection to form.

A   I mean, he had -- he had the data, which he -- you know, first of all, from the first post, I shut his website down for two days.  So I don't know what the traffic was because he promised me that his website could handle it, and it couldn't handle it.  So that was our first source of argument was because I said, "Before I post, I want you to make sure that your website can handle this traffic, because it's going to be a lot of traffic.  It's going to be 30,000 users a second."

I was like, "And I need you to make sure your website can handle."

And he said, "Oh, it's no problem.  I promise you it can handle it."

He swore up and down, "The website's ready.  Do the post, bro," all this nonsense.

The website was shut down for two days.  Two days he couldn't get his website up.  So obviously I was sending him a lot of traffic because, you know, he swore up and down that it could handle any amount of traffic, and it couldn't handle that amount, so it was more than he expected.

BY MR. STEARNS:

Q   In your experience, does all traffic equal a

Page 158

sale?  Like, does every person who visits a website buy a product, in your experience?

A   Obviously not.

Q   Obviously not.

Are you familiar with the term "conversion rate," referring to the number of persons who visit a website and are converted into a sale?

A   Yes.

Q   Have you heard that phrase before?

A   Yes.

Q   So if I use the word "conversion rate," you know what that means; yes, sir?

A   I do.

Q   Okay.  Do you know what the conversion rate was for your posts when you posted about STEEL's products?

A   Well, there's -- there's different conversion rates because there's first-time buys, and then there's conversion rate of, like, do you eventually get that customer through retargeting, through email blasting, through all of this other stuff, which is what they did in using my likeness to do Facebook ads and Instagram ads.

So the initial conversion rate, I don't know what that was; but the -- you know, what ended up, I mean, you see it in the sales, you know.  So obviously

Page 159

it converted.  It converted massively.  And so, you know, he didn't have any other big influencers posting for him, so it was all driven by me.

Q   So the answer to my question -- were you done?  I'm sorry.

A   I don't -- I don't have access to his, you know, analytics, so I would not know what the conversion rate was.

Q   Right.  And that would have been a shorter answer.  So that was actually the answer to my question.  Did you have access, and did you know the conversion rate?

A   No.

Q   The answer is no.  Okay.

A   No.

Q   Okay.  Did you have access or did you have knowledge of any of the analytics with respect to STEEL's sales, website traffic conversion rates, and marketing specs?  Did you have access to any of that information?

A   Not until later on, I don't believe, but I saw --

Q   Okay.

A   I -- he showed me basically the sales right after I posted, and it was like over 100,000 in the

Page 160

24-hour period that I posted, and that was pretty much half his monthly sales before that.

So it was a massive spike and a massive increase; and then, you know, he obviously got more and more customers through the retargeting and through the email captures.  And now he's got a massive email list, which is worth, you know, tens of millions of dollars.  So, you know, over time this stuff accumulates.

And he's got a pixel on the website, which, you know, tracks all of those, you know, customers; and then he can retarget them through Facebook and Instagram ads, and it's extremely effective.

Q   Do you know how much money STEEL spends in social media advertising monthly?

A   I don't.

Q   Do you have any idea, sitting here today, whether or not STEEL's sales align or track with its marketing activities unrelated to your post?  It's a yes or no.

A   I don't have access to their information.

Q   Okay.  So sitting here today, you can't tell the Court whether, when you posted a sale, it's tied to your activity or whether it's tied to other activity for which you just testified you don't have access?

A   Yes, I can, because I saw the spikes.  So I saw

40 (Pages 157 to 160)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 161

when I posted, and I saw the sales for that 24-hour period. And, like I said, it reflected, you know, a half a month's worth of sales before that. It shut down the website, and then all of a sudden it sprung to 1.2 million in sales, which the company hadn't done in the entire past year.

So clearly, you know, there was a direct correlation with my posts and the conversion and the traffic that it, you know, equated to. So it's not a maybe. It's not a possibly. It absolutely, unequivocally resulted in tons of sales, and he wasn't able to capture those kind of sales until I posted, and you see it. Because he could have spent a bunch of money before that, and he could have done, you know, all of this other stuff that you're talking about him doing; but he didn't do it, and he couldn't do it until he had that massive traffic to then retarget.

He needed customers to retarget, customers that I recommended that went to the site, that saw STEEL, and then the next time they saw an ad posted by me via STEEL, then they went to the site and bought.

Because the second and the third time is when you got them, after somebody sees something two, three times, they trust the site, they trust the product, and they want to try it. And that's what he did. And he

Page 162

did that because he was able to capitalize on the traffic that I sent him.

Q Do you recall --

A If he didn't need me, he wouldn't have offered me 40 percent.

Q Anything else?

A Nope.

Q Do you recall the STEEL folks asking you to use a tracking code so that they could track conversion rates based on your posts? Do you recall that?

A Initially, he wanted to do some kind of a tracking, which obviously is never effective because you don't get credit for all of the retargeting that they do. You don't get credit for the people that just type STEEL into the Google app. You don't get credit for the people that, you know, a day later decide to, you know, just -- you know, type it in and whatever, so -- and we saw it with Ignite, you know.

We would pay influencers, and those influencers would never equate to very much sales; however, when we cut off all of our influencers, our sales dropped dramatically, and -- but we were never able to track. We were never able to track effectively. So tracking links do not work.

Q All right. That wasn't my question. My

Page 163

question was whether he asked you or whether STEEL asked you to use tracking codes so that your posts could be tracked with sales? You do recall that conversation, yes?

A Not directly. That was probably five years ago they wanted to do that.

Q Okay. But you have some recollection of -- obviously of the -- of the conversation?

A So initially, when we were negotiating the contract, they wanted to give me a percentage of the sales that I drove that -- that they could track; and I said, "Absolutely not, because you're not going to give me credit for all of the traffic that I drive."

And I've seen it numerous times. You never get credit with those links, because not everybody uses that link.

They see STEEL, and then they see it again, and then later on they Google it or they see an Instagram ad, they see a Facebook ad, and then you don't get credit, even though the first time they heard or saw STEEL, it was through you.

So I don't use ads, and I don't -- and I know that they don't work, like I said, because we were running a 300-, you know, influencer-a-month campaign on Ignite, and I saw exactly what happened when we tried to

Page 164

track the links. It didn't equate to any sales; but when we cut off the influencers, we saw a massive drop. So I, you know, had no interest in doing that, and so we didn't put that in the contract.

Q Is it your testimony that you believe, sitting here today, that Ignite's marketing team is better qualified and more successful in marketing than STEEL's team?

MR. McCOY: Form.

A Why do you make things up that I don't say? Why do you try and, like, put things in my mouth?

BY MR. STEARNS:

Q Sir, just --

A Ask me a question, but don't just -- don't -- don't -- don't present testimony as if I said it.

BY MR. STEARNS:

Q Okay. I'm not, sir. But you can say "no." If the answer is no, just say "no." Is that your testimony?

A What was the question? What's the question?

Q Is it your testimony that Ignite and its marketing team is more effective and better suited to market than STEEL's marketing team?

A No.

Q Because you made a reference a second ago to

41 (Pages 161 to 164)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 165

why you wouldn't use targeting. You didn't think targeting was a good idea, that Ignite had not found that to be a successful tool, so you refused to use targeting for STEEL. That's what you just said, right?

A No. I said that tracking links are not effective, and we saw that when we -- when we hired a bunch of influencers for Ignite, and we tried to use the tracking links, and we never were able to actually attribute many sales to that influencer. But then when we cut off all the influencers, we noticed a dramatic decrease in sales.

So there was a direct increase between those influencers' posts and the sales; however, it does not effectively track through links. But that was much later on.

I didn't even start Ignite until 2017 or '18, and I did this deal with STEEL in, you know, '16, '17, and that's when he was recommending using tracking links.

I've known tracking links don't work. I just had proof later when we did the Ignite, you know, influencer campaign, and I saw it correctly. You never get credit for your -- your traffic with the links. You really don't, so...

Q When you first met Jason Huh in 2016 -- I think

Page 166

it was through Joey Swoll -- you were getting bodybuilding advice from Jason; is that fair?

A No.

Q Your testimony today is that you didn't reach out to Jason Huh to ask him questions about bodybuilding?

A No. Jason reached out to me in an interest to do a deal with -- he wanted me involved in STEEL. He wanted to give me a piece of the company. That was why the introduction was made.

Q And what's the basis for that understanding that you have?

A That's what Joey told me. Joey asked me, "Hey, can I hook you up with Jason? He wants you to do something with STEEL."

And at that time I was looking into doing a supplement deal. I was talking to the owner of 1st Phorm. I had other options, and I wanted to consider this one. So that's -- that's why the introduction was made.

And one of the stipulations Joey had was that if he made the introduction, that he would be able to be a part of the deal as well, and Jason reneged on that.

Q Is it fair to say that when you and Jason Huh communicated over text message or other written

Page 167

communication, you sometimes use colorful language?

A Yes.

Q I think earlier, you know, you mentioned a couple of words, you know, like "fuck." You've said "fuck" on text?

A Yep.

Q You've used the word "gay"?

A Yep.

Q You have -- you use a lot of words that most folks would say are colorful language, that most folks wouldn't want to use; is that fair?

A Yes.

MR. McCOY: Form.

BY MR. STEARNS:

Q But Jason -- well, you don't -- you're not -- you don't have any biases towards any of these -- any of these folks, whether they're white or black or gay or not gay? I mean, you -- you might use these words, but you don't have any ill will towards those groups, fair?

A Yes, fair.

Q And you would agree with me that in your texting with Jason, you never understood that he did either, right?

A I don't know. I mean, he wouldn't hire -- he wouldn't hire Joey because he said Joey was gay, so I

Page 168

would assume that he has ill will towards gays.

I have hired, you know, only gay assistants. I -- you know, all of my hairdressers are gay. I hang out with gay people all the time, so I don't have a problem with them; but being that Jason didn't want to hire Joey because he was gay would tell me that he's got a serious bias against gays.

Q You don't know if Jason has hired gay folks at STEEL or not, do you?

A Well, Jason specifically told me the reason he didn't want to hire Joey was because he was gay, so I don't know how you get more biased than that.

Q And when did he tell you that, Mr. Bilzerian?

A He told me that -- I believe it was in 2017.

Q On the phone? In person?

A I believe it was via phone, text. I mean, I don't -- I don't remember how it was communicated, but it was unequivocally communicated. I think it's in text.

Q Are you -- might you be confusing it with not being gay but rather being associated with the porn business instead?

A He knew all of this before he promised Joey a job for introducing me. So all of this was knowledge that he had. So if that was his issue, he shouldn't

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 169 | Page 170 |
|---|---|

**Page 169**

have told Joey, "Hey, if you introduce me to Dan, I'm going to give you a job."

If he had an issue with him doing gay porn, he should have brought that up, and said, "Hey, you know, if you introduce me to Dan, that would be great; but I can't hire you because you used to do gay porn." But that's not Jason.

He's not an honest guy. So, you know, he chose to pretend that he was going to give him a job; and then later on, you know, after I argued with him a bunch -- because it would have been organic to have Joey promoting. And I could have promoted Joey, driven traffic to Joey. Joey could drive it to STEEL, and it would just give me one more avenue that I had, you know, like I did with Robert Frank. But, you know, he didn't want to do that because he said Joey was gay; so, you know, that's his issue, not mine.

Q  Prior to doing the deal with STEEL, had you reached out to any other supplement companies to possibly have a business relationship?

A  Yes.

Q  Which ones?

A  1st Phorm, and I believe there was another one that I was considering at the time.

Q  I'm sorry. I didn't catch the name of the

**Page 170**

company. What was it?

A  1st Phorm. It was -- oh. The CEO of 1st Phorm, I can't -- Andy Frisella. I was talking to him. He wanted to start a business using basically 1st Phorm, a lot of their formulations, their -- you know, their corporate structure and whatever. And he was offering me a third of the company. He would take two-thirds, and he would run it and do everything, and I would, you know, be the promotion arm.

MS. STEIN: Jason --

BY MR. STEARNS:

Q  Do you recall the time period?

MS. STEIN: Jason --

MR. STEARNS: I'm sorry?

MS. STEIN: Hold on. I'm sorry. After this question, can we please take a break? I've got to call -- make a phone call -- it's kind of important -- for my husband.

MR. STEARNS: Sure. How long do you need?

MS. STEIN: Let's just be safe because I know people have to go to the bathroom -- say 10 minutes. If you want to finish this question, that's fine. I just didn't want to --

MR. STEARNS: You cut off. I didn't hear. How much time?

| Page 171 | Page 172 |
|---|---|

**Page 171**

MS. STEIN: 10 minutes, if that's okay, just to be sure so we can go to the restroom, too. But I've got to make this call back. If you want to ask your question, then that's fine. I just have to --

MR. STEARNS: No, that's fine. All right. We'll come back at 1:50 your time.

MS. STEIN: Okay. Thank you.

THE VIDEOGRAPHER: Off the record 4:38 p.m.

(Recess taken from 4:38 p.m. to 4:57 p.m.)

THE VIDEOGRAPHER: On the record 4:57 p.m.

MR. McCOY: All right. During the break, we had a discussion. We are going to designate the entirety of this transcript, both the stenographic and the video record, as confidential pursuant to the confidentiality agreement. And I think, per our discussion with the court reporter, we'll mark all of the pages as confidential. And delivery of any order of copies will therefore go to counsel of record and no outside or nonparties to the case. Thanks.

BY MR. STEARNS:

Q  Okay. Mr. Bilzerian, earlier today we were talking about emails and your efforts to comply with the subpoena. Do you remember that?

A  I do.

**Page 172**

Q  And I believe earlier you testified that Paul Bilzerian, your father, had no part in the negotiations of the agreement. Do you remember that?

A  Yes.

MR. STEARNS: Okay. Sarah, can you go ahead and upload premarked Exhibit 11?

(Exhibit Number 5 marked for identification.)

MR. STEARNS: Madam Court Reporter, is this Exhibit 5?

THE COURT REPORTER: Let me check for you. I think so, but let me make sure. Yes, it is.

MR. STEARNS: Kim and Kevin, do you guys have that yet?

MR. McCOY: I'm not seeing it when I refresh the share file, but I got it from Dawn. It's all in -- going to be in that folder, right? Let me just hit refresh again. Hold on.

MR. STEARNS: It's Blitz 878.

MR. McCOY: Blitz 878.

MS. STEIN: It's there now. I just saw it.

MR. McCOY: Okay. I mean, you can go ahead. I'll -- I'll -- we'll either look at it on screen-share or -- I got it. Yep, thanks.

MR. STEARNS: Oop. Sarah's got it. Okay.

BY MR. STEARNS:

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 173

Q Okay, sir. I'm showing you Exhibit 5. This is a document that was produced by Blitz. You'll see at the top, there's a black box. Scroll down. On the first page, it's marked Blitz 878. If you'll scroll down, Sarah. Right there.

Do you see that, sir?

A I do.

Q All right. Going down to the bottom of the page -- the bottom of the exhibit, I'm sorry -- page 879, it appears to be the email -- scroll up, Sarah.

It appears to be an email from Paul Bilzerian, the sent block says International Investments & Consulting, LTD?

A Yeah, "To add to our conversation on Saturday" --

THE COURT REPORTER: Sir, I can't hear you if you're speaking for the record.

THE WITNESS: Oh, I was just reading it. Okay.

BY MR. STEARNS:

Q So --

A He's offering -- he's offering legal advice or -- or to draft a contract.

Q Right. So my question is, is this -- this is February 6th of 2017, right?

Page 174

A This is what?

Q This is February 6, 2017?

A Okay.

Q And this is the -- an email with the subject "Jason Huh." Do you see that?

A I do.

Q And do you understand what your father, Paul Bilzerian, is referring to in this email?

A I mean, he's -- from what I read, it said that "if Kim can't draft it in the short notice, let me know and I'll draft it, or you can use Walter, a Tampa attorney."

MR. STEARNS: Right. And then if you scroll up to the -- so go up to 878, the first page of Exhibit 5, Sarah. Right there.

BY MR. STEARNS:

Q There's an email from David Vingiano on Monday, February 7, 2017, and it's addressed to Paul -- I assume Paul Bilzerian; is that right?

A Yep.

Q Yourself, and a guy name Scott ICES. Who is Scott ICES?

A Scott Rohleder.

Q Okay. And is Scott Rohleder a lawyer?

A He's an accountant.

Page 175

Q So he's not a lawyer?

A Nope.

Q Okay. In this email, it looks like Mr. Vingiano is telling your father that Kim -- is that Kim Stein, to your knowledge?

A Yep.

Q Kim Stein would be working on the agreement with STEEL. Is that what you understand this email to be conveying?

A Yes.

Q Okay. My question is: Do you know, sitting here, what is in this black box or why that's blacked out?

A I don't. Maybe it's, like, personal information.

Q You don't know, though?

A How -- I mean, no, I don't know. I would assume that it's, you know, the -- his personal information, like his address, his cellphone. I mean, that usually comes at the end of an email.

Q So going back to the subpoena issue, you know, here's an example prior to signing the agreement where Paul Bilzerian is working with David Vingiano and folks at your team about deals that you have and stuff, you know. It would appear to me that your father would have

Page 176

had some involvement, at least that's what the exhibit shows. I'm wondering what --

A I mean, I disagree completely.

MS. STEIN: Go ahead.

MR. McCOY: Object to form.

MS. STEIN: Yeah, I was just going to object to form. But go ahead, Dan, I'm sorry.

A I don't think this shows he had any involvement in the negotiation whatsoever. He's -- this is all about drafting up a contract and finding a lawyer to do it.

BY MR. STEARNS:

Q Right. And do you remember, there was the subpoena request that dealt with negotiating the agreement. Do you remember that one?

A The one that you pulled up earlier?

Q Yes.

A I remember seeing it earlier, yes.

Q Right. And there was also a request that was just more broadly about the agreement itself, not the negotiations, but the agreement itself. Do you remember that?

A I mean, I would have to see it. I don't remember exactly what it said.

Q Okay. You would agree with me that Exhibit 5,

44 (Pages 173 to 176)

888.909.2720           Anthem Reporting           813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 177

which we're looking at, is a document from your father -- it's an email from your father to your team -- about the STEEL agreement, yes?

A This is from David Vingiano to my father.

Q Right. The earlier one, right below this, it's February 6th from your father to David Vingiano --

A Yeah.

Q -- talking about the relationship and the agreement with STEEL. Yes?

A He's saying, "If you need help drafting it, I can do it, or here's a lawyer that can help draft the agreement." It has nothing to do with the negotiation of this agreement.

Q Understood.

MR. STEARNS: Okay. You can take that down, Sarah.

BY MR. STEARNS:

Q Do you remember telling folks at your team or expressing your displeasure with Jason Huh not posting enough?

A My --

MS. STEIN: Object to the form.

A My displeasure with him not posting enough?

BY MR. STEARNS:

Q Right. Do you remember telling David Vingiano,

Page 178

Jason Huh's not posting on his account for STEEL and complaining about that?

A Yeah. It seemed very strange to me. Why would the guy not want to promote his own company?

Q But I'm just curious. I mean, I've read through those text messages.

MR. STEARNS: And remind me, Sarah, which Exhibit Number is 7, premarked 7?

MS. GOTTLIEB: Premarked 7 is Bilzerian 191 --

MR. STEARNS: Yes.

MS. GOTTLIEB: -- which is the Vingiano text messages.

MR. STEARNS: Which is Deposition Exhibit Number 1?

MS. GOTTLIEB: Yes, correct.

MR. STEARNS: All right. Can you pull up Exhibit 1, Sarah? Can you go to page 219? I'm sorry. 245, Sarah.

MS. GOTTLIEB: Okay.

BY MR. STEARNS:

Q Okay. Do you see this page, sir? This is --

A Yeah.

Q -- 245. And it appears that you're messaging David Vingiano. And you say, "Why does Jason never post STEEL?"

Page 179

Do you see that?

A Yep.

Q Okay. 5/10/17 at 6:44 you say, "Yea. I mean, he should be posting way more than me."

Do you see that?

A Yeah. It's his company.

Q Okay. Do you know how often STEEL, whether it was Jason Huh or one of the STEEL employees, was actively engaging in posting on social media about STEEL products? Do you know, sitting here today, how often they were doing that in 2017?

A Jason posted less than I did.

Q That's not my question.

A Okay.

Q I'm talking about STEEL, not Jason Huh, not Jason Huh personally but STEEL?

A Who gives a shit what STEEL posted? They had like 40 followers. Like, what does that matter? Like, the company's website posted a bunch, I'm sure. It had no followers. It's irrelevant. What does it matter?

MR. STEARNS: Can you go to page 246, Sarah?

BY MR. STEARNS:

Q All right. Right below the black box May 11, you say to David Vingiano, "I don't think Jason has a fucking clue what he's doing with pricing."

Page 180

Do you see that?

A Yep.

Q Okay. In May 11, 2017, what did you know about STEEL's prices?

A I knew they were too high.

Q Okay. And what did you know about their operating costs?

A I knew their profit margins were huge, and they didn't need to be, you know, pricing their products, you know, out of the realm of, you know, what the other -- I mean, there's -- there's a sweet spot, right? Like 29.99 is, like, what all of the other preworkouts were being sold for, and that was the sweet spot.

And, you know, I told him, I said, "Your preworkout, it's too heavily dosed."

And he said, "Oh, the people that are -- that are taking it are just fucking pussies," because it made my girlfriend sick. It made David Vingiano sick. It made another one of my buddies sick, and it made me sick.

And so I told him, "You got to, you know, lighten it."

And he's like, "Oh, no. They're just fucking pussies."

And I said, "Well, how much of it are you

45 (Pages 177 to 180)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 181

fucking taking?

And he's like, "I don't take preworkout."

I said, "Exactly." I said, "The people that take preworkout, you know, are the fucking people that need the edge. Like, the people that are going to the gym training that don't need preworkout, those are the people that fucking are sensitive to this stuff. The people that you're calling pussies are the people that need to take a fucking, you know, thing to go motivate them to work out."

And so we got into this big argument about it, because his dosing was fucked up, his pricing was too high, and it was -- you know, it was ridiculous. I mean, I'm like, "Do some AB testing."

You know, other companies do that. There's a reason why all of the other preworkouts are in the, you know, 29.99 range. And so then he finally later on came out with, you know, 29.99 and acted like it was his idea and whatever; but, you know, we would get into arguments, because I said, "Look, just do the -- do the testing. Just do the AB testing. See -- see what the market says."

He would just come off the cuff and just come up with arbitrary prices without doing market research. And it was just, you know, seat-of-the-pants stuff,

Page 182

which worked because I sent him a ton of traffic, and I gave him strong endorsements. But, you know, he -- he definitely wasn't optimizing for, you know -- you know, price sensitivity in the market.

And he saw that when he started doing the sales, and the sales started converting massively because now all of a sudden, he was in the right price point.

And I told him to do bundles. He listened to that. I mean, I gave him a ton of advice that he listened to. There was just some stuff that I couldn't get through his head.

Q Right. And you remember all of the times that Mr. Huh would tell you, "I hear what you're saying, Dan. I hear all of your advice. I take some of it. Some of it, I don't take it. Let me do my job. You do your job."

You remember that, right?

A If you -- if you have it in the texts, I mean, pull it up, right, you know. I mean, we would get into arguments. I don't -- I mean, he was usually just hard-headed and, you know, he would come up with stupid answers like, "Oh, those people are just fucking pussies."

And I'm like, "Well you know, that's the

Page 183

average consumer, so..."

And he's like, "Well, we're marketing to hard-core bodybuilders," blah-blah-blah.

And I'm like, "Well, you know, my demographic is the average person, so I think you probably ought to consider, you know, if you're make the average person sick, you might want to lower the dose." I mean, I don't know. I was -- it was very difficult to work with him.

Q Right. You were working with Jason Huh to get STEEL's products out to, in your words, the average person, your followers?

A Yeah, exactly. And he wanted to just only hard-core bodybuilding, and that was, you know, what he said.

And I'm like, "Okay. That's fine, but it doesn't mean you need to make people sick."

And so, you know, we got into this argument. Because his original preworkout stuff was heavy on amphetamines and, you know, it made people sick.

Q So I'm looking at Exhibit -- Exhibit 1. We're on page 245 still. Go a couple of -- on page 246, I'm sorry, of Exhibit 1.

Do you see here where you say at 8:55 a.m., "He really -- he needs to really sell the customer on the

Page 184

neutrop" -- it says "neutropic aspects of this."

Do you see that?

A Where is it at?

Q I've got it highlighted on the screen. Oh, I'm sorry. It's on the screen. 8:55:22.

MR. STEARNS: Scroll up a little bit, Sarah. Right there.

BY MR. STEARNS:

Q Right -- halfway in the middle of the page, you say, "He needs to really sell the customer on the neutropic aspects of this." Do you see that?

A Yep. I see it.

MR. STEARNS: And, Sarah, just go ahead and release to Kim and Kevin premarked Number 13. We're going to be getting there shortly.

BY MR. STEARNS:

Q Okay. What were you referring to in this text with David Vingiano, sir?

A I was saying that he needs to -- let's see. He needs to get other athletes promoting his shit.

Q No, I'm sorry. Just the line that we're referring to. At 8:55:22, your statement, "He needs to really sell the customer on the neurotropic aspects of this."

You're referring to nootropic aspects, yes?

888.909.2720            Anthem Reporting            813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 185

A  That was one of the aspects.  I mean, I was talking about a bunch of different things; but, yeah, that was one of the things that I said.

I mean, I was talking about him selling the customers and, you know, sitting in front of the camera and explaining why his products are good, which is something that he later finally listened to me and -- and started doing, and he did it very effectively.  But, yeah, I was telling him he needs to get out there and start doing some posts where he explains why his products are good.

Q  Understood.  My question was just, quite simply, that you understand that a preworkout, such as "Focused as Fuck," which is what the preworkout is we're talking about, is something that has a nootropic, yes?

A  I don't believe we were talking about Focused here.  I thought we were talking about --

Q  Go three lines down, sir, 5/11 8:50, David --

A  Can you --

Q  -- Vigiano --

A  Can you go -- can you go up a little bit so I can get some context?

MR. STEARNS:  Sure.  Sarah, can you scroll up?

BY MR. STEARNS:

Q  There's a lot of black lines that are blacked

Page 186

out, so I apologize, but some of the context is lost on me, too.

A  Can -- can you go up to where I can see something?  Okay.

"Why does Jason never post STEEL?"

"That's a good question.  He used to post it a ton, and now it's just his kids."

I said, "Yeah, I don't know why.  Nobody's following him to see his kids."

He said, "I'll ask him, but probably best to do so after you post next."

I said, "I mean he should be posting way more than me."

THE COURT REPORTER:  Slow down, please.  Slow down, please.

THE WITNESS:  Okay.

BY MR. STEARNS:

Q  You can just read to yourself, sir.

A  Yeah.  Okay.  And then this is blacked out why?

Q  That was -- that was my question to you.  This is how I got it from your lawyer.  This is how --

A  Okay.

Q  -- you produced it.

A  Got it.

Q  I don't know why it's blacked out.  Can you

Page 187

tell me?

A  Maybe it was sensitive information.  I have no idea.

Q  Do you think it would have helped you to provide context to have the full string?

MR. McCOY:  Objection, form.

MS. STEIN:  Join.

A  I mean, this is a -- 76 pages, and you're pointing to one line; so, yeah, I mean, it would probably be good to have some more context.  But, look, I mean, you know, we -- we talked about a bunch of stuff.  There's 76 pages here, obviously, so...

BY MR. STEARNS:

Q  Well, you know, let's just go back to my other question that you wanted more context for, but my question is:  You know what a nootropic is, correct?

A  Yep.

Q  What is a nootropic?

A  I -- I -- I mean, I know a loose definition.  It's something that's supposed to stimulate your brain.

Q  Okay.  And you understand that preworkouts often contain nootropics, yes?

A  No, not usually.  It's not the preworkouts that usually have nootropics.

Q  Okay.

Page 188

A  That was his -- that was his Focused formula, which I don't think did very well.

Q  Okay.  So some form of bodybuilding supplement, whatever you want to call it, a focused supplement, contains nootropics to help bodybuilders focus, yes?

A  No.

MR. McCOY:  Form.

A  It's not for bodybuilders; but, I mean, focusing -- focusing, I mean, that's like Adderall.  That's like a Vyvanse.  That's not a bodybuilding thing.

Bodybuilding is something that builds muscle, like protein, andro's, creatine, pump formulas, the ADA, the Adbolic.  All of those, those are bodybuilder things.  Nootropic has nothing to do with bodybuilding whatsoever.  It's --

BY MR. STEARNS:

Q  You're saying bodybuilders don't take nootropics to focus in their training?

MR. McCOY:  Form.

A  None that I know of.  I'm not saying there aren't some that do, but it's not a common bodybuilding thing to take nootropics.

BY MR. STEARNS:

Q  Why are you telling -- let's go back to 246, then.  I don't understand.

47 (Pages 185 to 188)

888.909.2720              Anthem Reporting              813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                        5e86d368-f0ee-4618-947c-1e3600535c25

Page 189

Why are you telling David Vingiano he needs to market this product and talk about nootropics? If he's a bodybuilding supplement company, why talk about nootropics?

A   Because he --

MR. McCOY:  Form.

A   He launched a bunch of products that weren't bodybuilding supplements like his dick pills, you know. He added vitamins. He added, I mean, prohor- -- probiotics.

I mean, he offered a ton of stuff that wasn't bodybuilding related whatsoever. Like Focused as Fuck is not a bodybuilding supplement, I mean, but he can still sell it. I mean, he was just, you know -- I mean, he originally started off as like the hard-core bodybuilding stuff; but then he branched out into, you know, anything that he could slap his label on, so -- Focus being one of them. It was kind of like an Adderall alternative, but it wouldn't have anything to do with bodybuilding. That's for sure.

BY MR. STEARNS:

Q   Okay. Would you defer to Jason Huh and STEEL Supplements about what their supplements are used for and -- and who uses them, or do you think that, sitting here today, you're telling the judge you know more about

Page 190

STEEL supplements than -- than Jason Huh and his company?

MR. McCOY:  Form.

MS. STEIN:  Objection to form.

A   I would say I know about as much as Jason Huh.

BY MR. STEARNS:

Q   You would say that your knowledge about bodybuilding and supplements is on par with Jason Huh?

A   Yeah. I was a certified nutritionist. I mean, I was a personal trainer. I've been -- I mean, just because I didn't overload on steroids doesn't mean that I don't know more about nutrition and fitness than he does.

I mean, I've done, you know, the Iron Man aspects of it. I've done -- you know, I'm much more well versed. He's, you know, a "do a bunch of roids and lift weights" type of guy. That doesn't give you, you know, a very advanced knowledge of, you know, personal fitness outside of the weight room.

I mean, in fact, he's given me a bunch of horrible advice. He told me that I should take the skin off apples. He recommend me cut eggs out of my diet. I remember he recommended me remove all fiber.

I was like, "All right. I'll try it." I couldn't shit. I mean, it was like the worst advice I'd

Page 191

ever gotten. I got bloated. It was like -- it was horrible.

I mean, I -- I originally thought that he knew what he was talking about; and then I, you know, tried some of the things that he said just because he was so adamant about it, and it was just terrible advice.

So as, you know, the relationship went down the road -- I mean, in fact, Floyd Mayweather offered to box me. He was going to, you know, pay me like 10, 20 million bucks to box him; and Jason's recommendation was that I take trenbolone, which is a steroid that is terrible for cardio, and his advice is, "Oh, yeah. It will make you really angry and mean. It will be perfect for boxing."

I mean, I -- I honestly don't think Jason knows jack shit about fitness if we're being frank here.

Q   Okay. Anything else?

A   Nope.

Q   Okay. Do you remember, we were talking about --

A   Well, actually, one -- one thing I will say. Bodybuilders are probably the least healthy people on earth.

Q   Okay. We were talking about Ignite earlier. Remember I asked you whether or not you had personal

Page 192

knowledge of whether Ignite had reached out to the STEEL marketing team for advice about how to market products direct to consumer.

Do you recall that conversation?

A   It was about retargeting, and the issue was that our products couldn't get retargeted like STEEL because our products -- you know, we're -- we're heavily regulated, so we couldn't do the Facebook retargeting. We couldn't do the Instagram retargeting that STEEL was able to do, which is why, you know, Ignite kept bugging me to do a supplement line, because they knew it would work. They knew my demographic would respond to it. And I kept telling them, "No, I have a deal with STEEL. I can't do supplements."

So I mean, they -- they were really adamant they wanted to do supplements because that's something that we could actually really capitalize on my -- you know, my reach and whatnot; but, you know, I had agreed to, you know, do this deal with Jason, and so I passed up on it. And I passed up on numerous things.

Q   Right. Do you recall asking David Vingiano if a -- I'm sorry -- asking Jason Verona if an energy drink would be a competitive product under your contract?

A   They wanted to do an energy drink, and I said, "Okay. You know, just make sure that STEEL doesn't have

48 (Pages 189 to 192)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 193

any kind of issue with it. I mean, they shouldn't, but just run it by them."

Jason Verona ran it by them. I believe Curtis Heffernan did. And I think -- well, what was his name, my old business manager -- damnit. Michael Feder.

I believe all three of them had contact with him. And I -- and I saw an email from Jason Verona to Jason Huh talking about it.

I mean, Jason never had issue with ZRO. He was notified of it in the very infant stages of it along with, you know, the whole way through, never had any issue, never expressed any concern, said it was not a compet- -- you know, competitive product or he would have, you know, said something about it. So he -- he had no issue until he wanted to weasel out of this agreement.

Q Sir, do you know if the agreement prohibits other competitors from competing with STEEL, or does it just prohibit you from promoting competitive products?

MR. McCOY: Form.

MS. STEIN: Objection to the extent it calls for a legal conclusion.

BY MR. STEARNS:

Q If you know.

A Does it -- I'm sorry. You have to ask --

Page 194

Q Right.

A -- that again.

Q Could STEEL -- could STEEL stop Ignite from competing against STEEL in your view, or can STEEL stop you from promoting and endorsing?

MS. STEIN: Same --

A STEEL --

MS. STEIN: Same objection. Hold on. Sorry, Dan. Just same objection. Go ahead.

A STEEL couldn't stop Ignite from doing anything, I mean, because Ignite can do whatever Ignite wants to do.

But, you know, STEEL, if it had a concern, could voice that concern with me, because I'm the one that has -- you know, Blitz has the agreement with STEEL. So if, you know, they don't want me, you know, doing an energy drink or promoting an energy drink, they could have just, you know, said that, and we would have discussed it then. But it was in no way, shape, or form a competitive product, and they didn't see it as such, so it wasn't ever really a, you know, conversation.

BY MR. STEARNS:

Q Right. Okay. I thought you said that you -- you have an understanding or belief that folks at Blitz reached out to STEEL about your ability to promote an

Page 195

energy drink. Is that -- is that what you were saying?

A Well, they reached out to them about numerous things. First of all, they wanted to know if STEEL was interested in doing a CBD-infused line like an Ignite-STEEL thing. And at the time they said that they weren't interested in doing anything with CBD. We said, "Okay. Fine."

Q Mr. Bilzerian, I -- just a second. Hold on. I -- I just want to get an answer to my question.

My question is: Is it your testimony that your Blitz team reached out to the STEEL team to get permission or authorization for you to promote an energy drink? Yes or no?

A I don't remember the exact context of it. I know that Jason Verona had communication with STEEL regarding ZRO, and there was no pushback. There was no issue. There was, you know, no -- nothing raised, and this was very early on.

Q Okay. Well, you know, if STEEL and Jason Huh and those guys testify that never once was there a conversation where STEEL authorized you to promote ZRO, it sounds like you're going to dispute their testimony; is that fair?

MS. STEIN: Objection. Misstates prior testimony, but you can go ahead and answer.

Page 196

MR. McCOY: Join. Form.

A Can you say that one more time?

BY MR. STEARNS:

Q Yeah. Mr. Huh is going to testify under oath that he never authorized you to promote ZRO. My question is: Are you going to tell the Court that that's not true and are you going to dispute that?

MS. STEIN: Objection, form.

MR. McCOY: Join. Same.

A Jason Huh lies all the time, as I've proven numerous times today.

BY MR. STEARNS:

Q It's a yes or no.

A So if he decides to lie under oath, I mean, you know, what -- what do you want me to do? I mean, the, guy's -- you know, he's perjured himself numerous times. I'm sure he's going to continue to do so.

Q So back in 2017, all right, you -- you knew or you at least thought perhaps energy drinks might fall within the exclusivity provision of the contract, right? Do you remember that?

A No.

Q It didn't happen?

A No.

Q Okay. Take a look at Exhibit 1 again.

49 (Pages 193 to 196)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 197

MR. STEARNS: Sarah, go ahead and take that down -- or go to page 233 of that exhibit.

Hey, Sarah, go ahead and close out of it. I'll go ahead and share my screen. It looks like yours is refreshing.

MS. STEIN: Actually, Jason, I'll just let you know, it's not Sarah's fault. It's doing the same thing in the Dropbox. It won't load.

MR. STEARNS: Yeah, I think it's just because some of these are large files, and we're dealing with a lot of -- you know, it's all over the internet.

Here, let me just do this.

MS. GOTTLIEB: I've got it in a PDF, if you want me to share.

BY MR. STEARNS:

Q I've got it here. Do you see it, sir, on the screen? It says Bilzerian 233. Do you see this?

A What's that?

Q Do you see the screen, Bilzerian 233, with the text thread?

A I do.

Q It's a WhatsApp message that we marked as Exhibit 1. Do you see that?

A Yeah. Yeah, I'm looking --

Page 198

Q Okay.

A I'm looking at the page that starts with "Just sent you the main part of the proposed amendment"?

Q Yes. If you look at the bottom there where I've highlighted, you see on March 19, 2017, it appears you asked David Vingiano, "Would an energy drink promotion be against the contract?" Do you see that?

A Uh-huh. Yeah, and David said, "No, it shouldn't be." He said --

Q Okay.

A -- "I spoke to Jason. He's cool with the amendment, but you may want to call him on strategy."

So he asked Jason, and Jason said, "No, it's not." It's literally proof that it's not.

Q Sir, again, my questions -- and I understand sometimes they're bad questions, but I just need you to focus on answering my questions.

And then let's walk through that.

A Okay.

Q So at 6:31:33 -- it goes down to the portions of the second -- that's when you asked David Vingiano if an energy-drink promotion would be against the contract, correct?

A Yep.

Q About 20 seconds later, David Vingiano

Page 199

responded "No, shouldn't be." Do you see that?

A Yep.

Q Okay. Several minutes later, David Vingiano says, "Spoke to Jason." Do you see that?

A Yep.

Q Okay. It's true that David Vingiano responded that "No, an energy drink promotion wouldn't be against the contract," but he did that within several seconds and before ever talking to Jason, fair?

A And then he said he spoke to Jason --

MR. McCOY: Form.

A -- and Jason is cool with it.

BY MR. STEARNS:

Q Sir -- sir, just answer my question. Is that what happened?

MR. McCOY: Form.

MS. STEIN: Join.

A Okay. Say the question again? What?

BY MR. STEARNS:

Q I'm looking at the time stamp. And as I understand it, David Vingiano responded within 24 seconds to your -- to your question with the answer, "No, it shouldn't be against the contract to promote" --

A Uh-huh.

Q -- "the energy drink." Right?

Page 200

A Yep.

Q Yes?

A And then two minutes later he said he spoke to Jason --

Q There's not a question.

A -- and he's cool with it.

Q Okay. My question is -- and I was going to ask this question. When he says -- when David Vingiano says at 8:54, "He's cool with the amendment, but you may want to have a call with him on the strategy tomorrow," what amendment, if you know, is he referring to?

MS. STEIN: Objection, form.

MR. McCOY: Join.

A Okay. So, I mean, I don't know what the -- he said at the top of this -- all I have is what you're giving me, and it says, "Just sent you part of the proposed amendment." So I --

Q Right.

A -- I don't know what the amendment --

Q And I was breaking it down because my question was about your --

A Okay.

Q -- your question to David Vingiano about whether or not an energy-drink promotion would violate the contract. And you went on sort of a narrative to

50 (Pages 197 to 200)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 201

say, "Yeah, and he just spoke to Jason and he was cool with it," right?

My -- my question to you is: Where in this text thread does it say that Jason Huh is okay with you promoting an energy drink?

A Well, when he said he spoke to Jason and he's cool with it.

Q So you're reading David Vingiano's text on March 29th at 8:54 to tell you Jason Huh is cool with you promoting an energy drink?

A I mean, yeah. That's -- that's what it said there. I mean, I -- yeah. I mean, I don't -- is that not what you're reading?

Q It doesn't say that to me, sir. It doesn't say that at all. It says that he's cool with an amendment. And I was asking you what the amendment is that he was referring to, if you know?

A I don't remember what the amendment was.

MS. STEIN: I'm going to object -- hold on, Dan. I'm just going to object to form.

BY MR. STEARNS:

Q Do you know, sitting here today, sir, whether there was an amendment to the March 7, 2018 contract that's at issue in this litigation?

A I don't remember. I don't -- I mean, I don't

## Page 202

remember an amendment.

MR. STEARNS: Okay. Go ahead and and, Sarah, stop this and go ahead and publish Exhibit -- premarked Exhibit B. I'm going to show you Exhibit 6.

(Exhibit Number 6 marked for identification.)

THE WITNESS: Can I hit the bathroom for 30 seconds?

MR. STEARNS: Yeah, let's take a five-minute break.

THE WITNESS: I don't even need five. I just need, like, one minute.

MR. STEARNS: Well, I do, because mine's down the hall, so --

THE WITNESS: Okay.

MR. STEARNS: -- take five minutes.

THE WITNESS: All right.

THE VIDEOGRAPHER: Off the record 5:31 p.m.

(Recess taken from 5:31 p.m. to 5:38 p.m.)

THE VIDEOGRAPHER: On the record 5:38 p.m.

BY MR. STEARNS:

Q Okay. Sir, I'm going to show you what we're going to mark as Exhibit 7 -- or I'm sorry, 6. This will be premarked 14, Kim and Kevin. Do you have that?

MS. STEIN: No.

MR. STEARNS: It should be in your folder.

## Page 203

MS. STEIN: I'm refreshing. Yeah, there it is. Okay. Thanks. I just refreshed.

BY MR. STEARNS:

Q Okay. Okay. Sir, do you see Exhibit 6?

A I do.

Q And do you see that there's a subject line that says "Final Contract" in the email on March 4, 2017?

A Yep.

Q Okay. And that was sent from Jason Huh to you on March 4, 2017.

MR. STEARNS: Let's scroll down. There's a contract -- oh, I'm sorry. Sarah, Exhibit 7, which is premarked 15. They got separated.

Kim and Kevin, we're going to go to Exhibit 7, premarked 15.

(Exhibit Number 7 marked for identification.)

BY MR. STEARNS:

Q Okay, sir. Do you see this agreement?

A Yep.

MR. STEARNS: Can you just scroll down, Sarah, to Section 1.8.

BY MR. STEARNS:

Q My first question is -- stop it there -- Mr. Bilzerian, do you know what MIADOCS is? Are you familiar with that stamp on the bottom?

## Page 204

A No.

Q Did you have a lawyer draft this contract, or do you know if a lawyer was involved in drafting the contract?

A Can you -- can you go up a little bit? Yeah, so this is an old contract. It has a -- it has an end date, so this is not applicable.

Q Understood. This was on March 4, 2017. This is that -- that email that was sent from Jason Huh. There were changes made.

Do you understand there were multiple drafts of the contract?

A Yeah, but this is not the final.

Q Understood. It says "final contract." This contract was not signed, right?

A No. I wouldn't have signed it, not with an expiration date. Our understanding was in perpetuity, so...

Q Okay. We'll get to that in a second.

My question was, "MIADOCS," do you know what that means? Was there a lawyer drafting it?

A I don't know what that means.

Q Okay. See at the bottom 1.8, it says "gross profits." Do you see that?

A I see it says "gross profits."

888.909.2720        Anthem Reporting        813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 205

Q   Do you know what it means when it says, "Gross profits shall mean all income derived by STEEL Supp"?

A   I mean, that's not what -- our contract says "gross sales," so why are we looking at an old contract that wasn't signed?

Q   So my question --

A   Answer me that.

Q   I'm sorry.  I didn't mean to interrupt.
My question is:  Do you know the difference between "gross sales" and "gross profits"?

A   I know what "gross sales" is.  I'd have to Google "gross profits."

Q   Okay.  You don't know the difference?

A   Okay.  I mean, profit would be, you know, after deductions.  I mean, it's a totally different term.

Q   Do you know what "income" means?

A   Yes.

Q   What does "income" mean?

A   Income is money coming in.

Q   Okay.  What's a "sale"?

A   A sale is when you sell an item and receive money.  I mean...

Q   So a sale would be money comes in as well, yes?

A   Okay.  The --

MR. McCOY:  Form.

Page 206

A   -- textbook definition for "gross sales" is top-line revenue, okay?  And that -- and that does not include deductions for returns or any of this stuff.  This is not, like, up for debate.  I know that you want to, like, fence around with this term, but this is a very specific term that any accountant knows.  And it's top-line revenue.  And it -- and it is -- and it has nothing to do with sales, discounts, returns, none of that.  It's not applicable.  It is just gross sales, which means everything that is sold, top-line revenue.  It's a very specific term.  I know you guys want to create ambiguity, which there is none.  Gross sales is a very specific thing.

Q   Okay.  Sir, what's your college background?  Did you receive a degree?

A   I did not.

Q   Okay.  Do you have any background in accounting?

A   I took college accounting courses, but that doesn't make me an expert on accounting.  But I all -- I mean, all you need to know is how to Google "gross sales" and you'll figure out what "gross sales" is.  Any accountant can tell you that.  It's not a very complex term.  I mean, I took business.  I was a business major.  This is very basic stuff.  I mean, I've seen accounting

Page 207

done.  I mean, gross sales is top-line revenue.  It's not debatable what that is.

Q   And I'm sorry.  You said there's a definition of that somewhere.  Where is that?

A   Google it.  Google "gross sales" and see what comes up.

MR. STEARNS:  Okay.  Go ahead and -- Sarah, go ahead and pull up premarked Exhibit 22.  This is going to be Exhibit 8.

(Exhibit Number 8 marked for identification.)

MR. STEARNS:  And then 23, Kim and Kevin, will be Exhibit 9.

(Exhibit Number 9 marked for identification.)

BY MR. STEARNS:

Q   Okay, sir.  Can you see on the screen what we've marked as Exhibit A -- 8?

A   I see S16 PDF.

MR. STEARNS:  Sarah, can you zoom -- zoom out so that the contract shows the full page.  We'll zoom in, sir, to read it; but you see on each page, there are -- scroll down each page, Sarah.

BY MR. STEARNS:

Q   Do you see some initials at the bottom?

A   Yeah, I see "gross sales" in there.

Page 208

Q   Okay.  Well -- and that was going to be my question, sir.  Do you see at the last page here, it looks like there's a signature for STEEL by Jason Huh and a signature for Blitz NV by you.
Do you see those signatures?

A   I do.

Q   And do you see your initials on the bottom of page 6?

A   I do.

Q   And do you see your initials on every page?

A   I would have to go back and look.

MR. STEARNS:  Scroll back up and go in reverse order, Sarah.

BY MR. STEARNS:

Q   Do you see it on page 5?

A   I do.

Q   Page 4?

A   Yep.

Q   Page 3?

A   Yep.

Q   2 and 1?

A   Okay.

Q   Those are your sig- -- those are your initials?

A   Yeah, right there, right where it says "gross sales."

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 209

MR. STEARNS: Okay. Can you zoom in on page 1, Sarah? Oh, I'm sorry. Strike that. Go to Exhibit 9.

MS. STEIN: I'm sorry, Jason. Exhibit 9 as to today or Exhibit 9 premarked?

MR. STEARNS: Premarked 23. It will be Deposition Exhibit 9.

MS. STEIN: Sorry. I just want to make sure I get it right.

MR. STEARNS: That's a fair question.

BY MR. STEARNS:

Q You can ignore the first page, Mr. Bilzerian. This is just a cover letter because it was filed with the Court.

Go to page 2 of Exhibit 9. Do you see at the top there are initials in the intro paragraph after "Sarasota, Florida"? It looks like somebody initialed it.

A Yeah, I see some scribbling in there.

Q Okay.

A I don't know if that's an initial, but it's something.

Q Can you go down to the last page, page 6. This is page 6 of Exhibit 9. Is that your signature there, sir?

Page 210

A Yep.

Q I don't -- I don't know if there's a way to do this in a way that you can have them side by side, but do you know, sitting here today, whether it's the same signature on both pages of Exhibit 8 and Exhibit 9, but the only difference is there were some differences in the contract, like gross sales is now there, and there's initials on every page? Do you -- do you know how that played out?

A I'm not sure what you're asking.

Q Yeah, I'm asking you why there are two versions of the contract, if you know. Both have your signature and Jason Huh's signature on the last page, but the first page says in one version -- on the Exhibit 8 version, it says "gross sales." On the Exhibit 9 version, it says "gross profits." Do you know why that is?

A Well, I saw on the one that was initialed on every page had "gross sales."

Q Okay. But my question is: Do you know why there are two different versions?

A Probably because you guys fabricated a document to show gross profit that I didn't sign.

Q Okay. That didn't happen in this case, sir, but my question was just simple. If you don't know,

Page 211

that's fine. Do you know --

A If you're asking what I think, I think you guys manufactured documents so you could probably try and weasel out of this agreement, because I -- there's no reason why there would be no initials on the pages other than if you guys just manufactured a document. Because I -- I never saw anything that had -- I would never have signed anything that said "gross profit" because our agreement was very specific, gross sales. Because I didn't want to have to audit these fucking guys, and I'm glad that I didn't have to, given that every time I turn around, I find them screwing me out of money, you know, not reporting sales on Amazon, creating shell corporations to hide sales -- CM Innovations, what a joke that is -- and then, you know, you guys not paying me on -- on gross sales after the contract very specifically says "gross sales."

So there's three places that you guys have been cheating me out of money. So, I mean, fabricating a document, I'm sure that's not out of your wheelhouse.

Q Okay, sir. You don't have any knowledge that documents are fabricated. You're just -- you're just kind of making that claim now?

A I mean, I've seen what you guys have done in this case. I mean, it's unbelievable. I mean, what's

Page 212

CM Innovations? I mean, that's cute. You guys created a company to cheat me out of money and not report sales. I mean, it's unbelievable, every time I turn around.

My -- my business manager had to find you guys selling products on Amazon, and then you're like, "Oh, yeah. I guess we were," and then started paying me on that. Like, if I hadn't found out, I never would have got paid on Amazon sales either. I don't know how many other things you guys probably cheated me out of. I mean, every time we turn around, we find something new.

Q Are you done?

A Yeah.

MR. STEARNS: Okay. Sarah, go ahead and pull up Exhibit 10. This was premarked 20, Kevin and Kim.

(Exhibit Number 10 marked for identification.)

BY MR. STEARNS:

Q Mr. Bilzerian, do you see the email from David Vingiano on March 7th at 4:42?

A I do.

Q And you're copied on it?

A It says I am.

Q Do you see there -- scroll down, Sarah.

Do you see there in the second sentence, he says the only change he made was in Section 1.6 to make

53 (Pages 209 to 212)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 213

that definition consistent with the language in Section 4?

A   That's what he said.

Q   Okay.  Were you on any phone calls with Jason Huh or any of the folks at STEEL about that change that you recall?

A   I don't know what Section 1.6 is off the top of my head.

MR. STEARNS:  Sarah, can you pull up Exhibit 8 and 9 side by side?

A   So let me just get this straight.  So you're going with the contract that doesn't even have a date written in here, that doesn't have any, you know, signatures at the bottom, that has no initials; you're saying that that supersedes the one that's actually filled in properly, that has, you know, signatures and initials on every page?  Is that what you're alleging here?

BY MR. STEARNS:

Q   Sir, I hadn't asked the question yet.

My question is:  Do you see that there are two Sections 1.6?  Do you see that in the two exhibits, Exhibit 8 and 9?

A   Yep.

Q   One says "gross sales"; one says "gross

Page 214

profits"?

A   Yep.

Q   Which one in your mind was the operative agreement?

A   Gross sales.

Q   Okay.  Do you know, sitting here today, what the difference is between 1.6 on Exhibit 8 and 1.6 on Exhibit 9?

A   The one that we signed said "gross sales," and the other one says "gross profits," which, you know, we never agreed to gross profits, which is why there's no initials, which is probably why the email said we're changing Section 1.6, because, you know, maybe it was wrong.  I don't know.  But "gross sales" is what we initialed.  That's what we agreed on.

Q   Right, and I'm looking at 1.6.  And it says, on Exhibit 8, "Gross sales shall mean all sales derived by STEEL Supps."

And I'm asking you:  Is it your testimony and are you telling the Court that "all sales" means all sales, whether discounted or returned, it doesn't matter, every sale; that's what you get paid on?  That's your testimony?

MS. STEIN:  Object to the form.

A   That's what --

Page 215

MS. STEIN:  Let me make my objection.

MR. McCOY:  Join.

A   That's the definition of "gross sales."

BY MR. STEARNS:

Q   Okay.  And where do you get that definition from?

A   From the dictionary.

Q   Okay.  Which dictionary?

A   I mean, I could pull up Oxford, if you want.  We could pull up an accounting dictionary.  You could Google it.  You could ask any accountant.

Anybody will tell you what "top-line gross sales revenue" is, and it does not include discounting.  It doesn't include returns, none of that.  It is gross sales, meaning all sales; all sales.  It has nothing to do with returns.  It has nothing to do with discounts, none of that --

Q   So your --

A   -- gross.

Q   So your testimony is if STEEL sells $100,000 worth of product in February of 2020 and $99,000 gets returned, you still get 10 grand?

A   Yes.

Q   Okay.  And that, you think, is something that is made clear by 1.6, "Gross Sales"?

Page 216

A   Because --

MS. STEIN:  Objection to form.

A   Because the definition of "gross sales," exactly is what I told you, top-line revenue; and so -- and that's never going to happen.

And the reason I chose gross sales over 40 percent equity in this company is because it's top line, and I don't have to audit these people.  And as we've seen, when we have audited you, we've caught you stealing from us numerous times and numerous ways.  So I'm glad that I did gross sales.  It's just, you know, unfortunate that you guys didn't choose to honor that; but that's what we agreed to, and that was very specific in the contract.

10 percent of gross sales is still not as good as 40 percent equity in the company; but it's, you know, not just 10 percent.  I mean, 10 percent of gross is more than just 10 percent.  I didn't agree to 10 percent of profit, because I don't want to have to audit.  I didn't want to have to figure out what his expenses are, what he's going to write off if, you know, if -- whatever, you know, if a Lamborghini is a marketing expense.  I didn't want to have to deal with any of that stuff.

I said "gross sales," and I only took

54 (Pages 213 to 216)

888.909.2720                Anthem Reporting                813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 217

10 percent. That was a very fair deal considering he offered me 40 percent of equity. And I chose that because I didn't want to have to deal with any nonsense.

BY MR. STEARNS:

Q I'm confused. You've used the phrase "top-line revenue" and "gross sales" today. Are you saying that you understand those to be the same?

A No.

MR. McCOY: Form.

A Gross sales is -- it has nothing to do with discounts. It doesn't have anything to do with returns. It is just gross sales. I mean, I don't know why we're even arguing this. This is a -- this is a clearly defined term in the dictionary, in accounting. You can look this up. Any accountant will tell you this.

I don't know why we're arguing over it. I mean, it's -- I mean, I do know why, because you guys have been cheating me on what you're supposed to be paying me. I get why we're arguing it, but it's a ridiculous argument.

BY MR. STEARNS:

Q So in -- in -- is your understanding of "gross sales," sir, all sales derived by STEEL's -- STEEL Supps? Is that to include shipping costs as well?

MS. STEIN: Objection to form. Go ahead.

Page 218

MR. McCOY: Join.

A Okay. I -- I believe if you guys are charging for shipping, that's a part of the sale.

BY MR. STEARNS:

Q So you consider shipping a sale, yes?

A I believe that's part of the sale, the gross sales.

Q If STEEL Supplements discounts a product and sells it at as a discount and the customer buys it at a discount, you're saying you're entitled to 10 percent of the presale discount price?

MS. STEIN: Objection to form. Go ahead.

MR. McCOY: Join.

A I am saying I am entitled to the gross sale amount, which is per the contract. And not only that, but these guys were making pills for 9 bucks, and they were selling them for 90. Their profit margin was insane.

So if they discounted a little bit of the shipping cost or they discounted the product, they were still making massive margins. So don't act like these guys weren't making tons of money and this 10 percent was crippling them.

It was 10 percent of gross, which is very easily attainable in this industry, especially with the

Page 219

prices and the margins that he was charging. So, you know, you can make the case, "Oh, yeah. Somebody's going to return $99,000 of product if they only bought a hundred," but that's just nonsense.

BY MR. STEARNS:

Q Okay. But I'm trying to understand, because it's important -- and I don't know if you've seen them, but there are different expert reports that have been produced in this case, some by Blitz and some by Steel.

So you have accountants that are going to testify later -- and we'll talk about that with the accountants, Mr. Bilzerian, but my question is: What did you understand?

Are you telling this Court in this trial that STEEL should pay you 10 percent on a sale of a product that might have been MSRP'd at 100 but it actually was sold at 50, that you should get 10 percent of 100?

A Yes.

MR. McCOY: Objection to form.

MS. STEIN: Objection to form. Argumentative.

MR. McCOY: And asked and answered. You asked that exact question two minutes ago, Mr. Stearns.

BY MR. STEARNS:

Q Did you understand the question, sir?

A Yes, and I've answered it twice.

Page 220

Q And what is your answer? Do you get 10 percent of the MSRP even though it gets sold for less?

A For the third time, yes, I'm entitled to gross sales as per the contract.

Q Understood.

MR. STEARNS: Okay. Sarah, go ahead and let's mark Exhibit B.

Kevin and Kim, you should have what's been premarked as Exhibit B. We're going to make this Exhibit 11.

THE COURT REPORTER: Excuse me, Mr. Stearns. You didn't mark an Exhibit 10 yet.

MR. STEARNS: Oh, I'm sorry. I thought I did. So let's make this Exhibit 10.

THE COURT REPORTER: I believe you referred to a document, but you didn't say it was Exhibit 10.

MR. STEARNS: Okay. Well, let's leave 10 open either way. Let's make Exhibit B, premarked Exhibit B, Exhibit 11.

MS. STEIN: I don't see a premarked B.

MS. GOTTLIEB: I'm moving it now.

MS. STEIN: Oh, thank you.

(Exhibit Number 11 marked for identification.)

MR. STEARNS: Can you scroll to --

MS. STEIN: What's the Bates stamps?

888.909.2720　　　　Anthem Reporting　　　　813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 221

MR. STEARNS: I don't have a Bates stamp on this one, because it wasn't produced by Blitz, and the text messages we produced are in an Excel spreadsheet. So this doesn't have a Bates page, but we'll Bates it after this. If you want, we can send that over.

Do you see the beginning of it, Sarah? There's the January 3rd time.

MS. STEIN: I hate to do this. Remember, I have to do a thing at 3:00, so we have about a minute. I apologize. Remember?

MR. STEARNS: Okay. That's fine.

BY MR. STEARNS:

Q  Mr. Bilzerian, do you see this text?

A  Yes.

Q  Do you recall a text with Jason Huh in January of '17 where he was sending you pictures of samples of product and then this conversation about a 5-Hour Energy? Do you recall this?

A  In the package (inaudible) --

THE COURT REPORTER: Again, sir, I can't hear you if you're trying to be on the record.

THE WITNESS: No, I'm just reading it.

A  Okay. Like 5-Hour Energy but meth in comparison. Okay. So...

## Page 222

MR. STEARNS: Scroll back up to the top of Exhibit 11, Sarah.

BY MR. STEARNS:

Q  You see the picture of some bottles in a box?

A  Yep.

Q  You received a box with sample product from Jason Huh, and that's pictured here, right?

A  Yeah. It looks like the unflavored versions of his preworkout and BCAs.

Q  And it says, "It was just liquid."

These were liquid RTD samples, yes?

A  No, those were not. Those are his -- that's his Amped and Charged and whatever. Those are -- those are powdered.

Q  Okay. In your view, is there a difference between an RTD and a powder, other than -- it's still a drink, right? So one you have to mix with water, one you have to drink -- or one you don't have to mix?

A  It's a big difference. I mean, an RTD is a total -- I mean, nobody ships RTDs in the mail. RTDs are a point-of-sale item. You have to get shipping for them. I mean, it's a whole different animal. It's a completely different business model.

Nobody sells RTDs online. People don't go online and buy Monster Energy. You buy a Monster Energy

## Page 223

at a gas station or a Costco. So it's a different deal. I mean, shipping costs with RTDs are super expensive, cost prohibitive. It's an entirely different business model.

Q  You're saying that folks don't purchase RTDs on Amazon?

A  Nobody I know does.

Q  Okay. But do you know if Amazon actually sells RTDs, or are you just speculating?

A  I mean, I don't know. Maybe they do. I mean, we've -- we've noticed that, you know, sales with online energy drinks is, you know, minuscule.

Q  Okay. My question, though, is: Does this refresh your recollection about Jason Huh sending you sample energy shots?

A  No. And an energy -- and an energy shot is a completely different thing than a -- than an RTD or an energy drink. Like an energy shot, a 5-Hour Energy is a one-ounce little bottle, and it's a completely different thing than -- you know, than a Monster Energy or a Red Bull or you know, ZRO, totally different drinks.

Q  What's the basis for that testimony?

A  Well, one is in a 16-ounce can. It's carbonated. It's, you know, a completely different concentration. The other one is 2 ounces. I mean, it's

## Page 224

a completely different, you know, product.

I mean, I wouldn't even consider 5-Hour Energy an RTD. That's just like a shot.

But he never came out with a product. Like, he never released that product. That was never a thing.

Q  Well, I was just -- earlier I was asking you whether or not you recalled Jason Huh discussing energy drinks and energy shots and RTDs --

A  Well, a shot is --

Q  Sir -- sir --

A  Go ahead.

Q  The court reporter cannot take both of our testimony.

A  I apologize. Go ahead.

Q  It's okay. No, this is tough.

Earlier, I had asked whether you remembered Jason Huh sending you various samples of product, including sample energy shots or energy drinks, and I thought you said earlier you didn't remember receiving any. Is that -- is that true?

A  Yeah. You said an energy -- an RTD energy drink, and I said, no, I never received any of that from him.

Q  Okay.

A  I actually don't remember getting the little

56 (Pages 221 to 224)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 225

5-hour energy shots either. I don't remember getting those. I don't remember -- he never launched those. That was never really a thing, so if he sent me a sample once, I don't remember getting it.

MR. STEARNS: Okay. Kim, did you need to take a break?

MS. STEIN: Yeah, I really do. I'm three minutes late, so if we could do that.

MR. STEARNS: How long do you need?

MS. STEIN: This is the half-hour one.

A If you see on there, I put two question marks when he said it was just liquid.

MR. STEARNS: Can you -- do you have to go, Kim, or do you want to hit this when we come back?

MS. STEIN: Yeah, I really need to go. Dan?

MR. STEARNS: All right. We'll come back in 30 minutes?

MS. STEIN: Yeah, we can do -- 3:30 is fine. We can do -- 25 should be fine.

MR. STEARNS: All right.

MS. STEIN: Thank you.

THE VIDEOGRAPHER: Off the record 6:04 p.m.

(Recess taken from 6:04 p.m. to 6:33 p.m.)

THE VIDEOGRAPHER: On the record 6:33 p.m.

MR. STEARNS: Sarah, can you go ahead and pull

Page 226

up Exhibit 11?

Can you zoom in on that, Sarah, or make the picture bigger on the screen, the whole exhibit?

MS. GOTTLIEB: Like zoom out to make it fit?

MR. STEARNS: Like, on my screen, I see a white box with a lot of black on the side. Is it possible to fill that whole computer screen, or is that the biggest it gets?

MS. GOTTLIEB: Is that any better?

MR. STEARNS: Yeah, do that all the way to the end. Keep going.

BY MR. STEARNS:

Q Okay. Mr. Bilzerian, we're looking at Exhibit 11. What I'd like you to do is read from the top down, and Ms. Gottlieb will scroll through Exhibit 11.

So starting with the picture and then Mr. Huh in the text in the blue, right, read him -- read his text and your text, and just go to the bottom. Let's read this from start to finish.

A Okay. You've cut off -- you've cut off most of the picture here, so I can't really see what's in the box.

Q I'll see if I can get a better picture, but I think you said earlier you recall receiving that box of

Page 227

product, yes?

A The only thing that I see in the box is the -- the powder, but I'll read it.

"All of your unflavored products are ready."

And then I said, "It was just liquid."

Q Okay. And what did Mr. Huh say?

A And then he put question marks, and then he said, "Ooh, in the package that's the new Amped-AF energy shots. Like a 5-Hour Energy but meth in comparison. Give some to some people and tell them to only drink half a shot."

Q All right. Just stop there for a second. So this is Mr. Huh back in January of '17, telling you about the new Amped-AF energy shots, correct?

A Yes.

Q Okay. Keep going. What does he say?

A "The pills are the new hard-AF dandickenlargement pills.

"Eight is a serving. Eight is a serving. You'd take 4 a.m. 4 p.m."

And I say, "Oh. Gotcha. LOL."

MR. STEARNS: Okay. Scroll down, Sarah.

BY MR. STEARNS:

Q What did Mr. Huh say in response?

A "I know you've been busy as fuck traveling but

Page 228

did any of the boys get to try the dick pills or energy shots?"

I said, "I get back Thursday. Let me guinea pig them lot a bit.

"Ha, ha, titties."

Q Okay. Did you guinea pig the energy shots that Mr. Huh sent to you in 2017?

A No. I never -- I never saw them.

Q Well, that's what was in the box.

A No, that wasn't energy shots. That's unflavored -- that was unflavored, you know, Amped and -- and the BCAs and whatever that I asked him to send me with no flavoring.

Q So your testimony is you never received the energy shots that you guys were discussing in January of '17?

A I don't believe I got them. And if I did, I never tried them.

MR. STEARNS: Okay. Keep going, Sarah.

A "Serving is 6 but only do 4.

"The energy shot only half. Liquid coca lol."

I said, "Haha. Okay."

"I'm not kidding, bro. Lol. That is the strongest energy shot on the planet legally. I made sure of it. 5-Hour Energy is a micro dick in

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 229

comparison."

Q  Okay.

A  "You sure there isn't legal liability with that?

"Legally it's tits.  Not to mention backed by the best legal team in the fucking supplement industry.

"Nice.

"Let's talk business when I get back.

"Yes, sir.  CPA has prepared all of the financials.  Just let me know when is good.

"Send those over when you can so my business manager can get started on it.

"I'll have a meeting tomorrow with him to get them soon."

MR. STEARNS:  All right.  Go back up to the first page of Exhibit 11, Sarah.

BY MR. STEARNS:

Q  Do you see there the first -- the response you sent to Jason Huh when you -- when you got the picture was, "It was just liquid."  Do you see that?

A  Yeah.

Q  Right.  You're telling Mr. Huh these products are just liquid, right?

A  No.

Q  What did you mean when you said, "It was just

Page 230

liquid"?

A  Not --

Q  Sorry.

A  I don't -- I don't know, without context, what I was talking about in 2017 when I said, "It was just liquid."

Q  Okay.

A  I might have been asking it as a question.  I'm not sure.

Q  But your testimony is you don't believe these are bottles of liquid energy shots?

A  I know those are not bottles of liquid energy shots.  Those are like -- those are the Amped or, you know, Rested.  Those are big bottles, and those are powder bottles.  Those are not energy.  5-Hour Energy is 2 ounces.  They're tiny.  This is a -- you know, this is a tub.  This is for powder, and he says -- and he says it right there, "All your unflavored products are ready."  It's a picture of the unflavored products.

MR. STEARNS:  Okay.  All right.  You can take that down, Sarah.

BY MR. STEARNS:

Q  So we were talking about energy drinks.  I think, before we took a break, you had mentioned something about RTDs are not sold on websites.  They're

Page 231

sold at a point of sale?  Is that what you were saying?

A  Yeah.

Q  Do you know that, or are you just -- are you just guessing that that's what happens?

A  Well, I know because we sell RTDs, and all of our RTDs that we've been selling have all been point of sale.  We barely sell anything online, but we sell, you know, in all of the stores.

And that's -- and I talked to the owner of Bang Energy, and he said the same thing.

Q  Well, but I guess that was going to be my question.  You are aware that Ignite sells ZRO online, right?

A  Yeah, and it barely does any sales.

Q  Okay.  What were the sales last year?

MS. STEIN:  I'm going to go ahead and object as to form and also make sure -- I know we've designated the transcript, but anything to do with this, when you ask on sales, as to which entity?

As you know, we've discussed, you know, he's not a 30(b)(6) witness for Ignite International.  That would be a more specific question for them.  But which company are you referring to and where?

So I'm going to ask you to kind of rephrase that, Jason.

Page 232

MR. STEARNS:  No, no.  I only asked the question because he started making statements that were just false, and I didn't know if he was guessing.  I was trying to find out what he was -- what he was talking about.

MS. STEIN:  I'm not sure if he made statements that were false, so I would object to that.

BY MR. STEARNS:

Q  All right.  So you agree with me, Mr. Bilzerian, that RTDs are not only sold at stores, correct?

A  They're mostly sold in stores.  That is my understanding.

Q  Okay.  So earlier when you said that they weren't sold online, you were wrong?

A  No.  I said that RTDs are mostly sold in stores, and it's not really a -- you know, something that people buy online.  I mean, I'm sure there's exceptions to all rules, but I would bet a lot that the bulk of RTDs are sold in gas stations, point of sale, Costco, whatever, and it's not sold online.

MR. STEARNS:  Can you pull up Exhibit 1, Sarah?

BY MR. STEARNS:

Q  So you've made a reference a couple of times today about the agreement in perpetuity.  Do you

58  (Pages 229 to 232)

888.909.2720              Anthem Reporting              813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 233

remember that?

A   Yep.

MR. STEARNS:  Go to page Blitz 22, Sarah, of Exhibit 1.

MS. GOTTLIEB:  Did you say Blitz 22, Jason?

MR. STEARNS:  Yes.

MS. GOTTLIEB:  I have Exhibit 1 starting at Bilzerian 191.

MR. STEARNS:  Oh, okay.  Go ahead and -- yeah, go ahead and pull up premarked Exhibit 24 --

MS. GOTTLIEB:  Okay.

MR. STEARNS:  -- or release it to Kevin and Kim, and I'll pull it up right now.

MS. GOTTLIEB:  It was released.

MR. STEARNS:  Oh.  Go ahead and pull that up.

MS. GOTTLIEB:  Yep, pulling it up now.

MR. STEARNS:  Can you scroll down?

BY MR. STEARNS:

Q   All right.  So this is the text message string between you and Jason Huh, Exhibit 1 -- or I'm sorry.

MR. STEARNS:  What's this new exhibit, Exhibit 12?

THE COURT REPORTER:  Yes.

(Exhibit Number 12 marked for identification.)

BY MR. STEARNS:

Page 234

Q   Okay.  Do you see at the bottom, Mr. Bilzerian, Blitz 22?

A   Yes, I do.

Q   Okay.  You said -- this is you and Jason Huh talking March 4, 2017 about the agreement, correct?

A   Yep.

Q   And do you see where you tell Mr. Huh, "He said it didn't say indefinite and there was a termination clause, but other than that that was good."

Do you see that?

A   Yeah.  "Other than that, it was good," yep.

Q   All right.  And Mr. Huh's response was, "It absolutely is indefinite unless you or I want to part ways due to some major issue or catastrophe."

Do you see that?

A   Yes.

Q   Okay.  You understood that the agreement could be terminated for certain reasons?  You understood that, yes?

MS. STEIN:  Objection to the -- to form.

A   He -- he envisions a major issue or catastrophe which I would, you know, cite the contract, which says basically if I were to be, you know, thrown in prison or -- I mean, some major thing, not just he doesn't want to pay his fucking bills.

Page 235

MR. McCOY:  And can we -- could I just ask that you scroll down to the next page so we have the full exchange, perhaps?

MR. STEARNS:  Sure.

Okay.  Can you pull up Exhibit 8, Sarah?  Scroll down to 2.2.

BY MR. STEARNS:

Q   Sir, I'm showing you in Exhibit 8, a contract at Section 2.2.  Can you read that where it says "Termination"?

A   "Blitz may, upon written notice, terminate" --

Q   The question is just:  Can you read it?  I'm not asking you to read it -- I'm sorry -- but can you?  Is it big enough?  Can you read it?

A   Yes.

Q   Okay.  Sorry.

So my question is:  You understand that this is what Blitz is purporting to be the operative agreement?  And if you want to scroll up to 1.6 so you can see, it's the gross sales one.

A   Yep.

Q   Right?  Do you see that with the initials?

MS. STEIN:  I'll object just as to form.

BY MR. STEARNS:

Q   Okay.  So this is Exhibit 8, and Section 2.2

Page 236

has a termination clause.  Do you see that, right?

A   I do.

Q   And I want to draw your attention to 2.2, (ii) -- I'm sorry -- (iii), where it says, "If Blitz is in material breach of this agreement."

Can you see that?

A   Yes.

Q   Do you agree that STEEL can terminate the agreement if Blitz is in breach, material breach?

MS. STEIN:  Objection to the extent it calls for a legal conclusion.

MR. McCOY:  Join.

MS. STEIN:  You can go ahead.

MR. McCOY:  Sorry.

THE WITNESS:  What is that, Kim?

MS. STEIN:  You can go ahead and answer.

A   Okay.  Yeah, that's what the contract says, if Blitz is in material breach of this agreement.

MR. STEARNS:  Okay.  Can you scroll down to -- Sarah, can you scroll down to Section 4 -- I'm sorry -- 3.1.  Go back up.

BY MR. STEARNS:

Q   Okay.  So do you see here Section 3?  It's titled "Sponsorship Rights," and it states that "Blitz is granting the following rights to STEEL," and

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 237

Section 3.1 is the exclusivity rights. Do you see that?

A  Yep.

Q  Section 3.1.1 restricts your -- you're the celebrity in this contract?

A  Yep.

Q  And 3.1.1 states that, "You shall not promote, publicize, or endorse the services or products of any competitor of STEEL SUPPS."

Do you see that?

A  Yep.

Q  Yes?  And you understand that meant a provider, seller, manufacturer, or distributor of bodybuilding supplement products, right?

A  Yep.

Q  Okay.  Starting with the easy one, Full Send is a distributor of bodybuilding supplement products, right?

MR. McCOY:  Form.

A  Not that I'm aware.

BY MR. STEARNS:

Q  Okay.

A  I've never seen them promote that one time.  I don't know anybody that's even used that.  I've never seen that.  It's -- you know, when you think of Full Send, you think of their merch.  You think of their

Page 238

YouTube.  I don't think they're doing any supplement sales; I mean, none that I'm aware of anyways.

Q  And if it turns out you're wrong, for whatever reason that you didn't know Full Send sells supplements, you promoted a Full Send product, didn't you?

A  Untrue.

MR. McCOY:  Form.

A  Because I have a bag doesn't mean I'm promoting Full Send, because a bag is in a video.  That's like saying if I have an L.L. Bean backpack on and L.L. Bean carries some kind of supplements, that I'm promoting L.L. Bean.  That's not -- that's not how that works.

I didn't tag them.  I didn't promote them.  I didn't say, "Go buy this." I didn't put a link.  It was not an endorsement in any way, shape, or form.  It's a bag with a logo on it.  That's not an endorsement.  That's not me promoting another competitor's product.  I didn't get anything out of that.  It -- no, that -- good luck with that one.

MS. STEIN:  I just want to know if the court reporter is getting Kevin gave a -- did you -- did you get Kevin's objection prior, because I wanted to join that.

THE COURT REPORTER:  Hold on.

(Record read.)

Page 239

MS. STEIN:  Yeah, I want to join that.  I just want to make sure.  Dan, can you please slow down a little bit for everybody?

THE WITNESS:  Okay.  Sorry.

BY MR. STEARNS:

Q  So, Mr. Bilzerian, your testimony -- you were telling the Court that, sitting here today, you have no idea that Full Send sells a line of supplements, bodybuilder supplements?  That's your testimony?

A  Until you mentioned it --

MR. McCOY:  Form.

A  -- I had no idea that they sold any bodybuilding supplements whatsoever.

BY MR. STEARNS:

Q  Who's Bradley Martin?

A  He is a YouTube gym owner, internet personality.

Q  Okay.  Any connection with Full Send, to your knowledge?

A  They do videos together; but, yeah, I don't know what their connection is.

Q  And your testimony is you've spoken to the Full Send folks and never once discussed their supplement line?

A  Not once.

Page 240

Q  And you've never been to the Full Send website and seen all of their supplements that they sell?

A  Not once.

Q  And so -- well, let me ask you this: The -- the bag -- are you telling the Court that your post with that Full Send bag in the trunk of your truck was an accident; it wasn't an intentional promotion?

A  It was not a promotion.  It's a bag in a car that was in a, you know, swiping video.  That's not a promotion.

Q  Okay.  So your -- your testimony is Full Send didn't send you that bag with the expectation that you would promote Full Send by posting it?

MR. McCOY:  Form.

A  I get $400,000 to post.  I'm not going to promote somebody for a $20 bag, no.  That's not the case.

BY MR. STEARNS:

Q  Okay.

A  You think I'm doing bag promotions like for $15 bags?  I'm just, you know, pumping people's shit?  No, that's not how it works.

Q  Can you go ahead and go to -- well, actually before we do that.

Do you see where it says, 3.1.1, "A competitor

60  (Pages 237 to 240)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 241

of STEEL SUPPS is defined as a provider, seller, manufacturer, or distributor of bodybuilding supplement products."

Do you see that?

A  I do.

Q  And did you ever tell Jason Huh a bodybuilding supplement product might include -- or it might not include everything STEEL sells; it might be a smaller subset?  In other words, did you ever try to define that when you talked to Jason Huh?

A  Well, if STEEL doesn't sell it, then it can't be a competing product, right?

Q  Okay.  But if STEEL sells it, it can be a competing product, correct?

A  Yes --

Q  Okay.

A  -- but --

Q  And you understand --

A  -- not a bodybuilding product.  I mean, just because they decide that they want to go, you know, sell water doesn't mean water is a bodybuilding supplement, you know.

So I know that they would like to make that claim, but it doesn't make it a case.  I mean, our agreement was bodybuilding supplements.  So I would go

Page 242

by the textbook definition of bodybuilding when I, you know, think about that, not anything that they want to slap their, you know, label on.

Q  You -- you knew Jason Huh's background, right?  He was a professional bodybuilder competing?

A  Yep.

Q  Okay.  You're not telling the Court that bodybuilding is limited only to the Jason Huhs of the world, who actually get on a stage and pose and compete, are you?

A  No, that was what he wanted.  He wanted to have a company that was for hard-core bodybuilders.  And we got into this argument numerous times when he was doing the Amped and the Charged, and he wanted all of this amphetamine in there, and he just kept on saying, "This is for hard-core bodybuilders.  This isn't a pussy-assed company.  We're not, you know, marketing to women.  This is for hard-core dudes," blah-blah-blah.

So that was his intention.  And, you know, I disagreed with it, but that's -- that was his intention and when he, you know, wrote this contract up, "bodybuilding supplements" were exactly what it says, "bodybuilding supplements."

Q  All right.  And you understood that STEEL was focused in marketing towards the fitness industry; you

Page 243

knew that?

MR. McCOY:  Form.

A  Bodybuilding industry.

MS. STEIN:  Join.

BY MR. STEARNS:

Q  Okay.  You don't think STEEL in the beginning of this relationship, and before you even came on board, was more generally marketing towards athletes in the fitness industry?

A  Absolutely not.

MR. McCOY:  Form.

A  It was bodybuilding, very specifically stated by Jason Huh in the texts.

MR. STEARNS:  Let's go to Exhibit 1, Sarah.  Can you go to Blitz 69?

MS. GOTTLIEB:  For Exhibit 1, I don't have a Blitz 69.

MR. STEARNS:  It was premarked 74.  Because I'm looking at premarked 74, and it goes all the way down.  Do you have a different premarked 74?

MS. GOTTLIEB:  No, I --

MR. STEARNS:  My premarked 74 starts with Blitz 9, and it's 682 pages.

MS. GOTTLIEB:  So premarked 74?

MR. STEARNS:  Yeah, but we marked it as

Page 244

Exhibit 1, didn't we?

MS. GOTTLIEB:  I have Exhibit 1 marked as premarked 7.

MR. STEARNS:  I'm sorry.  What was Exhibit 74, premarked 74?  What did we mark that as?

MS. GOTTLIEB:  I don't have that.

MR. STEARNS:  Oh.  Well, we've been using it.  So let's go ahead and mark it now as Exhibit 12.  So premarked 74, we'll mark that as Exhibit 12.

MS. STEIN:  I thought we had a 12.

THE COURT REPORTER:  I thought we had a 12.

MR. STEARNS:  So 13 will be premarked 74.

MS. STEIN:  I don't have 74.

MS. GOTTLIEB:  We didn't previously release 74.

MR. STEARNS:  Oh, I'm sorry, guys.  So when I've been going through the text messages, Kim and Kevin, you didn't have them?

MS. STEIN:  Your text message that you showed was Exhibit 9 --

MR. STEARNS:  All right.  Go ahead and release --

MS. STEIN:  -- premarked 9.

MR. STEARNS:  Let's go ahead and release premarked 74, Sarah.

MS. GOTTLIEB:  Okay.

888.909.2720                Anthem Reporting                813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 245

MR. STEARNS: All right. Just to keep moving, guys, we're going to release, but I'll pull it up on the screen.

MS. STEIN: That's fine. I just wanted to make sure you -- I was getting confused, so.

MR. STEARNS: No, it confused me, too.

BY MR. STEARNS:

Q Okay. Mr. Bilzerian, do you see on the screen a text message thread? We're going to mark this Exhibit 13.

(Exhibit Number 13 marked for identification.)

BY MR. STEARNS:

Q And it looks like it starts February 22, 2017. Do you see that on page 1?

A Yep.

Q And there's 682 pages?

A There's what? How many pages?

Q You can see at the very top here.

A Oh, yeah.

Q It says 682.

A I can see it, yep.

Q All right. I'm going to show you page Blitz 69. This is a text message between you and Mr. Huh. We'll scroll up to get a date. It appears to be March 14, 2017. When you scroll down -- I'm sorry,

Page 246

March 14th. Right.

So we're on March 14, 2017. Did you see that?

A Okay. Yeah, can you go up a little bit more so I can get some context here?

Q Where would you like to go? Right there?

A Okay. Let's see here. Let me -- okay. So I'm talking about his website crashing. Big thing is you can't lose clients. Okay. Got it. Okay.

Q You tell Mr. Huh, "Your clients are fitness guys." Do you see that?

A Uh-huh.

Q Okay. And I'm going to scroll -- I'm going to keep going down to 98. So I'll scroll up to give you the context, if you need me to.

This is March 27th, sir. This is the same month that you signed the contract with Jason Huh and STEEL --

A Okay.

Q -- '17. And do you see up here you guys were talking about whether you want to do a preworkout or a Focused. Do you see that?

A Yep.

Q And that's about a post, right?

A Yep.

Q So -- so in -- towards the end of March,

Page 247

March 27th, you and Mr. Huh are talking about what kind of post you're going to do for STEEL, and --

A Uh-huh.

Q -- you're debating whether it's preworkout or Focused, correct?

A Yep.

Q Okay. And do you see your text to Jason Huh? You refer to him on your phone as "Jason Huge," right?

A Yep.

Q Okay. You tell Jason Huh, "Yea, but the key words being 'fitness industry.' I wanna appeal to the masses. I wanna appeal the masses."

Do you see that?

A Yeah. He was talking about he was, you know, hard-core bodybuilding, and I'm telling him that I want to appeal to the masses. That's, you know, exactly, you know, what I was telling you earlier.

Q Right. Well, I'm just trying to get a sense. I mean, you understood that the STEEL products were fitness-related products, and they were going to appeal to the masses. That's -- that's who buys these products? Everybody buys the products?

A Well, I wanted it --

MR. McCOY: Form.

A -- to be more towards the masses, and he was

Page 248

arguing, you know, this hard-core bodybuilding shit. And I kept trying to go, you know, more towards general fitness because that would be more of my wheelhouse, you know. He's, you know, bodybuilding, bodybuilding, bodybuilding, and I'm saying, "Okay, let's try and get some, you know, fitness people in here."

But if you look -- I mean, you're taking little snippets of the conversation; but if you read the whole thing, I mean, there's sections in here where he's, you know, saying that these people are pussies and this and that, and this is, you know, hard-core shit; and, you know, we argue back and forth.

Like I said, he got a bunch of my staff sick. I mean, the stuff was -- you know, his formulations were, you know, just over the top with this Adderall-based, gray-market shit that he was putting in there.

BY MR. STEARNS:

Q Sir, sitting here today, you don't know -- you don't have the analytics or data to say who purchases STEEL products and whether they're average joes, fitness buffs or competitive bodybuilders? You don't know that, do you?

MR. McCOY: Form.

MS. STEIN: Objection, form.

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 249

Dan, again, let us --

THE WITNESS: Sorry.

MS. STEIN: Slow down, please.

A   I was talking about my traffic, and my traffic would be more middle of the road.  And he was arguing that he wanted to be hard-core bodybuilding, and I was saying, "Well, if I'm posting, you're going to get more middle-of-the-road stuff, so let's have stuff that appeals to more average-joe guys."  That was a big argument that we got into.

BY MR. STEARNS:

Q   Okay.  But sitting here today, you don't know who -- the demographics or analytics of who buys particular STEEL products?  Even back in 2017, you didn't know that?

A   I just knew what Jason said; and that was, you know, "This is a company for hard-core bodybuilders."  That's what he kept saying.  So all I know is what he is saying.  I don't know who goes to the site.  He would know more about his customers than me.

Q   100 percent.  And I'm trying to -- the reason I'm asking this more than once is because I'm asking a question about whether you know something, and you're injecting answers that have nothing to do with my question.

Page 250

A   Well, that's not true.  I'm saying --

Q   Sure.

A   -- that Jason told me.  So you're asking me, and I'm telling you where I got the knowledge from, and I got it right from the horse's mouth.

Jason told me that his customers were hard-core bodybuilders, so that's the information I have, and it came from Jason.  Whether it's true or not, I don't know.

Q   Sir, you're testifying that Jason Huh told you that for each of his supplement products that STEEL sells, they were all purchased by hard-core bodybuilders and not just general-fitness people or average joes; that's your testimony?

A   No.  I said that he wanted the supplement line to be catered towards hard-core bodybuilders.  That's why he came up with STEEL.  That's why he liked the name.  That's why he wanted these preworkouts to be so powerful, because it was meant for hard-core bodybuilders.

Q   Mr. Huh never told you that he wanted to limit his market base, did he?  He never told you he wanted to limit who purchased his products?

A   No.  He said he wanted to focus on hard-core bodybuilders.

Page 251

Q   And obviously sell as much product as he can to everybody?

MR. McCOY: Objection (inaudible) --

MS. STEIN: Object to the form.

A   That's not what he said.

THE COURT REPORTER: Wait.  I think you both were objecting at the same time, maybe.

MR. McCOY: It's a form --

MS. STEIN: Sorry.

MR. McCOY: Form objection, both of us.  Go ahead.  Sorry.

BY MR. STEARNS:

Q   Well, sir -- Mr. Bilzerian, I'm just curious, because this is news to me, what you're saying that Mr. Huh has been telling you.

So I'm curious, did Mr. Huh tell you he did not want to sell his STEEL products to anybody unless they were a hard-core professional bodybuilder of that type?

MS. STEIN: Objection --

A   No.

MS. STEIN: -- to form.

A   That's not what I said.  I said he wanted to focus his company on hard-core bodybuilders.  That's -- I mean, if you look at the texts, I'm pretty sure it's in there.  I mean, we had plenty of phone conversations,

Page 252

but I'm pretty sure it's in the texts.

MR. STEARNS:  Okay.  Sarah, can you pull up Exhibit 8 again, please?  Can you go to Section 3.1.2?

BY MR. STEARNS:

Q   Okay.  Mr. Bilzerian, this is the contract, Exhibit 8, and it states that you will promote STEEL -- we talked about this earlier -- and it says that you will promote STEEL products through your social media sites by posting, at celebrity's discretion, regarding contents and amount, to celebrity's social media sites.

Do you see that?

A   Yep.

Q   We talked about that earlier, right?

A   Yep.

Q   And we talked about how it also requires you to post to the best of your ability, right?

A   Let me read it.  It says, "Celebrity's social media."  It said, "Celebrity shall promote the STEEL SUPPS products through the Celebrity's social media sites by posting at celebrity's discretion regarding content and amount to celebrity's social media sites."

Q   Okay.  Keep going.

A   "Otherwise participate in or be involved in STEEL SUPPS activities designed to increase brand

63 (Pages 249 to 252)

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 253

awareness and generate sales as agreed by celebrity from time to time. Blitz agrees and will procure that celebrity provides the services to the best of their skill and ability. STEEL SUPPS shall have no ability to control any other" -- you're going to have to scroll.

MR. STEARNS: Just scroll down, Sarah.

A Okay. Here we go. All right. Stop.

"STEEL SUPPS shall have no ability to control any other social media posts made by celebrity, and celebrity shall not be obligated to remove any such posts."

BY MR. STEARNS:

Q Right. So my question, Mr. Bilzerian, is: Do you agree that Blitz agreed with STEEL under this agreement that Blitz and you would perform these services to the best of your skill and ability?

A Yes.

MS. STEIN: Objection, form.

BY MR. STEARNS:

Q Okay. And so there was a fair amount of discretion for you to choose when and how to post; but in any event, Mr. Bilzerian, you agreed you would do so to the best of your skill and ability, correct?

MS. STEIN: Objection to form.

MR. McCOY: Join.

Page 254

A Which I did.

BY MR. STEARNS:

Q Okay. I'm sorry. I didn't hear your answer. You said, yes, you did agree to that?

A Yes, which -- and I did do that.

Q Okay. How is --

A The sales reflect it.

Q So when the Court is looking at this contract, what is the Court to "understand best of your skill and ability" to mean?

MS. STEIN: Objection --

MR. McCOY: Objection.

MS. STEIN: -- form. Calls for legal conclusion.

MR. McCOY: Join.

MS. STEIN: And, again, you're not asking the Court. This is a deposition. This is not testimony, so I just want to kind of go to your form consistently.

MR. STEARNS: Okay.

BY MR. STEARNS:

Q Mr. Bilzerian, how is the Court going to interpret this contract and understand what "best of your skill and ability" means?

A Well, they're going to look --

Page 255

MR. McCOY: Form.

A -- and they're going to see that when I first started posting, they were doing 2- to $300,000 in sales. I jumped them to 1.2 million, and then I got them to over $5 million a month. So I would say that what I did was extremely effective --

BY MR. STEARNS:

Q Okay.

A -- and the numbers reflect that.

Q And you agree, sir, that the STEEL team frequently asked you and the Blitz team to get you to post more frequently?

A Yeah. They constantly harassed us from the very start, but it didn't change the fact that I was extremely effective at what I did.

Q And -- and your Blitz folks, including Jason Verona, would relay those messages to you and tell you that STEEL wanted you to post more frequently, correct?

A Yes.

Q Who else, if you recall, sitting here today, would ask you to post more frequently on behalf of STEEL?

A Jason would once in a while suggest that I post.

Page 256

MR. McCOY: Is that -- just to clarify, is that Jason Huh?

THE WITNESS: Yes.

MR. McCOY: We have a number of them. Okay.

THE WITNESS: Yes, Jason Huh.

MR. STEARNS: Okay. So back to Exhibit 13. Sarah, if you can pull that up? Can you go to page Bates-labeled 175, Blitz 175? Actually, go up to 172 just to get a timestamp on this. All right. Right there.

BY MR. STEARNS:

Q Mr. Bilzerian, do you see May 3, 2017?

A Yes.

Q Okay. So that's on page 172. Let's scroll down to 175. Okay. Right here on page 175, there's a text from Jason Huh, third one down on the left. It says, "Do you have an idea when you're planning to post?"

A Yep.

Q Okay. That's an example of how Mr. Huh would frequently communicate to you and say, "Hey, when are you going to post?" This was an example of what we were just talking about, correct?

A Yep.

MR. STEARNS: Okay. Can you go to page 179,

64 (Pages 253 to 256)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 257

Sarah, of Exhibit 13? Okay. Right there.

BY MR. STEARNS:

Q May 8, 2017, second line down on the left, Mr. Huh is saying, "What day you planning on the Focused post?"

Do you see that?

A I do.

Q Okay. You respond to Mr. Huh, telling him you were going to do it on Sunday. You were going to try to do it tomorrow. You just need to make a good video, right?

A Yep.

Q Scroll down to May 9th at 7:41. Do you see that text?

A Yeah.

Q Okay. Two months into this relationship with STEEL, Mr. Huh's asking you to post. You're telling him, "I'm going to get to it eventually."

And is this a text where you're telling him you're busy working like a dog on your book?

A Yeah. Obviously, that's exactly what it says.

Let me -- let me just take a second here because two months into this relationship, they had gone from 200,000 a month to 1.2 million in sales, okay?

Their metric for a massive success was if I

Page 258

could get their company to 750K in sales. I did that in the first, like, four weeks, okay? I surpassed that. And then -- then I got their company 25 times what they were doing initially in sales.

So you're going to sit here and try and, like, tell me that I didn't post enough when I got them to 1.2 million in sales in one month, which is more than they did the entire year prior?

And their metric, by the way, what they wanted to include in the original agreement was that I would get all of my stock or whatever it was -- my, you know, full percent -- but that I had to get the company to 750K a month. That was their benchmark of massive success. I -- I almost doubled that in month 2, okay, so just to give you a little context here.

Q Sir, do you -- do you know, sitting here today, what STEEL did between March of 2017 and December of 2017 month by month to grow the company and increase its sales? Do you have personal knowledge of what STEEL was doing behind the scenes?

A They were leaning --

MS. STEIN: Objection to form.

A -- on my posts. Leaning on my posts, and they were retargeting all of the traffic that I sent to them.

BY MR. STEARNS:

Page 259

Q Do you have any idea how much STEEL was spending on -- on advertising during those months?

MS. STEIN: Objection to form.

MR. McCOY: Join.

BY MR. STEARNS:

Q That was a question, sir.

A Okay. No, I don't know exactly what they spent on marketing.

Q Do you know what kind of SEO or retargeting efforts STEEL --

A They said they're -- they said they're --

THE COURT REPORTER: Wait, wait, wait. Hold it. Hold it. Hold it, please. I don't have a complete question.

I have, "Do you know what kind of SEO or retargeting efforts STEEL" --

BY MR. STEARNS:

Q Yeah, I'm just asking, sir, if you have personal knowledge. I'm not -- I'm not actually asking you to guess.

Do you know what STEEL was doing and its marketing efforts were between April of '17 and December of '17?

A Jason --

MS. STEIN: Same objection.

Page 260

A -- told me that -- Jason told me that they were getting 10 to 1 on every dollar that they spent on sales. So for every dollar they spent, they were getting 10 dollars in sales. That's what he told me. So whatever they were spending, they were 10 Xing.

BY MR. STEARNS:

Q Okay. And if your recollection is wrong, that's what you remember?

MS. STEIN: Objection to form.

MR. McCOY: Form.

A No.

MS. STEIN: Dan, you've got to slow down for everybody.

A Fuck. All right.

MR. STEARNS: Okay. Go to page 180, Sarah.

BY MR. STEARNS:

Q Top of the page, May 10, 8:24, Jason Huh asks you, "Any luck on the video?" You see that?

A Yes.

Q And you're testifying Jason Huh, you've tried. Nothing feels natural, right?

A Yes.

Q And that's sort of with the -- we're talking about with the organic posting; you would -- you would do a test run. You would think about it. If it seems

65 (Pages 257 to 260)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 261 | Page 262 |
|---|---|

**Page 261**

organic, you like it, you'll post it; is that fair?

A   Yes.

Q   Okay.  And then you tell him on May 10th -- we talked about this text already -- there's a point where you just have to align with STEEL to promote it?

A   Yes.

Q   Okay.

A   Not to promote it.  I said, there's a point where I just have to align with STEEL and promote it, saying that I can do more posts if I align with STEEL, which was, from the beginning, the plan.

Q   Would doing more posts benefit STEEL?

A   I think organic posts are worth -- one organic post, I think, is worth, you know, five advertised type of posts; but if he wanted more, I was willing to do more, but I was going to have to align with STEEL to do it.

Q   And you state on May 10th, you feel like "for it to have the max impact, I've got to post commercial first."

What does -- what does that mean?

A   He was asking for a post, and then they also wanted me to post this commercial.  So I said, "I think it's better if I post the commercial first."

I mean, we're just discussing post options.

**Page 262**

MR. STEARNS:  Sarah, can you go to 195?  Actually, go up, Sarah, to 193.

BY MR. STEARNS:

Q   Okay.  So we're now on May 16, 2017.  Do you see that?

A   Yep.

Q   Scroll below that picture.

First text, you say, "Does this mean you're going to start listening to me?"  Do you see that?

A   Yep.

Q   And you're referring to the business advice you were giving Jason that he, in your view, wasn't taking you up on, right?

A   I don't know what this is in reference to.  There's 682 pages of text, and you're referring to one line, so I don't know five years ago what that was referencing exactly.

Q   Okay.  Top of page 194, Jason says, "Listening to you?  When have I not?  When have I not listened and considered your every word?"

Do you see that?

A   And I said, "I think you've argued with everything I've ever suggested, not even exaggerating."

Q   Does that refresh your recollection about what this conversation's about?

**Page 263**

A   No.

Q   Okay.

A   I'd have to see what's before that, so I could get context, not what's after.

And I said to him -- I said, "This is like Dollar Beard Club.  I think God is making me his own Groundhog Day movie," because this guy has promised me numerous times that he's going to hire a CEO and then went back on his word.  So I'm sure that that's what this was talking about.  Let's -- let's go back up in the texts a few pages and see.

Q   Well, let me ask my questions, sir, and then we'll -- you know, if your lawyers want to talk about something with you, you can certainly do that.

MR. STEARNS:  So let's keep going down, Sarah.

BY MR. STEARNS:

Q   Okay.  So this is, again, the text from the beginning.  You say -- you say to Mr. Huh, "You want this to be a big company," and you're talking about a seasoned CEO; and this is an example of you telling Jason Huh you wanted him to hire a CEO, right?

A   No.  No.  That's -- that's misrepresenting what I'm saying.  And it says here right in the text, "I said this explicitly and you agreed.  Neither of us have the experience to run a big company.  I did what I said I

**Page 264**

was going to do, and I five X'd the company overnight.  I've had to battle with you guys, working here from the start.  And no offense, but they're a bunch of amateurs."

MR. McCOY:  And, Dan, just to remind you, you've got to slow down.  Slow down.

THE WITNESS:  Okay.

BY MR. STEARNS:

Q   But, Dan, my question was related to the CEO, which is the first sentence.  You're telling Jason, "You got to bring in a seasoned CEO and let him hire a solid team."  That's what you're telling Jason?

A   If you could scroll up in the text, you'll see where I called him out on promising to hire a CEO.  So just go up a couple of pages so we can get context of what we're talking about here.

Q   Mr. Bilzerian, I don't know that it's unclear.  Tell me if you disagree.

Did you just tell Jason Huh, "You got to bring in a seasoned CEO"?  That's what you told him; yes or no?

A   If you go up --

MS. STEIN:  Objection.  Hold on.

A   A couple of pages --

MS. STEIN:  Wait.  Stop.  Objection, form and

66 (Pages 261 to 264)

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 265

argumentative. Then you can go ahead and answer.

A If you go up a couple of pages, you'll see where I called him out on him promising to hire a CEO and him reneging on his word, so that's what this argument was about is him going back on his word, which is something that Jason Huh does all the time.

BY MR. STEARNS:

Q Okay.

A It was very early in the relationship.

Q Mr. Bilzerian, you wanted Jason to step down and bring in a different CEO; true or false?

A I wanted him to honor his word and hire a CEO like he said he was going to.

Q Okay. You wanted Jason to hire a CEO, correct?

A Yes.

Q Okay. And he told you no eventually, right?

A After promising that he would, he then went back on his word, yes.

Q Okay. And you also told Jason Huh that you did what you said you were going to do, and you five X'd the company overnight. You saw that?

A Exactly. It went from 200,000 in sales to 1.2 million in sales, so I did my part.

MR. STEARNS: Okay. Scroll down to the next -- next page, Sarah.

Page 266

BY MR. STEARNS:

Q This is page 195. Top of the -- top of the page, Jason Huh tells you, "You absolutely did not 5X the company. Our baseline was 10K a day, bro. We not baseline at 20K. That's not close to 5X."

Do you see that?

A And I say, "You guys were doing 2 to 300K a month. I did one post. You jumped to 500K and next month 1.2 million."

And I said, "This month was looking at 800K, and it wasn't. It was 900,000."

So they went from 2- to 300,000. Then when I did the first post, the website crashed. It was down for two days, so we didn't -- we weren't able to capture the benefit of it, but we still did 500K. And then the next month, 1.2 million, and then the month after that, without one post, we did 900,000. I remember the numbers exactly. So I did 5X this company, and I did it in two months --

Q All right.

A -- with his website going down.

MR. STEARNS: Sarah, can you scroll down?

BY MR. STEARNS:

Q Okay. Same thread. You're telling Mr. Huh, "You told me unequivocally that you'd hire a seasoned

Page 267

CEO and staff up."

And he responded immediately, "Haha. I never said I hired a CEO, never. Maybe a COO but not a CEO."

Do you see that -- that response?

A I see where he lied, yes.

Q Okay. So your testimony is Jason Huh is just lying to you all the times?

A I'll take a lie detector test. I'll bet whatever you want. I'll lay you odds. This dude lies all the time, and he lied about being a CEO. I'll take a lie detector test. You can bet whatever you want.

Q So this is May of 2017. It sounds to me like already you're sensing this is not the deal you thought you were getting. There's tension between you and Jason already out of the gates. Is that a fair assessment?

A When I found out that he was lying, yes, and it was very frustrating.

And also he wasn't doing what he promised. He promised he would hire a CEO. He promised that his website could handle the traffic. I mean, every time I turned around, it was like amateur hour with this guy.

I was doing what I said I was going to do.

THE COURT REPORTER: Slow down. Slow down, please.

A I drove him the traffic. I kept my word, and

Page 268

he couldn't handle it.

MR. STEARNS: Okay. Can you go to page 195, Sarah? I'm sorry. 198. Strike that.

BY MR. STEARNS:

Q Okay. Here's another example of Mr. Huh sending you a text, "When are you posting? When are we going to do this video?"

Do you see that?

A I do.

Q Your response was, "When are you posting? You haven't posted in six weeks." Do you see that?

A Yep.

Q Mr. Huh responds, "Why is everything thrown at me as thought" -- I think he meant "as though" -- "we aren't doing anything?"

Do you see that?

A Yeah, I do.

Q Okay. Nowhere in the agreement is your posting, your obligation to post, contingent upon STEEL doing anything?

A I never said it was; but if you look at the next sentence, "I just got Steve Aoki for free." He posted. He had 10 million followers. He did a free post.

Q Okay. That's not you promoting STEEL through

67 (Pages 265 to 268)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 269

posting on your social media, correct?

MS. STEIN: Objection.

A No.

MS. STEIN: Hold on. Objection to form. Argumentative. Go ahead.

A Obviously not. It's a 10 million-follower celebrity account that I got to post for free, so that's value. I added value as usual.

MR. STEARNS: 21, Sarah.

A And, I mean, this is -- this is a perfect example. I mean, I 5X this company, and this guy's harassing me about posts every two seconds.

It's like if he wanted a post every single month or every two months, he should have put that in the contract. You don't sign and give me permission to do what I think, you know, is -- is appropriate and then harass me nonstop about it. I mean, it's -- it's just not what you do.

If you want a post every month or you want a post every two months, you specify that in the contract. If you want to just let me, you know, make your company 25 times bigger and do my thing, then fine; but don't bitch about it when you're driving a Rolls-Royce, bringing in 5 million a month. I did my part.

BY MR. STEARNS:

Page 270

Q I mean, the contract said "best of your ability," and I --

A Which and I think 5 million a month from 200K a month is probably pretty good. No? Would you be happy with that?

Q Okay. So here's another example here, sir, on page 201 where Mr. Huh is asking, "Why aren't you plotting with me the next post or video?"

Do you see that?

A I mean, if you just want to read him, like, harassing me to post, I'm sure, you know, you could find a bunch of those. What's the point?

Q No. I mean, that's -- and that's what I was going to do, but you're right.

I mean, I can scroll through these texts, and there's a bunch of examples of Mr. Huh asking you to post. You would agree with that, right?

A Yeah, and that wasn't in the contract to harass me to post all the time.

I did my job. The company grew. The company's worth a billion dollars now because of me. It was doing -- it was doing, 200K, 100K, 300K, 200K, and it didn't move.

The big moves were immediately after I was signed and I posted, and that wasn't an accident. I did

Page 271

my job. The company is super successful because of me.

If you want to say I didn't post enough, well, you know, okay, that's your opinion, but I think 5 million in sales a month is enough. I think it did well. I think it was extremely effective. I think it drove them tons of traffic.

They've got a massive email list now. They've had tons of celebrities post for free. I got plenty of celebrities to endorse their product for nothing. I got him so much value. I, you know, helped this guy at every turn. I crafted posts. We did viral videos. I mean, the amount of effort that I put into this relationship cannot be quantified just by the posts that I did. It's all of the value that I added to this company, which is obviously reflected in the sales.

MR. STEARNS: Can you go to page 667, Sarah? 667. Okay. Scroll down, Sarah, just a little bit below that cartoon.

Okay. So this is -- looks like June 29th. Scroll up, Sarah, to see if there's a date-stamp above this.

BY MR. STEARNS:

Q If you need to read anything for context, Mr. Bilzerian, just let me know. Stop right there for a second.

Page 272

Do you see the last date is June 27th?

A Correct.

Q And this is 2020, right? Because it says, "Nah, not really. Dealing with a bunch of shit cuz COVID with Ignite."

Do you see that?

A Yep.

Q So this would have been June 27, 2020, right?

A Okay.

Q Okay. That's what you said?

MS. STEIN: Objection. Misstates the testimony. He agreed with you.

MR. STEARNS: Well, no, I just said that that was his statement.

BY MR. STEARNS:

Q "Nah, not really, dealing with a" -- or "W a bunch of shit cuz COVID W Ignite."

You said that, right?

A Yes. That was a text.

Q Okay. And Jason asked you if it was employees catching it.

You said, "No, imports with China, partners struggling, et cetera. Also firing some people, lotta shit."

Do you see that?

68 (Pages 269 to 272)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

## Page 273

A  I do.

Q  Sir, in June of 2020, how much time were you spending with Ignite?  As the CEO of Ignite, how much time were you devoting to that company?

A  I don't -- I don't know how many hours I was spending on June 27th of 2020.  I don't know.  I would just be guessing.

Q  Do you know, was it a -- was it a full-time job?  Were you essentially acting, you know, like a CEO, running the company, going -- you know, going to meetings, talking to people every day?

A  Yes.

Q  And do you know when that started in 2020 for you being that active with Ignite?

A  I was active with Ignite since the beginning.  It was more marketing in the beginning, but it was -- I mean, I was always doing the board meetings.  I was meeting with, you know, people that were hiring.  I was -- I mean, I was meeting with business partners.  I mean, it was a full-time job running the company.

MR. STEARNS:  Okay.  Can you scroll down a little bit, Sarah?  Below the picture, the cartoon.

BY MR. STEARNS:

Q  All right.  On -- on June 29th, you say, "Gonna do a post for you guys, just been working around the

## Page 274

clock for Ignite.  Haven't gotten a good gym video yet."  Do you see that?

A  Yep.

Q  Okay.  So you're telling Jason Huh, "Sorry I haven't posted for STEEL.  I'm just busy with another company, Ignite"?

MR. McCOY:  Form.

MS. STEIN:  Join.

BY MR. STEARNS:

Q  All right.  That was what you said?

MR. McCOY:  Form.

MS. STEIN:  Form.

A  That's my text.

BY MR. STEARNS:

Q  Okay.  Sir, do you know -- do you know the dates that you posted for STEEL?  Do you happen to have that information or did you look at finding out how often you posted for STEEL?

A  At one point I looked up STEEL posts, and there was a bunch.  I mean, I think I had at least 24, not counting my Snapchats, not counting Twitter, and not counting Facebook.  There was a lot of posts for STEEL.

Q  Okay.  I've got approximately 24 Instagram posts.  It's consistent with what you understand, right?

A  Yep.

## Page 275

Q  I've got two Facebook posts.  Does that sound right by your -- by your standard -- by your recollection?

A  I think -- I think it was more than that.

Q  How would you find out how many it was?

A  I mean, I'd have to go -- go through the archives.

Q  Have you done that in this case?  Have you gone through the archives of your social media accounts and produced every STEEL post that you've made?

A  I did.  I -- I found, I think, most of them that I did on Instagram.

Q  What about Facebook?

A  I don't know if I looked on Facebook.

Q  How about Snapchat?

A  Snapchat, I don't think that they all saved.  I could -- I can look at the archives.

MR. STEARNS:  Can you go up to 664, Sarah?

A  I mean, I kind of see where you're getting at, right?  You're saying that I didn't post enough and that I'm not contributing enough.  But if -- if you pull your calculator out and do a little simple math.

So let's say I get at least 8 million views on my stories on Instagram, so that's 24 times 8 million.  That's 192 million views.  Plus, you add the Snapchat,

## Page 276

which is about 3 million views per Snapchat times 24.  That's another, like, what, 75 million?  So you're like, what, 250 million views?

What do you think 250 million views is worth?  What do you think they pay for Super Bowl ads?  Do you know how many millions they pay for that?  I mean, and -- and -- and that's not counting the Facebook stuff.  That's not counting the 20, 30 million impressions per Instagram post.  That's just the stories, okay?

So I don't know.  I mean, 250 million people seeing something.  I mean, I think that's worth a decent amount.  I don't know.  That's almost all of America.

MS. STEIN:  Jason, is this a good time to take five minutes?

MR. STEARNS:  Sure, that's fine.  Five minutes?

MS. STEIN:  Is that okay?

MR. STEARNS:  Yep.  We'll go off the record.

MS. STEIN:  Thanks.

THE VIDEOGRAPHER:  Off the record at 7:31 p.m.

(Recess taken from 7:31 p.m. to 7:38 p.m.)

THE VIDEOGRAPHER:  On the record 7:38 p.m.

BY MR. STEARNS:

Q  Mr. Bilzerian, I think you just said shortly before the break -- you were talking about all of the

69 (Pages 273 to 276)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 277

postings and your view of the revenue generation. And I think you said, of course, then that must mean you satisfied your obligation under the contract. Is that sum -- a fair representation of your view of this?

A   Yeah. I mean, I think I went above and beyond what was, you know, expected? Like I said, their original metric for me performing was 750,000 a month in sales. We blew through that month 2 and never looked back. So I massively overperformed. And just because he wanted to harass me about posting here and there doesn't mean that I wasn't performing. The sales reflected it. The traffic reflected it, you know. I did my job, and I did my job, you know, above and beyond.

I got people to post for free. I hooked him up with other athletes. I got him in contact with Floyd Mayweather. I got him in contact with Logan Paul. I got Aoki to post for free. I got many other celebrities to post for free. Adam White's been posting for free -- he's got 11 million followers -- multiple times.

I mean, you know, I -- I brought value to him every -- every time I was turning around. So, you know, I think it's just misrepresenting the facts to say that I was underperforming when the numbers show otherwise.

Page 278

MR. STEARNS: Scroll to the top of the page of 283, Sarah.

BY MR. STEARNS:

Q   Mr. Bilzerian, at the top of 283, there's a text from you to Jason Huh. It says, "You are the number one company strictly because I posted for you."

Do you see that?

A   Yep.

Q   What was Jason Huh's response?

A   "LMFAO."

Q   What does that mean?

A   Laughing my fucking ass off.

Q   And what did you understand him to mean when he said "LMFAO"?

A   That he's an idiot, and he doesn't understand what I did, because it was pretty clear. Everybody else on his team understood. It was pretty obvious. I mean, when you go from 200,000 in sales to 1.2 million in sales, I mean, only an idiot would respond with "LMFAO." It's like everybody else with a brain would recognize, "Wow, we're crushing it."

Q   Mr. Huh told you, next line down from his side, "No, we were the fastest growing prior to you even at those numbers. You just have no idea of the supplement industry, and it's beyond apparent."

Page 279

That's what he said, correct?

A   His -- his growth was flatlined. If you look at his previous sales, I'd love it if you pulled it up, because it's absolutely flatlining. He wasn't making any progress whatsoever.

I got in there, and it was a hockey stick. I mean, it's actually kind of a joke. I wish you could pull it up. Please do if you have it.

Q   Okay. Mr. Bilzerian, you actually went at one point pretty early on in the relationship -- what was it -- seven months without a single post for STEEL; is that right?

A   I don't know what the time was between posts.

Q   Okay. Do you have any reason to believe that it wasn't the seven-month period of time where you didn't post a single time for STEEL --

MR. McCOY: Form.

BY MR. STEARNS:

Q   -- in 2017?

A   I don't remember. If -- if he think -- if he thought that I was underperforming, he should have canceled the contract then or tried to cancel the contract then, I mean, if that was the case; but the bottom line is I was bringing him tons of traffic, and his company was crushing it because of me. So if he

Page 280

didn't think so, then why didn't he try and cancel the contract?

Q   Fair to say in June of 2017, these text messages show you telling Jason Huh, you're growing the company, and Jason Huh is telling you, he disagrees. We're growing the company. That's what the text messages show, right?

MS. STEIN: Objection to form.

BY MR. STEARNS:

Q   Is that true, Mr. Bilzerian?

A   That -- that's shows how out of touch with reality he is.

Q   Yeah. But, no, I'm just trying to get a sense of -- there was no doubt in your mind that Mr. Huh, back in 2017, disagreed with you that you were growing STEEL. You had the conversation, and he just disagreed with you, right?

A   No. He knew that I was growing STEEL. I mean, you see it in the text messages. He was thanking me, like, you know, "We're doing great, brother," all of this other stuff.

You're just pointing at the times when we got into arguments because, you know, he's, you know, very thickheaded. So we would butt heads; but, like I said, I mean, when you go from 200K a month in sales to

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 281

1.2 million, I mean, I don't know how that doesn't explain to you what I did for the company.

It's -- it wasn't an accident. It's not like he made any -- like, had any big months prior to that. It's not like he was growing at a fast rate. He was begging me to be a part of his company; and the moment I joined, his company went to the moon.

So it wasn't a coincidence. It wasn't an accident. I mean, he knew the power. That's why he was begging to get me on. That's why he begged Joey to reach out to me and -- you know, and that's why he wanted to get this deal done.

MR. STEARNS: Go to page 21 of Exhibit 13, Sarah.

MS. GOTTLIEB: I have this as Exhibit 13. Is it page 21 -- the same thing?

MR. STEARNS: Yeah. Yes. Yeah, premarked 74. Blitz. Go to Blitz 20, just the bottom of it. Okay. Right there.

BY MR. STEARNS:

Q So this is March 7, 2017. Do you see that, sir?

A I do.

Q Okay. Scroll down to page 21, next page, the same text.

Page 282

This is you talking to Jason to find out if he still wants to do the deal. Is that what's going on?

A I'll have to read it. Okay. Can you keep scrolling?

Q That's the end right there.

A Okay.

Q See that, sir?

A I do.

Q If you go up to the second-to-last sentence, do you see where it says, "I can only stand behind one company if I'm seriously trying to build a brand, so I've got opportunity cost."

A Yep.

Q Do you see that?

A Uh-huh.

Q What did you mean by that statement when you told Mr. Huh?

A Well, obviously, I can only endorse one supplement company, so I have to, you know, either pick this one or the 1st Phorm deal -- or, you know, there's an opportunity cost. If I go with Jason, then I can't do the 1st Phorm deal. If I, you know -- there's -- obviously I can't promote two different supplement companies.

Q Do you recall, sir, between 2017 and the

Page 283

present whether you ever had discussions with other supplement companies to go into business with a competing supplement company and just terminate the STEEL contract?

A I had discussions before and while I was in negotiation with STEEL. Once I went with STEEL, other companies approached me; but I, you know, shot down the offers because I'd built so much value in STEEL.

Q Do you recall ever having a conversation with anybody at Ignite about a possible business relationship with a competing bodybuilding supplement company that would mean terminating your agreement with STEEL? Do you recall that?

A Yeah. They begged me all the time to get out of my deal with STEEL so that we could do supplements because they saw how much value I added to STEEL, and they knew that we would crush it in supplements, and so they kept, you know, asking me and begging me to, you know, get out of the deal.

Q All right. And that was something you considered?

A No. I mean, I had put in -- I had put in so much effort into STEEL, and I'd grown the company, that to walk away from it, it was -- to me, it just didn't seem like smart business because, like I said, I put in

Page 284

so much effort and time and promoted STEEL that just to walk away from it after I had done everything that I did, it just seemed like a mistake.

Q Okay. So along the same lines with competing with STEEL, remember, earlier we were talking about you doing your posting, and including other bodybuilding supplement products, non-STEEL-related, within a single post. Do you remember that?

A The very first post --

MR. McCOY: Form.

A -- I did was other supplements, and Jason was ecstatic about it. That was the site -- that was the post that crashed their website for two and a half days. We implemented that from the very beginning, and that was something that Jason was excited about. That was something that worked well.

BY MR. STEARNS:

Q Your testimony is that Jason -- Jason Huh was okay with that post, and he was excited about it; it was a good post in his view?

A Yeah, you can review the text messages and his responses. Just like the last one that he included in the court document where he said, "That was a great fucking post, it's titties," blah-blah-blah, loved it, and he cited that as something that he, you know, took

71 (Pages 281 to 284)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 285

issue with. I mean, that's just classic Jason.

MR. STEARNS: Okay. Can you go to page Blitz 33 on Exhibit 13, Sarah? It's page 26 out of 682.

A Yeah. I mean, look at -- look at those videos right there. 55 million views if you -- I bet you don't want to scroll past those.

MR. STEARNS: Page 33, Sarah.

A Yeah, those videos right there, 60 million views.

MR. STEARNS: Can you scroll down? Okay. Get -- Sarah, put the picture of the March 12th frame in the -- in the box. Yep, that's good right there.

BY MR. STEARNS:

Q Mr. Bilzerian, at Blitz 33 of Exhibit 13, do you see the photograph?

A Uh-huh.

Q Is this what you're referring to?

A Yeah. That's a classic example of where I incorporated other brands, and Jason was happy with it, and it did really well.

MR. McCOY: Will you scroll down? Can we scroll down to see the rest?

MR. STEARNS: Kevin, yeah, yeah. I'll get

Page 286

there, sir.

MR. McCOY: Yeah. Well, in context -- let him have context. It's clear what you're doing, Jason, so just let him see the page.

MR. STEARNS: Mr. McCoy, if you have an objection, that's fine.

BY MR. STEARNS:

Q Mr. Bilzerian, your testimony is that you posted this. It has a competitive product, but Jason was okay with it; he liked it. That's your testimony?

A Can you scroll down, please?

Q Sure. Scroll down. Okay?

A Okay. And then keep going. Can you scroll down? Okay. Here we go.

"What do you think about that pic?

"LMFAO, fucking hilarious. But it has other brands in there, which is no bueno."

Q So stop right there, sir. Isn't --

A Yep.

Q -- that Mr. Huh telling you there are other brands, which is no bueno, which means not good?

MS. STEIN: Objection to form.

A Keep -- keep going with the conversation.

BY MR. STEARNS:

Q Well, we will keep going, but didn't Mr. Huh

Page 287

tell you, "It has other brands in there, which is no bueno"; yes or no?

A And he did. And then you'll see what -- you'll see the rest of the conversation. That wasn't posted. That was a picture that I sent to him.

Q Okay.

A Let's keep going. Scroll down.

Q Scroll down as far as you need to, sir.

A Okay. So I said, "Lotta guys been asking me what kind of shit I take. HGH, andro pills" --

MR. McCOY: Slow down.

A -- "Kre-Alkalyn." What?

MR. STEARNS: Slow down.

THE COURT REPORTER: Slow down is right.

A All right.

"Kre-Alkalyn, coffee, and vegan protein. Sugar and dairy are horrible for you. I eat a lot of red meat."

He said, "Could throw in your ADA and have it look like a concept product you're testing out."

Let's keep scrolling.

I said, "I feel like nobody's going to buy that expensive rice shit.

"LMFAO.

"Nobody would think it's an add because there's

Page 288

other products in there.

"Sorry about the delay. I was at the fucking hospital," blah-blah-blah.

Let's keep going. Can we scroll?

Okay. I said, "All good, bro. Just trying to get this rolling since Robert Frank might take a little bit."

He said, "Absolutely. I'll get days and times when supplement posts typically do best. As far as generating sales, I know Sunday night is -- 9 p.m. Eastern time is one of them."

I said, "Yea. I wanted to do something yesterday." Let's keep going.

So, I mean, he's obviously okay with the post. He's liking it. He just wants me to throw in ADA.

Let's keep going. So he's approved the post. Let's keep going.

BY MR. STEARNS:

Q Well, we'll keep going, sir, but I guess I'm confused because we saw the text where Mr. Huh said, "It has a competitive product, no bueno."

Are you telling the Court that you did not understand Mr. Huh to be telling you, "Do not include competitive products"? That's a yes or no.

MS. STEIN: Objection to form. And it's not a

72 (Pages 285 to 288)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

Page 289

yes or no. It misstates testimony, and I'm so tired of you telling the Court. This is not telling the Court, so please stop.

MR. STEARNS: Well, Ms. Stein, I'm going to be playing this video to the judge, and so --

MS. STEIN: I hope you do.

MR. STEARNS: -- then we'll be telling the Court, so...

MS. STEIN: You'll not be playing this video to the judge, because he'll be testifying. And you can use it on -- only on impeachment. You cannot use testimony if he's available; and you know that, unless -- apparently you've never been to trial --

BY MR. STEARNS:

Q Mr. Bilzerian --

MS. STEIN: -- which is clear to me from the way you ask a deposition question.

BY MR. STEARNS:

Q Mr. Bilzerian --

A Yes.

Q -- did Mr. Huh tell you posting about a competitive product is no bueno?

A At first that was his response; and then when I said, "I think it will look less like an ad," he said -- you know, he was totally okay with it. He was on board

Page 290

and he gave me the times when he thinks that it would be best to post it.

And if you keep reading, he's completely fine with it. So this is a perfect example very early on in the relationship where he was okay with me posting other products because he felt like it was less of an advertisement if I have other products in there. So this set the precedent, and this was -- this post did extremely well.

And many posts that I did were approved by him with other products in there because it looked less addy, and that was what I was actually taking at the time. And the Carbolin was not a competitive product to him, and he wasn't offering the vegan protein at the time.

So that's why I did it, because that's what I was actually taking. So it was an organic post, me telling people exactly what I was taking. And he was totally okay with it; and -- you know, and our sales crushed accordingly, because it was honest and it was legit.

And if you see the text message combo, he's totally on board. Just like the last post that I did that had that other product in there that he was trying to say competed, and he said, "It was a great fucking

Page 291

post, bro."

So, you know he clearly doesn't have issue with this. And, by the way, this is, like, what, 2017? So you're telling me if -- so if this was such an issue in 2017, why didn't he terminate the contract then?

MR. STEARNS: All right. So I'm going to mark Exhibit 14, sir.

Kim and Kevin, you should have STEEL 127. Sarah, can you go ahead and put that on the screen?

(Exhibit Number 14 marked for identification.)

MS. STEIN: In the Dropbox, it was 27.

MR. STEARNS: It was just emailed to you.

MS. STEIN: Oh, okay. Sorry.

BY MR. STEARNS:

Q Mr. Bilzerian, while we're getting the exhibit up, do you recall your team proposing an amendment to the contract to allow you to post about competitive products?

A I don't remember that, no. Well, to post about competitive products? That was never -- that was never a suggested amendment. Who -- who told you that?

MR. STEARNS: You know what? I'll share my screen.

Madam Court Reporter, this will be Exhibit 14.

BY MR. STEARNS:

Page 292

Q Mr. Bilzerian, do you see this?

A Okay. First Amendment Personal Services --

THE COURT REPORTER: Sir, again, if you're reading --

A Okay.

BY MR. STEARNS:

Q And I want you to read paragraph C, in your head. You don't have to read it out loud.

A Okay.

Q Does this refresh your recollection, sir?

A I don't remember this ever being signed or agreed to.

Q It was not.

A Okay. So what's the --

Q Well, my question is: I understand your testimony now to be that you thought it was just okay to use an organic-style post with a competitive product and that Jason would acquiesce to that.

Is that a fair summary of the testimony that you've been giving about this topic?

A No. Jason liked that because it was organic. I mean, he approved -- I sent him all the posts. I mean, I would send him the post right before I was about to do it. I would send him, you know, when I did it. I mean, he always saw the post, and he always approved

73 (Pages 289 to 292)

888.909.2720                 Anthem Reporting                 813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                 5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 293

them. He was happy with them. We talked about them. You know, before I put it up, I sent him video options. I mean, there was a lot that went into this. It wasn't just like me randomly shooting off posts, firing at the hip. This was a collaborative effort between me and Jason, and he was very onboard with my posts, like I said, up until the last post when, you know, he sent me a text message talking about how great it was and then included it in the lawsuit, so -- you know. I don't know. I just think this is a bit silly.

Q I understand. Have you ever asked Mr. Huh why he filed this lawsuit and why he didn't like the way you were posting? Have you ever had that conversation with him?

A Well, he filed a lawsuit because he wanted to weasel out of the agreement. That was very clear. I mean, he did it with -- you know, and I think he gave me, what, two hours to respond before he filed? I mean, it was, like, a total joke.

Q Sir --

A And I mean, he listed stuff that he said -- you know, that he approved, he listed that as being reasons why he wanted to terminate the contract.

He even put in there that because I used weed, when he promoted marijuana on his own page and on

Page 294

STEEL's page. I mean, everything that he put in there was so counter to, you know, the facts that it was just -- I mean, it was laughable.

I mean, it was so obvious that what he was trying to do is use his lawyers so that he wouldn't have to pay the 10 percent. Because Jason is not a man of his word. Just like he didn't hire Joey Swoll like he promised him he was going to do; just like, you know, he didn't hire the CEO like he promised me he was going to do.

I mean, he's got a long history of not keeping his word, and this is a perfect example. He didn't want to honor his agreement. He wanted to weasel out.

Q Okay. I'll ask my question again. I would -- I would appreciate it if you'd answer it.

I just asked you if you ever asked him to explain to you why he filed the lawsuit? I think what you just said is why you assume he filed the lawsuit. I want to know: Did you ask Jason Huh why he filed the lawsuit and what the problem with these posts was? Did you do that, sir?

MS. STEIN: Form.

A I knew that for a fact that it wasn't related to the posts. It was bullshit. He literally in his texts told me how much he liked my posts, and then he

Page 295

lists it in the lawsuit. Does that make any sense to you? Like, why would you ask a guy why are you filing this lawsuit when he tells you how great a post is and then puts the post in there and then tries to act like he's got a problem with me smoking weed when he considered going into the marijuana business himself.

He posted me smoking weed on his Instagram, posted me smoking weed on the STEEL SUPPLEMENTS page, and then he acted like that was a reason for termination?

I mean, you think I'm going to take anything that guy says seriously? He's clearly a weasel. I mean, he's trying to get out of paying his debts, which is his MO, which is what he did with CM Innovations, which is what he did with our Amazon sales, which is what he did with gross sales.

I mean, every time you turn around, this guy's trying to like, you know, rob me. It's crazy, and it's been like that since the very beginning of the contract.

BY MR. STEARNS:

Q Sorry. So that's a "no," you never asked him?

A I didn't have to ask. I knew he was -- I mean, I didn't have an opportunity. He literally gave us, what, two hours to respond before he filed? I mean, I think, Dan, was it two hours that he gave us?

Page 296

Q He's not going to testify, but okay.

I'm going to go ahead and mark as Exhibit 15 what was premarked as Exhibit 63.

MR. STEARNS: Kim and Kevin, do you have that?

MS. STEIN: Let me check. Yes, it's in the box.

MR. STEARNS: Go ahead and publish that when you can, Sarah.

MS. GOTTLIEB: Can I have the number again, Jason?

MR. STEARNS: Yeah, premarked 63.

(Exhibit Number 15 marked for identification.)

BY MR. STEARNS:

Q If you could scroll to the bottom.

So this is an email string, sir. It has three pages. There's the January 30th email at the top.

MR. STEARNS: Go to the bottom, Sarah.

BY MR. STEARNS:

Q Okay. The first email is at 1089. Do you see that January 30, 2020 Michael Feder to you? Do you see that?

A I do.

MR. STEARNS: Scroll up, Sarah, so he can read it.

BY MR. STEARNS:

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 297

Q  I'd like you to read from the bottom up, sir. Just read this email.

A  "Dan, Alister" --

Q  I'm sorry.  I'm sorry.  Read it to yourself.

A  Okay.  Okay.

MR. STEARNS:  Go up, Sarah.

A  Yep.

BY MR. STEARNS:

Q  Okay.  Okay.  So my first question is:  When did you first start posting for Alister?

A  I don't remember the exact date.

Q  Is it when it launched?

A  I don't remember the exact date.

Q  Okay.  Michael Feder tells you at the very top, "Alister claims you've posted four times."

Do you see that?

A  I do.

Q  Okay.  Do you know if you posted in January of 2020 for STEEL?

A  I don't.  I don't remember.

Q  Okay.  And we'll be able to go back, and you can look in your archives and confirm this, but I will tell you that you did not.

And so my -- my next question is:  Why were you posting more for Alister than you were for STEEL?

Page 298

A  Well, I posted four times for Alister, it says, and I posted what you said at least 24 times just on Instagram alone for STEEL, so that's inaccurate.

Q  Well, no, my question -- right.  Were you posting for Alister back in 2017?

A  No.

Q  Okay.  Are you testifying that you posted more for STEEL than you did for Alister?

A  Yes.

Q  Okay.  If you go right below that, on January 30, you told Mr. Feder, "I posted more for Alister than I did for STEEL and they couldn't convert shit."

So my first question is:  Were you correct when you told Mr. Feder that you posted more for Alister than you did for STEEL?

A  I was talking about a very limited time period.

Q  Okay.  All right.  So in that limited time period, you posted more for Alister than you did for STEEL, correct?

A  Yeah.  So in a four- or five-month period, I posted more for Alister than I did for STEEL.  What's the point?

Q  My next question is:  You say, "They couldn't convert shit."  Who is "they"?

Page 299

A  The team at Alister.

Q  So are you telling Mr. Feder you posted less for STEEL; and compared to Alister, STEEL got less than your posts but converted more.  Is that essentially what you're telling Mr. Feder?

A  No.  I was saying that at that point in time, I was posting more for Alister, and they weren't converting shit.

I had done a ton of STEEL posts prior to this. STEEL was also a much better product for my customer.  I mean, getting people to buy soap online is a lot harder than getting them to buy protein powder and workout stuff.  So it's, you know, two completely different products.

And I never actually even wanted the Alister deal.  The only reason I did is because they were guaranteeing us brick and mortar, and they didn't produce the brick and mortar.

So the whole -- like I said, the whole reason I did Alister was because of the brick-and-mortar promise. I never really thought that we were going to do a lot of online sales of soap.  That's not really, like, something that people go online to buy.  They go online to buy protein powder, preworkout, that sort of thing. So it was just a bad business model.

Page 300

Q  So is -- what is your business model?  When you decide whether you're going to sign on with a company as an influencer, what is your business model?

A  Well, for this deal, like I said, they promised us brick-and-mortar distribution.  They promised to get us in, you know, JCPenney's, a bunch of these malls, this, that and the other.

Michael Feder, you know, is since fired, but he's the one that set up this deal, and he set it up poorly and -- and, you know -- and he convinced me to do a post before they got the brick-and-mortar sales, and their website crashed, and their website was down for the whole first day.

And the second time I posted for them, their website crashed again, so they weren't able to realize the traffic or do anything with it.  It was a total nightmare.

Q  Who -- you talking about Alister?

A  Yes.

Q  Okay.

A  I crashed almost every website that I've posted for initially until they figure out how to handle the traffic.

Q  Understood.  And so what I'm trying to understand is your business model.  You, Dan Bilzerian,

75 (Pages 297 to 300)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 301

owner of Goat Works and Blitz and the social media contracts that you get into, is there -- is there sort of a model that you have where you want to help a company get off the ground by posting more and then taper off how much you post and just collect like a -- like a royalty off it?  I mean, that's what I'm trying to understand.  Is that something that you do specifically or -- or not?

MS. STEIN:  Objection to form.

A   So, I mean, with any kind of a, you know, influencer, you know, company relationship, you're going to do more work in the beginning.  The beginning is going to be much more frontloaded because you're building that customer base.  You're building that email list.  You're building, you know, the ability to retarget.  You're getting all the -- all their data in the pixel when you send the traffic to the website, so the beginning is definitely going to be more frontloaded.  Plus, it's the first time you talked about the company.

You know, after you do, you know, 30, 40 posts for something, people stop paying attention as much as they did in the very beginning.

It also depends on the type of post that you do; but, yeah, I would say that a lot of these

Page 302

businesses are more frontloaded, but this was, you know, pretty much at the startup phase when I got on board.

So when I -- when I was first doing my posts for STEEL, I wasn't getting paid nearly what I would get to post for something else.  So I was putting in the sweat equity.  I was doing the posts for much less than what I normally would get paid because I believed that we could build the brand, and that's exactly what we did.

So, you know, much like, you know, people that put in that initial risky money, I put in the initial, you know, posts, and so I invested in the company via my posts.

BY MR. STEARNS:

Q   So by my count in 2017, you posted six times on three different platforms on six different dates for STEEL.  Does that sound consistent with what you recall?

A   I don't recall my 2017 posts.  I mean, I just -- I remember the impact of the posts.  I remember the first -- the first month, like I said, we shut the website down for two days.  We got to 500K.  The next month, we got to 1.2 million.  The third month, I didn't post at all, and we still maintained 900,000; and, you know -- and from there, it was off to the races.

So I don't remember exactly how much posting;

Page 303

but it was never supposed to be, you know, posting every month, every couple of months.  It was never supposed to be like that.

This was the Dollar Beard Club model.  What I did with Dollar Beard Club is I posted one -- two viral videos for them, and the company took off.  And it was, you know, extremely successful because I reposted a couple of videos.  So a small, you know, correct push launched it.  Just like the Preparis, they had one viral video, and it launched the entire company.

It doesn't take pounding and pounding and pounding promotion to get these things off.  If you do one good viral video, that can make or break a company.  And, you know, if -- like I said, if you look at the numbers, the numbers don't lie.

There is a reason why Jason was, you know, super eager to get me involved, willing to offer me 40 percent of his company.  It was because he knew what I could do, and I came in and I did it.

Q   Right.  But what I hear you telling me is that it gets to a point where you really don't have to put any effort in at all, and just what you -- you think what you did in the initial outside launching of a company is enough to carry that business through and let the company run it.  Is that what you're saying?

Page 304

MR. McCOY:  Form.

A   No.  What I'm saying that, you know -- the initial -- the initial posts are the most valuable because that's when you acquire the email lists.  That's when you get the customer data.  That's when you, you know, utilize the pixel the most.  That's when you get to retarget these guys.  Not to mention they were utilizing my image and likeness in my videos to then do the retargeting.  So they were -- they were promoting with my videos and my face.

In fact, they were misrepresenting me.  They put my face, you know, promoting when I said that the -- that the charge was really good, they used that; and they used that to promote their dick pills.  I never said that about their dick pills.  They misrepresented that, and they -- you know, they went off and just went rogue and pretended like I was promoting their dick pills, so -- you know, but I didn't -- you know, I didn't bitch at them.  It was -- it was like, you know, I thought it was kind of shady, but it was whatever.  I mean, but they did that consistently.

They started a whole TikTok, and every TikTok video was me working out.

You know, they did multiple video shoots at my house.  Robert Frank promoted it.  They promoted it on

76 (Pages 301 to 304)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

Page 305

their YouTube channels.

I mean, they basically used me to carry their -- their wagon, you know, until they felt like, okay, you know, we've got this email -- you know, email list. We've got this customer base. You know, now we really don't need to pay him, and we can, you know, use all of the work that he did and all of the customers that he sent and we can, you know, operate without him, I mean, you know.

And that was the whole reason why I did this deal in perpetuity is because I knew that I would build the value in the beginning; and that if the deal wasn't in perpetuity, then once they got, you know, 5, 6 million a month, they obviously wouldn't want to be continuously cutting the check, and they can go off and do their thing.

And that's what, you know, he's trying to do. He's trying to weasel out of the deal, because for him he doesn't feel like the value that I add now is worth what he's paying me, but he's discounting the fact that I put in the sweat equity early.

BY MR. STEARNS:

Q Right. So by "sweat equity," by my count, you had six posts in 2017. When you said "sweat equity," that's what you mean?

Page 306

A Like I said, I don't remember how many posts I did in 2017.

Q Your archives will tell us -- will tell us what that number is, correct?

A I don't know if they go back that far. 2017, I don't know if they -- I don't think they go back five years.

Q Okay. So if you don't have any archives, how would you ever confirm how many times you posted?

A I mean, I didn't feel like there was a need to, because if there's an issue in 2017, we would have addressed it in 2017. He wouldn't wait until two thousand twenty-fucking-one to bring up 2017 numbers because they're obviously good enough to drive his company through the roof.

So if he was -- if he was complaining about it, he should have complained about it then when he said I went seven months without posting. If that was an issue, then he should have ended the contract then, don't you think.

Q Your testimony is that -- that Mr. Huh never told you in that six-month time period that he wanted you to post again?

A Yeah. I mean, he told me that he wanted me to post constantly. I mean, you know, he was always

Page 307

harping on it; but it doesn't mean that every time he says "post," I'm just going to post.

I mean, the reason that I structured this at my discretion is because, similar to the Dollar Beard thing, I learned my lesson there. They kept asking me to post, post, post, post, and it wasn't necessary. I did a few posts for them, and the company went through the roof.

It doesn't take pounding. It takes precision. It takes properly crafted posts; not just volume, it takes good posts.

Conor McGregor posts a million times, you know, and people zone it out. It's white noise. Nobody pays attention. They don't care.

But when a guy doesn't promote stuff, like Joe Logan, he infrequently posts; so when he does, people listen. So there's a lot of diminishing returns, you know. More posts is not always better if you're thinking about like the longevity of the company.

Sometimes, you know, carefully calculated, proper posts are better than a volume of, you know, mediocre ones; and especially organic over addy and -- you know; but like I said, if he wanted me to post more and he wanted to do the addy -- I offered him.

I said, "Okay. We can -- we can do that.

Page 308

Let's do it. I'm -- I'm game. It's time. I've done all of the organic posts, you know, that I can do in a reasonable period of time because, you know, I think it's just time to announce that, you know, we're -- we're partnering here. Let me invest in the company."

I mean, that's what we planned on doing. You saw me text him that in 2017.

Q So I have the last post in '17 that you did for STEEL was in July 16, 2017. The next post was February 22, 2018.

Is there -- is there an intentional -- was that an intentional gap? Do you -- did you say there's a business reason I'm going to stop posting between July of '17 and February of '18, and that's going to be better to STEEL? Is that what you're saying?

A Is that what you think that I'm saying?

Q I don't know why you didn't post for seven months, sir. Why didn't you?

A Well, then just ask why I didn't post for seven months. Don't like, you know, throw out some ridiculous statement and claim that it's mine. Just ask the question. Say, "Why didn't you post for seven months," and I'll answer.

Q Why didn't you post for seven months?

A Because I didn't feel like there was an organic

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 309

post. I had done -- I had done a lot of posts for me. I wasn't posting a lot of times. So back then, my posts were very infrequent, but they were powerful. They carried a lot of weight.

When I recommended something, people listened, and I drove the traffic. That's why their website shut down for two days; but you can't just, you know, keep doing that.

You know, when 2018, 2019, came around, I was doing a lot more stuff with Ignite. We had a bunch of girls around. We were throwing parties, so I was able to promote more, you know.

When you're doing a lot of stuff -- it's like commercials, right? If you've got a TV show and -- you know, and you've got five hours of film on a TV show, you can play a lot more commercials than when you're only watching, you know, 20 minutes. I mean, how many commercials can you get in a 20-minute show? A lot less than a five-hour program.

So, you know, it ebbed and flowed. Sometimes I was posting twice a month. Other times, like you said, I didn't post for multiple months. It's -- you know, that's the organic piece of it.

Q And in your view, is that using your best effort?

Page 310

A It is.

Q Okay. Would you agree with me that you understood, at least as of 2019, that you had to put in minimal effort in your view with respect to the STEEL deal?

A I don't think I put in minimal effort at all. I think I put in a ton of effort. And, like I said, I got other people to post. I -- I got him -- I got him in contact with Floyd Mayweather. I put him in contact with Logan Paul. I reached out to mult- -- I mean, I reached out to probably 50 different celebrities for him, so I was constantly trying to broker those deals, trying to get him hooked up, getting people to post for free. I was, you know, testing product. We were shooting viral videos. I was working with Robert Frank. I was tagging Jason Hugh in posts so then he could promote. I mean, I was doing tons of things besides just the posts that you see.

Q So you don't think you did minimal effort for STEEL?

A Absolutely not.

MR. STEARNS: All right. Sarah, can you pull up premarked Exhibit 64? And that's going to be Exhibit 15.

THE COURT REPORTER: 16, don't you mean?

Page 311

MR. STEARNS: I thought we were on 15. Is that what -- are we on 16?

THE COURT REPORTER: We just finished 15, didn't we?

MR. STEARNS: Okay. I had it mislabeled, so 16 will be premarked 64.

(Exhibit Number 16 marked for identification.)

BY MR. STEARNS:

Q Sir, I'm showing you Exhibit 16. It's an email May 31, 2019 to Michael Feder at 4:55 a.m. Do you see that?

A I do.

Q You tell Mr. Feder -- and I'm reading your email -- "I make 2 million a year personally from STEEL in perpetuity and growing for minimal effort and don't want to put that in jeopardy."

Those were your words, correct?

A Yes, because when you initially do it, it takes a lot more effort to grow a brand than it does to just, you know, prod it every now and then, which is what you do.

I mean, when you're starting a company and when you have to grow something, you have to put in a lot of effort, and you have to come up with, you know, perfectly crafted posts and this and that.

Page 312

When people have seen STEEL numerous times, then it takes much less effort to keep, you know, reminding them of STEEL because that's already in their mind. Now it's going to be the 23rd time they've seen STEEL instead of the third time, so it takes a lot less to convert those sales later. Not to mention that you already have the email lists. You already have, you know, the customer base. You already have the traffic to retarget. They're pulling out my, you know, videos every two seconds on Instagram and Facebook; so, you know, the machine had already gotten running, and that -- and that was not easy. That was a lot of work.

So to keep that machine running is much less effort than to start a whole new one, so that's what I'm referencing there.

Q Right. Well, in 2019, you're telling Mr. Feder, going forward, you have to put in minimal effort for STEEL. That's what you're telling Mr. Feder?

A Compared to starting a brand-new company, yes. That was -- that was the reference. Because he was trying to get me to do a different deal. And so, yeah, I said, you know, for me to basically start over from scratch would be much more effort than to just continue down the road with STEEL.

And if you look, I was saying 2 million a year.

78 (Pages 309 to 312)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 313

That number jumped dramatically. So from this point on, I still tripled the company from where I was there. So we still grew it 3X. So, you know, if you want to call that "minimal effort," I mean, three Xing a company that's doing 2 million a year is not insignificant. I mean, that's what I was getting, 2 million a year, which means that they were, you know, making 20 million a year.

So that's not insignificant, because when I got in -- you know, when I kept doing it, we got up to 60. So, you know, the run rate kept on increasing and increasing, so what I was doing was clearly working.

Q Okay. Those were your words, not mine, sir. That's why I asked the question.

A Yeah, and I gave you the context for that.

MR. STEARNS: Mike, what's our tape time?

THE VIDEOGRAPHER: Five hours, 32 minutes and counting right now.

MR. STEARNS: Okay. I need to take a break, guys. Can we do about 20 minutes? Does that work for you guys? It's 8:30. I just have to handle a couple of quick phone calls, like you did earlier, Kim and Kevin, so it may be 8:45.

MS. STEIN: So hopefully not like I had to do earlier, but --

Page 314

MR. STEARNS: So come back at 8:45 Eastern, 5:45 Central -- or Pacific.

MS. STEIN: So we're at five -- I just want to make sure. We're five hours and what?

MR. STEARNS: There's an hour and a half left.

MS. STEIN: An hour and a half left.

THE VIDEOGRAPHER: Off the record 8:21 p.m.

(Recess taken from 8:21 p.m. to 8:49 p.m.)

(Court Reporter Black joined the deposition, and Court Reporter Replogle left the deposition.)

THE VIDEOGRAPHER: On the record, 8:49 p.m.

BY MR. STEARNS:

Q Mr. Bilzerian, I want to talk about Ignite ZRO. What exactly was your involvement with the creation and launch of the Ignite ZRO product?

A Pretty minimal. I helped out with the can design a little bit. It was never really a big priority, to be honest.

Q Okay. Were you involved in bringing James Gracely on board?

A Not directly, no.

Q How were you indirectly involved?

A Well, Curtis, I believe, at the time was the acting president and so he was responsible for the recruitment.

Page 315

Q So how did that involve you?

A I mean, I was one of the people to approve it, you know, on the board.

Q And did you know James Gracely before him coming on board?

A I don't recall. I think I did, but I'm not positive.

Q What was James Gracely's role, to your knowledge, at Ignite when -- when this was going on? Do you know why he was brought on and what he was tasked to do?

A Well, he used to work at Bang Energy, and I think he was brought on to be involved in the energy drink production, formulation.

Q Were you involved in any strategy discussions at the board level or executive level about target market -- market target audience for the ZRO product?

A I mean, it was no different than any of the rest of our product line. I mean, I think it was all kind of my following -- you know, we picked up my following. It was -- yeah, it was probably one of the least important products in my eyes.

Q Okay. As the president or on the board of Ignite, did you have occasion to ever see any executive summaries or presentations about the product and how it

Page 316

would be marketed and sold?

A I'm sure there was. I mean, I was pretty much the marketing department, so I think they were relying on my promotion as being a big push.

Q Well, I was going to ask you that. You recall -- you know who John Schaefer is?

A Yes.

Q Who is John Schaefer?

A He is the current acting president.

Q Do you recall how long John Schaefer's been with Ignite?

MS. STEIN: Object as to form.

A I don't. I don't know exactly.

BY MR. STEARNS:

Q Okay. And John Schaefer, among many others, would ask you to promote the ZRO product on behalf of Ignite; correct?

A Yes.

Q Did John Schaefer or anyone else at Ignite ever send you emails with marketing information and other information about the Ignite ZRO product?

MS. STEIN: Again, I'm going to object as to form. And I'm going to ask you, Counsel, so we don't have to keep objecting, which Ignite?

BY MR. STEARNS:

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 317

Q  Mr. Bilzerian, the Ignite ZRO product falls under which of the Ignite entities, if you know?

A  I believe it's under Ignite Beverages.

Q  Currently?

A  I believe so.

Q  Is Ignite Beverages an entity that is owned or controlled by the Ignite entity that you're the CEO of?

A  I believe it's under -- under the -- the main corporation.

Q  And that's the Canadian company?

A  The main corporation, I believe, is a Canadian public company, yeah.

Q  Okay.  And when you, just your day-to-day interactions with Ignite, and in specific, or in particular with respect to ZRO, did you make distinctions between various corporate entities and who you were e-mailing and what questions you were asking stuff?

A  Wait, say that again.

Q  Yeah.  No, so your lawyer has objected and said, you know, there's -- we're having an issue, your lawyer and I, about some of the Ignite corporate forms.

A  Okay.

Q  And I'm just trying to find out, did it matter to you which entity you were e-mailing or talking to

Page 318

when it came to ZRO?

A  Did it matter to me which corporation I was talking to?  I still don't understand the question.  I'm not trying to be difficult, I just don't.

Q  No, no, it's a bad question.  I guess it's getting late for all of us.

What is it -- you're the CEO of Ignite, is that correct?

A  Yes, correct.

Q  And majority shareholder?

A  Yes.

Q  And you're on the board?

A  Yes.

Q  And you're responsible for -- principally responsible for marketing Ignite ZRO?

A  I would not say I'm responsible for that.  That's Ignite Beverages.

Q  Okay.  And who works for Ignite Beverages, if you know?

A  Oh, I think John is in charge of it, and I'm not sure -- you know, I really focused on nicotine.  I don't -- I couldn't even name the team, honestly, of who is on Ignite Beverages.  I mean, I can get it for you, I just don't know it off the top of my head.

Q  Does John Schaefer report to you?

Page 319

A  Yes, ultimately.  I mean, he reports to me, the board, I guess.

Q  And if you -- have you ever had occasion where you needed to relay information to the Ignite team and you would just tell John Schaefer this is what I want to do, and John Schaefer takes care of it?  Is that how it works?

MS. STEIN:  I will object to the form.  Go ahead.

A  Yes, I would say that's accurate.  John is usually my go-to.

BY MR. STEARNS:

Q  Right.  And there are multiple Ignite entities; right?

A  Yes.  Yes.

Q  I mean, I've got a list.  Ignite Brands, LLC is one; right?

A  Uh-huh.

Q  Yes?

A  I believe so, yes.

Q  Ignite International, LTD is another; yes?

A  If you have the list, I'm going to trust that I -- I know there's a decent amount.  Like I said, I am aware of Ignite Beverages.  Yeah, I think there's multiple.

Page 320

Q  Right.  So Ignite has multiple arms, is that a fair characterization, multiple corporate arms?

A  Yes.  Yeah, I would say that's fair.

Q  And also fair that you're not personally familiar with the details of all of those corporate forms and that each entity and what each entity specifically is charged with doing; is that fair?

A  Yeah, I'm -- I'm not super involved in all the day-to-day.  John's really kind of more running that sort of stuff.

I'm making high-level decisions, I'm on the board and I'm on the calls, and I'm kind of focusing on that sort of stuff.  But yeah, he's in the weeds every day in there running the company.

Q  Has there ever been an occasion where you've told John Schaefer, I want you to do X, and John tells you, no, I'm not doing that?

A  I've definitely got pushback from him, yeah.  And you know -- and I can't just snap my fingers and do whatever I want; I have to kind of get his blessing.  There's the board -- you know, just depends on what sort of, you know, what sort of decisions it is.

Q  Sure enough.  Do you recall ever speaking with John Schaefer about the STEEL contract?

A  I don't think I talked to John.  I mean, at the

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 321

time all this was going on it was Curtis, I believe, Curtis and Michael Feder would be the guys and then Jason Verona also reached out.

I mean, it was -- you know, when they decided they wanted to do ZRO, I made sure everybody got STEELS' blessing on that, that there wasn't any issue. Any time, you know, they brought up doing a CBD protein or any sort of thing like that, it was always run by STEEL.

MR. STEARNS: Sarah, can you go ahead and publish the Ignite ZRO composite? And what's the -- I think that's premarked 69 for Kim and Kevin.

MR. McCOY: 69 -- let's see.

MS. STEIN: I don't have that. Maybe I can refresh.

THE WITNESS: Let me grab a water.

MS. STEIN: Okay, there it is.

MR. STEARNS: You guys have that.

MS. STEIN: It is now. I had to refresh. Sorry.

(Whereupon, Exhibit Number 17 was marked for identification.)

BY MR. STEARNS:

Q So Mr. Bilzerian, I'm going to show you Exhibit 17. You'll see these documents called Page Vault. That's just a litigation record of sort. So I

Page 322

won't ask you any questions about the Page Vault.

MR. STEARNS: But if we could go to the next page after the Page Vault, Sarah.

Okay. Is it possible to make that picture on the picture bigger, Sarah, both the screen as well as zooming in? You can enlarge -- there you go.

BY MR. STEARNS:

Q Do you recognize -- oh, we just lost it.

On Exhibit 17, Mr. Bilzerian, do you recognize -- scroll back down the page 2, Sarah.

Okay. Do you recognize this, sir?

A Not particularly, but -- I mean, I haven't seen that page in a long time, but I'm aware of its existence. I don't control it and I've never had access to it.

MR. STEARNS: Can you scroll up, Sarah? Right there.

BY MR. STEARNS:

Q Do you see at the top, sir, there's an Ignite logo?

A Yeah.

Q And if you need Sarah to zoom in, she can do that. But do you see to the right of that it says "Ignite ZRO"?

A I do.

Page 323

Q And then below that there's a number of posts. Go ahead and zoom in a little bit, Sarah.

You see where it says, "Official page for add Ignite ZRO Performance Drink," sir?

A Yes.

Q Do you recognize this as the official Ignite ZRO Performance page?

A I mean, I would assume that it is. Like I said, I've never had access or control of it.

Q But you've gone to the Ignite ZRO page and visited that; right?

A It's been a long time, but I have been to the page before. I think it only has 85 posts here, it says, so it's not a very active account.

MR. STEARNS: Do you -- let's keep going. Let's go to the next post, Sarah. I'm looking at Bates labeled page 3505.

BY MR. STEARNS:

Q It's a little fuzzy. Can you read those hashtags in there, sir?

A Energy drink, energy, energy drinks, drink, fitness drinks, healthy lifestyle, lifestyle, energy boost, energy drinks, workout nutrition.

Q Great. In the social media space on Instagram, what is the purpose of those hashtags?

Page 324

A To get engagement, get more people to go to the post.

Q Do you know how that works? Do you have personal knowledge of how that would get more people to get to the post?

A I don't use them, so I'm not -- I don't really think hashtags do too much, but I don't know. I've never -- never used them really.

Q Are you aware that they are used, though, to market a particular post and target audience in search terms?

A Yeah, I mean, I think it's supposed to get more engagement. I don't know that it works, but yeah.

Q Okay. Do you know -- we were talking earlier about RTDs. You think Ignite ZRO is an RTD; is that right?

A Yeah.

Q And we talked about RTDs, or specifically ZRO being sold both POS, point of sale, brick and mortar sales, but also online; right?

A Pretty much all brick and mortar, but yeah.

Q Do you know which brick and mortar stores ZRO is sold at?

A I think we're in some gas stations now. I don't think we're very many places. I think it's just

81 (Pages 321 to 324)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 325

gas stations.

Q What about Vitamin Shoppe?

A I don't believe we're in Vitamin Shoppe.

Q GNC?

A Not that I'm aware of. Doesn't mean they're not, I just -- I'm not aware if we are.

Q What is GNC, if you know?

A General -- I don't know. I'd be guessing. I assume General Nutrition Center. So --

MR. STEARNS: Okay. Can you scroll down to page 10 of 64, Sarah?

Is there a way to get the full picture on that?

BY MR. STEARNS:

Q Do you see this post, sir?

A I do.

Q Is this a post by the Ignite ZRO marketing team stating that you can purchase Ignite ZRO at Anytime Fitness?

MS. STEIN: Objection to form.

A I'd be guessing. Like I said, I don't run the page, I haven't seen the page, so --

BY MR. STEARNS:

Q Do you know if Ignite ZRO was sold at Anytime Fitness?

A I don't. I would assume if it says here it is,

Page 326

but I don't know.

MR. STEARNS: Sarah, can you go ahead and scroll down to page 18 of 64?

BY MR. STEARNS:

Q So we're still in Exhibit 17, sir. This is page 18 out of 64, 3517. Do you see this picture?

A I do.

Q Can you read what the Ignite ZRO team wrote in this post about -- about Ignite ZRO?

A "ZRO is the key for your morning cardio. Grab one to make it through your next workout."

Q Do you know why Ignite ZRO team posted that?

MS. STEIN: Objection as to form.

A I mean, I --

MR. STEARNS: What's the form objection? Kim, what's the form objection?

MS. STEIN: Lacks foundation.

MR. STEARNS: That's why I said, "do you know." I mean, I understand you want to object to every question, but I said, "do you know."

MS. STEIN: I don't object to every question. It's a terrible question. You're asking about -- and also, to be honest, and I don't want to make speaking objections, but you're asking about the Ignite team. You haven't established who that team

Page 327

is or even if this witness knows that.

A Yeah, I don't -- once again, I don't have access to this page, I don't control this page and I don't look at this page. So I have no control over what they say, what they do or what they post.

And frankly, with 10,000 followers, it's pretty irrelevant. But I mean, you know, we can keep going through --

BY MR. STEARNS:

Q Mr. Bilzerian, my question for you is -- and we can keep going through the pictures, and I want to ask a couple more questions about them, but looking at these posts, would you agree with me that ZRO is being marketed in the fitness and workout industry?

A This one post? I mean, I don't know. Why, because there's a girl holding it? I mean, it says "workout"?

I mean, to me this is not bodybuilding in any way, shape or form, and that's how the contract reads. So I think this is just kind of a waste of time. I mean, it's not a competing product in any way, shape or form, no different than Monster Energy is or Red Bull or anything else.

So I mean, we can keep looking at girls in fitness outfits and argue that it's, you know, a

Page 328

competing product, but it's just not at the end of the day.

Q It's geared towards working out and fitness; correct?

A No, it's an energy drink. I mean --

Q Okay. So your testimony is when it states, "Grab one to make it through your next workout," that is not Ignite telling consumers to drink this product to get through the next workout?

A I'm sure --

MS. STEIN: Objection. Misstates prior testimony.

A I'm sure Red Bull, you know, or Monster says, you know, "If you're tired, drink this, if you want to get through your next workout," but that doesn't mean it's a bodybuilding supplement. I mean, Red Bull and Monster are not bodybuilding supplements, just the same as coffee isn't.

I mean, do people use coffee to get through their workouts? Yes. Does that mean it's a bodybuilding supplement? No.

Do people take Gatorade when they work out? Yes. Does that mean it's a bodybuilding supplement? No.

I mean, this is just like kind of a waste of

82 (Pages 325 to 328)

888.909.2720                Anthem Reporting                813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 329

time. I realize you guys are grasping at straws here, but it's not a bodybuilding -- you know, I mean, that's the definition in the contract is a bodybuilding supplement. And by no way, shape or form is Ignite ZRO a bodybuilding supplement. End of story.

BY MR. STEARNS:

Q And you're -- you're going by what, a dictionary definition? Is that what you're going to ask the Court to adopt?

MR. McCOY: Form.

MS. STEIN: Objection.

A I mean, it's natural --

MS. STEIN: Hold on, Dan. I'm going to interject on form, I'm joining. Go ahead.

A I feel like the dictionary is a decent place to find the definition of a word.

BY MR. STEARNS:

Q So is that a yes?

A Yeah, if we're in disagreement, let's go to the dictionary. I mean, if we're defining words, it seems to be the place to define words.

MR. STEARNS: Can you go to page 27 out of 64, Sarah?

BY MR. STEARNS:

Q Can you read the hash tag -- first of all,

Page 330

what's the picture on page 27 of 64?

A It's a girl drinking ZRO or pretending to drink ZRO.

Q And where is she?

A You know, I -- I don't know where --

Q Is she in a gym, sir?

A I would guess. Probably.

Q There's weights behind her; right?

A I -- I mean, I see a basketball. I -- you know, I don't know. Maybe it's -- let's say it's a gym.

Q Okay. Do you see that hash tag "pre-workout"?

A I see post workout vibes, energy drink, pre-workout, Ignite your life, Ignite ZRO.

Q I mean, as a social media influencer, a guy who spends a lot of time on social media, would you agree with me that this is Ignite ZRO marketing this product to folks who are going to be on Instagram looking for pre-workouts?

MR. McCOY: Form.

A No.

BY MR. STEARNS:

Q You disagree --

A I'll give you an example: A marathon runner, a guy that does an Ironman Triathlon, those are all people that work out, those are all athletes. Those are not

Page 331

bodybuilders.

So you have to understand the distinction between bodybuilding and working out, and there is a massive distinction.

I would not look at her and say that she is drinking a bodybuilding supplement. So, you know, it's -- that's how it's characterized in the document that we both signed, so why would we not use that definition?

I mean, there's a ton of things that people do before they work out. It doesn't mean that it's a bodybuilding supplement. I mean, like I said, people drink coffee before they work out all the time. Is coffee a bodybuilding supplement? I think not, no different than this is. Just like Red Bull is not a bodybuilding supplement. It doesn't build muscle. And so, you know, it's one of those things that gives you energy, but so do, you know, like the truck driver pills, but that's not a bodybuilding supplement. They still give you energy. Adderall gives you energy; it's not a bodybuilding supplement.

I mean, I could go down the whole list of things that people take before they work out that are not bodybuilding supplements that give them energy. Just because it's adds energy doesn't mean it's a

Page 332

bodybuilding supplement. Just like drinking tea gives you caffeine, but it's not a bodybuilding supplement.

I mean, that's where we're having a fundamental disagreement here is the definition of bodybuilding supplements. And that is the key term because that is in our contract. So that's what you need to focus on, not hashtags on an account I don't control.

Q Okay, is the STEEL Pre product a bodybuilding supplement in your view?

A STEEL Pre? No. I mean, I would say that that's a pre-workout.

Q So in your view, all of Steel's Pre-Workouts, none of those are bodybuilding supplements, to your understanding?

A I mean, I wouldn't say that that helps you build muscle. I mean, it gives you energy, but it doesn't -- I mean, to me bodybuilding is -- is protein, it's pro hormones, it's AB abolic, it's the pump stuff, it's, you know, the BCAAs, it's all these things that help you build muscle. Because to me, bodybuilding is about building muscle. And energy drinks do not help you build muscle; in fact, they're catabolic.

So, you know, to me, you know, I look at bodybuilding by definition as something that helps you build your body and build muscle, and this is not one of

83 (Pages 329 to 332)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 333

those things.

Q   Sir, I mean, do you know -- if you don't, that's fine.  But folks take Pre-Workout to work out and they gain muscle; is that your understanding?

MR. McCOY:  Form.

A   I think --

MS. STEIN:  Form.

A   I think they take Pre-Workout to give them energy to go to the gym because maybe they're tired.  I mean, I've been working out for 24 years and I don't take Pre Workouts.  I don't need that.  I've done steroids and plenty -- I mean, Jason Hugh, the guy is 300 pounds, he never took Pre-Workout.

Most bodybuilders I know of don't take Pre-Workout.  It's kind of a lazy guy's aid to get in the gym because they're lazy.

Bodybuilders, people that are serious about working out, they don't need to fucking take a scoop of something to get their ass to the gym.  It's a lifestyle.  I've never taken it.  I've worked out for 26 years.

BY MR. STEARNS:

Q   So do you think that you could promote a Pre-Workout without violating the contract with STEEL?

MR. McCOY:  Form.

Page 334

MS. STEIN:  Join.

A   Okay, so Pre-Workout, I would say, would be in a different category because that was an existing, you know, supplement since the beginning that STEEL was selling.  So I wouldn't consider going out promoting somebody else's Pre-Workout.  I think that that would be competing product because that's one of the core of the STEEL lines.  So, you know, I wouldn't -- I mean, yeah, I wouldn't -- I wouldn't do that.  I wouldn't promote another Pre-Workout.

BY MR. STEARNS:

Q   Pre-Workouts are bodybuilding supplements made by STEEL.

A   Like I said, I wouldn't categorize it as a bodybuilding supplement, but it is something that STEEL sells, so I wouldn't, you know, try and compete with that.  But this is an RTD drink, much like Monster Energy, you know.  I mean, coffee has caffeine in it; coffee is not a competitor to STEEL.  You know, I mean, just because a Pre-Workout does have caffeine and coffee has caffeine doesn't make them competitors.

Like I said, the pills that you buy at the gas station to give the truck drivers energy, they have a very similar effect, but I wouldn't consider that a competing supplement.

Page 335

MR. STEARNS:  Can you go to page 42 of 64, Sarah?

BY MR. STEARNS:

Q   Do you see, sir, again, another picture of a female in the ad #workout, #athlete, #performance drink.  You see those?

A   I do; apparel, fitness, workout, athlete.  I mean, they're basically just tagging anything that they think might drive engagement to the page.  It's a very, like, elementary strategy that people implemented back in like 2014.  I don't think people are really doing it that much.  And I don't think they have as much effect.  But they're clearly just trying to put anything on there that will drive traffic to the page.

I mean, but like I said, I don't have control of this page; I'm not on this page.  You know, I don't know why we're going over this, you know, continuously.  This is not something I have any, you know, part of.

Q   Okay.  I mean, does it make sense to target and drive people to a page for a market that you don't want to sell your market in?  Is that a strategy that as a social media influencer would implement?

A   I didn't drive traffic to that page.  I've never tagged -- I've never tagged that page that I can remember, so --

Page 336

Q   Okay.  But, my question, and it was probably a bad one, is would it make sense from a social media influencer perspective to drive folks to a post if you don't believe those folks in that market are interested in buying the product?  Would that make sense?

MR. McCOY:  Form.

A   For me I want to drive as much traffic as humanly possible.  I wouldn't differentiate.  I'd use every hash tag in the world if I thought it would drive more traffic.

So you don't really know, you know, who's going to drink an energy drink.  I mean, everybody drinks energy drinks.  I've seen old ladies drink them, I've seen kids drink them, I've seen everybody in between.

So I don't think it's specific for the fitness industry, I don't think it's specific for bodybuilding, I don't think it's specific for athletes, I don't think it's specific for anybody.  I think, you know, everybody across the board drinks energy drinks just like everybody across the board drinks coffee.  I think it's, you know, a universally adopted beverage that people buy at gas stations.

And when I see somebody drinking Monster Energy, I certainly don't think that they're a fitness person.  When I see somebody drinking Red Bull or a ZRO,

84  (Pages 333 to 336)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 337

I don't associate them with them being an athlete; in fact, I look at them as being unhealthy.

MR. STEARNS: Sarah, can you -- one second.

All right, Sarah, I'm going to go ahead and go to the Dan post on ZRO. Do you have those sent to Kim and Kevin?

MS. GOTTLIEB: Yes.

MR. STEARNS: Okay. All right, I'm trying to find, Sarah -- just one second, guys.

Where is the folder for the Dan post? I can't find it on the L drive.

MS. GOTTLIEB: Okay.

MR. STEARNS: Off the record for just a second.

THE VIDEOGRAPHER: Off the record. 9:18 p.m.

(There was a brief recess.)

THE VIDEOGRAPHER: On the record. 9:19 p.m.

MR. STEARNS: Did you go ahead and post 83, Sarah?

(Whereupon, Exhibit Number 18 was marked for identification.)

BY MR. STEARNS:

Q All right, Mr. Bilzerian, I'm going to show you Exhibit 18. Let me know if you recognize this.

Okay, that was a four-second clip as Exhibit 18. Do you recognize that, sir?

Page 338

A I mean, what were we looking at, the ocean there? A couple dumbbells?

Q Well, that's what I'm asking you. Do you remember posting this on your Instagram page?

A I don't remember that exact post. It doesn't mean I didn't do it, I just -- it doesn't stand out to me.

That was the whole post?

MR. STEARNS: Yeah, go ahead and hit play again, Sarah. And if you can stop it at the three second point.

BY MR. STEARNS:

Q Is this your house, Mr. Bilzerian?

A No, this is a house I rented in Mexico.

Q Okay. Do you recall holding the phone and actually making this video yourself?

A Now that I see the ZRO can, I do.

Q Okay. That's something we talked about earlier where you would make a -- you would sort of use your phone and you'd make an organic post and place certain things in the video intentionally to then post about it; is that fair?

A Yeah, that's accurate.

Q And you put that ZRO can on -- what is that, a rowing machine?

Page 339

A I think my girl did. She was actually drinking it at the time.

Q Do you recall on your various trips receiving cases of ZRO from Ignite that you could use the cans for your post in order to promote ZRO?

A Yeah, they were constantly harassing me to promote it.

Q So this is an example of you finally taking a can and promoting it; right?

A Well, there just happened to be a can in that video. My girl is working out. I think I was kind of showing the view or whatever, because I didn't even see it on the first go-through, but now I remember it.

Q So your testimony is that in this video you were just showing the view of the ocean and the workout equipment, you didn't mean to include ZRO in it; is that right?

A I mean, it was there. I think, like I said, my girl was drinking it. But this is like certainly not an ad in my eyes.

Q Well, this morning, or I guess it was this afternoon, but at the beginning of our deposition I asked you if you were intentional about your social media posts and whether you would place products intentionally that would look organic, and if that was

Page 340

something you did often, and you said yes. Do you remember that?

A Yeah, I did that with -- there was one where there was a computer and I put a ZRO can next to it when I was playing poker. I thought that's the one you were referencing. So that one -- that one, I was.

But look, I mean, I -- I've promoted ZRO. So if that's what you're getting at, we can just save the time. I promoted ZRO. I have promoted ZRO.

Q What I'm getting at is it looks like there's a ZRO can with exercise equipment and you made the video, and I'm wondering was that an intentional act by your part to make ZRO associated with fitness equipment?

A No.

Q That's your testimony under oath?

A Yes.

MR. STEARNS: All right, Sarah, Exhibit 91, we'll mark this as 19.

Is the sound working, Sarah?

THE WITNESS: It's not, but I get the gist of it.

MR. STEARNS: Let's see if we can get the sound to work.

Sarah, let me pull it up on mine. I can't pull that one up.

888.909.2720            Anthem Reporting            813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 341

BY MR. STEARNS:

Q Okay, well, you recall that video? You said you got the gist of it?

A I reposted my buddy, yep.

MR. STEARNS: Okay. And go ahead and pull that back up, Sarah, Exhibit 19.

(Whereupon, Exhibit Number 19 was marked for identification.)

BY MR. STEARNS:

Q Did you see the Vitamin Shoppe in the back of the video?

A I did.

If this is the best you got, I wouldn't feel too confident.

Q No, I'm just asking questions, sir.

A I get it. I feel like this is grasping at some real straws.

Yeah, it's a Vitamin Shoppe. So what?

Q Okay. So this is you posting --

A Like I said, I've already -- I've already told you, I promoted ZRO. So like, yes, I have promoted ZRO. I don't know -- like, that's me. I posted it there, yes. I did. There's cans of ZRO.

MR. STEARNS: Okay. 93. Premarked 93, we're going to make this Exhibit 20.

Page 342

(Whereupon, Exhibit Number 20 was marked for identification.)

BY MR. STEARNS:

Q Does Vitamin Shoppe sell bodybuilding supplements, Mr. Bilzerian?

A I've never been in a Vitamin Shoppe, but from the name of it, it doesn't sound like a bodybuilding place.

Q Your testimony is you don't know?

A I don't. I don't know what they sell.

MS. STEIN: Listen, if you're asking 93, I don't see 93. It came to us differently.

MR. STEARNS: Did you send 93 to Kim and Kevin?

MS. GOTTLIEB: No.

MR. STEARNS: Oh, sorry. Can you go ahead and send 93 and then publish it?

MS. GOTTLIEB: I can send it by email.

MR. STEARNS: Yeah, okay.

Can you go to page 2, Sarah, and zoom in?

BY MR. STEARNS:

Q Sir, do you recognize Exhibit 20?

A I don't.

Q This is on the Ignite ZRO page.

MR. STEARNS: Scroll up, Sarah.

BY MR. STEARNS:

Page 343

Q Do you see that?

A I do.

Q Okay. And what is this picture showing, if you know?

A Showing Ignite ZRO.

Q What's in the background?

A I don't know what that is. It looks like protein.

You know, you could surround Ignite ZRO with protein and steroids and everything else you want, but it's not going to make it a bodybuilding supplement. As much as you're going to try, you can surround it by whatever you what, it doesn't change what it is; an R2D energy drink.

Q Okay. So you agree with me this is a pictures of cases of Ignite ZRO in front of multiple brands of bodybuilding supplements; yes?

MS. STEIN: Objection to form.

A Which proves nothing. Still an energy drink.

BY MR. STEARNS:

Q No, but I don't think my question is difficult. I know it's getting late, but sir, is this Ignite ZRO -- cases of Ignite ZRO pictured in front of multiple bodybuilding supplements; yes or no?

A I don't know. It's what I would assume. I

Page 344

don't know what those are. It looks like some protein.

Q Okay. And you testified earlier the protein, whey protein is a bodybuilding supplement; yes?

A I would consider it, yes.

Q Okay. So, I mean, you've testified about what you understand a supplement to be. Do you know that this is a picture of ZRO, cases of ZRO in front of bodybuilding supplements?

A That's what it looks like.

So if we throw a pack of cigarettes in there, is the cigarettes bodybuilding supplements because they're by the whey protein? Is that how that works, guilty by association? Like where are we going to draw the line? Maybe we throw a cheeseburger in there, the cheeseburger is a bodybuilding supplement, I mean, because it's in a GNC, right? Is that how that works? How about the candy at the counter, are we going to call that bodybuilding, too? Because it's around protein. I mean, fuck, why not; right?

Q Mr. Bilzerian, as the president or CEO of Ignite, do you know why the Ignite ZRO marketing team was marketing ZRO in conjunction with bodybuilding supplements? If the answer's no, that's fine.

MS. STEIN: Objection to form.

MR. McCOY: Join.

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 345

A  I don't believe they were, but I can't speak for what they were trying to do.

MR. STEARNS:  All right, let's go to Exhibit 95, Sarah.

(Whereupon, Exhibit Number 21 was marked for identification.)

BY MR. STEARNS:

Q  This is Exhibit 21.  Mr. Bilzerian, is that a post that you posted about Ignite ZRO?

A  I don't recall, but if you say it is, I believe that it is.

MR. STEARNS:  Exhibit 98, Sarah.  We'll call this 22.

(Whereupon, Exhibit Number 22 was marked for identification.)

MS. STEIN:  I'm sorry, Jason, can you say that other number?

MR. STEARNS:  Premarked 98 will be Exhibit 22.

MS. STEIN:  Okay.  Thank you.

BY MR. STEARNS:

Q  Is this the poker post you were talking about, sir?

A  That is exactly the one.

Q  And you posted this photo on your social media?

A  I did.

Page 346

Q  And that was a promotion of ZRO?

A  Yes, it was.

MR. STEARNS:  Okay.  Exhibit 99 -- premarked 99, Sarah.  This will be Exhibit 23.

(Whereupon, Exhibit Number 23 was marked for identification.)

BY MR. STEARNS:

Q  Did you post that?  Do you recognize Exhibit 23, sir?

A  I do.

Q  Did you post that?

A  I did.  That's some weed, that's my hat, glass, girl's ass and the ZRO right there.  Nicotine pen.

Q  And that's a promotion of ZRO as well; right?

A  Yeah, but that doesn't look like bodybuilding to me.

Q  What was the purpose of posting the can of ZRO with the poker table?

A  Well, I had to do a post for GG Poker, so I figured I'd kill two birds with one stone and get the Ignite people to stop fucking harassing me about posting it.

MR. STEARNS:  Sarah, let's go to Exhibit 100.  This will be -- I think we're on Exhibit 24 now.

(Whereupon, Exhibit Number 24 was marked for

Page 347

identification.)

BY MR. STEARNS:

Q  We already saw this one; right?

A  Yeah.

MR. STEARNS:  All right, let's do 104.  This will be 25.

(Whereupon, Exhibit Number 25 was marked for identification.)

BY MR. STEARNS:

Q  Do you recognize that picture, sir?

A  I do.

Q  Did you post it?

A  Yes, I believe so.

Q  Is that you working on your book?

A  It is.

MR. STEARNS:  Okay, we'll go ahead and shut that down.

All right, Sarah, let's go to Exhibit 82.

BY MR. STEARNS:

Q  Before we pull that up, Mr. Bilzerian, I want to shift over to Full Spin.  Remember we talked about duffle bag in the back of the truck?

A  Yes.

Q  And your testimony was that was not an intentional promotion like the ZRO cans that we just

Page 348

talked about, that was --

A  No.

Q  -- just a bag in your truck.

A  100 percent.

MR. STEARNS:  Okay.  Go ahead and play Exhibit 82.  This will be Exhibit 105 (sic).

Stop there, Sarah.

(Whereupon, Exhibit Number 26 was marked for identification.)

BY MR. STEARNS:

Q  Okay.  So Mr. Bilzerian, Exhibit 105, that's a video you took; yes?

A  It is.

Q  And what was the purpose of taking that video?

A  Well, I bought that car to blow it up.  So I showed the car and then I showed the guns that I was going to use to blow it up.  And then we took it out and blew it up.

Q  Okay.  And the Full Send bag, it's facing where the logo is directly out.  You're saying that you just happened to throw the bag in or somebody happened to throw it in and that's how it was facing?

A  No, I threw it in.  It's got all the ammo in it.

Q  Right.  But earlier you said that that was not

87 (Pages 345 to 348)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 349

a promotion. You were not trying to promote Full Send; is that true?

A For the fifteenth time, I'm not promoting a company that I got no piece of, that ain't paying me for a $15 bag, I can assure you.

So no, just like they told you, it wasn't a paid promotion; I've told you it wasn't a paid promotion. That's what I chose to put my ammo in. If it was a Nike bag, you know, and Nike sold supplements, it wouldn't be any more of an advertisement for Nike than it was for Full Send. It's a bag that has a brand on it. You know, I'm not going to, like, tape out every brand that I stick in my car. And like I told you before this, before we even spoke, I didn't even know they sold supplements.

But here's the bottom line: I didn't get a dollar from them. No compensation. I got no stock, no equity in the company. I have no reason to promote them. So it's a non-issue, just like the Treigning Labs, just like the original post that we talked about initially that Jason then finally said was okay, I didn't have any piece of those either.

So I'm not in the business of promoting companies that I don't have a piece of for any reason other than if it's just naturally in the thing. So this

Page 350

is a perfect example of, you know, it was a bag that I threw my ammo in and threw it in the back of the car. This is by no means a promotion for that, just like it isn't a promotion for Benelli or, you know, an AR-15 or the, you know, fucking Escalade or whatever vehicle that is, you know. It's not a promotion for any of it.

Q Right. And again, you keep using the word "paid promotion." I understand that your testimony is that you weren't paid.

But you'd agree with me that this could be a promotion that is unpaid. That's -- that's a possibility?

A No. No, I've -- here is the thing: I'll qualify it better. I didn't get paid. I have no equity, I have no agreement with them for reciprocal posting, no favors, literally zero. I have no incentive whatsoever to promote Full Send. Zero. This is absolutely not a promotion.

Just because there's a brand on the bag, which I actually just attribute it to merch, just like I would to Supreme -- I mean, to me, Full Send is like an urban streetwear brand like Supreme. So I didn't even consider it a bodybuilding supplement.

But like I said, I didn't follow Full Send, I didn't tag them, there's no -- there's nothing here. I

Page 351

mean, if this is -- if this is what you guys are grasping, I'm telling you, you got a rough time in court.

Q Okay. Understood.

Would you say then if it's not a promotion, would you agree at least you're publicizing the bag and the brand?

A No more than I am Explorer or Benelli or whatever gun that is either. I mean, every -- I mean, anything has a brand; right? Just like I'm not promoting the concrete company that laid my driveway. I mean, just because it's in the video doesn't mean I'm promoting them.

Q Right. I asked if you publicized it, sir.

A I mean, like I said, no different than the guns or the magazines or the car or anything else that was, you know, featured in any one of the, you know, hundreds of thousands of Snapchats I posted.

Q So you seem like a guy who makes very intentional decisions with your time. Is that a fair statement?

MR. McCOY: Form.

A Yes.

BY MR. STEARNS:

Q And so what is the purpose behind appearing on

Page 352

podcasts and associating with the Nelk Boys and Full Send in public? What's the purpose in that?

A I did the podcast --

MS. STEIN: Object to the form. Just hold on.

I believe, Kevin, you also said that, but I couldn't hear.

MR. McCOY: That's all right.

A I did the -- I did the podcast for promotion of my book.

BY MR. STEARNS:

Q Okay. Do you follow the Nelk Boys on social media?

A I do.

Q Do they follow you?

A I believe so.

Q And is that because both of you have different or maybe perhaps overlapping, but also additional fan bases or followers to cross-pollenate?

MR. McCOY: Form.

A I just started following them because I thought their videos were funny. But yeah, I mean, I -- I really never worked with the guys. I did the podcast because they were getting pretty good views on their YouTube Channel and I wanted to promote the book. So that's why I did the podcast.

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 353

MR. STEARNS: All right, Sarah, can you go ahead and post 84? This will be 106.

A One last thing by the way. And I've been following the Nelk Boys for two years. I've literally never seen them one time promote a bodybuilding supplement. I'm not saying they haven't, I just have never seen it one time, not for any of them, or their channel.

BY MR. STEARNS:

Q Did you receive any money or pay Nelk Boys any money for the podcast you did in September?

A Zero.

MR. STEARNS: Can you pull up 106, Sarah?

BY MR. STEARNS:

Q Do you recognize Exhibit 106?

A I do. I think this is the post that Jason said was great, and titties.

MR. STEARNS: Keep playing.

BY MR. STEARNS:

Q Okay. This is a post that you made to promote STEEL; correct?

A That's correct.

Q And top of the post, what supplements do you take and when do you take them. Did you type that out?

A It was a question that was asked that I

Page 354

responded to via the video.

Q Well, how did that question get on the video? That's my question.

A It was one that I selected so that I could promote STEEL.

Q Okay.

A I was looking for organic ways to promote STEEL and one of the things I thought was to do a Q&A, and then I figured somebody could ask me that, and if they didn't I could ask myself that and then, you know, give me an opportunity to organically post what I take.

Q Have you ever taken Rested AF?

A I did. I didn't like it.

Q Okay. But you understand Rested AF has L-tryptophan?

A I didn't -- I didn't know all the ingredients. It's got a bunch of stuff.

MR. STEARNS: Can you go back to that video, Sarah, from the beginning? I think it's the Treigning. So right there, pause it.

BY MR. STEARNS:

Q Oh, do you see that Treigning Labs product in the white bottle?

A I do.

Q And what was that product for?

Page 355

A I think it's an amino acid. I think it's similar to, like, melatonin, which is in no way, shape or form a bodybuilding supplement, if that's what you're getting at.

Q So your testimony is that that Treigning Labs product is not a bodybuilding supplement?

A That's not only my testimony, but anybody that knows anything about fitness would testify the exact same way because L-tryptophan is not a bodybuilding supplement in any way, shape or form. It doesn't promote muscle gain, it doesn't promote, you know, athletic performance. It's simply supposed to make you tired, much like melatonin, which also is not a bodybuilding supplement.

Q What's the name of the company that sells it?

A You said Treigning Lab.

Q Okay. Do you know what Treigning Lab is?

A I know nothing about them.

Q Could it mean bodybuilding training?

A I would be guessing. I've never been to the website, never bought their products. It was sent to me by a buddy of mine that said it would help me sleep.

MR. STEARNS: Okay, I need to take a quick break. Let's do 10 minutes. Come back in about 10. We're wrapping up, guys. We're almost done.

Page 356

THE VIDEOGRAPHER: Off the record, 9:42 p.m.

(There was a brief recess.)

THE VIDEOGRAPHER: On the record, 9:59 p.m.

BY MR. STEARNS:

Q Okay, Mr. Bilzerian, a couple follow-up questions and then we're going to move over to a different topic.

Earlier we were talking about the Treigning Labs product that you -- that you included in the promotion of the STEEL products. Remember that?

A I do.

Q And you said a friend sent that to you. Do you remember talking about that?

A TJ Dillashaw.

Q Okay. How do you know TJ Dillashaw?

A I met him doing stem cells in Panama.

Q When was that?

A I believe around 2016, '17-ish.

Q Did TJ Dillashaw tell you whether or not he took the product?

A Stem cells?

Q No. I'm sorry. The Treigning Lab product.

A Oh, yeah, he said it helped him sleep.

Q Okay. Did you guys talk about weightlifting and fitness with respect to that product?

89 (Pages 353 to 356)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 357

A   No, it's just a -- I think it's a naturally occurring amino acid that helps you sleep.

Q   Were you involved at Ignite, sir, with respect to the deal between Ignite and Vitamin Shoppe to sell ZRO at Vitamin Shoppe?

A   I was not. I didn't have a part of that.

Q   Do you have any personal knowledge with respect to that deal?

A   I wasn't a fan because I felt like it was the wrong place to carry it.

Q   Why did you think it was the wrong place?

A   I expressed it to them numerous time. I thought the place to have it was gas stations. To me, it's a point of sale item, it's just not something that I feel like people would go into a -- you know, a Vitamin Shoppe to get. I mean, it's -- when I saw them, they were on -- they were on pallets. And you know, to me, if somebody hasn't tried an energy drink, they're not going to buy a whole pallet. And if you got them warm on a shelf, it doesn't seem very appealing. So to me it wasn't much different than us selling it online, which hadn't proven to be very effective.

So I wanted it in gas stations and gas stations only.

Q   Well, ultimately Ignite pitched and marketed

Page 358

the product to more than just gas stations; right?

A   We -- we tried in Vitamin Shoppe and they wanted support and I, you know, I gave them that one post and that was about it, and then I think we pulled out of Vitamin Shoppe. I'm pretty sure we're not in Vitamin Shoppe anymore.

Q   So I was -- we were going through the Ignite ZRO page a moment ago, and I've looked at it several times. I've never seen social media posts with Ignite ZRO in a gas station. Have you?

A   No. No, I don't think so. I mean, not -- not on our side that I know of.

Q   All the Ignite ZRO posts I see are either just the can itself with a bunch of, you know, either hashtags or narratives, or Ignite ZRO, you know, gym or fitness-related. That's what I've seen.

Is that what you've seen?

A   Like I said, I haven't been to the page in six months. It was -- you know, it has 10,000 followers. I think it's run by some peon that I don't think even understands social media, so I never paid any attention to it.

And to be honest, I was never really big on the product in general. So it wasn't something I put much focus in. If you see my posts, I mean, it's something I

Page 359

barely promoted, and I think -- I think four of the five posts that you had were all done within a two-day period on a trip I had down to Mexico because they were giving me a bunch of shit about never promoting it.

It was just -- I don't know, it was part of the whole beverage rollout. I was excited about the vodka, I was excited about the tequila, the water. It's just that, I don't know.

Initially I was a little excited about the energy drink, but we just, you know, haven't gotten the shelf space in the gas stations, so it's, you know, it's -- to me it's a back burner item. I mean, our vapes are doing, I think, 99 percent of our sales and I think ZRO is less than 1 percent. I mean, I would be surprised if it's even half a percent of our sales. In fact, I'm almost positive it's less than half a percent of our sales.

Q   Why did you tell me that? Why does that matter?

A   Because it's not something that we're selling. It's not something that's competing. It's not something I care about. It's not something I'm actively promoting.

I mean, to me it's a straw that you guys are grasping at to try and get out of this agreement, but

Page 360

it's got nothing to do with it. It's not a bodybuilding supplement, it's not something I'm leaning on, it's not something that's taken away from STEEL.

It's an RTD that doesn't compete. STEEL, you know, has yet to release any RTDs. And you know, it's been what, a year since you guys filed the lawsuit and you still have yet to come out with any RTD, but yet you're saying it competes? I don't know, it just seems like nonsense to me.

Q   Okay. I was just wondering why the information about the percentage of Ignite sales was relevant.

A   Because it -- you know, I mean, I focus on the thing that's making us money and that's nicotine vape right now.

Q   Okay. With respect to Ignite ZRO, though, do you happen to recall who over at Ignite you would deal with or work with if you wanted to discuss marketing efforts or social media?

A   I never really wanted to market it. I never really wanted to promote it. The only time I heard from it was when they were giving me shit because I hadn't promoted it, so I did the, you know, few posts on the Cabo trip in conjunction with the GG Poker thing and my book and whatever. So -- but that was it. I mean, that was it. That and the one static post that I did. Aside

888.909.2720              Anthem Reporting              813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 361

from that, I've never promoted Ignite ZRO.

Q   When you say "they," you're referring to they at Ignite were pushing you to promote it; who's they?

A   The beverage department, the beverage division, and John.  You know, I was just getting a lot of flack because they didn't have support.

Q   Do you remember the names other than John Schaefer?

A   No, I don't remember.  I mean, it was mostly coming from John, he was relaying, or I'd hear it, you know, in the -- in the meetings.

Q   Okay.  If you needed to access Ignite ZRO's social media page, do you believe that you could ask somebody and get the credentials to access that page yourself?

MR. McCOY:  Form.

A   Eventually I believe so.  I mean, it wouldn't be immediate.

I think -- have they posted anything in the last few months?  I don't think so.  But I could be wrong.

BY MR. STEARNS:

Q   But you believe you could get those credentials eventually?

MS. STEIN:  Objection, form.

Page 362

MR. McCOY:  Join.

BY MR. STEARNS:

Q   You can answer.

A   I think I -- yeah, I'm pretty sure I could get them.  I'm not -- I think we fired the guy that was in charge of the little social media accounts.  So I don't know, I'm sure we could, if I wanted to.  Like I said, it's got 10,000 followers.  It's a speed bump to me.

Q   Do you know, sir, whether or not Blitz was ever compensated for your promotion of the Ignite products?

A   It was not.

Q   Is that because you're an owner of Ignite so there's no need to compensate Blitz?

MS. STEIN:  Objection.  Form.

A   I never asked for compensation.

MR. STEARNS:  Okay.  We're going to go into questions about Curtis Heffernan.  Kim and Kevin, I -- the first several questions are really background; I don't think they're objectionable, but --

MS. STEIN:  Could you stop the screen share?

MR. STEARNS:  Sure.  You can take that down, Sarah.

BY MR. STEARNS:

Q   Mr. Bilzerian, who is Curtis Heffernan?

Page 363

A   He was the old, I believe, president.

Q   Of Ignite?

A   Yes.

Q   Do you know when you met Mr. Heffernan?

A   I don't remember the exact date.

Q   Do you -- do you know how you met Mr. Heffernan?

A   To be honest, I don't.  I don't know who recruited him or how he came to work at Ignite.

Q   What was his title again?

A   He ended up when we fired him, he was the president.  He was about to be replaced.

And before that, I don't remember what his title was.

Q   And just to be clear, you're saying Mr. Heffernan was the president, was he the president of a specific Ignite entity or was he -- what was he the president of?

A   He was basically doing what John Schaefer is doing now, which is kind of acting president and running the day-to-day, holding the management meetings, you know, kind of, you know, handling the direct reports.  And then we would discuss the high-level stuff and he would, you know, be the guy that went into work every day and managed the company.

Page 364

Q   When you say doing what John Schaefer does now, the day-to-day, you're referring to the entire Ignite conglomerate and all the different branches?  That's what John handles?

A   Yes, John is acting president of, you know, basically Ignite International, which then has the other corporations underneath it.

Q   So to your understanding there's no component to the Ignite brand currently that doesn't fall under the supervision or purview of John Schaefer at a high level?

MR. McCOY:  Form.

MS. STEIN:  Join.

MR. STEARNS:  What?

MS. STEIN:  We just objected.

MR. McCOY:  I objected to form.

MR. STEARNS:  Okay.

MS. STEIN:  I joined.

A   Oh.  No, I mean, it -- yeah, no, they would be under him, I believe.  Everybody.

BY MR. STEARNS:

Q   Do you know specifically what Mr. Heffernan's titles were over time, or do you know at all?

A   I just remember when we fired him I believe he was the president or COO.  I think COO was his title,

91 (Pages 361 to 364)

888.909.2720                    Anthem Reporting                    813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

Page 365

but I'm not 100 percent positive. It's been about a year-and-a-half now, I think.

Q Do you know if Mr. Heffernan had any involvement with ZRO?

A Yes, I think he was the one that kind of headed up Ignite Beverage. I believe he recruited Gracely and kind of started that whole thing. I know he had a hand in the tequila as well.

Q Who is Scott Rohleder?

A Scott Rohleder is the --

MS. STEIN: I object. I'm sorry; you're going too quick. Just asked and answered. Actually, it was many hours ago, but go ahead.

A He's the current CFO of Ignite.

BY MR. STEARNS:

Q Do you remember when he became the CFO of Ignite?

A When Scott did?

Q Yes.

A It was recently, I believe. I believe it was probably within the last -- I'd be guessing, but I would say two months-ish maybe.

MR. STEARNS: Okay, Kim and Kevin, this is probably where you're going to chime in.

BY MR. STEARNS:

Page 366

Q Mr. Bilzerian, do you know if Mr. Rohleder advised you to classify a PP loan in a 5-million option payment on the 10979 Chalon Road property as miscellaneous property?

MS. STEIN: I'm going --

MR. McCOY: I'm going to instruct him not to answer pursuant to the Court's Order.

MR. STEARNS: Okay.

MS. STEIN: Join.

MR. McCOY: Separately from that, so we're clear, object to form, too. I mean, so far outside of bounds of anything remotely even close to be spending time on at this hour.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you ever ask Mr. Heffernan to classify a loan or an option payment as miscellaneous income?

MR. McCOY: Do not answer based on the Court's Order.

MS. STEIN: Form.

MR. McCOY: And form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you ever have a concern that

Page 367

Ignite's auditors would not support Ignite as a going concern without a cash infusion?

MR. McCOY: Do not answer based upon the Court's Order, and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you instruct Mr. Heffernan or anybody at Ignite to use Ignite funds for a yacht rental in the amount of 703 Euros?

MR. McCOY: Do not answer based upon the Court's Order and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Same question. Mr. Bilzerian, did you instruct anybody at Ignite to use Ignite resources to pay for a 102,000-Pound stay in London?

MR. McCOY: Do not -- do not answer based upon the Court's Order, and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you ever instruct anybody at Ignite to use Ignite funds to pay for your monthly $200,000 rent at 10979 Chalon Road property?

MR. McCOY: Do not answer based upon the Court's Order, and objection to form.

Page 368

MS. STEIN: Join.

BY MR. STEARNS:

Q Same question with respect to the paintball field, rock climbing wall, pool renovations, game rooms, bed frame, theater projector and vaults at that property?

MR. McCOY: Do not answer based upon the Court's Order, and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Sir, do you know whether or not Ignite classified as an Ignite business expense the liquor tab for the Valentine's Day party that you threw?

MR. McCOY: Do not answer based upon the Court's Order. Objection to form.

MS. STEIN: Join.

A What does a liquor tab have to do with STEEL? I'm so confused.

MR. McCOY: Dan --

MS. STEIN: Dan, no. Don't answer anything. Don't answer the question.

THE WITNESS: All right.

BY MR. STEARNS:

Q Did you ever instruct anybody at Ignite to compensate the models that you would hire for parties at

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

| Page 369 | Page 370 |
|---|---|

**Page 369**

your house?

MR. McCOY: Do not answer based upon the Court's Order. Objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, do you recall a time where Ignite's auditors raised concerns about these -- these expenses?

MR. McCOY: Do not answer based upon the Court's Order. Objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you, your father and Scott Rohleder decide shortly thereafter to replace those auditors?

MR. McCOY: Do not answer based upon the Court's Order, and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Mr. Bilzerian, did you pressure or ask anybody else to pressure Mr. Heffernan to sign off on those expenses as Ignite business expenses?

MR. McCOY: Do not answer based upon the Court's Order and objection to form.

MS. STEIN: Join.

**Page 370**

BY MR. STEARNS:

Q Sir, after you accused Heffernan -- or after Heffernan refused, do you recall accusing Mr. Heffernan of taking drugs?

MR. McCOY: Do not answer based upon the Court's Order and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Acting strange?

MR. McCOY: Do not answer based upon the Court's Order and objection to form.

MS. STEIN: Join.

BY MR. STEARNS:

Q Did you fire Mr. Heffernan the next day?

MR. McCOY: Do not answer based upon the Court's Order and objection to form.

MS. STEIN: Join.

MR. STEARNS: Okay, I'm done with Heffernan stuff. One last question, guys.

Sarah, go ahead and pull up premarked Exhibit 92. I'm sorry, yeah, 92.

Madam Court Reporter, do you know the next exhibit number that we're on?

THE REPORTER: I want to say 27. Does that sound right to you?

**Page 371**

MR. STEARNS: It does.

We're going to mark this as Exhibit 27. Sarah, go ahead and play that.

(Whereupon, Exhibit Number 27 was marked for identification.)

MR. STEARNS: Is there a way to get the sound, Sarah?

MS. GOTTLIEB: I can hear it, so I'm not sure why you can't.

MR. STEARNS: Go ahead and --

MS. STEIN: Sarah, under your -- under share screen there should be an option for sound.

MS. GOTTLIEB: I don't see anything. This is the first time all day I've had this issue.

Hang on, let me try this.

Is that working?

MR. STEARNS: Yes. Go back to the beginning.

SPEAKER: "Then I take this Pre-Workout, gives you better pump. And this is my post-workout protein. Do the Vegan. And then before I go to sleep I take that. It helps me pass the fuck out and get better sleep."

BY MR. STEARNS:

Q Sir, you recall posting this?

A I -- yeah. I mean, I think so. I don't

**Page 372**

remember it exactly, but it looks like a post I did.

Q And just to be clear, is it your testimony that the Treigning Lab component of this is not workout-related, but the other part is? Is that what you were saying?

MS. STEIN: Objection. Asked and answered. Go ahead.

MR. McCOY: Join.

A Yeah, it's not -- it has nothing to do with working out. It's just, as I said, it helps me sleep.

BY MR. STEARNS:

Q You just threw the Treigning Lab in there unrelated to the workout stuff?

A Yeah, I didn't want it to be STEEL STEEL STEEL STEEL, because then it looks like an advertisement. So I threw in other stuff that I take that wasn't STEEL like I've been doing since the beginning of my ads, you know. That's part of the organic piece of the ads is that, you know, it's not only one product. And you know, like I said, I explained that to Jason at the very beginning. He was on board with it and he was good with it. So, you know, we did that back in 2017. I mean, he's been good with it the whole time and he was okay with this one.

In fact, I think his response was, "Great post.

93 (Pages 369 to 372)

888.909.2720        Anthem Reporting        813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)        5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 373

Titties."

MR. STEARNS: Okay. I'm done for now. Kim or Kevin, do you have any questions?

MR. McCOY: I have no questions. We will read and sign.

And I think that's -- that's the end of it, so thanks, everybody.

MR. STEARNS: Have a good night.

THE VIDEOGRAPHER: Off the record, 10:18 p.m.

(The deposition concluded at 10:18 p.m.)

Page 374

CERTIFICATE OF REPORTER

STATE OF FLORIDA     )

COUNTY OF HILLSBOROUGH )

I, BEVERLY REPLOGLE, RPR, Court Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DANIEL BILZERIAN; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 313, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED November 4, 2021 at Tampa, Hillsborough County, Florida.

_Beverly L. Replogle_
BEVERLY REPLOGLE, RPR
Notary Public

Page 375

CERTIFICATE OF REPORTER

STATE OF FLORIDA     )

COUNTY OF HILLSBOROUGH )

I, KELLEY N. BLACK, RPR, Court Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DANIEL BILZERIAN; that a review of the transcript was requested; and that the foregoing transcript, pages 314 through 373, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED November 5, 2021 at Tampa, Hillsborough County, Florida.

_____
KELLEY N. BLACK, RPR
Notary Public

Page 376

CERTIFICATE OF OATH

STATE OF FLORIDA     )

COUNTY OF HILLSBOROUGH )

I, BEVERLY REPLOGLE, RPR, Notary Public, State of Florida, certify that the witness, DANIEL BILZERIAN, appeared before me via Zoom videoconference on November 2, 2021 and was duly sworn.

WITNESS my hand and official seal this date:  November 5, 2021.

Identification:

Personally Known _____

Or Produced Identification_____X_____

Type of Identification Produced:  Driver's License

_Beverly L. Replogle_
BEVERLY REPLOGLE, RPR
Notary Public, State of Florida
MY COMMISSION GG 946680
EXPIRES 2/25/24

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    5e86d368-f0ee-4618-947c-1e3600535c25

CONFIDENTIAL

Page 377

E R R A T A  S H E E T

IN RE: STEEL SUPPLEMENTS, INC. vs. BLITZ NV, LLC

DEPOSITION OF: DANIEL BILZERIAN     TAKEN: 11/02/2021

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

Please sign, date, and return this sheet to our office.

If additional lines are required for corrections, attach

additional sheets.

At the time of the reading and signing of the

deposition, the following changes were noted:

PAGE   LINE   CHANGE       REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalty of perjury, I declare that I have read my

deposition and that it is true and correct subject to

any changes in form or substance entered here.

SIGNATURE OF DEPONENT: _____

DATE: _____

Page 378

November 4, 2021

Kevin P. McCoy, Esquire

Carlton Fields Jorden Burt, P.A.

4221 West Boy Scout Boulevard, Suite 1000

Tampa, Florida 33607

813-223-7000

kmccoy@carltonfields.com

In Re: STEEL Supplements, Inc., vs. BLITZ NV, LLC

Dear Mr. McCoy:

Enclosed please find the original errata page with your copy of the transcript so DANIEL BILZERIAN may read and sign. Please have him make whatever changes are necessary on the errata page and sign it. Please make a copy of the errata page and place it in your copy of the transcript. Please then forward the original errata page back to our office at 101 South Franklin Street, Suite 101, Tampa, Florida 33602.

If the errata page is not signed by the witness within 30 days after this letter has been furnished, we will then process the transcript without a signed errata page. If DANIEL BILZERIAN wishes to waive his right to read and sign, please have him sign on the signature line at the bottom of this letter and send it back to our office.

Your prompt attention to this matter is appreciated.

Sincerely,

Beverly Replogle, RPR

Anthem Reporting

I do hereby waive my signature

_____

DANIEL BILZERIAN

cc: Jason P. Stearns, Esquire
    Kimberly Stein, Esquire

95 (Pages 377 to 378)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          5e86d368-f0ee-4618-947c-1e3600535c25

# EXHIBIT 4

David Vingiano
President & COO
Bilzerian Entertainment
8560 W. Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Email: david@danbilzerian.com
Office: 1-424-274-4581
Mobile: 1-978-375-6165

---

**From:** paul@internationalinvestmentsltd.com
**Sent:** Tuesday, February 7, 2017 3:15 AM
**To:** David Vingiano
**Cc:** Dan Bilzerian; Scott ICES
**Subject:** RE: Jason Huh
**Great News! Good luck and let Scott and I know if you need our help.**

Best regards,

**Paul A. Bilzerian**
**Consultant**
**International Investments & Consulting, Ltd.**
**858 Zenway Blvd.**
**Frigate Bay, St. Kitts**
**P.O. Box 2086**
**Basseterre, St. Kitts**
**Office: (869) 466-8000**
**Office: (869) 466-7396**
**Office: (869) 465-9793**
**Cell: (869) 660-7347**
**Fax: (813) 388-4458**

-------- Original Message --------
Subject: RE: Jason Huh
From: David Vingiano <david@danbilzerian.com>
Date: Mon, February 06, 2017 8:46 pm
To: "paul@internationalinvestmentsltd.com"
<paul@internationalinvestmentsltd.com>
Cc: Dan Bilzerian <dan@danbilzerian.com>, Scott ICES <Scott@icesltd.com>

Thanks Paul, I'll let you know if we need your help with the agreement. However, we just received their corporate docs this morning and Kim told me she would have something done by tomorrow. I've set this this expectation with Jason's team and Dan is also aware of the timeline.

**EXHIBIT**

Bilzerian Exhibit 5  11221br

exhibitsticker.com



Thanks,
David Vingiano
President & COO
Bilzerian Entertainment
8560 W. Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Email: david@danbilzerian.com
Office: 1-424-274-4581

**From:** paul@internationalinvestmentsltd.com [mailto:paul@internationalinvestmentsltd.com]
**Sent:** Monday, February 6, 2017 7:52 AM
**To:** David Vingiano <david@danbilzerian.com>
**Cc:** Dan Bilzerian <dan@danbilzerian.com>; Scott ICES <Scott@icesltd.com>
**Subject:** Jason Huh

**Dear David,**

**To add to our conversation on Saturday, if Kim cannot get a contract done for Jason Huh today that is very short, let me know and I will draft it. Also, keep in mind Walter Aye is in Tampa and he could represent Dan if Jason gets a local lawyer. Walter would probably do it for Dan as a courtesy. Please keep me informed on this great opportunity.**

**Perhaps it would be useful to send me a status report on all of Dan's projects and investment opportunities.**

**Best regards,**

**Paul A. Bilzerian**
**Consultant**
**International Investments & Consulting, Ltd.**
**858 Zenway Blvd.**
**Frigate Bay, St. Kitts**
**P.O. Box 2086**
**Basseterre, St. Kitts**
**Office: (869) 466-8000**
**Office: (869) 466-7396**
**Office: (869) 465-9793**
**Cell: (869) 660-7347**
**Fax: (813) 388-4458**

BLITZ_000879

# EXHIBIT 5

Message

**From:**     Jason Verona [jason@blitznv.com]
**Sent:**      1/28/2019 6:53:47 PM
**To:**         Jason Huh [jason@steelsuppsusa.com]
**CC:**        Scott Rohleder [scott@danbilzerian.com]
**Subject:**  Merchant Account Solution CBD


Dear Jason:

I brought our CFO, Scott Rohleder (cc'd), in on the conversation we had re: your interest in selling CBD infused products through your website and/or potentially wholesaling through other retailers.

If still interested in pursuing, he has recommended that you speak with Troy Loehr of Imperium Payment Solutions. He would be an appropriate contact to guide you through the merchant process so there's no chance of SS getting shut down if/when you decide to launch a new CBD-focused line.

His contact info is…
tml@imperiumpaymentsolutions.com
O: 747-220-6827
M: 818-852-8025

I didn't want to put you on the spot, so I did not add Troy on this chain. He would however be more than happy to talk you through it; proposing ways in which to protect sales of the core SS line.

Best,
Jason



**EXHIBIT 7**
J. VERONA
9/2/2021
Elsa Hernandez, FPR