**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: 702-685-4444
Email:  ccarlyon@carlyoncica.com
dcica@carlyoncica.com

**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ. *(Pro Hac Vice)*
SARAH A. GOTTLIEB, ESQ. *(Pro Hac Vice)*
201 North Franklin Street, Suite 3550
Tampa, FL 33602
Phone: 813-488-2920
Telephone 813-488-2920
Email: jstearns@sgrlaw.com
sgottlieb@sgrlaw.com

BRIAN P. HALL, ESQ. *(Pro Hac Vice)*
MICHAEL F. HOLBEIN, ESQ. *(Pro Hac Vice)*
1105 W. Peachtree St. NE, Suite 1000
Atlanta, GA 30309
Phone: 404-815-3500
Email: bhall@sgrlaw.com
mholbein@sgrlaw.com

*Co-Counsel for STEEL Supplements, Inc.*

CARLYON CICA CHTD.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. BK-S-23-13871-NMC |
| BLITZ NV, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | **STEEL SUPPLEMENTS, INC.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY INTERNATIONAL INVESTMENTS, LTD. AND REQUEST FOR FEES AND COSTS** |
| | **Hearing Date:** N/A<br>**Hearing Time:** N/A |

SGR/80675445.1

STEEL Supplements, Inc. ("STEEL"), by and through its undersigned counsel, hereby files this *Motion to Compel Compliance with Subpoena by International Investments, Ltd.* (the "Motion").

This Motion is made and based upon the Points and Authorities filed herewith, the pleadings, papers, and records on file which are referenced by docket number on the Court's electronic filing system ("ECF #")[1], the declaration of Jason P. Stearns, Esq. (the "Stearns Decl.") filed herewith, and any evidence and oral argument which the Court may consider at the time of the hearing of the Motion.

Respectfully submitted this 28th day of July, 2025.

By: /s/ *Jason P. Stearns*
**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ
SARAH A. GOTTLIEB, ESQ
 201 North Franklin Street, Suite 3550
*Co-Counsel for STEEL Supplements, Inc.*

**&**

**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
TALI J. FREY, ESQ.
Nevada Bar No. 16537
*Co-Counsel for STEEL Supplements, Inc.*

## POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The Debtor's indirect and sole beneficial owner – Dan Bilzerian—and a cabal of Debtor's insiders and affiliates continue undeterred in their campaign to benefit from the use and enjoyment of Debtor's assets at the expense of STEEL, the Debtor's only legitimate creditor. To further this scheme, they must conceal the nature and extent of the collective Bilzerian enterprise's shell game. These efforts are most recently reflected in International Investments' near-total failure to

---

[1] Pursuant to FRE 201, STEEL requests the Court take judicial notice of the relevant pleadings on its docket.

substantively respond to STEEL's subpoena, a subpoena prompted by Ignite's effort to purchase all of the Debtor's assets through suspect sale procedures clearly designed to chill a competitive auction and focused on, among other things, a series of fraudulent or unauthorized post-petition transfers of assets by Debtor to Ignite.

STEEL has sought, and the Court has ordered, the production of documents by International Investments and an examination of an International Investments designee under Rule 2004. The documents and information sought are relevant—indeed, key—to understanding the scope and value of Debtor's assets and circumstances pertinent to an eventual sale. Responses to STEEL's document subpoena were initially due on June 30, 2025, and an examination was scheduled for July 2, 2025 (about two weeks before the July 17, 2025 auction). International Investments responded with boilerplate objections and only a handful of documents and further refused to provide a corporate designee for oral examination. Accordingly, at STEEL's request, the parties stipulated to the continuation of the auction in order to engage in a meaningful conferral about the scope of the production and deposition topics. Those efforts have been unsuccessful and STEEL requests an order directing International Investments to comply with the subpoena.

## II.

## FACTS

1.  Blitz NV, LLC, ("Debtor") filed a bankruptcy petition under Chapter 11 on September 6, 2023 (the "Petition Date"). The case converted to Chapter 7 on December 19, 2023, and the then-acting Subchapter V Trustee, Brian Shapiro, was appointed interim Chapter 7 trustee. Mr. Shapiro became the permanent trustee at the conclusion of the meeting of creditors on January 29, 2024.

2.  Debtor is wholly owned by Goat Works, LLC ("Goat Works"), which is in turn wholly owned by Dan Bilzerian. ECF # 38, Ex. 2 p. 4. Prior to the bankruptcy, Debtor functioned as a holding company for Bilzerian's various personal and business interests. ECF # 38 p. 4, n.3.

**Ignite's Relationship to Debtor**

3.  In addition to his ownership interest in Debtor, Dan Bilzerian is, or was, a majority shareholder and former CEO of Ignite International, Ltd. ("Ignite"), which he founded in 2017. Ex. 1 (Bilzerian Dep. Tr.) at 19:3-25.

3

4.  Ignite's Chief Financial Officer, Scott Rohleder, works for Dan's father, convicted felon Paul Bilzerian, in a variety of roles including as nominal president and director of Rohleder, Inc., a company operated at the direction of and for the benefit of the elder Bilzerian.

5.  Through Rohleder, Paul Bilzerian effectively controls Ignite and operates as the ringleader of the collusive insider corporate raid of the Debtor's assets.

6.  In addition to controlling Ignite, Paul Bilzerian runs International Investments Ltd. ("International Investments")[2], a St. Kitts-based entity that he uses to shelter his assets from the U.S. government's effort to collect a $160 million SEC judgment against him. While in Chapter 11, Debtor sought debtor-in-possession financing from International Investments. ECF # 41. The Debtor's motion was denied, with the Court observing that the arrangement possessed the hallmarks of an impermissible *sub rosa* plan designed to enrich International Investments at the expense of Debtor's only legitimate creditor, STEEL. *See* ECF # 72 .

7.  Paul Bilzerian and Rohleder are currently under federal indictment in California for conspiring  to avoid Paul Bilzerian's payment of a $160 million SEC judgment. That judgment, which dates back decades to Paul Bilzerian's days as a corporate raider, has been avoided by Paul Bilzerian's claims that he is "indigent and unable to pay" while, at the same time, utilizing several entities, including International Investments, to "funnel millions of dollars of his assets to capitalize [Ignite] while concealing his role in [Ignite's] ownership and management through nominees." *See United States of America v. Paul A. Bilzerian et al.*, No. 2:24-cr-569 (C.D. Cal.). Ex 2, ¶ 3.a-c. As further alleged in the Indictment, "[Ignite] would seek to misleadingly downplay that involvement by issuing a press release mischaracterizing [Paul Bilzerian and Rohleder] as "unpaid consultants" to [Ignite]." *Id*. at ¶ 3.d. But, as alleged, "[i]n truth, as defendant [Ignite] then knew, [Paul Bilzerian] was the de facto head and beneficial owner of [Ignite], and [Rohleder] was a de facto executive of defendant [Ignite]."

8.  For his part, "at [Paul Bilzerian's] direction, [Rohleder] would assist in deploying [Paul Bilzerian's] assets to capitalize [Ignite], including by using entities controlled by [Rohleder],

---

[2] STEEL has also served a subpoena on Internal Investments and by separate motion is seeking to compel production by International Investments under that subpoena.

including Rohleder, Inc., as a vehicle to hold and transfer assets belong to International Investments." *Id.* at ¶ 3.c.iii.

9.   Based upon the limited productions made by Ignite and International Investments, STEEL recently learned that Paul Bilzerian, acting on behalf of either Ignite or International Investments or perhaps both, was heavily involved in decisions about the potential purchase of Debtor's assets. Comp. Ex. 3 (trustee communications). For example, Paul Bilzerian emailed the Trustee *from an International Investments email* account to negotiate *on behalf of Ignite* for the purchase of Debtor's assets, including the intellectual property that was improperly transferred to Ignite post-petition, as described below. *See* Comp. Ex. 3.[3]

10. Communications between Ignite and International Investments, their principals, the Trustee, and each of their counsel reveal that Paul Bilzerian is using the same playbook he used to engage in the alleged fraud and conspiracy to commit fraud for which he was indicted.

11. Just as Paul Bilzerian used Rohleder (vis-a-vis Rohleder, Inc.) to funnel millions of dollars in and out of Ignite to shield his assets from collection by the SEC, Ex. 2 at ¶ 3.c.iii., International Investments produced documents showing wire transfers from Rohleder, Inc. to Dan Bilzerian and Bilzerian Entertainment, LLC, from November 22, 2022 to September 20, 2023. *See* Ex. 4. International Investments will likely attempt to use these documents to support its untimely proof of claim for $3,972,111.11, which was submitted on May 30, 2025, over a year past the claims bar date and one week after the Court held a hearing announcing that it would deny the motion to approve the sale of Debtor's assets to Ignite and instead directed the Trustee to enter into the proposed agreement with STEEL. ECF Claim 2.

**The Voidable Ignite Transactions**

12. On September 26, 2023 (days *after* the Petition Date), Debtor's Chief Operating Officer, Jason Verona, executed an "Assignment of Trademark" from Debtor to Ignite purportedly effective as of July 1, 2022, by which Debtor assigned to Ignite all right, title, and interest that

---

[3] On April 21, 2025, the Trustee filed a motion to approve the sale of Blitz's assets to Ignite. ECF # 218. The Trustee provided a table summarizing the disclosures required by Local Rule 6004, including the statement that "Ignite is not an insider." *Id.* at p. 5. The Trustee got it wrong.

5

Debtor had in two U.S. trademark registrations (Nos. 6,782,632 and 7,075,665) in exchange for consideration of ten dollars ($10.00). Ex. 5 (September 26, 2023 Assignment of Trademark). By another agreement, this one undated[4] but also purportedly effective July 1, 2022, Debtor transferred several trademarks to Ignite, again without consideration. Ex. 6 (July 1, 2022 Assignment and License); Ex. 1 (Bilzerian Tr.) at 48:5-52:18.

13. The two marks purportedly assigned to Ignite, and similar other marks representing images of goat skulls, were emblems of both Blitz and Ignite. ECF # 226 p. 5. Ignite appears to continue to utilize the logo,[5] which is owned by the estate and among the assets being sold.

14. Additional recent events further suggest collusion by Debtor and its affiliates to conceal or move assets. First, STEEL was shocked to learn that, on October 31, 2024, counsel for Dan Bilzerian (the same counsel who appeared at his 2004 examination in this bankruptcy) filed a name change for Blitz NV, LLC, making the name change FRG Properties, LLC. See Ex.7. Perhaps just as shocking, STEEL informed the Trustee of the name change and the Trustee, who indicated that he was unaware, has yet to take any action to prosecute this clear stay violation.

15. Second, on March 17, just three days after Dan Bilzerian's 2004 examination, the G-IV/SP private jet that Dan Bilzerian used, and which he testified was likely security for the loan to another entity owned by Dan Bilzerian, Goat Airways, in the amount of $8,297,000 was registered to a new owner, Kenmore Crew Leasing Inc. See Ex. 8; *see also* Bilzerian Tr. at 30:1-15.

16. Kenmore Crew Leasing, Inc. d/b/a Shepard Aero is a company that "offers a complement of services for aircraft owners, including Trustee, Ferry, Training, Management, and entry-into-service programs" and, to that end, has "operating bases around the United States, Hawaii, China, India, and South Africa, Shepherd Aero resources are strategically located to serve clients

---

[4] The document has a "wet" signature that purports to be Dan Bilzerian's signature, though he has no recollection of signing it, Ex. 1 (Bilzerian Tr.) at 53:8-18, and an electronic Docusign signature that purports to be Scott Rohleder's signature. STEEL has requested communications, in part, to determine the actual dates and the circumstances under which these documents were purportedly executed.

[5] *See* https://ignite.co/.

6

anywhere on earth." See Shepard Aero LinkedIn (https://www.linkedin.com/company/shepherdaero/) (last visited July 25, 2025).

17. STEEL is concerned that Dan Bilzerian, Paul Bilzerian, Ignite, and/or International Investments are working in concert to move the plane out of the country, perhaps eventually to St. Kitts, where Paul and Dan Bilzerian are citizens. Bilzerian Tr. at 7:9-14.

**III.**

**THE EXAMINATION TOPICS AND DOCUMENTS REQUESTED**

STEEL set forth just eleven matters for examination, as reflected in the attached subpoena. Ex. 9. The examination topics seek testimony about the Debtor's assets, as known to certain of its suspected insiders and affiliates, and the relationships between Debtor and those insiders and affiliates. Similarly, the requests for production seek documents concerning Debtor's relationship with insiders and affiliates, such as Ignite and International Investments, and information about the Debtor's assets and liabilities as known to those entities and the individuals behind them.

STEEL's counsel met and conferred with International Investments' counsel on July 15, 23, and 28, 2025. The parties agreed to narrow document requests 1 through 4, and International Investments' counsel subsequently agreed his client would produce documents for those requests (although he did not know when). For the remainder of the requests, International Investments' counsel indicated several times that he would confer with his client and get back to us about what responsive documents it has and what it would voluntarily produce.

The following are the requests, including, where modified as agreed in connection with the Parties' meet and confers:

| Request No. | Original Request | Request Following Meet and Confer or What International Investments Agrees to Produce |
|---|---|---|
| 1 | Produce all Documents reflecting ownership interests in Claimant November 22, 2022, through May 30, 2025, including, without limitation, | Narrowed to documents sufficient to show ownership interest. |

| | | |
|---|---|---|
| | Operating Agreements, membership lists, records of purchases, issuance, sale, transfer, or termination of any ownership interests in Claimant. | |
| 2 | Produce all Documents reflecting the identity of Your officers, directors, managing members, managers, or persons in control of You during the period November 22, 2022 through May 30, 2025. | International Investments agrees to produce only documents sufficient to show the current identity of its officers, directors, managing members, managers, or persons in control of it. |
| 3 | Produce all Documents evidencing or relating to each transfer between Creditor and Debtor, including, without limitation, bank records, wire transfer records, cancelled checks, electronic funds transfer records, and receipts, for the period October 1, 2014, through May 20, 2015. | International Investments produced some documents. Agreed to narrow to documents sufficient to show. International Investments has not agreed to time frame. |
| 4 | Produce all Documents evidencing any consideration passing between Creditor and Debtor during the period October 1, 2014 through May 30, 2025. | Agreed to narrow to documents sufficient to show. International Investments has not agreed to time frame. |
| 5 | Produce all Communications between You and Daniel Bilzerian between October 1, 2014, and May 30, 2025. | No change. |
| 6 | Produce all Communications between You and Paul Bilzerian between October 1, 2014, and May 30, 2025. | No change. |
| 7 | Produce all Communications between You and the Trustee. | International Investments produced documents and counsel confirmed no documents are being withheld. |
| 8 | Produce all Communications between You and the Debtor. | No change. |

8

| 9 | Produce all Communications between You and Ignite International Brands, Ltd. between October 1, 2014, and May 30, 2025. | No change. |
|---|---|---|
| 10 | Produce all Communications between You and Ignite International, Ltd. between October 1, 2014, and May 30, 2025. | No change. |
| 11 | Produce all Communications between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025. | No change. |
| 12 | Produce all Communications between You and John Schaefer between October 1, 2014, and May 30, 2025. | No change. |
| 13 | Produce all Communications between You and Jason Verona between October 1, 2014, and May 30, 2025. | No change. |
| 14 | Produce all Communications between You and Paul Dowdall between October 1, 2014, and May 30, 2025. | No change. |
| 15 | Produce all Communications between You and Scott Rohleder between October 1, 2014, and May 30, 2025. | No change. |
| 16 | Produce all Communications between You and Fox Rothschild, LLP between October 1, 2014, and May 30, 2025. | No change. |
| 17 | Produce all Communications between You and Jakub Medrala between October 1, 2014, and May 30, 2025. | No change. |
| 18 | Produce all Communications between You and Goat Works, LLC between October 1, 2014, and May 30, 2025. | No change. |

| 19 | Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025. | No change. |
|---|---|---|
| 20 | Produce all Documents evidencing each and every Transaction between You and Paul Bilzerian between October 1, 2014 and May 30, 2025. | No change. |
| 21 | Produce all Documents evidencing each and every Transaction between You and Ignite International Brands, Ltd. between October 1, 2014 and May 30, 2025. | No change. |
| 22 | Produce all Documents evidencing each and every Transaction between You and Ignite International, Ltd. between October 1, 2014 and May 30, 2025. | No change. |
| 23 | Produce all Documents evidencing each and every Transaction between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025. | No change. |
| 24 | Produce all Documents evidencing each and every Transaction between You and John Schaefer between October 1, 2014, and May 30, 2025. | No change. |
| 25 | Produce all Documents evidencing each and every Transaction between You and Jason Verona between October 1, 2014, and May 30, 2025. | No change. |
| 26 | Produce all Documents evidencing each and every Transaction between You and P[a]ul Dowdall between October 1, 2014, and May 30, 2025. | No change. |
| 27 | Produce all Documents evidencing each and every Transaction between You and Scott Rohleder between October 1, 2014, and May 30, 2025. | No change. |
| 28 | Produce all Documents evidencing each and every Transaction between You and Goat Works, LLC between October 1, 2014, and May 30, 2025. | No change. |

| 29 | Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025. | No change. |
|---|---|---|
| 30 | Produce all Documents evidencing each and every Transaction between You and the Debtor. | No change. |
| 31 | Produce Your monthly balance sheets for the periods October 1, 2014, through May 30, 2025. | No change. |
| 32 | Produce Your income statements for the periods October 1, 2024, through May 30, 2025. | No change. |
| 33 | Produce Your tax returns for the years 2014-2024. | No change. |
| 34 | Produce all Documents evidencing the source of funds you lent to the Debtor. | No change. |

Multiple requests sought documents beginning in 2014, an approximately ten-year lookback period relevant based on the potential discovery of voidable transactions and the possible tolling of limitations period for concealment. Despite the relevance of documents as far back as 2014, STEEL's counsel offered, during counsels' July 15 and 23, 2025 phone calls (in addition to other concessions described above), to potentially agree to a shorter timeline. Specifically, STEEL requested that International Investments explain the scope of the documents it believes exist to support its undue burden objections and/or to propose an acceptable timeline and scope of production. International Investments' counsel represented several times that he would confer with his client and determine what documents International Investments has, what it would produce without a Court order, and whether it would propose a narrower production timeframe. International Investments' counsel has been unable to offer further information or proposal on each subsequent meet and confer, including the meet and confer of July 28.

To date, International Investments has failed to produce documents for every request except two, no. 7 regarding communications between it and the Trustee and no. 3 where International Investments produced some documents concerning wires between it and the Debtor. International Investments still has not agreed to produce a witness for examination.

11

## IV.

## LEGAL ARGUMENT

International Investments has not filed a motion to quash the Subpoena. Instead, it has set forth improper boilerplate general objections. *See* International Investments' Responses and Objections, a copy of which is attached hereto as Exhibit 10. None of these boilerplate general objections justify the failure to produce any documents in response to 32 of the 34 document requests or the failure to agree to produce a witness expeditiously.

A Rule[6] 2004 examination "may relate" to the "Debtor's acts, conduct, or property," the Debtor's "liabilities and financial condition," or ***"any matter which may affect the administration of the debtor's estate."*** See Fed. R. Bankr. P. 2004(b) (emphasis added). LR 2004(C) provides for compelling documents in connection with a 2004 examination "via subpoena as provided by Fed. R. Civ. P. 45 (a)(1)(C) as adopted by Fed. R. Bankr. P. 9016."

Here, the requested examination and documents undoubtedly relate to matters that are within the permitted scope of Rule 2004, as such matters relate to the acts, conduct, property, liabilities, and financial condition of the Debtor, as well as to other matters that may affect the administration, including the sale, of the Debtor's estate. Each of STEEL's topics and requests track, and seek information about, the suspicious circumstances surrounding the Debtor's acts, conduct, property, liabilities, financial condition, and sale of the estate, as discussed in the Facts section of this brief. More specifically, STEEL seeks to uncover the details of the post-petition transfer of intellectual property from Debtor to Ignite; the potential transfer of any other assets between Debtor and Ignite over the period of their shared ownership and post-petition; the potential transfer of assets between Debtor and International Investments; and the corporate structure and relationships between and among Debtor, Ignite, and International Investments.

---

[6] Unless otherwise indicated, all references to a "Section" or a "Chapter" are to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "Local Rule" or "LR" references are to the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada. "Civil Rule" references are to the Federal Rules of Civil Procedure. All references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the clerk of court.

In addition to approximately three pages of boilerplate "General Objections," within each response to the requests, International Investments incorporates the "foregoing general objections" and includes "addition[al]" objections regarding relevance and undue burden, without explanation. International Investments' boilerplate and general objections are improperly "designed to evade, obfuscate, and obstruct discovery." *Kristensen v. Credit Payment Servs., Inc.*, No. 2:12-CV-0528-APG, 2014 WL 6675748, at *4 (D. Nev. Nov. 25, 2014). International Investments rotely objects to almost every request as follows or in similar fashion:

> In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

E.g., Ex. 10 p. 4 (Request no. 1).

International Investments' objections fail to acknowledge the obvious relevance of the requests and the need for comprehensive discovery under the circumstances. Further, STEEL's counsel made various efforts to confer with International Investments' counsel, including to narrow several of the requests. Despite STEEL's agreement to narrow certain requests, as demonstrated in the above chart, International Investments *still* has not produced any documents responsive to any request other than request nos. 3 and 7.

## V.

## CONCLUSION

For the reasons set forth above, STEEL respectfully requests that that the Motion be Granted, that the Court award STEEL its fees and costs related to making the Motion, and for such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

13

I certify that, on behalf of STEEL, I have in good faith conferred with opposing counsel in an effort to resolve the disputes without court action.

Respectfully submitted this 28th day of July, 2025.

By: /s/ *Jason P. Stearns*
**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ
SARAH A. GOTTLIEB, ESQ
 201 North Franklin Street, Suite 3550
*Co-Counsel for STEEL Supplements, Inc.*

**&**

**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
TALI J. FREY, ESQ.
Nevada Bar No. 16537
*Co-Counsel for STEEL Supplements, Inc.*

14

**CERTIFICATE OF SERVICE**

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Cristina Robertson*
An employee of Carlyon Cica Chtd.

SGR/6338703.1

15

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re BLITZ NV, LLC,                    )
                                       )
                    Debtor.            )
                                       )
                                       ) CASE NO. 23-13871-nmc
                                       ) CHAPTER 7
_____)


VIDEOTAPED RULE 2004 EXAMINATION OF

DAN BILZERIAN

LAS VEGAS, NEVADA

FRIDAY, MARCH 14, 2025


Reported By Mia C. O'Sullivan, RMR, NV CCR No. 964

Job No. 7181021

Page 1

VIDEOTAPED RULE 2004 EXAMINATION OF DAN BILZERIAN, taken at the offices of The Medrala Law Firm, PLLC, located at 615 South Sixth Street, in Las Vegas, Nevada, on Friday, March 14, 2025, at 10:00 a.m., before Mia C. O'Sullivan, Certified Court Reporter, in and for the State of Nevada.

APPEARANCES:

For the Witness:

    THE MEDRALA LAW FIRM, PLLC
    BY: JAKUB P. MEDRALA, ESQ.
    615 South Sixth Street
    Las Vegas, Nevada 89101
    (702) 935-1119
    jmedrala@medralaw.com

For Chapter 7 Trustee Brian Shapiro:

    DIAMOND MCCARTHY LLP
    BY: STEPHEN T. LODEN, ESQ.
    909 Fannin Street
    Suite 3700
    Houston, Texas 77010
    (713) 333-5100
    sloden@diamondmccarthy.com

For Steel Supplements:

    SMITH GAMBRELL & RUSSELL LLP
    BY: JASON STEARNS, ESQ. (via Zoom)
    201 North Franklin Street
    Suite 3550
    Tampa, Florida 33602
    (813) 488-2920
    jstearns@sgrlaw.com

///
///
///

Page 2

---

APPEARANCES (Continued):

The Videographer:

    VERITEXT LEGAL SOLUTIONS
    BY: MARCO CASTANEDA
    BY: ALEX CASTILLO
    3960 Howard Hughes Parkway
    Suite 700
    Las Vegas, Nevada 89169
    (702) 314-7200
    videowest@veritext.com

Also Present:

    BRIAN SHAPIRO, Chapter 7 Trustee
    MEHDY KARBID, Steel Supplements (via Zoom)
    JASON HUH, Steel Supplements (via Zoom)

Page 3

---

I N D E X

WITNESS: DAN BILZERIAN

EXAMINATION                PAGE
BY MR. LODEN                6

E X H I B I T S

MARKED                    PAGE

Exhibit 1    Operating Agreement of Blitz NV, LLC    22

Exhibit 2    Voluntary Petition for Non-Individuals Filing for Bankruptcy    26

Exhibit 3    Declaration Under Penalty of Perjury for Non-Individual Debtors    37

Exhibit 4    Personal Services Sponsorship/License Agreement    45

Exhibit 5    Assignment and License Agreement    48

Exhibit 6    2022 Expenses by Vendor Summary    57

Exhibit 7    2022 Profit & Loss    61

Exhibit 8    2023 Profit & Loss    65

Page 4

---

LAS VEGAS, NEVADA; FRIDAY, MARCH 14, 2025

10:00 A.M.

***

VIDEOGRAPHER CASTANEDA: Good morning. We are going on the record at 10:00 a.m.

This is Media Unit 1 of the video recorded deposition of Mr. Dan Bilzerian, taken by counsel for plaintiff, in the matter of Blitz NV, LLC, filed in the District Court of Nevada.

The location of the deposition is 615 South Sixth Street, Las Vegas, Nevada 89101.

My name is Marco Castaneda, representing Veritext, and I am the videographer. The court reporter is Mia O'Sullivan from the firm Veritext.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LODEN: Good morning. My name is Steve Loden. I'm with the law firm of Diamond McCarthy in Houston, Texas, and I represent the Chapter 7 trustee, Brian Shapiro, who is also here with me this morning.

MR. MEDRALA: Good morning. My name is Jakub Medrala, and I am counsel for the deponent, Mr. Dan Bilzerian.

MR. STEARNS: Good morning. Jason Stearns, Smith

Page 5

2 (Pages 2 - 5)

Gambrell & Russell, on behalf of Steel Supplements. Also present is Jason Huh and Mehdy Karbid from Steel Supplements.

VIDEOGRAPHER CASTANEDA:  Will the court reporter please swear in the witness, and then counsel may proceed.

Whereupon,

DAN BILZERIAN,

having first been called as a witness, was duly sworn and testified as follows:

EXAMINATION

BY MR. LODEN:

Q.  Good morning.  As you just heard, my name is Steve Loden, and I represent the Chapter 7 trustee in the Blitz, LLC, bankruptcy case that is pending here in Nevada.  I don't represent Steel Services or Ignite.

My sole goal here is to assist Mr. Shapiro in trying to identify sufficient assets owned by Blitz to pay all claims in the bankruptcy case and close out the case.

Do you understand that?

A.  I do.

Q.  Okay.  Can you state your full name for the record, please.

A.  Dan Bilzerian.

Page 6

Q.  What is your date of birth?

A.  12-7-80.

Q.  12-7-80?

A.  Yup.

Q.  Okay.  Are you a U.S. citizen?

A.  I am.

Q.  Do you hold a U.S. passport?

A.  I do.

Q.  Are you a citizen of any other country?

A.  I am.

Q.  Which country is that?

A.  St. Kitts and Armenia.

Q.  St. Kitts and Armenia?

A.  Armenia, yup.

Q.  Do you hold passports from either of those countries?

A.  I do.

Q.  Both of them?  Or --

A.  Yes.

Q.  Okay.  Are you a resident of the state of Nevada?

A.  I am.

Q.  What is your current residence address?

A.  5990 West Patrick Lane.

Q.  Is that your mailing address as well?

A.  Yes.

Page 7

Q.  Who owns 5990 West Patrick Lane?

A.  I do.

Q.  You do.  It's held in your name?

A.  Well, look, I don't know how it's structured, so I -- yeah, I mean, a business or a business that I own.

Q.  Okay.  If you wanted to find out who owns 5990 West Patrick Lane, who would you ask?

A.  I would ask my accountant.

Q.  Who is that?

A.  Victor.

Q.  Victor?

THE WITNESS:  Do you know his last name?

A.  I don't know his last name.

BY MR. LODEN:

Q.  Is he here in Las Vegas?

A.  I don't believe so.

Q.  Do you know where he is?

A.  I'd have to ask my business manager.

Q.  Is that Mr. Verona?

A.  It was.  It's -- now it's Bethany.

Victor Rodriguez.

Q.  Rodriguez.

Is there a mortgage on your residence at 5990 West Patrick Lane?

A.  I believe so.

Page 8

Q.  Do you know who the borrower on that mortgage is?

A.  I don't.

Q.  Again, that would be a question for Mr. Rodriguez?

A.  Yes.

Q.  Okay.  I assume you, yourself, live at the residence on Patrick Lane?

A.  Yes.

Q.  Does anyone else live there with you?

A.  I mean, I have staff that -- nobody lives in.

Q.  But you have staff that lives on the -- on the premises?

A.  No.  No.  They just come.

Q.  Okay.  How long have you lived on Patrick Lane?

A.  2018.

Q.  Since 2018.  Okay.

Was it -- did you recently list it for sale?

A.  I did.

Q.  Is it still on the market?

A.  Yes.

Q.  Any chances of selling it anytime soon?

A.  I don't know.  I -- yeah, I don't know.

Q.  Do you have a broker listing it?

A.  I do.

Q.  Okay.  Who's that broker?

Page 9

3 (Pages 6 - 9)

A. Frank Napoli.
Q. Do you have any other residences other than West Patrick Lane?
A. No.
Q. No houses anywhere else?
A. No.
Q. Okay. Do you own a plane?
A. I do.
Q. Tell me about it. What kind of plane is it?
A. G-IV/SP.
Q. G-IV. Where is the plane kept?
A. In a hangar.
Q. Here in Las Vegas?
A. Yes.
Q. Do you know if there's a mortgage on the plane?
A. There is not.
Q. So you own it outright?
A. I do.
Q. Do you fly it? Are you a pilot?
A. No. No. I fly on it.
Q. I'm sorry?
A. I fly on it. I don't -- I don't --
Q. Okay. You don't fly it.
A. No.
Q. Got it. So you employ a pilot, then?

Page 10

A. Two.
Q. Two pilots. What are their names?
A. Shit. I should know this.
Q. You trust your life with them every time you get on a plane.
A. Yeah. I don't know why I'm -- it's not coming to me.
Q. Fair enough.
A. I can get you their names, though.
Q. Okay. Well, I'm going to ask you about a couple of names that --
A. Bill.
Q. -- appear on the paperwork later.
A. Bill. That's the head guy.
Q. Bill?
A. Yeah.
Q. Okay. Do you have any other staff that works the plane with you when you're on it, or just those --
A. No.
Q. -- the pilot? Okay.
A. No. There's two pilots. Bill, and I think the other one's Mario.
Q. Okay. How long have you owned the plane?
A. 2014.
Q. Did you buy it new?

Page 11

A. No.
Q. Okay. I think I read online that you were born in Tampa --
A. That's correct.
Q. -- Florida?
A. Well, St. Pete, yeah.
Q. Okay. Did you go to college or university?
A. I did.
Q. Where was that?
A. University of Florida.
Q. What did you study?
A. Business and criminology.
Q. Did you graduate?
A. I did not.
Q. How far did you get?
A. Fourth year.
Q. Okay. After you left -- so what year did you leave University of Florida?
A. I think it was '07.
Q. 2007. What did you do then?
A. What do you mean?
Q. Well, after you left college, did you start a job? Or --
A. Oh, I was playing poker for a living.
Q. Is that when you moved to Las Vegas?

Page 12

A. I moved in '09. 2009.
Q. Okay. I've got a list of companies that, to my understanding, you're affiliated with. For the next part of your deposition, what I'd like to do is go through those companies and ask you a set of -- a series of questions for each one.
A. Okay.
Q. The first one being Goat Works, LLC. What is your relationship to that company?
A. I mean, we could probably save you some time. I don't know exactly how all the companies are structured. That was set up by my business manager and my accountant, my attorney. So I couldn't tell you exactly how they're all structured.
Q. Well, Goat Works, LLC, is a company within your -- your business world, though; right?
A. Yup. One of the companies I own.
Q. Okay. And you said "own." Do you own it?
A. Once again, I don't know exactly how it's structured, but I believe that I own a part of it or -- like I said, I --
Q. Okay.
A. Yeah.
Q. What is the business of Goat Works, LLC?
A. I don't know, to be totally honest with you.

Page 13

4 (Pages 10 - 13)

Q. If I refer to a Mr. Verona, do you know who I'm referring to? Jason --

A. That's my old business manager.

Q. Jason Verona?

A. Yup.

Q. He testified previously that you, yourself, are the sole member of Goat Works. Does that sound accurate to you?

A. Yeah.

Q. Okay. Does Goat Works, LLC, have any physical office space?

A. I don't think so.

Q. Okay. Do you know if it has a bank account?

A. I would assume so, but I don't know.

Q. Okay. Who keeps the books and records for Goat Works, LLC?

A. I would think that my accountant, Victor, would be doing that.

Q. Victor?

A. Yeah.

Q. Do you know if Goat Works, LLC, files tax returns?

A. I would assume so.

Q. But, again, that's a Victor question?

A. Yeah.

Page 14

Q. Okay. What about Goat Wheels? Do you know what the business of that entity is?

A. I believe that owns the vehicles.

Q. How many vehicles do you have?

A. I don't know.

Q. You're talking about cars?

A. Yeah.

Q. Okay. And you said you don't know how many you own?

A. I don't.

Q. Okay. Are you affiliated with Goat Books?

A. Once again, I'd have to ask my accountant. But I believe that that would be a business focused on the book that I published.

Q. What's the name of that book?

A. The Setup.

Q. I think I know the answer for this one, but Goat Airways, what's the business of Goat Airways?

A. I believe that owns the plane.

Q. Does Mr. Rodriguez keep the books for Goat Airways?

A. I would assume so, yes.

Q. Does Mr. Verona -- well, strike that.

Does Mr. Verona have any relationship or responsibilities with respect to Goat Airways?

Page 15

A. He doesn't work for me anymore.

Q. Has -- in the past, did he ever have any?

A. Yeah. He was managing all of the businesses. Or working with Victor.

Q. When did Mr. Verona stop working for you?

A. I believe it was last year.

Q. In 2024?

A. Yeah. I don't know the exact date.

Q. Okay. Did you-all separate on good terms or what?

A. I believe so. Somewhat amicable, yeah.

Q. Why did he leave?

A. I mean, there was a list of reasons.

THE WITNESS: Do I have to give up his personal information? Or like how does this work? I don't even know.

BY MR. LODEN:

Q. Well, let me see if I can get it in a different way. Did --

A. I don't know what that has to do with this, but.

Q. Did you fire him?

A. I did.

Q. What were the reasons for firing him?

A. Well, I mean -- so is this confidential? I mean, there's other people listening to this, and this is

Page 16

recorded. Like what is -- I don't want to give up --

Q. I'm not --

A. -- other people's personal information.

Q. I appreciate the sensitivity. I don't want you to give any -- you know, if he had a medical issue or something like that, I'm not asking for that.

I'm asking, were there business reasons that he was -- that you terminated him, such as he's not doing his job or he stole from you or, you know, something like that?

A. I don't believe that he was being fiscally responsible, so.

Q. He was spending too much money?

A. He just wasn't being very careful with it.

Q. Are there any examples of him not being careful, like -- that you can share with me?

A. Yeah. I mean, like he paid the paintball referees like $3,000 or something to referee some paintball games.

Q. Okay. Did you hire someone else to take Mr. Verona's place?

A. Bethany.

Q. What's Bethany's last name?

A. Laiti, think. I can't really pronounce it correctly. I think that's how you say it.

Page 17

5 (Pages 14 - 17)

Q. Okay. And that happened in 2024, last year?

A. Yes.

Q. Okay. What is the business of Bilzerian Entertainment?

A. Once again, I don't know how every one of these corporations is structured. But -- yeah, I mean, I don't want to guess.

Q. Okay. Does Bethany assist you in managing Bilzerian Entertainment?

A. She does.

Q. Okay. Same question with respect to Goat Airways. Is she managing Goat Airways too?

A. Yes.

Q. Okay. Does Mr. Rodriguez keep the books and records for Bilzerian -- excuse me -- Bilzerian Entertainment?

A. I believe he keeps the books and records for all the companies.

Q. Okay. Great. Thank you.
How about Ignite International Limited? What's the business of that company?

A. Currently, selling vapes, selling -- I mean, just a lot of things. Vodka, tequila --

Q. And that's --

A. -- energy drinks.

Page 18

Q. -- a Canadian company?

A. It is.

Q. What is your relationship with Ignite International?

A. I just own shares in the company.

Q. Do you know what percentage of the company you own?

A. I believe it's 55 or 56 percent.

Q. Are those shares held in your name personally or in an entity?

A. I don't know how it's structured.

Q. Okay. How about International Investments Limited? Do you know what the business of that company is?

A. I don't.

Q. Have you heard of it before?

A. It's a company that my father's operating somehow.

Q. Have you ever had any involvement with International Investments Limited?

A. Yes.

Q. Tell me about that.

A. I mean, there's been a bunch of involvement. They own shares in Ignite. I believe I'm currently suing them. Yeah.

Page 19

Q. Did International Investments Limited have any business with Blitz?

A. I believe so.

Q. Okay. We'll look at that a little bit later.
I believe you said earlier that you weren't sure of the entity that owns the residence on Patrick Lane. Does the name "30 Meadowhawk, Lane, LLC," ring a bell?

A. That sounds correct.

Q. As being the -- the entity that owns the residence?

A. I believe so.

Q. Okay. Last one. Aragon Security Services Corp., what's your relationship with that entity?

A. I don't know how it's structured. But that, I believe, owns the Class 3 firearms and silencers.

Q. Those are guns that you keep or firearms that you keep in -- at your residence?

A. Yes.

Q. Okay. Let's turn our focus, then, to Blitz itself. You started Blitz in 2014, I believe. Is that right?

A. Sounds right.

Q. Why did you start the company?

A. That was 11 years ago. I'm not sure exactly what it was doing 11 years ago. I'd have to talk to my

Page 20

accountant about that.

Q. Well, what is -- up until the bankruptcy filing, what was Blitz's business?

A. I believe it was the beneficiary to Steel Supplements. It was getting payments. I had negotiated a deal to get 10 percent of gross in perpetuity, and then Jason weaseled out of that. I think it was around 2021, somewhere around there.

Q. Let me -- let me ask you to pause there.
I think that's a different Jason. Not Jason Verona?

A. Yeah, no. Jason Huh, the guy that owns Steel Supplements.

Q. Okay.

A. And so he defaulted on his agreement to start -- to be paying 10 percent of gross in perpetuity. And I believe that company was handling payroll as well. And it had the rights to my IP for the goat skull. And -- yeah, that was -- that was like a primary company that was doing the bulk of the business, I believe.

Q. Did Blitz have any business other than promoting the Dan Bilzerian brand?

A. I don't know everything that it was involved in. But I do know the Steel Supplements deal was done through that, and I know that it had the assignment

Page 21

6 (Pages 18 - 21)

rights for the goat skull. And -- yeah.

Q. So as far as you're aware, Blitz was -- the business of Blitz was to operate your -- your businesses, the Dan Bilzerian businesses?

A. No. Not all the businesses. Just -- it was doing Steel Supplements. It was doing some of the employee payroll. And, like I said, it had the IP rights as well to the goat skull.

Q. Okay. I want to show you what I'll ask the reporter to mark as Exhibit 1 to your deposition.

(Exhibit 1 was marked.)

BY MR. LODEN:

Q. Mr. Bilzerian, you've just been handed Exhibit 1 to your deposition. Do you recognize this document to be the operating agreement for Blitz, LLC?

A. I mean, if this was a document from 11 years ago, I mean --

Q. Yeah, well, you anticipated my first question.

You see the date up there on top? It says October 1st --

A. Yeah.

Q. -- 2014?

A. Yeah.

Q. If I could get you to turn to page 4 of the document --

Page 22

A. Okay.

Q. -- please. You see there at Section 2.19 that the manager for Blitz, LLC, is identified as Goat Works, LLC?

A. Okay.

Q. Do you know if that is still the case today?

A. I have no idea.

Q. Okay. If I could get you to turn one more page to page 5, please.

There in the middle of the page, Section 3.1, do you see that it says the members of Blitz, LLC, will be credited as having made a capital contribution in the amount set forth on Exhibit A?

A. That's what it says.

Q. Yup. And so I'll tell you, Exhibit A starts at page 24 of the document. It's actually the last page of the document.

A. Okay.

Q. It looks like Dan Bilzerian, yourself, is the 100 percent owner and member of Blitz, LLC; is that correct?

A. That's what it says.

Q. Do you know if that ever changed?

A. I don't know.

Q. So you don't know if there were ever any other

Page 23

members added?

A. No, I don't.

Q. Okay. If I could get you to turn to page 18 of Exhibit 1, please. Let me know when you're there.

A. Okay.

Q. Down there at the bottom of the page, Section 13.2, it references special meetings and says that special meetings may be called by any member or manager.

My question for you, sir, is, do you recall ever asking for a special meeting of Blitz, LLC?

A. I don't recall a special meeting.

Q. If you turn to page 19, Section 13.7 says the manager of the LLC shall preside at meetings of the members and a record shall be maintained of the meetings.

To the best of your recollection, have there ever been any meetings of the members of Blitz, LLC?

A. I mean, I have a lot of companies, and this is 11 years ago, so I would have to consult my accountant, my business manager, and ask them. Because I -- yeah, I don't remember everything that happened 11 years ago.

Q. Okay. The language I just pointed you to says a record of the meetings shall be kept.

Who would be responsible for maintaining that

Page 24

record?

A. It depends on what year you're talking about.

Q. How about 2022?

A. 2022, it would have been, I guess, Jason and Victor.

Q. Jason Verona and Victor Rodriguez?

A. Yes.

Q. How about 2023?

A. Same.

Q. And in '24?

A. I would assume the same. Until Bethany came on.

Q. Okay. So then, in 2024, it would be -- when Bethany replaced Jason, it would be Bethany and Victor?

A. Yes.

Q. Okay. Thank you.

You're aware, of course, that Blitz filed for bankruptcy protection in September of 2023; right?

A. Yes. I believe it was around then.

Q. Were you involved in the decision to put Blitz into bankruptcy?

A. I was.

Q. Why did Blitz file for bankruptcy?

A. Its liabilities exceeded its assets.

Q. And what liabilities was that?

A. I believe there was money owed to Steel

Page 25

7 (Pages 22 - 25)

Supplements.

Q. I'd like to ask the reporter to mark Exhibit 2 to your deposition.

(Exhibit 2 was marked.)

BY MR. LODEN:

Q. Mr. Bilzerian, the reporter just handed you Exhibit 2 to your deposition. Have you ever seen this document before?

A. I don't remember.

Q. Fair enough. I'll tell you, this is the -- if you look at the first page, you'll see this is the -- what us bankruptcy lawyers call the voluntary petition for bankruptcy that Blitz NV, LLC, filed.

Do you see that?

A. Okay. I do.

Q. And this was signed, if you flip over to page 5 -- and I'm referring to the page numbers at the top in blue. You know, 1 of 26. I'm referring to 5 of -- excuse me -- of 16.

You'll see that on page 5 of 16 that Mr. Verona signed the Blitz bankruptcy petition.

Do you see that?

A. Okay. I do.

Q. Am I correct in understanding that you authorized Mr. Verona to sign and file this bankruptcy petition on

Page 26

behalf of Blitz?

A. I did.

Q. When did Mr. Verona start working for you?

A. I don't remember the exact year.

Q. When did you last speak with him?

A. I don't remember. It's been months.

Q. It's been a while?

A. Yeah.

Q. Not recent?

A. No.

Q. If I could get you to turn to page 6 -- 6 and 7 of 16.

A. All right.

Q. Do you see that these two pages are titled "Action by Written Consent of the Chief Operating Officer" for Blitz?

A. That's what it says.

Q. And that COO for Blitz, that's Mr. Verona; correct?

A. I don't know. What -- at what time are you talking about?

Q. Well, when this was filed in September of '23.

A. Oh. Yeah. I guess that would be his title.

Q. And, again, you authorized Mr. Verona to sign these resolutions on behalf of Blitz?

Page 27

A. That's correct, as per my attorney's recommendation.

Q. Got it.

MR. MEDRALA: Excuse me. Can we take a five-minute break? And I'll explain why. There's this hearing that I told you about in Canada --

MR. LODEN: Sure. Let's -- let's take a break.

VIDEOGRAPHER CASTANEDA: Okay. We're going off the record at 10:31 a.m.

***

(RECESS TAKEN FROM 10:31 A.M. TO 11:52 A.M.)

***

VIDEOGRAPHER CASTANEDA: We are back on the record at 11:52 a.m.

BY MR. LODEN:

Q. Mr. Bilzerian, before the break, we were talking about Exhibit -- I believe it was 2 to your deposition. Do you have it in front of you?

A. This one right here?

Q. Exhibit 2. Yes. The voluntary petition for Blitz.

A. Yup. Okay.

Q. And I think we were talking about Mr. Verona signing the petition as the COO -- excuse me -- COO of Blitz. He put his signature on that application with

Page 28

your permission; correct?

A. Yes. I mean, my counsel advised me to file bankruptcy because the liabilities were greater than the assets, so that's -- and I believe he was the one that exercised that.

Q. Was the counsel you're referring to Brett Axelrod?

A. Brett Axelrod and Kim Stein, I believe.

Q. Okay. You mentioned that Bethany took over as manager for -- for Blitz after Jason Verona --

A. Yup.

Q. -- left?

Do you know how to get ahold of Bethany?

A. I do.

Q. How?

A. Phone. Do you want her phone number?

Q. Sure.

A. Okay. It is area code 702-817-2201.

Q. Thank you.

And is she here in Las Vegas?

A. Yes.

Q. Okay. Does she have possession of the records, the -- the papers for Blitz?

A. I would assume she has -- yeah, I would assume she does.

Page 29

8 (Pages 26 - 29)

Q. Okay. Turning back to Exhibit 2 in front of you, we were talking earlier about the resolution that Mr. Verona signed with your permission to authorize the bankruptcy filing. If I could get you to turn one page further into the document that's numbered page 8 of 16. Let me know when you're there.

A. Okay.

Q. You see that's the balance sheet of Blitz?

A. Yes.

Q. As of August 31, 2023?

A. Uh-huh.

Q. If you go down about a third of the way down, do you see there's a reference to "Loan to Goat Airways"?

A. I do.

Q. And the amount of that loan is $8,297,000 and change?

A. That's what it says.

Q. When was that loan funded, if you know?

A. I don't know.

Q. Do you know if there's any documents reflecting that loan?

A. I don't know. I'd have to talk to my accountant.

Q. Do you recall signing a promissory note either on behalf of Blitz or Goat Airways for that loan?

A. I don't specifically, no.

Page 30

Q. Okay. Do you know if that loan is secured?

A. I don't. I would assume that it would be secured by the plane, but I don't know.

Q. Okay. Do you know what the purpose of that loan was?

A. I don't. I don't -- I don't know how this stuff was structured, to be honest with you.

Q. Okay. Are you aware of any attempts by Blitz to seek repayment of that loan from Goat Airways?

A. I'd have to talk to my accountant about it.

Q. Okay. But you, yourself, haven't gone to Goat Airways and said, "Hey, where's our money?"

A. No.

Q. Okay. Same set of questions for the second loan there to Bilzerian Entertainment in the amount of $971,000 and change. Do you recall when that loan was closed?

A. I don't.

Q. Do you recall signing any documents with respect to that loan?

A. I don't.

Q. Do you know if there are any documents for that loan?

A. I'd have to ask my accountant.

Q. Okay. That's Mr. Rodriguez?

Page 31

A. Yes.

Q. Okay. Do you know if the loan to Bilzerian Entertainment, is that secured by any collateral?

A. I -- I haven't -- I haven't gone through these balance sheets fully, so I'd have to -- this is --

Q. Okay.

A. -- the first time I've seen this, so I'd have to --

Q. Okay.

A. -- spend some time with my accountant to understand.

Q. Do you know why Blitz loaned almost a million dollars to Bilzerian Entertainment?

A. I don't.

Q. Okay. And are you, yourself, aware of any efforts by Blitz to seek repayment of that amount?

A. Like I said, I -- I need to talk to my accountant about this. I haven't looked at this balance sheet until now.

Q. Okay. Fair enough.

Going down a little bit further, under the heading on the balance sheet for "Liabilities & Equities" -- "& Equity" -- excuse me -- you see there's a loan from 30 Meadowhawk Lane in the amount of $253,000.

Page 32

Do you see that?

A. I do.

Q. Do you know what that loan was for?

A. I don't. I don't think I'm going to be much help on this without talking to Victor.

Q. Okay. How about -- you see the line right below, "Loan from Shareholder," $3.9 million.

Do you see that?

A. I do.

Q. Do you know who the shareholder is that's referred to there?

A. I don't. I don't.

Q. Okay. If I could get you -- well, before I go there, are you aware of any documents -- loan documents, promissory notes, or otherwise -- for that loan from shareholder to Blitz in the amount of 3.9 million?

A. Like I said, I really would have to talk to my accountant to fully understand, you know, all -- all these figures, because I -- I haven't gone through it with him.

Q. Well, I was -- I was asking a slightly different question. My question was are you aware of any documents as you sit here today. I understand that -- that you may find out there are documents that you're not aware of today, but as you sit here today, are you

Page 33

9 (Pages 30 - 33)

aware of any documents for those loans?

A. You know, there was -- there was loans made, but I don't know -- yeah, I -- I would -- like I said, I -- I don't remember exactly, no.

Q. Okay. If I could get you to turn to page 13 of 16 of Exhibit 2, please.

A. Okay.

Q. Are you there?

A. Yup.

Q. Do you see in the chart in the middle of the page there's a reference to Steel Supplements having filed a lawsuit?

A. Yup. "Lawsuit filed. Disputed."

Q. That's the lawsuit that Steel Supplements filed against Blitz that you referred to earlier this morning?

A. Okay.

Q. I'm asking, is that the lawsuit?

A. I -- I -- I believe so.

Q. Okay. Do you understand that lawsuit to be a breach of contract claim?

A. Yeah. I believe they breached their contract.

Q. Contract with Blitz?

A. Yes. The contract was with Blitz.

Q. Who negotiated that contract with Steel Supplements on behalf of Blitz?

Page 34

A. That was a long time ago. It might have been Rob Hagen. I'm not sure.

Q. That's a new name for me. Rob?

A. It might have been. Yeah, I don't know. I know he was working for me around about that time.

Q. You said his last name is?

A. Hagen.

Q. H-A-G?

A. E-N.

Q. Okay. Do you know if Mr. Verona had any involvement in those negotiations?

A. I just don't remember who was my business manager. I believe Jason -- I don't know. I just don't know when I hired him. He wasn't -- he didn't -- he wasn't my business manager the whole time. He became my business manager later. And there was multiple business managers before him.

Q. Okay.

A. Yeah.

Q. Okay. Am I correct in understanding that you, yourself, Dan Bilzerian, were involved in the negotiations with Steel Supplements?

A. Yes.

Q. Were you aware that Mr. Verona was deposed in connection with that litigation?

Page 35

A. I -- I don't remember. I don't -- or I don't know.

Q. Okay.

A. If you're saying he was, then I assume he was.

Q. I'll just represent to you that -- that he was deposed. And I'm assuming, then, that you haven't read that deposition transcript?

A. No.

Q. Well, I'll also represent to you that in that deposition, Mr. Verona agreed that Dan Bilzerian is Blitz, and Blitz is Dan Bilzerian. My question for you is, do you disagree with that statement?

A. I do.

Q. Why is that?

A. I mean, it's a separate company. I mean, I do tons of things that the company's not involved in.

Q. Have you ever told Mr. Verona that he's wrong to say that?

A. I didn't know that he said that.

Q. So the answer's no, you haven't ever told him that?

A. Well, he -- he -- he should know that. I mean, obviously, everything that I do is not run through Blitz. It's why I have multiple companies. I mean, Aragon Security Services is completely separate of

Page 36

Blitz.

Q. So you don't know why Mr. Verona said that?

A. No, I don't.

(Exhibit 3 was marked.)

BY MR. LODEN:

Q. I'd like to show you now Exhibit 3 to your deposition. And I'll represent to you that Exhibit 3 to your deposition is what us bankruptcy lawyers call the schedules and statements of financial affairs that were filed in the Blitz bankruptcy. Have you ever seen this document before?

A. If I did, I don't remember.

Q. Okay.

A. I mean --

Q. Fair enough.

A. -- yeah.

Q. Do you see there on the first page that it was also signed by Mr. Verona as chief operating officer for Blitz?

A. I do. That's what it says here.

Q. Can I get you to turn to page 6 of 24, please. Let me know when you're there.

A. Okay.

Q. Do you see there in the middle of the page, Question No. 59? It says "Does the debtor have any

Page 37

10 (Pages 34 - 37)

interests in intangibles or intellectual property?"

Do you see that?

A. I do.

Q. And then the answer is "Yes," and then there's three items there listed, the first which is patents, copyrights, trademarks, and trade secrets for the trademark "Dan Bilzerian."

Do you see that?

A. I do.

Q. The second is a website, blitznv.com, and the third is danbilzerian.com.

My question for you is, the value of the debtor -- of Blitz's interests in those intellectual property is listed as "Unknown."

Do you see that?

A. I do.

Q. Do you think those -- well, strike that.

Do you think those pieces of intellectual property have value?

A. The websites and the song?

Q. The websites, the song, the trademark "Dan Bilzerian," are they worth something?

A. I didn't know that you could trademark your name, but I would assume there's some value to that. I don't know. The blitznv and the danbilzerian.com, I don't

Page 38

think those would have very much value, but maybe something. I'm not sure.

Q. And then, the song. Do you think the song has any value?

A. I was supposed to be paid royalties for it, but I never received any.

Q. But at least with respect to your name, do you think that that has some worth?

A. Can you sell your name? Is that a thing?

Q. I believe that your name has been trademarked, and it was listed as a trademark that Blitz had an interest in.

A. Okay.

Q. My question for you -- the value of that interest was listed as "Unknown," so I thought, "Why not go to the guy whose name was trademarked to say, 'How much value does it have?'"

A. I don't know. I'd have to talk to an attorney -- a trademark attorney. I have no idea.

Q. Okay.

A. I don't know what it -- I don't even know what it means, to be honest.

Q. Okay. If I could get you to turn to page 10 of 24, please.

A. Okay.

Page 39

Q. Does Blitz owe you, Dan Bilzerian, any money?

A. I'd have to talk to Victor about that.

Q. So you don't know as you sit here today?

A. I don't.

Q. Okay. You'll see there on page 10 of 24 the reference to a creditor named International Investments Limited for $3.937 million.

A. Okay.

Q. That is the same number as we looked at earlier for the loan from shareholder on the balance sheet at the bankruptcy filing. Does -- does seeing this refresh your recollection as to who that shareholder was on the -- the balance sheet?

A. Yeah. International Investments is a St. Kitts company, so that would make sense. Yeah, it was listed under shareholder. I didn't know shareholder of what, but.

Q. Okay. So why did Blitz loan $3.9 million to International Investments Limited?

A. Did Blitz loan it to them, or did they loan it to Blitz? I feel like it says here that they loaned it to Blitz.

Q. This -- the schedule on page 10 of 24 is a list of creditors who have unsecured claims against Blitz.

A. Yeah. That would mean that Blitz -- they loaned

Page 40

it to Blitz, not the other way around.

Q. Right. Right. Did I say -- I said it backwards, didn't I?

A. Yeah.

Q. Yeah. I apologize. Let me -- let me restate that, then.

Do you know why International Investments Limited appears to have loaned $3.937 million to Blitz?

A. I'd have to talk to Victor, but I do remember loans coming from International Investments to Blitz.

Q. And I think we said earlier International Investments Limited is a company run by your dad?

A. He has -- he is -- he's listed as a consultant. I don't know the full breakdown of what his position is. He claims that he is not; the government claims that he is. I don't know how the business is run fully.

Q. As you sit here today, do you recall ever seeing any documentation for that loan?

A. Yes.

Q. What have you -- what do you recall seeing?

A. There was -- there was loan documents, I believe, sent to Jason from International Investments.

Q. When Jason stopped being your manager and Bethany took over, do you know if Jason transferred all of the files and paperwork that he kept to Bethany? Or what

Page 41

11 (Pages 38 - 41)

happened there?

A. I would hope so.

Q. Those files, are they kept by Bethany -- well, strike that.

What I'm asking is physically, where are all those files located? Are they at Patrick Lane? Are they at Bethany's residence or some other office address? Do you know where they are?

A. I'd have to ask Bethany.

Q. Okay. Does Blitz maintain an office space on Patrick Lane?

A. I don't know if it's technically considered an office. I'd have to talk to Victor.

Q. Okay. Well, we said earlier that Patrick Lane is your home, your residence.

A. Uh-huh.

Q. Are you aware of any Blitz records or files being stored in your residence?

A. I would assume there's some.

Q. Okay. Do you have like a home office or something like that with a filing cabinet?

A. There's an office, yeah.

Q. Okay. So again, if there's documentation on that loan that's reflected here on page 10 of the schedules, Bethany would be the person to ask about that?

Page 42

A. Yes.

Q. Okay. If I could get you to turn to page 23 of 24, please.

A. Okay.

Okay.

Q. Do you see that this page is titled "Disclosure of Compensation of Attorney for Debtors"?

A. I see that.

Q. And I think you said earlier that Brett Axelrod was the attorney for Blitz hired to file the bankruptcy?

A. That's correct. I believe so.

Q. And this document, then, discloses how much she was paid for making that filing. Is that your understanding?

A. I don't remember what she was paid. But if it says 50,000, it sounds right.

Q. Okay. And it says there on line 3 that the source of the compensation paid to Ms. Axelrod was Dan Bilzerian.

Do you see that?

A. I do.

Q. So you, personally, paid Ms. Axelrod the filing -- the fees for filing the case?

A. I don't remember. I mean, I think at the time Blitz didn't have any money, so I might have paid that.

Page 43

I'm not sure.

Q. Do you remember how it was paid? Credit card? Check? Cash?

A. I'd have to ask her or Jason.

Q. Okay.

A. It definitely wasn't cash.

Q. That actually brings up a question I had earlier.

How do you -- in your regular life, buying a cup of coffee, buying dinner, something like that, how do you pay for things?

A. I mean, credit card. Usually my assistant gets it.

Q. Okay. So is the credit card issued in your name or in the name of one of your companies?

A. I'd have to ask. I don't know how -- I mean, it says my name on the card.

Q. Okay. Do you have a checking account or personal bank accounts that you use?

A. I think I have multiple.

Q. What -- what banks are those held with?

A. We've switched banks. I don't know. I mean, there's been numerous banks over the years.

Q. Okay.

A. Wells Fargo, Bank of America.

Q. Okay. But as far as everyday expenses -- dinner,

Page 44

coffee, whatever, gas for the car or whatever --

A. I don't --

Q. -- you put it on the credit card?

A. I don't leave the house too much. And when I do, usually Bethany gets it, so.

Q. Okay. I'm just trying to understand when you -- when you do spend money, when you do leave the house, it sounds like you put it on a credit card --

A. Usually.

Q. -- if you're doing it? Okay.

(Exhibit 4 was marked.)

BY MR. LODEN:

Q. We talked a moment ago about the Steel Supplements lawsuit. We saw it referenced on the schedules. I want to show you what has been marked as Exhibit 4 to your deposition.

A. Okay.

Q. Ask you, do you recognize this to be the contract that is the subject of the litigation between Blitz and Steel Supplements?

A. Do you want me to read the whole thing? Or --

Q. No. Don't read the whole thing. I'm not going to ask you questions about the whole thing.

My -- let me ask it this way. Is this the contract between Blitz and Steel Supplements?

Page 45

12 (Pages 42 - 45)

A. I'd have to go through it. Let's see here.

I don't know if this was the final contract or not. It looks like it's -- it says signed here, so.

Q. Okay. Well -- well, do you see on the first page that it's titled "Personal Services Sponsorship/License Agreement"?

A. It says that, yes.

Q. And then, in that first paragraph, the parties to this personal services agreement are defined to be Steel Supplements; Blitz, LLC; and Dan Bilzerian.

Do you see those three are defined as the parties?

A. Well, no. It says "a Nevada limited liability company for the services of Dan Bilzerian."

Q. Right.

A. I don't --

Q. "Collectively, the 'Parties.'"

A. Okay.

Q. And the personal services that are represented -- that are referenced there, those are personal services of Dan Bilzerian; right? No one else?

A. What do you mean?

Q. Well, was anyone else contracting to provide personal services, or was it just yourself?

A. For Steel? Yeah. They had other athletes.

Page 46

Q. Under this agreement.

A. Oh. No. This agreement was between, I believe, Blitz and Steel.

Q. For the personal services of Dan Bilzerian?

A. Well, it says "the services." Yeah. I mean -- yeah, it says "the services of Dan Bilzerian." It doesn't say "personal," but I don't -- what's -- I don't understand the question. What's the question?

Q. I'm just wanting to make sure that you don't disagree with me that this is the agreement; it defines Steel Supplements and Blitz and Dan Bilzerian collectively as the parties, and the services that were to be provided under this agreement were to be provided by Dan Bilzerian. That's all I'm asking.

A. Well, I believe it was provided by Blitz, but that --

Q. Okay.

A. -- I would be, you know, doing it on behalf. I don't -- like I said, this is legal lingo.

Q. Okay. Fair enough. I'm done with that document.

A. Okay.

Q. We talked briefly a moment ago about the trademark "Dan Bilzerian" and the other intellectual property. Do you recall Blitz assigning those trademarks and other intellectual property to Ignite

Page 47

International?

A. I don't believe they assigned my name, but I think that they assigned the goat skull.

(Exhibit 5 was marked.)

BY MR. LODEN:

Q. I want to show you what's been marked as Exhibit 5 to your deposition.

A. Okay. What --

Q. This is a --

A. -- page?

Q. This is a long document. It's 23 pages long. But I'll represent to you that it is what I believe to be the assignment and license agreement between Blitz as assignor and Ignite International Limited as assignee effective of -- effective as of July 1, 2022.

Do you see that there on the first page?

A. I do.

Q. And then, in the first "whereas" clause, it says assignor -- that's Blitz -- owns certain rights in trademark applications, registrations, service marks, everything identified on Exhibit A.

Do you see that?

A. Exhibit A, where is it?

Q. Exhibit A starts on page 6.

A. Okay.

Page 48

Q. And then continues for the rest of the document.

THE WITNESS: Was this the legitimate one?

MR. MEDRALA: What do you mean?

THE WITNESS: Was this like the legitimate transfer? The first or the second one?

MR. MEDRALA: This is the last one, the assignments.

THE WITNESS: The one that I got no compensation for?

MR. MEDRALA: Yes.

THE WITNESS: Okay. What's the question?

BY MR. LODEN:

Q. So you see this is the agreement -- well, it's -- the agreement says that Blitz is assigning the trademarks on Exhibit A to Ignite International; right?

A. Yeah. Yeah. This was the one that I got no compensation for, so I don't know if this is a legitimate transfer.

Q. Well, that's what we're going to get to. I'm trying to set the groundwork for that.

A. Okay.

Q. But we'll get to it.

So this was a transfer, an assignment and license agreement, where Blitz purported to transfer to Ignite International the trademarks on Exhibit A and the

Page 49

13 (Pages 46 - 49)

copyrights on Exhibit B, Exhibit B being the last page of the document in front of you.

Do you understand that?

A. Yup.

Q. Would you agree that the trademarks and copyrights that Blitz purportedly assigned to Ignite, that those items have value?

A. Yes.

Q. In your opinion, what is the value of those trademarks? Can you put a range on it?

A. Millions of dollars.

Q. Millions?

A. Yes.

Q. How do you know that to be the case?

A. Well, they're doing, I think, 12, 13 million a month in sales in South America alone.

Q. Using those intellectual property?

A. Yes.

Q. Why did Blitz assign those valuable intellectual property rights ownership to Ignite?

A. My con artist father sent it over to be signed, I think.

Q. I'm sorry. I missed that. Your --

A. Con artist father, criminal.

Q. Con artist --

Page 50

A. Yes.

Q. -- father? Okay.

A. Criminal, scumbag.

Q. Why did he want you to sign it over?

A. Because he like took control of Ignite.

Q. Did he pressure you to sign it over?

A. I don't even know if I signed it. I think he sent it over to Jason, but I'm not positive.

Q. If you look on page 5 --

A. Okay.

Q. -- of 23, is that your signature there for Blitz?

A. Yeah. I'm not sure if they even -- I mean, they had me sign a bunch of stuff, so I'm not sure if they even showed me what it was for. You know, Jason would routinely put stuff in front of me and tell me that he had looked at it or whatever, so -- Scott's currently indicted by the DOJ, I believe, so.

Q. I had a question about your signature there. Are you the manager for Blitz?

A. Am I the manager?

Q. Yeah. You see the -- it says your title there under the signature block is manager. I thought Goat Works, LLC, was the manager for Blitz.

A. You know, I'd have to ask Victor. I don't -- I don't remember exactly how that was structured.

Page 51

Q. And you just mentioned a moment ago Scott. Is it Rohleder?

A. Yup.

Q. He signed on behalf of Ignite as its CFO?

A. Yeah.

Q. Did Mr. Rohleder ever maintain the books and records for Blitz?

A. I don't know. I don't know.

Q. Does he have any title, like CFO or otherwise, for Blitz, to your knowledge?

A. I don't know.

Q. Do you think this assignment of those valuable intellectual property rights from Blitz to Ignite was a good deal for Blitz?

A. Well, without any compensation, I don't think it's a legitimate transaction; right?

Q. So I guess that's a no, you don't think it was a good deal for Blitz?

A. Well, we didn't get anything for it, so no.

Q. No cash?

A. (Moved head.)

Q. Any -- did Ignite agree to provide any services to Blitz in exchange --

A. No.

Q. -- for the assignment?

Page 52

When did you first learn about this assignment?

A. I think -- I think it was when we were in court in maybe 2023, something like that.

Q. So the year after it was supposedly signed?

A. Yeah.

Q. Were you surprised?

A. I was.

Q. Why?

A. Because I didn't remember signing it, so -- or, you know -- and I didn't know why I would sign over the trademarks for -- and not get anything for it. It didn't make any sense.

Q. Okay. Do you have any question as you sit here today whether what appears to be your signature on page 5 is -- is actually your signature?

A. I wouldn't be surprised if it wasn't.

Q. If it was --

A. I don't -- I don't remember signing it.

Q. Okay. I'm done with that exhibit. Thank you.

MR. SHAPIRO: One second.

MR. LODEN: Sure.

(Pause in proceedings.)

BY MR. LODEN:

Q. Okay. You said a moment ago that you were surprised when you found out in court about this

Page 53

14 (Pages 50 - 53)

assignment because you don't remember signing it. Did you do anything after that to inquire or follow up or say, "What's going on here?"

A. I don't remember exactly. I mean, my lawyers basically said they thought it wasn't a legitimate transaction, because there was no compensation received, so that was their position. But then we came to terms with Ignite where I was going to be the sole chairman and board member, and so the lawsuit was dropped.

Q. I'm not sure I understand the last part of what you just said. You came --

A. Well, basically, I sued them because -- well, I got a lawyer involved. I believe it was a shareholder oppression lawsuit. But basically, my father was controlling the company. He illegally kicked me off the board, fired me as the CEO because I fired -- or sorry -- fired -- yeah, fired me as the CEO and then appointed the COO, Scott Rohleder, who I fired for knowingly selling expired vapes, as a CEO.

So basically, they fired me as CEO and then appointed the guy that I fired who I caught selling expired vapes. And at that point, you know, it became a lawsuit. He had his proxies controlling the board. It was a whole thing, so.

Q. Okay.

Page 54

A. I told him he didn't have the right to use my name and likeness, you know, the right to use, you know, the goat skull.

And he said, "Well, you know, those got assigned." That was kind of the premise of the argument.

Q. So I want to make sure the record's clear.

You're not saying that you were placed on the board of Ignite in exchange for this assignment. You're not saying that; right?

A. I'd been on the board of Ignite.

Q. Okay. So again, just so the record is clear, as you sit here today, can you think of anything that Blitz, LLC, received of value in exchange for the assignment in Exhibit 5?

A. No.

Q. I asked you a little bit earlier if Blitz maintained an office at your residence on Patrick Lane.

Were you aware that Blitz listed Patrick Lane as its business address in the bankruptcy filing?

A. It would make sense.

Q. Okay. And, in fact, Blitz --

A. By the way, when I --

Q. Yeah.

A. -- say things like that, it's not -- it's not

Page 55

because I'm saying it's not the case. I just don't know how it's structured; right? I don't know --

Q. Fair enough.

A. -- where they listed a business address. I don't know who sometimes they have as, you know, a certain position. You know, I don't know all the ins and outs of every single company and how they file. So some of this stuff is, you know, legal questions that --

Q. Sure.

A. -- you know, I consult an attorney for. Some of it's stuff that I consult my accountant. You know, I'm not trying to be difficult. I just honestly --

Q. No, I --

A. -- don't know the full structure of all the stuff.

Q. I appreciate that. I appreciate that. Yeah, and I'm not trying to pull a fast one on you. I'm truly not.

Can you think of any other address that Blitz might claim as a business address other than Patrick Lane?

A. I mean, there -- I think we had a PO Box at one time, but I don't know if that would apply. Like I said, I honestly --

Q. Okay.

Page 56

A. -- I don't know how it's structured.

Q. Okay. Do you recall that Blitz signed a lease for the residence at Patrick Lane?

A. I think there was something where the house was owned by a company but then leased, because it was promoting businesses and it was used -- you know, I put the goat logo on the rock wall. I put it on the climb wall by the pool. I put it on the trampoline or the airbag, the -- you know, the paintball fields. The logo was all over, and it was used in promotion of Ignite. It was used in promotion of Steel. The house was used to, you know, promote various businesses that I was involved in.

(Exhibit 6 was marked.)

BY MR. LODEN:

Q. I'm going to show you what I asked the reporter to mark as Exhibit 6 to your deposition. And I'll represent to you that this is a printout from Blitz's financial records, which --

A. Okay.

Q. -- shows expenses by vendor summary for the year 2022.

Do you see that at the top?

A. Okay.

Q. And if I could just ask you -- and I've got a pen

Page 57

15 (Pages 54 - 57)

ready to mark -- but can you go down the list of the vendors there and just rattle off the names of ones that you recognize as being related to the house -- things for the house.

A. Being related to the house.

You know, I would assume Computer Repair would be related to the house.

I mean, there's just a lot of names. I don't know.

Q. Well, let me ask -- let me ask about a couple of them.

Buddies Extermination, is that an exterminator for the house?

A. I mean, just like the computer stuff, I'd be guessing. I mean, like I said, Computer Repair sounds like something that would, you know, be related to the house, but I --

Q. Okay.

A. -- I don't know. Yeah.

Q. Do you see there at the top there's a name, Chaz Vorrias (pronouncing) -- Vorrias (pronouncing)?

A. Vorrias, yeah.

Q. Do you know who that is?

A. Security guard.

Q. Security. For the house?

Page 58

A. Well, he was personal security as well --

Q. Okay.

A. -- and for the house, and for, you know, events, and --

Q. Okay.

A. -- so I don't know if I would --

Q. How about, going a little bit down, Double X Pool Service? You mentioned there's a pool at the house?

A. There is a pool at the house.

Q. So was that for service of the pool?

A. I'd be guessing.

Q. Okay. A little bit further down, how about Interior Visions? Does that one ring a bell?

A. No, it doesn't.

Q. Okay. There's another pool and spa company a little bit further down that's a big number, Laguna Pool & Spa, for $120,000 in 2022.

A. Okay.

Q. Did they do work on the pool or renovations? Do you recall what that was about?

A. Once again, I'd be guessing. I don't remember the names of most of these people. I mean, Chaz, I remember, but.

Q. Okay. Well, did you do a remodel or renovation of the pool in '22?

Page 59

A. There was some tiles that were replaced.

Q. Then we see a little bit further down a landscaping service.

A. Okay.

Q. And then NV Energy. Is that the electric bill for the house?

A. I don't know.

Q. There's another big number a little bit further down from there, Paychex. Do you see that for $678,000?

A. Okay.

Q. Do you know what that is for?

A. I don't.

Q. In 2022, Mr. Verona was your business manager still?

A. Yes.

Q. So would he be the person to ask what these expenses were for?

A. Him or the accountant, yeah.

Q. Okay.

A. Probably the accountant, because he had to categorize everything. Probably Victor.

Q. You mentioned earlier that -- just a moment ago, you said you recall there being some tile work being done on the pool. Is that something that Mr. Verona as the manager would have typically arranged to get

Page 60

repaired?

A. Probably.

Q. I mean, does -- you said Bethany took over for Mr. Verona. Is that something that she would take care of for you now?

A. Or my assistant, Jimmy, maybe.

Q. Okay. But you don't -- you, yourself, don't pick up the phone and call the tile company --

A. Huh-uh.

Q. -- to come over to the house?

A. (Moved head.)

Q. Okay.

(Exhibit 7 was marked.)

BY MR. LODEN:

Q. Okay. So this was expenses summary for '22 in Exhibit 6. Now I want to look at the profit and loss statement for Blitz in that same year.

I've just handed you what's been marked as Exhibit 7. And again, this is a printout from Blitz's books and records, profit and loss statement for the year 2022.

Do you see that?

A. Okay.

Q. Just a couple of questions about this.

At the top, under "Ordinary Income/Expenses,"

Page 61

16 (Pages 58 - 61)

there's a reference to "Long-Term Capital Gain - DBC."

Q. Do you see that?

A. I do.

Q. Do you know what DBC refers to?

A. I don't. I don't.

Q. Okay. So it looks like in 2022, Blitz reported a gross profit of slightly over $4 million.

Q. Do you see that?

A. It says "Total Income."

Q. Right.

And then, a little bit further down the page, there's a section for nonoperational expenses, and each one of those has "DB" out beside it.

Q. Do you see that?

A. I do.

Q. Your initials are DB; correct?

A. That's correct.

Q. And those expenses for 2022 total 1.779 million.

Q. Do you see that for total nonoperational expenses?

A. Yeah.

Q. And they include things like $300,000 for travel and $134,000 for vehicles.

Q. Do you see that?

A. I do.

Page 62

Q. If you turn with me, please, to the second page of Exhibit 7, there's another $548,000 in travel expenses reflected on page 2.

Q. Do you see that?

A. I do.

Q. So adding those together, roughly $850,000 in travel expenses in 2022?

A. Yeah, I mean, that -- yeah, that's probably where the Ignite reimbursement comes in.

Q. And for the year, net income for Blitz was a loss of $821,000 for 2022.

Q. Do you see that?

A. That's what it says.

Q. Okay. Just real quick, going back to the Ignite assignment. I'm sorry for shifting gears on you. I'm just trying to push through.

We talked about Ignite -- or excuse me.

We talked about Blitz assigning the trademarks and copyrights to Ignite under the agreement that we saw earlier. Do you know if -- if anything else was transferred from Blitz to Ignite beyond those intellectual property?

A. Sorry. Say that one more time.

Q. Yeah, I'm sorry. It was a really obtuse question.

Page 63

You said earlier -- I think we agreed earlier that Blitz assigned trademarks and copyrights, the goat head and what have you, to Ignite, and that Blitz received nothing in exchange for that assignment; right?

A. That's what the contract says, yeah.

Q. My question is, other than that intellectual property, did Blitz assign anything else to Ignite for which it received nothing in exchange?

A. Not that I can think of.

Q. Okay.

A. Actually, no. I take that back. My book. All the proceeds from my book, they took, and I got nothing back for that.

Q. Are you still expecting to receive proceeds from the book going forward?

A. No. That was another one of those deals where I kind of got shafted or Blitz got shafted or -- I don't know how they structured it or what company owned the book or how that was done, but.

Q. But as -- as you sit here today, you don't believe Blitz received anything in exchange for the assignment of those book rights?

A. No. I don't think so.

Q. Anything else you can think of that Blitz assigned to Ignite without getting paid for it?

Page 64

A. Not that I know of -- not that I can think of, I guess. Let me put it that way.

Q. Okay.

(Exhibit 8 was marked.)

BY MR. LODEN:

Q. If I can show you what I've marked as Exhibit 8 to your deposition, please. We just looked through in Exhibit 7 the Blitz profit and loss statement for 2022. Now, Exhibit 8 is the same profit and loss statement, but now it's for 2023.

Q. Do you see that?

A. Okay.

Q. And there in the middle of the page, there's those nonoperational expenses with your initials out beside each line item, totaling 1.159 million.

Q. Do you see that?

A. Okay. Yeah.

Q. And then there's a line item right below that, "Internet" -- "Office Internet and Phone Expense," $10,505.

Q. Do you see that?

A. I do.

Q. Is that for cell phones and internet at -- at the house?

A. I don't know.

Page 65

17 (Pages 62 - 65)

Q. Okay. Do you know who -- you have a cell phone in front of you, an iPhone. Do you know who pays the bill for that?

A. You know, I don't know how -- how that's structured, to be honest with you. Yeah, I mean, my business manager kind of handles all that.

Q. Bethany?

A. Yeah.

Q. Okay.

A. I say, "Get a cell phone," and she gets a cell phone.

Q. Fair enough. If you turn to page 2, it looks like in 2023 Blitz reported a net loss of $1.8 million.

Do you see that?

A. That's what it says.

Q. Have you ever signed a tax return for Blitz?

A. You know, I don't -- me, personally?

Q. Yeah.

A. I don't remember. I mean, I -- I mean, I know Victor does the taxes, so --

Q. Okay. You anticipated my next question.

A. Yeah.

Q. Do you know if Blitz, LLC, is a pass-through entity for IRS purposes?

A. What do you mean by pass-through?

Q. That answers my question.

Under IRS rules, some LLCs are what they refer to as "disregarded entities," which means that the profits and losses for that LLC flow through to the members' personal tax returns as opposed to it being a corporate tax return.

So my question is, do you know if Blitz, LLC, was one of those sorts of entities?

A. I wouldn't think so. I mean, because it kind of -- you know, it -- it had its sources of income, and it had its expenses. But I believe that that was separate from my personal tax return.

Q. Okay.

A. Unless it paid out or something like that.

Q. Okay.

A. I'm not sure.

Q. Does Victor also take care of your personal tax returns?

A. I believe so. I think he does all my taxes.

Q. Okay. Have you ever been audited?

THE WITNESS: Did I get audited? That was probably before you.

A. I think I -- I think I have been audited.

BY MR. LODEN:

Q. Do you remember who did the audit? Not the name.

Like -- I'm saying the IRS or the State of Nevada or someone.

A. I think I got an IRS audit before.

Q. Okay.

A. I think it was -- I'd have to ask Victor.

Q. Okay. We're done with Exhibit 8. Thank you.

If I could get you to put Exhibit 5 back in front of you. Maybe your counsel can hand it to you.

I apologize. It's not 5. It's Exhibit 3. Page 5 of Exhibit 3, there's something I want to ask about.

Do you have Exhibit 3 in front of you again?

A. Okay. So on the top, it says page 5, but on the bottom, it says page 2. Are --

Q. Right.

A. -- we talking about the top?

Q. Yeah. I'm looking at page 5 of 24.

A. Okay.

Q. There -- about two-thirds of the way down the page, there's a listing for some office furniture and some office fixtures there.

Do you see that?

A. I do.

Q. Those were items that were kept in Blitz's office on Patrick Lane; is -- is that correct?

A. I mean, I don't know. I just see two desks, one filing cabinet, four chairs, and one couch.

Q. And then computers and printers, phones, iPads.

Do you see all that?

A. Yup. I see that.

Q. Do you know where those items are today?

A. I don't. Well, it says "Liquidation." I don't know what that means, but.

Q. Well, that's the valuation, so --

A. Okay.

Q. -- nothing. A liquidation value.

A. Got it.

Q. But I'm asking physically where those items are located. Do you know?

A. Okay. I don't.

Could we take a ten-minute break real quick? I just got to deal with the Canada court thing. Are we almost done?

Q. I've probably got 10 or 15 minutes --

A. Okay.

Q. -- left, so.

A. Yeah. Let's do it, yeah.

Q. Okay.

A. No problem.

Q. Who would know where those items are located,

18 (Pages 66 - 69)

that furniture and fixtures?

A. When was this done? This is in '23. I mean, I would -- I would think Jason would, if he did this. Yeah, I don't know.

Q. Okay.

A. Maybe they sold them. It says -- yeah, I don't know.

Q. If we're able to locate those items, would you have any problem with turning them over to the Chapter 7 bankruptcy trustee for Blitz?

A. Seems fine to me.

THE WITNESS: I mean, Jakub, what's the -- yeah, I mean, I don't know if we -- I think we sold them, but if we didn't, I mean, yeah, we can give them over; right?

I don't know how this -- I don't know how this --

MR. MEDRALA: I can't testify.

THE WITNESS: I don't know how this works. I mean, whatever --

BY MR. LODEN:

Q. Fair enough.

A. -- whatever I'm supposed to do, I'll do.

Q. Okay. Well, they're listed as assets of Blitz, so --

A. Okay.

Page 70

Q. -- that's why I'm asking about them.

A. Yeah. So -- okay. So then yeah.

Q. Okay.

A. If we have them and --

Q. Okay.

A. -- they're assets of Blitz and you guys are --

Q. Okay.

A. -- controlling Blitz, then I'm happy to hand them over.

Q. And it sounds like maybe the person to ask about that would be Bethany at this point?

A. If she knows -- yeah, if she knows what this is talking about, then yeah. For sure. Bethany or Jason or somebody, you know.

Q. Okay. Got it. Last couple of questions for right now, I think.

Does Goat Airways, to your knowledge, have an attorney?

A. I don't know.

Q. Okay. Same question with respect to Bilzerian Entertainment. Does that entity have an attorney?

A. Not like a GC, I don't think. I mean, he would be my attorney for most things.

Q. For Bilzerian Entertainment?

A. Yeah, I don't think he's worked on that, but --

Page 71

Q. Okay.

A. -- I mean, if I needed legal advice --

Q. Well, let me ask -- let me ask a more direct question, then.

If Mr. Shapiro, as Chapter 7 trustee, wanted to reach out to Goat Airways to talk about that $8 million loan that we looked at earlier, who should he call?

A. That's a good question. Let me ask Bethany and see what she -- her, Victor, somebody.

Q. Okay. Same question with respect to the $971,000 loan to Bilzerian Entertainment. Who should Mr. Shapiro call for that?

A. Probably Victor would have the most information on all the -- because he has to categorize everything --

Q. Okay.

A. -- and so he usually goes through with -- before, it would have been Jason, but now Bethany, on like, you know, "What is this expense," you know.

Q. Okay.

A. I'm pretty sure that's how they do the taxes. You know, every month, they go through and categorize everything. You know, "This is a business expense" or "This is," you know, "an expense for this company" or...

Q. A lot of the answers you've given today have -- I don't want to put words in your mouth, but --

Page 72

essentially boiled down to "ask Bethany, ask Victor," which I totally understand.

My question is -- we're happy to speak with them, and we can do it formally like this, if we need to, if you want us to. But my question is, would you have any problem with us just talking -- Mr. Shapiro talking to them about it off the record or make them available to us?

A. I mean, I --

MR. LODEN: We can talk about it afterwards, if you want.

MR. MEDRALA: Yeah, we can talk about it afterwards. I honestly have no problems with something like this, as long as I'm present and I can --

MR. LODEN: Fair enough.

MR. MEDRALA: -- figure it out.

MR. LODEN: Fair enough. Well, yeah, it's a lot cheaper and easier for everyone if we don't have to go through --

THE WITNESS: Okay.

MR. LODEN: -- the formal process, so that's why I wanted to ask.

BY MR. LODEN:

Q. We talked today about the furniture and equipment that was listed on the schedules for Blitz. And we've

Page 73

19 (Pages 70 - 73)

talked about the intellectual property and the book rights that were supposedly assigned to Ignite.

A. Uh-huh.

Q. Can you think of any other assets or property, either tangible or intangible, that Blitz owns?

A. I mean, look, I wouldn't even bother with some iPads. I'd go after the trademark or go after the fucking book. You want millions, go after millions; right? Like --

Q. Right.

A. -- it's pretty, you know -- I mean, you guys can call Bethany about, you know, selling a chair or something if you want. But, I mean, I think you can get, you know, 10 million, $20 million for these, you know, trademark rights. And I think there could be a bidding war, and I think there would be multiple people interested. Our distributors in Paraguay, possibly a, you know, competitor to Ignite, Ignite itself, you know, so --

Q. No, I hear you loud and clear, and I totally agree. We're not going after iPads, certainly. But -- but --

A. I mean, do what you want. I'm just saying --

Q. No, no, no. I appreciate the -- the advice. It's good advice, I think.

Page 74

A. And the book alone -- I think the book was like $2 million.

Q. Right. Okay. Beyond that, can you think of anything of value that Blitz owns that we should be --

A. I mean --

Q. -- looking for?

A. I mean, as I remember it, the big, you know, things that they had of value was the income stream from Steel Supplements, which they reneged on. You know, the trademarks have become very valuable. The book, like I said, I think -- and I'm just totally guessing. Don't hold me to this, but I think it was around $2 million in sales, something like that. And they're still selling.

So, I mean, look, it was a legitimate business. It had, you know, income coming in, and it took care of things. I mean, it wasn't, you know, like some, you know, just corporation to hide shit. It was --

Q. Right.

A. -- you know, doing legitimate business. And until Steel stopped paying, you know, it was profitable. I mean, I think it was, because, you know, money was coming in, so.

Q. Right.

A. Yeah, I -- you know, if there's anything else I can, you know, help you with, let me know. I mean, I'm

Page 75

happy to --

THE WITNESS: You know, if, you know, you want to put him in touch with -- with Victor or whatever --

BY MR. LODEN:

Q. Well, we can put a pin in that question. But certainly, if you think of something like, "Oh, crap, I forgot about this or that deal" or whatever, let Jakub know, and Jakub will let us know.

A. I think the trademark is -- like the whole thing is done like that.

Q. Okay.

A. You know, I think -- I think there's a bidding war for it. I think it's immediate money coming in. I think it satisfies, you know, every creditor, and it's done.

Q. Okay. Great. Well...

(Pause in proceedings.)

BY MR. LODEN:

Q. Are you aware that Steel Supplements filed a proof of claim in the Blitz bankruptcy case?

A. I don't know what that is.

Q. Okay. Fair enough. Do you know how much Steel Supplements claims to be owed by Blitz?

A. I think it was 500K.

Q. And what's the basis for that understanding?

Page 76

A. The basis for the 500K? I mean, I -- I think it's complete horse shit. I think they should owe me $50 million. I mean, I built their company, so -- I mean, I've got a contract that says I should get 10 percent in perpetuity. He weaseled out saying that I posted some bag that I wasn't paid for. So, I mean, I think it's complete horse shit, if you want my honest opinion.

Q. Well, was the --

A. But they did get a judgment, I mean -- or they got a ruling or whatever it was in Florida, so.

Q. Well, was the $500,000 a settlement amount?

A. I think so. I think it was -- yeah, I mean, it was just such nonsense. They said that I breached the contract for selling water, you know, and they tried to claim that that was a bodybuilding supplement. I mean, the whole thing was just ridiculous, but I guess we had a bad attorney and we lost, so.

Q. Okay. All right. Well, I thank you for your time. And like I said, let's -- let's keep the conversations going, because -- certainly, if you can think of any other assets of Blitz that we haven't talked about today that are significant, I'd really like to know about that.

A. Yeah, no. I'll think about it. Those -- those

Page 77

20 (Pages 74 - 77)

two are pretty significant, though.

Q. Sure. Obviously. Yeah.

A. So.

Q. Okay. Very good. Well, thanks for your time.

A. Cool.

MR. MEDRALA: Thank you, guys.

MR. LODEN: We're off the record.

VIDEOGRAPHER CASTANEDA: We're off the record at 1:01 p.m., and this concludes today's testimony given by Dan Bilzerian. The total number of media used was two, and it will be retained by Veritext.

(Proceedings concluded at 1:01 p.m.)

Page 78

---

In Re: Blitz NV, LLC

Mr. Dan Bilzerian Job No. 7181021

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____     _____

Mr. Dan Bilzerian                    Date

Page 80

---

CERTIFICATE OF REPORTER

STATE OF NEVADA   )
                  ) ss:
COUNTY OF CLARK   )

I, MIA C. O'SULLIVAN, a Certified Court Reporter in Clark County, State of Nevada, do hereby certify:

That I reported the taking of the Rule 2004 Examination of DAN BILZERIAN, commencing on Friday, March 14, 2025, at 10:00 a.m.

That prior to being deposed, the witness was by me duly sworn to testify to the truth, that I thereafter transcribed my said shorthand notes into typewriting, and that the typewritten transcript is a complete, true, and accurate transcription of said shorthand notes and that witness was not asked to review and correct the transcript.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 28th da

MIA C. O'SULLIVAN, RMR, NV CCR #964

Page 79

---

In Re: Blitz NV, LLC

Mr. Dan Bilzerian 7181021

ACKNOWLEDGEMENT OF DEPONENT

I, Mr. Dan Bilzerian, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     _____

Mr. Dan Bilzerian                    Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Page 81

---

21 (Pages 78 - 81)

**[& - 56]**

| & | | | |
|---|---|---|---|
| **&** | **13.2** 24:7 | 60:13 61:21 | **3.937** 40:7 41:8 |
| **&** 2:19 4:19,20 | **13.7** 24:13 | 62:6,18 63:7 | **30** 20:7 32:24 |
| 6:1 32:22,23 | **134,000** 62:23 | 63:11 65:8 | **300,000** 62:22 |
| 59:17 | **14** 1:15 2:4 5:1 | **2023** 4:20 25:8 | **31** 30:10 |
| **0** | 79:8 | 25:17 30:10 | **314-7200** 3:6 |
| | **15** 69:19 | 53:3 65:10 | **31457** 79:24 |
| **07** 12:19 | **16** 26:19,20 | 66:13 | **333-5100** 2:17 |
| **09** 13:1 | 27:12 30:5 | **2024** 16:7 18:1 | **33602** 2:21 |
| **1** | 34:6 | 25:12 | **3550** 2:21 |
| | **18** 24:3 | **2025** 1:15 2:4 | **37** 4:14 |
| **1** 4:10 5:6 | **19** 24:13 | 5:1 79:8,23 | **3700** 2:16 |
| 22:10,11,13 | **1:01** 78:9,12 | **22** 4:10 59:25 | **3960** 3:4 |
| 24:4 26:18 | **1st** 22:20 | 61:15 | **4** |
| 48:15 | **2** | **23** 27:22 43:2 | |
| **1.159** 65:15 | | 48:11 51:11 | **4** 4:15 22:24 |
| **1.779** 62:18 | **2** 4:12 26:2,4,7 | 70:2 | 45:11,16 62:7 |
| **1.8** 66:13 | 28:17,20 30:1 | **23-13871** 1:6 | **45** 4:15 |
| **10** 21:6,16 | 34:6 63:3 | **24** 23:16 25:10 | **48** 4:17 |
| 39:23 40:5,23 | 66:12 68:14 | 37:21 39:24 | **488-2920** 2:22 |
| 42:24 69:19 | 75:2,12 | 40:5,23 43:3 | **5** |
| 74:14 77:5 | **2.19** 23:2 | 68:17 | |
| **10,505** 65:20 | **20** 74:14 81:15 | **253,000** 32:25 | **5** 4:17 23:9 |
| **100** 23:20 | **2004** 1:12 2:1 | **26** 4:12 26:18 | 26:17,18,20 |
| **10:00** 2:4 5:2,5 | 79:6 | **28th** 79:23 | 48:4,7 51:9 |
| 79:8 | **2007** 12:20 | **3** | 53:15 55:15 |
| **10:31** 28:9,11 | **2009** 13:1 | | 68:7,9,10,13,17 |
| **11** 20:24,25 | **201** 2:20 | **3** 4:14 20:15 | **50** 77:3 |
| 22:16 24:20,22 | **2014** 11:24 | 37:4,6,7 43:17 | **50,000** 43:16 |
| **11:52** 28:11,14 | 20:20 22:22 | 68:9,10,12 | **500,000** 77:12 |
| **12** 50:15 | **2018** 9:15,16 | **3,000** 17:18 | **500k** 76:24 |
| **12-7-80** 7:2,3 | **2021** 21:8 | **3.1** 23:10 | 77:1 |
| **120,000** 59:17 | **2022** 4:18,19 | **3.9** 33:7,16 | **548,000** 63:2 |
| **13** 34:5 50:15 | 25:3,4 48:15 | 40:18 | **55** 19:8 |
| | 57:22 59:17 | | **56** 19:8 |

Page 1

[57 - application]

| | | | |
|---|---|---|---|
| **57**  4:18 | **8,297,000**  30:15 | **action**  27:15 | **ahold**  29:13 |
| **59**  37:25 | **813**  2:22 | 79:19,20 | **airbag**  57:9 |
| **5990**  7:23 8:1,7 | **821,000**  63:11 | **actually**  23:16 | **airways**  15:18 |
| 8:24 | **850,000**  63:6 | 44:7 53:15 | 15:18,21,25 |
| **6** | **89101**  2:11 | 64:11 | 18:12,12 30:13 |
| | 5:11 | **added**  24:1 | 30:24 31:9,12 |
| **6**  4:6,18 27:11 | **89169**  3:5 | **adding**  63:6 | 71:17 72:6 |
| 27:11 37:21 | **9** | **additions**  81:6 | **alex**  3:4 |
| 48:24 57:14,17 | | **address**  7:22,24 | **america**  44:24 |
| 61:16 | **909**  2:15 | 42:8 55:20 | 50:16 |
| **61**  4:19 | **935-1119**  2:12 | 56:4,19,20 | **amicable**  16:11 |
| **615**  2:3,11 5:10 | **964**  1:21 79:25 | **advice**  72:2 | **amount**  23:13 |
| **65**  4:20 | **971,000**  31:16 | 74:24,25 | 30:15 31:15 |
| **678,000**  60:9 | 72:10 | **advised**  29:2 | 32:16,24 33:16 |
| **7** | **a** | **affairs**  37:9 | 77:12 |
| | | **affiliated**  13:3 | **answer**  15:17 |
| **7**  1:6 2:13 3:8 | **a.m.**  2:4 5:2,5 | 15:11 | 38:4 |
| 4:19 5:20 6:14 | 28:9,11,11,14 | **affiliations** | **answer's**  36:20 |
| 27:11 61:13,19 | 79:8 | 5:16 | **answers**  67:1 |
| 63:2 65:8 70:9 | **able**  70:8 | **ago**  20:24,25 | 72:24 |
| 72:5 | **above**  81:7 | 22:16 24:20,22 | **anticipated** |
| **700**  3:5 | **account**  14:13 | 35:1 45:13 | 22:18 66:21 |
| **702**  2:12 3:6 | 44:17 | 47:22 52:1 | **anymore**  16:1 |
| **702-817-2201** | **accountant**  8:8 | 53:24 60:22 | **anytime**  9:21 |
| 29:18 | 13:13 14:17 | **agree**  50:5 | **apologize**  41:5 |
| **713**  2:17 | 15:12 21:1 | 52:22 74:21 | 68:9 |
| **7181021**  1:21 | 24:20 30:22 | **agreed**  36:10 | **appear**  11:13 |
| 80:2 81:2 | 31:10,24 32:10 | 64:1 | **appearances** |
| **77010**  2:16 | 32:17 33:18 | **agreement**  4:10 | 2:8 3:1 5:16 |
| **8** | 56:11 60:18,20 | 4:16,17 21:15 | **appears**  41:8 |
| | **accounts**  44:18 | 22:15 46:6,9 | 53:14 |
| **8**  4:20 30:5 | **accurate**  14:7 | 47:1,2,10,13 | **appended**  81:7 |
| 65:4,6,9 68:6 | 79:13 | 48:13 49:13,14 | **application** |
| 72:6 | **acknowledge...** | 49:24 63:19 | 28:25 |
| | 81:3 | | |

Veritext Legal Solutions
346-293-7000

[applications - best]

applications 48:20

apply 56:23

appointed 54:18,21

appreciate 17:4 56:16,16 74:24

aragon 20:12 36:25

area 29:18

argument 55:6

armenia 7:12 7:13,14

arranged 60:25

artist 50:21,24 50:25

asked 55:17 57:16 79:14

asking 17:6,7 24:11 33:21 34:17 42:5 47:14 69:13 71:1

assets 6:18 25:23 29:4 70:23 71:6 74:4 77:22

assign 50:19 64:7

assigned 48:2,3 50:6 55:5 64:2 64:25 74:2

assignee 48:14

assigning 47:24 49:14 63:18

assignment 4:17 21:25 48:13 49:23 52:12,25 53:1 54:1 55:9,15 63:15 64:4,22

assignments 49:7

assignor 48:14 48:19

assist 6:17 18:8

assistant 44:11 61:6

assume 9:6 14:14,23 15:22 25:11 29:24,24 31:2 36:4 38:24 42:19 58:6

assuming 36:6

athletes 46:25

attempts 31:8

attorney 5:17 13:13 39:18,19 43:7,10 56:10 71:18,21,23 77:18

attorney's 28:1

audit 67:25 68:3

audited 67:20 67:21,23

august 30:10

authorize 30:3

authorized 26:24 27:24

available 73:7

aware 22:2 25:16 31:8 32:15 33:14,22 33:25 34:1 35:24 42:17 55:19 76:19

axelrod 29:7,8 43:9,18,22

**b**

b 4:8 50:1,1

back 28:13 30:1 63:14 64:11,13 68:7

backwards 41:2

bad 77:18

bag 77:6

balance 30:8 32:5,18,22 40:10,13

bank 14:13 44:18,24

bankruptcy 1:1 4:13 6:15,19 21:2 25:17,20 25:22 26:12,13 26:21,25 29:3 30:4 37:8,10

40:11 43:10 55:20 70:10 76:20

banks 44:20,21 44:22

basically 54:5 54:12,14,20

basis 76:25 77:1

beginning 5:17

behalf 6:1 27:1 27:25 30:24 34:25 47:18 52:4

believe 8:16,25 13:20 15:3,13 15:19 16:6,11 17:11 18:17 19:8,24 20:3,5 20:11,15,20 21:4,17,20 25:18,25 28:17 29:4,8 34:18 34:21 35:13 39:10 41:21 43:11 47:2,15 48:2,12 51:17 54:13 64:21 67:11,19

bell 20:7 59:13

beneficiary 21:4

best 24:17

Veritext Legal Solutions
346-293-7000

[bethany - business]

| | | | |
|---|---|---|---|
| **bethany** 8:20 17:22 18:8 25:11,13,13 29:9,13 41:23 41:25 42:3,9 42:25 45:5 61:3 66:7 71:11,13 72:8 72:17 73:1 74:12 | 78:10 79:7 80:2,24 81:2,4 81:12 | 52:10,13,14,18 52:23 55:14,17 55:19,22 56:19 57:2 61:17 62:6 63:10,18 63:21 64:2,3,7 64:17,21,24 65:8 66:13,16 66:23 67:7 | 61:20 |
| | **birth** 7:1 | | **born** 12:2 |
| | **bit** 20:4 32:21 55:17 59:7,12 59:16 60:2,8 62:11 | | **borrower** 9:1 **bother** 74:6 **bottom** 24:6 68:14 |
| **bethany's** 17:23 42:7 | **blitz** 1:4 4:10 5:8 6:15,18 20:2,19,20 21:21 22:2,3 22:15 23:3,11 23:20 24:11,18 25:16,19,22 26:13,21 27:1 27:16,18,25 28:21,25 29:10 29:23 30:8,24 31:8 32:12,16 33:16 34:15,22 34:23,25 36:11 36:11,24 37:1 37:10,19 39:11 40:1,18,20,21 40:22,24,25 41:1,8,10 42:10,17 43:10 43:25 45:19,25 46:10 47:3,11 47:15,24 48:13 48:19 49:14,24 50:6,19 51:11 51:19,23 52:7 | 70:10,23 71:6 71:8 73:25 74:5 75:4 76:20,23 77:22 80:1 81:1 | **box** 56:22 |
| **beyond** 63:21 75:3 | | | **brand** 21:22 **breach** 34:20 |
| **bidding** 74:16 76:12 | | **blitz's** 21:3 38:13 57:18 61:19 68:24 | **breached** 34:21 77:14 |
| **big** 59:16 60:8 75:7 | | | **break** 28:5,7,16 69:16 |
| **bill** 11:12,14,15 11:21 60:5 66:3 | | **blitznv** 38:25 **blitznv.com** 38:10 | **breakdown** 41:14 |
| **bilzerian** 1:13 2:1 4:3 5:7,24 6:8,25 18:3,9 18:15,15 21:22 22:4,13 23:19 26:6 28:16 31:15 32:2,13 35:21 36:10,11 38:7,22 40:1 43:19 46:10,14 46:21 47:4,6 47:11,14,23 71:20,24 72:11 | | **block** 51:22 **blue** 26:18 **board** 54:9,16 54:23 55:9,11 **bodybuilding** 77:16 **boiled** 73:1 **book** 15:14,15 64:11,12,15,19 64:22 74:1,8 75:1,1,10 **books** 14:15 15:11,20 18:14 18:17 52:6 | **brett** 29:6,8 43:9 **brian** 2:13 3:8 5:21 **briefly** 47:22 **brings** 44:7 **broker** 9:23,25 **buddies** 58:12 **built** 77:3 **bulk** 21:20 **bunch** 19:23 51:13 **business** 8:5,5 8:18 12:12 13:12,16,24 14:3 15:2,13 15:18 17:7 18:3,21 19:13 20:2 21:3,20 |

Veritext Legal Solutions
346-293-7000

[business - complete]

| | | | |
|---|---|---|---|
| 21:21 22:3 24:21 35:12,15 35:16,16 41:16 55:20 56:4,20 60:13 66:6 72:22 75:14,19 | cars 15:6 case 1:6 6:15 6:19,20 23:6 43:23 50:14 56:1 76:20 | 80:10,13,16,19 changed 23:23 changes 81:6 chapter 1:6 2:13 3:8 5:20 6:14 70:9 72:5 | college 12:7,22 come 9:13 61:10 comes 63:9 coming 11:6 41:10 75:15,22 76:13 |
| businesses 16:3 22:4,4,5 57:6 57:12 | cash 44:3,6 52:20 castaneda 3:3 5:4,12 6:4 28:8 28:13 78:8 | chart 34:10 chaz 58:20 59:22 cheaper 73:18 | commencing 79:7 companies 13:2 13:5,11,17 |
| buy 11:25 buying 44:8,9 | castillo 3:4 categorize 60:21 72:14,21 | check 44:3 checking 44:17 chief 27:15 | 18:18 24:19 36:24 44:14 company 13:9 |
| **c** | caught 54:21 ccr 1:21 79:25 | 37:18 citizen 7:5,9 | 13:15 18:21 19:1,5,6,13,17 |
| c 1:21 2:4 79:4 79:25 | cell 65:23 66:1 66:10,10 | claim 34:20 56:20 76:20 | 20:23 21:17,19 36:15 40:15 |
| cabinet 42:21 69:2 | ceo 54:16,17,19 54:20 | 77:16 claims 6:19 | 41:12 46:14 54:15 56:7 |
| call 26:12 37:8 61:8 72:7,12 74:12 | certain 48:19 56:5 | 40:24 41:15,15 76:23 | 57:5 59:15 61:8 64:18 |
| called 6:9 24:8 | certainly 74:21 76:6 77:21 | clark 79:3,5,22 class 20:15 | 72:23 77:3 company's |
| canada 28:6 69:17 | certificate 79:1 certified 2:5 | clause 48:18 clear 55:7,12 | 36:16 compensation |
| canadian 19:1 capital 23:12 62:1 | 79:4 certify 79:5,16 cfo 52:4,9 | 74:20 climb 57:7 close 6:19 | 43:7,18 49:8 49:17 52:15 54:6 |
| car 45:1 card 44:2,11,13 44:16 45:3,8 | chair 74:12 chairman 54:8 chairs 69:2 | closed 31:17 code 29:18 coffee 44:9 45:1 | competitor 74:18 complete 77:2 |
| care 61:4 67:17 75:15 careful 17:14 17:15 | chances 9:21 change 30:16 31:16 80:4,7 | collateral 32:3 collectively 46:17 47:12 | 77:7 79:12 81:8 |

Veritext Legal Solutions
346-293-7000

[completely - deponent]

completely 36:25

computer 58:6 58:14,15

computers 69:3

con 50:21,24,25

concluded 78:12

concludes 78:9

confidential 16:24

connection 35:25

consent 27:15

considered 42:12

consult 24:20 56:10,11

consultant 41:13

continued 3:1

continues 49:1

contract 34:20 34:21,22,23,24 45:18,25 46:2 64:5 77:4,15

contracting 46:23

contribution 23:12

control 51:5

controlling 54:15,23 71:8

conversations 77:21

coo 27:18 28:24 28:24 54:18

cool 78:5

copyrights 38:6 50:1,6 63:19 64:2

corp 20:12

corporate 67:5

corporation 75:17

corporations 18:6

correct 12:4 20:8 23:21 26:24 27:19 28:1 29:1 35:20 43:11 62:16,17 68:25 79:14 81:8

corrections 81:6

correctly 17:25

couch 69:2

counsel 5:7,15 5:23 6:5 29:2,6 68:8 79:17

countries 7:16

country 7:9,11

county 79:3,5 79:22

couple 11:10 58:10 61:24

71:15

course 25:16

court 1:1 2:5 5:9,13 6:4 53:2 53:25 69:17 79:4

crap 76:6

credit 44:2,11 44:13 45:3,8

credited 23:12

creditor 40:6 76:14

creditors 40:24

criminal 50:24 51:3

criminology 12:12

cup 44:8

current 7:22

currently 18:22 19:24 51:16

**d**

d 4:1

dad 41:12

dan 1:13 2:1 4:3 5:7,23 6:8 6:25 21:22 22:4 23:19 35:21 36:10,11 38:7,21 40:1 43:18 46:10,14 46:21 47:4,6 47:11,14,23

78:10 79:7 80:2,24 81:2,4 81:12

danbilzerian.... 38:25

danbilzerian.... 38:11

date 7:1 16:8 22:19 80:24 81:12

day 79:23 81:15

db 62:13,16

dbc 62:1,4

deal 21:6,24 52:14,18 69:17 76:7

deals 64:16

debtor 1:5 37:25 38:13

debtors 4:14 43:7

decision 25:19

declaration 4:14

declare 81:4

deemed 81:6

defaulted 21:15

defined 46:9,11

defines 47:10

definitely 44:6

depends 25:2

deponent 5:23 81:3

**[deposed - expenses]**

**deposed**  35:24
  36:6 79:9
**deposition**  5:7
  5:10 13:4
  22:10,14 26:3
  26:7 28:17
  36:7,10 37:7,8
  45:16 48:7
  57:17 65:7
**desks**  69:1
**diamond**  2:14
  5:19
**diamondmcc...**
  2:17
**different**  16:18
  21:10 33:21
**difficult**  56:12
**dinner**  44:9,25
**direct**  72:3
**disagree**  36:12
  47:10
**discloses**  43:12
**disclosure**  43:6
**disputed**  34:13
**disregarded**
  67:3
**distributors**
  74:17
**district**  1:2 5:9
**document**
  22:14,16,25
  23:16,17 26:8
  30:5 37:11
  43:12 47:20

  48:11 49:1
  50:2
**documentation**
  41:18 42:23
**documents**
  30:20 31:19,22
  33:14,14,23,24
  34:1 41:21
**doing**  14:18
  17:8 20:25
  21:20 22:6,6
  45:10 47:18
  50:15 75:19
**doj**  51:17
**dollars**  32:13
  50:11
**double**  59:7
**drinks**  18:25
**dropped**  54:9
**duly**  6:9 79:10

          **e**

**e**  4:1,8 35:9
  80:3,3,3
**earlier**  20:5
  30:2 34:15
  40:9 41:11
  42:14 43:9
  44:7 55:17
  60:22 63:20
  64:1,1 72:7
**easier**  73:18
**effective**  48:15
  48:15

**efforts**  32:16
**either**  7:15
  30:23 74:5
**electric**  60:5
**employ**  10:25
**employee**  22:7
  79:17,18
**energy**  18:25
  60:5
**entertainment**
  18:4,9,16
  31:15 32:3,13
  71:21,24 72:11
**entities**  67:3,8
**entity**  15:2
  19:10 20:6,9
  20:13 66:24
  71:21
**equipment**
  73:24
**equities**  32:23
**equity**  32:23
**esq**  2:10,15,20
**essentially**  73:1
**events**  59:3
**everyday**  44:25
**exact**  16:8 27:4
**exactly**  13:11
  13:13,19 20:24
  34:4 51:25
  54:4
**examination**
  1:12 2:1 4:5
  6:11 79:7

**examples**  17:15
**exceeded**  25:23
**exchange**  52:23
  55:9,14 64:4,8
  64:21
**excuse**  18:15
  26:19 28:4,24
  32:23 63:17
**exercised**  29:5
**exhibit**  4:10,12
  4:14,15,17,18
  4:19,20 22:10
  22:11,13 23:13
  23:15 24:4
  26:2,4,7 28:17
  28:20 30:1
  34:6 37:4,6,7
  45:11,16 48:4
  48:7,21,23,24
  49:15,25 50:1
  50:1 53:19
  55:15 57:14,17
  61:13,16,19
  63:2 65:4,6,8,9
  68:6,7,9,10,12
**expecting**
  64:14
**expense**  65:19
  72:18,22,23
**expenses**  4:18
  44:25 57:21
  60:17 61:15,25
  62:12,18,20
  63:3,7 65:14

Veritext Legal Solutions
346-293-7000

[expenses - goat]

67:11
expired  54:19
  54:22
explain  28:5
extermination
  58:12
exterminator
  58:12

**f**

fact  55:22
fair  11:8 26:10
  32:20 37:15
  47:20 56:3
  66:12 70:21
  73:15,17 76:22
fannin  2:15
far  12:15 22:2
  44:25
fargo  44:24
fast  56:17
father  50:21,24
  51:2 54:14
father's  19:17
feel  40:21
fees  43:23
fields  57:9
figure  73:16
figures  33:19
file  25:22 26:25
  29:2 43:10
  56:7
filed  5:8 25:16
  26:13 27:22

34:11,13,14
  37:10 76:19
files  14:21
  41:25 42:3,6
  42:17
filing  4:12 21:2
  30:4 40:11
  42:21 43:13,23
  43:23 55:20
  69:2
final  46:2
financial  37:9
  57:19
financially
  79:19
find  8:6 33:24
fine  70:11
fire  16:21
firearms  20:15
  20:16
fired  54:16,16
  54:17,17,18,20
  54:21
firing  16:23
firm  2:2,10
  5:14,19
first  6:9 13:8
  22:18 26:11
  32:7 37:17
  38:5 46:4,8
  48:16,18 49:5
  53:1
fiscally  17:11

five  28:5
fixtures  68:21
  70:1
flip  26:16
florida  2:21
  12:5,10,18
  77:11
flow  67:4
fly  10:19,20,22
  10:23
focus  20:19
focused  15:13
follow  54:2
follows  6:10
foregoing  81:5
forgot  76:7
formal  73:21
formally  73:4
forth  23:13
forward  64:15
found  53:25
four  69:2
fourth  12:16
frank  10:1
franklin  2:20
friday  1:15 2:4
  5:1 79:7
front  28:18
  30:1 50:2
  51:15 66:2
  68:7,12
fucking  74:8
full  6:23 41:14
  56:14

fully  32:5 33:18
  41:16
funded  30:18
furniture  68:20
  70:1 73:24
further  30:5
  32:21 59:12,16
  60:2,8 62:11
  79:16

**g**

g  10:10,11 35:8
gain  62:1
gambrell  2:19
  6:1
games  17:19
gas  45:1
gc  71:22
gears  63:15
getting  21:5
  64:25
give  16:14 17:1
  17:5 70:14
given  72:24
  78:9 81:9
go  12:7 13:4
  30:12 33:13
  39:15 46:1
  58:1 72:21
  73:18 74:7,7,8
goal  6:17
goat  13:8,15,24
  14:7,10,15,21
  15:1,11,17,18

Veritext Legal Solutions
346-293-7000

[goat - initials]

15:20,25 18:11 18:12 21:18 22:1,8 23:3 30:13,24 31:9 31:11 48:3 51:22 55:3 57:7 64:2 71:17 72:6
**goes**  72:16
**going**  5:5 11:10 28:8 32:21 33:4 45:22 49:19 54:3,8 57:16 59:7 63:14 64:15 74:21 77:21
**good**  5:4,18,22 5:25 6:13 16:9 52:14,18 72:8 74:25 78:4
**government** 41:15
**graduate**  12:13
**great**  18:19 76:16
**greater**  29:3
**gross**  21:6,16 62:7
**groundwork** 49:20
**guard**  58:24
**guess**  18:7 25:4 27:23 52:17 65:2 77:17

**guessing**  58:15 59:11,21 75:11
**guns**  20:16
**guy**  11:14 21:12 39:16 54:21
**guys**  71:6 74:11 78:6

**h**

**h**  4:8 35:8 80:3
**hagen**  35:2,7
**hand**  68:8 71:8 79:21
**handed**  22:13 26:6 61:18
**handles**  66:6
**handling**  21:17
**hangar**  10:12
**happened**  18:1 24:22 42:1
**happy**  71:8 73:3 76:1
**head**  11:14 52:21 61:11 64:3
**heading**  32:22
**hear**  74:20
**heard**  6:13 19:16
**hearing**  28:6
**held**  8:3 19:9 44:20

**help**  33:4 75:25
**hereto**  81:7
**hey**  31:12
**hide**  75:17
**hire**  17:20
**hired**  35:14 43:10
**hold**  7:7,15 75:12
**home**  42:15,20
**honest**  13:25 31:7 39:22 66:5 77:7
**honestly**  56:12 56:24 73:13
**hope**  42:2
**horse**  77:2,7
**house**  45:4,7 57:4,11 58:3,4 58:5,7,13,17,25 59:3,8,9 60:6 61:10 65:24
**houses**  10:5
**houston**  2:16 5:20
**howard**  3:4
**hughes**  3:4
**huh**  3:9 6:2 21:12 30:11 42:16 61:9 74:3

**i**

**idea**  23:7 39:19
**identified**  23:3 48:21
**identify**  6:18
**ignite**  6:16 18:20 19:3,24 47:25 48:14 49:15,24 50:6 50:20 51:5 52:4,13,22 54:8 55:9,11 57:10 63:9,14 63:17,19,21 64:3,7,25 74:2 74:18,18
**illegally**  54:15
**immediate** 76:13
**include**  62:22
**including**  5:15
**income**  61:25 62:9 63:10 67:10 75:8,15
**indicted**  51:17
**individual**  4:14
**individuals** 4:12
**information** 16:15 17:3 72:13
**initials**  62:16 65:14

**[inquire - know]**

inquire  54:2
ins  56:6
intangible  74:5
intangibles
  38:1
intellectual
  38:1,13,18
  47:23,25 50:17
  50:19 52:13
  63:22 64:6
  74:1
interest  39:12
  39:14
interested
  74:17 79:19
interests  38:1
  38:13
interior  59:13
international
  18:20 19:4,12
  19:20 20:1
  40:6,14,19
  41:7,10,11,22
  48:1,14 49:15
  49:25
internet  65:19
  65:19,23
investments
  19:12,20 20:1
  40:6,14,19
  41:7,10,12,22
involved  21:23
  25:19 35:21
  36:16 54:13

57:13 79:18
involvement
  19:19,23 35:11
ip  21:18 22:7
ipads  69:3 74:7
  74:21
iphone  66:2
irs  66:24 67:2
  68:1,3
issue  17:5
issued  44:13
item  65:15,18
items  38:5 50:7
  68:24 69:6,13
  69:25 70:8
iv  10:10,11

**j**

jakub  2:10 5:22
  70:12 76:7,8
jason  2:20 3:9
  5:25 6:2 14:2,4
  21:7,10,10,12
  25:4,6,13
  29:10 35:13
  41:22,23,24
  44:4 51:8,14
  70:3 71:13
  72:17
jimmy  61:6
jmedrala  2:12
job  1:21 12:23
  17:9 80:2

jstearns  2:22
judgment
  77:10
july  48:15

**k**

karbid  3:9 6:2
keep  15:20
  18:14 20:16,17
  77:20
keeps  14:15
  18:17
kept  10:11
  24:24 41:25
  42:3 68:24
kicked  54:15
kim  29:8
kind  10:9 55:5
  64:17 66:6
  67:9
kitts  7:12,13
  40:14
know  8:4,12,13
  8:17 9:1,22,22
  10:15 11:3,6
  13:11,19,25
  14:1,13,14,21
  15:1,5,8,17
  16:8,16,20
  17:5,9 18:5
  19:6,11,13
  20:14 21:23,24
  21:25 23:6,23
  23:24,25 24:4

26:18 27:20
29:13 30:6,18
30:19,20,22
31:1,3,4,6,22
32:2,12 33:3
33:10,18 34:2
34:3 35:4,4,10
35:13,14 36:2
36:19,22 37:2
37:22 38:23,25
39:18,21,21
40:3,16 41:7
41:14,16,24
42:8,12 44:15
44:21 46:2
47:18 49:17
50:14 51:7,14
51:24 52:8,8
52:11 53:10,10
54:22 55:2,2,4
56:1,2,5,5,6,6,8
56:10,11,14,23
57:1,6,9,12
58:6,9,16,19,23
59:3,6 60:7,11
62:4 63:20
64:18 65:1,25
66:1,2,4,4,17
66:19,23 67:7
67:10 69:1,6,8
69:14,25 70:4
70:7,13,16,16
70:18 71:14,19
72:18,18,21,22

Veritext Legal Solutions
346-293-7000

**[know - loden]**

72:23 74:11,12
74:14,15,18,18
75:7,9,15,16,17
75:19,20,21,24
75:25,25 76:2
76:2,8,8,12,14
76:21,22 77:15
77:24
**knowingly**
54:19
**knowledge**
52:10 71:17
**knows**  71:12,12

**l**

**laguna**  59:16
**laiti**  17:24
**landscaping**
60:3
**lane**  7:23 8:1,7
8:24 9:7,14
10:3 20:6,7
32:24 42:6,11
42:14 55:18,19
56:21 57:3
68:25
**language**  24:23
**las**  1:14 2:3,11
3:5 5:1,11 8:15
10:13 12:25
29:20
**law**  2:2,10 5:19
**lawsuit**  34:12
34:13,14,17,19

45:14 54:9,14
54:23
**lawyer**  54:13
**lawyers**  26:12
37:8 54:4
**learn**  53:1
**lease**  57:2
**leased**  57:5
**leave**  12:18
16:12 45:4,7
**left**  12:17,22
29:12 69:21
**legal**  3:3 47:19
56:8 72:2
**legitimate**  49:2
49:4,18 52:16
54:5 75:14,19
**liabilities**  25:23
25:24 29:3
32:22
**liability**  46:13
**license**  4:16,17
46:5 48:13
49:23
**life**  11:4 44:8
**likeness**  55:2
**limited**  18:20
19:13,20 20:1
40:7,19 41:7
41:12 46:13
48:14
**line**  33:6 43:17
65:15,18 80:4
80:7,10,13,16

80:19
**lingo**  47:19
**liquidation**
69:7,11
**list**  9:17 13:2
16:13 40:23
58:1
**listed**  38:5,14
39:11,15 40:15
41:13 55:19
56:4 70:23
73:25
**listening**  16:25
**listing**  9:23
68:20
**litigation**  35:25
45:19
**little**  20:4 32:21
55:17 59:7,12
59:16 60:2,8
62:11
**live**  9:6,9
**lived**  9:14
**lives**  9:10,11
**living**  12:24
**llc**  1:4 4:11 5:8
6:15 13:8,15
13:24 14:10,16
14:21 20:7
22:15 23:3,4
23:11,20 24:11
24:14,18 26:13
46:10 51:23
55:14 66:23

67:4,7 80:1
81:1
**llcs**  67:2
**llp**  2:14,19
**loan**  30:13,15
30:18,21,24
31:1,4,9,14,16
31:20,23 32:2
32:24 33:3,7
33:14,15 40:10
40:18,20,20
41:18,21 42:24
72:7,11
**loaned**  32:12
40:21,25 41:8
**loans**  34:1,2
41:10
**locate**  70:8
**located**  2:3
42:6 69:14,25
**location**  5:10
**loden**  2:15 4:6
5:18,19 6:12
6:14 8:14
16:17 22:12
26:5 28:7,15
37:5 45:12
48:5 49:12
53:21,23 57:15
61:14 65:5
67:24 70:20
73:10,15,17,21
73:23 76:4,18
78:7

Veritext Legal Solutions
346-293-7000

**[logo - million]**

| | | | |
|---|---|---|---|
| **logo** 57:7,9 | **maintaining** 24:25 | **matter** 5:8 | **medical** 17:5 |
| **long** 9:14 11:23 35:1 48:11,11 62:1 73:14 | **make** 40:15 47:9 53:12 55:7,21 73:7 | **mccarthy** 2:14 5:19 | **medrala** 2:2,10 2:10 5:22,23 28:4 49:3,6,10 70:17 73:12,16 78:6 |
| **look** 8:4 20:4 26:11 51:9 61:16 74:6 75:14 | **making** 43:13 | **meadowhawk** 20:7 32:24 | |
| **looked** 32:18 40:9 51:16 65:7 72:7 | **manager** 8:18 13:12 14:3 23:3 24:9,14 24:21 29:10 35:13,15,16 41:23 51:19,20 51:22,23 60:13 60:25 66:6 | **mean** 8:5 9:10 12:21 13:10 16:13,24,24 17:17 18:6,22 19:23 22:16,17 24:19 29:2 36:15,15,22,24 37:14 40:25 43:24 44:11,15 44:21 46:22 47:5 49:3 51:12 54:4 56:22 58:8,14 58:15 59:22 61:3 63:8 66:5 66:19,19,25 67:9 69:1 70:2 70:12,13,14,19 71:22 72:2 73:9 74:6,11 74:13,23 75:5 75:7,14,16,21 75:25 77:1,3,4 77:6,10,13,16 | **medralaw.com** 2:12 |
| **looking** 68:17 75:6 | | | **meeting** 24:11 24:12 |
| **looks** 23:19 46:3 62:6 66:12 | | | **meetings** 24:7,8 24:14,16,18,24 |
| | **managers** 35:17 | | **mehdy** 3:9 6:2 |
| **loss** 4:19,20 61:16,20 63:10 65:8,9 66:13 | **managing** 16:3 18:8,12 | | **member** 14:7 23:20 24:8 54:9 |
| | **march** 1:15 2:4 5:1 79:8,23 | | **members** 23:11 24:1,15,18 67:4 |
| **losses** 67:4 | **marco** 3:3 5:12 | | **mentioned** 29:9 52:1 59:8 60:22 |
| **lost** 77:18 | **mario** 11:22 | | |
| **lot** 18:23 24:19 58:8 72:24 73:17 | **mark** 22:10 26:2 57:17 58:1 | | **mia** 1:21 2:4 5:14 79:4,25 |
| **loud** 74:20 | **marked** 4:9 22:11 26:4 37:4 45:11,15 48:4,6 57:14 61:13,18 65:4 65:6 | **means** 39:22 67:3 69:8 | **middle** 23:10 34:10 37:24 65:13 |
| **m** | | | **million** 32:12 33:7,16 40:7 40:18 41:8 50:15 62:7,18 65:15 66:13 72:6 74:14,14 75:2,12 77:3 |
| **made** 23:12 34:2 81:5 | | **media** 5:6 78:10 | |
| **mailing** 7:24 | | | |
| **maintain** 42:10 52:6 | **market** 9:19 | | |
| **maintained** 24:15 55:18 | **marks** 48:20 | | |

Veritext Legal Solutions
346-293-7000

**[millions - okay]**

**millions** 50:11 50:12 74:8,8
**minute** 28:5 69:16
**minutes** 69:19
**missed** 50:23
**moment** 45:13 47:22 52:1 53:24 60:22
**money** 17:13 25:25 31:12 40:1 43:25 45:7 75:21 76:13
**month** 50:16 72:21
**months** 27:6
**morning** 5:4,18 5:21,22,25 6:13 34:15
**mortgage** 8:23 9:1 10:15
**mouth** 72:25
**moved** 12:25 13:1 52:21 61:11
**multiple** 35:16 36:24 44:19 74:16

**n**

**n** 4:1 35:9
**name** 5:12,18 5:22 6:13,23

8:3,12,13 15:15 17:23 19:9 20:7 35:3 35:6 38:23 39:7,9,10,16 44:13,14,16 48:2 55:2 58:20 67:25
**named** 40:6
**names** 11:2,9 11:11 58:2,8 59:22
**napoli** 10:1
**necessary** 81:6
**need** 32:17 73:4
**needed** 72:2
**negotiated** 21:5 34:24
**negotiations** 35:11,22
**net** 63:10 66:13
**nevada** 1:2,14 2:3,6,11 3:5 5:1,9,11 6:16 7:20 46:13 68:1 79:2,5,22
**never** 39:6
**new** 11:25 35:3
**nmc** 1:6
**non** 4:12,14
**nonoperational** 62:12,19 65:14
**nonsense** 77:14

**north** 2:20
**notary** 81:13 81:19
**note** 30:23
**noted** 81:7
**notes** 33:15 79:11,13
**noticing** 5:17
**number** 29:16 40:9 59:16 60:8 78:10
**numbered** 30:5
**numbers** 26:17
**numerous** 44:22
**nv** 1:4,21 4:10 5:8 26:13 60:5 79:25 80:1 81:1

**o**

**o'sullivan** 1:21 2:5 5:14 79:4 79:25
**obtuse** 63:24
**obviously** 36:23 78:2
**october** 22:20
**office** 14:11 42:7,10,13,20 42:22 55:18 65:19 68:20,21 68:24 79:22

**officer** 27:16 37:18
**offices** 2:2
**oh** 12:24 27:23 47:2 76:6
**okay** 6:23 7:5 7:20 8:6 9:6,14 9:16,25 10:7 10:23 11:10,17 11:20,23 12:2 12:7,17 13:2,7 13:18,22 14:10 14:13,15 15:1 15:8,11 16:9 17:20 18:1,3,8 18:11,14,19 19:12 20:4,12 20:19 21:14 22:9 23:1,5,8 23:18 24:3,5 24:23 25:12,15 26:15,23 28:8 28:22 29:9,18 29:22 30:1,7 31:1,4,8,11,14 31:25 32:2,6,9 32:15,20 33:6 33:13 34:5,7 34:16,19 35:10 35:18,20 36:3 37:13,23 39:13 39:20,23,25 40:5,8,18 42:10,14,20,23

Veritext Legal Solutions
346-293-7000

[okay - penalty]

43:2,4,5,17
44:5,13,17,23
44:25 45:6,10
45:17 46:4,18
47:17,20,21
48:8,25 49:11
49:21 51:2,10
53:13,19,24
54:25 55:12,22
56:25 57:2,20
57:24 58:18
59:2,5,12,15,18
59:24 60:4,10
60:19 61:7,12
61:15,23 62:6
63:14 64:10
65:3,12,17
66:1,9,21
67:13,15,20
68:4,6,13,18
69:10,15,20,23
70:5,23,25
71:2,3,5,7,15
71:20 72:1,10
72:15,19 73:20
75:3 76:11,16
76:22 77:19
78:4
**old**  14:3
**once**  13:19
  15:12 18:5
  59:21
**one's**  11:22

**ones**  58:2
**online**  12:2
**operate**  22:3
**operating**  4:10
  19:17 22:15
  27:15 37:18
**opinion**  50:9
  77:8
**opposed**  67:5
**oppression**
  54:14
**ordinary**  61:25
**outright**  10:17
**outs**  56:6
**owe**  40:1 77:2
**owed**  25:25
  76:23
**own**  8:5 10:7
  10:17 13:17,18
  13:18,20 15:9
  19:5,7,24
**owned**  6:18
  11:23 57:5
  64:18
**owner**  23:20
**ownership**
  50:20
**owns**  8:1,6 15:3
  15:19 20:6,9
  20:15 21:12
  48:19 74:5
  75:4

**p**

**p**  2:10
**p.m.**  78:9,12
**page**  4:5,9
  22:24 23:8,9
  23:10,16,16
  24:3,6,13
  26:11,17,17,20
  27:11 30:4,5
  34:5,10 37:17
  37:21,24 39:23
  40:5,23 42:24
  43:2,6 46:4
  48:10,16,24
  50:1 51:9
  53:15 62:11
  63:1,3 65:13
  66:12 68:10,13
  68:14,17,20
  80:4,7,10,13,16
  80:19
**pages**  27:14
  48:11
**paid**  17:17 39:5
  43:13,15,18,22
  43:25 44:2
  64:25 67:14
  77:6
**paintball**  17:17
  17:19 57:9
**papers**  29:23
**paperwork**
  11:13 41:25

**paragraph**
  46:8
**paraguay**
  74:17
**parkway**  3:4
**part**  13:4,20
  54:10
**parties**  46:8,12
  46:17 47:12
  79:17,18
**pass**  66:23,25
**passport**  7:7
**passports**  7:15
**past**  16:2
**patents**  38:5
**patrick**  7:23
  8:1,7,24 9:7,14
  10:3 20:6 42:6
  42:11,14 55:18
  55:19 56:20
  57:3 68:25
**pause**  21:9
  53:22 76:17
**pay**  6:19 44:10
**paychex**  60:9
**paying**  21:16
  75:20
**payments**  21:5
**payroll**  21:17
  22:7
**pays**  66:2
**pen**  57:25
**penalty**  4:14

Veritext Legal Solutions
346-293-7000

[pending - published]

| | | | |
|---|---|---|---|
| pending 6:15 | physical 14:10 | positive 51:8 | profit 4:19,20 |
| people 16:25 | physically 42:5 | possession | 61:16,20 62:7 |
| 59:22 74:16 | 69:13 | 29:22 | 65:8,9 |
| people's 17:3 | pick 61:7 | possibly 74:17 | profitable |
| percent 19:8 | pieces 38:18 | posted 77:6 | 75:20 |
| 21:6,16 23:20 | pilot 10:19,25 | premise 55:5 | profits 67:3 |
| 77:5 | 11:20 | premises 9:12 | promissory |
| percentage | pilots 11:2,21 | present 3:7 | 30:23 33:15 |
| 19:6 | pin 76:5 | 5:15 6:2 73:14 | promote 57:12 |
| perjury 4:14 | place 17:21 | preside 24:14 | promoting |
| permission | placed 55:8 | pressure 51:6 | 21:21 57:6 |
| 29:1 30:3 | plaintiff 5:8 | pretty 72:20 | promotion |
| perpetuity 21:6 | plane 10:7,9,11 | 74:11 78:1 | 57:10,11 |
| 21:16 77:5 | 10:15 11:5,18 | previously 14:6 | pronounce |
| person 42:25 | 11:23 15:19 | primary 21:19 | 17:24 |
| 60:16 71:10 | 31:3 | printers 69:3 | pronouncing |
| 79:19 | playing 12:24 | printout 57:18 | 58:21,21 |
| personal 4:15 | please 6:5,24 | 61:19 | proof 76:20 |
| 16:14 17:3 | 23:2,9 24:4 | prior 79:9 | property 38:1 |
| 44:17 46:5,9 | 34:6 37:21 | probably 13:10 | 38:14,19 47:24 |
| 46:19,20,24 | 39:24 43:3 | 60:20,21 61:2 | 47:25 50:17,20 |
| 47:4,7 59:1 | 63:1 65:7 | 63:8 67:22 | 52:13 63:22 |
| 67:5,12,17 | pllc 2:2,10 | 69:19 72:13 | 64:7 74:1,4 |
| personally 19:9 | po 56:22 | problem 69:24 | protection |
| 43:22 66:17 | point 54:22 | 70:9 73:6 | 25:17 |
| pete 12:6 | 71:11 | problems 73:13 | provide 46:23 |
| petition 4:12 | pointed 24:23 | proceed 6:6 | 52:22 |
| 26:12,21,25 | poker 12:24 | proceedings | provided 47:13 |
| 28:20,24 | pool 57:8 59:7 | 53:22 76:17 | 47:13,15 |
| phone 29:16,16 | 59:8,9,10,15,17 | 78:12 | proxies 54:23 |
| 61:8 65:19 | 59:19,25 60:24 | proceeds 64:12 | public 81:19 |
| 66:1,10,11 | position 41:14 | 64:14 | published |
| phones 65:23 | 54:7 56:6 | process 73:21 | 15:14 |
| 69:3 | | | |

Veritext Legal Solutions
346-293-7000

**[pull - repayment]**

| | | | |
|---|---|---|---|
| **pull** 56:17 | **r** | **recollection** | **refresh** 40:11 |
| **purported** 49:24 | **r** 80:3,3 | 24:17 40:12 | **registrations** 48:20 |
| **purportedly** 50:6 | **range** 50:10 | **recommendat...** 28:2 | **regular** 44:8 |
| **purpose** 31:4 | **rattle** 58:2 | **record** 5:5,17 | **reimbursement** 63:9 |
| **purposes** 66:24 | **reach** 72:6 | 6:24 24:15,24 | **related** 58:3,5,7 |
| **push** 63:16 | **read** 12:2 36:6 | 25:1 28:9,14 | 58:16 |
| **put** 25:19 28:25 | 45:21,22 81:5 | 55:12 73:7 | **relationship** |
| 45:3,8 50:10 | **ready** 58:1 | 78:7,8 | 13:9 15:24 |
| 51:15 57:6,7,8 | **real** 63:14 | **record's** 55:7 | 19:3 20:13 |
| 65:2 68:7 | 69:16 | **recorded** 5:6 | **relative** 79:16 |
| 72:25 76:3,5 | **really** 17:24 | 17:1 | 79:18 |
| | 33:17 63:24 | **records** 14:15 | **remember** |
| **q** | 77:23 | 18:15,17 29:22 | 24:22 26:9 |
| **question** 9:3 | **reason** 80:6,9 | 42:17 52:7 | 27:4,6 34:4 |
| 14:24 18:11 | 80:12,15,18,21 | 57:19 61:20 | 35:12 36:1 |
| 22:18 24:10 | **reasons** 16:13 | **refer** 14:1 67:2 | 37:12 41:9 |
| 33:22,22 36:11 | 16:23 17:7 | **referee** 17:18 | 43:15,24 44:2 |
| 37:25 38:12 | **recall** 24:10,12 | **referees** 17:18 | 51:25 53:9,18 |
| 39:14 44:7 | 30:23 31:16,19 | **reference** 30:13 | 54:1,4 59:21 |
| 47:8,8 49:11 | 41:17,20 47:24 | 34:11 40:6 | 59:23 66:19 |
| 51:18 53:13 | 57:2 59:20 | 62:1 | 67:25 75:7 |
| 63:25 64:6 | 60:23 | **referenced** | **remodel** 59:24 |
| 66:21 67:1,7 | **receive** 64:14 | 45:14 46:20 | **remotely** 5:15 |
| 71:20 72:4,8 | **received** 39:6 | **references** 24:7 | **reneged** 75:9 |
| 72:10 73:3,5 | 54:6 55:14 | **referred** 33:11 | **renovation** |
| 76:5 | 64:4,8,21 | 34:15 | 59:24 |
| **questions** 13:6 | **recent** 27:9 | **referring** 14:2 | **renovations** |
| 31:14 45:23 | **recently** 9:17 | 26:17,18 29:6 | 59:19 |
| 56:8 61:24 | **recess** 28:11 | **refers** 62:4 | **repair** 58:6,15 |
| 71:15 | **recognize** | **reflected** 42:24 | **repaired** 61:1 |
| **quick** 63:14 | 22:14 45:18 | 63:3 | **repayment** |
| 69:16 | 58:3 | **reflecting** | 31:9 32:16 |
| | | 30:20 | |

Veritext Legal Solutions
346-293-7000

[replaced - see]

replaced  25:13 60:1
reported  1:21 62:6 66:13 79:6
reporter  2:5 5:13 6:4 22:10 26:2,6 57:16 79:1,4
represent  5:20 6:14,16 36:5,9 37:7 48:12 57:18
represented 46:19
representing 5:12
required  81:13
residence  7:22 8:23 9:7 20:6 20:10,17 42:7 42:15,18 55:18 57:3
residences  10:2
resident  7:20
resolution  30:2
resolutions 27:25
respect  15:25 18:11 31:19 39:7 71:20 72:10
responsibilities 15:25

responsible 17:12 24:25
rest  49:1
restate  41:5
retained  78:11
return  66:16 67:6,12
returns  14:22 67:5,18
review  79:14
ridiculous 77:17
right  13:16 20:21,22 25:17 27:13 28:19 33:6 41:2,2 43:16 46:15,21 49:15 52:16 55:1,2,10 56:2 62:10 64:4 65:18 68:15 70:15 71:16 74:9,10 75:3 75:18,23 77:19
rights  21:18 22:1,8 48:19 50:20 52:13 64:22 74:2,15
ring  20:7 59:13
rmr  1:21 79:25
rob  35:1,3
rock  57:7
rodriguez  8:21 8:22 9:4 15:20

18:14 25:6 31:25
rohleder  52:2,6 54:18
roughly  63:6
routinely  51:15
royalties  39:5
rule  1:12 2:1 79:6
rules  67:2
ruling  77:11
run  36:23 41:12,16
russell  2:19 6:1

s

s  4:8 80:3
sale  9:17
sales  50:16 75:13
satisfies  76:14
save  13:10
saw  45:14 63:19
saying  36:4 55:8,10 56:1 68:1 74:23 77:5
says  22:19 23:11,14,22 24:7,13,23 27:17 30:17 37:20,25 40:21 43:16,17 44:16

46:3,7,13 47:5 47:6 48:18 49:14 51:21 62:9 63:13 64:5 66:15 68:13,14 69:7 70:6 77:4
schedule  40:23
schedules  37:9 42:24 45:15 73:25
scott  52:1 54:18
scott's  51:16
scumbag  51:3
second  31:14 38:10 49:5 53:20 63:1
secrets  38:6
section  23:2,10 24:7,13 62:12
secured  31:1,2 32:3
security  20:12 36:25 58:24,25 59:1
see  16:18 22:19 23:2,11 26:11 26:14,20,22 27:14 30:8,13 32:23 33:1,6,8 34:10 37:17,24 38:2,8,15 40:5 43:6,8,20 46:1

**[see - speak]**

46:4,11 48:16 48:22 49:13 51:21 57:23 58:20 60:2,9 61:22 62:2,8 62:14,19,24 63:4,12 65:11 65:16,21 66:14 68:22 69:1,4,5 72:9

**seeing** 40:11 41:17,20

**seek** 31:9 32:16

**seems** 70:11

**seen** 26:7 32:7 37:10

**sell** 39:9

**selling** 9:21 18:22,22 54:19 54:21 74:12 75:13 77:15

**sense** 40:15 53:12 55:21

**sensitivity** 17:4

**sent** 41:22 50:21 51:8

**separate** 16:9 36:15,25 67:12

**september** 25:17 27:22

**series** 13:5

**service** 48:20 59:8,10 60:3

**services** 4:15 6:16 20:12 36:25 46:5,9 46:14,19,20,24 47:4,5,6,12 52:22

**set** 13:5,12 23:13 31:14 49:20 79:21

**settlement** 77:12

**setup** 15:16

**sgrlaw.com** 2:22

**shafted** 64:17 64:17

**shapiro** 2:13 3:8 5:21 6:17 53:20 72:5,11 73:6

**share** 17:16

**shareholder** 33:7,10,16 40:10,12,16,16 54:13

**shares** 19:5,9 19:24

**sheet** 30:8 32:18,22 40:10 40:13

**sheets** 32:5

**shifting** 63:15

**shit** 11:3 75:17 77:2,7

**shorthand** 79:11,13

**show** 22:9 37:6 45:15 48:6 57:16 65:6

**showed** 51:14

**shows** 57:21

**sign** 26:25 27:24 51:4,6 51:13 53:10

**signature** 28:25 51:11,18,22 53:14,15 79:24

**signed** 26:16,21 30:3 37:18 46:3 50:21 51:7 52:4 53:4 57:2 66:16

**significant** 77:23 78:1

**signing** 28:24 30:23 31:19 53:9,18 54:1

**silencers** 20:15

**single** 56:7

**sir** 24:10

**sit** 33:23,25 40:3 41:17 53:13 55:13 64:20

**sixth** 2:3,11 5:10

**skull** 21:18 22:1,8 48:3

55:3

**slightly** 33:21 62:7

**sloden** 2:17

**smith** 2:19 5:25

**sold** 70:6,13

**sole** 6:17 14:7 54:8

**solutions** 3:3

**somebody** 71:14 72:9

**somewhat** 16:11

**song** 38:20,21 39:3,3

**soon** 9:21

**sorry** 10:21 50:23 54:17 63:15,23,24

**sorts** 67:8

**sound** 14:7

**sounds** 20:8,22 43:16 45:8 58:15 71:10

**source** 43:18

**sources** 67:10

**south** 2:3,11 5:10 50:16

**sp** 10:10

**spa** 59:15,17

**space** 14:11 42:10

**speak** 27:5 73:3

Veritext Legal Solutions
346-293-7000

[special - tax]

special 24:7,8 24:11,12
specifically 30:25
spend 32:10 45:7
spending 17:13
sponsorship 4:16 46:5
ss 79:2
st 7:12,13 12:6 40:14
staff 9:10,11 11:17
start 12:22 20:23 21:15 27:3
started 20:20
starts 23:15 48:24
state 2:6 5:16 6:23 7:20 68:1 79:2,5,22
statement 36:12 61:17,20 65:8,9
statements 37:9
states 1:1
stearns 2:20 5:25,25
steel 2:18 3:9,9 6:1,2,16 21:4 21:12,24 22:6

25:25 34:11,14 34:24 35:22 45:13,20,25 46:9,25 47:3 47:11 57:11 75:9,20 76:19 76:22
stein 29:8
stephen 2:15
steve 5:18 6:14
stole 17:9
stop 16:5
stopped 41:23 75:20
stored 42:18
stream 75:8
street 2:3,11,15 2:20 5:11
strike 15:23 38:17 42:4
structure 56:14
structured 8:4 13:11,14,20 18:6 19:11 20:14 31:7 51:25 56:2 57:1 64:18 66:5
study 12:11
stuff 31:6 51:13 51:15 56:8,11 56:15 58:14
subject 45:19

subscribed 81:14
sued 54:12
sufficient 6:18
suing 19:25
suite 2:16,21 3:5
summary 4:18 57:21 61:15
supplement 77:16
supplements 2:18 3:9,9 6:1 6:3 21:5,13,24 22:6 26:1 34:11,14,25 35:22 45:14,20 45:25 46:10 47:11 75:9 76:19,23
supposed 39:5 70:22
supposedly 53:4 74:2
sure 20:5,24 28:7 29:17 35:2 39:2 44:1 47:9 51:12,13 53:21 54:10 55:7 56:9 67:16 71:13 72:20 78:2
surprised 53:6 53:16,25

swear 6:5
switched 44:21
sworn 6:9 79:10 81:14

t

t 2:15 4:8 80:3 80:3
take 17:20 28:4 28:7 61:4 64:11 67:17 69:16
taken 2:2 5:7 28:11
talk 20:25 30:22 31:10 32:17 33:17 39:18 40:2 41:9 42:13 72:6 73:10,12
talked 45:13 47:22 63:17,18 73:24 74:1 77:23
talking 15:6 25:2 27:21 28:16,23 30:2 33:5 68:16 71:13 73:6,6
tampa 2:21 12:3
tangible 74:5
tax 14:21 66:16 67:5,6,12,17

Veritext Legal Solutions
346-293-7000

[taxes - tried]

taxes  66:20
  67:19 72:20
technically
  42:12
tell  10:9 13:13
  19:22 23:15
  26:10 51:15
ten  69:16
tequila  18:23
term  62:1
terminated
  17:8
terms  16:9 54:7
testified  6:10
  14:6
testify  70:17
  79:10
testimony  78:9
  81:8
texas  2:16 5:20
thank  18:19
  25:15 29:19
  53:19 68:6
  77:19 78:6
thanks  78:4
thing  39:9
  45:21,22,23
  54:24 69:17
  76:9 77:17
things  18:23
  36:16 44:10
  55:25 58:3
  62:22 71:23
  75:8,16

think  11:21
  12:2,19 14:12
  14:17 15:17
  17:24,25 21:7
  21:10 28:23
  33:4 38:17,18
  39:1,3,8 41:11
  43:9,24 44:19
  48:3 50:15,22
  51:7 52:12,15
  52:17 53:2,2
  55:13 56:19,22
  57:4 64:1,9,23
  64:24 65:1
  67:9,19,23,23
  68:3,5 70:3,13
  71:16,22,25
  74:4,13,15,16
  74:25 75:1,3
  75:11,12,21
  76:6,9,12,12,13
  76:14,24 77:1
  77:2,7,13,13,22
  77:25
third  30:12
  38:11
thirds  68:19
thought  39:15
  51:22 54:5
three  38:5
  46:11
tile  60:23 61:8
tiles  60:1

time  11:4 13:10
  27:20 32:7,10
  35:1,5,15
  43:24 56:23
  63:23 77:20
  78:4
title  27:23
  51:21 52:9
titled  27:14
  43:6 46:5
today  23:6
  33:23,25,25
  40:3 41:17
  53:14 55:13
  64:20 69:6
  72:24 73:24
  77:23
today's  78:9
together  63:6
told  28:6 36:17
  36:20 55:1
tons  36:16
took  29:9 41:24
  51:5 61:3
  64:12 75:15
top  22:19 26:18
  57:23 58:20
  61:25 68:13,16
total  62:9,18,19
  78:10
totaling  65:15
totally  13:25
  73:2 74:20
  75:11

touch  76:3
trade  38:6
trademark
  38:7,21,23
  39:11,19 47:23
  48:20 74:7,15
  76:9
trademarked
  39:10,16
trademarks
  38:6 47:25
  49:15,25 50:5
  50:10 53:11
  63:18 64:2
  75:10
trampoline
  57:8
transaction
  52:16 54:6
transcribed
  79:11
transcript  36:7
  79:12,15 81:5
  81:8
transcription
  79:13
transfer  49:5
  49:18,23,24
transferred
  41:24 63:21
travel  62:22
  63:2,7
tried  77:15

Veritext Legal Solutions
346-293-7000

**[true - wanting]**

| | | | |
|---|---|---|---|
| **true** 79:12 81:8 | 47:1,13 51:22 | 39:14,17 50:7 | 40:2 41:9 |
| **truly** 56:17 | 61:25 63:19 | 50:9 55:14 | 42:13 51:24 |
| **trust** 11:4 | 67:2 | 69:11 75:4,8 | 60:21 66:20 |
| **trustee** 2:13 3:8 | **understand** | **vapes** 18:22 | 67:17 68:5 |
| 5:20 6:14 | 6:21 32:11 | 54:19,22 | 72:9,13 73:1 |
| 70:10 72:5 | 33:18,23 34:19 | **various** 57:12 | 76:3 |
| **truth** 79:10 | 45:6 47:8 50:3 | **vegas** 1:14 2:3 | **video** 5:6 |
| **trying** 6:18 | 54:10 73:2 | 2:11 3:5 5:1,11 | **videographer** |
| 45:6 49:20 | **understanding** | 8:15 10:13 | 3:2 5:4,13 6:4 |
| 56:12,17 63:16 | 13:3 26:24 | 12:25 29:20 | 28:8,13 78:8 |
| **turn** 20:19 | 35:20 43:14 | **vehicles** 15:3,4 | **videotaped** |
| 22:24 23:8 | 76:25 | 62:23 | 1:12 2:1 |
| 24:3,13 27:11 | **unit** 5:6 | **vendor** 4:18 | **videowest** 3:6 |
| 30:4 34:5 | **united** 1:1 | 57:21 | **visions** 59:13 |
| 37:21 39:23 | **university** 12:7 | **vendors** 58:2 | **vodka** 18:23 |
| 43:2 63:1 | 12:10,18 | **veritext** 3:3 | **voluntary** 4:12 |
| 66:12 | **unknown** 38:14 | 5:13,14 78:11 | 26:12 28:20 |
| **turning** 30:1 | 39:15 | **veritext.com** | **vorrias** 58:21 |
| 70:9 | **unsecured** | 3:6 | 58:21,22 |
| **two** 11:1,2,21 | 40:24 | **verona** 8:19 | |
| 27:14 68:19 | **use** 44:18 55:1 | 14:1,4 15:23 | **w** |
| 69:1 78:1,10 | 55:2 | 15:24 16:5 | **wall** 57:7,8 |
| **typewriting** | **used** 57:6,10,11 | 21:11 25:6 | **want** 17:1,4 |
| 79:11 | 57:11 78:10 | 26:20,25 27:3 | 18:7 22:9 |
| **typewritten** | **using** 50:17 | 27:18,24 28:23 | 29:16 45:15,21 |
| 79:12 | **usually** 44:11 | 29:10 30:3 | 48:6 51:4 55:7 |
| **typically** 60:25 | 45:5,9 72:16 | 35:10,24 36:10 | 61:16 68:10 |
| | | 36:17 37:2,18 | 72:25 73:5,11 |
| **u** | **v** | 60:13,24 61:4 | 74:8,13,23 |
| **u.s.** 7:5,7 | **valuable** 50:19 | **verona's** 17:21 | 76:2 77:7 |
| **uh** 30:11 42:16 | 52:12 75:10 | **victor** 8:10,11 | **wanted** 8:6 |
| 61:9 74:3 | **valuation** 69:9 | 8:21 14:17,19 | 72:5 73:22 |
| **under** 4:14 | **value** 38:12,19 | 14:24 16:4 | **wanting** 47:9 |
| 32:21 40:16 | 38:24 39:1,4 | 25:5,6,13 33:5 | |

Veritext Legal Solutions
346-293-7000

**[war - zoom]**

war   74:16
  76:13
water   77:15
way   16:19
  30:12 41:1
  45:24 55:23
  65:2 68:19
we've   44:21
  73:25
weaseled   21:7
  77:5
website   38:10
websites   38:20
  38:21
wells   44:24
west   7:23 8:1,7
  8:24 10:2
wheels   15:1
whereof   79:21
witness   2:9 4:3
  6:5,9 8:12
  16:14 49:2,4,8
  49:11 67:21
  70:12,18 73:20
  76:2 79:9,14
  79:21
words   72:25
work   16:1,15
  59:19 60:23
worked   71:25
working   16:4,5
  27:3 35:5
works   11:17
  13:8,15,24

14:7,10,16,21
  23:3 51:23
  70:18
world   13:16
worth   38:22
  39:8
written   27:15
wrong   36:17

**x**

x   4:1,8 59:7

**y**

yeah   8:5 9:22
  11:6,16 12:6
  13:23 14:9,20
  14:25 15:7
  16:3,8,11
  17:17 18:6
  19:25 21:12,19
  22:1,18,21,23
  24:21 27:8,23
  29:24 34:3,21
  35:4,19 37:16
  40:14,15,25
  41:4,5 42:22
  46:25 47:5,6
  49:16,16 51:12
  51:21 52:5
  53:5 54:17
  55:24 56:16
  58:19,22 60:18
  62:21 63:8,8
  63:24 64:5
  65:17 66:5,8

66:18,22 68:17
  69:22,22 70:4
  70:6,12,14
  71:2,2,12,13,25
  73:12,17 75:24
  77:13,25 78:2
year   12:16,17
  16:6 18:1 25:2
  27:4 53:4
  57:21 61:17,21
  63:10
years   20:24,25
  22:16 24:20,22
  44:22
yup   7:4,14
  13:17 14:5
  23:15 28:22
  29:11 34:9,13
  50:4 52:3 69:5

**z**

zoom   2:20 3:9
  3:9

Veritext Legal Solutions
346-293-7000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 2

FILED
CLERK, U.S. DISTRICT COURT

9/26/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>PAUL A. BILZERIAN,<br>SCOTT ROHLEDER, and<br>IGNITE INTERNATIONAL BRANDS,<br>    LTD.,<br><br>            Defendants. | CR   2:24-cr-00569-MEMF<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy to Defraud the United States; 18 U.S.C. § 371: Conspiracy to Commit Wire Fraud and Fraud in Connection with Purchase and Sale of Securities; 18 U.S.C. § 1343: Wire Fraud; 26 U.S.C. § 7206(2): Assisting in the Preparation of False Tax Return; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant PAUL A. BILZERIAN was a resident of St. Kitts and Nevis and previously an American businessman and corporate raider.  In 1989, defendant BILZERIAN was convicted of securities

fraud, among other charges, in the United States District Court for the Southern District of New York and sentenced to four years' imprisonment.

b.   In 1989, the United States Securities and Exchange Commission ("SEC") brought a civil action against defendant BILZERIAN in the United States District Court for the District of Columbia based on the same underlying conduct as the criminal case (the "SEC Case").  In 1993, the SEC obtained civil judgments totaling approximately $62,337,600 against defendant BILZERIAN (the "SEC Judgment"), including more than $33 million in disgorgement and more than $29 million in prejudgment interest.  Since then, defendant BILZERIAN has evaded enforcement of the judgments.

c.   In 2000, the United States District Court for the District of Columbia found defendant BILZERIAN in contempt of the SEC Judgment and appointed a receiver to collect defendant BILZERIAN's assets to effectuate the SEC Judgment.  In 2001, when defendant BILZERIAN continued to evade the SEC Judgment, the same court held defendant BILZERIAN in contempt of the receivership order.  Since then, the SEC has reported that it has only been successful in recovering a net amount of approximately $547,000 toward satisfaction of the SEC Judgment.  With interest, the amount of the SEC Judgment now exceeds $180 million.

d.   D.B. was defendant BILZERIAN's son.  D.B. was a professional poker player and social media influencer who gained notoriety for portraying his conspicuous lifestyle on social media, including photographs and videos depicting him partying with scantily clad women, jet-skiing, drinking, smoking, shooting large guns, spending time on boats and beaches, and flying around the world in

2

private jets.  D.B.'s primary residence was a mansion located on West Patrick Lane in Las Vegas, Nevada (the "Patrick Lane Mansion").

e.    Defendant SCOTT ROHLEDER was a resident of North Carolina and Florida and a certified public accountant.  Since at least 2018, defendant ROHLEDER worked for defendant BILZERIAN and his various business interests in a number of roles.  Defendant ROHLEDER also regularly assisted in the preparation of D.B.'s tax returns.

f.    Defendant IGNITE INTERNATIONAL BRANDS, LTD. ("IGNITE") was a publicly traded company that marketed itself as a "lifestyle brand," selling vape pens, liquor, clothing, cannabidiol products, and various other products inspired by the persona that D.B. portrayed on his social media accounts.  Beginning in 2019, shares of defendant IGNITE were publicly traded over the counter in United States securities markets under the symbol "BILZF" and constituted "securities" within the meaning of the Securities Exchange Act of 1934.  Soon after going public, defendant IGNITE completed a reverse takeover with Ignite International Ltd. ("Ignite US"), formerly Vulcan Enterprises Ltd., making Ignite US a wholly owned subsidiary of defendant IGNITE.  Defendant IGNITE primarily operated out of its offices in Los Angeles, California, and Vaughan, Canada.  Putatively, D.B. was the Chief Executive Officer ("CEO"), founder, and Chairman of defendant IGNITE.  Defendant ROHLEDER held various roles at defendant IGNITE, including Chief Financial Officer.

g.    G.G.-P. was a resident of St. Kitts and Nevis and an associate of defendant BILZERIAN.  G.G.-P. was elected to defendant IGNITE's board of directors in July 2020.

h.    International Investments Ltd. ("International Investments") was a business entity based in St. Kitts and Nevis and

3

originally incorporated in February 2007.  Initially, International Investments was nominally owned by V.V. and defendant BILZERIAN's other son, A.B.  Eventually, nominal ownership in International Investments was transferred to Another Dimension Ltd., which was owned by G.G.-P.  In truth, G.G.-P. served as a straw owner for International Investments, which operated at the direction of and for the benefit of defendant BILZERIAN.  Through International Investments and other corporate entities, defendant BILZERIAN funneled millions of dollars into defendant IGNITE.

          i.   Rohleder, Inc., was a Florida corporation operating out of North Carolina.  While defendant ROHLEDER was nominally the president and director of Rohleder, Inc., he operated the company at the direction of and for the benefit of defendant BILZERIAN.

B.   CONSPIRACY TO DEFRAUD THE UNITED STATES

2.   Beginning no later than in or about December 2018, and continuing through at least September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and willfully conspired with one another, and with others known and unknown to the Grand Jury, to defraud the United States and agencies thereof, namely, the SEC, by impeding, impairing, obstructing, and defeating the lawful government functions of the SEC with respect to collection of the SEC Judgment by deceitful and dishonest means.

C.   MANNER AND MEANS OF THE CONSPIRACY

3.   The object of the conspiracy was carried out, and was to be carried out, in substance, as follows:

          a.   Defendant BILZERIAN would cause the incorporation of businesses operated at his direction and for his benefit but

4

nominally under the ownership of other individuals, including but not limited to International Investments, Vulcan Enterprises, Ltd., and Veritas Investments (the "PAUL BILZERIAN Entities").

b.    To avoid satisfying his obligation in the SEC case, defendant BILZERIAN would falsely represent that he was indigent and unable to pay the SEC Judgment, including through filing an application to proceed in forma pauperis, claiming in that the only asset he possessed was a purported federal tax refund claim, and providing tax returns and financial disclosures omitting the considerable assets he held in the PAUL BILZERIAN Entities.

c.    To continue to deploy his considerable wealth in the United States while evading the SEC Judgment, defendant BILZERIAN would funnel millions of dollars of his assets to capitalize defendant IGNITE while concealing his role in defendant IGNITE's ownership and management through nominees.

i.    Defendant BILZERIAN would invest millions of dollars to acquire shares in defendant IGNITE through the PAUL BILZERIAN Entities.  With assistance from defendant ROHLEDER, defendant BILZERIAN also would lend millions of dollars more to defendant IGNITE through the PAUL BILZERIAN Entities, including more than a dozen promissory notes totaling more than $20 million for short-term or convertible debt.

ii.    Although D.B. was nominally the CEO of defendant IGNITE, in truth, defendant BILZERIAN exercised de facto control at defendant IGNITE.  Together with defendant ROHLEDER, defendant BILZERIAN would oversee operations, strategy, marketing, and fundraising at defendant IGNITE, to the point of holding daily management meetings.  As a beneficial owner of defendant IGNITE,

defendant BILZERIAN also would exert significant influence in decisions to hire and fire defendant IGNITE's executives and members of the board of directors.

iii. At defendant BILZERIAN's direction, defendant ROHLEDER would assist in deploying defendant BILZERIAN's assets to capitalize defendant IGNITE, including by using entities controlled by defendant ROHLEDER, including Rohleder, Inc., as a vehicle to hold and transfer assets belonging to International Investments.

iv. Despite defendant BILZERIAN's prominent leadership role at defendant IGNITE, defendants BILZERIAN, ROHLEDER, and IGNITE would conceal his role, including by omitting his name in publicly filed disclosures. Additionally, while defendant IGNITE would publicly disclose the numerous promissory notes it entered into with International Investments, it would conceal that International Investments and its assets were controlled by and belonged to defendant BILZERIAN and that defendant BILZERIAN was a major shareholder in defendant IGNITE through shares held by the PAUL BILZERIAN Entities.

d. After learning federal authorities had become aware of defendant BILZERIAN's involvement in defendant IGNITE, defendant IGNITE would seek to misleadingly downplay that involvement by issuing a press release mischaracterizing defendants BILZERIAN and ROHLEDER as "unpaid consultants" to defendant IGNITE. In truth, as defendant IGNITE then knew, defendant BILZERIAN was the de facto head and beneficial owner of defendant IGNITE, and defendant ROHLEDER was a de facto executive of defendant IGNITE.

D.    OVERT ACTS

4.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants BILZERIAN, ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:    On April 16, 2018, defendant BILZERIAN filed a motion to proceed in forma pauperis in the SEC case in which he listed $740 in gross monthly wages, $260 held in checking and savings accounts, and a purported joint tax refund claim for $8,243,125.

Overt Act No. 2:    On July 3, 2018, defendant BILZERIAN sent an email to the SEC offering to resolve the SEC Judgment by giving the SEC 90 percent of a purported federal tax refund, which defendant BILZERIAN stated "is essentially the only asset I have to work with."

Overt Act No. 3:    On July 10, 2018, defendant BILZERIAN submitted to the SEC an IRS Form 433-A in which he listed a gross monthly income of $2,738, cash holdings of $10, no personal bank accounts, no investments, no real property, no personal assets, and no credit.

Overt Act No. 4:    On May 16, 2019, defendant BILZERIAN caused International Investments to make a $3 million loan to Ignite Distribution, LLC, a subsidiary of defendant IGNITE.

Overt Act No. 5:    On July 15, 2019, defendant BILZERIAN sent an email to the SEC asking the agency to stop garnishing his Social Security payments, stating "As you know, I have filed bankruptcy twice and a receiver confiscated and liquidated all my assets, including my wages . . . ."

7

Overt Act No. 6:   On June 8, 2020, defendant BILZERIAN caused International Investments to make a $5 million (Canadian or "CAD") loan to defendant IGNITE.

Overt Act No. 7:   On June 11, 2020, defendant BILZERIAN caused International Investments to make a $3.35 million loan to defendant IGNITE.

Overt Act No. 8:   On November 16, 2020, defendant BILZERIAN caused International Investments to make a $6.5 million CAD loan to defendant IGNITE.

Overt Act No. 9:   On January 27, 2021, defendant BILZERIAN caused International Investments to make a $3.2 million CAD loan to defendant IGNITE.

Overt Act No. 10:   On February 6, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO to account for the $4.63 million accounts receivable owed by International Investments for defendant IGNITE's vape product inventory by offsetting a $5 million note obligation that defendant IGNITE owed to International Investments.

Overt Act No. 11:   On March 7, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of [International Investments]."

Overt Act No. 12:   On May 24, 2021, defendant BILZERIAN caused International Investments to make a $1.5 million loan to defendant IGNITE.

Overt Act No. 13: On October 14, 2021, defendant BILZERIAN caused International Investments to make a $1.886 million loan to defendant IGNITE.

Overt Act No. 14: On December 21, 2021, defendant IGNITE issued a press release misleadingly characterizing defendants BILZERIAN and ROHLEDER as having served as "unpaid consultants" for defendant IGNITE.

Overt Act No. 15: On a date before September 19, 2024, defendant BILZERIAN wrote in an email to a journalist that he had never owned shares in, or controlled, International Investments.

COUNT TWO

[18 U.S.C. § 371]

[ALL DEFENDANTS]

5.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    INTRODUCTORY ALLEGATIONS

6.    At times relevant to this Indictment:

a.    Beginning in or around October 2020, defendant IGNITE contracted with Company 1, a company located in Phoenix, Arizona, to serve as both a distributor and a third-party logistics company ("3PL") for defendant IGNITE's products, including vaping products, which largely were imported into the United States from foreign nations, including the People's Republic of China.  In its role as 3PL, Company 1 would store defendant IGNITE's products in a designated 3PL section of Company 1's warehouse.  When defendant IGNITE notified Company 1 of a purchase order placed by a customer, Company 1 would package and ship defendant IGNITE's products to the customer.  By contrast, when Company 1 purchased defendant IGNITE products in its role as a distributor, Company 1 would submit a purchase order to defendant IGNITE and would move the purchased products from defendant IGNITE's 3PL section of the warehouse over to Company 1's designated section.

b.    In or around November 2020, defendant IGNITE began ordering large shipments of vape products from China and storing them in its designated 3PL section of Company 1's warehouse.  On or about December 15, 2020, Company 1 clarified to defendant IGNITE that Company 1 was storing the inventory in defendant IGNITE's 3PL section, not purchasing it.  Defendant IGNITE's then-President

10

confirmed his understanding that Company 1 had not purchased this inventory.

c. On or about January 16, 2021, in response to an email from defendant BILZERIAN on behalf of defendant IGNITE, Company 1's principal reiterated to defendants BILZERIAN and IGNITE that Company 1 had not purchased the large quantity of vape product inventory being stored at Company 1's warehouse and that the inventory still belonged to defendant IGNITE.

B.    OBJECTS OF THE CONSPIRACY

7.    Beginning no later than in or about October 2020, and continuing through September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE conspired with one another and with others known and unknown to the Grand Jury to commit the following offenses:

a. Wire Fraud, in violation of Title 18, United States Code, Section 1343; and

b. Fraud in Connection with the Purchase and Sale of Securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

C.    MANNER AND MEANS OF THE CONSPIRACY

8.    The objects of the conspiracy were carried out, and were to be carried out, in substance, as follows:

a. To create the false impression among investors that its sales were both sizeable and growing, thereby increasing the value of its shares, defendant IGNITE would issue press releases that

11

inflated sales figures in 2020 by including unsold inventory stored by Company 1 in its capacity as defendant IGNITE's 3PL.

b.   When Company 1 refused to certify to defendant IGNITE's auditor that it had purchased the unsold inventory, defendant BILZERIAN, through foreign wire communications, would cause defendant IGNITE to sell approximately $4.63 million in vape product inventory to International Investments in exchange for extinguishing an equal amount of defendant IGNITE's debt that International Investments held in various convertible notes.

c.   Notwithstanding the sale of the vape product inventory to International Investments, at defendant BILZERIAN's direction, defendant IGNITE would continue to track the inventory and produce invoices for subsequent sales of the vape products -- behavior inconsistent with a bona fide sale to International Investments -- with all invoices and payments going through defendant ROHLEDER and Rohleder, Inc.

d.   Knowing that neither Company 1 nor International Investments had purchased the vape product inventory in December 2020, defendant ROHLEDER would falsely inform defendant IGNITE's auditor that the sale occurred in December 2020 and that International Investments stepped into the shoes of Company 1 as purchaser.

e.   Defendants BILZERIAN, ROHLEDER, and IGNITE would mislead investors into believing the sale to International Investments was a profitable, arms-length transaction, by:

i.   continuing to falsely backdate the sale of vape products to 2020 in public statements;

12

ii.  concealing the fact that International Investments was a shell company controlled by defendant BILZERIAN, and that defendant BILZERIAN also controlled defendant IGNITE; and

iii. failing to disclose that International Investments was not a distributor or vendor or vape products and therefore could only sell the inventory in competition with defendant IGNITE, thereby undermining the latter's future sales.

9.   On January 19, 2021, after issuing its false and misleading press release, defendant IGNITE's share price increased from approximately $0.42 to $1.20 per share, representing a gain of approximately $84 million in market capitalization.

D.   OVERT ACTS

10.  On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants BILZERIAN, ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:   On January 19, 2021, defendant IGNITE issued a press release stating, "Revenue grew steadily throughout the fourth quarter beginning with a $1.2 million in October and increasing to $3.7 million in November, followed by revenue of $5.2 million in December."

Overt Act No. 2:   On January 28, 2021, defendant BILZERIAN stated on a phone call with Company 1 personnel and others that, if Company 1 refused to take financial responsibility for defendant IGNITE's vape product inventory, then defendant BILZERIAN would pay for the vape product inventory out of his own pocket.

13

Overt Act No. 3:   On February 6, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO to account for the $4.63 million accounts receivable owed by International Investments for defendant IGNITE's vape product inventory by offsetting a $5 million note obligation that defendant IGNITE owed to International Investments.

Overt Act No. 4:   On March 7, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN instructed defendant IGNITE's CFO that "[a]ll invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of [International Investments]."

Overt Act No. 5:   On April 6, 2021, in an email to members of defendant IGNITE's auditor, defendant ROHLEDER claimed, as CFO for International Investments, that latter had "stepped into the shoes of [Company 1]" with respect to the purchase of vape products from defendant IGNITE.

Overt Act No. 6:   On April 30, 2021, defendant IGNITE publicly released consolidated financial statements for 2019 and 2020, listing total sales of approximately $16,944,159 in 2020 and claiming that International Investments "made purchases of product from Ignite of $5,878,244 in 2020."

COUNTS THREE THROUGH SIX

[18 U.S.C. § 1343]

[ALL DEFENDANTS]

11.  The Grand Jury realleges paragraphs 1, 6, 8, 9 and 10 of this Indictment here.

A.    THE SCHEME TO DEFRAUD

12.  Beginning no later than in or about October 2020, and continuing through September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises.

13.  The scheme to defraud operated, in substance, as described in paragraphs 6, 8, 9, and 10 of this Indictment.

B.    USE OF INTERSTATE AND FOREIGN WIRES

14.  On or about the dates set forth below, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendants BILZERIAN, ROHLEDER, and IGNITE transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

15

| COUNT | DEFENDANTS | DATE | INTERSTATE OR FOREIGN WIRE TRANSMISSION |
|---|---|---|---|
| THREE | BILZERIAN, IGNITE | 01/19/2021 | Press Release published on Canada's System for Electronic Document Analysis and Retrieval ("SEDAR") from defendant IGNITE falsely representing that "Revenue grew steadily throughout the fourth quarter beginning with a $1.2 million in October and increasing to $3.7 million in November, followed by revenue of $5.2 million in December." |
| FOUR | BILZERIAN, ROHLEDER, IGNITE | 02/06/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Company 1 Reconciliation," directing CFO to account for International Investments' purchase of vape inventory by offsetting debt that defendant IGNITE owed to International Investments. |
| FIVE | BILZERIAN, ROHLEDER, IGNITE | 03/07/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Aspire/II Sales," directing that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of II." |
| SIX | BILZERIAN, ROHLEDER, IGNITE | 04/30/2021 | Press Release published on SEDAR from defendant IGNITE falsely representing that "International Investments had principal and interest due to it of $10,719,785 as of December 31, 2020 and made purchases of product from Ignite of $5,878,244 in 2020." |

16

COUNTS SEVEN THROUGH NINE

[26 U.S.C. § 7206(2)]

[DEFENDANT ROHLEDER]

15. The Grand Jury realleges paragraph 1 of this Indictment here.

16. In or around May 2018, D.B. decided to purchase the Patrick Lane Mansion. Ignite US paid approximately $8.5 million in cash for the property and, during escrow, assigned the property to a single-member LLC owned by D.B. ("LLC 1").

17. In or around November 2018, with the initial public offering of defendant IGNITE looming, defendant ROHLEDER drafted two agreements, both backdated to June 2018, concerning the Patrick Lane Mansion. One was a promissory note stating that Ignite US loaned LLC 1 approximately $8.5 million with an interest rate of 5 percent. The second was a lease agreement to give the appearance that LLC 1 leased the Patrick Lane Mansion to Ignite US for a monthly rent of approximately $35,000. As defendant ROHLEDER intended, these two agreements effectively cancelled each other out, as 5 percent interest on a $8.5 million loan amounts to roughly $35,000 per month. By making it appear that D.B. was renting the Patrick Lane Mansion back to Ignite US, defendant ROHLEDER obviated the need for D.B. to make monthly payments to repay Ignite US.

18. Defendant ROHLEDER assisted D.B. in the preparation of his personal tax returns for tax years 2018, 2019, and 2020. Despite knowing that the Patrick Lane Mansion was D.B.'s primary residence during this period, defendant ROHLEDER knowingly provided D.B.'s tax preparer with financial statements for LLC 1 for tax years 2018, 2019, and 2020, that reported rental income and interest expenses in

17

connection with the Patrick Lane Mansion.  As a result, the Schedules E attached to D.B.'s Forms 1040 reported rental income, interest expenses, and/or depreciation for the Patrick Lane Mansion, resulting in improper deductions in D.B.'s tax returns.  For D.B.'s home address, defendant ROHLEDER provided D.B.'s tax preparer with an address that corresponded to a hangar at Harry Reid International Airport in Las Vegas, Nevada.

19.  To repay the promissory note between LLC 1 and Ignite US, defendant ROHLEDER drafted a Share Purchase Agreement dated November 20, 2018 between D.B. and Ignite US, whereby D.B. sold 2.5 million of his Ignite US shares back to Ignite US at the price of $4.00 per share for a total of $10 million.  Under the agreement, approximately $8.7 million of the sale proceeds were used to pay off the promissory note to LLC 1 and its interest.  Because D.B. first acquired the Ignite US shares no earlier than December 28, 2017, the stock sale constituted a short-term capital gain that was supposed to be taxed as ordinary income.  Upon realizing this, and despite knowing that the stock sale occurred in November 2018, defendant ROHLEDER knowingly and falsely informed D.B.'s tax preparer that the stock sale occurred on December 30, 2018 so that it would appear to qualify as a "long-term" capital gain -- that is, capital held for more than one year -- which, for D.B., was taxable at a lower rate than ordinary income.

20.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROHLEDER willfully aided and assisted in, and procured, counseled, and advised, the preparation and presentation to the Internal Revenue Service, under, and in connection with a matter

18

arising under, the internal revenue laws, of the tax returns for taxpayer D.B. and other documents set forth below, which were fraudulent and false as to material matters, and thereby resulting in losses over the three years to the Internal Revenue Service of approximately $1,536,949:

| COUNT | CALENDAR YEAR | FILING DATE | TAX RETURNS CONTAINING MATERIALLY FALSE ITEMS |
|-------|---------------|-------------|-----------------------------------------------|
| SEVEN | 2018 | 08/08/2019 | A 2018 United States Individual Income Tax Return, Form 1040, including (1) a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 214 "fair rental days"; and (2) a fraudulent Form 8949 listing a false sale date of December 30, 2018, for shares of Vulcan Enterprises Ltd. |
| EIGHT | 2019 | 07/15/2020 | A 2019 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 365 "fair rental days" |
| NINE | 2020 | 10/15/2021 | A 2020 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 366 "fair rental days" |

19

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

21.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in Counts One through Six of this Indictment.

22.   Any defendant, if so convicted, shall forfeit to the United States of America the following:

a.   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

23.   Pursuant to Title 18, United States Code, Section 981(a)(1)(c), as incorporated by Title 28, United States Code, Section 2461(c), any defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has

been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL


                                        /S/
                                        Foreperson


E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRETT A. SAGEL
Assistant United States Attorney
Chief, Corporate and Securities
    Fraud Strike Force

ALEXANDER B. SCHWAB
Assistant United States Attorney
Deputy Chief, Corporate and
    Securities Fraud Strike Force

DAVID H. CHAO
Assistant United States Attorney
Deputy Chief, General Crimes Section

21

# COMPOSITE EXHIBIT 3

 Outlook

**Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Tue 11/26/2024 12:09 PM

**To** Paul Bilzerian <paul@internationalinvestmentsltd.com>

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

IntInv000015

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000016

◯ Outlook

---

**RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Tue 11/26/2024 8:25 PM

**To**    Paul Bilzerian <paul@internationalinvestmentsltd.com>

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval. However, Steel could object to any sale. As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern. I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court. Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement. I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million. I presume this amount was previously passed onto you and/or Dan. However, in the interest of trying to reach a mutually acceptable sales price, I would be inclined to sell the Estate's claims and assets at 1.1 million. The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000. I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.


~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

IntInv000011

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me.  In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim.  As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim.  No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further.  I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

IntInv000012

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000013

IntInv000014

 Outlook

---

**RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Tue 12/3/2024 1:07 PM

**To** Paul Bilzerian <paul@internationalinvestmentsltd.com>

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary details, my legal team is proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate.  If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement.

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.


~ Brian



Brian D. Shapiro

Bankruptcy Trustee

510 S. 8th Street

Las Vegas, NV  89101

(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that**

you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval. However, Steel could object to any sale. As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern. I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court. Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement. I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million. I presume this amount was previously passed onto you and/or Dan. However, in the interest of trying to reach a mutually acceptable sales price, I would be inclined to sell the Estate's claims and assets at 1.1 million. The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000. I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.


~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101

IntInv000033

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me. In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim. As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim. No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further. I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

IntInv000035

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) named above and may contain information that is privileged, confidential, proprietary, or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000036

 Outlook

---

**RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Tue 12/3/2024 4:20 PM

**To**    Paul Bilzerian <paul@internationalinvestmentsltd.com>

📎 1 attachment (586 KB)

23-13871 Non-Individual Summary of Assets and Liabilities, Schedule[s] A_B, C, D, E_F, G, H, Declaration Concerning Debtor[s] Schedules, , 20 Largest Unsecured Creditors Non-Individual , Statement of .pdf;

Paul:

To ensure a favorable outcome for you and/or the entity, I would propose implementing certain "stalking horse" protections. Specifically, if the initial sale bid is set at $1.1 million, any overbids would need to start at $1.5 million. Should you not succeed as the highest bidder, you would be entitled to a breakup fee ranging from 5% to 10% of the initial purchase price, which compensates for your initial commitment and effort.

Attached are the asset schedules of Blitz, detailing disclosed assets. It appears, though not definitively confirmed, that the estate may include various intellectual property rights, such as trademarks, domain names and social media accounts associated with Dan. Further, it appears to me that there are direct claims against Dan and a variety of his entities, including Goat Airways, Bilzerian Entertainment and Uninclusive Agency LLC.   There could be an alter ego claim as well. We are still investigating as to whether the Estate has an equitable claim to the ownership of the home on Meadowlark Lane.   These potential claims add significant litigation value.

Regarding the potential distribution of proceeds from the sale, the following is a preliminary outline based on statutory priorities, which is subject to further detailed analysis:

| Description | Amount | Balance |
|---|---|---|
| Proceeds | $1,100,000 | $1,100,000 |
| Potential Administrative Expense Claims | $150,000 | $950,000 |
| Potential State/Federal Tax Claims | $350,000 | $600,000 |
| Payment to Steel | $600,000 | $0.00 |
| Excess Proceeds to Debtor | | |

In your email, as an example, you listed International Investments Ltd. as a claimant.  The Schedules do list an amount owed of $3,937,803.91 but no proof of claim was filed.  A proof of claim is required to be filed to obtain any type of payment.  Assuming it has a claim, it should file a proof of claim.  This would be a late filed claim and subordinated to Steel's claim. If such claim is valid, then I may be inclined to litigate the Steel Claim because any funds saved would go to International Investments Ltd. and then to the Debtor.

IntInv000017

I will await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 10:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for following up.  We are still interested in acquiring the assets and the discussions are ongoing.  Some of the concerns are that if Ignite made a bid, it would essentially be a stalking horse that would only begin the bidding process.  In addition, Ignite is dealing with many challenges and wants to make good use of its limited resources.  Can you provide us with a detailed list of assets that would be purchased, including a list of specific legal claims?  Also, for sake of our analysis, assuming the estate received $1 million, please give us your best judgment of how that money would be disbursed amongst the creditors, including tax authorities, and administrative expenses.  [E.g., $350,000 to Steel; $350,000 to International Investments, $100,000 to state and federal tax authorities; $200,000 to administrative expenses].  We appreciate your wish to bring the case forward to a close.  Once we receive this information, we will provide you with our final position within seven days.  Thanks for your patience.

Best regards,

Paul A. Bilzerian
Consultant

IntInv000018

IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 2:05 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary details, my legal team is proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate.  If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement.

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.


~ Brian



Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

IntInv000019

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval. However, Steel could object to any sale. As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern. I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court. Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement. I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million. I presume this amount was previously passed onto you and/or Dan. However, in the interest of trying to reach a mutually acceptable sales price, I would be inclined to sell the Estate's claims and assets at 1.1 million. The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000. I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.

~ Brian

IntInv000020

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV 89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me. In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim. As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim. No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further. I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000

IntInv000021

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that**

IntInv000022

**you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000023

 Outlook

---

**RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

From  Trustee Brian Shapiro <brian@trusteeshapiro.com>

Date  Tue 12/3/2024 5:33 PM

To     Paul Bilzerian <paul@internationalinvestmentsltd.com>

Paul:

Regarding your inquiries, in Chapter 11 proceedings, a claim that is not disputed on the schedules is typically deemed allowed unless otherwise objected.  However, in Chapter 7 cases, a proof of claim must be filed within the specified timeframe, or it risks being subordinated to other timely filed claims.  That is the current situation with International Investments' status, it currently does not have any claim in the case because it is a Chapter 7.  If it files a claim, then it will be subordinated to Steel's claim.

Concerning Steel's hypothetical offer, I would not be inclined to accept it unless it were an all-cash, particularly if International Investments decides to file a claim. Accepting offers that are not strictly cash could complicate the comparison and valuation process.

I note that I obviously do not represent you nor any proposed purchaser so my comments should not be construed as providing legal advice and obtaining independent legal advice to confirm my comments should be considered.

I hope this clarifies the situation.  Let me know if that makes sense to you or if you have any further comments/questions.

~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

IntInv000024

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 1:48 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you.  International Investments was under the impression that because Blitz listed the claim, a proof of claim was not required. Were they misinformed?  One last question, if Steel submits a competing bid based on its $2.8 million claim how would that have to be resolved? Ignite does not want to be in a position where it bids $1.1 million and Steel bids $2.8 million plus $500,00 in cash to pay the other claims for a total of $3.3 million. It would appear the only way to avoid this scenario is to contest the Steel claim or get Steel to agree to reduce it to the settlement amount of $486,000.  This is the primary obstacle that has kept Ignite from making an offer.  I apologize for all the questions, but I promised you an answer by December 10 and plan to keep that promise. Your answers have been very helpful and if I could ask for the final answers to these questions that should do it.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 5:19 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Paul:

To ensure a favorable outcome for you and/or the entity, I would propose implementing certain "stalking horse" protections. Specifically, if the initial sale bid is set at $1.1 million, any overbids would need to start at $1.5 million. Should you not succeed as the highest bidder, you would be entitled to a breakup fee ranging from 5% to 10% of the initial purchase price, which compensates for your initial commitment and effort.

Attached are the asset schedules of Blitz, detailing disclosed assets. It appears, though not definitively confirmed, that the estate may include various intellectual property rights, such as trademarks, domain names and social media accounts associated with Dan. Further, it appears to me that there are direct claims against Dan and a variety of his entities, including Goat Airways,

Initny000025

Bilzerian Entertainment and Uninclusive Agency LLC.   There could be an alter ego claim as well. We are still investigating as to whether the Estate has an equitable claim to the ownership of the home on Meadowlark Lane.   These potential claims add significant litigation value.

Regarding the potential distribution of proceeds from the sale, the following is a preliminary outline based on statutory priorities, which is subject to further detailed analysis:

| Description | Amount | Balance |
| --- | --- | --- |
| Proceeds | $1,100,000 | $1,100,000 |
| Potential Administrative Expense Claims | $150,000 | $950,000 |
| Potential State/Federal Tax Claims | $350,000 | $600,000 |
| Payment to Steel | $600,000 | $0.00 |
| Excess Proceeds to Debtor | | |

In your email, as an example, you listed International Investments Ltd. as a claimant.  The Schedules do list an amount owed of $3,937,803.91 but no proof of claim was filed.  A proof of claim is required to be filed to obtain any type of payment.  Assuming it has a claim, it should file a proof of claim.  This would be a late filed claim and subordinated to Steel's claim. If such claim is valid, then I may be inclined to litigate the Steel Claim because any funds saved would go to International Investments Ltd. and then to the Debtor.

I will await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

TNTInv000026

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 10:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for following up.  We are still interested in acquiring the assets and the discussions are ongoing.  Some of the concerns are that if Ignite made a bid, it would essentially be a stalking horse that would only begin the bidding process.  In addition, Ignite is dealing with many challenges and wants to make good use of its limited resources.  Can you provide us with a detailed list of assets that would be purchased, including a list of specific legal claims?  Also, for sake of our analysis, assuming the estate received $1 million, please give us your best judgment of how that money would be disbursed amongst the creditors, including tax authorities, and administrative expenses.  [E.g., $350,000 to Steel; $350,000 to International Investments, $100,000 to state and federal tax authorities; $200,000 to administrative expenses].  We appreciate your wish to bring the case forward to a close.  Once we receive this information, we will provide you with our final position within seven days.  Thanks for your patience.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 2:05 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary details, my legal team is proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate.  If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement. <span>IntInv000027</span>

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.


~ Brian



Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval.  However, Steel could object to any sale.   As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern.  I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court.  Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement.  I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

IntInv000028

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million.  I presume this amount was previously passed onto you and/or Dan.   However, in the interest of trying to reach a mutually acceptable sales price,  I would be inclined to sell the Estate's claims and assets at 1.1 million.  The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000.  I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.


~ Brian


Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

IntInv000029

Dear Brian,

Thank you for reaching out to me.  In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim. As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim.  No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further.  I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could

IntInv000030

represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro

Bankruptcy Trustee

510 S. 8th Street

Las Vegas, NV  89101

(t) 702-386-8600; (f) 702-383-0994

*** **It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com** ***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000031

 Outlook

---

RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

---

From  Trustee Brian Shapiro <brian@trusteeshapiro.com>
Date  Wed 12/11/2024 5:42 PM
To     Paul Bilzerian <paul@internationalinvestmentsltd.com>

Paul:

I am just following up as I have not received a response from you.

` Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 2:46 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you so much. That is all I need.

IntInv000037

Best wishes,

Paul

On Dec 3, 2024, at 6:33 PM, Trustee Brian Shapiro <brian@trusteeshapiro.com> wrote:

Paul:

Regarding your inquiries, in Chapter 11 proceedings, a claim that is not disputed on the schedules is typically deemed allowed unless otherwise objected.  However, in Chapter 7 cases, a proof of claim must be filed within the specified timeframe, or it risks being subordinated to other timely filed claims.  That is the current situation with International Investments' status, it currently does not have any claim in the case because it is a Chapter 7.  If it files a claim, then it will be subordinated to Steel's claim.

Concerning Steel's hypothetical offer, I would not be inclined to accept it unless it were an all-cash, particularly if International Investments decides to file a claim. Accepting offers that are not strictly cash could complicate the comparison and valuation process.

I note that I obviously do not represent you nor any proposed purchaser so my comments should not be construed as providing legal advice and obtaining independent legal advice to confirm my comments should be considered.

I hope this clarifies the situation.  Let me know if that makes sense to you or if you have any further comments/questions.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

IntInv000038

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 1:48 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you.  International Investments was under the impression that because Blitz listed the claim, a proof of claim was not required. Were they misinformed?  One last question, if Steel submits a competing bid based on its $2.8 million claim how would that have to be resolved? Ignite does not want to be in a position where it bids $1.1 million and Steel bids $2.8 million plus $500,00 in cash to pay the other claims for a total of $3.3 million. It would appear the only way to avoid this scenario is to contest the Steel claim or get Steel to agree to reduce it to the settlement amount of $486,000.  This is the primary obstacle that has kept Ignite from making an offer.  I apologize for all the questions, but I promised you an answer by December 10 and plan to keep that promise. Your answers have been very helpful and if I could ask for the final answers to these questions that should do it.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 5:19 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Paul:

To ensure a favorable outcome for you and/or the entity, I would propose implementing certain "stalking horse" protections. Specifically, if the initial sale bid is set at $1.1 million, any overbids would need to start at $1.5 million. Should you not succeed as the highest bidder, you would be entitled to a breakup fee ranging from 5% to 10% of the initial purchase price, which compensates for your initial commitment and effort.

Attached are the asset schedules of Blitz, detailing disclosed assets. It appears, though not definitively confirmed, that the estate may include various intellectual property rights, such as trademarks, domain names and social media accounts associated with Dan.

Further, it appears to me that there are direct claims against Dan and a variety of his entities, including Goat Airways, Bilzerian Entertainment and Uninclusive Agency LLC. There could be an alter ego claim as well. We are still investigating as to whether the Estate has an equitable claim to the ownership of the home on Meadowlark Lane. These potential claims add significant litigation value.

Regarding the potential distribution of proceeds from the sale, the following is a preliminary outline based on statutory priorities, which is subject to further detailed analysis:

| Description | Amount | Balance |
| --- | --- | --- |
| Proceeds | $1,100,000 | $1,100,000 |
| Potential Administrative Expense Claims | $150,000 | $950,000 |
| Potential State/Federal Tax Claims | $350,000 | $600,000 |
| Payment to Steel | $600,000 | $0.00 |
| Excess Proceeds to Debtor | | |

In your email, as an example, you listed International Investments Ltd. as a claimant. The Schedules do list an amount owed of $3,937,803.91 but no proof of claim was filed. A proof of claim is required to be filed to obtain any type of payment. Assuming it has a claim, it should file a proof of claim. This would be a late filed claim and subordinated to Steel's claim. If such claim is valid, then I may be inclined to litigate the Steel Claim because any funds saved would go to International Investments Ltd. and then to the Debtor.

I will await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact

IntInv000040

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 10:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for following up.  We are still interested in acquiring the assets and the discussions are ongoing.  Some of the concerns are that if Ignite made a bid, it would essentially be a stalking horse that would only begin the bidding process.  In addition, Ignite is dealing with many challenges and wants to make good use of its limited resources.  Can you provide us with a detailed list of assets that would be purchased, including a list of specific legal claims?  Also, for sake of our analysis, assuming the estate received $1 million, please give us your best judgment of how that money would be disbursed amongst the creditors, including tax authorities, and administrative expenses.  [E.g., $350,000 to Steel; $350,000 to International Investments, $100,000 to state and federal tax authorities; $200,000 to administrative expenses].  We appreciate your wish to bring the case forward to a close.  Once we receive this information, we will provide you with our final position within seven days.  Thanks for your patience.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 2:05 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary

details, my legal team is proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate. If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement.

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.


~ Brian



Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

IntInv000042

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval.  However, Steel could object to any sale.  As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern.  I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court.  Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement.  I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million.  I presume this amount was previously passed onto you and/or Dan.   However, in the interest of trying to reach a mutually acceptable sales price,  I would be inclined to sell the Estate's claims and assets at 1.1 million.  The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000.  I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.


~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.

IntInv000043

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me.  In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim.  As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim.  No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further.  I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000045

O Outlook

---

**RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

From   Trustee Brian Shapiro <brian@trusteeshapiro.com>

Date   Fri 12/13/2024 4:56 PM

To     Paul Bilzerian <paul@internationalinvestmentsltd.com>

Thank you for the update, and no worries at all. I understand how schedules can shift unexpectedly. I appreciate you keeping me informed.

I look forward to discussing the Blitz offer on Monday.

Have a nice weekend.

~ B

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV 89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Friday, December 13, 2024 1:26 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

IntInv000046

I am terribly sorry but we were not able to address the Blitz offer at today's meeting, but it has been rescheduled to Monday morning. They say the road to Hell is paved with the best of intentions; I am beginning to feel there might be something to that. Have a great weekend.


Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Wednesday, December 11, 2024 6:59 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

I am so sorry. The management has tried to get together every day this work and have finally scheduled a time on Friday when we will all have time to finalize discussions. I am highly confident Ignite will submit an offer to you and we should be in a position to do it on Friday. Thank you for your patience.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Wednesday, December 11, 2024 6:42 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Paul:

I am just following up as I have not received a response from you.

` Brian

IntInv000047

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV 89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 2:46 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you so much. That is all I need.

Best wishes,

Paul

> On Dec 3, 2024, at 6:33 PM, Trustee Brian Shapiro <brian@trusteeshapiro.com> wrote:

Paul:

Regarding your inquiries, in Chapter 11 proceedings, a claim that is not disputed on the schedules is typically deemed allowed unless otherwise objected. However, in Chapter 7 cases, a proof of claim must be filed within the specified timeframe, or it risks being subordinated to other timely filed claims. That is the current situation with International Investments' status, it currently does not have any claim in the case because it is a Chapter 7. If it files a claim, then it will be subordinated to Steel's claim.

Concerning Steel's hypothetical offer, I would not be inclined to accept it unless it were an all-cash, particularly if International Investments decides to file a claim. Accepting

IntInv000048

offers that are not strictly cash could complicate the comparison and valuation process.

I note that I obviously do not represent you nor any proposed purchaser so my comments should not be construed as providing legal advice and obtaining independent legal advice to confirm my comments should be considered.

I hope this clarifies the situation. Let me know if that makes sense to you or if you have any further comments/questions.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV 89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 1:48 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you. International Investments was under the impression that because Blitz listed the claim, a proof of claim was not required. Were they misinformed? One last question, if Steel submits a competing bid based on its $2.8 million claim how would that have to be resolved? Ignite does not want to be in a position where it bids $1.1 million and Steel bids $2.8 million plus $500,00 in cash to pay the other claims for a total of $3.3 million. It would appear the only way to avoid this scenario is to contest the Steel claim or get Steel to agree to reduce it to the settlement amount of $486,000. This is the primary obstacle that has kept Ignite from making an offer. I apologize for all the questions, but I

promised you an answer by December 10 and plan to keep that promise. Your answers have been very helpful and if I could ask for the final answers to these questions that should do it.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 5:19 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Paul:

To ensure a favorable outcome for you and/or the entity, I would propose implementing certain "stalking horse" protections. Specifically, if the initial sale bid is set at $1.1 million, any overbids would need to start at $1.5 million. Should you not succeed as the highest bidder, you would be entitled to a breakup fee ranging from 5% to 10% of the initial purchase price, which compensates for your initial commitment and effort.

Attached are the asset schedules of Blitz, detailing disclosed assets. It appears, though not definitively confirmed, that the estate may include various intellectual property rights, such as trademarks, domain names and social media accounts associated with Dan. Further, it appears to me that there are direct claims against Dan and a variety of his entities, including Goat Airways, Bilzerian Entertainment and Uninclusive Agency LLC. There could be an alter ego claim as well.  We are still investigating as to whether the Estate has an equitable claim to the ownership of the home on Meadowlark Lane.   These potential claims add significant litigation value.

Regarding the potential distribution of proceeds from the sale, the following is a preliminary outline based on statutory priorities, which is subject to further detailed analysis:

| Description | Amount | Balance |
|---|---|---|
| Proceeds | $1,100,000 | $1,100,000 |
| Potential Administrative Expense Claims | $150,000 | $950,000 |
| Potential State/Federal Tax Claims | $350,000 | $600,000 |
| Payment to Steel | $600,000 | $0.00 |
| Excess Proceeds to Debtor | | |

IntInv000050

In your email, as an example, you listed International Investments Ltd. as a claimant. The Schedules do list an amount owed of $3,937,803.91 but no proof of claim was filed. A proof of claim is required to be filed to obtain any type of payment. Assuming it has a claim, it should file a proof of claim. This would be a late filed claim and subordinated to Steel's claim. If such claim is valid, then I may be inclined to litigate the Steel Claim because any funds saved would go to International Investments Ltd. and then to the Debtor.

I will await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 10:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for following up.  We are still interested in acquiring the assets and the discussions are ongoing.  Some of the concerns are that if Ignite made a bid, it would essentially be a stalking horse that would only begin the bidding process.  In addition, Ignite is dealing with many challenges and wants to make good use of its limited resources.  Can you provide us with a detailed list of assets that would

be purchased, including a list of specific legal claims?  Also, for sake of our analysis, assuming the estate received $1 million, please give us your best judgment of how that money would be disbursed amongst the creditors, including tax authorities, and administrative expenses.  [E.g., $350,000 to Steel; $350,000 to International Investments, $100,000 to state and federal tax authorities; $200,000 to administrative expenses].  We appreciate your wish to bring the case forward to a close.  Once we receive this information, we will provide you with our final position within seven days.  Thanks for your patience.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 2:05 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary details, my legal team is proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate.  If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement.

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul:

Thank you for your response.

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval.  However, Steel could object to any sale.   As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern.  I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court.  Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement.  I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million.  I presume this amount was previously passed onto you and/or Dan.   However, in the interest of trying to reach a

IntInv000053

mutually acceptable sales price, I would be inclined to sell the Estate's claims and assets at 1.1 million. The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000. I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV 89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me. In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim. As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim. No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

IntInv000054

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further. I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

IntInv000055

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000056

Outlook

---

Re: 2023 balance sheet.pdf

---

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Thu 12/19/2024 11:00 AM

**To** Paul Bilzerian <paul@internationalinvestmentsltd.com>

**Cc** Scott Rohleder <scott.rohleder@ignite.co>; Rupy Dhadwar <rupy.dhadwar@ignite.co>; John Schaefer <john.schaefer@ignite.co>; Michalis Voulelis <michalis.voulelis@ignite.co>; Kristin Shapiro <kshapiro@brianshapirolaw.com>

Dear Paul,

Thank you for your update. I've reviewed the recently filed motion to dismiss and now have a clearer understanding of the underlying concerns surrounding the situation. It's evident the stakes are high, and the challenges (both on a personal and business level) are significant.

I'm truly sorry to hear that this season has not brought more joy to you and your wife. As a parent, I can only imagine the strain such circumstances must impose on both of you, and my thoughts are with your family during this trying time.

I appreciate your efforts to keep the lines of communication open and to move forward with the negotiation to acquire the Blitz assets.

Please know that I am here to assist in any way I can to facilitate a smooth process.

I will await your response next week.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work

IntInv000057

product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.3~~~~~~~~~ and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Thursday, December 19, 2024 4:00:05 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Cc:** Scott Rohleder <scott.rohleder@ignite.co>; Rupy Dhadwar <rupy.dhadwar@ignite.co>; John Schaefer <john.schaefer@ignite.co>; Michalis Voulelis <michalis.voulelis@ignite.co>
**Subject:** Re: 2023 balance sheet.pdf

Dear Brian,

The Ignite Board of Directors authorized the management team to negotiate the terms of an offer to acquire the assets of Blitz and to make an offer if the terms were acceptable to management.  Today we have a complete full plate which will end with the Ignite shareholders meeting that will put an end to the dispute with Dan over control of Ignite.  Tomorrow we have a film crew that will consume the day preparing a documentary to address the bogus indictment of Ignite, Scott and me.  We have scheduled a management meeting on Monday to, among other things, finalize a proposed offer to acquire the Blitz assets. I appreciate your understanding and patience.  This has not been a happy holiday season for my wife and I but I am hoping it will be for you and your family.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 17, 2024 3:53 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** 2023 balance sheet.pdf

IntInv000058

Outlook

---

**Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

From  Trustee Brian Shapiro <brian@trusteeshapiro.com>

Date  Wed 1/8/2025 6:18 PM

To      Paul Bilzerian <paul@internationalinvestmentsltd.com>

Dear Paul:

I am reaching out once again regarding the Blitz matter, as I need to provide my counsel with instructions on how to proceed with various claims owned by the Estate.

From my perspective and as we discussed, it seems logical to sell all assets and claims that the Estate may have to Ignite and/or its assignees. This approach would consolidate ownership of any claims against Dan and his related entities, as well as any claims the Estate might hold against Ignite, including those tied to the trademarks.  It was my understanding that you believed that Ignite was agreeable to purchase any and all assets and claims but were waiting for the conclusion of the shareholder and directors meeting.  At that time, Ignite would make a formal offer.  Unfortunately, no offer has been made since the conclusion of those meetings.

If Ignite or one of its assignees remains interested, then I need to finalize this matter promptly and to place the funds for the sale in trust pending court approval (i.e. in Garman Turner Garman's Trust Account or my Trust Account).

I am hopeful that you can promptly respond to my inquiry.

~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.

IntInv000001

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000002

**Outlook**

---

**23-13871 BLITZ NV, LLC RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry**

---

**From** Trustee Brian Shapiro <brian@trusteeshapiro.com>

**Date** Tue 1/14/2025 11:15 AM

**To** Paul Bilzerian <paul@internationalinvestmentsltd.com>

**Cc** Scott Rohleder <scott.rohleder@ignite.co>; Rupy Dhadwar <rupy.dhadwar@ignite.co>; Michalis Voulelis <michalis.voulelis@ignite.co>; John Schaefer <john.schaefer@ignite.co>; Kristin Shapiro <kshapiro@brianshapirolaw.com>

---

Dear Paul:

Thank you for your email. I am agreeable to the $650,000.00 offer. While I acknowledge that the breakup fee is high, I understand the reasoning behind your request.

That said, I do have a few requests:

1. I would need the agreement finalized by the end of January.  I am hopeful that counsel, which I believe is Garman Turner Gordon, can draft the agreement promptly.
2. Upon execution of the agreement, the funds should be promptly placed in either my trust account or Garman Turner Gordon's Trust Account and are deemed property of the bankruptcy estate unless the Court does not approve the agreement.

I trust these terms will be acceptable, and I look forward to confirmation.

~ Brian



Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

IntInv000003

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Friday, January 10, 2025 11:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Cc:** Scott Rohleder <scott.rohleder@ignite.co>; Rupy Dhadwar <rupy.dhadwar@ignite.co>; Michalis Voulelis <michalis.voulelis@ignite.co>; John Schaefer <john.schaefer@ignite.co>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

First, thank you for your considerable patience and understanding.  The Ignite management team has determined Ignite is prepared to make an offer to acquire all the assets of Blitz for $650,000.  Although I know this is less than you were expecting, we spent some considerable time trying to evaluate the assets Ignite would be actually recovering and it turned out to be quite a bit less than we hoped.  First, it appears Blitz has no valuable trademarks, at least that we could identify.  It also appears Blitz does not own any social media accounts.  The major asset would be the claim against Steel but that is quite complicated based on the status of the case in Florida.  Ignite would have to appeal the summary judgment in the Florida case, win, and then prosecute Blitz's claim against Steel.  A more realistic scenario would be a settlement that paid Steel $450,000 and an exchange of releases eviscerating any claim against Steel.  There are claims against Dan's other companies, but we do not believe they have any meaningful assets.  The only other assets might be some difficult claims against Dan but they will likely cost more than they are worth.  If you see any other valuable assets we would be happy to reconsider the amount of the offer but it difficult to even justify $650,000.  If this offer is reasonable to you, we would like to add a break fee of $250,000 and hire counsel to submit it to you.  Thank you, Brian.


Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 5:19 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Paul:

To ensure a favorable outcome for you and/or the entity, I would propose implementing certain "stalking horse" protections. Specifically, if the initial sale bid is set at $1.1 million, any overbids would need to start at $1.5 million. Should you not succeed as the highest bidder, you would be

Hunnwood4

entitled to a breakup fee ranging from 5% to 10% of the initial purchase price, which compensates for your initial commitment and effort.

Attached are the asset schedules of Blitz, detailing disclosed assets. It appears, though not definitively confirmed, that the estate may include various intellectual property rights, such as trademarks, domain names and social media accounts associated with Dan. Further, it appears to me that there are direct claims against Dan and a variety of his entities, including Goat Airways, Bilzerian Entertainment and Uninclusive Agency LLC.   There could be an alter ego claim as well. We are still investigating as to whether the Estate has an equitable claim to the ownership of the home on Meadowlark Lane.   These potential claims add significant litigation value.

Regarding the potential distribution of proceeds from the sale, the following is a preliminary outline based on statutory priorities, which is subject to further detailed analysis:

| Description | Amount | Balance |
| --- | --- | --- |
| Proceeds | $1,100,000 | $1,100,000 |
| Potential Administrative Expense Claims | $150,000 | $950,000 |
| Potential State/Federal Tax Claims | $350,000 | $600,000 |
| Payment to Steel | $600,000 | $0.00 |
| Excess Proceeds to Debtor | | |

In your email, as an example, you listed International Investments Ltd. as a claimant.  The Schedules do list an amount owed of $3,937,803.91 but no proof of claim was filed.  A proof of claim is required to be filed to obtain any type of payment.  Assuming it has a claim, it should file a proof of claim.  This would be a late filed claim and subordinated to Steel's claim. If such claim is valid, then I may be inclined to litigate the Steel Claim because any funds saved would go to International Investments Ltd. and then to the Debtor.

I will await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office

**before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, December 3, 2024 10:42 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for following up. We are still interested in acquiring the assets and the discussions are ongoing. Some of the concerns are that if Ignite made a bid, it would essentially be a stalking horse that would only begin the bidding process. In addition, Ignite is dealing with many challenges and wants to make good use of its limited resources. Can you provide us with a detailed list of assets that would be purchased, including a list of specific legal claims? Also, for sake of our analysis, assuming the estate received $1 million, please give us your best judgment of how that money would be disbursed amongst the creditors, including tax authorities, and administrative expenses. [E.g., $350,000 to Steel; $350,000 to International Investments, $100,000 to state and federal tax authorities; $200,000 to administrative expenses]. We appreciate your wish to bring the case forward to a close. Once we receive this information, we will provide you with our final position within seven days. Thanks for your patience.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, December 3, 2024 2:05 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul,

I hope you enjoyed the recent holiday weekend.

I am writing to follow up on our previous communications regarding the potential sale of the estate's assets. As I have yet to receive your feedback on my prior email, I wanted to inform you that in the interest of advancing the Estate's claims and securing all necessary details, my legal team is

IntInv000006

proceeding with preparations for depositions and further discovery. This process is expected to be thorough and, inevitably, costly.

To mitigate these expenses, I am keen on reaching a resolution that avoids extensive legal fees by selling the assets of the estate.  If there is still interest on your end in acquiring the estate's assets, I would appreciate your prompt engagement to explore a potential sale agreement.

Could you please provide an update on your considerations concerning this proposal? Your timely response will be greatly appreciated as it will help guide my next steps.

Thank you for your attention to this matter and I await your response.

~ Brian

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

---

**From:** Trustee Brian Shapiro
**Sent:** Tuesday, November 26, 2024 5:25 PM
**To:** 'Paul Bilzerian' <paul@internationalinvestmentsltd.com>
**Subject:** RE: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Paul:

Thank you for your response.

IntInv000007

Please keep in mind that any sale is only subject to my business judgment and the Bankruptcy Court's approval. However, Steel could object to any sale. As to whether Steel is entitled to approximately $500K or $500 million is not really my main concern. I do have a fiduciary duty to all of the creditors of the estate but my business judgment, provided I can articulate a valid reason, usually is persuasive to the Court. Steel filed a claim for $2,887,837.87 and have taken a differing opinion as to the validity of the settlement. I do believe that they have some arguments to support such claim, but I am not convinced that they would prevail.

As to a plan of reorganization, considering the Court's comments on denying the DIP financing and decision on conversion, I do not believe that the Court would look favorably to myself attempting to reorganize a business that has no operations.

As to a sale amount, I have no desire to negotiate against myself, but I did authorize my counsel to advise parties that I would sell the assets at 1.5 million. I presume this amount was previously passed onto you and/or Dan. However, in the interest of trying to reach a mutually acceptable sales price, I would be inclined to sell the Estate's claims and assets at 1.1 million. The 1.1 million would be utilized to pay all of the administrative expenses and tax claims which would result in an amount paid to Steel, if I do not object to their claim, in an amount of approximately $620,000. I recognize that this amount is more than the purported settlement, but it avoids the potential claim of $2.8 million.

Again, thank you for responding and I await your response.


~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***


**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests. It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

TMTFIV000008

**From:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Sent:** Tuesday, November 26, 2024 11:48 AM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Subject:** Re: Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Brian,

Thank you for reaching out to me.  In order to address whether it would make sense to acquire the assets and claims of Blitz, we would need to address an important issue regarding the Steel claim.  As you know, a settlement was reached in the Florida case where the parties agreed Blitz would pay Steel $486,868.43 to settle the case. For various reasons, Blitz filed bankruptcy instead and Steel filed its claim.  No judgment was entered in the Steel case. How much would the Chapter 7 bankruptcy estate realistically require to satisfy the claims and pay the fees?

Alternatively, if the Chapter 7 were converted to a Chapter 11 and Ignite were to propose a plan to acquire Blitz (rather than just its assets and claims) and liquidate its debts, one of which is to Steel, how much would be required to get a Chapter 11 Reorganization Plan confirmed?

If you can provide me with your estimates of what would be required of Ignite under these two scenarios, I will talk with the Ignite management and then arrange a call to discuss it further.  I do think there might be a deal here if the numbers work.

Best regards,

Paul A. Bilzerian
Consultant
IIC Management Company, Ltd.
858 Zenway Boulevard
Frigate Bay, St. Kitts
P.O. Box 2086
Basseterre, St. Kitts
Office: (869) 466-8000
Cell: (869) 660-7347
US No. (813) 260-4973

---

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, November 26, 2024 1:08 PM
**To:** Paul Bilzerian <paul@internationalinvestmentsltd.com>
**Subject:** Dan Bilzerian and Blitz Bankruptcy Estate Inquiry

Dear Mr. Bilzerian:

As the appointed bankruptcy trustee for the Blitz bankruptcy estate currently under proceedings in Las Vegas, I am tasked with overseeing and resolving the estate's affairs. It has come to my attention that your son, Dan, has initiated litigation against you and Ignite in the Nevada Federal District Court. I understand that you are likely preparing to defend against this action.

In reviewing the estate's holdings, it appears that the Blitz Bankruptcy Estate possesses a range of potential causes of action against Dan and his associated entities. These claims, integral to the estate, may present a strategic opportunity for you in the ongoing litigation.

Given this situation, I am contacting you to see if you wish to explore the possibility of you acquiring all assets and claims held by the Blitz Bankruptcy Estate. Acquiring these could shift your

IntInv000009

position from defensive to potentially offensive in the current lawsuit, offering a unique strategic advantage.

Should this proposal interest you, I invite you to engage in a discussion to further explore this opportunity. Please feel free to contact me at your earliest convenience to discuss the potential benefits this acquisition could hold for you in the context of your legal strategies. This could represent a pivotal shift in your approach to the pending litigation, turning a defensive posture into an assertive, proactive one.

~ Brian Shapiro

Brian D. Shapiro
Bankruptcy Trustee

510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

**\*\*\* It is requested that all emails be copied to Kristin, my assistant, at kshapiro@brianshapirolaw.com \*\*\***

**FRAUD ALERT: If you receive an email from this office requesting that you wire or otherwise transfer funds, to protect yourself, please confirm the request and any corresponding instructions by telephone with this office before you initiate any transfer. Email accounts of attorneys, trustees, and other legal professionals are targets of cyber criminals that use information in an attempt to initiate fraudulent wire requests.  It is recommended that you independently research our contact information to confirm instructions and do not rely on information contained in an email signature block.**

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

IntInv000010

# EXHIBIT 4

**First National Bank** **Outgoing Wire Form**

Date of Input: **11/22/2022 3:05 PM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$500,000.00, America (United States) Dollars - USD**

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **SCOTT J ROHLEDER**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **08/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **122400724**

Beneficiary Bank Name: **BANK OF AMERICA**

Beneficiary Bank City: **NEW YORK**

Beneficiary Bank State: **NY**

Beneficiary Bank Authorized Account #: **229002909029**

Beneficiary Name: **DAN B BILZERIAN**

Beneficiary Street Address: **6005 LAS VEGAS BLVD SOUTH ST**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV  89119**

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

CUSTOMER'S SIGNATURE

Sign:_____ **SCOTT J ROHLEDER**

Sign:_____

WIRE REQUESTED BY

Date Requested: **11/22/2022 3:05 PM**

Approved By:_____ **JOSEPH ORLANDODOBERT**

Verified By:_____ **JANET BOWEN**

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt
of a copy signed by the above signed of this Payment Order and Agreement.

IntInv000059

11/22/2022

Outgoing Wire Form

 First National Bank **Outgoing Wire Form**

Date of Input: **1/5/2023 11:07 AM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$500,000.00, America (United States) Dollars - USD**

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **Scott J Rohleder**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **08/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **026009593**

Beneficiary Bank Name: **BANK OF AMERICA**

Beneficiary Bank City: **NEW YORK**

Beneficiary Bank State: **NY**

Beneficiary Bank Authorized Account #: **229002909029**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: **6005 LAS VEGAS BLVD SOUTH SU**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV  89119**

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

CUSTOMER'S SIGNATURE

Sign:_____Scott J Rohleder

Sign:_____

WIRE REQUESTED BY

Date Requested: 1/5/2023 11:07 AM

Approved By:_____JOSEPH ORLANDODOBERT

Verified By:_____JANET BOWEN

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt

of a copy signed by the above signed of this Payment Order and Agreement

IntInv000060



# First National Bank **Outgoing Wire Form**

Date of Input: **1/30/2023 2:39 PM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$500,000.00, America (United States) Dollars - USD**

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **Scott J Rohleder**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **09/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **121000248**

Beneficiary Bank Name: **WELLS FARGO**

Beneficiary Bank City: **SAN FRANCISCO**

Beneficiary Bank State: **CA**

Beneficiary Bank Authorized Account #: **2981245133**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: **6005 LAS VEGAS BLVD S 7**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV  89119**

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

**He has know Dan for 15 years.  Does business with him on a regular basis.  Verified instructions with Dan.**

CUSTOMER'S SIGNATURE

Sign:_____Scott J Rohleder

Sign:_____

WIRE REQUESTED BY

Date Requested: **1/30/2023 2:39 PM**

Approved By:_____JOSEPH ORLANDODOBERT

Verified By:_____JANET BOWEN

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt

of a copy signed by the above signed of this Payment Order and Agreement.

IntInv000061

1/30/2023



**First National Bank** **Outgoing Wire Form**

Date of Input: **3/22/2023 1:02 PM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$500,000.00, America (United States) Dollars - USD**

<u>CUSTOMER INFORMATION SECTION</u>

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **SCOTT J ROHLEDER**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **08/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **4155887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

<u>BENEFICIARY INFORMATION SECTION</u>

Beneficiary Bank ABA #: **026009593**

Beneficiary Bank Name: **BANK OF AMERICA**

Beneficiary Bank City: **NEW YORK**

Beneficiary Bank State: **NY**

Beneficiary Bank Authorized Account #: **229002909029**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: **6005 LAS VEGAS BLVD SOUTH SU**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV  89119**

Wire Reason: **OERATING FUNDS**

Further Credit To or Additional Information:

<u>CUSTOMER'S SIGNATURE</u>

Sign:_____**SCOTT J ROHLEDER**

Sign:_____

<u>WIRE REQUESTED BY</u>

Date Requested: **3/22/2023 1:02 PM**

Approved By:_____**JOSEPH ORLANDODOBERT**

Verified By:_____**JANET BOWEN**

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt
of a copy signed by the above signed of this Payment Order and Agreement

IntInv000062

3/22/2023

# First National Bank **Outgoing Wire Form**

Date of Input: **4/17/2023 2:58 PM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$500,000.00, America (United States) Dollars - USD**

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **Scott J Rohleder**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **09/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **121000248**

Beneficiary Bank Name: **WELLS FARGO**

Beneficiary Bank City: **SAN FRANCISICO**

Beneficiary Bank State: **CA**

Beneficiary Bank Authorized Account #: **2981245133**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: **5990 W PATRICK LANE**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV  89118**

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

**HE HAS KNOWN DAN FOR 15 YEARS.  VERIFIED INSTRUCTIONS WITH DAN**



CUSTOMER'S SIGNATURE

Sign:_____  Scott J Rohleder

Sign:_____

WIRE REQUESTED BY

Date Requested: **4/17/2023 2:58 PM**

Approved By:_____  JOSEPH ORLANDODOBERT

Verified By:_____  JANET BOWEN



I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt
of a copy signed by the above signed of this Payment Order and Agreement

IntInv000063
4/17/2023

## First National Bank  **Outgoing Wire Form**

Date of Input: 5/17/2023 9:38 AM

Cost Center & Location: 1052, CARY PRESTON

Transfer Amount: $500,000.00, America (United States) Dollars - USD

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **Scott J Rohleder**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **09/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **Drivers License**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **121000248**

Beneficiary Bank Name: **WELLS FARGO**

Beneficiary Bank City: **SAN FRANCISCO**

Beneficiary Bank State: **CA**

Beneficiary Bank Authorized Account #: **2891245133**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: ~~6005 LAS VEGAS BLVD S 7~~  *5990 W. PATRICK Lane*

Beneficiary Street Address 2:

Beneficiary City, State & Zip: LAS VEGAS, NV ~~89119~~ *89118*

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

CUSTOMER'S SIGNATURE

Sign:_____ Scott J Rohleder

Sign:_____

WIRE REQUESTED BY

Date Requested: 5/17/2023 9:38 AM

Approved By:_____ JOSEPH ORLANDODOBERT

Verified By:_____ JANET BOWEN

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt
of a copy signed by the above signed of this Payment Order and Agreement



# First National Bank **Outgoing Wire Form**

Date of Input: **7/12/2023 12:33 PM**

Cost Center & Location: **1052, CARY PRESTON**

Transfer Amount: **$600,000.00, America (United States) Dollars - USD**

CUSTOMER INFORMATION SECTION

Paid By: **Debit**

Authorized Account Number: **95862842**

Account Type: **Checking**

Customer's Name: **ROHLEDER INC**

Signer's Name: **SCOTT J ROHLEDER**

Customer's Street Address: **125 BENDING OAK WAY**

Customer's Street Address 2:

City, State & Zip: **MORRISVILLE, NC 27560**

Customer's Telephone Number: **813-416-8198**

Customer's Date of Birth: **09/28/1963**

Customer's Taxpayer's ID Number: **307724779**

Customer's DL No./Passport No.: **41555887**

Means of Identification: **DRIVERS LICENSE**

State of Issuance: **NC**

BENEFICIARY INFORMATION SECTION

Beneficiary Bank ABA #: **121000248**

Beneficiary Bank Name: **WELLS FARGO**

Beneficiary Bank City: **SAN FRANCISCO**

Beneficiary Bank State: **CA**

Beneficiary Bank Authorized Account #: **2981245133**

Beneficiary Name: **DAN BILZERIAN**

Beneficiary Street Address: **5990 W PATRICK LANE**

Beneficiary Street Address 2:

Beneficiary City, State & Zip: **LAS VEGAS, NV 89118**

Wire Reason: **OPERATING FUNDS**

Further Credit To or Additional Information:

CUSTOMER'S SIGNATURE

Sign:_____ **SCOTT J ROHLEDER**

Sign:_____

WIRE REQUESTED BY

Date Requested: **7/12/2023 12:33 PM**

Approved By:_____ **JOSEPH ORLANDODOBERT**

Verified By: _Judith Harris_ **JUDITH HARRIS**

I hereby authorized this transfer and accept the terms and conditions, and acknowledge receipt
of a copy signed by the above signed of this Payment Order and Agreement

IntInv000065

DocuSign Envelope ID: 24BB3F37-C302-404E-9D7D-EEF0CB456F63

# BAYFIRST

: **Outgoing Wire Transfer Request Form**

Email to the Wire Department at
Wires@bayfirstfinancial.com

Member
**FDIC**

## WIRING INSTRUCTIONS

The undersigned Customer ("Customer") hereby requests BayFirst to transfer funds subject to the following specific instructions and subject to the terms and conditions set forth in the Wire Transfer Agreement which the Customer has executed, if applicable.

| Type: | Cost: $22.00 | Cutoff Time: |
|---|---|---|
| Domestic Wire | | 4:30 p.m. |

## GENERAL INFORMATION

Requested Execution Date: 09/20/2023            Wire Amount: $ 200,000.00

## SENDER INFORMATION

Authorized Sender: SCOTT ROHLEDER            SSN/TIN: 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
Account Title: ROHLEDER INC
Physical Address: 125 BENDING OAK WAY MORRISVILLE NC 27560
Account Number: 34007831            ☐ Loan ☒ Checking ☐ Savings ☐ CD ☐ GL

## RECEIVING PARTY'S INFORMATION (Beneficiary)

Beneficiary (Person receiving funds): BILZERIAN ENTERTAINMENT, LLC            ☐ Individual ☒ Company
Beneficiary's Physical Address: 5990 W. PATRICK LANE
City, State, Zip: LAS VEGAS, NV 89118
Beneficiary's Account Number : 1022028821

## FINANCIAL INSTITUTION RECEIVING FUNDS (Beneficiary's Bank)

Bank Name: ESQUIRE BANK            Bank ABA #: 026073066
Bank Physical Address: 100 JERICHO QUADRANGLE, SUITE 100
City, State, Zip: JERICHO, NY 11753

## INTERMEDIARY BANK INFORMATION (if applicable)

Bank Name: _____            Bank ABA #: _____
Bank Physical Address: _____
City, State, Zip: _____

## SPECIAL INSTRUCTIONS

Additional Information or Special Instructions:

1. This receipt is part of and is subject to all the provisions of this contract and said receipt is not negotiable.
2. Payment will be made subject to the rules and regulations of any governmental agencies, and banks or any other private agencies used in effecting payment, and BayFirst ("Bank") shall not be liable for any act or omission of any agency or correspondent employed to make such payment or for any loss or damage resulting therefrom or from the errors or delays on the part the originator or on the part of cable, radio or other communication companies in the transmission of any message relating to such payment nor for any delay in delivery or failure to deliver any such message or for any acts or loss or damage resulting from any laws, decrees, orders or regulations purporting to be effective where payment is to be made, or from any civil, military or war conditions, or from any cause beyond the control of the Bank.
3. Bank shall be held harmless if beneficiary's bank credits an account not in the intended beneficiary's name due to inconsistencies in the name or account or other identifying numbers specified in the payment order by customer. Bank shall be liable only if it acts in a grossly negligent manner or if its acts constitute willful misconduct. Without limiting the foregoing, Bank shall not be liable for any loss arising directly or indirectly from: (a) The negligence or misconduct of customer or customer's agents, (b) any ambiguity in the instructions provided to Bank, or (c) The negligent act or omission of any third party. In all cases, the Bank's liability for any act or failure to act pursuant to this authorization shall be limited to the resulting direct loss and not to any incidental, special or exemplary damages or for attorney's fees whether or not the likelihood of such damage was known or contemplated by the Bank and regardless of the legal or equitable theory of liability which customer may assert.
4. The Bank shall be under no obligation to obtain the receipt of the payee. The Bank, on request, will use reasonable efforts to trace payment; no request for tracing shall be made prior to three months from date of the order on foreign remittances.
5. If for any reason the credit covered by the remittance herein is returned or recredited to the Bank, the remitter agrees to accept refund in the amount of the equivalence in United States dollars of the amount of the foreign money credit based on the current buying rate of the Bank's correspondent bank on the date of the refund less any charges and expenses of the Bank.
6. Subject to any service charges or taxes levied by sending agents.
7. Originator understands that after this request has been processed, the funds will have been permanently transferred to the beneficiary and that a stop payment order will not be possible. This payment implements an agreement between the originator and the beneficiary. The Bank is not a party of the agreement and has no obligations other than to process the wire transfer of funds request in accordance with conditions specified herein. The originator understands that the Bank handles wire transfer requests expeditiously, but Bank cannot guarantee that requests will be completed in any specific time period.

AUTHORIZED SIGNATURE: x ___DocuSigned by:___ SCOTT ROHLEDER
13765CD58851436...

Rev: 04/26/2022

IntInv000066

# EXHIBIT 5

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM846866

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Blitz NV, LLC | | 09/26/2023 | Limited Liability Company: NEVADA |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Ignite International, Ltd. |
| Street Address: | 3308 Towerwood Drive |
| City: | Farmers Branch |
| State/Country: | TEXAS |
| Postal Code: | 75234 |
| Entity Type: | Corporation: WYOMING |

## PROPERTY NUMBERS Total: 2

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 6782632 | |
| Registration Number: | 7075665 | |

## CORRESPONDENCE DATA

| | |
|---|---|
| Fax Number: | 8132294133 |

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 8132237000 |
| Email: | trademarks@carltonfields.com |
| Correspondent Name: | William G. Giltinan |
| Address Line 1: | P.O. Box 3239 |
| Address Line 2: | IP Dept |
| Address Line 4: | Tampa, FLORIDA 33601 |

| NAME OF SUBMITTER: | William G. Giltinan |
|---|---|
| SIGNATURE: | /William G. Giltinan/ |
| DATE SIGNED: | 10/18/2023 |

**Total Attachments: 2**
source=US TM Assignment#page1.tif
source=US TM Assignment#page2.tif

CH $65.00  6782632

## ASSIGNMENT OF TRADEMARK

By this assignment having an effective date of July 1, 2022, BLITZ NV, LLC ("ASSIGNOR"), a limited liability company of Nevada, having an address of 6005 Las Vegas Blvd. South, Suite 7, Las Vegas, NV 89119, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, transfers and assigns to IGNITE INTERNATIONAL, LTD. ("ASSIGNEE"), a corporation of the state of Wyoming, having an address of 3308 Towerwood Drive, Farmers Branch, TX 75234-2317, all right, title and interest Assignor has or may have in and to the trademarks listed in **Schedule A**, including all goodwill associated therewith.

BLITZ NV, LLC

Date: 9.26.23

By: _____

Name: Jason Verong

Title: Chief Operating Officer

ASSIGNOR

SCHEDULED A

| TRADEMARK | COUNTRY | APPLICATION | FILED | REGISTRATION | REGISTERED | CLASS(ES) |
|---|---|---|---|---|---|---|
| | United States | 88/125,045 | 9/20/2018 | 6,782,632 | 7/5/2022 | 25, 35 |
| | United States | 88/985,051 | 9/20/2018 | 7,075,665 | 6/6/2023 | 33, 34 |

RECORDED: 10/18/2023

TRADEMARK
REEL: 008231 FRAME: 0790

# EXHIBIT 6

## ASSIGNMENT AND LICENSE AGREEMENT

This Assignment and License Agreement (this "Agreement"), by and between Blitz NV, LLC ("Assignor"), and Ignite International, Ltd. ("Assignee") shall be effective as of July 1, 2022_ ("Effective Date").

### WITNESSETH:

**WHEREAS**, Assignor has certain rights in the trademark applications, trademark registrations, trademarks, and service marks identified on Exhibit A attached hereto (the "Marks");

**WHEREAS**, Assignor has certain rights in the works of authorship and copyright registration(s) identified on Exhibit B attached hereto (the "Works");

**WHEREAS**, Assignee and Assignor are parties to a separate written agreement that licenses use of the Marks and Works to Assignee entitled TRADEMARK AND COPYRIGHT LICENSE AGREEMENT, effective September 28, 2018, and then amended on May 16, 2019, and again on or about September 28, 2019  (as amended, the "Original License"); and

**WHEREAS**, Assignor and Assignee hereby wish to terminate the Original License by mutual consent as of the Effective Date, assign all rights in and to the Marks and the Works from Assignor to Assignee as set forth herein, and grant a license back from Assignee to Assignor according to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants herein, and other good and valuable consideration, receipt, adequacy, and legal sufficiency of which are hereby acknowledged by Assignor and Assignee, and all parties intending to be legally bound hereby, Assignor and Assignee agree as follows:

### SECTION 1. TRADEMARK ASSIGNMENT

1.1 Assignor hereby irrevocably contributes, grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, and its successors and assigns, any and all right, title, and interest Assignor has or may have in or to the Marks, including without limitation all common law rights, rights acquired through use, license or assignment, state law rights, rights in foreign nations, all registrations and applications for registration thereof, in all states, nations, communities, and regions worldwide, and all goodwill associated therewith, together with all liabilities, duties and obligations relating to the Marks and the Registrations and Applications, all rights to file applications directed to and obtain and maintain registrations for the Marks worldwide, and all rights to bring actions and recover damages for any and all past, present and future infringements of the Marks in any and all jurisdictions throughout the world, including all rights as opponents in any opposition.

### SECTION 2. COPYRIGHT ASSIGNMENT

2.1 Assignor hereby irrevocably contributes, grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, and its successors, assigns, all right, title and interest Assignor has or may have in or to the Works in all forms and all media now existing or future-created.  For avoidance of doubt, the foregoing assignment (i) is intended to include each identified work of authorship as it exists today, and any prior versions thereof or derivative works based thereon, that may exist now or in the future, and (ii) includes, without limitation, all copyright rights, performance rights, distribution rights and rights to seek damages for past, present and future infringements or performances thereof.  Assignor consents to the filing of copyright registrations in the Works and any derivatives thereof in the name of Assignee and

129859099.2                                                                                                          Page 1 of 23

agrees to cooperate with Assignee, without charge, in connection with any such filings.

2.2 Assignor, on behalf of itself, and to the extent legally permitted, on behalf of its officers, employees, contractors and representatives, hereby waives all moral rights, attribution rights, and related rights pertaining to the Works and applications for the registration thereof.

## SECTION 3. ONGOING DISPUTES AND FURTHER ASSURANCES

3.1  Assignor understands and agrees that certain Marks or Works identified as "Opposed" in the attached exhibits are, or may be, the subject of legal disputes in their respective jurisdictions ("Disputed Marks or Works").  For all Disputed Marks and Works, the assignment of right, title and interests herein shall be effective on the earlier of (i) the date Assignee notifies Assignor of its intent to have such assignment made effective, and (ii) the date on which the applicable dispute is fully and finally resolved or settled.  For all other Marks and Works, the assignment of rights herein shall be effective as of the Effective Date.

3.2 Assignor agrees to cooperate with Assignee, upon Assignee's request, and for no additional consideration, to perfect, record, and otherwise document Assignee's rights in and to the Marks, Works and associated rights and goodwill, and all registrations and applications for registrations thereof throughout the world, including, without limitation, executing such separate assignments, certifications, and other documents as Assignee may reasonably deem necessary or desirable in maintaining such rights, filing, prosecuting or maintaining any registrations or applications, and recording and otherwise perfecting and enforcing Assignee's rights and title hereunder.

3.3  To the extent any separate assignments or similar documents are executed and/or recorded in connection with any registration or application, such separate assignment shall be deemed to be a memorialization of the transfer of rights, title, and interests described herein and, to the extent any such separate assignment or other document is inconsistent with this Assignment, the separate assignment or other document and this Assignment shall be interpreted together such that the maximum possible rights, title and interest are assigned and transferred to Assignee.

3.4 Assignor hereby authorizes Assignee, its successors and assigns, to take any appropriate action in connection with the Marks and the Works, and all related applications, registrations, goodwill, and rights assigned hereunder, in the name of the Assignor, but at Assignee's own expense.  Any nation or state, or agency or representative thereof, or individual, partnership, corporation, or other entity, may rely without further inquiry upon the powers and rights granted to Assignee herein and upon any notarization, certification, verification, affidavit, or jurat by any notary public of any state relating to the authorization, execution, and delivery of this Assignment of the authenticity of any copy, conformed or otherwise, hereof.

3.5 Assignor shall, at the request and cost of Assignee, but at no charge, assist Assignee with any proceedings which may be brought by or against Assignee (or against any of the Marks or Works) by or against any third party in relation to the Marks or Works or any related application or registration.

3.6 Assignee shall bear the cost and expense of future registration of the Marks and Works, as well as the cost of future registration disputes, and the cost of enforcing rights in and to the Marks and Works against third parties provided, however, that Assignor shall continue to be responsible for all costs, expenses, and judgments resulting from, or in connection with, any enforcement action, registration action or legal dispute commenced prior to the Effective Date in which Assignor is a named party relating to the Marks or Works.

3.7 It is understood and agreed that the Works, the Marks, and the rights conveyed herein are AS IS with no warranties whatsoever, express or implied, including, without limitation, warranties of non-infringement, title, merchantability or fitness for a particular purpose.

## SECTION 4. TERMINATION AND RELEASE OF PRIOR AGREEMENT(S)

4.1  Except as set forth in Section 4.2 below, all prior licenses and consents between or among Assignor and Assignee in connection with the Marks and  Works, including, without limitation, the Original License, are hereby terminated by mutual agreement of the parties.  Each party acknowledges and agrees that, as between the parties, all obligations under such agreements have been duly and timely fulfilled, or are hereby forever released and discharged as of the Effective Date.

4.2  To the extent Assignor previously granted any consent, license or permission in connection with any Disputed Marks or Works, such license or permission shall remain in effect until such time as the assignment of such Mark or Work is made effective by Assignee pursuant to Section 3.1 above, provided that such license or permission shall remain in effect only in the jurisdiction in which the applicable Mark or Work is in dispute.

## SECTION 5. LICENSE TO ASSIGNOR

5.1   Assignee understands and acknowledges that the Works are used, have been used, and will continue to be used as a personal symbol of Mr. Dan Bilzerian, and appear on a variety of online properties, social media accounts and postings, personal possessions, real estate, body art, gifts, clothing articles, and promotional materials related to Mr. Bilzerian's celebrity and public appearance activities ("Personal Uses").

5.2 Assignee further understands and acknowledges that the Works, and variations thereof, have appeared, do appear, and will appear in the future in various websites, photos, movies, videos and artistic works featuring or relating to Mr. Bilzerian, his property, his life, and his celebrity ("Publication Uses"). For avoidance of doubt, Publication Uses includes, without limitation, the book entitled the "The Setup," authored by Mr. Bilzerian, and all videos and photographs posted by or for Mr. Bilzerian.

5.3 Assignee further understands and  acknowledges that Mr. Bilzerian has engaged, or may engage, in personal appearances, host events, appear in videos and movies, publicize his life and lifestyle, write books, stories or screenplays, produce videos, series or movies, commission works of art and architecture, and enter into endorsement or similar arrangements in connection with certain third party products ("Promotional Uses").

5.4  Effective on the Effective Date, Assignee hereby grants to Assignor an unlimited, royalty-free, perpetual, irrevocable, and worldwide right and license to use the Works (including prior versions thereof and current and future derivative works based thereon) for current and future Personal Uses, Publication Uses and Promotional Uses relating to Mr. Bilzerian.  The foregoing license may be assigned or sublicensed for value or otherwise, and may be exercised freely by Assignor in perpetuity.

5.5 Assignor understands and acknowledges that Assignee is, or may be in the future, party to certain settlement agreements, coexistence agreements, license agreements and other agreements with respect to the Marks and Works, and may enter into such agreements at any time in the future ("Third Party Agreements").  Assignee shall give notice to Assignor of all restrictions and limitations relating to uses of the Marks and Works set forth in such Third Party Agreements, after which Assignor shall comply with such restrictions and limitations to the extent applicable to licensed Personal Uses, Publication Uses and Promotional Uses.  The parties agree that the licenses granted to Assignor herein shall be subject all such restrictions and limitations, whether now in existence, or future created.  Assignee agrees to use

DocuSign Envelope ID: 8745BF75-9563-48B3-9C1C-BFA465548080

commercially reasonable efforts to avoid entering into any new Third Party Agreement that would materially restrict Assignor's rights under the license(s) granted herein without Assignor's prior consent, which consent will not be unreasonably withheld.

5.6  Neither Assignor nor Assignee shall have any right or entitlement to any accounting, reporting, royalty, fee or other compensation in connection with any use of the Marks or Works by the other party.

## SECTION 6. ENFORCEMENT

6.1  To the extent Assignor or Assignee are aware, or become aware of any third party infringement, misappropriation, unfair competition, or unauthorized use of any of the Marks or Works, the parties shall notify each other and cooperate, at no charge, to take appropriate action to protect the Marks and the Works and their respective rights therein.

6.2 Unless otherwise agreed in writing by both parties, any future action for infringement or other misuse of the Marks or Works against any third party will be brought only by Assignee, at its sole option. If requested by Assignee, Assignor will cooperate with Assignee in any such action at no charge, but at Assignee's cost, including by joining the action as a party if so requested.

## SECTION 7. MISCELLANEOUS

7.1 The terms and provisions of this Agreement shall be binding upon and shall extend to, and inure to the benefit of the parties and their successors and assigns.  Either party may freely assign this Agreement, or may freely assign or sublicense its rights and obligations hereunder.

7.2 In the event that any term or provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, such term or provision shall be deemed amended to the extent necessary to render it valid, legal and enforceable, and the parties agree to be bound by the same as thus amended, and the remaining terms and provisions of this Agreement shall not be affected or impaired thereby.

7.3 This Agreement shall be construed under the laws of the State of Nevada, without reference to principles of conflicts of laws.

7.4 This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## SIGNATURES ON FOLLOWING PAGE

129859099.2

**IN WITNESS WHEREOF**, the parties have entered into this Agreement intending to be legally bound as of the Effective Date first written above.

Assignor:  Blitz NV, LLC

BY: _____

NAME:  Dan Bilzerian

TITLE: _Manager

Assignee:   Ignite International, Ltd.

BY: _____

NAME:  Scott J. Rohleder

TITLE:  CFO

## Exhibit A
### Marks

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| BILZERIAN ENTERTAINMENT LOGO | UNITED STATES | 87/940,058 | 5/29/2018 | 5,808,173 | 7/16/2019 | 041 | REGISTERED |
| BILZERIAN GOAT SKULL LOGO | IRAN | 139850140001072701 | 10/20/2019 | | | 18, 25, 34, 35, 39 | PENDING |
| BLITZ TV LOGO | UNITED STATES | 87/244,217 | 11/21/2016 | | | 041 | SUSPENDED |
| BLITZ TV LOGO | UNITED STATES | 87/244,205 | 11/21/2016 | | | 009 | SUSPENDED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.075 | 12/7/2018 | | | 01 | PUBLISHED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | ARGENTINA | 3.764.078 | 12/7/2018 | 3221773 | 10/21/2021 | 25 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.079 | 12/7/2018 | 3071125 | 4/24/2020 | 29 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.080 | 12/7/2018 | 3071126 | 4/24/2020 | 30 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.081 | 12/7/2018 | 3071127 | 4/24/2020 | 31 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.082 | 12/7/2018 | 3071128 | 4/24/2020 | 32 | REGISTERED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | ARGENTINA | 3.764.083 | 12/7/2018 | 3071130 | 4/24/2020 | 33 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.084 | 12/7/2018 | 3071129 | 4/24/2020 | 34 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.077 | 12/7/2018 | 3071124 | 4/24/2020 | 05 | REGISTERED |
| GOAT SKULL LOGO | AUSTRALIA | 1999690 | 11/26/2018 | 1457985 | 1/10/2022 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352110 | 11/30/2018 | 916352110 | 9/17/2019 | 01 | REGISTERED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | BRAZIL | 916352641 | 11/30/2018 | 916352641 | 9/17/2019 | 25 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352706 | 11/30/2018 | 916352706 | 9/17/2019 | 29 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352803 | 11/30/2018 | 916352803 | 9/17/2019 | 30 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352943 | 11/30/2018 | 916352943 | 9/17/2019 | 31 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916353028 | 11/30/2018 | 916353028 | 9/17/2019 | 32 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | BRAZIL | 916353117 | 11/30/2018 | 916353117 | 9/17/2019 | 33 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916353168 | 11/30/2018 | 916353168 | 9/17/2019 | 34 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352510 | 11/30/2018 | 916352510 | 9/17/2019 | 05 | REGISTERED |
| GOAT SKULL LOGO | CANADA | 1,924,364 | 10/10/2018 | | | 01, 03, 05, 09, 10, 16, 18, 20, 21, 25, 28, 29, 30, 31, 32, 33, 34, 35, 40, 41, 44 | PUBLISHED |
| GOAT SKULL LOGO | CHILE | 1308993 | 12/10/2018 | 1329716 | 9/25/2020 | 01, 03, 05, 25, 29, 30, 31, 32, 33, 34 | REGISTERED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | COLOMBIA | 1457985 | 11/26/2018 | 650838 | 6/4/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | EUROPEAN UNION (EUTM & RCD) | 17968145 | 10/15/2018 | 017968145 | 3/13/2019 | 01, 03, 05, 09, 10, 16, 18, 20, 25, 28, 29, 30, 31, 32, 33, 34, 35, 41 | REGISTERED |
| GOAT SKULL LOGO | INDIA | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | OPPOSED |
| GOAT SKULL LOGO | ISRAEL | 1457985 | 11/26/2018 | 315,278 | 5/4/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | JAPAN | 1457985 | 11/26/2018 | 1457985 | 11/5/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | MEXICO | 2186952 | 11/26/2018 | 2332560 | 12/1/2021 | 005 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186953 | 11/26/2018 | 2332561 | 12/1/2021 | 025 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186954 | 11/26/2018 | 2045935 | 10/11/2019 | 029 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186955 | 11/26/2018 | 2045936 | 10/11/2019 | 030 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186956 | 11/26/2018 | 2045937 | 10/11/2019 | 031 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | MEXICO | 2186957 | 11/26/2018 | 2045938 | 10/11/2019 | 032 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186958 | 11/26/2018 | 2045939 | 10/11/2019 | 033 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186959 | 11/26/2018 | 2045940 | 10/11/2019 | 034 | REGISTERED |
| GOAT SKULL LOGO | NEW ZEALAND | 1457985 | 11/26/2018 | 1117094 | 3/24/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | NORWAY | 201904362 | 11/26/2018 | 1457985 | 10/15/2021 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | RUSSIA | 1457985 | 11/26/2018 | 1457985 | 10/10/2019 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35622 | 11/28/2018 | | | 01 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35625 | 11/28/2018 | | | 25 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35626 | 11/28/2018 | | | 29 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35627 | 11/28/2018 | | | 30 | PENDING |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35628 | 11/28/2018 | | | 31 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35629 | 11/28/2018 | | | 32 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35630 | 11/28/2018 | | | 33 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35631 | 11/28/2018 | | | 34 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35624 | 11/28/2018 | | | 05 | PENDING |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | SOUTH KOREA | 1457985 | 11/26/2018 | 85-2020-1270164 | 3/9/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | SWITZERLAND | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | PENDING |
| GOAT SKULL LOGO | THAILAND | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | PENDING |
| GOAT SKULL LOGO | TURKEY | 1457985 | 11/26/2018 | 1457985 | 12/9/2019 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | UNITED KINGDOM | UK00917968145 | 10/15/2018 | UK00917968145 | 3/13/2019 | 01, 03, 05, 09, 10, 16, 18, 20, 25, 28, 29, 30, 31, 32, 33, 34, 35, 41 | REGISTERED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | VIETNAM | 1457985 | 11/26/2018 | 1457985 | 3/30/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | WIPO | 1457985 | 11/26/2018 | 1457985 | 11/26/2018 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO (NO EYES) | ARMENIA | 20220544 | 3/2/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | BELARUS | 20220411 | 2/28/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | CANADA | 2,163,364 | 2/1/2022 | | | 33 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | CANADA | 2,163,365 | 2/1/2022 | | | 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | CHINA | 60087306 | 10/26/2021 | | | 34 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | EGYPT | 468922 | 2/22/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) | EGYPT | 468921 | 2/22/2022 | | | 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | INDIA | 5305009 | 1/29/2022 | | | 35 | PUBLISHED |
| GOAT SKULL LOGO (NO EYES) | IRAN | 140050140001041252 | 7/3/2021 | | | 32 | PENDING |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | KAZAKHSTAN | 107641 | 3/10/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | TM2020029861 | 12/10/2020 | | | 001, 003, 005, 029, 030, 031, 032, 033, 034 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | | | | | 34 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | TM202029861-A1 | | | | 034 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27328 | 4/8/2022 | | | 34 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27332 | 4/8/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27319 | 4/8/2022 | | | 05 | PENDING |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27324 | 4/8/2022 | | | 9 | PENDING |
| GOAT SKULL LOGO (NO EYES) | RUSSIA | 2022713553 | 3/3/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) (MADRID BASE 1, 5, 29 - 34) | UNITED STATES | 88/976,316 | 9/20/2018 | | | 001, 005, 009, 010, 016, 020, 028, 029, 030, 031, 032, 033, 034, 041 | PUBLISHED |

129859099.2

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) (MADRID BASE 3, 25) | UNITED STATES | 88/125,045 | 9/20/2018 | | | 003, 018, 025, 035 | ALLOWED |
| IGNITE | THAILAND | 220103470 | 1/27/2022 | | | 34 | PENDING |
| IGNITE GOAT SKULL LOGO | CHINA | 59894227 | 10/18/2021 | | | 34 | CLIENT MANAGED |
| IGNITE GOAT SKULL LOGO | JAPAN | 1457189 | 12/4/2018 | 1457189B | 12/10/2020 | 01, 03, 05, 29, 30, 31, 32, 33, 34 | REGISTERED |
| IGNITE GOAT SKULL LOGO | SOUTH KOREA | 1457189 | 12/4/2018 | 852020003646725 | 7/23/2020 | 01, 03, 05, 29, 30, 31, 32, 33, 34 | REGISTERED |
| IGNITE GOAT SKULL LOGO | THAILAND | 1457189 | 12/4/2018 | | | 01, 03, 05, 29, 30, 31, 32, 33, 34 | PENDING |

129859099.2

## Exhibit B
Works

| Works | |
|-------|--|
| | |
| | |
| | |
| | |

| Title | Registration No. | Registration Date | Application No. | Filing Date | Status | Client Name |
|---|---|---|---|---|---|---|
| CPY - US - GOAT SKULL LOGO (COPYRIGHT) | VA0002141891 | 03/11/2019 | | | REGISTERED | BLITZ NV, LLC |
| CPY - US - IGNITE GOAT SKULL LOGO NO EYES (COPYRIGHT) | VA0002171807 | 07/22/2019 | | | REGISTERED | BLITZ NV, LLC |
| CPY - CN - IGNITE GOAT SKULL | | | | | PENDING | BLITZ NV, LLC |
| CPY - CA - IGNITE GOAT SKULL | 1190082 | 01/24/2022 | | | REGISTERED | BLITZ NV, LLC |
| CPY - CA - GOAT SKULL (NO EYES) | 1190083 | 01/24/2022 | | | REGISTERED | BLITZ NV, LLC |
| CPY - IN - GOAT SKULL (NO EYES) | | | | | PENDING | BLITZ NV, LLC |
| CPY - CN  - GOAT SKULL (NO EYES) | | | | | PENDING | BLITZ NV, LLC |
| CPY - PY - GOAT SKULL LOGO (NO EYES)  App No. 22-12278 | | | 22-12278 | 02/23/2022 | PENDING | BLITZ NV, LLC |
| CPY - CN - IGNITE SHEEP HEAD (CHINESE CHARACTERS) | | | 2022-F-10002377 | | PENDING | BLITZ NV, LLC |
| CPY - CN IGNITE SHEEP HEAD (CHINESE CHARACTERS) | | | 2022-F-10002378 | | PENDING | BLITZ NV, LLC |
| CPY - CN - IGNITE SHEEPHEAD STRIPES (CHINESE CHARACTERS) | | | 2022-F-10002379 | | PENDING | BLITZ NV, LLC |
| CPY - CN - STRIPE (CHINESE CHARACTERS) | | | 2022-F-10002380 | | PENDING | BLITZ NV, LLC |

129859099.2

# EXHIBIT 7

**FRANCISCO V. AGUILAR**
**Secretary of State**
**401 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website:  www.nvsos.gov**
           **www.nvsilverflume.gov**

# Annual or Amended List and State Business License Application

☑ ANNUAL    ☐ AMENDED (check one)

## List of Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers:

| | |
|---|---|
| **FRG Properties LLC** | **NV20141620647** |
| NAME OF ENTITY | Entity or Nevada Business Identification Number (NVID) |

## TYPE OR PRINT ONLY - USE DARK INK ONLY - DO NOT HIGHLIGHT

*IMPORTANT:* *Read instructions before completing and returning this form.*

Please indicate the entity type (check only one):

☐ Corporation

    ☐ This corporation is publicly traded, the Central Index Key number is:

☐ Nonprofit Corporation (see nonprofit sections below)

☑ Limited-Liability Company

☐ Limited Partnership

☐ Limited-Liability Partnership

☐ Limited-Liability Limited Partnership

☐ Business Trust

☐ Corporation Sole

| Filed in the Office of | Business Number **E0504142014-5** |
|---|---|
| *F V Aguilar* | Filing Number **20244442063** |
| Secretary of State State Of Nevada | Filed On **10/31/2024 19:00:31 PM** |
| | Number of Pages **2** |

Additional Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers, may be listed on a supplemental page.

---

**CHECK ONLY IF APPLICABLE**

Pursuant to NRS Chapter 76, this entity is exempt from the business license fee.

☐ 001 - Governmental Entity

☐ 006 - NRS 680B.020 Insurance Co, provide license or certificate of authority number

---

**For nonprofit entities formed under NRS chapter 80:** entities without 501(c) nonprofit designation are required to maintain a state business license, the fee is $200.00. Those claiming an exemption under 501(c) designation must indicate by checking box below.

☐ Pursuant to NRS Chapter 76, this entity is a 501(c) nonprofit entity and is exempt from the business license fee.
    Exemption Code 002

---

**For nonprofit entities formed under NRS Chapter 81:** entities which are Unit-owners' association or Religious, Charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C $ 501(c) are excluded from the requirement to obtain a state business license. Please indicate below if this entity falls under one of these categories by marking the appropriate box. If the entity does not fall under either of these categories please submit $200.00 for the state business license.

☐ Unit-owners' Association    ☐ Religious, charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. $501(c)

---

**For nonprofit entities formed under NRS Chapter 82 and 80:Charitable Solicitation Information - check applicable box**

Does the Organization intend to solicit charitable or tax deductible contributions?

☐ No - no additional form is required

☐ Yes - the "Charitable Solicitation Registration Statement" is required.

☐ The Organization claims exemption pursuant to NRS 82A 210 - the "Exemption From Charitable Solicitation Registration Statement" is required

**\*\*Failure to include the required statement form will result in rejection of the filing and could result in late fees.\*\***

page 1 of 2



**FRANCISCO V. AGUILAR**
Secretary of State
401 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website:  www.nvsos.gov
        www.nvsilverflume.gov

# Annual or Amended List and State Business License Application - Continued

## Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers:

CORPORATION, INDICATE THE <u>Manager</u>:

| GOAT WORKS, LLC | USA |
|---|---|
| Name | Country |

| 121 WISCONSIN AVE STE 101 | WHITEFISH | MT | 59937 |
|---|---|---|---|
| Address | City | State | Zip/Postal Code |

None of the officers and directors identified in the list of officers has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of an officer or director in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

**X**  Jakub Medrala

**Signature of Officer, Manager, Managing Member, General Partner, Managing Partner, Trustee, Subscriber, Member, Owner of Business, Partner or Authorized Signer** *FORM WILL BE RETURNED IF UNSIGNED*

| Authorized Signer | 10/31/2024 |
|---|---|
| Title | Date |



**FRANCISCO V. AGUILAR**
**Secretary of State**
**401 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**
         **www.nvsilverflume.gov**



| Filed in the Office of | Business Number |
|---|---|
| | **E0504142014-5** |
| | Filing Number |
| | **20244370200** |
| Secretary of State | Filed On |
| State Of Nevada | **10/01/2024 13:08:07 PM** |
| | Number of Pages |
| | **2** |

# Registered Agent Acceptance/Statement of Change

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| | |
|---|---|
| **1. Entity information:** | Name of represented entity:<br>**FRG Properties LLC**<br><br>Entity or Nevada Business Identification Number (NVID):    **NV20141620647**<br>(for entities currently on file) |
| **2. Registered Agent Acceptance:** | ☐ Registered Agent Acceptance |
| **3. Information Being Changed:** | Statement of Change takes the following effect: (select only one)<br>   ☑ Appoints New Agent (complete section 5)<br>   ☐ Update Represented Entity Acting as Registered Agent (complete sections 5)<br>   ☑ Update Registered Agent Name (complete sections 4 & 5)<br>   ☑ Update Registered Agent Address (complete sections 4 & 5) |
| **4. Registered Agent Information Before the Change:** (Non-commercial registered agents **ONLY**) | Name                 Telephone<br><br>Street Address      City      Nevada **0**      Zip Code<br><br>Mailing Address (only if different from above)   City   Nevada   Zip Code |
| **5. Newly Appointed Registered Agent or Registered Agent Information After the Change:** | ☑ Commercial Registered Agent (name only below)    ☐ Noncommercial Registered Agent (name and address below)    ☐ Office or position with Entity (title and address below)<br><br>**THE MEDRALA LAW FIRM PROF LLC**<br>Name of Registered Agent OR Title of Office or Position with Entity<br><br>**615 S. 6th Street**    **Las Vegas**    Nevada **89107**<br>Street Address      City      Zip Code<br><br>Mailing Address (only if different from above)   City   Nevada   Zip Code |
| **6. Electronic Notification:** (Optional) | Email address for electronic notifications for "Non-Commercial" or "Office or Positions with Entity" registered agents only: |
| **7. Certificate of Acceptance of Appointment of Registered Agent:** (Required) | *I hereby accept appointment as Registered Agent for the above named Entity.*<br><br>X   **Jakub Medrala**       **10/01/2024**<br>Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity    Date |
| **8. Signature of Represented Entity:** (Required) | X   **Jakub Medrala**       **10/01/2024**<br>Authorized Signature On Behalf of the Entity    Date |

*This form must be accompanied by appropriate fees.*

page1 of 1

Docusign Envelope ID: A45E5FBB-C2FB-43C1-A2Z2-8GF09F5DB53B



**FRANCISCO V. AGUILAR**
**Secretary of State**
**401 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

| Filed in the Office of | Business Number |
|---|---|
| *F.V.Aguilar* (signature) Secretary of State State Of Nevada | **E0504142014-5** |
| | Filing Number **20244370200** |
| | Filed On **10/01/2024 13:08:07 PM** |
| | Number of Pages **2** |

# Registered Agent Acceptance/Statement of Change

(PURSUANT TO NRS 77.310, 77.340, 77.350, 77.380)

**TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT**

| | |
|---|---|
| **1. Entity information:** | Name of represented entity: <br> FRG PROPERTIES LLC <br><br> Entity or Nevada Business Identification Number (NVID): (for entities currently on file)    E0504142014-5 |
| **2. Registered Agent Acceptance:** | ☒ Registered Agent Acceptance |
| **3. Information Being Changed:** | Statement of Change takes the following effect: (select only one) <br> ☒ Appoints New Agent (complete section 5) <br> ☐ Update Represented Entity Acting as Registered Agent (complete sections 5) <br> ☐ Update Registered Agent Name (complete sections 4 & 5) <br> ☐ Update Registered Agent Address (complete sections 4 & 5) |
| **4. Registered Agent Information Before the Change:** (Non-commercial registered agents **ONLY**) | KPS Leslie, LLC <br> Name of Registered Agent    **OR**    Title of Office or Position with Entity <br> 3275 S Jones Blvd, Suite 105     Las Vegas     Nevada   89146 <br> Street Address      City      Zip Code <br><br>      Nevada <br> Mailing Address (if different from street address)   City     Zip Code |
| **5. Newly Appointed Registered Agent or Registered Agent Information After the Change:** | ☒ Commercial Registered Agent:(name only below)    ☐ Noncommercial Registered Agent (name and address below)    ☐ Office or Position with Entity (title or position and address below) <br> The Medrala Law Firm Prof LLC <br> Name of Registered Agent   **OR**   Title of Office or Position within Entity <br> 615 S. 6th Street     Las Vegas     Nevada   89101 <br> Street Address      City      Zip Code <br><br>      Nevada <br> Mailing Address (if different from street address)   City     Zip Code |
| **6. Electronic Notification:** (Optional) | Email address for electronic notifications for "Non-Commercial" or "Office or Positions with Entity" registered agents only: <br> ahill@medralaw.com |
| **7. Certificate of Acceptance of Appointment of Registered Agent:** (Required) | *I hereby accept appointment as Registered Agent for the above named Entity.* <br> X _(signature)_____    9/30/24 <br> **Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity**    Date |
| **8. Signature of Represented Entity:** (Required) | X _____    10/1/2024 <br> **Authorized Signature On Behalf of the Entity**    Date |

**FEE: $60.00**
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 8/1/2023

10:54:27 a.m. 02-15-2024    2    18003911302

To: Expedite Filings                    Page: 2 of 5                    2024-02-15 18:54:26 GMT                                    Peterson

| | |
|---|---|
| | Filed in the Office of Business Number **E0504142014-5** |
| *F.V.Aguilar* | Filing Number **20243824707** |
| Secretary of State State Of Nevada | Filed On **2/15/2024 10:54:00 AM** |
| | Number of Pages **2** |



**FRANCISCO V. AGUILAR**
Secretary of State
401 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

## Limited-Liability Company:
### Certificate of Amendment (PURSUANT TO NRS 86.216, 86.221 and 86.543)
### Certificate to Accompany Restated Articles or Amended and Restated Articles (PURSUANT TO NRS 86.221)

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

**1. Entity information:**

Name of entity as on file with the Nevada Secretary of State:

Blitz NV LLC

Entity or Nevada Business Identification Number (NVID):    E0504142014-5

**2. Restated or Amended and Restated Articles**
(Select one):

(If restating or amending and restating, complete section 1,2 3, 5 and 6.)

☐ Certificate to Accompany Restated Articles or Amended and Restated Articles

☐ Articles have been Restated

☒ Articles have been Amended and Restated

* Restated or Amended and Restated articles must be included with this filing type.

**3. Type of amendment filing being completed:**
(Select only one box):

(If amending, complete section 1, 3, 5 and 6.)

☐ Certificate of Amendment to Articles of Organization For a Nevada Limited-Liability Company Before Issuance of Member's Interest (Pursuant to NRS 86.216)

The signers thereof are at least two-thirds of the ☐ organizers or the ☒ managers of the limited-liability company

As of the date of the certificate, no member's interest in the limited-liability company has been issued.

☒ Certificate of Amendment to Articles of Organization For a Nevada Limited-Liability Company (Pursuant to NRS 86.221)

The limited-liability company is managed by ☒ Managers or ☐ Members

The certificate of amendment must be signed by a manager of the company or, if management is not vested in a manager, by a member.

☐ Amendment to Application for Registration of a Foreign Limited-Liability Company (Pursuant to NRS Chapter 86)

Name of Foreign Limited-Liability Company if different than registered to transact business in Nevada:

_____

If amendment is to change the name, the change taking effect: (select all that apply)

☐ The name under which Limited-Liability Company transacts business in this State

☐ Foreign Limited-Liability Company name from home jurisdiction

This form must be accompanied by appropriate fees.



**FRANCISCO V. AGUILAR**
Secretary of State
401 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Limited-Liability Company:
## Certificate of Amendment (PURSUANT TO NRS 86.216, 86.221 & 86.543)
## Certificate to Accompany Restated Articles or Amended and Restated Articles (PURSUANT TO NRS 86.221)

| | |
|---|---|
| **4. Effective date and time:** (Optional) | Date: 01/05/2024          Time: 8:00am<br>(must not be later than 90 days after the certificate is filed) |
| **5. Information being changed:** | Changes to takes the following effect:<br>☒ The entity name has been amended.<br>☐ The registered agent has been changed. (attach Certificate of Acceptance from new registered agent)<br>☐ The purpose of the entity has been amended.<br>☐ The directors, managers or general partners have been amended.<br>☐ IRS tax language has been added.<br>☐ Articles have been added.<br>☐ Articles have been deleted.<br>☐ Other.<br>The articles have been amended as follows: (provide article numbers, if available)<br>The name of this company shall be: FRG Properties LLC<br><br>(attach additional page(s) if necessary) |
| **6. Signature:** (Required) | X <u>Christopher Peterson</u>                    Manager<br>Signature of Manager, Member or Authorized Signer          Title<br><br>X _____<br>Signature of Manager, Member or Authorized Signer          Title |
| | **Please include any required or optional information in space below:**<br>(attach additional page(s) if necessary) |

This form must be accompanied by appropriate fees.

# EXHIBIT 8

# N701DB - 1987 GULFSTREAM AEROSPACE G-IV

## N701DB REGISTRATION DATA

*Note: This aircraft is not currently for sale on our platform.*

## Current Registration

**Serial Number:** 1036

**Aircraft:** 1987 GULFSTREAM AEROSPACE G-IV

**Owner:** KENMORE CREW LEASING INC TRUSTEE

**Issue Date:** 03/20/2025

**Expiration Date:** 03/31/2032

**City:** BELLINGHAM

**State:** WA

**Country:** US

**Zipcode:** 98226

## Previous Registration

| Date | Owner | Location |
|---|---|---|
| 05/16/2024 | GOAT AIRWAYS LLC | STUDIO CITY CA |
| 04/19/2024 | GOAT AIRWAYS LLC | STUDIO CITY CA |
| 03/10/2023 | GOAT AIRWAYS LLC | LOS ANGELES CA |
| 03/16/2020 | GOAT AIRWAYS LLC | LOS ANGELES CA |
| 12/26/2018 | GOAT AIRWAYS LLC | LOS ANGELES CA |
| 08/15/2017 | GOAT AIRWAYS LLC | SANTA MONICA CA |
| 06/01/2015 | GOAT AIRWAYS LLC | LAS VEGAS NV |
| 11/06/2014 | GOAT AIRWAYS LLC | LOS ANGELES CA |

# EXHIBIT 9

**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
TALI J. FREY, ESQ.
Nevada Bar No. 16537
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: 702-685-4444
Email:  ccarlyon@carlyoncica.com
           dcica@carlyoncica.com
           tfrey@carlyoncica.com
*Co-Counsel for STEEL Supplements, Inc.*

**SMITH, GAMBRELL & RUSSELL, LLP**
JASON P. STEARNS, ESQ
*(Pro Hac Vice)*
SARAH A. GOTTLIEB, ESQ
*(Pro Hac Vice)*
Email: jstearns@sgrlaw.com
sgottlieb@sgrlaw.com

BRIAN P. HALL
(*Pro Hac Vice*)
MICHAEL F. HOLBEIN
(*Pro Hac Vice*)
Email: bhall@sgrlaw.com
mholbein@sgrlaw.com
*Co-Counsel for STEEL Supplements, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>   BLITZ NV, LLC,<br><br>                    Debtor. | Case No. 23-13871-NMC<br>Chapter 11 (Subchapter V)<br><br>**NOTICE OF ISSUANCE OF SUBPOENA FOR DOCUMENT PRODUCTION OF INTERNATIONAL INVESTMENTS LTD** |

       **PLEASE TAKE NOTICE** that STEEL Supplements, Inc., ("Movant"), by and through

its counsel, the law firm of Carlyon Cica Chtd., hereby provides notice of the issuance of a

subpoena for document production on International Investments, Ltd. A copy of the subpoena is attached hereto as **Exhibit 1**.

DATED this 13th day of June 2025.

**CARLYON CICA CHTD.**

By: /s/ *Tali J. Frey*
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
TALI J. FREY, ESQ.
Nevada Bar No. 16537
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: 702-685-4444
*Co-Counsel for STEEL Supplements, Inc.*

**CARLYON CICA CHTD.**
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

**CERTIFICATE OF SERVICE**

I am an employee of Carlyon Cica Chtd. On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE: Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL: By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER: By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE: By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Cristina Robertson*
An employee of Carlyon Cica Chtd.

**CARLYON CICA CHTD.**
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

# EXHIBIT "1"

# EXHIBIT "1"

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ District of _____

In re  BLITZ NV, LLC,

                Debtor

Case No. __23-13871-NMC_____

Chapter __11_____

## SUBPOENA FOR RULE 2004 EXAMINATION

To:  International Investments, Ltd.
_____
*(Name of person to whom the subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure.  A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| Carlyon Cica Chtd<br>265 E. Warm Springs Road Suite 107<br>Las Vegas NV, 89119 | Production Deadline: June 30, 2025 at 10:00 a.m.<br><br>Examination Date: July 2, 2025 at 9:00 a.m. |

The examination will be recorded by this method: Audio and/or video technology in addition to stenographically

☑    *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

      The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __06/13/2025_____

           CLERK OF COURT

                               OR

_____     /s/ *Tali Frey*
   *Signature of Clerk or Deputy Clerk*         _____
                             *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* _____ ,  who issues or requests this subpoena, are:
Candace C. Carlyon or Tali J. Frey of Carlyon Cica Chtd 265 E. Warm Springs Road, Suite 107, Las Vegas NV 89119 ph. (702)-685-4444 emails: ccarlyon@carlyoncica.com & tfrey@carlyoncica.com  with a copy to crobertson@carlyoncica.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

# PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

     I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT "1"

# EXHIBIT "1"

**EXHIBIT "A"**

**(Please review the definitions and instructions before responding.)**

**I.**
**DEFINITIONS**

The following definitions shall apply to the Subpoena:

1. "**Affiliate**" has the meaning set forth in 11 U.S.C. §101(2),

2. "**Bankruptcy Case**" shall mean *In re Blitz NV, LLC*, Case No. 23-13871-nmc (Bankr. D. Nev.).

3. "**Claimant**" shall mean International Investments, Ltd.

4. "**Communication**" means any oral or written statement, dialogue, colloquy, discussion, e-mail, facsimile, or conversation, and includes any transfer of thoughts or ideas or data or information, between persons or locations by means of any Document or by any other means, including but not limited to electronic or similar means.

5. "**Concerning**" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests.

6. "**Control**" means in your possession, custody or control or under your direction and includes in the possession, custody, or control of those under the direction of you or your employees, agents, attorneys, accountants, officers, directions, Insiders, Affiliates, managers, consultants, experts, parent or affiliated corporations or entities, and anyone acting or purporting to act your behalf,

7. "**Debtor**" shall mean Blitz NV, LLC, which is the debtor in the Bankruptcy Case, and any of its Affiliates, Insiders, agents, servants, managers, directors, officers, owners, employees, representatives, attorneys, accountants, investigators and/or any person or entity acting or who has acted by or on its behalf.

8. "**Document**" shall have the broadest meaning accorded to it by the Federal Rules of Bankruptcy Procedure, and includes without limitation all written, typed, printed, reproduced, filmed, stored, or recorded material of any kind, including ESI, in the possession, custody, or control of you or any of your past or present agents, employees, consultants, attorneys or other persons acting on your

1

behalf, including but not limited to any of the following: correspondence; letters; memoranda; interoffice memoranda; writings; notes; notebooks; charts; electronic mail; studies; plans; analyses; work papers; statistical records; bills and other billing records; receipts; books; press releases; reports; contracts and agreements; records, summaries, memorialization's, minutes, agendas or notes of meetings, conferences, telephone calls, or other conversations; calendars and diaries; appointment books and message pads; photographs; tape recordings or other audio or video records; handwritten notes or notations in any form; computer tapes, disks, and other data compilations from which information can be obtained, translated, if necessary, by the Committee through detection devices into reasonably usable form - including, without limitation, electronic or computerized data compilations (including electronic mail), electronic bookkeeping and accounting records (including QuickBooks files), and any printouts thereof; attachments and enclosures; and drafts of any of the foregoing. For purposes of the foregoing, the term "draft" means any earlier, preliminary, preparatory, or tentative version of all or part of a document, whether or not such draft was superseded by a later draft and whether or not the terms of the draft are the same as or different from the terms of the final document.

9. "**Insider**" has the meaning set forth in 11 U.S.C. §101(31).

10. **"Transaction"** means any and all agreements, arrangements, dealings, or exchanges, whether direct or indirect, entered into between the Parties and/or any of their Affiliates, including, without limitation:

A. **Business Sales or Acquisitions**:

    a. Sale, purchase, or transfer of all or substantially all of a Party's assets or equity,

    b. Mergers, consolidations, share-exchanges, reorganizations, or restructurings;

B. **Operational Contracts**:

    a. Contracts or arrangements for the provision or receipt of goods, materials, services, licensing, manufacturing, or distribution;

    b. Leases, financing arrangements, loans, security or pledge agreements, guarantees, and concessions;

C. **Financial Transactions**:

   a. Payment processing, settlements, billing, reimbursement, or investment transactions;

   b. Credit, debt, derivative, or hedging transactions;

D. **Commercial and Strategic Deals**:

   a. Joint ventures, strategic alliances, collaborations, channel or co-marketing agreements;

   b. Franchises, sublicenses, agency, and distribution or reseller agreements;

   c. Sharing of any assets, employees, expenses, or resources.

E. **IP & Technology Transfers**:

   a. Licenses, assignments, sublicenses, or transfers of intellectual property;

   b. Software development, outsourcing, or technology integration arrangements;

F. **Other Legal or Corporate Actions**:

   a. Any other transaction, series of related transactions, or commercial activity that involves the sharing, exchange, transfer, or disposition of rights, property, services, interests, or obligations.

   b. Any payments made on behalf of or for the benefit of another.

11. "**Trustee**" shall mean Brian Shapiro, along with his agents, employees, attorneys, accountants, representatives, or any other person acting or who has acted on his behalf.

12. "**You**" or "**Your**" means the person or entity to which these requests are directed, including their employees, agents, attorneys, accountants, officers, directions, Insiders, Affiliates, managers, consultants, experts, parent or affiliated corporations or entities, and anyone acting or purporting to act their behalf.

3

## II.

## INSTRUCTIONS

a.      Each request for Documents extends to all Documents in You possession, custody, or control or in the possession, custody, or control of anyone acting on Your behalf. A Document is in Your possession, custody, or control if it is in Your physical custody, or if it is in the physical custody of any other person and You (1) own such Document on any terms, (2) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms, or (3) have, as a practical matter, been able to use, inspect, or examine, or copy such Document when You have sought to do so.

b.      A request for a particular Document means that particular Document and all non-identical drafts. All Documents that cannot be legibly copied should be produced in their original form.

c.      In the event any information is redacted from a Document produced pursuant to these requests, identify where the redaction has been made by stamping or writing the word "Redacted" at the location of the Document where the information has been deleted and separately .log each redaction on a privilege log.

d.       If You object to all or any portion of any category of Document called for by these requests, please produce all Documents within each category to which Your objection does not apply, and please state whether any Documents are being withheld based on Your objection.

e.      Produce all Documents as they are kept in the usual course of business, in the file folders or other organizational order in which they are kept or organize and label each Document to identify the request or requests to which such Document is responsive and the entity in whose possession such Document was found.

f.      In producing Documents, indicate and segregate the Documents by the specific request in response to which each Document or group of Documents is produced.

g.      Regarding production of ESI:

c.   All  Documents shall be Produced in native format.

d.   All attachments to email communications shall be produced with the pertinent email.

4

e. All ESI shall be produced with all metadata, including, without limitation, author, sender, recipients (including cc and bcc), date and time sent, date and time received, date and time created, modified, and accessed, custodian, filetype, filename, file location, software, attachment status, and attachment count.

f. All passwords and login credentials necessary to access the ESI Documents shall be produced.

8. If it is claimed that the attorney-client privilege or any other privilege applies to any Document sought by these requests, specify the privilege claimed and the factual basis You contend supports the assertion of the privilege, and identify the Document as follows:

a. the type of document (i.e., letter, memorandum, etc.) or some other means of identifying it;

b. its subject matter;

c. its date;

d. its author(s), addressee(s) and recipient(s);

e. its present location; and

f. the claim of privilege with respect thereto.

13. For each document requested herein that was formerly in your possession, custody or control and has been lost, destroyed or otherwise disposed of, furnish the following:

a. the type of document (i.e., letter, memorandum, etc.) or some other means of identifying it;

b. its subject matter;

c. its date;

d. its author(s), addressee(s) and recipient(s);

e. the date on which it was lost, destroyed or otherwise disposed of;

f. the reason for any such destruction or disposal; and

g. the person(s) requesting and performing such destruction or disposal.

9. For any Communication to which a privilege is asserted, identify the person or entities

among whom the Communication took place, the date of the Communication, the subject of the Communication, the specific privilege claimed, and the factual basis You contend supports the assertion of the privilege.

10.    If any Document sought by these discovery requests has been destroyed, discarded, or otherwise disposed of, that Document is to be identified as completely as possible, including, without limitation, the following information:

a.    Identify each author of the Document;

b.    Identify each preparer of the Document;

c.    Identify each addressee or intended recipient of the Document;

d.    Identify each person or entity who received the Document;

e.    State the date of the Document;

f.    State the subject matter of the Document;

g.    State the reason for the disposal of the Document;

h.    Identify each person or entity who authorized disposal of the Document; and

i.    Identify each person or entity who disposed of the Document.

11.    If any Document was, but is no longer, in Your possession, custody, or control, provide the following information:

a.    State the disposition of the Document;

b.    State the date such disposition was made;

c.    Identify the present custodian of the Document, or, if the Document no longer exists, so state;

d.    Identify the persons or entities who made the decision regarding the disposition of the Document; and

e.    State the reasons for the disposition and describe the Document and the contents of the Document, including the title, author, position or title of the author, addressee, position, or title of the addressee, whether indicated or blind copies were made, date, subject matter, number of pages, attachments or appendices, and all persons or entities to whom the Document was distributed, shown, or explained.

6

12.     These Requests are deemed continuing so as to require further and supplemental production if additional documents are received, generated, or discovered after the time of the original production.

13 .     If, in answering these Requests, you claim that any Request, or a definition or instruction applicable thereto, is ambiguous, do not use such claim as a basis for refusing to respond, but rather, set forth as a part of the response the language you claim is ambiguous and the interpretation you have used to respond to the Request.

14.     Unless otherwise indicated, these requests cover the time from June 13 , 2019 through to present.

### III.

### DOCUMENTS TO BE PRODUCED

1.     Produce all Documents reflecting ownership interests in Claimant November 22, 2022, through May 30, 2025, including, without limitation, Operating Agreements, membership lists, records of purchases, issuance, sale, transfer, or termination of any ownership interests in Claimant.

2.     Produce all Documents reflecting the identity of Your officers, directors, managing members, managers, or persons in control of You during the period November 22, 2022 through May 30, 2025.

3.     Produce all Documents evidencing or relating to each transfer between by Creditor and Debtor including, without limitation, bank records, wire transfer records, cancelled checks, electronic funds transfer records, and receipts, for the period October 1, 2014, through May 20, 2015.

4.     Produce all Documents evidencing any consideration passing between Creditor and Debtor during the period October 1, 2014 through May 30, 2025.

5.     Produce all Communications between You and Daniel Bilzerian between October 1, 2014, and May 30, 2025.

6.     Produce all Communications between You and Paul Bilzerian between October 1, 2014, and May 30, 2025.

7.     Produce all Communications between You and the Trustee.

8. Produce all Communications between You and the Debtor.

9. Produce all Communications between You and Ignite International Brands, Ltd. between October 1, 2014, and May 30, 2025.

10. Produce all Communications between You and Ignite International, Ltd. between October 1, 2014, and May 30, 2025.

11. Produce all Communications between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025.

12. Produce all Communications between You and John Schaefer between October 1, 2014, and May 30, 2025.

13. Produce all Communications between You and Jason Verona between October 1, 2014, and May 30, 2025.

14. Produce all Communications between You and Paul Dowdall between October 1, 2014, and May 30, 2025.

15. Produce all Communications between You and Scott Rohleder between October 1, 2014, and May 30, 2025.

16. Produce all Communications between You and Fox Rothschild, LLP between November 22, 2022, and May 30, 2025.

17. Produce all Communications between You and Jakub Medrala between November 22, 2022, and May 30, 2025.

18. Produce all Communications between You and Goat Works, LLC between October 1, 2014, and May 30, 2025.

19. Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025.

20. Produce all Documents evidencing each and every Transaction between You and Paul Bilzerian between October 1, 2014 and May 30, 2025.

21. Produce all Documents evidencing each and every Transaction between You and Ignite International Brands, Ltd. between October 1, 2014 and May 30, 2025.

22. Produce all Documents evidencing each and every Transaction between You and Ignite International, Ltd. between October 1, 2014 and May 30, 2025.

23. Produce all Documents evidencing each and every Transaction between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025.

24. Produce all Documents evidencing each and every Transaction between You and John Schaefer between October 1, 2014, and May 30, 2025.

25. Produce all Documents evidencing each and every Transaction between You and Jason Verona between October 1, 2014, and May 30, 2025.

26. Produce all Documents evidencing each and every Transaction between You and Pul Dowdall between October 1, 2014, and May 30, 2025.

27. Produce all Documents evidencing each and every Transaction between You and Scott Rohleder between October 1, 2014, and May 30, 2025.

28. Produce all Documents evidencing each and every Transaction between You and Goat Works, LLC between October 1, 2014, and May 30, 2025.

29. Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025.

30. Produce all Documents evidencing each and every Transaction between You and the Debtor.

31. Produce Your monthly balance sheets for the periods October 1, 2014, through May 30, 2025.

32. Produce Your income statements for the periods October 1, 2024, through May 30, 2025.

33. Produce Your tax returns for the years 2014-2024.

34. Produce all Documents evidencing the source of funds you lent to the Debtor.

# IV.

## MATTERS FOR EXAMINATION

1. The purported loans between You and the Debtor.

2. The source of funds You purportedly loaned to the Debtor.

3. All transactions between You and the Debtor.

4. Your Proof of Claim in the Bankruptcy Case.

5. Your relationship with the Debtor, its Affiliates and Insiders.

6. Your activity in the Bankruptcy Case.

7. Your communications with the Debtor.

8. Your communications with the Trustee.

9. Your relationship to the Debtor, its Affiliates and Insiders.

10. Alter Ego Claims which may be held or asserted by the Debtor.

11. Assets and liabilities of the Debtor.

# EXHIBIT 10

**ANDERSEN BEEDE WEISENMILLER**
Ryan A. Andersen, Esq.
Nevada Bar No. 12321
Email: *ryan@abwfirm.com*
3199 E Warm Springs Rd, Ste 400
Las Vegas, Nevada 89120
Phone: 702-522-1992
Fax:    702-825-2824

*Counsel for International Investments, Ltd.*

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

In re:

BLITZ NV, LLC,

                    Debtor.

Case No.: 23-13871-NMC
Chapter 7

### INTERNATIONAL INVESTMENT, LTD.'S RESPONSES AND OBJECTIONS TO STEEL SUPPLEMENTS, INC.'S SUBPOENA FOR DOCUMENT PRODUCTION AND 2004 EXAMINATION

International Investments, Ltd. ("II"), by and through its undersigned counsel, hereby provides its responses and objections to the June 13, 2025 Subpoena issued by STEEL Supplements, Inc. ("Steel") and the Request for Production of Documents ("Requests") served therewith.

### GENERAL OBJECTIONS

1.      II objects to the Subpoena generally, as it seems Steel has issued the Subpoena as a litigation tactic. II's only involvement in the above-captioned bankruptcy case ("Bankruptcy Case") is as the holder of an unsecured claim in the amount of $3,972,111.11, as set forth in its properly filed Proof of Claim.  Even so, nearly none of the discovery sought by Steel is even remotely related to the Proof of Claim. Instead, the Subpoena seeks information that has no relation to the Case and seems, at best, related to other litigation to which STEEL is a party.

2.      A contested matter is pending, and, thus, the Pending Proceeding Rule applies. Furthermore, to the extent that STEEL wishes to object to II's claim, it must do so and then seek discovery through that contested matter.

3. II objects to the place for compliance with the Subpoena, specifically that it purports to require compliance with its subpoena, including an in-person examination, in Las Vegas, Nevada. II is a company registered in St. Kitts, with its headquarters in Basseterre, St. Kitts. Because St. Kitts is a foreign country, and because St. Kitts is certainly more than 100 miles away from the specified place of compliance, the Subpoena is improper under Rule 45 of the Federal Rules of Civil Procedure.

4. II objects to the Subpoena to the extent it fails to provide a list of topics that describe with reasonable particularity the matters for examination, as required by Rule 30(b)(6) of the Federal Rules of Civil Procedure. See Risinger v. SOC, LLC, 306 F.R.D. 655, 662 (D. Nev. 2015) ("Moreover, the request for the deponent to have knowledge of a plethora of information concerning most of the allegations and affirmative defenses in the pleadings blatantly ignores the purpose of a Rule 30(b)(6) deposition, which is to 'streamline the discovery process.'"); Apple Inc. v. Samsung Elecs. Co., No. C 11-1846 LHK PSG, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27, 2012) (it is well accepted that Rule 30(b)(6) does not permit "burdening the responding party with production and preparation of a witness on every facet of the litigation.").

5. II objects to the Requests to the extent they violate the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Federal Rules of Civil Procedure ("FRCP"), the Local Rules of Practice of the United States Bankruptcy Court District of Nevada ("Local Rules"), and/or any other applicable statute or orders or rules of the United States Bankruptcy Court District of Nevada ("Court"), as well as to the extent they are propounded for an improper purpose, to harass, and to needlessly increase costs to II.

6. II objects to the Requests because the time to comply with the Requests is unreasonable and imposes an undue burden and prejudice upon II under the circumstances.

7. II objects to the Requests as the time periods specified, most commonly October 1, 2014, are unreasonably long and, for this separate reason, impose an undue burden upon II under the circumstances.

8. II does not concede that any of the information, documents, and communications produced are, or will be, admissible into evidence. II does not intend to waive, but rather intends to

preserve, each and every available objection to the use and admissibility of the information and documents that may be disclosed in response to the Requests.

9.     II objects to the Requests to the extent they seek confidential commercial, business, financial, proprietary, or competitively sensitive information, or information which is subject to non-disclosure agreements or undertakings.  See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1469-70 (9th Cir. 1992); Hartley Pen Co. v. U.S. Dist. Court, 287 F.2d 324 (9th Cir. 1961).

10.     II objects to the Requests to the extent they call for information and/or the production of documents prepared in anticipation of a dispute or litigation and/or information and documents that are otherwise protected from disclosure by the attorney-client privilege, common-interest privilege, the attorney work-product doctrine, accountant-client privilege, mediation privilege, or any other applicable protection, privilege, or immunity.  See e.g., Clarke v. American Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992) (describing right of objection for attorney-client and attorney work-product privilege); In re Harwood P-G, Inc., 403 B.R. 445, 459-460 (Bankr. W.D. Tex. 2009) (citations omitted) (recognizing the common-interest privilege in bankruptcy cases).

11.     II objects to the Requests to the extent they seek documents and communications that are not in II's possession, custody, or control.

12.     II objects to the Requests to the extent they seek information and/or the production of documents that are available from a more convenient source or through other means of discovery that are more convenient, more efficient, or more practical.

13.     II objects to the Requests to the extent they are unduly burdensome, oppressive, annoying, and/or harassing.

14.     II objects to the Requests to the extent they are vague and ambiguous, compound, confusing, unclear, and/or amenable to different meanings, understandings, or interpretations.  To the extent possible, II is responding to the Requests as it interprets and understands them.

15.     II objects to the Requests to the extent they assume the existence of a fact or facts not in evidence.  In responding to the discovery, II does not concede or otherwise admit, by adoptive admission or otherwise, the existence of any fact or facts presupposed by the Requests.  Similarly, by

ANDERSEN BEEDE WEISENMILLER

ABW

responding to the Requests or disclosing any documents, II does not acquiesce to STEEL's characterization of any information, facts, theories, or conclusions, nor does II admit that any of the information produced reflects any fact, characterization, or conclusion.

The foregoing General Objections shall be considered as made, to the extent applicable, in response to each of the individual Request as if the General Objections were fully set forth in each such response.

To the extent the II discovers other responsive documents or communications, II reserves the right to supplement these Responses.

II reserves the right, but does not assume any obligation, to revise, correct, supplement, or clarify the content of the Responses herein, or to assert additional objections to the Requests. II does not in any way waive or intend to waive objections as to relevance, materiality, and/or admissibility of any information or subject matter. II does not waive, and expressly preserves, its right to move to quash the Subpoena or seek a protective order, without conceding any obligation to do so.

As all of STEEL's requests are improper pursuant to Rule 45 of the Federal Rules of Civil Procedure and Rule 2004 of the Federal Rules of Bankruptcy Procedure, only limited documents are being produced at this time. II will meet and confer in good faith with STEEL concerning the discovery it has propounded.

<strong><u>SPECIFIC OBJECTIONS AND RESPONSES</u></strong>

1.    Produce all Documents reflecting ownership interests in Claimant November 22, 2022, through May 30, 2025, including, without limitation, Operating Agreements, membership lists, records of purchases, issuance, sale, transfer, or termination of any ownership interests in Claimant.

        a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

4 of 15

ANDERSEN BEEDE WEISENMILLER
ABW

2.    Produce all Documents reflecting the identity of Your officers, directors, managing members, managers, or persons in control of You during the period November 22, 2022 through May 30, 2025.

    a.    Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

3.    Produce all Documents evidencing or relating to each transfer between Creditor and Debtor, including, without limitation, bank records, wire transfer records, cancelled checks, electronic funds transfer records, and receipts, for the period October 1, 2014, through May 20, 2015.

    a.    Response: In addition to the foregoing general objections, II objects as this Request is overbroad, unduly burdensome, and is intended to annoy and harass II. Answering further, II produces documents IntIv000059 to IntInv000071.

4.    Produce all Documents evidencing any consideration passing between Creditor and Debtor during the period October 1, 2014 through May 30, 2025.

    a.    Response: See Response to Request No. 3.

5.    Produce all Communications between You and Daniel Bilzerian between October 1, 2014, and May 30, 2025.

    a.    Response: In addition to the foregoing general objections, II objects as this Request overbroad, unduly burdensome, and is intended to annoy and harass II.

6.    Produce all Communications between You and Paul Bilzerian between October 1, 2014, and May 30, 2025.

7.    Produce all Communications between You and the Trustee.

    a.    Response: With reference to the foregoing general objections, II produces documents IntInv000001 to IntInv000058.

5 of 15

8. Produce all Communications between You and the Debtor.

    a. Response: In addition to the foregoing general objections, II objects as this Request is overbroad, unduly burdensome, and is intended to annoy and harass II.

9. Produce all Communications between You and Ignite International Brands, Ltd. between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

10. Produce all Communications between You and Ignite International, Ltd. between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

11. Produce all Communications between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004

of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

12.     Produce all Communications between You and John Schaefer between October 1, 2014, and May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

13.     Produce all Communications between You and Jason Verona between October 1, 2014, and May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

14.     Produce all Communications between you and Paul Dowdall from October 1, 2014, and May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

15.     Produce all Communications between You and Scott Rohleder between October 1, 2014, and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

16.     Produce all Communications between You and Fox Rothschild, LLP between November 22, 2022, and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

17.     Produce all Communications between You and Jakub Medrala between November 22, 2022, and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

18.     Produce all Communications between You and Goat Works, LLC between October 1, 2014, and May 30, 2025.

ANDERSEN
BEEDE
WEISENMILLER

ABW

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

19. Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

20. Produce all Documents evidencing each and every Transaction between You and Paul Bilzerian between October 1, 2014 and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

21. Produce all Documents evidencing each and every Transaction between You and Ignite International Brands, Ltd. between October 1, 2014 and May 30, 2025.

a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is

9 of 15

intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

22.    Produce all Documents evidencing each and every Transaction between You and Ignite International, Ltd. between October 1, 2014 and May 30, 2025.

   a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

23.    Produce all Documents evidencing each and every Transaction between You and Rudy Dhadwar between October 1, 2014, and May 30, 2025.

   a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

24.    Produce all Documents evidencing each and every Transaction between You and John Schaefer between October 1, 2014, and May 30, 2025.

   a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

25. Produce all Documents evidencing each and every Transaction between You and Jason Verona between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

26. Produce all Documents evidencing each and every Transaction between You and Pul Dowdall between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

27. Produce all Documents evidencing each and every Transaction between You and Scott Rohleder between October 1, 2014, and May 30, 2025.

    a. Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II. There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

28. Produce all Documents evidencing each and every Transaction between You and Goat Works, LLC between October 1, 2014, and May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

29.  Produce all Documents evidencing each and every Transaction between You and Daniel Bilzerian between October 1, 2014 and May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

30.  Produce all Documents evidencing each and every Transaction between You and the Debtor.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

31.  Produce Your monthly balance sheets for the periods October 1, 2014, through May 30, 2025.

a.  Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is

intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

32.   Produce Your income statements for the periods October 1, 2024, through May 30, 2025.

a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

33.   Produce Your tax returns for the years 2014-2024.

a.   Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

//
//
//
//
//
//
//
//
//

34.    Produce all Documents evidencing the source of funds you lent to the Debtor.

a.    Response: In addition to the foregoing general objections, II objects as this Request is irrelevant to the Bankruptcy Case, overbroad, unduly burdensome, not calculated to obtain information relevant to these proceedings, and is intended to annoy and harass II.  There is no legitimate reason under Rule 2004 of the Federal Rules of Bankruptcy Procedure for STEEL to be requesting this information.

Dated this 3rd day of July, 2025.

**ANDERSEN BEEDE WEISENMILLER**

By:    /s/ Ryan A. Andersen
        Ryan A. Andersen, Esq.
        Nevada Bar No. 12321
        3199 E Warm Springs Rd, Ste 400
        Las Vegas, Nevada 89120

*Counsel for International Investments, Ltd.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that on July 3, 2025, the foregoing **INTERNATIONAL INVESTMENT, LTD.'S RESPONSES AND OBJECTIONS TO STEEL SUPPLEMENTS, INC.'S SUBPOENA FOR DOCUMENT PRODUCTION AND 2004 EXAMINATION** was served via email and mail upon the following:

Candace C. Carlyon, Esq.
Carylon Cica Chtd.
265 E. Warm Springs Road, Suite 107
Las Vegas, Nevada 89119
ccarlyon@carlyoncica.com
*Co-Counsel for STEEL Supplements, Inc.*

Michael F. Holbein, Esq.
Smith, Gambrell & Russell, LLP
Via email only: mholbein@sgrlaw.com
*Co-Counsel for STEEL Supplements, Inc.*

/s/ Melissa Rodriguez
Melissa Rodriguez, an employee
of Andersen Beede Weisenmiller

ANDERSEN BEEDE WEISENMILLER
ABW